1  Whitney, Thompson & Jeffcoach LLP
   Marshall C. Whitney, #82952
2  Brodie Surfus, #349269
   970 W. Alluvial Ave.
3  Fresno, California 93711
   Telephone:    (559) 753-2550
4  Facsimile:    (559) 753-2560

5  Attorneys for Federal Agricultural Mortgage
   Corporation

6

7

8                    UNITED STATES DISTRICT COURT

9          EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

10

11  FEDERAL AGRICULTURAL MORTGAGE      Case No.
    CORPORATION,
12                                     **COMPLAINT FOR:**
                  Plaintiff,
13                                     **(1) BREACH OF CONTRACT;**
          v.                           **(2) APPOINTMENT OF RECEIVER,**
14                                     **ACCOUNTING, AND SPECIFIC**
    ASSEMI BROTHERS, LLC; MARICOPA     **PERFORMANCE; AND**
15  ORCHARDS, LLC; C & A FARMS, LLC;   **(3) FOR INJUNCTIVE RELIEF AGAINST**
    WHITESBRIDGE FARMS, LLC; WILLOW    **ALL DEFENDANTS;**
16  AVENUE INVESTMENTS, LLC; LINCOLN
    GRANTOR FARMS, LLC; COPPER
17  AVENUE INVESTMENTS, LLC; ACAP
    FARMS, LLC; CANTUA ORCHARDS, LLC;
18  GRADON FARMS, LLC,

19                Defendants.

20

21          COMES NOW Plaintiff Federal Agricultural Mortgage Corporation ("Farmer Mac" or

22  "Plaintiff"), a corporation organized and existing under the laws of the United States, by and through

23  the undersigned counsel, and pursuant to Fed. R. Civ. P. 66 for its causes of actions against

24  Defendants Assemi Brothers, LLC, a California limited liability company ("Assemi Brothers"),

25  Maricopa Orchards, LLC, a California limited liability company ("Maricopa"), C & A Farms, LLC,

26  a California limited liability company ("C & A Farms"), Whitesbridge Farms, LLC, a California

27  limited liability company ("Whitesbridge"), Willow Avenue Investments, LLC, a California limited

28  liability company ("Willow Avenue"), Lincoln Grantor Farms, LLC, a California limited liability

company ("Lincoln"), Copper Avenue Investments, LLC, a California limited liability company ("Copper Avenue"), ACAP Farms, LLC, a California limited liability company ("ACAP"), Cantua Orchards, LLC, a California limited liability company ("Cantua"), and Gradon Farms, LLC, a California limited liability company ("Gradon", and collectively, the "Borrower Defendants").

## INTRODUCTION

1.      Borrower Defendants breached their obligations owing to Farmer Mac under various loans.  Consequently, Farmer Mac now seeks judgment against the Borrower Defendants for amounts owed through the date of judgment as a result of the breach of the Farmer Mac Loans (as defined herein), the appointment of a receiver, an accounting, and specific performance of its right to possession and rents and profits under the applicable section of each of the Deeds of Trust (as defined herein), in addition to injunctive relief.

2.      Borrower Defendants have defaulted on their obligations under the Farmer Mac Loans (as defined herein) by, inter alia, failing to make payment of outstanding accrued interest and outstanding principal on or before July 1, 2024, under certain of the Farmer Mac Loans more particularly described below, in addition to certain financial covenant defaults under the terms of certain of the Farmer Mac Loans as defined below.  As of the filing hereof, the outstanding amount owed under the Loan Documents, inclusive of interest and fees, by the Borrower Defendants is $41,833,201.59.

3.      Unless a receiver is appointed to, inter alia, collect rents, protect and manage the Real Property (as defined herein), the Real Property, which serves as Farmer Mac's Collateral (as defined herein) is at risk of significant harm and diminution of value, resulting in significant harm to Farmer Mac.  The Real Property consists of approximately 4,373 acres of real property utilized for the farming of pistachios and almonds, with certain tracts of such Real Property dedicated to the development of solar power generation.  The farmland requires regular care and maintenance to preserve its value and ensure the health of the pistachio and almond trees on the land.  Upon information and belief, the Borrower Defendants' (and related farming entities) business situation is such that they lack the necessary funds to maintain their real property and crops, including the Real Property, as a result of severe financial stress, and the same is in danger of damage or harm,

1    ultimately causing harm to Farmer Mac.  The Borrower Defendants' and related entities' financial

2    distress has resulted in the commencement of multiple legal actions and appointment of multiple

3    receivers already as a result of the Borrower Defendants and their related entities having outstanding

4    debts due and owing in an amount close to $1,000,000,000 with no means to repay such debts,

5    including that owed to Farmer Mac.

6         4.     Farmer Mac is entitled to the relief requested.  The Borrower Defendants have

7    defaulted under the terms of the Farmer Mac Loans, and following the acceleration of the same, the

8    total outstanding principal and interest, currently accruing at the default rate, due and owing on the

9    Famer Mac Loans (exclusive of fees and costs) is at least $41,416,040.49 as of November 21, 2024.

10                                    **THE PARTIES**

11        5.     Farmer Mac is a corporation organized and existing under the laws of the United

12   States and is authorized to do business in the State of California, with a principal place of business

13   located in Washington, D.C.

14        6.     Upon information and belief, Defendant Assemi Brothers is a limited liability

15   company organized and existing under the laws of the State of California, with a principal place of

16   business in Fresno County, California.  Plaintiff is informed and believes that Assemi Brothers is

17   owned by: (i) The Amended and Restated Farid Assemi Revocable Trust (the "Farid Assemi

18   Revocable Trust"), the Trustee of which is Farid Assemi, a citizen of California; (ii) The Amended

19   and Restated Darius Assemi Revocable Trust (the "Darius Assemi Revocable Trust"), the Trustee

20   of which is Darius Assemi, a California citizen; and (iii) The Amended and Restated Farshid Assemi

21   and Sonia Rosemary Assemi Revocable Trust (the "Farshid and Sonia Assemi Revocable Trust"),

22   the Co-Trustees of which are Farshid Assemi and Sonia Rosemary Assemi, citizens of California.

23   As the Trustees or Co-Trustees of each trust that owns Assemi Brothers are citizens of California,

24   Assemi Brothers is a citizen of California for the purposes of diversity jurisdiction.

25        7.     Upon information and belief, Defendant Maricopa is a limited liability company

26   organized and existing under the laws of the State of California, with a principal place of business

27   in Fresno County, California.  Plaintiff is informed and believes that Maricopa is owned by: (i) The

28   Farid Assemi Revocable Trust, The Trustee of which is Farid Assemi, a citizen of California; and

1   (ii) the Darius Assemi Revocable Trust, the Trustee of which is Darius Assemi, a California citizen;

2   (iii) The Farshid Assemi 1997 Ranch Trust (the "Farshid Assemi Ranch Trust"), the Trustee of

3   which is Faris Assemi, a California citizen; (iv) The Farid Assemi 1997 Ranch Trust (the "Farid

4   Assemi Ranch Trust"), the Co-Trustees of which are Farshid Assemi and Neema Eliot Assemi,

5   citizens of California; and (v) The Farshid and Sonia Assemi Revocable Trust, the Co-Trustees of

6   which are Farshid Assemi and Sonia Rosemary Assemi, citizens of California.  As the Trustees or

7   Co-Trustees of each trust that owns Maricopa are California citizens, Maricopa is a citizen of

8   California for purposes of diversity jurisdiction.

9          8.     Upon information and belief, Defendant C & A Farms is a limited liability company

10   organized and existing under the laws of the State of California, with a principal place of business

11   in Fresno County, California.  Plaintiff is informed and believes that C & A Farms is owned by: (i)

12   The Farid Assemi Revocable Trust, the Trustee of which is Farid Assemi, a citizen of California;

13   (ii) The Darius Assemi Revocable Trust, the Trustee of which is Darius Assemi, a California citizen;

14   (iii) The Farshid Assemi and Sonia Assemi Revocable Trust, the Co-Trustees of which are Farshid

15   Assemi and Sonia Rosemary Assemi, citizens of California; (iv) The Farshid Assemi Ranch Trust,

16   the Trustee of which is Faris Assemi, a California citizen; and (v) The Farid Assemi Ranch Trust,

17   the Co-Trustees of which are Farshid Assemi and Neema Eliot Assemi, citizens of California.  As

18   the Trustees or Co-Trustees of each trust that owns C & A Farms are California citizens, C & A

19   Farms is a citizen of California for purposes of diversity jurisdiction.

20          9.     Upon information and belief, Defendant Whitesbridge is a limited liability company

21   organized and existing under the laws of the State of California, with a principal place of business

22   in Fresno County, California.  Plaintiff is informed and believes that Whitesbridge is owned by: (i)

23   the Farid Assemi 2010 grantor Trust Dated December 30, 2010 (the "Farid Assemi Grantor Trust"),

24   the Trustee of which is Neema Assemi, a citizen of California; and (ii) The Farshid and Sonia

25   Assemi 2010 Grantor Trust dated December 30, 2010 (the "Farshid and Sonia Assemi Grantor

26   Trust"), the Trustee of which is Melissa Layne, a California citizen.  As the Trustees of each trust

27   that owns Whitesbridge are California citizens, Whitsebridge is a citizen of California for purposes

28   of diversity jurisdiction.

10.     Upon information and belief, Defendant Willow Avenue is a limited liability company organized and existing under the laws of the State of California, with a principal place of business in Fresno County, California.  Plaintiff is informed and believes that Willow Avenue is owned by: (i) The Farid Assemi Grantor Trust, the Trustee of which is Neema Assemi, a citizen of California; (ii) The Farshid and Sonia Assemi Grantor Trust, the Trustee of which is Melissa Layne, a California citizen; and (iii) The Darius Assemi Revocable Trust, the Trustee of which is Darius Assemi, a California citizen.  As the Trustees of each trust that owns Willow Avenue are California citizens, Willow Avenue is a citizen of California for purposes of diversity jurisdiction.

11.     Upon information and belief, Defendant Lincoln is a limited liability company organized and existing under the laws of the State of California, with a principal place of business in Fresno County, California.  Plaintiff is informed and believes that Lincoln is owned by: (i) The Farid Assemi Revocable Trust, the Trustee of which is Farid Assemi, a citizen of California; and (ii) The Darius Assemi Revocable Trust, the Trustee of which is Darius Assemi, a California citizen. As the Trustees of each trust that owns Lincoln are California citizens, Lincoln is a citizen of California for purposes of diversity jurisdiction.

12.     Upon information and belief, Defendant Copper Avenue is a limited liability company organized and existing under the laws of the State of California, with a principal place of business in Fresno County, California.  Plaintiff is informed and believes that Copper Avenue is owned by: (i) The Farid Assemi Revocable Trust, the Trustee of which is Farid Assemi, a citizen of California; (ii) The Darius Assemi Revocable Trust, the Trustee of which is Darius Assemi, a California citizen; and (iii) The Farshid and Sonia Assemi Revocable Trust, the Co-Trustees of which are Farshid Assemi and Sonia Rosemary Assemi, citizens of California.  As the Trustees or Co-Trustees of each trust that owns Copper Avenue are California citizens, Copper Avenue is a citizen of California for purposes of diversity jurisdiction.

13.     Upon information and belief, Defendant ACAP is a limited liability company organized and existing under the laws of the State of California, with a principal place of business in Fresno County, California.  Plaintiff is informed and believes that ACAP is owned by: (i) The Farid Assemi Revocable Trust, the Trustee of which is Farid Assemi, a citizen of California; (ii)

1   The Darius Assemi Revocable Trust, the Trustee of which is Darius Assemi, a California citizen;

2   and (iii) The Farshid and Sonia Assemi Revocable Trust, the Co-Trustees of which are Farshid

3   Assemi and Sonia Rosemary Assemi, citizens of California.  As the Trustees or Co-Trustees of each

4   trust that owns ACAP are California citizens, ACAP is a citizen of California for purposes of

5   diversity jurisdiction.

6       14.     Upon information and belief, Defendant Cantua is a limited liability company

7   organized and existing under the laws of the State of California, with a principal place of business

8   in Fresno County, California.  Plaintiff is informed and believes that Cantua is owned by: (i) The

9   Farid Assemi Revocable Trust, the Trustee of which is Farid Assemi, a citizen of California;  (ii)

10  The Darius Assemi Revocable Trust, the Trustee of which is Darius Assemi, a California citizen;

11  (iii) The Farshid Assemi Ranch Trust, the Trustee of which is Faris Assemi, a California citizen;

12  (iv) The Farid Assemi Ranch Trust, the Co-Trustee of which are Farshid Assemi and Neema Eliot

13  Assemi, citizens of California; and (v) The Farshid and Sonia Assemi Revocable Trust, the Co-

14  Trustees of which are Farshid Assemi and Sonia Rosemary Assemi, citizens of California.  As the

15  Trustees or Co-Trustees of each trust that owns Cantua are California citizens, Cantua is a citizen

16  of California for purposes of diversity jurisdiction.

17      15.     Upon information and belief, Defendant Gradon is a limited liability company

18  organized and existing under the laws of the State of California, with a principal place of business

19  in Fresno County, California.  Plaintiff is informed and believes that Gradon is owned by: (i) The

20  Farid Assemi 2010 Grantor Trust, the Trustee of which is Neema Assemi, a citizen of California;

21  (ii) The Farshid and Sonia Assemi Grantor Trust, the Trustee of which is Melissa Layne, a California

22  citizen; and (iii) The Darius Assemi Revocable Trust, the Trustee of which is Darius Assemi, a

23  California citizen.  As the Trustees of each trust that owns Gradon are California citizens, Gradon

24  is a citizen of California for purposes of diversity jurisdiction.

25                           **VENUE AND JURISDICTION**

26      16.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. §

27  1332(a)(1) because the controversy is between citizens of different states and the amount in

28  controversy exceeds $75,000, exclusive of interest and costs.

17.     Venue in this district is proper pursuant to 28 U.S.C. § 1391.

**FACTUAL BACKGROUND**

**A.     Farmer Mac Loans**

18.     Beginning in or around January 2018, Farmer Mac entered into a series of transactions whereby, pursuant to that certain Farmer Mac Seller/Servicer Agreement dated May 12, 2014 by and between Farmer Mac and Conterra Agricultural Capital, LLC ("Conterra"), a true and accurate copy of which is attached hereto as **Exhibit A**, it became the holder of certain loans and security interests originated by Conterra in favor of the Borrower Defendants.  Specifically:

a.     On or about January 8, 2018, C & A and Whitesbridge executed a promissory note in favor of Conterra in the original principal amount of $5,500,000 (as amended, restated or modified from time to time, the "Loan 1725 Note").  The terms of the Loan 1725 Note were amended by that Certain Amendment to Note dated June 27, 2018. Conterra has assigned all of its rights, title and interest in the Loan 1725 Note to Farmer Mac pursuant to that certain Allonge to Promissory Note dated as of January 8, 2018, pursuant to which Conterra instructed the relevant Borrower Defendants to make all payments due and owing under the Loan 1725 Note to the order of U.S. Bank National Association, as custodian/trustee for Farmer Mac.  Farmer Mac is the holder of the Loan 1725 Note.   True and accurate copies of the Loan 1725 Note, amendment and allonge evidencing Farmer Mac's ownership of the loan are attached hereto as **Exhibit B**.

b.     On or about January 8, 2018, C & A and Whitesbridge executed a promissory note in favor of Conterra evidencing a line of credit extended to the relevant Borrower Defendants in the original principal amount of $1,500,000 (as amended, restated or modified from time to time, the "Loan 1728 Note").  The terms of the Loan 1728 Note were modified by that certain Exhibit A to Note Form of Agreement to Convert dated as of June 27, 2018.  Conterra has assigned all of its rights, title and interest in the Loan 1728 Note to Farmer Mac pursuant to that certain Allonge to Promissory Note dated as of January 8, 2018, pursuant to which Conterra instructed the relevant Borrower Defendants to make all payments due and owing under the Loan 1728 Note to the order of U.S. Bank National Association, as custodian/trustee for Farmer Mac.  Farmer Mac is the holder of the Loan 1728 Note.  True and accurate copies of the Loan 1728 Note, amendment and allonge

1   evidencing Farmer Mac's ownership of the loan are attached hereto as **Exhibit C**.

2          c.      On or about October 11, 2019, Copper, Maricopa, along with non-defendant

3   California limited liability companies Ashlan & Hayes Investments, LLC ("A&H") and ACAP

4   Holdings, LLC ("ACAP Holdings") executed a promissory note in favor of Conterra evidencing a

5   line of credit extended to the relevant Borrower Defendants in the original principal amount of

6   $5,297,232 (as amended, restated or modified from time to time, the "Loan 1673 Note").  The terms

7   of the Loan 1673 Note were modified by that certain First Amendment to Note dated February 2,

8   2023.  Conterra has assigned all of its rights, title and interest in the Loan 1673 Note to Farmer Mac

9   pursuant to that certain Allonge to Promissory Note dated as of October 11, 2019, pursuant to which

10  Conterra instructed the relevant Borrower Defendants to make all payments due and owing under

11  the Loan 1673 Note to the order of U.S. Bank National Association, as custodian/trustee for Farmer

12  Mac.  Farmer Mac is the holder of the Loan 1673 Note.  True and accurate copies of the Loan 1673

13  Note, amendment and allonge evidencing Farmer Mac's ownership of the loan are attached hereto

14  as **Exhibit D**.  Ashlan & Hayes Investments, LLC and ACAP Holdings, LLC assigned all rights,

15  title and interest in and to Loan 1673 Note and the real property collateral securing Loan 1673 Note

16  as evidenced by those certain Assumption Agreements dated February 2, 2023, true and accurate

17  copies of which are attached hereto as **Exhibit E**.

18         d.      On or about October 11, 2019, Copper, Maricopa, along with non-defendants

19  A&H and ACAP Holdings executed a promissory note in favor of Conterra in the original principal

20  amount of $10,258,632 (as amended, restated or modified from time to time, the "Loan 1674 Note").

21  The terms of the Loan 1674 Note were modified by that certain First Amendment to Note dated

22  February 2, 2023.  Conterra has assigned all of its rights, title and interest in the Loan 1674 Note to

23  Farmer Mac pursuant to that certain Allonge to Promissory Note executed October 11, 2019,

24  pursuant to which Conterra instructed the relevant Borrower Defendants to make all payments due

25  and owing under the Loan 1674 Note to the order of U.S. Bank National Association, as

26  custodian/trustee for Farmer Mac.  Farmer Mac is the holder of the Loan 1674 Note.  True and

27  accurate copies of the Loan 1674 Note, amendment and allonge evidencing Farmer Mac's

28  ownership of the loan are attached hereto as **Exhibit F**.  A&H and ACAP Holdings assigned all

WHITNEY
THOMPSON &
JEFFCOACH

1   rights, title and interest in and to Loan 1674 Note and the real property collateral securing Loan

2   1674 Note as evidenced by those certain Assumption Agreements dated February 2, 2023, true and

3   accurate copies of which are attached hereto as **Exhibit G**.

4   　　　　　　　e.　　On or about December 14, 2020, Maricopa, C & A, Willow, Assemi Brothers

5   and Whitesbridge executed a promissory note in favor of Conterra, evidencing a line of credit

6   extended to the relevant Borrower Defendants in the original principal amount of $12,500,000 (as

7   amended, restated or modified from time to time, the "Loan 2676 Note").  Conterra has assigned all

8   of its rights, title and interest in the Loan 2676 Note to Farmer Mac pursuant to the direction included

9   in the Loan 2676 Note to the relevant Borrower Defendants to make all payments to the order of

10  U.S. Bank National Association, as custodian/trustee for Farmer Mac.  Farmer Mac is the holder of

11  the Loan 2676 Note.  True and accurate copies of the note evidencing Farmer Mac's ownership of

12  the loan are attached hereto as **Exhibit H**.

13  　　　　　　　f.　　On or about December 14, 2020, Maricopa, C & A, Willow, Assemi Brothers

14  and Whitesbridge executed a promissory note in favor of Conterra, evidencing a line of credit

15  extended to the relevant Borrower Defendants in the original principal amount of $12,500,000 (as

16  amended, restated or modified from time to time, the "Loan 2678 Note").  Conterra has assigned all

17  of its rights, title and interest in the Loan 2678 Note to Farmer Mac pursuant to the direction included

18  in the Loan 2678 Note to the relevant Borrower Defendants to make all payments to the order of

19  U.S. Bank National Association, as custodian/trustee for Farmer Mac.  True and accurate copies of

20  the note evidencing Farmer Mac's ownership of the Loan 2678 Note are attached hereto as **Exhibit**

21  **I**.

22  　　　　　　　g.　　On or about February 2, 2023, Maricopa, Copper, Lincoln, C & A, Willow,

23  Cantua, Gradon and ACAP executed a promissory note in favor of Conterra in the original principal

24  amount of $7,400,000 (as amended, restated or modified from time to time, the "Loan 1004 Note";

25  and together with the Loan 1725 Note, the Loan 1728 Note, the Loan 1673 Note, the Loan 1674

26  Note, the Loan 2676 Note, and the Loan 2678 Note, the "Farmer Mac Loans").  Conterra has

27  assigned all of its rights, title and interest in the Loan 1004 Note to Farmer Mac pursuant to the

28  direction included in the note to the relevant Borrower Defendants to make all payments to the order

1  of U.S. Bank National Association, as custodian/trustee for Farmer Mac.  A true and accurate copy

2  of the Loan 1004 Note evidencing Farmer Mac's ownership of the loan is attached hereto as **Exhibit**

3  **J**.

4        19.    The Farmer Mac Loans each contain cross-default and cross-collateralization

5  provisions referencing the other of the Farmer Mac Loans.

6  **B.**    **Farmer Mac Deeds of Trust**

7        20.    In connection with the Farmer Mac Loans, the Borrower Defendants executed a

8  series of deeds of trust (as described in further detail herein below and collectively, the "Deeds of

9  Trust") pursuant to which the Borrower Defendants granted Farmer Mac an interest in certain real

10  property collateral (collectively, the "Real Property") located in and around Fresno County,

11  California, Kings County, California, and Kern County, California in order to secure all obligations

12  under the Farmer Mac Loans.  Specifically:

13        a.    The Borrower Defendants' obligations under the Loan 1725 Note are secured

14  by that certain Amended and Restated Deed of Trust, Security Agreement, Assignment of Rents and

15  Fixture Filing dated February 2, 2023, encumbering real property located in Fresno County,

16  California as more particularly described therein and recorded as file no. 2023-0011222 in the

17  Fresno County Recorder, Fresno County, California on February 2, 2023 (the "Loan 1725 DOT").

18  A true and accurate copy of the Loan 1725 DOT is attached hereto as **Exhibit K**.

19        b.    The Borrower Defendants' obligations under the Loan 1728 Note are secured

20  by that certain Amended and Restated Deed of Trust, Security Agreement, Assignment of Rents and

21  Fixture Filing dated February 2, 2023, encumbering real property located in Fresno County,

22  California as more particularly described therein and recorded as file no. 2023-0011223 in the

23  Fresno County Recorder, Fresno County, California on February 2, 2023 (the "Loan 1728 DOT").

24  A true and accurate copy of the Loan 1728 DOT is attached hereto as **Exhibit L**.

25        c.    The Borrower Defendants' obligations under the Loan 1673 Note are secured

26  by that certain Amended and Restated Deed of Trust (with Future Advances Clause), Security

27  Agreement, Assignment of Rents and Fixture Filing dated February 2, 2023, encumbering real

28  property located in Kings County, California as more particularly described therein and recorded as

1   document no. 2303339 in the Kings County Recorder, Kings County, California on March 3, 2023;

2   and, that certain Amended and Restated Deed of Trust (with Future Advances Clause), Security

3   Agreement, Assignment of Rents and Fixture Filing dated February 2, 2023, encumbering real

4   property located in Fresno County, California as more particularly described therein and recorded

5   as file no. 2023-0011386 in the Fresno County Recorder, Fresno County, California on February 8,

6   2023 (together, the "Loan 1673 DOTs").  True and accurate copies of the Loan 1673 DOTs are

7   attached hereto as **Exhibit M**.

8           d.      The Borrower Defendants' obligations under the Loan 1674 Note are secured

9   by that certain Amended and Restated Deed of Trust (with Future Advances Clause), Security

10  Agreement, Assignment of Rents and Fixture Filing dated February 2, 2023, encumbering real

11  property located in Kings County, California as more particularly described therein and recorded as

12  document no. 2303340 in the Kings County Recorder, Kings County, California on March 3, 2023;

13  and, that certain Amended and Restated Deed of Trust, Security Agreement, Assignment of Rents

14  and Fixture Filing dated February 2, 2023, encumbering real property located in Fresno County,

15  California as more particularly described therein and recorded as file no. 2023-0011359 in the

16  Fresno County Recorder, Fresno County, California on February 8, 2023 (together, the "Loan 1674

17  DOTs").  True and accurate copies of the Loan 1674 DOTs are attached hereto as **Exhibit N**.

18          e.      The Borrower Defendants' obligations under the Loan 2676 Note and the

19  Loan 2678 Note are secured by that certain Amended and Restated Deed of Trust (with Future

20  Advances Clause), Security Agreement, Assignment of Rents and Fixture Filing dated February 2,

21  2023, encumbering real property located in Kern County, California as more particularly described

22  therein and recorded as document no. 223016523 in the Kern County Official Records, Kern

23  County, California on February 13, 2023 (the "Loan 2676/2678 DOT").  A true and accurate copy

24  of the Loan 2676/2678 DOT is attached hereto as **Exhibit O**.

25          f.      The Borrower Defendants' obligations under the Loan 1004 Note are secured

26  by that certain Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing dated

27  February 2, 2023, encumbering real property located in Kings County, California as more

28  particularly described therein and recorded as document no. 2301891 in the Kings County Official

Records, Kings County, California on February 7, 2023; that certain Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing dated February 2, 2023, encumbering real property located in Fresno County, California as more particularly described therein and recorded as file no. 2023-0010330 in the Fresno County Recorder, Fresno County, California on February 6, 2023; and, that certain Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing dated February 2, 2023, encumbering real property located in Kern County, California as more particularly described therein and recorded as document no. 223013714 in the Kern County Official Records, Kern County, California (together, the "Loan 1004 DOTs").  True and accurate copies of the Loan 1004 DOTs are attached hereto as **Exhibit P**.

21.     In addition to the Real Property, pursuant to Section 19 of each of the Deeds of Trust, the Deeds of Trust "constitute a security agreement within the meaning of the Uniform Commercial Code as adopted by the State of California," and provide that the Farmer Mac Loans are secured, pursuant to the recital portion of each of the Deeds of Trust, by certain other items of personal property collateral and fixtures, including but not limited to: all buildings, improvements, equipment, fixtures and permanent plantings affixed, attached to or incorporated in the Real Property, all water rights appurtenant to the Real Property (the "Water Rights"), whether such water rights are riparian, appropriative or otherwise, along with all ditch and ditch rights and shares of stock, licenses, permits and contracts evidencing such water or ditch rights appurtenant to the Real Property, and all wells, reservoirs, dams, embankment or fixtures located on the Real Property, all windmills, pumps, irrigation, equipment, motors, engines, and devices of every kind associated with the Real Property (exclusive of the Water Rights, the "Personal Property"; and together with the Water Rights and the Real Property, the "Collateral").

22.     Farmer Mac's interest in the Personal Property Collateral and Water Rights was properly perfected by the filing of certain UCC-1 financing statements (the "UCCs"), specifically:

a.     UCC Filing Acknowledgment filed January 31, 2018, with the California Secretary of State, Filing Number 18-7631437101;

b.     UCC recorded January 31, 2018, in the Fresno County Recorder, File No. 2018-0011387-00;

1          c.        UCC recorded October 15, 2019, in the Fresno County Recorder, File No.

2 2019-0123393;

3          d.        UCC recorded October 15, 2019, in the Official Records of Kings County,

4 Document Number 1917425;

5          e.        UCC Filing Acknowledgment filed October 16, 2019, with the California

6 Secretary of State, Filing Number 19-7741674006.

7     True and accurate copies of the UCCs and corresponding UCC-1 Continuation Statements

8 are attached here to as **Exhibit Q**.

9 **C.**    **Defaults Under the Farmer Mac Loans**

10    23.    The Borrower Defendants have defaulted under the terms of the Farmer Mac Loans

11 by, inter alia, failing to make payments of outstanding principal and interest as due under the terms

12 of the applicable Farmer Mac Loans, and failing to meet certain non-monetary covenants under the

13 terms of the Farmer Mac Loans (the "Events of Default").  Specifically:

14          a.        The Borrower Defendants have failed to make payment of accrued interest

15 under the applicable terms of each of the Farmer Mac Loans on or before July 1, 2024, which

16 constitutes an event of default under each of the Farmer Mac Loans;

17          b.        The Borrower Defendants have failed to make payment of principal amounts

18 due and owing before July 1, 2024, under the applicable terms of the Loan 1725 Note, the Loan

19 1728 Note, the Loan 1674 Note and the Loan 1004 Note, which require the applicable Borrower

20 Defendants to make payment of such principal amounts on or before July 1, 2024, which constitutes

21 an event of default under each such Farmer Mac Loan;

22          c.        The Borrower Defendants have defaulted under the terms of the Loan 2676

23 Note, the Loan 2678 Note and the Loan 1004 Note by failing to maintain as of the 2023 fiscal year

24 end a debt service coverage ratio of greater than or equal to 1.25:1.00, which constitutes an event of

25 default under each such Farmer Mac Loan;

26          d.        The Borrower Defendants have defaulted under the terms of the Loan 2676

27 Note, the Loan 2678 Note and the Loan 1004 Note by failing to maintain as of the 2023 fiscal year

28 end a current ratio of not less than 1.50:1.00, which constitutes an event of default under each such

WHITNEY
THOMPSON &
JEFFCOACH

1   Farmer Mac Loan; and,

2          e.      Finally, each of the Farmer Mac Loans is cross defaulted with each of the
3   other individual Farmer Mac Loans and, accordingly, each of the Events of Default under the Farmer
4   Mac Loans and Loan Documents described in subparagraphs (a) through (d) constitutes an event of
5   default under all Famer Mac Loans.

6          24.     On or about September 12, 2024, Farmer Mac provided notice of the Events of
7   Default to the Borrower Defendants by mailing a Notice of Events of Default and Reservation of
8   Rights (the "September Notice").  A true and accurate copy of the September Notice is attached
9   hereto as **Exhibit R**.

10         25.     On or about October 16, 2024, Farmer Mac provided notice of the Events of Default
11  to the Borrower Defendants by mailing a Notice of Events of Default and Reservation of Rights (the
12  "October Notice"), notifying the Borrower Defendants of the continuing Events of Default and
13  imposition of the default interest rate under the applicable terms of each of the Farmer Mac Loans.
14  A true and accurate copy of the October Notice is attached hereto as **Exhibit S**.

15         26.     Following notice to the Borrower Defendants of the Events of Default under Section
16  23 of each of the Deeds of Trust, Famer Mac is entitled to, inter alia, seek to collect rents and profits
17  from Real Property, and "shall be entitled to have a receiver appointed to take possession of and
18  manage the [Real] Property and collect the Rents and profits derived from the [Real] Property . . ."

19  **D.    <u>Borrower Defendants' Failure to Maintain Real Property</u>**

20         27.     Upon information and belief, the Borrower Defendants are without resources,
21  monetary or otherwise, sufficient to maintain the Real Property.

22         28.     Upon information and belief, the Real Property requires regular maintenance,
23  including watering and spraying which necessitate significant inputs of manpower, water,
24  chemicals, and other materials, none of which are within the Borrower Defendants' current capacity
25  to fund.

26  ///
27  ///
28  ///

WHITNEY THOMPSON & JEFFCOACH

885.0 06189963.000

14

COMPLAINT

29.     In light of the Borrower Defendants' inability to finance the continued maintenance of the Real Property, the Real Property is in imminent danger of loss, deterioration, and diminution in value.  Given the Real Property's significance to the ability of the Borrower Defendants to repay the Famer Mac Loans, Farmer Mac is at serious risk of material losses and injuries.

30.     Farmer Mac has the right, pursuant to the Deeds of Trust, Farmer Mac Loans and applicable law, to the appointment of a receiver.  Farmer Mac is entitled to the immediate appointment of a receiver to take possession of and hold, manage, or dispose of, subject to the direction of this Court, the Real Property, its revenue, and all other Collateral located on or affixed to the Real Property that secures the Farmer Mac Loans.

31.     The Borrower Defendants intend to cooperate with Farmer Mac and have consented to the appointment of a receiver over the Real Property pursuant to their agreement with Farmer Mac on the terms of an agreed upon form of order appointing a receiver, to be filed substantially contemporaneously herewith or as soon as reasonably practicable thereafter.

32.     Farmer Mac intends to cooperate with other lenders, including but not limited to Prudential Life Insurance Company, on the funding of a receiver to maintain the Real Property, as the Real Property securing the Farmer Mac Loans is intermingled with real property collateral of other lenders to the Borrower Defendants.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

33.     Plaintiff repeats and realleges paragraphs 1 through 32 as if fully set forth herein.

34.     Plaintiff is the lawful holder of the Farmer Mac Loans and beneficiary under the Deeds of Trust.

35.     As set forth above, the Farmer Mac Loans require the Borrower Defendants to make payment of accrued interest under the applicable terms of each of the Farmer Mac Loans on or before July 1, 2024.  The Borrower Defendants have failed to make such payments of accrued interest on or before July 1, 2024, as required under the terms of the Farmer Mac Loans.

36.     As set forth above, applicable terms of the Loan 1725 Note, the Loan 1728 Note, the Loan 1674 Note and the Loan 1004 Note require the applicable Borrower Defendants to make

WHITNEY
THOMPSON &
JEFFCOACH

payment of outstanding principal amounts on or before July 1, 2024.  The applicable Borrower Defendants have failed to make such payments of outstanding principal on or before July 1, 2024, as required by the relevant Farmer Mac Loans.

37.     As set forth above, the relevant Borrower Defendants have defaulted under the terms of the Loan 2676 Note, the Loan 2678 Note and the Loan 1004 Note by failing to maintain as of the 2023 fiscal year end a debt service coverage ratio of greater than or equal to 1.25:1.00, and have defaulted under the terms of the Loan 2676 Note, the Loan 2678 Note and the Loan 1004 Note by failing to maintain as of the 2023 fiscal year end a current ratio of not less than 1.50:1.00, as required by each of the relevant Farmer Mac Loans.

38.     The Borrower Defendants have breached the terms of the Farmer Mac Loans by, inter alia, failing to make payment of all outstanding principal and interest by July 1, 2024, and failing to meet certain financial covenants under the relevant Farmer Mac Loans.

39.     Farmer Mac duly notified the Borrower Defendants of the Events of Default via the September Notice and October Notice, and the Borrower Defendants have failed to cure such Events of Default, and all applicable cure periods, if any, have expired or are mooted by the Borrower Defendants' consent to the appointment of a receiver as requested herein and described in Paragraph 31 hereof.

40.     As a direct and proximate result of the Borrower Defendants' breach of the Farmer Mac Loans, Plaintiff has suffered damages in an amount to be determined at trial, but in any event no less than $41,833,201.59; including (i) unpaid principal; (ii) unpaid accrued interest; (iii) late charges; (iv) fees, costs, and other charges (including legal fees and costs) to which Plaintiff is entitled under the governing documents through the date of judgment; and (v) pre-judgment and post-judgment interest at the rate provided by law.

///

///

///

///

///

WHITNEY
THOMPSON &
JEFFCOACH

885.0 06189963.000

16

1

2

### SECOND CAUSE OF ACTION
### (Appointment of Receiver, Accounting, and Specific Performance)

3

41.     Plaintiff repeats and realleges paragraphs 1 through 40 as if fully set forth herein.

4

5

6

42.     The Borrower Defendants have breached the terms of the Farmer Mac Loans by, inter alia, failing to make payment of all outstanding principal and interest by July 1, 2024, and failing to meet certain financial covenants under the relevant Farmer Mac Loans.

7

8

9

10

11

43.     Farmer Mac duly notified the Borrower Defendants of the Events of Default via the September Notice and October Notice, and the Borrower Defendants have failed to cure such Events of Default, and all applicable cure periods, if any, have expired or are mooted by the Borrower Defendants' consent to the appointment of a receiver as requested herein described in Paragraph 31 hereof.

12

13

14

44.     Pursuant to Section 23 of each of the Deeds of Trust, Plaintiff is entitled to the appointment of a receiver in light of the Events of Default and proper notice to the Borrower Defendants.

15

16

17

45     Due to the Borrower Defendants' default, there is risk of immediate and irreparable harm to the Real Property and real and irreparable harm to Farmer Mac through the diminution in value of its Collateral.

18

19

20

46.     The immediate appointment of a receiver is necessary to preserve the value of the Real Property, and Collateral generally, and to protect the Real Property from value destructive irreparable harm.

21

22

23

47.     Plaintiff has no adequate remedy at law to enforce the Farmer Mac Loans as set forth herein and will suffer irreparable harm unless equitable relief is granted and a receiver is appointed to manage, operate, and control the Real Property and Collateral generally.

24

25

26

27

28

48.     A receiver should be appointed, pursuant to, inter alia, Fed. R. Civ. P. 66, with the powers and duties of a court-appointed receiver, including the power to bring and defend actions in his own name as receiver, to take and keep possession of the Real Property, to receive rents and any profits, collect debts, to make transfers, to sell the Real Property through private sale or at public auction and generally take such actions respecting the Real Property as the Court may authorize

WHITNEY
THOMPSON &
JEFFCOACH

pending any future foreclosure under the Deeds of Trust.

49.     Plaintiff has met the requirements for appointment of a receiver, and a receiver is necessary to protect the Real Property.  The Borrower has consented to the appointment of a receiver as described in Paragraph 31 hereof and Plaintiff is entitled to the immediate appointment of a receiver pursuant to the Court's equitable authority, the Loan Documents, and applicable law.

<div align="center">

**THIRD CAUSE OF ACTION**
**(For Injunctive Relief Against All Defendants)**

</div>

50.     Plaintiff repeats and realleges paragraphs 1 through 49 as if fully set forth herein.

51.     To enable the receiver to properly and effectively carry out the specific and general duties and powers, and to prevent Plaintiff from suffering irreparable harm and irreparable injury, Plaintiff seeks a preliminary injunction and permanent injunction enjoining Borrower Defendants and their agents, partners, property managers, employees, officers, directors, affiliates, assigned successors, representatives, and all persons acting under, in concert with or for them, from:

a.     Committing or permitting any waste on the Real Property or any part thereof, or suffering or committing or permitting any act on the Real Property or any part thereof in violation of law, or removing or otherwise disposing of any of the Real Property or the fixtures presently on the Real Property, or any part thereof;

b.     Demanding, collecting, receiving, discounting, or in any other way diverting or using any of the rents and any profits from the Real Property;

c.     Directly or indirectly interfering in any manner with the discharge of the receiver's duties or the receiver's possession of and operation or management of the Real Property; and,

d.     Doing any act which will, or which will tend to impair, defeat, divert, prevent, or prejudice the preservation of the Real Property, including the rents, or any amounts due and owing to the Borrower Defendants with respect to the Real Property, and any profits, or the preservation of Plaintiff's interest in the Real Property.

///

///

WHITNEY
THOMPSON &
JEFFCOACH

885.0 06189963.000

18

COMPLAINT

<div align="center">

**PRAYER FOR RELIEF**

</div>

WHEREFORE Plaintiff requests the following relief against all Borrower Defendants as follows:

1.  That the Court enter judgment against Borrower Defendants for amounts owed through the date of judgment in an amount to be determined at trial, but in any event no less than the cumulative amount under the Farmer Mac loans of $41,833,201.59, including (i) $37,604,067.25 in unpaid principal;(ii) $3,811,973.24 in unpaid accrued interest; (iii) $294,161.10 in late charges; (iv) fees, costs, and other charges (including legal fees and costs) to which Plaintiff is entitled under the governing documents through the date of judgment and which may be determined at trial; and (v) pre-judgment and post-judgment interest at the rate provided by law;

2.  That the Court enforce the provisions of California Code of Civil Procedure Section 564(a) 564(b)(2), 564(b)(9), and 564(b)(11) by specifically enforcing the assignment of rents clauses and Farmer Mac's express entitlement to the appointment of a receiver in the Deeds of Trust, and appoint a receiver to bring and defend actions in his or her own name as receiver, to take and keep possession of the Real Property, to receive rents, collect debts, to compound for and compromise the same, to make transfers, to sell the Real Property by private sale or public auction, and generally to do such acts respecting the Real Property as the Court may authorize pending the forthcoming foreclosure under the Deeds of Trust;

3.  That the Court enter an order directing that the Borrower Defendants:

    A.  Shall relinquish and turn over possession of the Real Property and all Collateral to the receiver upon his or her appointment becoming effective;

    B.  Shall turn over to the receiver and direct all property managers and other third parties in possession thereof to turn over all keys, leases, books, records, books of account, ledgers, operating statements, budgets, real estate tax bills and all other business records relating to the Real Property or Personal Property Collateral, wherever located, and in whatever mode maintained, including information contained on computers and any and all software relating thereto as well as all banking records, statements, and canceled checks;

///

WHITNEY
THOMPSON &
JEFFCOACH

C.     Shall turn over to the receiver all documents which pertain to all licenses, permits, or government approvals relating to the Real Property, or Personal Property Collateral, and shall immediately advise the receiver of their Federal Taxpayer Identification Numbers used in connection with the operation of the Real Property;

D.     Shall immediately advise the receiver as to the nature and extent of insurance coverage on the Real Property and Personal Property Collateral.  Borrower Defendants shall immediately name the receiver as an additional insured on the insurance policy (or if multiple, insurance policies) for the period that the receiver shall be in possession of the Real Property and Personal Property Collateral.  Borrower Defendants shall be prohibited from cancelling, reducing, or modifying any and all insurance coverage currently in existence with respect to the Real Property; and,

E.     Shall immediately turn over to the receiver any monies (including but not limited to, security deposits, prepaid rent, or funds in property management bank accounts for the Real Property) which represent net rental or lease payments with respect to the Real Property.  Any tenants occupying, using, or leasing the Real Property, or any portion thereof, and any parties owing funds to Borrower Defendants as a result of the Real Property shall make payment to the receiver.

4.     That the Court enter an order for an accounting by the Borrower Defendants of any rents from the Real Property, and any profits;

5.     That the Court enter a preliminary injunction and permanent injunction enjoining Borrower Defendants and their agents, partners, property managers, employes, officers, directors, affiliates, assignees, successors, and representative and all persons acting under, in concert with, or for them, from:

A.     Committing or permitting any waste on the Real Property or Personal Property Collateral or any part thereof, or suffering or committing or permitting any act on the Real Property or any part thereof in violation of law, or removing or otherwise disposing of any of the Real Property or the fixtures presently on the Real Property, or any part thereof;

B.     Demanding, collecting, receiving, discounting, or in any other way diverting or using any of the rents and any profits from the Real Property;

1          C.       Directly or indirectly interfering in any manner with the discharge of the

2   receiver's duties or the receiver's possession of and operation or management of the Real Property;

3   and,

4          D.       Doing any act which will, or which will tend to impair, defeat, divert, prevent,

5   or prejudice the preservation of the Real Property, including the rents, or any amounts due and owing

6   to the Borrower Defendants with respect to the Real Property, and any profits, or the preservation

7   of Plaintiff's interest in the Real Property.

8         6.       That the Court award to Farmer Mac costs incurred in connection with collection of

9   monies owed under the Farmer Mac Loans, including but not limited to the costs of this complaint;

10  for attorneys' fees incurred in connection with this action; and,

11        7.       For such other relief as the Court may deem just and proper.

12  Dated:  November 27, 2024            WHITNEY, THOMPSON & JEFFCOACH LLP

13

14                 By:

15                        Marshall C. Whitney

16                 Attorneys for Federal Agricultural Mortgage
                             Corporation

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit A

FARMER MAC
SELLER/SERVICER AGREEMENT

This Seller/Servicer Agreement (the "Agreement") is dated as of ___5/12___, 20_14_, between the FEDERAL AGRICULTURAL MORTGAGE CORPORATION, a federal instrumentality of the United States ("Farmer Mac") and _Conterra Asset Management_, a _____ (the "Seller").  All capitalized terms used in this Agreement and not otherwise defined shall have the meanings set forth in Farmer Mac's Seller/Servicer Guide (the "Guide").

Farmer Mac operates a mortgage loan purchase program to provide agricultural mortgage lenders an agricultural secondary mortgage market.  Farmer Mac is willing to purchase Qualified Loans from approved sellers pursuant to mortgage purchase programs announced by Farmer Mac from time to time.  Farmer Mac has developed the Guide to set forth the requirements for, and conditions respecting, participation in any mortgage purchase program announced by Farmer Mac to purchase Qualified Loans.

The Seller intends to originate or purchase Qualified Loans and sell such loans to Farmer Mac.

Farmer Mac, either itself or through a Farmer Mac designated Loan Reviewer, will review loan files with respect to mortgage loans submitted by approved sellers for purchase and may approve such loans for sale to Farmer Mac if they meet the requirements set forth in the Guide.  Farmer Mac, either itself or through a Farmer Mac designated Central Servicer, will also service Qualified Loans it purchases and will delegate certain servicing responsibilities with respect to such Qualified Loans to the approved sellers under the conditions and in accordance with the provisions of the Guide.

The purpose of this Agreement is to establish the Seller as an approved seller of Qualified Loans to Farmer Mac; to provide the terms and conditions of sales; to specify the requirements with respect to loan file review; to establish the Seller as a Field Servicer of Qualified Loans on behalf of Farmer Mac and any Central Servicer; and to provide the terms and conditions of servicing.

In consideration of the purpose of this Agreement and of all the provisions and mutual promises contained herein, the Seller and Farmer Mac agree as follows:

Section 1. Seller/Servicer Guide.  Farmer Mac has provided the Guide to the Seller and the Seller has received and reviewed the Guide which is incorporated herein by reference as though fully set forth in this Agreement.  Farmer Mac and the Seller agree to comply with and be bound by all of the terms and provisions of the Guide which Farmer Mac may, in its discretion and without the consent of the Seller, amend or supplement at any time by written notice to the Seller.  From and after the date of each amendment or supplement, the Guide, as so amended or supplemented, shall be a part of this Agreement; however, no such amendment or supplement will affect any Commitment to

1

Purchase (rate lock) issued prior to the date of the amendment or supplement or any servicing obligations undertaken prior to such date.

Section 2. Selling.  Seller eligibility and sales of Qualified Loans to Farmer Mac hereunder shall be governed by Parts 2, 3 and 5 of the Guide.

2.1   Individual Commitments, Separate Agreements.  Each purchase by Farmer Mac hereunder will be made only pursuant to a written Commitment to Purchase (rate lock).  Each Commitment to Purchase (rate lock) constitutes a separate agreement between the Seller and Farmer Mac with respect to each Qualified Loan required to be delivered or actually delivered thereunder, and each such separate agreement may be separately assigned, and separately enforced, by Farmer Mac or any assignee, without affecting the rights of any party to, or assignee under, such Commitment to Purchase (rate lock) with respect to any other mortgage loan.

2.2   Basic Seller Obligations.  There are certain basic obligations imposed upon the Seller under this Agreement, including but not limited to obligations to:

- sell Qualified Loans to Farmer Mac once a Commitment to Purchase (rate lock) has been issued by Farmer Mac;

- pay a Pairoff Fee to Farmer Mac in the event a Qualified Loan or substitute is not delivered in accordance with the terms of such Commitment to Purchase (rate lock), as set forth in Part 3 of the Guide; and

- make representations and warranties with respect to each Qualified Loan and incur certain consequences in connection with the breach of such representations and warranties, as set forth in Part 3 of the Guide.

2.3   No Purchase Obligation.  The fact that Farmer Mac signed this Agreement does not mean that Farmer Mac must issue a Commitment to Purchase (rate lock) for any mortgage loan submitted to Farmer Mac for review and approval.  Any obligation to purchase will arise only after review and approval and the issuance by Farmer Mac of a Commitment to Purchase (rate lock).

Section 3. Loan File Review.  Submission of documents for review and approval by Farmer Mac shall be governed by Parts 2 and 3 of the Guide.

Section 4. Servicing.  Servicing of Qualified Loans hereunder shall be governed by Part 4 of the Guide or by a field servicing contract between the Seller and a Central Servicer.  The field servicing contract, the form of which will have been reviewed by Farmer Mac, will neither increase the duties of nor reduce the field servicing fee to be paid to the Seller.

2

Section 5. <u>Events of Default; Remedies; Indemnification</u>.  Seller will be in default under this Agreement upon the occurrence of any Event of Default under the Guide, and will be subject to any remedies available to Farmer Mac, including, but not limited to, indemnification of Farmer Mac and Seller's obligation to repurchase one or more of the Qualified Loans, as more fully set forth in the Guide.

Section 6. <u>Termination and Effect of Termination</u>. This Agreement and the Guide may be terminated as set forth in the Guide.  The Guide sets forth the effect of any such termination.

Section 7. <u>Miscellaneous</u>.

7.1 <u>Notice</u>. Any notice shall be given and shall be effective as specified in Part 1 of the Guide and shall be given to Farmer Mac at the address specified in Part 1 of the Guide, and to the Seller at the following address, or to such other address as may be given by one party to the other party in writing:

Seller's Address:  7755 Office Plaza Dr. North Suite 195 West Des Moines, IA 50266

7.2 <u>Severability and Enforcement</u>.  If any provision of this Agreement conflicts with applicable law, the other provisions of this Agreement that can be carried out without the conflicting provision will not be affected.  All rights and remedies under this Agreement are distinct and cumulative not only as to each other but as to any rights or remedies afforded by law or equity.  They may be exercised together, separately or successively.  Any failure by Farmer Mac to exercise any of its remedies does not constitute a waiver of that remedy in the future as to the same or any other Event of Default.  These rights and remedies are for the benefit of Farmer Mac and any of its respective successors and assigns.

7.3 <u>Governing Law</u>.  This Agreement will be governed by, and construed in accordance with, federal law; to the extent federal law incorporates state law, that state law shall be the laws of the District of Columbia.

7.4 <u>Assignability</u>.  As more fully set forth in the Guide, it is understood and agreed that: (i) Seller may not transfer or assign any of its rights or duties under this Agreement or the Guide without Farmer Mac's prior written consent; and (ii) Farmer Mac may assign its rights and duties under such documents without Seller's consent or approval.

3

7.5   <u>Entire Agreement</u>.   This Agreement and the Guide, including the exhibits attached to the Guide and all updates and other documents incorporated by reference in the Guide, constitute the entire understanding between Farmer Mac and the Seller and supersede all other agreements, covenants, representations, warranties, understandings and communications between the parties, whether oral or written, with respect to the transactions contemplated by the Guide.

This Agreement may be executed in two or more counterparts, which, when combined, will constitute one instrument.

This Agreement has been executed as of the date first written by duly authorized representatives of Farmer Mac and the Seller.

**Federal Agricultural Mortgage Corporation**

By: _____

Name: Tom Stenson

Title:   EVP & Chief Operating Officer


**Seller**

By: _____

Name: _____

Title: _____

4

## UNANIMOUS WRITTEN CONSENT IN LIEU OF
## A SPECIAL MEETING
## OF
## THE BOARD OF DIRECTORS
## OF
## CONTERRA HOLDINGS, LLC

In lieu of a Special Meeting of the Board of Directors of CONTERRA HOLDINGS, LLC, an Iowa limited-liability company (the "Company"), the undersigned, constituting all of the Directors of the Company, hereby resolve to take the following actions as if taken at a duly constituted meeting of the Members and Managers of the Company.

**APPROVAL OF SELLER/SERVICER AGREEMENT WITH FARMER MAC**

RESOLVED, that the Company is authorized to enter into the Seller/Service Agreement ("Agreement") with the Federal Agricultural Mortgage Corporation ("Farmer Mac") attached hereto as **Exhibit A**, and perform all requirements under the Agreement.

**FURTHER AUTHORIZATIONS**

RESOLVED, that Paul A. Erickson is authorized, empowered, and directed to take all necessary or appropriate actions in order to fully and expeditiously accomplish the foregoing resolutions.

The undersigned, being all of the Directors of the Company as of the undersigned date, by signing this written consent hereby approve the actions transacted by this written consent in lieu of such meeting.

**APPROVED**
as of the 31st day of March, 2014.

**PAUL A. ERICKSON,**
an individual

By:   Paul A. Erickson
      Director, President and CEO

**APPROVED**
as of the 31st day of March, 2014.

**DAVID L. PROBST,**
an individual

By:   David L. Probst
      Director

**APPROVED**
as of the 31st day of March, 2014.

**STEPHEN E. KIMPEL,**
an individual

By:   Stephen E. Kimpel
      Director

**APPROVED**
as of the 31st day of March, 2014.

**MICHAEL J. ENDRES,**
an individual

By:   Michael J. Endres
      Director

Exhibit B

# NOTE

Loan <sup>REDACTED</sup>1725

| January 8, 2018 | Fresno, | CA |
| [Date] | [City] | [State] |

**1306 W. Herndon Avenue, Suite 101**
**Fresno, California 93711**

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that Borrower has received, Borrower promises to pay U.S. **$5,500,000.00** (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **Conterra Agricultural Capital, LLC**. Borrower will make all payments under this Note in the form of cash, check or money order.

Borrower understands that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is also called the "Lender."

## 2. INTEREST

Prior to default, interest will be charged on unpaid principal until the full amount of Principal has been paid. Borrower will pay interest at a yearly rate of **3.26%**. The interest rate Borrower will pay will change in accordance with this Section 2.

| INITIAL ADJUSTMENT DATE | **March 1, 2018** |
|---|---|
| ORIGINAL AMORTIZATION TERM | **25 years   Balloon Term 15 Years** |
| ADJUSTMENT FREQUENCY PERIOD monthly | |
| MARGIN | **1.70%** |

**ADJUSTABLE RATE PROVISION.** The interest rate stated in this Note is subject to adjustment by the Lender or any subsequent holder of this Note on the Initial Adjustment Date and on subsequent dates established by the Adjustment Frequency Period thereafter. Any such change in the interest rate shall be made automatically but in no event shall the adjusted interest rate exceed the maximum interest rate then permitted by law. When the rate is adjusted the remaining current principal balance of the Note will be reamortized over the remaining amortization term to determine subsequent payment amounts. Lender reserves the right to not adjust the loan in the event of default. Notice of the adjusted rate and the new amortized payment will be sent to the Borrower after each interest rate adjustment.

**INDEX.** Beginning with the Initial Adjustment Date, the adjustable interest rate will be based on an Index. The "Index" is the *one month "London Interbank Offered Rate" (LIBOR)* as published in *The Wall Street Journal* 2 business days before the applicable rate change date, rounded to 2 decimal places. The Index percentage will be added to the interest rate Margin to determine the adjustable rate. If the Index is no longer available, the Note Holder will choose a new index that is based on comparable information.

**CONVERSION OPTION.** On any payment date the Borrower may exercise the Conversion Option to convert this loan to another ARM or Fixed Rate loan product. The loan products which may be elected will be those in effect at the time of conversion. The Borrower must provide their notice of conversion 21 days prior to the conversion date. Conversion will modify the Adjustment Dates, Adjustment Frequency Period, Interest Rate Margin, and the Payment. If the Borrower converts this loan to a fixed-rate loan, it may then be subject to loan

provisions, Yield Maintenance for Fixed-Rate Loans, Partial Open Prepayment Fee, prepayment penalties or other payment limitation. The conversion will be made only if the loan is not in default. The Borrower will pay a conversion fee equivalent to the greater of $1,000 or .5% of the outstanding principal balance at the time the Conversion Option is requested; however, such conversion fee shall not exceed $5,000. The borrower may be required to execute any documents the Lender requires to effect the conversion. The converted loan product selected for conversion must be a different than the current loan product.

The converted interest rate in effect as of the Conversion Date will be equal to the Federal Agricultural Mortgage Corporation's required net yield as of noon Eastern Time, 7 days prior to the Conversion Date plus **1.700%**.

After default, interest will be charged on unpaid principal at the interest rate stated in Section 7 of this Note.

3. **SCHEDULED PAYMENTS**

   **(A)    Time and Amount of Payments**
   **1 interest payment on July 1, 2018, with interest calculated from the date of closing on the unpaid principal balance at 3.260% per annum; 29 consecutive semi-annual principal and interest payments of $163,463.00 each, beginning January 1, 2019, and the final payment of $2,836,523.37 on July 1, 2033, which is called the "Maturity Date."**

   **(B)    Place of Payments**
   Borrower will make payments at **7755 Office Plaza Dr. North, Suite 195, West Des Moines, IA  50266** or at a different place if required by Lender

   If Lender at any time determines, in its sole but reasonable discretion, that it has miscalculated the amount of any installment payment (whether because of a miscalculation of the Adjustable Rate or otherwise), then Lender shall give notice to Borrower of the corrected amount of the installment payment (and the corrected Adjustable Rate, if applicable) and (i) if the corrected amount of the installment payment represents an increase, then Borrower shall, within 30 calendar days thereafter, pay to Lender any sums that Borrower would have otherwise been obligated under this Note to pay to Lender had the amount of the installment payment not been miscalculated, or (ii) if the corrected amount of the installment payment represents a decrease thereof and Borrower is not otherwise in breach or default under any of the terms and provisions of this Note, the Security Instrument or any other loan document evidencing or securing this Note, then Borrower shall thereafter be paid the sums that Borrower would have not otherwise been obligated to pay to Lender had the amount of the installment payment not been miscalculated.

4. **INTEREST CALCULATION**

   Interest on this Note is computed on a 30/360 simple interest basis; that is, with the exception of odd days in the first payment period, monthly interest is calculated by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by a month of 30 days. Interest for the odd days is calculated on the basis of the actual days to the next full month and a 360-day year. Unless required by applicable law, payments will be applied first to interest, second to principal, third to advances under the Security Instrument, and finally to late charges.

5. **PREPAYMENTS**

   Any prepayments of scheduled installments that are made on a date that is not an installment payment date must be accompanied by interest to the next installment payment date and that such prepayment will not be credited to the Borrower's account until such installment payment date.

   Any prepayments, partial or in whole, other than scheduled installment payments must be accompanied by unpaid interest accrued on such principal amount from the date to which interest was last paid to the next installment payment date, and such prepayment shall not be considered as having been received and will not be credited to the Borrower's account until such installment payment date. If the Borrower makes a prepayment there will be no delays in the due dates of Borrower's installment payments unless the Lender agrees in writing to those delays and that unless the Borrower and Lender agree otherwise, the Lender at its sole discretion may reamortize the Note on the basis of the new principal balance; otherwise the making of a prepayment will operate only to discharge the Note at an earlier date.

MULTISTATE ADJUSTABLE RATE NOTE – Farmer Mac UNIFORM                                           Form 6005
INSTRUMENT

1530290317 [Doc Id 9641 M10312013]

Excepting the requirement that Borrower shall pay all interest to the next installment payment date with any prepayment, there shall be no additional prepayment penalties, fees, or premium charged to Borrower for early payment of this Note.

6.     **BORROWER'S FAILURE TO PAY AS REQUIRED**

     (A)    **Late Charge for Overdue Payments**

If any installment of principal or interest is not received by the Lender by the end of the 10th calendar day after the date it is due, a late fee shall be payable on such defaulted payment at a rate which is equal to 5% per annum above the current rate of interest under this note, subject to a minimum interest charge of 5% of such defaulted payment.

     (B)    **Default**

If Borrower does not pay the full amount of each installment on the date it is due, Borrower will be in default.

     (C)    **Notice of Default**

If Borrower is in default and if allowed by applicable law, Lender will send Borrower a written notice telling Borrower that if Borrower does not pay or cure the default within thirty (30) days after receipt of written notice from Lender specifying the nature of the default, Lender may require Borrower to pay immediately the full amount of Principal which has not been paid and all the interest that Borrower owes on that amount.

     (D)    **No Waiver By Lender**

Even if, at a time when Borrower is in default, Lender does not require Borrower to pay immediately in full as described above, Lender will still have the right to do so if Borrower is in default at a later time.

     (E)    **Payment of Lender's Costs and Expenses**

If Lender has required Borrower to pay immediately in full as described above, Lender will have the right to be paid back by Borrower for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. If allowed by applicable law those expenses include, for example, reasonable attorneys' fees.

7.     **INTEREST AFTER DEFAULT**

Upon default, including failure to pay upon final maturity, at Lender's option, Lender may add any unpaid interest to principal and such sum will bear interest there from until paid at the rate provided in this Note (including any increased interest rate). Upon Borrower's failure to pay all amounts declared due pursuant to this section, Lender, at its option, may increase the interest rate on this Note five (5) percentage points.

8.     **ANNUAL FINANCIAL STATEMENTS**

Borrower agrees to provide Lender with updated financial statements and other requested financial reports, including tax returns on or before May 31st of each year. The failure of Borrower to provide annual financial statements or other requested reports within a reasonable time may be declared to be a default of this Note by Lender and Lender may exercise all remedies under Section 6 of this Note or as provided elsewhere in this Note.

9.     **DISSEMINATION OF INFORMATION**

If Lender determines at any time to sell, transfer or assign this Note, the Security Instrument and any other security instruments, and any or all servicing rights with respect thereto, or to grant participations therein ("Participations") or issue, in a public offering or private placement, mortgage pass-through certificates or other securities evidencing a beneficial interest in the loan ("Securities"), Lender may forward to each purchaser, transferee, assignee, servicer, participant, investor, or their respective successors in such Participations and/or Securities ("collectively, the "Investor"), any rating agency rating such Securities and each prospective Investor, all documents and information which Lender now has or may hereafter acquire relating to the Indebtedness and to Borrower, any guarantor, any indemnitors and the Property, which shall have been furnished by Borrower, any guarantor or any indemnitors, as Lender determines necessary or desirable. All information furnished by Borrower shared with each prospective Investor shall be shared on a confidential basis and, excepting information shared with the Federal Agricultural Mortgage Corporation and any of its affiliates, which Borrower hereby consents without further notice, Borrower shall receive notice thereof.

10.     **LENDER ADVANCES**

MULTISTATE ADJUSTABLE RATE NOTE — Farmer Mac UNIFORM                     **Form 6005**
INSTRUMENT

1530290317 [Doc Id 9641 M10312013]

Lender may make advances under the mortgage or deed of trust, security agreement or other instrument providing security for this Note, to protect the Lender's interest in any mortgage or deed of trust, security agreement or other instrument providing security for this Note from loss of value or damage. Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate stated in Section 7 of this Note shall become an obligation due and owing under the terms of this Note immediately upon the date advanced by Lender and is an obligation of Borrower secured by the mortgage or deed of trust, security agreement or other instrument providing security for this Note.

## 11.     GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to Borrower under this Note will be given by delivering it or by mailing it by first class mail to Borrower at the Property Address above or at a different address if Borrower gives Lender a notice of Borrower's different address.

Any notice that must be given to Lender under this Note will be given by delivering it or by mailing it by first class mail to Lender at the address stated in Section 3(B) above or at a different address if Borrower is given a notice of that different address.

## 12.     WAIVERS

Borrower and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require Lender to demand payment of amounts due. "Notice of Dishonor" means the right to require Lender to give notice to other persons that amounts due have not been paid.

## 13.     UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Lender under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Lender from possible losses which might result if Borrower does not keep the promises which Borrower makes in this Note. That Security Instrument describes how and under what conditions Borrower may be required to make immediate payment in full of all amounts Borrower owes under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred to a third party not under the common control of one or more of the Guarantors (or if Borrower is not a natural person and a beneficial interest in Borrower of more than ten percent (10%) is sold or transferred, excluding transfer to trusts for estate planning purposes) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

C&A Farms, LLC, a California limited liability company

By: _____

Whitesbridge Farms LLC, a California limited liability company

By: _____

*[Sign Originals Only]*

PAY TO THE ORDER OF
U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs
WITHOUT RECOURSE

Conterra Agricultural Capital, LLC

Signature
**Paul Erickson, President**

## AMENDMENT TO NOTE

RE: <sup>REDACTED</sup> 1725

This AMENDMENT TO NOTE (this "Amendment") is made and entered into as of the 27 day of June, 2018 (the "Effective Date"), by and between C&A Farms, LLC, a California limited liability company and Whitesbridge Farms LLC, a California limited liability company (collectively, "Borrower"), and U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation ("Lender").

## RECITALS

WHEREAS, Borrower entered into a certain Note dated January 8, 2018, in the amount of $5,500,000.00, payable to Lender (the "Note"), and secured by real property and a security instrument of the same date (the "Security Instrument");

WHEREAS, Borrower has requested to adjust the interest rate and term under the Note, and Lender has approved Borrower's request, subject to Borrower entering into this Agreement and a $2,000 Conversion Fee;

WHEREAS, Borrower and Lender desire to amend the Note in certain respects as set forth in this Amendment;

NOW THEREFORE, for the reasons set forth above and for other good and valuable consideration, the sufficiency of which is acknowledged, Borrower and Lender (each a "Party" and collectively, the "Parties") hereby agree as follows:

## AGREEMENT

1.   **AMENDMENT TO NOTE**

The Parties agree that the recitals set forth above are true and accurate and are hereby incorporated in and made a part of this Agreement. The Note is hereby amended by deleting Section 2 and Section 3 in full with the following inserted in its place:

Section 2.    **INTEREST**
Prior to default, interest will be charged on unpaid principal until the full amount of Principal has been paid. Borrower will pay interest at a yearly rate of 4.71% effective July 1, 2018.

| | |
|---|---|
| ADJUSTMENT DATE | July 1, 2025 |
| REMAINING AMORTIZATION TERM | 25 years |
| ADJUSTMENT FREQUENCY PERIOD | 7 years |

ADJUSTABLE RATE PROVISION. The interest rate stated in this Note is subject to adjustment by the Lender or any subsequent holder of this Note on the Initial Adjustment Date and on subsequent dates established by the Adjustment Frequency Period thereafter. Any such change in the interest rate shall be made automatically, but in no event shall the adjusted interest rate exceed the maximum interest rate then

permitted by law.  When the rate is adjusted the remaining current principal balance of the Note will be reamortized over the remaining amortization term to determine subsequent payment amounts.  Lender reserves the right to not adjust the loan in the event of default.  Notice of the adjusted rate and the new amortized payment will be sent to the Borrower after each interest rate adjustment and at least 30 days prior to a payment change caused by an interest rate adjustment.

The variable interest rate shall change to a rate that shall be based upon the 1 month Libor then in effect on the Initial Adjustment Date or any subsequent Adjustment Date, unless Borrower specifically requests a different rate product then being offered by the Federal Agricultural Mortgage Corporation at least 60 days prior to the Initial Adjustment Date or any subsequent Adjustment Date, plus the current spread at that time.

Section 3.        SCHEDULED PAYMENTS
Semi-annual principal and interest payments of $190,376.08 each, beginning 1/1/2019, and a final payment due on July 1, 2033 which is called the "Maturity Date".

If Lender at any time determines, in its sole but reasonable discretion, that it has miscalculated the amount of any installment payment (whether because of a miscalculation of the Adjustable Rate or otherwise), then Lender shall give notice to Borrower of the corrected amount of the installment payment (and the corrected Adjustable Rate, if applicable), and (i) if the corrected amount of the installment payment represents an increase, then Borrower shall, within 30 calendar days thereafter, pay to Lender any sums that Borrower would have otherwise been obligated under this Note to pay to Lender had the amount of the installment payment not been miscalculated, or (ii) if the corrected amount of the installment payment represents a decrease thereof and Borrower is not otherwise in breach or default under any of the terms and provisions of this Note, the Security Instrument or any other loan documents evidencing or securing this Note, then Borrower shall thereafter be paid the sums that Borrower would not have otherwise been obligated to pay to Lender had the amount of the installment payment not been miscalculated.

## 2.        TERMS OF NOTE

Capitalized terms used in this Amendment that are not defined shall have the meaning assigned to such terms in the Note.  Except as set forth in this Amendment, all of the provisions of the Note shall remain unchanged, shall continue in full force and effect, and are hereby ratified and confirmed in all respects by the Parties.

In addition to the modifications to the Note stated in this Agreement, Borrower understands that, upon Borrower's signing of this Agreement, Lender will have the option to require immediate payment in full of all sums secured by the Security Instrument if all or any part of the Property or any interest in it is sold or transferred without Lender's prior written consent, as provided in the Security Instrument.

Except as stated in this Agreement, Borrower's promise to pay, the terms, and the covenants and agreements under the Note and under the Security Instrument continue without change.

**Amendment to Note**
**Page 3 of 3**

**NOTICE IS HEREBY GIVEN TO MAKER THAT ORAL AGREEMENTS OR ORAL COMMITMENTS TO LEND MONEY, EXTEND CREDIT, MODIFY LOAN TERMS OR FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER CALIFORNIA LAW.**

IN WITNESS WHEREOF, Borrower and Lender have executed this Agreement.

**C&A Farms, LLC, a California limited liability company**

By: Farid Assemi
Its: Manager

**Whitesbridge Farms, LLC, a California liability company**

By: Kevin Assemi
Its: Manager

PAY TO THE ORDER OF
**U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs**
WITHOUT RECOURSE

**Conterra Agricultural Capital, LLC**

**Paul Erickson, President**

# Allonge to Promissory Note

Loan # 1725

For purposes of further endorsement of the following described Note, this Allonge is affixed and becomes a permanent part of said Note:

Note Date: <u>January 8, 2018</u>

Original Amount: <u>$5,500,000.00</u>

Borrower Name(s):<u>C&A Farms, LLC and Whitesbridge Farms, LLC</u>

Property Address: <u>350.37 Acres Devoted to an Almond Orchard, Fresno County, California</u>

PAY TO THE ORDER OF

**U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs**

WITHOUT RECOURSE

Conterra Agricultural Capital, LLC

Signature

**Paul Erickson, President**

# ADJUSTABLE RATE RIDER

RE: REDACTED 1725

THIS ADJUSTABLE RATE RIDER is made this 2nd day of February , 2023, and is incorporated into and shall be deemed to amend and supplement the amended and restated Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's adjustable rate Note (the "Note") to **U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs** (the "Lender") dated January 8, 2018 and covering the property described in the Security Instrument and located at:

**350.37 Acres Devoted to an Almond Orchard**
**Fresno County, CA**
[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE PERIODIC PAYMENT**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

The Note has the following terms which provide for changes in the interest rate and periodic payments, as follows:

2.    **INTEREST**
Prior to default, interest will be charged on unpaid principal until the full amount of Principal has been paid. Borrower will pay interest at a yearly rate of 3.26**%**. The interest rate Borrower will pay will change in accordance with this Section 2.

**INITIAL ADJUSTMENT DATE.**         **March 1, 2018**

**ORIGINAL AMORTIZATION TERM.**   **25 years.**

**ADJUSTMENT FREQUENCY PERIOD. monthly**

**MARGIN**         **1.70%.**

**ADJUSTABLE RATE PROVISION.**   The interest rate stated in this Note is subject to adjustment

**MULTISTATE ADJUSTABLE RATE RIDER--Farmer Mac UNIFORM INSTRUMENT**                                                      **Form 6005r**

1                        ©PeirsonPatterson, LLP.-Arlington, Texas  2016

1221050417 [Doc Id 9642 M11142012]

by the Lender or any subsequent holder of this Note on the Initial Adjustment Date and on subsequent dates established by the Adjustment Frequency Period thereafter. Any such change in the interest rate shall be made automatically but in no event shall the adjusted interest rate exceed the maximum interest rate then permitted by law. When the rate is adjusted the remaining current principal balance of the Note will be reamortized over the remaining amortization term to determine subsequent payment amounts. Lender reserves the right to not adjust the loan in the event of default. Notice of the adjusted rate and the new amortized payment will be sent to the Borrower after each interest rate adjustment.

**INDEX.** Beginning with the Initial Adjustment Date, the adjustable interest rate will be based on an Index. The "Index" is the *one month "London Interbank Offered Rate" (LIBOR)* as published in *The Wall Street Journal* 2 business days before the applicable rate change date, rounded to 2 decimal places. The Index percentage will be added to the interest rate Margin to determine the adjustable rate. If the Index is no longer available, the Note Holder will choose a new index that is based on comparable information.

**CONVERSION OPTION.** On any payment date the Borrower may exercise the Conversion Option to convert this loan to another ARM or Fixed Rate loan product. The loan products which may be elected will be those in effect at the time of conversion. The Borrower must provide their notice of conversion 21 days prior to the conversion date. Conversion will modify the Adjustment Dates, Adjustment Frequency Period, Interest Rate Margin, and the Payment. If the Borrower converts this loan to a fixed-rate loan, it may then be subject to loan provisions, Yield Maintenance for Fixed-Rate Loans, Partial Open Prepayment Fee, prepayment penalties or other payment limitation. The conversion will be made only if the loan is not in default. The Borrower will pay a conversion fee equivalent to the greater of $1,000 or .5% of the outstanding principal balance at the time the Conversion Option is requested; however such conversion fee shall not exceed $5,000. The borrower may be required to execute any documents the Lender requires to effect the conversion.

The converted interest rate in effect as of the Conversion Date will be equal to the Federal Agricultural Mortgage Corporation's required net yield as of noon Eastern Time, 7 days prior to the Conversion Date plus 1.70%.

After default, interest will be charged on unpaid principal at the interest rate stated in Section 7 of this Note.

**3.   SCHEDULED PAYMENTS**
**(A)   Time and Amount of Payments**

MULTISTATE ADJUSTABLE RATE RIDER--Farmer Mac UNIFORM INSTRUMENT                                                  Form 6005r

©PeirsonPatterson, LLP.-Arlington, Texas  2016
1221050417 [Doc Id 9642 M11142012]

1 interest payment on July 1, 2018, with interest calculated from the date of closing on the unpaid principal balance at 5.000% per annum; 29 consecutive semi-annual principal and interest payments of $163,463.00 each, beginning January 1, 2019, and the final payment of $2,836,523.37 on July 1, 2033, which is called the "Maturity Date."

**(B)     Place of Payments**

Borrower will make payments at **5465 Mills Civic Parkway, Suite 201 West Des Moines, IA 50266** or at a different place if required by Lender.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

**C&A Farms, LLC, a California limited liability company**

By: _____ FARID ASSEMI _____               *[Sign Originals Only]*

---

MULTISTATE ADJUSTABLE RATE RIDER--Farmer Mac UNIFORM INSTRUMENT                    **Form 6005r**

©PeirsonPatterson, LLP.-Arlington, Texas  2016
1221050417 [Doc ld 9642 M11142012]

# CROSS COLLATERALIZATION RIDER

RE: REDACTED1725

THIS CROSS COLLATERALIZATION RIDER is made this _February 2_, **2023**, and is incorporated into and shall be deemed to amend and supplement the amended and restated Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date, given by the undersigned Borrowers and Grantors to secure a Note to **U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs** (the "Lender") dated January 8, 2018 and covering the Property described in the Security Instrument and located at:

**350.37 Acres Devoted to an Almond Orchard**
**Fresno County, CA**
[Property Address]

In addition to the covenants and agreements made in the Security Instrument, Borrower Parties further covenant and agree that on the date hereof the following other loans have been sold to Federal Agricultural Mortgage Corporation:

| Borrowers/Co-Signers' Names | Date | Loan Amount/Loan No. |
|---|---|---|
| Copper Avenue Investments, LLC, ACAP Farms, LLC, Gradon Farms, LLC Lincoln Grantor Farms, LLC, Maricopa Orchards, LLC & Cantua Orchards, LLC | 10/11/2019 | 10.258.632.00/REDACTE1674 |
| Copper Avenue Investments, LLC, ACAP Farms, LLC, Gradon Farms, LLC, Lincoln Grantor Farms, LLC, Maricopa Orchards, LLC & Cantua Orchards, LLC | 10/11/2019 | $5,297,232.00 REDACTED1673 |
| C&A Farms, LLC & Whitebridge Farms, LLC | 01/08/2018 | $1,500,000.00/REDACTE1728 |
| Assemi Brothers, LLC, C&A Farms, LLC, Whitebridge Farms, LLC, Maricopa Orchards, LLC & Willow Avenue Investments, LLC | 12/14/2020 | $12,500,000.00REDACTE2676 |
| Assemi Brothers, LLC, C&A Farms, LLC, Whitebridge Farms, LLC, Maricopa Orchards, LLC & Willow Avenue Investments, LLC | 12/14/2020 | $12,500,000.00/REDACTE2678 |

---

Farmer Mac Cross-Collateralization Rider

1

| | | |
|---|---|---|
| **C & A Farms, LLC, Willow Avenue Investments, LLC, Gradon Farms, LLC, Cantua Orchards, LLC, Copper Avenue Investments, LLC, Lincoln Grantor Farms, LLC, ACAP Farms, LLC and Maricopa Orchards, LLC** | 02/2/2023 | $7,400,000.00/REDACTED1004 |

each of which is evidenced by a separate promissory note (the "Other Notes"), and each of which is secured by a separate mortgage, deed of trust, or security deed (the "Other Security Instruments"). It is agreed that in addition to Borrower's Note, this Security Instrument secures the obligations, debts, and liabilities evidenced by the Other Notes and Other Security Instruments referenced herein, plus interest thereon, which is payable by Grantor to Lender and/or Federal Agricultural Mortgage Corporation.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Cross Collateralization Rider.

**C&A Farms, LLC, a California limited liability company**

Farid Assemi, General Manager

**Whitesbridge Farms, LLC, a California limited liability company**

Neema Assemi, General Manager

*[Sign Originals Only]*

---

©PeirsonPatterson, LLP.-Arlington, Texas  2016
1537050917 [Doc Id 2448 M01222014]

# CROSS DEFAULT RIDER

RE: REDACTED 1725

THIS CROSS DEFAULT RIDER is made this *February 2*, **2023,** and is incorporated into and shall be deemed to amend and supplement the amended and restated Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date, given by the undersigned Borrowers and Grantors to secure a Note to **U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs** (the "Lender") dated January 8, 2018 and covering the Property described in the Security Instrument and located at:

<div align="center">

350.37 Acres Devoted to an Almond Orchard
**Fresno County, CA**
[Property Address]

</div>

In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree that on the date hereof the following other loans have been sold to Federal Agricultural Mortgage Corporation:

| Borrowers/Co-Signers' Names | Date | Loan Amount/Loan No. |
|---|---|---|
| **Copper Avenue Investments, LLC, ACAP Farms, LLC, Gradon Farms, LLC, Lincoln Grantor Farms, LLC, Maricopa Orchards, LLC & Cantua Orchards, LLC** | 10/11/2019 | $10,258,632.00/REDACTED1674 |
| **Copper Avenue Investments, LLC, ACAP Farms, LLC, Gradon Farms, LLC, Lincoln Grantor Farms, LLC, Maricopa Orchards, LLC & Cantua Orchards, LLC** | 10/11/2019 | $5,297,232.00REDACTED1673 |
| **C&A Farms, LLC & Whitebridge Farms, LLC** | 01/08/2018 | $1,500,000.00/REDACTED1728 |
| **Assemi Brothers, LLC; C&A Farms, LLC, Whitebridge Farms, LLC, Maricopa Orchards, LLC & Willow Avenue Investments, LLC** | 12/14/2020 | $12,500,000.00REDACTED2676 |
| **Assemi Brothers, LLC; C&A Farms, LLC, Whitebridge Farms, LLC, Maricopa Orchards, LLC & Willow Avenue Investments, LLC** | 12/14/2020 | $12,500,000.00REDACTED2678 |

---

**FARMER MAC MULTISTATE CROSS DEFAULT RIDER**

<div align="center">1</div>

©PeirsonPatterson, LLP.-Arlington, Texas  2016
1538050917 [Doc Id 2424 M01142014]

| | | |
|---|---|---|
| C & A Farms, LLC, Willow Avenue Investments, LLC, Gradon Farms, LLC, Cantua Orchards, LLC, Copper Avenue Investments, LLC, Lincoln Grantor Farms, LLC, ACAP Farms, LLC and Maricopa Orchards, LLC | 02/2/2023 | $7,400,000.00/<sup>REDACTED</sup>1004 |

each of which is evidenced by a separate promissory note (the "Other Notes"), and each of which is secured by a separate mortgage, deed of trust, or security deed (the "Other Security Instruments"). It is agreed that any default under this Security Instrument or this Note shall be deemed a default under the Other Notes and Other Security Instruments; and any default under any or all of the Other Notes or Other Security Instruments shall be deemed to be a default under this Note and this Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Cross Default Rider.

C & A Farms, LLC, a California limited liability company

_____
Farid Assemi, General Manager

Whitesbridge Farms, LLC,
a California limited liability company

_____
Neema Assemi, General Manager

*[Sign Originals Only]*

FARMER MAC MULTISTATE CROSS DEFAULT RIDER

2

©PeirsonPatterson, LLP.-Arlington, Texas  2016
1538050917 [Doc Id 2424 M01142014]

Exhibit C

# NOTE

**January 8, 2018**  
[Date]

**Fresno,**  
[City]

**CA**  
[State]

**350.37 Acres Devoted to an Almond Orchard**, **Fresno County, California**  
[Property Address]

## 1.     BORROWER'S PROMISE TO PAY

In return for a loan that Borrower has received, Borrower promises to pay U.S. **$1,500,000.00** (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **Conterra Agricultural Capital, LLC**. Borrower understands that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is also called the "Lender", "Note holder" or "holder of the Note". Borrower will make all payments under this Note in the form of cash, check or money order.

## 2.     LINE OF CREDIT

Prior to the expiration of the Draw Period ("Draw Period") as calculated in accordance with this paragraph "2", this Promissory Note ("Note") evidences a revolving line of credit loan ("Loan") under which Loan advances may from time to time be extended to Borrower. Advances shall be in the minimum amount of $2,500 and shall be in amounts which are multiples of $100. Upon receipt of a verified funds request by Borrower to a telephone number provided from time to time by Lender, **or by such other funds request method as the Lender may establish,** and provided all conditions for an advance have been met, Lender shall promptly deliver the requested funds directly to Borrower's account at Borrower's bank ("Bank Account") as designated in the original Loan application or by separate written notice on forms to be provided by Lender. In most cases, if a valid funds request is received by Lender at its designated telephone number at or before 12:00 noon (all times in this paragraph refer to the time in Louisville, Kentucky (Eastern Standard Time EST), the requested funds will be delivered on the business day following receipt of the funds request (e.g., if the funds request is received at 11:00 a.m. on Monday, the funds will usually be delivered on Tuesday; if the funds request is received at 2:00 p.m. on Tuesday, the funds will usually be delivered on Thursday). A valid funds request shall be verified by one or more of the persons obligated to pay this Note on behalf of all persons obligated to pay this Note in a manner to be designated by the Lender. A valid designation of the Bank Account to which funds are to be advanced shall be signed by one or more of the persons obligated to pay this Note on behalf of all persons obligated to pay this Note. Lender shall be entitled to rely on the statements in any (i) verified funds request and/or (ii) signed designation of Bank Account, to the effect that the person who signed such instrument was fully authorized to do so by all of the persons obligated to pay this Note and all persons who are obligated to pay this Note hereby release any and all claims against Lender based on Lender's reliance on such statements.

Advances may be made without payment of a transaction fee.

The Draw Period referenced above shall terminate and expire upon the earlier of the date set forth in paragraph 9(A)(7) or at such date as determined by the Lender, in its sole discretion.

## 3.     REVOLVING FEATURE

During the Draw Period, Borrower may borrow, repay and reborrow under this Note at any time, up to the principal amount of this Note, subject to the terms and conditions of this Note (the "Revolving Loan provisions"), provided that Borrower is not in default under this Note or any other documents executed in connection with this Loan ("Loan Documents"). The unpaid principal balance owing on this Note at any time during the Draw Period will be evidenced by Lender's internal records and the amount advanced and outstanding may not exceed at any one time the face amount of this Note. Lender shall not be obligated to make any Loan advance to Borrower following occurrence of an Event of Default.

## 4.     PAYMENTS

A. During the Draw Period

---

MULTISTATE REVOLVING LINE OF CREDIT NOTE

1447050917 [Doc Id 1226 M08092017]

During the Draw Period, Borrower will be billed in arrears twice a year for interest accrued. Notwithstanding any provision in this Note to the contrary, during the Draw Period Borrower may make, free of penalty or minimum interest charge, any number of principal payments on any business day. Required interest payments may be made from a funds advance, provided the verified funds request for such advance specifies such a purpose in whole or in part for the requested funds. In addition, the periodic payment will include any late charges and other charges authorized by this Note, including, without limitation, any expenses or advances incurred by Lender under the security instrument.

Notwithstanding the foregoing, all amounts other than interest accruing over the period from the last date through which interest was last billed due under the terms of this Note, including but not limited to principal and all other interest, shall be due and payable in full upon the earlier of Lender's billing or the Maturity Date. Interest accruing over the period from the last date through which interest was billed until the later of (a) the actual date of payment of all other amounts or (b) the Maturity Date shall be billed promptly after all such other amounts have been received by Lender.

### B. After the Draw Period

Unless Borrower has exercised Borrower's conversion option set forth in Section 9(C) of this Note, the day after the Draw Period ends the repayment period ("Repayment Period") begins. Borrower must then repay the unpaid and outstanding loan account balance in the manner described in this Section. Borrower must repay this amount in substantially equal periodic installments with interest at the then-current annual interest rate, as set forth in Section 9(A)(1) of this Note. The periodic payment will be an amount that would be sufficient to repay the unpaid and outstanding loan account balance in full by the Maturity Date indicated in Section 9(A)(7) of this Note. The amount of the periodic payment may change as a result of changes in the Current Index indicated in Section 9(A)(7) of this Note. In addition, the periodic payment will include any late charges and other charges authorized by this Note, including, without limitation, any expenses or advances incurred by Lender under the security instrument.

### C. Prepayments after the Draw Period

Any prepayments of scheduled installments that are made on a date that is not an installment payment date must be accompanied by interest to the next installment payment date and that such prepayment will not be credited to the Borrower's account until such installment payment date.

Any prepayments, partial or in whole, other than scheduled installment payments must be accompanied by unpaid interest accrued on such principal amount from the date to which interest was last paid to the next installment payment date, and such prepayment shall not be considered as having been received and will not be credited to the Borrower's account until such installment payment date. If the Borrower makes a prepayment there will be no delays in the due dates of Borrower's installment payments unless the Lender agrees in writing to those delays and that unless the Borrower and Lender agree otherwise, the Lender at its sole discretion may reamortize the Note on the basis of the new principal balance; otherwise the making of a prepayment will operate only to discharge the Note at an earlier date.

## 5.   APPLICATION OF PAYMENTS
### A.   During the Draw Period

Notwithstanding any provision in this Note to the contrary, all payments during the Draw Period, other than a regularly scheduled payment of interest, will be applied first to:

    (1)      Principal; and then to
    (2)      All other amounts owed other than late changes; and then to
    (3)      Late charges; and then to

MULTISTATE REVOLVING LINE OF CREDIT NOTE

(4)     Accrued interest.

B.     After the Draw Period

All payments received after termination of the Draw Period will be applied first to:
(1)     Interest due; and then to
(2)     Principal; and then to
(3)     All other amounts owed other than late charges; and then to
(4)     Late charges; and then to

The term "late charges" is intended to include both flat fees associated with late payments, if any, and any incremental increase in interest rate as a result of maturity or default.

**6.     EARLY TERMINATION**

During the Draw Period, Borrower may terminate the revolving line of credit Loan represented by this Note by (i) providing written notice to Lender of the intent to do so, (ii) paying the outstanding principal balance in full and by (iii) agreeing to pay accrued but unbilled interest promptly upon being billed.  Borrower will be billed for the amount of accrued interest and all other amounts owed (if any) other than interest within fifteen (15) days after the later of Lender's receipt of the notice terminating the Loan and the payment in full of the principal.  The recorded Loan Documents including the Security Instrument will then be released of record upon receipt of the final payment of all amounts owed under this Note.  Amounts that might be owed other than interest include, but are not limited to, late charges, standby fees, taxes and other amounts advanced by Lender and attorney fees.  So long as the Borrower is not in default, the Loan will not terminate simply because the outstanding principal balance may be zero at any given time.  Notwithstanding any provision in this Note to the contrary, no prepayment penalty or minimum interest charge shall be due in the event of early termination as provided in this paragraph.

**7.     PROTECTIVE COVENANTS**

Borrower agrees to provide Lender with updated financial statements and other requested financial reports, including tax returns on or before May 31st of each year.

**8.     GENERAL PROVISIONS**

A.     Notwithstanding any provision of this Note to the contrary, any choice of law provision includes applicable Federal law and such provision is not intended to prevent the application of Federal law.  In addition to any other statutory authority listed in this Note, the terms of this Note and the interest rate and fees set forth herein are authorized by Title 12 of the United States Code, section 2279aa-12 as amended from time to time.

B.     Notwithstanding any provision of this Note to the contrary, interest will be calculated in any reasonable manner determined solely by the holder of this Note based on an assumed 30 day month, and a 360-day year.

C.     Notwithstanding any provision of this Note to the contrary, the whole of the principal sum and any accrued interest and any other sums advanced to protect and/or enforce the Note holder's interest in this Note and the Security Instrument (including reasonable costs of recovery and attorney's fees and expenses) shall bear interest from and after maturity, whether or not resulting from acceleration, at a rate equal to five percent (5.00%) per annum above the rate of interest under this Note had such maturity not occurred.

D.     During the Draw Period, notwithstanding any provision of this Note to the contrary, in the event any scheduled payment of principal or interest shall not be received by the fifteenth day of the month in which it is due and payable, interest shall be payable on such defaulted payment at a rate which is equal to five percent (5.00%) per annum above the rate of interest which would have existed from time to time under this Note but for such nonpayment, subject to a minimum interest charge of five percent (5.00%) of such defaulted payment.

After the Draw Period, notwithstanding any provision of this Note to the contrary, in the event any scheduled payment of principal or interest shall not be received by the tenth day of the month in which it is due and payable, interest shall be payable on such defaulted payment at a rate which is equal to five percent (5.00%) per annum

MULTISTATE REVOLVING LINE OF CREDIT NOTE

1447050917 [Doc Id 1226 M08092017]

above the rate of interest which would have existed from time to time under this Note but for such nonpayment, subject to a minimum interest charge of five percent (5.00%) of such defaulted payment.

      E.      Borrower shall, as required by paragraph 7, provide current financial statements to the holder of this Note. If Borrower obtains financial statements which are audited or reviewed by an independent certified public accountant for the relevant period, such financial statements provided hereunder shall be such reviewed or audited statements. Borrower authorizes Note holder to make or have made any credit inquiries Note holder feels are necessary. Borrower also authorizes the person or agencies to whom Note holder makes these inquiries to supply Note holder with the information Note holder requests.

      F.      If Lender determines at any time to sell, transfer or assign this Note, the Security Instrument and any other security instruments, and/or any or all servicing rights with respect thereto, or to grant participations therein ("Participations"), or issue, in a public offering or private placement, mortgage pass-through certificates or other securities evidencing a beneficial interest in the loan ("Securities"), Lender may forward to each prospective purchaser, transferee, assignee, servicer, participant, investor, or their respective successors in such Participations and/or Securities ("collectively, the "Investor"), any rating agency rating related to such Securities and all documents and information which Lender now has or may hereafter acquire relating to the indebtedness under this Note and to Borrower, any guarantor, any indemnitors and the Property, as Lender determines necessary or desirable. All information furnished by Borrower, any guarantor, or any indemnitor that shall be shared with any prospective Investor shall be shared on a confidential basis and, excepting information shared with the Federal Agricultural Mortgage Corporation and any of its affiliates, which Borrower hereby consents without further notice, Borrower shall receive notice thereof.

      G.      In the event Borrower defaults hereunder, or in the event any action is brought to enforce the terms of this Note or any document related thereto, or in the event of Borrower's bankruptcy, then the holder of this Note shall be entitled to recover all attorneys' fees and costs incurred as a result of such default and/or enforcing the terms of this Note and related documents.

      H.      The Borrower represents and agrees that at the time of making any and all requests for funds hereunder that none of the borrowers, guarantors and owners of the real and personal property security will be delinquent on any taxes (federal, state, or local) of any kind. This representation is material to the making of each advance.

      I.      The Borrower represents and agrees that any and all requests for funds hereunder will be used only for agricultural or other business purposes and not for personal, family, or household purposes.

      J.      The making of any false or misleading representation will constitute an Event of Default, entitling Lender to exercise remedies for default, including but not limited to acceleration of the indebtedness.

      K.      Borrower will make payments at **7755 Office Plaza Dr. North, Suite 195, West Des Moines, IA 50266** or at a different place if required by Lender.

      L.      If Borrower does not pay the full amount of each installment on the date it is due, Borrower will be in default.

      M.      If Borrower is in default under this Note for failure to pay the full amount of any installment on the date any such payment is due and if allowed by applicable law, Lender may send Borrower a written notice telling Borrower that if Borrower does not pay the overdue amount by a certain date, Lender may require Borrower to pay immediately the full amount of Principal which has not been paid and all the interest that Borrower owes on that amount.

      N.      Even if, at a time when Borrower is in default, Lender does not require Borrower to pay immediately in full as described above, Lender will still have the right to do so if Borrower is in default at a later time.

      O.      If Lender has required Borrower to pay immediately in full as described above, Lender will have the right to be paid back by Borrower for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. If allowed by applicable law those expenses include, for example, reasonable attorneys' fees.

## 9.    REVOLVING LINE OF CREDIT VARIABLE RATE PROVISIONS
    **A.**    **Payment of Principal and Interest.**
        (1)    Interest shall accrue on the unpaid balance of this Note until the Loan is repaid in full or

MULTISTATE REVOLVING LINE OF CREDIT NOTE

4

until the Borrower exercises the option to convert the variable rate to another rate as provided in subsection (9C) below.

(2)     The Initial Variable Rate (defined below) will be established at loan registration and upon the receipt of the Commitment to Purchase – AgEquity. Thereafter, the Variable Rate shall change according to the Rate Change Date at a rate equal to the sum of (i) the Current Index (defined below) and (ii) the Margin (defined below) (the "Variable Rate").

(3)     A payment of interest calculated at the Variable Rate on the outstanding principal balance represented under this Note from the date of the first advance hereunder shall be due on the First Interest Payment Date. Thereafter, consecutive semi-annual installments of interest, each in the amount required to pay the unpaid interest accruing through the applicable period, shall be due on each January 1 and July 1 at the Variable Rate until the Maturity Date (as defined below) or the Conversion Date (as defined below) as the case may be. Any remaining indebtedness, if not sooner paid, shall be due and payable on the Maturity Date (as defined below).

(4)     If Lender at any time determines, in its sole but reasonable discretion, that it has miscalculated the amount of any interest payment (whether because of a miscalculation of the Variable Rate or otherwise), then Lender shall give notice to Borrower of the corrected amount of the interest payment (and the corrected Variable Rate, if applicable) and (i) if the corrected amount of the installment payment represents an increase, then Borrower shall, within 30 calendar days thereafter, pay to Lender any sums that Borrower would have otherwise been obligated under this Note to pay to Lender had the amount of the installment payment not been miscalculated, or (ii) if the corrected amount of the installment payment represents a decrease thereof and Borrower is not otherwise in breach or default under any of the terms and provisions of this Note, the security instrument or any other Loan Document evidencing or securing this Note, then Borrower shall thereafter be paid the sums that Borrower would not have otherwise been obligated to pay to Lender had the amount of the installment payment not been miscalculated.

(5)     Borrower may make payments of principal in any amount on any business day of Lender during such time as the principal is accruing interest at the Variable Rate.

(6)     If Borrower timely exercises Borrower's option to (i) convert the interest rate on this Note to another rate and (ii) cancel the Revolving Line of Credit provisions of this Note pursuant to Section C ("Conversion Option") of this Note, the applicable interest rate under this Note, beginning on the date the conversion becomes effective and continuing until the Maturity Date, shall not be the rate determined in accordance with subsection (1) of this Section A above, but shall be the rate established in accordance with Section C "Conversion Option" below. Such rate shall be reflected in an "Agreement to Convert" substantially in the form attached as Exhibit A to this Note. If Borrower has not earlier exercised the Conversion Option, the Revolving Line of Credit Provisions will expire on **July 1, 2023** and the Conversion Option will be deemed to be exercised by selecting the loan terms indicated in subparagraph (7) below.

(7)     The following definitions shall apply to this Note:

**Current Index**: The Index that is published in The Wall Street Journal on the applicable Rate Change Date.

**Index**. Beginning with the initial Rate Change Date, the variable rate will be based on an Index. The "Index" is the *One Month "London Interbank Offered Rate" (LIBOR) as published in the Wall Street Journal* 2 business days prior to the applicable Rate Change Date. The Index percentage will be added to the Margin and then rounded to the nearest one hundreth of one percent (.01) subject to any limits. This rounded amount will be my new variable rate until the next Rate Change Date. If the Index is no longer available, the Note Holder will choose a new Index that is based on comparable information.

**Margin: 1.700%.**

**First Interest Payment Date: July 1, 2018.**

**Revolving Loan Provisions Termination Date: July 1, 2023.**

MULTISTATE REVOLVING LINE OF CREDIT NOTE

1447050917 [Doc Id 1226 M08092017]

First Principal Payment Date: January 1, 2024.

Maturity Date: July 1, 2038.

Rate Change Date:  3/01/2018 and on the 1ˢᵗ of every month thereafter

Initial Variable Rate: 3.26%

**B.**      **Prepayment.**

Prior to the Conversion Date (as defined below), Borrower may prepay all or part of the unpaid principal balance of this Note on any business day.

**C.**      **Interest Rate Conversion Option.**

**(1)  Option to Cancel Multiple Advance Provisions and Convert to Another Interest Rate.**
Borrower may exercise the Conversion Option unless Borrower is in default under this Note or the security instrument if the conditions of this subsection C(1) are met.  Borrower will be conclusively deemed to have exercised the Conversion Option upon the date of the Revolving Loan Provisions Termination Date.  The "Conversion Option" is the Borrower's option to (i) cancel and convert the interest rate specified in this Note from a variable rate with no interest rate limits to the rate calculated under Section C(2) below; and (ii) terminate and cancel the Revolving Loan provisions.

The conversion can only take place on a date a scheduled payment is due.  The date on which the Borrower converts the variable interest rate to the converted rate is called the "Conversion Date."

The Borrower's ability to exercise the Conversion Option is conditioned upon and no conversion shall be effective without: (i) the Borrower giving the Lender written notice at least 21 days prior to the Conversion Date (at 11:00 a.m. Louisville, Kentucky time) that the Borrower wants to exercise the Conversion Option; (ii) at the Conversion Date, the Borrower must not be in default under the terms of this Note or the security instrument; (iii) payment to the Lender at or prior to the Conversion Date of all of Lender's out of pocket expense of completing such Conversion while maintaining its lien priority, and (iv) the Borrower's completion and execution of any documents the Lender requires to effect the conversion.

**(2)  Calculation of Converted Rate.**  Upon request from the Borrower, the Lender shall provide a list of the loan products then offered by the Federal Agricultural Mortgage Corporation ("Farmer Mac") with a maturity date similar to the Maturity Date of this Note subject to a four week mandatory delivery commitment, including any prepayment restrictions and yield maintenance provision applicable to such products.  The description of loan products shall contain the then current rates applicable to such products, but the actual rate may be higher or lower and will be set as described in this paragraph.  The Borrower may then give written notice of the Borrower's election to convert this Note to one of those products for the remaining term of this Note to the Maturity Date by selecting one of the listed products and requesting conversion of this Note to the selected product.  The interest rate in effect for this Note after Conversion ("Converted Rate") will be an interest rate equal to the Farmer Mac required net yield for the selected loan product with a maturity similar to the Maturity Date of this Note subject to a four week mandatory delivery commitment, plus **1.700%** basis points (the "Modification Note Rate"), subject to any yield maintenance provision applicable to such product.  The converted rate in effect as of the Conversion Date will be equal to the rate calculated in the immediately preceding sentence as of 11:00 a.m. Louisville, Kentucky time, on the later of (a) the date which is four weeks prior to the Conversion Date and (b) the day lender receives Borrower's election to convert this Note.  If this required net yield is not available, the Lender will determine the Converted Rate by using comparable information.

If Borrower elects to convert this Note, or is required to convert this Note by the terms hereof, but does not select a particular product from the list of available products by the date specified in the list of products, the product designated by Lender as the Default Product on the list of available products will be deemed to have been selected by Borrower.

MULTISTATE REVOLVING LINE OF CREDIT NOTE

1447050917 [Doc Id 1226 M08092017]

(3) **Calculation of New Payment.**  Upon the Borrower's exercise of the Conversion Option, the Lender will determine the amount and payment schedule of the installments, which will be calculated to repay the unpaid principal (net of any principal payment due on the Conversion Date) in full over the period from the Conversion Date to the Final Amortization Date at the new interest rate in substantially equal payments applied first to interest and then to principal. Any remaining indebtedness, if not sooner paid, shall be due and payable on the Maturity Date.

**10.      LENDER ADVANCES**

Lender may make advances under the mortgage or deed of trust, security agreement or other instrument providing security for this Note, to protect the Lender's interest in any mortgage or deed of trust, security agreement or other instrument providing security for this Note from loss of value or damage. Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate stated in Section 8(D) of this Note shall become an obligation due and owing under the terms of this Note immediately upon the date advanced by Lender and is an obligation of Borrower secured by the mortgage or deed of trust, security agreement or other instrument providing security for this Note.

**11.      GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to Borrower under this Note will be given by delivering it or by mailing it by first class mail to Borrower at the Property Address above or at a different address if Borrower gives Lender a notice of Borrower's different address.

Any notice that must be given to Lender under this Note will be given by delivering it or by mailing it by first class mail to Lender at the address stated in Section 8(K) above or at a different address if Borrower is given a notice of that different address.

**12.      OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. Lender may enforce its rights under this Note against each person individually or against all of those persons together. This means that any one of the persons signing this Note may be required to pay all of the amounts owed under this Note.

**13.      WAIVERS**

Borrower and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require Lender to demand payment of amounts due. "Notice of Dishonor" means the right to require Lender to give notice to other persons that amounts due have not been paid.

**14.      UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Lender under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Lender from possible losses which might result if Borrower does not keep the promises which Borrower makes in this Note. That Security Instrument describes how and under what conditions Borrower may be required to make immediate payment in full of all amounts Borrower owes under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

---

**MULTISTATE REVOLVING LINE OF CREDIT NOTE**

1447050917 [Doc Id 1226 M08092017]

NOTICE IS HEREBY GIVEN TO MAKER THAT ORAL AGREEMENTS OR ORAL COMMITMENTS TO LEND MONEY, EXTEND CREDIT, MODIFY LOAN TERMS OR FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER CALIFORNIA LAW.

C&A Farms, LLC, a California limited liability company

By: _____

Whitesbridge Farms LLC, a California limited liability company

By: _____

*[Sign Originals Only]*

PAY TO THE ORDER OF
U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs
WITHOUT RECOURSE

Conterra Agricultural Capital, LLC

Signature

**Paul Erickson, President**

MULTISTATE REVOLVING LINE OF CREDIT NOTE

8

# EXHIBIT A TO NOTE
# FORM OF AGREEMENT TO CONVERT
### [To be Completed at Exercise of Conversion Option]

This Agreement is made this _____ day of _____, _____ by and between **Conterra Agricultural Capital, LLC** (the "Lender") and **C&A Farms, LLC and Whitesbridge Farms LLC** (the "Borrower") and modifies and amends certain terms of Borrower's indebtedness evidenced by a Promissory Note (the "Note") to Lender dated **December 29, 2017**, which is secured by a mortgage, deed of trust or security deed or similar instrument (the "Security Instrument") of the same date and covering the property described in the Security Instrument (the "Property") and located at:

### 350.37 Acres Devoted to an Almond Orchard, Fresno County, California
### [Property Address]

In consideration of Borrower's exercise of Borrower's option to convert Borrower's variable interest rate revolving line of credit Loan to another interest rate loan without revolving line of credit provisions pursuant to the provisions of the Note and to the Security Instrument, the Note is hereby modified and amended as follows:

I     Sections 9A and 9C of the "Revolving Line of Credit Variable Rate Provisions" of the Note are deleted in full and the following is inserted in its place:

[Insert interest rate provisions of the applicable loan product.]

II    Section 9B is changed to read:

2.    Prepayment.

[Select and insert the appropriate provision associated with the applicable loan product]

In addition to the modifications to the Note stated above, Borrower understands that, upon Borrower's signing of this Agreement, Lender will have the option to require immediate payment in full of all sums secured by the Security Instrument if all or any part of the Property or any interest in it is sold or transferred without Lender's prior written consent, as provided in the Security Instrument.

Except as stated in this Agreement, Borrower's promise to pay and the covenants and agreements under the Note and under the Security Instrument continue without change.

### *[remainder intentionally left blank – signature page follows]*

---

**MULTISTATE REVOLVING LINE OF CREDIT NOTE**

1447050917 [Doc Id 1226 M08092017]

IN WITNESS WHEREOF, Borrower and Lender have executed this Agreement.

**C&A Farms, LLC, a California limited liability company**

By: _____

**Whitesbridge Farms LLC, a California limited liability company**

By: _____

*[Sign Originals Only]*

PAY TO THE ORDER OF

**U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs**

WITHOUT RECOURSE

**Conterra Agricultural Capital, LLC**

Signature _____

**Paul Erickson, President**

---

**MULTISTATE REVOLVING LINE OF CREDIT NOTE**

2

1447050917 [Doc Id 1226 M08092017]

## EXHIBIT A TO NOTE
## FORM OF AGREEMENT TO CONVERT

Loan <sup>REDACTED</sup>1728

This Agreement to Convert (this "Agreement") is made this 27 day of June , 2018, by and between **Conterra Agricultural Capital, LLC, an Iowa limited liability** (the "Lender") and **C & A Farms, LLC, a California limited liability company and Whitesbridge Farms, LLC, a California limited liability company** ( C & A Farms, LLC and Whitesbridge Farms, LLC are collectively referred to herein as, the "Borrower") and modifies and amends certain terms of Borrower's indebtedness evidenced by a Promissory Note (the "Note") to Lender dated **January 8, 2018,** which is secured by a mortgage, deed of trust or security deed or similar instrument (the "Security Instrument") of the same date and covering the property described in the Security Instrument (the "Property") and located at:

### 350.37 Acres Devoted to an Almond Orchard,
### Fresno County, CA

In consideration of Borrower's exercise of Borrower's option to convert Borrower's variable interest rate revolving line of credit Loan to another interest rate loan without revolving line of credit provisions, pursuant to the provisions of the Note and to the Security Instrument, the Note is hereby modified and amended as follows:

I. Section 9 "Revolving Line of Credit Variable Rate Provisions" is deleted in full and the following is inserted in its place:

9. INTEREST
Prior to default, interest will be charged on unpaid principal until the full amount of Principal has been paid. Borrower will pay interest at a yearly rate of 4.59% effective June 1, 2018.

| | |
|---|---|
| ADJUSTMENT DATE | July 1, 2025 |
| REMAINING AMORTIZATION TERM | 20 years |
| ADJUSTMENT FREQUENCY PERIOD | 7 years |

ADJUSTABLE RATE PROVISION. The interest rate stated in this Note is subject to adjustment by the Lender or any subsequent holder of this Note on the Initial Adjustment Date and on subsequent dates established by the Adjustment Frequency Period thereafter. Any such change in the interest rate shall be made automatically, but in no event shall the adjusted interest rate exceed the maximum interest rate then permitted by law. When the rate is adjusted the remaining current principal balance of the Note will be reamortized over the remaining amortization term to determine subsequent payment amounts. Lender reserves the right to not adjust the loan in the event of default. Notice of the adjusted rate and the new amortized payment will be sent to the Borrower after each interest rate adjustment and at least 30 days prior to a payment change caused by an interest rate adjustment.

The variable interest rate shall change to a rate that shall be based upon the 1 month Libor then in effect on the Initial Adjustment Date or any subsequent Adjustment Date, unless Borrower specifically requests a different rate product then being offered by the Federal Agricultural Mortgage Corporation at least 60 days prior to the Initial Adjustment Date or any subsequent Adjustment Date.

A.    Scheduled Payments

Semi-annual principal and interest payments of $57,709.87 each, beginning 7/1/2018, and a final payment due on July 1, 2038 which is called the "Maturity Date".

If Lender at any time determines, in its sole but reasonable discretion, that it has miscalculated the amount of any installment payment (whether because of a miscalculation of the Adjustable Rate or otherwise), then Lender shall give notice to Borrower of the corrected amount of the installment payment (and the corrected Adjustable Rate, if applicable), and (i) if the corrected amount of the installment payment represents an increase, then Borrower shall, within 30 calendar days thereafter, pay to Lender any sums that Borrower would have otherwise been obligated under this Note to pay to Lender had the amount of the installment payment not been miscalculated, or (ii) if the corrected amount of the installment payment represents a decrease thereof and Borrower is not otherwise in breach or default under any of the terms and provisions of this Note, the Security Instrument or any other loan documents evidencing or securing this Note, then Borrower shall thereafter be paid the sums that Borrower would not have otherwise been obligated to pay to Lender had the amount of the installment payment not been miscalculated.

B.    Prepayment

Any prepayments of scheduled installments that are made on a date that is not an installment payment date must be accompanied by interest to the next installment payment date and that such prepayment will not be credited to the Borrower's account until such installment payment date.

Any prepayments, partial or in whole, other than scheduled installment payments must be accompanied by unpaid interest accrued on such principal amount from the date to which interest was last paid to the next installment payment date, and such prepayment shall not be considered as having been received and will not be credited to the Borrower's account until such installment payment date.  If the Borrower makes a prepayment there will be no delays in the due dates of Borrower's installment payments unless the Lender agrees in writing to those delays and that unless the Borrower and Lender agree otherwise, the Lender at its sole discretion may reamortize the Note on the basis of the new principal balance; otherwise the making of a prepayment will operate only to discharge the Note at an earlier date.

In addition to the modifications to the Note stated in this Agreement, Borrower understands that, upon Borrower's signing of this Agreement, Lender will have the option to require immediate payment in full of all sums secured by the Security Instrument if all or any part of the Property or any interest in it is sold or transferred without Lender's prior written consent, as provided in the Security Instrument.

Except as stated in this Agreement, Borrower's promise to pay, the terms, and the covenants and agreements under the Note and under the Security Instrument continue without change.

IN WITNESS WHEREOF, Borrower and Lender have executed this Agreement.

**C&A Farms, LLC, a California limited liability company**

By: Farid Assemi

Its: Manager

**Whitesbridge Farms, LLC, a California liability company**

By: Kevin Assemi

Its: Manager

PAY TO THE ORDER OF

**U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs**

WITHOUT RECOURSE

**Conterra Agricultural Capital, LLC**

**Paul Erickson, President**

# Allonge to Promissory Note

Loan [REDACTED]1728

For purposes of further endorsement of the following described Note, this Allonge is affixed and becomes a permanent part of said Note:

Note Date: **January 8, 2018**

Original Amount: **$1,500,000.00**

Borrower Name(s):**C&A Farms, LLC and Whitesbridge Farms, LLC**

Property Address: **350.37 Acres Devoted to an Almond Orchard, Fresno County, California**

PAY TO THE ORDER OF

**U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs**

WITHOUT RECOURSE

Conterra Agricultural Capital, LLC

Signature
**Paul Erickson, President**

---

Allonge to Promissory Note

1157040118 [Doc Id 7008 M05192014]

# ADJUSTABLE RATE RIDER

RE: REDACTED 1728

THIS ADJUSTABLE RATE RIDER is made this *2nd* day of *February*, 20*23* and is incorporated into and shall be deemed to amend and supplement the amended and restated Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's adjustable rate Note (the "Note") to **U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs** (the "Lender") dated January 8, 2018 and covering the property described in the Security Instrument and located at:

<div align="center">

**350.37 Acres Devoted to an Almond Orchard**
**Fresno County, CA**
[Property Address]

</div>

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE PERIODIC PAYMENT**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

The Note has the following terms which provide for changes in the interest rate and periodic payments, as follows:

2.    **INTEREST**
      Prior to default, interest will be charged on unpaid principal until the full amount of Principal has been paid. Borrower will pay interest at a yearly rate of 4.59%. The interest rate Borrower will pay will change in accordance with this Section 2.

   **INITIAL ADJUSTMENT DATE.**    **July 1, 2025**

   **ORIGINAL AMORTIZATION TERM.   20 years.**

   **ADJUSTMENT FREQUENCY PERIOD. 7 years**

   **ADJUSTABLE RATE PROVISION.** The interest rate stated in this Note is subject to adjustment

---

**MULTISTATE ADJUSTABLE RATE RIDER--Farmer Mac UNIFORM INSTRUMENT**                                    **Form 6005r**

<div align="center">

1

</div>

©PeirsonPatterson, LLP.-Arlington, Texas  2016
1221050417 [Doc Id 9642 M11142012]

by the Lender or any subsequent holder of this Note on the Initial Adjustment Date and on subsequent dates established by the Adjustment Frequency Period thereafter. Any such change in the interest rate shall be made automatically but in no event shall the adjusted interest rate exceed the maximum interest rate then permitted by law. When the rate is adjusted the remaining current principal balance of the Note will be reamortized over the remaining amortization term to determine subsequent payment amounts. Lender reserves the right to not adjust the loan in the event of default. Notice of the adjusted rate and the new amortized payment will be sent to the Borrower after each interest rate adjustment and at least 30 days prior to a payment change caused by an interest rate adjustment.

The variable interest rate shall change to a rate that shall be based upon the 1 month Libor then in effect on the Initial Adjustment Date or any subsequent Adjustment Date, unless Borrower specifically requests a different rate produce then being offered by the Federal Agricultural Mortgage Corporation at least 60 days prior to the Initial Adjustment Date or any subsequent Adjustment Date.

3.    **SCHEDULED PAYMENTS (A)**    **Time and Amount of Payments**

**Semi-annual principal and interest payments of $57,709.387 each, beginning 7/1/2018 and the final payment of due on July 1, 2038, which is called the "Maturity Date."**
**(B) Place of Payments**
**Borrower will make payments at 5465 Mills Civic Parkway, Suite 201 West Des Moines, IA 50266 or at a different place if required by Lender.**

If Lender at any time determines, in its sole but reasonable discretion, that it has miscalculated the amount of any installment payment (whether because of a miscalculation of the Adjustable Rate or otherwise), then Lender shall give notice to Borrower of the corrected amount of the installment payment (and the corrected Adjustable Rate, if applicable), and (i) if the corrected amount of the installment payment represents an increase, then Borrower shall, within 30 calendar days thereafter, pay to Lender any sums that Borrower would have otherwise been obligated under this Note to pay to Lender had the amount of the installment payment not been miscalculated, or (ii) if the corrected amount of the installment payment represents a decrease thereof and Borrower is not otherwise in breach or default under any of the terms and provisions of this Note, the Security Instrument or any other loan documents evidencing or securing this Note, then Borrower shall thereafter be paid the sums that Borrower would not have otherwise been obligated to pay to Lender had the amount of the installment payment not been miscalculated.

**4. Prepayment**

Any prepayments of scheduled installments that are made on a date that is not an installment payment date must be accompanied by interest to the next installment payment date and that such prepayment will not be credited to the Borrower's account until such installment payment date.

Any prepayments, partial or in whole, other than scheduled installment payments must be accompanied by unpaid interest accrued on such principal amount from the date to which interest was last paid to the next installment payment date, and such prepayment shall not be considered as having been received and will not be credited to the Borrower's account until such installment payment date. If the Borrower makes a prepayment there will be no delays in the due dates of Borrower's installment payments unless the Lender agrees in writing to those delays and that unless the Borrower and Lender agree otherwise, the Lender at its sole discretion may reamortize the Note on the basis of the new principal balance; otherwise the making of a prepayment will operate only to discharge the Note at an earlier date.

In addition to the modifications to the Note stated in this Agreement, Borrower understands that, upon Borrower's signing of this Agreement, Lender will have the option to require immediate payment in full of all sums secured by the Security Instrument if all or any part of the Property or any interest in it is sold or transferred without Lender's prior written consent, as provided in the Security Instrument.

Except as stated in this Agreement, Borrower's promise to pay, the terms, and the covenants and agreements under the Note and under the Security Instrument continue without change.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

*[Sign Originals Only]*

C&A Farms, LLC, a California limited liability company

By: _Fario Assemi_

# CROSS COLLATERALIZATION RIDER

RE: <sup>REDACTED</sup> 1728

THIS CROSS COLLATERALIZATION RIDER is made this *February 2*, 2023, and is incorporated into and shall be deemed to amend and supplement the amended and restated Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date, given by the undersigned Borrowers and Grantors to secure a Note to **U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs** (the "Lender") dated January 8, 2018 and covering the Property described in the Security Instrument and located at:

**350.37 Acres Devoted to an Almond Orchard**
**Fresno County, CA**
[Property Address]

In addition to the covenants and agreements made in the Security Instrument, Borrower Parties further covenant and agree that on the date hereof the following other loans have been sold to Federal Agricultural Mortgage Corporation:

| Borrowers/Co-Signers' Names | Date | Loan Amount/Loan No. |
|---|---|---|
| Copper Avenue Investments, LLC, ACAP Farms, LLC, Gradon Farms, LLC, Lincoln Grantor Farms, LLC, Maricopa Orchards, LLC & Cantua Orchards, LLC | 10/11/2019 | 10,258,632.0<sup>REDACTED</sup> 1674 |
| Copper Avenue Investments, LLC, ACAP Farms, LLC, Gradon Farms, LLC, Lincoln Grantor Farms, LLC, Maricopa Orchards, LLC & Cantua Orchards, LLC | 10/11/2019 | $5,297,232.00 <sup>REDACTE</sup> 1673 |
| C&A Farms, LLC & Whitebridge Farms, LLC | 01/08/2018 | $5,500,000.00/<sup>REDACT</sup> 1725 |
| Assemi Brothers, LLC; C&A Farms, LLC, Whitebridge Farms, LLC, Maricopa Orchards, LLC & Willow Avenue Investments, LLC | 12/14/2020 | $12,500,000.00<sup>REDACTE</sup>2676 |
| Assemi Brothers, LLC; C&A Farms, LLC, Whitebridge Farms, LLC, Maricopa Orchards, LLC & Willow Avenue Investments, LLC | 12/14/2020 | $12,500,000.00<sup>REDACTE</sup>2678 |

Farmer Mac Cross-Collateralization Rider

1

©PeirsonPatterson, LLP.–Arlington, Texas  2016
1537050917 [Doc Id 2448 M01222014]

| | | |
|---|---|---|
| **C & A Farms, LLC, Willow Avenue Investments, LLC, Gradon Farms, LLC, Cantua Orchards, LLC, Copper Avenue Investments, LLC, Lincoln Grantor Farms, LLC, ACAP Farms, LLC and Maricopa Orchards, LLC** | 02/2/2023 | $7,400,000.00/REDACTE1004 |

each of which is evidenced by a separate promissory note (the "Other Notes"), and each of which is secured by a separate mortgage, deed of trust, or security deed (the "Other Security Instruments"). It is agreed that in addition to Borrower's Note, this Security Instrument secures the obligations, debts, and liabilities evidenced by the Other Notes and Other Security Instruments referenced herein, plus interest thereon, which is payable by Grantor to Lender and/or Federal Agricultural Mortgage Corporation.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Cross Collateralization Rider.

**C & A Farms, LLC, a California limited liability company**

_____

**Farid Assemi, General Manager**

**Whitesbridge Farms, LLC, a California limited liability company**

_____

**Neema Assemi, General Manager**

*[Sign Originals Only]*

# CROSS DEFAULT RIDER

RE: REDACTED 728

THIS CROSS DEFAULT RIDER is made this *February 2*, **2023,** and is incorporated into and shall be deemed to amend and supplement the amended and restated Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date, given by the undersigned Borrowers and Grantors to secure a Note to **U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs** (the "Lender") dated January 8, 2018 and covering the Property described in the Security Instrument and located at:

**350.37 Acres Devoted to an Almond Orchard**
**Fresno County, CA**
[Property Address]

In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree that on the date hereof the following other loans have been sold to Federal Agricultural Mortgage Corporation:

| Borrowers/Co-Signers' Names | Date | Loan Amount/Loan No. |
|---|---|---|
| **Copper Avenue Investments, LLC, ACAP Farms, LLC, Gradon Farms, LLC, Lincoln Grantor Farms, LLC, Maricopa Orchards, LLC & Cantua Orchards, LLC** | **10/11/2019** | **$10,258,632.00**/REDACTED**1674** |
| **Copper Avenue Investments, LLC, ACAP Farms, LLC, Gradon Farms, LLC, Lincoln Grantor Farms, LLC, Maricopa Orchards, LLC & Cantua Orchards, LLC** | **10/11/2019** | **$5,297,232.00**/REDACTED**1673** |
| **C&A Farms, LLC & Whitebridge Farms, LLC** | **01/08/2018** | **$5,500,000.00**/REDACTED**1725** |
| **Assemi Brothers, LLC; C&A Farms, LLC, Whitebridge Farms, LLC, Maricopa Orchards, LLC & Willow Avenue Investments, LLC** | **12/14/2020** | **$12,500,000.00**REDACTED**2676** |
| **Assemi Brothers, LLC; C&A Farms, LLC, Whitebridge Farms, LLC, Maricopa Orchards, LLC & Willow Avenue Investments, LLC** | **12/14/2020** | **$12,500,000.00**/REDACTED**2678** |

**C & A Farms, LLC, Willow Avenue Investments,**    02/2/2023      **$7,400,000.00/**REDACTED**004**
**LLC, Gradon Farms, LLC, Cantua Orchards,**
**LLC, Copper Avenue Investments, LLC, Lincoln**
**Grantor Farms, LLC, ACAP Farms, LLC and**
**Maricopa Orchards, LLC**

each of which is evidenced by a separate promissory note (the "Other Notes"), and each of which is secured by a separate mortgage, deed of trust, or security deed (the "Other Security Instruments"). It is agreed that any default under this Security Instrument or this Note shall be deemed a default under the Other Notes and Other Security Instruments; and any default under any or all of the Other Notes or Other Security Instruments shall be deemed to be a default under this Note and this Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Cross Default Rider.

**C&A Farms, LLC, a California limited liability**
**company**

_____

**Farid Assemi, General Manager**
_____

**Whitesbridge Farms, LLC,**
**a California limited liability company**

_____

**Neema Assemi, General Manager**

*[Sign Originals Only]*

©PeirsonPatterson, LLP.-Arlington, Texas  2016
1538050917 [Doc Id 2424 M01142014]

Exhibit D

# NOTE

| | | |
|---|---|---|
| **October 11, 2019** | **Fresno,** | Loan i <sup>REDACTED</sup> 1673 |
| [Date] | [City] | CA |
| | | [State] |

**1,110 +/- Acres**
**Kings County and Fresno County, California**
[Property Address]

**1.      BORROWER'S PROMISE TO PAY**

In return for a loan that **Maricopa Orchards, LLC**, a California limited liability company, **Copper Avenue Investments, LLC**, a California limited liability company, **Ashlan & Hayes Investments, LLC**, a California limited liability company, and **ACAP Holdings, LLC**, a California limited liability company (collectively, the "Borrowers"), has received, Borrowers promise to pay U.S. **$5,297,232.00** (this amount is called "Principal"), plus interest, to the order of the Lender.  The Lender is **Conterra Agricultural Capital, LLC**. Borrowers will make all payments under this Note in the form of cash, check or money order.

Borrowers understand that the Lender may transfer this Note.  The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is also called the "Lender", "Note holder" or "holder of the Note".

**2.      LINE OF CREDIT**

Prior to the expiration of the Draw Period ("Draw Period") as calculated in accordance with this Section 2, this Promissory Note ("Note") evidences a revolving line of credit loan ("Loan") under which advances may from time to time be extended to Borrowers.  Advances shall be in the minimum amount of $2,500 and shall be in amounts which are multiples of $100.  Upon receipt of a verified funds request by Borrowers to a telephone number provided from time to time by Lender, **or by such other funds request method as the Lender may establish,** and provided all conditions for an advance have been met, Lender shall promptly deliver the requested funds directly to Borrowers' account at Borrowers' bank ("Bank Account") as designated in the original Loan application or by separate written notice on forms to be provided by Lender.  In most cases, if a valid funds request is received by Lender at its designated telephone number at or before 12:00 noon (all times in this Note refer to the time in Louisville, Kentucky (Eastern Standard Time EST), the requested funds will be delivered on the business day following receipt of the funds request (e.g., if the funds request is received at 11:00 a.m. on Monday, the funds will usually be delivered on Tuesday; if the funds request is received at 2:00 p.m. on Tuesday, the funds will usually be delivered on Thursday).  A valid funds request shall be verified by one or more of the persons obligated to pay this Note on behalf of all persons obligated to pay this Note in a manner to be designated by the Lender.  A valid designation of the Bank Account to which funds are to be advanced shall be signed by one or more of the persons obligated to pay this Note on behalf of all persons obligated to pay this Note.  Lender shall be entitled to rely on the statements in any (i) verified funds request and/or (ii) signed designation of Bank Account, to the effect that the person who signed such instrument was fully authorized to do so by all of the persons obligated to pay this Note and all persons who are obligated to pay this Note hereby release any and all claims against Lender based on Lender's reliance on such statements.

Advances may be made without payment of a transaction fee.

The Draw Period referenced above shall terminate and expire upon the earlier of the date set forth in Section 9(A)(7) or at such date as determined by the Lender, in its sole discretion.

**3.      REVOLVING FEATURE**

During the Draw Period, Borrowers may borrow, repay and reborrow under this Note at any time, up to the principal amount of this Note, subject to the terms and conditions of this Note (the "Revolving Loan provisions"), so long as no Event of Default exists under this Note or any other documents executed in connection with this Loan (collectively, the "Loan Documents").  The unpaid principal balance owing on this Note at any time during the Draw Period will be evidenced by Lender's internal records and the amount advanced and outstanding may not exceed at

MULTISTATE REVOLVING LINE OF CREDIT NOTE

any one time the face amount of this Note. Lender shall not be obligated to make any advance to Borrowers following occurrence of an Event of Default.

4.      **PAYMENTS**
        A. During the Draw Period
        During the Draw Period, Borrowers will be billed in arrears twice a year for interest accrued. Notwithstanding any provision in this Note to the contrary, during the Draw Period Borrowers may make, free of penalty or minimum interest charge, any number of principal payments on any business day. Required interest payments may be made from a funds advance, provided the verified funds request for such advance specifies such a purpose in whole or in part for the requested funds. In addition, the periodic payment will include any late charges and other charges authorized by this Note, including, without limitation, any expenses or advances incurred by Lender under the security instrument.
        Notwithstanding the foregoing, all amounts other than interest accruing over the period from the last date through which interest was last billed due under the terms of this Note, including but not limited to principal and all other interest, shall be due and payable in full upon the earlier of Lender's billing or the Maturity Date. Interest accruing over the period from the last date through which interest was billed until the later of (a) the actual date of payment of all other amounts or (b) the Maturity Date shall be billed promptly after all such other amounts have been received by Lender.

        B. After the Draw Period
        Unless Borrowers have exercised Borrowers' conversion option set forth in Section 9(C) of this Note, the day after the Draw Period ends the repayment period ("Repayment Period") begins. Borrowers must then repay the unpaid and outstanding loan account balance in the manner described in this Section. Borrowers must repay this amount in substantially equal periodic installments with interest at the then-current annual interest rate, as set forth in Section 9(A)(1) of this Note. The periodic payment will be an amount that would be sufficient to repay the unpaid and outstanding loan account balance in full by the Maturity Date indicated in Section 9(A)(7) of this Note. The amount of the periodic payment may change as a result of changes in the Current Index indicated in Section 9(A)(7) of this Note. In addition, the periodic payment will include any late charges and other charges authorized by this Note, including, without limitation, any expenses or advances incurred by Lender under the security instrument.

        C. Prepayments after the Draw Period
        Any prepayments of scheduled installments that are made on a date that is not an installment payment date must be accompanied by interest to the next installment payment date and that such prepayment will not be credited to the Borrowers' account until such installment payment date.

        Any prepayments, partial or in whole, other than scheduled installment payments must be accompanied by unpaid interest accrued on such principal amount from the date to which interest was last paid to the next installment payment date, and such prepayment shall not be considered as having been received and will not be credited to the Borrowers' account until such installment payment date. If the Borrowers make a prepayment there will be no delays in the due dates of Borrowers' installment payments unless the Lender agrees in writing to those delays and that unless the Borrowers and Lender agree otherwise, the Lender at its sole discretion may reamortize the Note on the basis of the new principal balance; otherwise the making of a prepayment will operate only to discharge the Note at an earlier date.

5.      **APPLICATION OF PAYMENTS**
        A.      During the Draw Period
        Notwithstanding any provision in this Note to the contrary, all payments during the Draw Period, other than a regularly scheduled payment of interest, will be applied first to:

                (1)     Principal; and then to

<hr>

**MULTISTATE REVOLVING LINE OF CREDIT NOTE**

(2)    All other amounts owed other than late changes; and then to
(3)    Late charges; and then to
(4)    Accrued interest

B.    After the Draw Period
All payments received after termination of the Draw Period will be applied first to:
(1)    collection expenses and protective advances, if any; and then to
(2)    Interest due; and then to
(3)    Principal; and then to
(4)    Late charges

The term "late charges" is intended to include both flat fees associated with late payments, if any.

**6.    EARLY TERMINATION**
So long as no Event of Default exists under this Note, during the Draw Period, Borrowers may terminate the revolving line of credit Loan represented by this Note by (i) providing written notice to Lender of the intent to do so, (ii) paying the outstanding principal balance in full and by (iii) agreeing to pay accrued but unbilled interest promptly upon being billed. Borrowers will be billed for the amount of accrued interest and all other amounts owed (if any) other than interest within fifteen (15) days after the later of Lender's receipt of the notice terminating the Loan and the payment in full of the principal. The recorded Loan Documents including the Security Instrument will then be released of record upon receipt of the final payment of all amounts owed under this Note. Amounts that might be owed other than interest include, but are not limited to, late charges, standby fees, taxes and other amounts advanced by Lender and attorney fees. So long as no Event of Default exists or is continuing under this Note, the Loan will not terminate simply because the outstanding principal balance may be zero at any given time. Notwithstanding any provision in this Note to the contrary, no prepayment penalty or minimum interest charge shall be due in the event of early termination as provided in this Section 6.

**7.    PROTECTIVE COVENANTS**
Borrowers agree to provide Lender with updated financial statements and other requested financial reports, including tax returns on or before May 31st of each year.

**8.    GENERAL PROVISIONS**
A.    Notwithstanding any provision of this Note to the contrary, any choice of law provision includes applicable Federal law and such provision is not intended to prevent the application of Federal law. In addition to any other statutory authority listed in this Note, the terms of this Note and the interest rate and fees set forth herein are authorized by Title 12 of the United States Code, section 2279aa-12 as amended from time to time.
B.    Notwithstanding any provision of this Note to the contrary, interest will be calculated in any reasonable manner determined solely by the holder of this Note based on an assumed 30 day month, and a 360-day year.
C    Notwithstanding any provision of this Note to the contrary, the whole of the principal sum and any accrued interest and any other sums advanced to protect and/or enforce the Note holder's interest in this Note and the Security Instrument (including reasonable costs of recovery and attorney's fees and expenses) shall bear interest from and after maturity, whether or not resulting from acceleration, at a rate equal to eighteen percent (18.00%) per annum, subject to a minimum interest charge of five percent (5.00%) of such defaulted payment.
D.    During the Draw Period, notwithstanding any provision of this Note to the contrary, in the event any scheduled payment of principal or interest shall not be received by the fifteenth day of the month in which it is due and payable, interest shall be payable on such defaulted payment at a rate which is equal to eighteen percent (18.00%) per annum, subject to a minimum interest charge of five percent (5.00%) of such defaulted payment.
After the Draw Period, notwithstanding any provision of this Note to the contrary, in the event any scheduled payment of principal or interest shall not be received by the tenth day of the month in which it is due and

**MULTISTATE REVOLVING LINE OF CREDIT NOTE**

payable, interest shall be payable on such defaulted payment at a rate which is equal to eighteen percent (18.00%) per annum, subject to a minimum interest charge of five percent (5.00%) of such defaulted payment.

E.     Borrowers shall, as required by Section 7, provide current financial statements to the holder of this Note. If Borrowers obtain financial statements which are audited or reviewed by an independent certified public accountant for the relevant period, such financial statements provided hereunder shall be such reviewed or audited statements. Borrowers authorize Note holder to make or have made any credit inquiries Note holder feels are necessary. Borrowers also authorize the person or agencies to whom Note holder makes these inquiries to supply Note holder with the information Note holder requests.

F.     If Lender determines at any time to sell, transfer or assign this Note, the Security Instrument and any other security instruments, and/or any or all servicing rights with respect thereto, or to grant participations therein ("Participations"), or issue, in a public offering or private placement, mortgage pass-through certificates or other securities evidencing a beneficial interest in the loan ("Securities"), Lender may forward to each prospective purchaser, transferee, assignee, servicer, participant, investor, or their respective successors in such Participations and/or Securities ("collectively, the "Investor"), any rating agency rating related to such Securities and all documents and information which Lender now has or may hereafter acquire relating to the indebtedness under this Note and to Borrowers, any guarantor, any indemnitors and the Property, as Lender determines necessary or desirable. All information furnished by Borrowers, any guarantor, or any indemnitor that shall be shared with any prospective Investor shall be shared on a confidential basis and, excepting information shared with the Federal Agricultural Mortgage Corporation and any of its affiliates, which Borrowers hereby consent without further notice, Borrowers shall receive notice thereof.

G.     Upon the occurrence of any Event of Default under the Note, or in the event any action is brought to enforce the terms of this Note or any document related thereto, or in the event of the bankruptcy of any of the Borrowers, then the holder of this Note shall be entitled to recover all attorneys' fees and costs incurred as a result of such Event of Default and/or enforcing the terms of this Note and related documents.

H.     The Borrowers represent and agree that at the time of making any and all requests for funds hereunder that none of the Borrowers, guarantors and owners of the real and personal property security will be delinquent on any taxes (federal, state, or local) of any kind. This representation is material to the making of each advance.

I.     The Borrowers represent and agree that any and all requests for funds hereunder will be used only for agricultural or other business purposes and not for personal, family, or household purposes.

J.     The making of any false or misleading representation will constitute an Event of Default, entitling Lender to exercise remedies for default, including but not limited to acceleration of the indebtedness.

K.     Borrowers will make payments at **7755 Office Plaza Dr. North, Suite 195, West Des Moines, IA 50266** or at a different place if required by Lender.

L.     If Borrowers do not pay the full amount of each installment on the date it is due, Borrowers will be in default.

M.     Upon the occurrence and during the continuance of any Event of Default under this Note, and if allowed by applicable law, Lender may send Borrowers a written notice telling Borrowers that if Borrowers do not pay the overdue amount by a certain date Lender may require Borrowers to pay immediately the full amount of Principal which has not been paid and all the interest and any applicable fees and costs that Borrowers owe on that amount.

N.     Even if after and during the continuance of any Event of Default under this Note, Lender does not require Borrowers to pay immediately in full as described above, Lender will still have the right to do so if an Event of Default occurs or is continuing at any later time.

O.     Upon the occurrence of any default under this Note or if Lender has required Borrowers to pay immediately in full as described above, Lender will have the right to be paid back by Borrowers for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. If allowed by applicable law those expenses include, for example, reasonable attorneys' fees.

MULTISTATE REVOLVING LINE OF CREDIT NOTE

4

9. **REVOLVING LINE OF CREDIT VARIABLE RATE PROVISIONS**
   A. **Payment of Principal and Interest.**
      (1)      So long as no Event of Default exists under this Note, interest shall accrue on the unpaid balance of this Note until the Loan is repaid in full or until the Borrowers exercise the option to convert the variable rate to another rate as provided in subsection (9C) below.
      (2)      The Initial Variable Rate (defined below) will be established at loan registration and upon the receipt of the Commitment to Purchase – AgEquity. Thereafter, the Variable Rate shall change according to the Rate Change Date at a rate equal to the sum of (i) the Current Index (defined below) and (ii) the Margin (defined below) (the "Variable Rate").
      (3)      A payment of interest calculated at the Variable Rate on the outstanding principal balance represented under this Note from the date of the first advance hereunder shall be due on the First Interest Payment Date. Thereafter, consecutive semi-annual installments of interest, each in the amount required to pay the unpaid interest accruing through the applicable period, shall be due on each January 1 and July 1 at the Variable Rate until the Maturity Date (as defined below) or the Conversion Date (as defined below) as the case may be. Any remaining indebtedness, if not sooner paid, shall be due and payable on the Maturity Date (as defined below).
      (4)      If Lender at any time determines, in its sole but reasonable discretion, that it has miscalculated the amount of any interest payment (whether because of a miscalculation of the Variable Rate or otherwise), then Lender shall give notice to Borrowers of the corrected amount of the interest payment (and the corrected Variable Rate, if applicable) and (i) if the corrected amount of the installment payment represents an increase, then Borrowers shall, within 30 calendar days thereafter, pay to Lender any sums that Borrowers would have otherwise been obligated under this Note to pay to Lender had the amount of the installment payment not been miscalculated, or (ii) if the corrected amount of the installment payment represents a decrease thereof and Borrowers are not otherwise in breach or default under any of the terms and provisions of this Note, the security instrument or any other Loan Document evidencing or securing this Note, then Borrowers shall thereafter be paid the sums that Borrowers would not have otherwise been obligated to pay to Lender had the amount of the installment payment not been miscalculated.
      (5)      Borrowers may make payments of principal in any amount on any business day of Lender during such time as the principal is accruing interest at the Variable Rate.
      (6)      If Borrowers timely exercises Borrowers' option to (i) convert the interest rate on this Note to another rate and (ii) cancel the Revolving Line of Credit provisions of this Note pursuant to Section C ("Conversion Option") of this Note, the applicable interest rate under this Note, beginning on the date the conversion becomes effective and continuing until the Maturity Date, shall not be the rate determined in accordance with subsection (1) of this Section A above, but shall be the rate established in accordance with Section C "Conversion Option" below. Such rate shall be reflected in an "Agreement to Convert" substantially in the form attached as Exhibit A to this Note. If Borrowers have not earlier exercised the Conversion Option, the Revolving Line of Credit Provisions will expire on **October 11, 2024**, and the Conversion Option will be deemed to be exercised by selecting the loan terms indicated in the following subsection (7).
      (7)      The following definitions shall apply to this Note:

         **Current Index**: The Index that is published in The Wall Street Journal on the applicable Rate Change Date.

         **Index**. Beginning with the initial Rate Change Date, the variable rate will be based on an Index. The "Index" is the *One Month "London Interbank Offered Rate" (LIBOR) as published in the Wall Street Journal* 2 business days prior to the applicable Rate Change Date. The Index percentage will be added to the Margin and then rounded to the nearest one hundreth of one percent (.01) subject to any limits. This rounded amount will be my new variable rate until the next Rate Change Date. If the Index is no longer available, the Note Holder will choose a new Index that is based on comparable information.

         **Margin**: **1.800%**.

_____
**MULTISTATE REVOLVING LINE OF CREDIT NOTE**

**First Interest Payment Date: January 1, 2020**.

**Revolving Loan Provisions Termination Date: October 11, 2024**.

**First Principal Payment Date: January 1, 2025**

**Maturity Date: October 11, 2044**.

**Rate Change Date: 11/01/2019 and on the 1ˢᵗ of every month thereafter**

**Initial Variable Rate: 3.820%**

B.      **Prepayment**.

Prior to the Conversion Date (as defined below), Borrowers may prepay all or part of the unpaid principal balance of this Note on any business day.

C.      **Interest Rate Conversion Option**.

(1)  **Option to Cancel Multiple Advance Provisions and Convert to Another Interest Rate**. Borrowers may exercise the Conversion Option unless Borrowers are in default under this Note or the security instrument if the conditions of this Section 9(C)(1) are met. Borrowers will be conclusively deemed to have exercised the Conversion Option upon the date of the Revolving Loan Provisions Termination Date. The "Conversion Option" is the Borrowers' option to (i) cancel and convert the interest rate specified in this Note from a variable rate with no interest rate limits to the rate calculated under Section 9(C)(2) below; and (ii) terminate and cancel the Revolving Loan provisions.

The conversion can only take place on a date a scheduled payment is due. The date on which the Borrowers convert the variable interest rate to the converted rate is called the "Conversion Date."

The Borrowers' ability to exercise the Conversion Option is conditioned upon and no conversion shall be effective without: (i) the Borrowers giving the Lender written notice at least 21 days prior to the Conversion Date (at 11:00 a.m. Louisville, Kentucky time) that the Borrowers want to exercise the Conversion Option; (ii) at the Conversion Date, the Borrowers must not be in default under the terms of this Note or the security instrument; (iii) payment to the Lender at or prior to the Conversion Date of all of Lender's out of pocket expense of completing such Conversion while maintaining its lien priority, and (iv) the Borrowers' completion and execution of any documents the Lender requires to effect the conversion.

(2)  **Calculation of Converted Rate**. Upon request from the Borrowers, the Lender shall provide a list of the loan products then offered by the Federal Agricultural Mortgage Corporation ("Farmer Mac") with a maturity date similar to the Maturity Date of this Note subject to a four week mandatory delivery commitment, including any prepayment restrictions and yield maintenance provision applicable to such products. The description of loan products shall contain the then current rates applicable to such products, but the actual rate may be higher or lower and will be set as described in this Section 9. The Borrowers may then give written notice of the Borrowers' election to convert this Note to one of those products for the remaining term of this Note to the Maturity Date by selecting one of the listed products and requesting conversion of this Note to the selected product. The interest rate in effect for this Note after Conversion ("Converted Rate") will be an interest rate equal to the Farmer Mac required net yield for the selected loan product with a maturity similar to the Maturity Date of this Note subject to a four week mandatory delivery commitment, plus **1.800%** (the "Modification Note Rate"), subject to any yield maintenance provision applicable to such product. The converted rate in effect as of the Conversion Date will be equal to the rate calculated in the immediately preceding sentence as of 11:00 a.m. Louisville, Kentucky time, on the later of (a) the date which is four weeks prior to the Conversion Date and (b) the day lender receives Borrowers' election to convert this Note. If this required net yield is not available, the Lender will determine the Converted Rate by using comparable

---

**MULTISTATE REVOLVING LINE OF CREDIT NOTE**

information.

If Borrowers elect to convert this Note, or are required to convert this Note by the terms hereof, but do not select a particular product from the list of available products by the date specified in the list of products, the product designated by Lender as the Default Product on the list of available products will be deemed to have been selected by Borrowers.

(3) **Calculation of New Payment.** Upon the Borrowers' exercise of the Conversion Option, the Lender will determine the amount and payment schedule of the installments, which will be calculated to repay the unpaid principal (net of any principal payment due on the Conversion Date) in full over the period from the Conversion Date to the Final Amortization Date at the new interest rate in substantially equal payments applied first to interest and then to principal. Any remaining indebtedness, if not sooner paid, shall be due and payable on the Maturity Date.

**10.     LENDER ADVANCES**

Lender may make advances under the Security Instrument, as defined below, providing security for this Note, to protect the Lender's interest in the Security Instrument or other instrument providing security for this Note from loss of value or damage. Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate stated in Section 8(D) of this Note shall become an obligation due and owing under the terms of this Note immediately upon the date advanced by Lender and is an obligation of Borrowers secured by the Security Instrument or other instrument providing security for this Note.

**11.     GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to Borrowers under this Note will be given by delivering it or by mailing it by first class mail to Borrowers at **1306 W Herndon Ave #101, Fresno, CA 93711**, or at a different address if Borrowers give Lender a notice of Borrowers' different address.

Any notice that must be given to Lender under this Note will be given by delivering it or by mailing it by first class mail to Lender at the address stated in Section 8(K) above or at a different address if Borrowers are given a notice of that different address.

**12.     OBLIGATIONS OF PERSONS UNDER THIS NOTE**

Each of the Borrowers, and each person executing this Note on each of the Borrowers' behalf, represents and warrants to Lender that by its execution below, each of the Borrowers is duly organized, is in good standing, and has the full power, authority and legal right to execute and deliver this Note, and is obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed and any additional amounts incurred under the terms of this Note. Each of the Borrowers also represent and warrant that any person who is a guarantor, surety or endorser of this Note is also obligated to keep all promises made in this Note, including the promise to pay the full amount owed and any additional amounts incurred under the terms of this Note. Lender may enforce its rights under this Note against each of the Borrowers and each person executing or guaranteeing this Note on each of the Borrowers' behalves, individually or against all such persons together. Any one of the Borrowers or any person guaranteeing this Note on any of the Borrowers' behalves may be required to pay all amounts due or incurred under this Note.

**13.     WAIVERS**

Borrowers and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require Lender to demand payment of amounts due. "Notice of Dishonor" means the right to require Lender to give notice to other persons that amounts due have not been paid.

**14.     UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Lender under this Note, one or more deeds of trust (each a "Security Instrument" and collectively, the "Security Instrument") dated the same date as this Note, protects the Lender from possible losses which might result if Borrowers do not keep the promises which Borrowers makes in this Note. That Security Instrument describes how

---

**MULTISTATE REVOLVING LINE OF CREDIT NOTE**


and under what conditions Borrowers may be required to make immediate payment in full of all amounts Borrowers owe under this Note. Some of those conditions are described as follows:

> If all or any part of the Property or any Interest in the Property is sold or transferred (or if any of the Borrowers is not a natural person and a beneficial interest in any of the Borrowers is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

## 15. USURY

The parties to this Note intend and agree that the indebtedness evidenced by this Note and any related documents shall remain in compliance with any usury provisions of the state within which this Note was made by Borrowers. This Note and any related documents are subject to the express condition that at no time shall the Borrowers be obligated, or required, to pay interest on the principal balance at a rate that could subject Lender to either civil or criminal liability as a result of such rate being in excess of the maximum rate which Lender is permitted to charge. If, by the terms of this Note, Borrowers are, at any time, required or obligated to pay interest on the principal balance at a rate in excess of such maximum rate, then the rate of interest under this Note shall be deemed to be immediately reduced to such maximum rate, and interest payable hereunder shall be computed at such maximum rate, and any portion of all prior Interest payments in excess of such maximum rate shall be applied, and/or shall retroactively be deemed to have been payments made, in reduction of the principal balance.

## 16. EVENT OF DEFAULT

The occurrence of any one or more of the following shall constitute an "Event of Default" under this Note, the Security Instrument, and any related Loan Documents, as such term is used herein:

**(A)** If Borrowers fail to repay any interest or Principal under the Note when due;

**(B)** If any of the Borrowers defaults in any material respect in the performance of any of the other covenants, agreements and obligations of the Borrowers under the Security Instrument or any related Loan Documents involving the payment of money and fails to cure such default within ten (10) days;

**(C)** If any of the Borrowers defaults in any material respect in the performance of any of the Borrowers' non-monetary covenants, agreements and obligations under this Note, the Security Instrument or any related Loan Documents and fails to cure such default within thirty (30) days after written notice thereof from Lender;

**(D)** If any representation or warranty, statement, report or certificate now or hereafter made by any of the Borrowers, was not true and correct in any material respect when made;

**(E)** If any bankruptcy or insolvency petition is filed by or against any of the Borrowers under the Federal Bankruptcy Code or any similar state or federal Law, whether now or hereafter existing (and, in the case of involuntary proceedings, failure to cause the same to be vacated, stayed or set aside within thirty (30) days after filing);

**(F)** If a default occurs under the Security Instrument or any of the related Loan Documents and continues beyond the applicable grace period, if any, contained therein;

**(G)** If any of the Borrowers transfer any interest in the Property in violation of Section 15 of the Security Instrument; provided, however, that Borrowers shall have the right to prepay the Principal balance of the Note, in whole or in part, subject to the prepayment conditions and any other applicable costs and fees, as further set forth in this Note.

**NOTICE IS HEREBY GIVEN TO MAKER THAT ORAL AGREEMENTS OR ORAL COMMITMENTS TO LEND MONEY, EXTEND CREDIT, MODIFY LOAN TERMS OR FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER CALIFORNIA LAW.**

---

MULTISTATE REVOLVING LINE OF CREDIT NOTE

**BORROWERS:**

**COPPER AVENUE INVESTMENTS, LLC,**
a California limited liability company

By: Darius Assemi
Its: Manager

**ASHLAN & HAYES INVESTMENTS, LLC,**
a California limited liability company

By: Darius Assemi
Its: Manager

**MARICOPA ORCHARDS, LLC,**
a California limited liability company

By: Darius Assemi
Its: General Manager

**ACAP HOLDINGS, LLC,**
a California limited liability company
By: Amended and Restated Farid Assemi Revocable
Trust, its Member

By: Farid Assemi, its Trustee

By: Amended and Restated Darius Assemi Revocable
Trust, its Member

By: Darius Assemi, its Trustee

By: Amended and Restated Farshid Assemi and
Sonia Rosemary Assemi Revocable Trust,
its Member

By: Farshid Assemi, its Co-Trustee

By: Sonia Assemi, its Co-Trustee

PAY TO THE ORDER OF
**U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs**
WITHOUT RECOURSE

**Conterra Agricultural Capital, LLC**

**Mark A. Smith, COO & General Counsel**

MULTISTATE REVOLVING LINE OF CREDIT NOTE

10

## FIRST AMENDMENT TO NOTE

Loan <sup>REDACTED</sup>**1673**

2nd  This FIRST AMENDMENT TO NOTE (this "Amendment") is made and entered into as of the ___ day of February , 2023 (the "Effective Date"), by and between Maricopa Orchards, LLC, a California limited liability company, Copper Avenue Investments, LLC, a California limited liability company, Ashlan & Hayes Investments, LLC, a California limited liability company and ACAP Holdings, LLC, a California limited liability company (individually and collectively, "Borrower"), Lincoln Grantor Farms, LLC, a California limited liability company ("Purchaser 1"), and ACAP Farms, LLC, a California limited liability company ("Purchaser 2"), and U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs ("Lender").

### RECITALS

WHEREAS, Borrowers executed a promissory note dated October 11, 2019, in the original principal amount of $5,297,232.00 payable to Conterra Agricultural Capital, LLC (the "Note"), and subsequently endorsed to Lender, which is secured by an Open-end Deed of Trust Security Agreement, Assignment of Rents and Fixture Filing dated October 11, 2019 (the "Security Instrument"), recorded with the Kings County, California Clerk-Recorder as Document Number 1917423 on October 15, 2019, and recorded with the Fresno County, California Recorder as Document Number 2019-0123389 on October 15, 2019, as further affected by an Assignment of Deed of Trust dated October 11, 2019, and recorded as Document Number 1917424 with the Kings County, California Clerk—Recorder on October 15, 2019, and as Document Number 2019-0123390 with the Fresno County, California Recorder on October 15, 2019.

WHEREAS, Borrower, Ashlan & Hayes Investments, LLC desires to convey its interests in the Property encumbered by the Security Instrument to Purchaser 1;

WHEREAS, the Security Instrument expressly prohibits the conveyance of the Property without the express written consent of the Lender;

WHEREAS, the Borrower, ACAP Holdings, LLC transferred its interest in the Property encumbered by the Security Instrument to Purchaser 2, a limited liability company owned and managed by Borrower, by Grant Deed dated October 22, 2020 and recorded with the Fresno County, California Recorder, on November 2, 2020 as Document Number 2020-01567, which constitutes a default under the Security Instrument (the "Default");

WHEREAS, the Lender is willing to (i) provide its consent to the transfer of the Property to Purchaser 1 (ii) waive the Default and consent to the transfer of the Property to Purchaser 2 (collectively, the "Purchasers") on condition that Purchasers assume the obligations under the Security Instrument and agree to perform all of the covenants and conditions contained in the Security Instrument, the Note, and related loan documents (collectively, the "Loan Documents");

WHEREAS, as part of the consideration for acquiring the Property and Lender's consent to acquisition of the Property, Purchaser 1 agrees to assume all rights, responsibilities, and obligations of Ashlan & Hayes Investments, LLC under the Note and Security Instrument and perform all of the covenants and conditions contained in the Loan Documents; and

WHEREAS, as part of the consideration for acquiring the Property and Lender's waiver of the Default and consent to acquisition of the Property, Purchaser 2 agrees to assume all rights, responsibilities, and obligations of ACAP Holdings, LLC under the Note and Security Instrument and perform all of the covenants and conditions contained in the Loan Documents;

NOW, THEREFORE, for and in consideration of the mutual agreements contained in this

**Amendment to Note**
**Page 2 of 2**

Amendment, Purchasers, Lender, and Borrowers (each a "Party" and collective, the "Parties") agree as follows:

<div align="center">

**AGREEMENT**

</div>

**1.     AMENDMENT TO NOTE**

The Parties agree that the recitals set forth above are true and accurate and are hereby incorporated in and made a part of this Agreement.  The Note is hereby amended by the following:

    a.   Lincoln Grantor Farms LLC, a California limited liability company, is added as a Borrower to the Note and hereby assumes and agrees to all terms under the Note, Security Instrument, this Amendment and the Loan Documents;

    b.   Ashlan &Hayes Investments, LLC is removed as a Borrower to the Note;

    c.   ACAP Farms, LLC, a California limited liability company, is added as a Borrower to the Note and hereby assumes and agrees to all terms under the Note, Security Instrument, this Amendment and the Loan Documents;

    d.   ACAP Holdings, LLC is removed as a Borrower to the Note.

**2.     TERMS OF NOTE**

Capitalized terms used in this Amendment that are not defined shall have the meaning assigned to such terms in the Note and Security Instrument.  Except as set forth in this Amendment, all of the provisions of the Note shall remain unchanged, shall continue in full force and effect, and are hereby ratified and confirmed in all respects by the Parties.

**NOTICE IS HEREBY GIVEN TO MAKER THAT ORAL AGREEMENTS OR ORAL COMMITMENTS TO LEND MONEY, EXTEND CREDIT, MODIFY LOAN TERMS OR FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER CALIFORNIA LAW.**

<div align="center">

*[remainder of page intentionally left blank – signature page follows]*

</div>

Amendment to Note
Page 3 of 2

IN WITNESS WHEREOF, the Parties, intending to be legally bound, have executed this Amendment as of the Effective Date.

**"BORROWERS"**

**COPPER AVENUE INVESTMENTS, LLC,**
A California limited liability company

By: Darius Assemi
Its: Manager

**ASHLAN & HAYES INVESTMENTS, LLC,**
A California limited liability company

By: Darius Assemi
Its: Manager

**MARICOPA ORCHARDS, LLC,**
A California limited liability company

By: Farshid Assemi
Its: General Manager

**ACAP HOLDINGS, LLC,**
A California limited liability company
By Amended and Restated Farid Assemi Revocable Trust, its Member

By: Farid Assemi
Its: Trustee

By Amended and Restated Darius Assemi Revocable Trust, its Member

By: Darius Assemi
Its: Trustee

By Amended and Restated Farshid Assemi and Sonia Rosemary Assemi Revocable Trust, its Member

By: Farshid Assemi
Its: Co-Trustee

By: Sonia Assemi
Its: Co-Trustee

Amendment to Note
Page 4 of 2


**"PURCHASER 1"**

**LINCOLN GRANTOR FARMS LLC,**
a California limited liability company

_____
By:  Neema Assemi
Its:  Manager


**"PURCHASER 2"**

**ACAP FARMS, LLC,**
a California limited liability company

_____
By:  Farshid Assemi
Its:  Manager


**"LENDER"**

**U.S. Bank National Association,**
**as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs**

_____
By:  Heather Wright Manager – Closing & Servicing of Federal Agricultural Mortgage Corporation
Attorney-In-Fact for U.S. Bank, National Association for Federal Agricultural Mortgage Corporation
programs, under Limited Power of Attorney dated August 25, 2021

Amendment to Note
Page 4 of 2


"PURCHASER 1"

**LINCOLN GRANTOR FARMS LLC,**
a California limited liability company

By:  Neema Assemi
Its:  Manager




"PURCHASER 2"

**ACAP FARMS, LLC,**
a California limited liability company

By:  Farshid Assemi
Its:  Manager




"LENDER"

**U.S. Bank National Association,**
as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs

By:  Heather Wright Manager – Closing & Servicing of Federal Agricultural Mortgage Corporation
Attorney-In-Fact for U.S. Bank, National Association for Federal Agricultural Mortgage Corporation
programs, under Limited Power of Attorney dated August 25, 2021

# Allonge to Promissory Note

Loan # <sup>REDACTED</sup> 1673

For purposes of further endorsement of the following described Note, this Allonge is affixed and becomes a permanent part of said Note:

Note Date: **October 11, 2019**

Original Amount: **$5,297,232.00**

Borrower Name(s): **Maricopa Orchards, LLC, Copper Avenue Investments, LLC, Ashlan & Hayes Investments, LLC, and ACAP Holdings, LLC**

Property Address: **1,110 +/- Acres, Kings County and Fresno County, California**

PAY TO THE ORDER OF

**U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs**

WITHOUT RECOURSE

**Conterra Agricultural Capital, LLC**

By: _____
Name: Mark A. Smith
Title: COO & General Counsel

Allonge to Promissory Note

1

# CROSS DEFAULT RIDER

Loan #<sup>REDACTED</sup>1673

THIS CROSS DEFAULT RIDER is made this *February 2*, **2023**, and is incorporated into and shall be deemed to amend and supplement the amended and restated Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date, given by the undersigned Borrower and Grantors to secure a Note to **U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs** (the "Lender") dated October 11, 2019 and covering the Property described in the Security Instrument and located **1,110 +/- Acres**

**Kings County and Fresno County, California**
[Property Address]

In addition to the covenants and agreements made in the Security Instrument, Borrowers, Grantors and Lender further covenant and agree that on the date hereof the following other loans have been sold to Federal Agricultural Mortgage Corporation:

| Grantors/Borrowers Names | Date | Loan Amount/Loan No. |
|---|---|---|
| Copper Avenue Investments, LLC, ACAP Farms, LLC, Gradon Farms, LLC, Lincoln Grantor Farms, LLC, Maricopa Orchards, LLC & Cantua Orchards, LLC | 10/11/2019 | $10,258,632.00/<sup>REDACTED</sup>1674 |
| C&A Farms, LLC & Whitebridge Farms, LLC | 01/08/2018 | $5,500,000.00/<sup>REDACTED</sup>1725 |
| C&A Farms, LLC & Whitebridge Farms, LLC | 01/08/2018 | $1,500,000.00/<sup>REDACTED</sup>1728 |
| Assemi Brothers, LLC, C&A Farms, LLC, Whitebridge Farms, LLC, Maricopa Orchards, LLC & Willow Avenue Investments, LLC | 12/14/2020 | $12,500,000.00/<sup>REDACTED</sup>2676 |
| Assemi Brothers, LLC, C&A Farms, LLC, Whitebridge Farms, LLC, Maricopa Orchards, LLC & Willow Avenue Investments, LLC | 12/14/2020 | $12,500,000.00/<sup>REDACTED</sup>2678 |
| C & A Farms, LLC, Willow Avenue Investments, LLC, Gradon Farms, LLC, Cantua Orchards, LLC, Copper Avenue Investments, LLC, Lincoln Grantor Farms, LLC, ACAP Farms, LLC and Maricopa Orchards, LLC | 2/2/2023 | $7,400,000.00/<sup>REDACTED</sup>1004 |

each of which is evidenced by a separate promissory note (the "Other Notes"), and each of which is secured by a separate mortgage, deed of trust, or security deed (the "Other Security Instruments"). It is agreed that any default under this Security Instrument or this Note shall be deemed a default under the Other Notes and Other Security Instruments; and any default under any or all of the Other Notes or Other Security Instruments shall be deemed to be a default under this Note and this Security Instrument.

BY SIGNING BELOW, Borrowers and Grantors accept and agree to the terms and covenants contained in this Cross Default Rider.

FARMER MAC MULTISTATE CROSS DEFAULT RIDER   1

Dated effective this 2nd day of ~~January~~ February, 2023

**BORROWERS:**

**COPPER AVENUE INVESTMENTS, LLC,**
a California limited liability company

By: Darius Assemi
Its: Manager

**CANTUA ORCHARDS, LLC**
a California limited liability company
      By: Farshid Assemi 1997 Ranch Trust, its Member

      Farid Assemi, its Trustee
      By: Farid Assemi 1997 Ranch Trust, its Member

      Farshid Assemi, its Trustee
      By: Farid Assemi Revocable Trust dated January 24, 2007, its Member

      Farid Assemi, its Trustee
      By: Darius Assemi Revocable Trust dated January 30, 2007

      Darius Assemi, its Trustee
      By: Farshid Assemi and Sonia Rosemary Assemi Revocable Trust dated January 31, 2007, its Member

      By: Farshid Assemi, its Co-Trustee

      By: Sonia Assemi, its Co-Trustee

**LINCOLN GRANTOR FARMS, LLC,**
a California limited liability company

By:  Neema Assemi
Its:  Manager

**GRADON FARMS, LLC,**
a California limited liability company

By: Darius Assemi
Its: Manager

**ACAP FARMS, LLC,**
a California limited liability company

By: Farshid Assemi
Its: Manager

**Maricopa Orchards, LLC,**
a California limited liability company

By: Farshid Assemi
Its: General Manager

FARMER MAC MULTISTATE CROSS DEFAULT RIDER
3

# CONVERTIBLE REVOLVING LINE OF CREDIT
# VARIABLE RATE RIDER
### (Daily Wall Street LIBOR Index – Semi-Annual Pay - No Rate Cap - Convertible)

Loan #REDACTE1673

This REVOLVING LINE OF CREDIT VARIABLE RATE RIDER is made this February 2, 2023, and is incorporated into and shall be deemed to amend and supplement the amended and restated mortgage, deed of trust or security deed (the "Security Instrument") of the same date given by the undersigned Borrowers and Grantors to secure a Promissory Note (the "Note") to **U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs** (the "Lender") dated October 11, 2019 and covering the property described in the Security Instrument and located at:

**1,110 +/- Acres**
**Kings County and Fresno County, California**
[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE. THE NOTE ALSO CONTAINS THE OPTION TO CONVERT THE VARIABLE RATE TO ANOTHER RATE.**

Additional Covenants. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## VARIABLE RATE AND SEMI-ANNUAL PAYMENT CHANGES

The Note provides for an initial interest rate to be determined on the date of the first, initial or only advance of funds under the Note. The Note provides for changes in the variable interest rate as follows:

1.    **Payment of Principal and Interest.**

(a)    Interest shall accrue on the unpaid balance of this Note until the Loan is repaid in full or until the Borrower exercises the option to convert the variable rate to another rate as provided in subsection (f) below.

(b)    The Initial Variable Rate (defined below) will be established at loan registration and upon the receipt of the Commitment to Purchase – AgEquity. Thereafter, the Variable Rate shall change according to the Rate Change Date at a rate equal to the sum of (i) the Current Index (defined below) and (ii) the Margin (defined below) (the "Variable Rate").

(c)    A payment of interest calculated at the Variable Rate on the outstanding principal balance represented under this Note from the date of the first advance hereunder shall be due on the First Interest Payment Date. Thereafter, consecutive semi-annual installments of interest, each in the amount required to pay the unpaid interest accruing through the applicable period shall be due on each January 1 and July 1 at the Variable Rate until the Maturity Date (as defined below) or the Conversion Date (as defined below) as the case may be. Any remaining indebtedness, if not sooner paid, shall be due and payable on the Maturity Date (as defined below).

(d)    If Lender at any time determines, in its sole but reasonable discretion, that it has miscalculated the amount of any interest payment (whether because of a miscalculation of the Variable Rate or otherwise), then Lender shall give notice to Borrower of the corrected amount of the interest payment (and the corrected Variable Rate, if applicable) and (i) if the corrected amount of the installment payment represents an increase, then Borrower shall, within

---

MULTISTATE ADJUSTABLE RATE RIDER

1

30 calendar days thereafter, pay to Lender any sums that Borrower would have otherwise been obligated under this Note to pay to Lender had the amount of the installment payment not been miscalculated, or (ii) if the corrected amount of the installment payment represents a decrease thereof and Borrower is not otherwise in breach or default under any of the terms and provisions of this Note, the security instrument or any other Loan Document evidencing or securing this Note, then Borrower shall thereafter be paid the sums that Borrower would not have otherwise been obligated to pay to Lender had the amount of the installment payment not been miscalculated.

Borrower may make payments of principal in any amount on any business day of Lender during such time as the principal is accruing interest at the Variable Rate.

(e)     If Borrower timely exercises Borrower's option to (i) convert the interest rate on this Note to another rate and (ii) cancel the Revolving Line of Credit provisions of this Note pursuant to Section C ("Conversion Option") of this Note, the applicable interest rate under this Note, beginning on the date the conversion becomes effective and continuing until the Maturity Date, shall not be the rate determined in accordance with subsection (a) of this Section 1 above, but shall be the rate established in accordance with Section 3 "Conversion Option" below.  Such rate shall be reflected in an "Agreement to Convert" substantially in the form attached as Exhibit A to this Note.  If Borrower has not earlier exercised the Conversion Option, the Revolving Line of Credit Provisions will expire on **October 11, 2024**, and the Conversion Option will be deemed to be exercised by selecting the loan terms indicated in subparagraph (f) below.

(f)     The following definitions shall apply to this Note:

**Current Index:** The Index that is published in The Wall Street Journal on the applicable Rate Change Date.

**Index.**  Beginning with the initial Rate Change Date, the variable interest rate will be based on an Index.  The "Index" is the *One Month "London Interbank Offered Rate" (LIBOR) as published in the Wall Street Journal* 2 business days prior to the applicable Rate Change Date.  The Index percentage will be added to the Margin and then rounded to the nearest one hundredth of one percent (.01) subject to any limits.  This rounded amount will be my new variable rate until the next Rate Change Date.  If the Index is no longer available, the Note Holder will choose a new Index that is based on comparable information.

**Margin: 1.800%.**

**First Interest Payment Date: January 1, 2020.**

**Revolving Loan Provisions Termination Date: October 11, 2024.**

**First Principal Payment Date: January 1, 2025**

**Maturity Date: October 11, 2044.**

**Rate Change Date:  11/01/2019 and on the 1st of every month thereafter**

**Initial Variable Rate: 3.820%**

## INTEREST RATE OPTION

The Note provides for the Borrower's option to convert from an variable interest rate to another interest rate, as follows:

---

**MULTISTATE ADJUSTABLE RATE RIDER**

**2.      Interest Rate Conversion Option.**

(a)      **Option to Cancel Multiple Advance Provisions and Convert to Another Interest Rate.** Borrower may exercise the Conversion Option unless Borrower is in default under this Note or the security instrument if the conditions of this subsection 3(a) are met. Borrower will be conclusively deemed to have exercised the Conversion Option upon the date the Revolving Loan Provisions Termination Date. The "Conversion Option" is the Borrower's option to (i) cancel and convert the interest rate specified in this Note from a variable rate with no interest rate limits to the rate calculated under Section 3(b) below; and (ii) terminate and cancel the Revolving Loan provisions.

The conversion can only take place on a date a scheduled payment is due. The date on which the Borrower converts the variable interest rate to the converted rate is called the "Conversion Date."

The Borrower's ability to exercise the Conversion Option is conditioned upon and no conversion shall be effective without: (i) the Borrower giving the Lender written notice at least 21 days prior to the Conversion Date (at 11:00 a.m. Louisville, Kentucky time) that the Borrower wants to exercise the Conversion Option; (ii) at the Conversion Date, the Borrower must not be in default under the terms of this Note or the security instrument; (iii) payment to the Lender at or prior to the Conversion Date of all of Lender's out of pocket expense of completing such Conversion while maintaining its lien priority, and (iv) the Borrower's completion and execution of any documents the Lender requires to effect the conversion.

(b)      **Calculation of Converted Rate.** Upon request from the Borrower, the Lender shall provide a list of the loan products then offered by the Federal Agricultural Mortgage Corporation ("Farmer Mac") with a maturity date similar to the maturity date of this Note subject to a four week mandatory delivery commitment, including any prepayment restrictions and yield maintenance provision applicable to such products. The description of loan products shall contain the then current rates applicable to such products, but the actual rate may be higher or lower and will be set as described in this paragraph. The Borrower may then give written notice of the Borrower's election to convert this Note to one of those products for the remaining term of this Note to the Maturity Date by selecting one of the listed products and requesting conversion of this Note to the selected product. The interest rate in effect for this Note after Conversion ("Converted Rate") will be an interest rate equal to the Farmer Mac required net yield for the selected loan product with a maturity similar to the maturity date of this Note subject to a four week mandatory delivery commitment, plus **1.800%** (the "Modification Note Rate"), subject to any yield maintenance provision applicable to such product. The converted rate in effect as of the Conversion Date will be equal to the rate calculated in the immediately preceding sentence as of 11:00 a.m. Louisville, Kentucky time, on the later of (a) the date which is four weeks prior to the Conversion Date and (b) the day lender receives Borrower's election to convert this Note. If this required net yield is not available, the Lender will determine the Converted Rate by using comparable information.

If Borrower elects to convert this Note, or is required to convert this Note by the terms hereof, but does not select a particular product from the list of available products by the date specified in the list of products, the product designated by Lender as the Default Product on the list of available products will be deemed to have been selected by Borrower.

(c)      **Calculation of New Payment.** Upon the Borrower's exercise of the Conversion Option, the Lender will determine the amount and payment schedule of the installments, which will be calculated to repay the unpaid principal (net of any principal payment due on the Conversion Date) in full over the period from the Conversion Date to the Maturity Date at the new interest rate in substantially equal payments applied first to interest and then to principal. Any remaining indebtedness, if not sooner paid, shall be due and payable on the Maturity Date.

To the extent that the Security Instrument and this Rider are inconsistent with each other, this Rider shall govern the agreements of the parties hereto.

By Signing Below, Borrower accepts and agrees to the terms and covenants contained in this Variable Rate Rider.

---

**MULTISTATE ADJUSTABLE RATE RIDER**

3

Dated effective this 2nd day of ~~January~~, February 2023

**BORROWERS:**

**COPPER AVENUE INVESTMENTS, LLC,**
a California limited liability company

By: Darius Assemi
Its: Manager

**CANTUA ORCHARDS, LLC**
a California limited liability company

By: Farshid Assemi 1997 Ranch Trust, its Member

Farid Assemi, its Trustee

By: Farid Assemi 1997 Ranch Trust, its Member

Farshid Assemi, its Trustee

By: Farid Assemi Revocable Trust dated January 24, 2007, its Member

Farid Assemi, its Trustee

By: Darius Assemi Revocable Trust dated January 30, 2007

Darius Assemi, its Trustee

By: Farshid Assemi and Sonia Rosemary Assemi Revocable Trust dated January 31, 2007, its Member

By: Farshid Assemi, its Co-Trustee

By: Sonia Assemi, its Co-Trustee

**LINCOLN GRANTOR FARMS, LLC,**
a California limited liability company

By: Neema Assemi
Its: Manager

---

**MULTISTATE ADJUSTABLE RATE RIDER**

4

**GRADON FARMS, LLC,**
a California limited liability company

By: Darius Assemi
Its: Manager

**ACAP FARMS, LLC,**
a California limited liability company

By: Farshid Assemi
Its: Manager

MULTISTATE ADJUSTABLE RATE RIDER

5

Exhibit E

**Recording Requested By:**
**Farmer Mac**

**After Recording Return to:**
**Farmer Mac**
**9169 Northpark Dr.**
**Johnston, IA 50131**
**Attn: Megan Spalding**

## ASSUMPTION AGREEMENT

Loan <sup>REDACTED</sup>1673

This ASSUMPTION AGREEMENT (this "Agreement") is made and entered into as of this 2nd day of February 4, 2023, by and between ACAP Farms, LLC, a California limited liability company ("Purchaser"), and U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs of St. Paul, Minnesota, ("Lender"), and Copper Avenue Investment, LLC, a California limited liability company, ACAP Holdings, LLC, a California limited liability company, Lincoln Grantor Farms LLC, a California limited liability company and Maricopa Orchards, LLC, a California limited liability company (collectively, "Borrowers").

### RECITALS

WHEREAS, Borrowers are indebted to Lender under a note dated October 11, 2019, in the principal amount of $5,297,232.00 (the "Note"), which is secured by an Open-end Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing of the same date, recorded with the Kings County, California Clerk-Recorder Document Number 1917423, on October 15, 2019 and recorded with the Fresno County, California Recorder on October 15, 2019 as Document Number 2019-0123389 (the "Security Instrument"), encumbering the real property as described therein (the "Property"); Said Security Instrument was assigned to U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs on October 11, 2019, and recorded as Document Number 1917424 on October 15, 2019 with the Kings County, California Clerk – Recorder and as Document Number 2019-0123390 on October 15, 2019 with the Fresno County, California Recorder.

WHEREAS, the Security Instrument expressly prohibits the conveyance of the Property without the express written consent of the Lender;

WHEREAS, Borrower, **ACAP Holdings, LLC** (the "Transferring Borrower") transferred its interest in the Property encumbered by the Security Instrument to Purchaser, a limited liability company owned and managed by Borrower, by Grant Deed dated October 22, 2020 and recorded with the Fresno County, California Recorder on November 2, 2020 as Document Number 2020-01567, which constitutes a default under the Security Instrument (the "Default");

WHEREAS, the Lender is willing to provide its waiver of the Default and consent to the transfer of the Property to Purchaser on condition that Purchaser assumes the obligations under the Security Instrument and agrees to perform all of the covenants and conditions contained in the Security Instrument,

1

the Note, and related loan documents (collectively, the "Loan Documents"); and

WHEREAS, as part of the consideration for acquiring the Property and Lender's waiver of the Default and consent to acquisition of the Property, Purchaser agrees to assume all rights, responsibilities, and obligations of the Transferring Borrower under the Note and Security Instrument and perform all of the covenants and conditions contained in the Loan Documents;

NOW, THEREFORE, for and in consideration of the mutual agreements contained in this Agreement and on condition that the lien of the Security Instrument held by Lender is a valid, first, and submitting lien on the Property and that the execution of this Agreement will not impair the lien of the Security Instrument, Purchaser, Lender, and Borrower (each a "Party" and collective, the "Parties") agree as follows:

## AGREEMENT

**1.     Assumption.** The Parties agree that the foregoing recitals are true and correct and are hereby incorporated fully by reference. Purchaser expressly assumes the Security Instrument and agrees to enter into an Amended and Restated Security Instrument and Amendment to Note, and agrees to perform all covenants, conditions, duties and obligations of Borrowers under the Loan Documents in accordance with the terms thereof.

**2.     Waiver of Default and Consent to Conveyance.** Lender hereby waives the Default and consents to the transfer of the Property from Borrower to Purchaser, but Lender expressly reserves the right to withhold its consent to any future sale or transfer of the Property, as provided for in the Security Instrument.

**3.     Warranties and Representations.** Purchaser and Borrower affirm, warrant, represent and covenant that neither Purchaser nor Borrower has any defenses or rights of set-off against Lender or against the payment, collection or enforcement of the indebtedness evidenced by the Note and secured by the Security Instrument. Purchaser and Borrower further warrant and represent as follows:

a.     Neither Purchaser nor Borrower has done any acts or omitted to do any act which might prevent Lender from, or limit Lender in, acting upon or under any of the provisions herein, in the Security Instrument, in the Note or any other Loan Documents;

b.     Neither Purchaser nor Borrower is prohibited under any other agreement with any other person or any judgment or decree, from the execution and delivery of this Agreement, the performance of each and every covenant hereunder or under the Security Instrument, Note or any other Loan Documents;

c.     No action has been brought or threatened which would in any way interfere with the right of Purchaser or Borrower to execute this Agreement and perform all of Purchaser's or Borrower's obligations contained herein, in the Note, in the Mortgage, or in any other Loan Document;

d.     All financial statements of Purchaser and Borrower are true and correct in all respects, fairly present the respective financial conditions of the subjects thereof, as of the respective dates thereof and no material adverse change has occurred that would affect Purchaser's or Borrower's ability to repay the indebtedness evidenced by the Note and secured by the Security

2

Instrument;

       e.        Purchaser is duly formed, validly existing and in good standing under the laws of the State of California and has full power and authority to consummate the transactions contemplated under this Agreement.

**4.**    **Acknowledgements.** Borrower acknowledges that:

       a.        The Loan Documents are in full force and effect; and,

       b.        The principal balance of the Note as of December 21, 2022, is FIVE MILLION TWO HUNDRED NINETY-SEVEN THOUSAND TWO HUNDRED THIRTY-TWO and no/100 DOLLARS ($5,297,232.00), and principal and interest are unconditionally due and owing to the Lender as provided in the Note.

    **5.**    **Costs.** Purchaser shall pay all costs of the transfer of the Property and assumption made under this Agreement, to include without limitation, attorneys' fees and recording costs, as well as the cost of an endorsement to Lender's title insurance policy insuring the lien of the Security Instrument after the recording of this Agreement. Such costs shall be due at closing hereunder and the payment thereof shall be a condition precedent to Lender's consent to the transfer of the Property to Purchaser. In the event that it is determined that additional costs relating to this transaction are due, Purchaser agrees to pay such costs immediately upon demand.

    **6.**    **Assumption Fee.** In consideration of Lender's waiving of the Default and consenting to the conveyance of the Property to the Purchaser, Lender is entitled to, and has earned, an assumption fee in the amount of $750.00. Said fee shall be due and payable upon the execution and delivery of this Agreement. Borrower hereby agrees and acknowledges that said fee is being charged solely for costs relating to the assumption of the Security Instrument and not as interest for the forbearance or use of money.

    **7.**    **Paragraph Headings.** The paragraph headings used herein are for convenience of reference only and shall not be used in the interpretation or construction hereof.

    **8.**    **Governing Law.** This Agreement shall be governed, interpreted and construed by, through and under the laws of the State of California.

    **9.**    **Attorneys' Fees.** All costs incurred by Lender in enforcing this Agreement and in collection of sums due Lender from Purchaser and Borrower, to include, without limitation, reasonable attorneys' fees through all trials, appeals, and proceedings, to include, without limitation, any proceedings pursuant to the bankruptcy laws of the United States.

    **10.**    **Binding Effect.** This Agreement shall inure to the benefit of and be binding upon the parties hereto as well as their successors and assigns, heirs and personal representatives.

*[remainder of page intentionally left blank – signature page follows]*

3

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**"BORROWERS"**

**COPPER AVENUE INVESTMENTS, LLC,**
A California limited liability company

By: Darius Assemi
Its: Manager

**LINCOLN GRANTOR FARMS LLC,**
a California limited liability company

By: Neema Assemi
Its:  Manager

**MARICOPA ORCHARDS, LLC,**
A California limited liability company

By: Farshid Assemi
Its: General Manager

**ACAP HOLDINGS, LLC,**
A California limited liability company
By Amended and Restated Farid Assemi Revocable Trust, its Member

By: Farid Assemi
Its: Trustee

By Amended and Restated Darius Assemi Revocable Trust, its Member

By: Darius Assemi
Its: Trustee

By Amended and Restated Farshid Assemi and Sonia Rosemary Assemi Revocable Trust, its Member

By: Farshid Assemi
Its: Co-Trustee

By: Sonia Assemi
Its: Co-Trustee

4

**"PURCHASER"**

**ACAP FARMS LLC,**
a California limited liability company

By:  Farshid Assemi
Its:  Manager


**"LENDER"**

**U.S. Bank National Association,**
**as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs**

By:  Heather Wright Manager – Closing & Servicing of Federal Agricultural Mortgage Corporation
Attorney-In-Fact for U.S. Bank, National Association for Federal Agricultural Mortgage Corporation
programs, under Limited Power of Attorney dated August 25, 2021

5

**Recording Requested By:**
**Conterra Ag Capital**

**After Recording Return to:**
**Conterra**
**5465 Mills Civic Pky, St. 201**
**West Des Moines, IA 50266**
**Attn: Alison**

## ASSUMPTION AGREEMENT

Loan REDACTED1673

This ASSUMPTION AGREEMENT (this "Agreement") is made and entered into as of this _____ day of ϝєɴʀυαм ᒪ 2023, by and between Lincoln Grantor Farms LLC, a California limited liability company ("Purchaser"), and U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs of St. Paul, Minnesota, ("Lender"), and Copper Avenue Investment, LLC, a California limited liability company, ACAP Holdings, LLC, a California limited liability company, Ashlan & Hayes Investments, LLC, a California limited liability company, and Maricopa Orchards, LLC, a California limited liability company (collectively, "Borrowers").

### RECITALS

WHEREAS, Borrowers are indebted to Lender under a note dated October 11, 2019, in the principal amount of $5,297,232.00 (the "Note"), which is secured by an Open-end Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing of the same date, recorded with the Kings County, California Clerk-Recorder Document Number 1917423, on October 15, 2019 and recorded with the Fresno County, California Recorder on October 15, 2019 as Document Number 2019-0123389 (the "Security Instrument"), encumbering the real property as described therein (the "Property"); Said Security Instrument was assigned to U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs on October 11, 2019, and recorded as Document Number 1917424 on October 15, 2019 with the Kings County, California Clerk – Recorder and as Document Number 2019-0123390 on October 15, 2019 with the Fresno County, California Recorder.

WHEREAS, Borrower, Ashlan & Hayes Investments, LLC (the "Transferring Borrower"), desires to convey their interest in the Property encumbered by the Security Instrument to Purchaser, a limited liability company owned and managed by Borrower;

WHEREAS, the Security Instrument expressly prohibits the conveyance of the Property without the express written consent of the Lender;

WHEREAS, the Lender is willing to provide its consent to the transfer of the Property to Purchaser on condition that Purchaser assumes the obligations under the Security Instrument and agrees to perform all of the covenants and conditions contained in the Security Instrument, the Note, and related loan documents (collectively, the "Loan Documents");

1

WHEREAS, as part of the consideration for acquiring the Property and Lender's consent to acquisition of the Property, Purchaser agrees to assume all rights, responsibilities, and obligations of the Transferring Borrower under the Note and Security Instrument and perform all of the covenants and conditions contained in the Loan Documents;

NOW, THEREFORE, for and in consideration of the mutual agreements contained in this Agreement and on condition that the lien of the Security Instrument held by Lender is a valid, first, and submitting lien on the Property and that the execution of this Agreement will not impair the lien of the Security Instrument, Purchaser, Lender, and Borrower (each a "Party" and collective, the "Parties") agree as follows:

<div align="center">AGREEMENT</div>

1.    **Assumption.** The Parties agree that the foregoing recitals are true and correct and are hereby incorporated fully by reference. Purchaser expressly assumes the Security Agreement, agrees to enter into an Amended and Restated Security Agreement and Guaranty of Note, and agrees to perform all covenants, conditions, duties and obligations of Borrower under the Loan Documents in accordance with the terms thereof. The Parties agree that the Note is hereby amended by substituting Purchaser for the Transferring Borrower, as borrower thereunder.

2.    **Consent to Conveyance.** Lender hereby consents to the transfer of the Property from Borrower to Purchaser, but Lender expressly reserves the right to withhold its consent to any future sale or transfer of the Property, as provided for in the Security Instrument.

3.    **Warranties and Representations.** Purchaser and Borrower affirm, warrant, represent and covenant that neither Purchaser nor Borrower has any defenses or rights of set-off against Lender or against the payment, collection or enforcement of the indebtedness evidenced by the Note and secured by the Security Instrument. Purchaser and Borrower further warrant and represent as follows:

a.    Neither Purchaser nor Borrower has done any acts or omitted to do any act which might prevent Lender from, or limit Lender in, acting upon or under any of the provisions herein, in the Security Instrument, in the Note or any other Loan Documents;

b.    Neither Purchaser nor Borrower is prohibited under any other agreement with any other person or any judgment or decree, from the execution and delivery of this Agreement, the performance of each and every covenant hereunder or under the Security Instrument, Note or any other Loan Documents;

c.    No action has been brought or threatened which would in any way interfere with the right of Purchaser or Borrower to execute this Agreement and perform all of Purchaser's or Borrower's obligations contained herein, in the Note, in the Mortgage, or in any other Loan Document;

d.    All financial statements of Purchaser and Borrower are true and correct in all respects, fairly present the respective financial conditions of the subjects thereof, as of the respective dates thereof and no material adverse change has occurred that would affect Purchaser's or Borrower's ability to repay the indebtedness evidenced by the Note and secured by the Security Instrument;

<div align="center">2</div>

       e.      Purchaser is duly formed, validly existing and in good standing under the laws of the State of California and has full power and authority to consummate the transactions contemplated under this Agreement.

**4.**     **Acknowledgements.**  Borrower acknowledges that:

       a.      The Loan Documents are in full force and effect; and,

       b.      The principal balance of the Note as of the December 21, 2022 is FIVE MILLION, TWO HUNDRED NINETY-SEVEN THOUSAND TWO HUNDRED THIRTY-TWO & 00/100 DOLLARS ($5,297,232.00) and principal and interest are unconditionally due and owing to the Lender as provided in the Note.

     **5.**     **Costs.**  Purchaser shall pay all costs of the transfer of the Property and assumption made under this Agreement, to include without limitation, attorneys' fees and recording costs, as well as the cost of an endorsement to Lender's title insurance policy insuring the lien of the Security Instrument after the recording of this Agreement. Such costs shall be due at closing hereunder and the payment thereof shall be a condition precedent to Lender's consent to the transfer of the Property to Purchaser. In the event that it is determined that additional costs relating to this transaction are due, Purchaser agrees to pay such costs immediately upon demand.

     **6.**     **Assumption Fee.**  In consideration of Lender's consenting to the conveyance of the Property to the Purchaser, Lender is entitled to, and has earned, an assumption fee in the amount of $750.00. Said fee shall be due and payable upon the execution and delivery of this Agreement. Borrower hereby agrees and acknowledges that said fee is being charged solely for costs relating to the assumption of the Security Instrument and not as interest for the forbearance or use of money.

     **7.**     **Paragraph Headings.**  The paragraph headings used herein are for convenience of reference only and shall not be used in the interpretation or construction hereof.

     **8.**     **Governing Law.**  This Agreement shall be governed, interpreted and construed by, through and under the laws of the State of California.

     **9.**     **Attorneys' Fees.**  All costs incurred by Lender in enforcing this Agreement and in collection of sums due Lender from Purchaser and Borrower, to include, without limitation, reasonable attorneys' fees through all trials, appeals, and proceedings, to include, without limitation, any proceedings pursuant to the bankruptcy laws of the United States.

     **10.**     **Binding Effect.**  This Agreement shall inure to the benefit of and be binding upon the parties hereto as well as their successors and assigns, heirs and personal representatives.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**"BORROWERS"**

**COPPER AVENUE INVESTMENTS, LLC,**
A California limited liability company

By: Darius Assemi
Its: Manager

**ASHLAN & HAYES INVESTMENTS, LLC,**
A California limited liability company

By: Darius Assemi
Its: Manager

**MARICOPA ORCHARDS, LLC,**
A California limited liability company

By: Farshid Assemi
Its: General Manager

**ACAP HOLDINGS, LLC,**
A California limited liability company
By Amended and Restated Farid Assemi Revocable Trust, its Member

By: Farid Assemi
Its: Trustee

By Amended and Restated Darius Assemi Revocable Trust, its Member

By: Darius Assemi
Its: Trustee

By Amended and Restated Farshid Assemi and Sonia Rosemary Assemi Revocable Trust, its Member

By: Farshid Assemi
Its: Co-Trustee

By: Sonia Assemi
Its: Co-Trustee

4

**"PURCHASER"**

**LINCOLN GRANTOR FARMS LLC,**
a California limited liability company

By: Neema Assemi
Its: Manager

**"LENDER"**

**U.S. Bank National Association,**
**as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs**

By: Heather Wright Manager -- Closing & Servicing of Federal Agricultural Mortgage Corporation
Attorney-In-Fact for U.S. Bank, National Association for Federal Agricultural Mortgage Corporation
programs, under Limited Power of Attorney dated August 25, 2021

# Exhibit F

# NOTE

Loan REDACTED 1674

| **October 11, 2019** | **Fresno,** | **CA** |
| [Date] | [City] | [State] |

**1,110 +/- Acres**
**Kings County and Fresno County, California**
[Property Address]

## 1.   BORROWERS' PROMISE TO PAY

In return for a loan that **Maricopa Orchards, LLC**, a California limited liability company, **Copper Avenue Investments, LLC**, a California limited liability company, **Ashlan & Hayes Investments, LLC**, a California limited liability company, and **ACAP Holdings, LLC**, a California limited liability company (collectively, the "Borrowers"), has received, Borrowers promise to pay U.S. **$10,258,632.00** (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **Conterra Agricultural Capital, LLC**. Borrowers will make all payments under this Note in the form of cash, check or money order.

Borrowers understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is also called the "Lender", "Note holder" or "holder of the Note".

## 2.   INTEREST

Prior to default, interest will be charged on unpaid principal until the full amount of Principal has been paid. Borrowers will pay interest at a yearly rate of **3.720%**. The interest rate Borrowers will pay will change in accordance with this Section 2.

| **INITIAL ADJUSTMENT DATE** | **November 1, 2019** |
| **ORIGINAL AMORTIZATION TERM** | **20 years** |
| **ADJUSTMENT FREQUENCY PERIOD** | **monthly** |
| **MARGIN** | **1.70%** |

**ADJUSTABLE RATE PROVISION**. The interest rate stated in this Note is subject to adjustment by the Lender or any subsequent holder of this Note on the Initial Adjustment Date and on subsequent dates established by the Adjustment Frequency Period thereafter. Any such change in the interest rate shall be made automatically but in no event shall the adjusted interest rate exceed the maximum interest rate then permitted by law. When the rate is adjusted the remaining current principal balance of the Note will be reamortized over the remaining amortization term to determine subsequent payment amounts. Lender reserves the right to not adjust the loan in the event of default. Notice of the adjusted rate and the new amortized payment will be sent to the Borrowers after each interest rate adjustment.

**INDEX**. Beginning with the Initial Adjustment Date, the adjustable interest rate will be based on an Index. The "Index" is the *one-month London Interbank Offered Rate ("LIBOR")* as published in the Wall Street Journal 2 business days before the applicable rate change date, rounded to 2 decimal places. The Index percentage will be added to the Margin to determine the adjustable rate.

---

MULTISTATE ADJUSTABLE RATE NOTE
Farmer Mac UNIFORM INSTRUMENT

1

**LIBOR INDEX RATE SUBSTITUTION.** If Lender determines, in its sole discretion, that the LIBOR base rate ("Index") (i) has been or imminently will be discontinued, (ii) is no longer an industry-accepted reference rate for loans of a similar type to the Loan and/or has been superseded by an alternative reference rate, or (iii) is no longer representative or may not be used pursuant to a public statement by the administrator of the Index or other regulatory authority (e.g., the Federal Reserve), in each case with respect to any type of loan or transaction, then Lender may select an alternative reference rate, which may reflect adjustments to the related spread or margin (collectively, the "Substitute Index Rate"), to be used in lieu of the LIBOR-based interest rate set forth in the Note and/or this Agreement (the "Pre-Substitute Rate").

Lender and Borrowers acknowledge that the discontinuation of the Index is a future event over which neither Lender nor Borrowers has influence but which will necessarily affect the Pre-Substitute Rate. Accordingly, Lender shall use reasonable efforts to select a Substitute Index Rate that Lender in good faith believes is a practical means of preserving the parties' intent relative to the economics of the Pre-Substitute Rate. Notwithstanding the foregoing, the parties acknowledge that, initially and/or over time, the Substitute Index Rate will differ from the Pre-Substitute Rate. In selecting the Substitute Index Rate, Lender shall consider to what extent and the manner in which industry-accepted substitutes for the Index have been established, and the parties acknowledge that different Substitute Index Rates may be selected for different types of loans and transactions. Borrowers agree that Lender shall not be liable in any manner for its selection of a Substitute Index Rate, provided that Lender makes such selection in good faith.

The Substitute Index Rate shall be used in lieu of the Pre-Substitute Rate, and all references in this Note to the Pre-Substitute Rate shall be deemed to refer to the Substitute Index Rate, effective as of the date specified by Lender in a written notice given by Lender to Borrowers. To the extent practicable, such notice shall be given at least 30 days prior to the effective date. The Substitute Index Rate shall remain in effect from the effective date set forth in such notice until the Maturity Date, as such may be extended, unless such an instance occurs where the Substitute Index Rate is no longer available, in which case the provisions of this section will again apply for purposes of replacing the Substitute Index Rate.

**CONVERSION OPTION.** On any payment date the Borrowers may exercise the Conversion Option to convert this loan to another ARM or Fixed Rate loan product. The loan products which may be elected will be those in effect at the time of conversion. The Borrowers must provide their notice of conversion 21 days prior to the conversion date. Conversion will modify the Adjustment Dates, Adjustment Frequency Period, Interest Rate Margin, and the Payment. If the Borrowers convert this loan to a fixed-rate loan, it may then be subject to loan

provisions, Yield Maintenance for Fixed-Rate Loans, Partial Open Prepayment Fee, prepayment penalties or other payment limitation. The conversion will be made only if the loan is not in default. The Borrowers will pay a conversion fee equivalent to the greater of $1,000 or .5% of the outstanding principal balance at the time the Conversion Option is requested; however, such conversion fee shall not exceed $5,000. The Borrowers may be required to execute any documents the Lender requires to effect the conversion. The converted loan product selected for conversion must be a different than the current loan product.

The converted interest rate in effect as of the Conversion Date will be equal to the Federal Agricultural Mortgage Corporation's required net yield as of noon Eastern Time, 7 days prior to the Conversion Date plus **1.700%.**

---

After default, interest will be charged on unpaid principal at the interest rate stated in Section 6 of this Note.

3.      **SCHEDULED PAYMENTS**
        **(A)      Time and Amount of Payments**
        **1 interest payment on January 1, 2020, with interest calculated from the date of closing on the unpaid Principal balance at the applicable interest rate under this Note; 38 consecutive semi-annual principal and interest payments of $365,865.66 each, beginning July 1, 2020, and the final payment of all remaining Principal, accrued interest, and any applicable fees and costs on October 11, 2039, which is called the "Maturity Date."**
        **(B)      Place of Payments**
        Borrowers will make payments at **7755 Office Plaza Dr. North, Suite 195, West Des Moines, IA 50266** or at a different place if required by Lender.

        If Lender at any time determines, in its sole but reasonable discretion, that it has miscalculated the amount of any installment payment (whether because of a miscalculation of the Adjustable Rate or otherwise), then Lender shall give notice to Borrowers of the corrected amount of the installment payment (and the corrected Adjustable Rate, if applicable) and (i) if the corrected amount of the installment payment represents an increase, then Borrowers shall, within 30 calendar days thereafter, pay to Lender any sums that Borrowers would have otherwise been obligated under this Note to pay to Lender had the amount of the installment payment not been miscalculated, or (ii) if the corrected amount of the installment payment represents a decrease thereof and Borrowers are not otherwise in breach or default under any of the terms and provisions of this Note, the Security Instrument or any other loan document evidencing or securing this Note, then Borrowers shall thereafter be paid the sums that Borrowers would not have otherwise been obligated to pay to Lender had the amount of the installment payment not been miscalculated.

4.      **INTEREST CALCULATION**
        Interest on this Note is computed on a 30/360 simple interest basis; that is, with exception of the month in which the loan settlement occurs, monthly interest is calculated by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by a month of 30 days. The month in which the loan settlement date occurs, interest shall accrue on a "30/360" basis from and including the settlement date to and including the last day of such month, calculated as if such month had 30 days. (For example, if this Note had settled on either February 15 or March 15, in either case, there would be 15 days of interest for the remainder of that first month.) Unless required by applicable law, payments will be applied first to collection expenses and protective advances, second to interest, third to principal, and finally to late charges.

5.      **PREPAYMENTS**
        Any prepayments of scheduled installments that are made on a date that is not an installment payment date must be accompanied by interest to the next installment payment date and that such prepayment will not be credited to the Borrowers' account until such installment payment date.
        Any prepayments, partial or in whole, other than scheduled installment payments must be accompanied by unpaid interest accrued on such principal amount from the date to which interest was last paid to the next installment payment date, and such prepayment shall not be considered as having been received and will not be credited to the Borrowers' account until such installment payment date. If the Borrowers make a prepayment there will be no delays in the due dates of Borrowers' installment payments unless the Lender agrees in writing to those delays and that unless the Borrowers and Lender agree otherwise, the Lender at its sole discretion may reamortize the Note on the basis of the new principal balance; otherwise the making of a prepayment will operate only to discharge the Note at an earlier date. Excepting the requirement that Borrowers shall pay all interest to the next installment payment date with any prepayment, there shall be no additional prepayment penalties, fees, or premium charged to Borrowers for early

payment of this Note.

**6.      INTEREST AFTER DEFAULT**

Upon the occurrence and during the continuance of any Event of Default under this Note, including failure to pay this Note upon final maturity, at Lender's option, Lender may add any unpaid interest and any applicable costs and expenses to Principal then due under the Note and such sum will bear interest therefrom until paid at the rate provided in this Note (including any increased interest rate). From and after the occurrence of any default, whether by nonpayment, maturity, acceleration, nonperformance or otherwise, and until such default has been cured, all outstanding amounts due under this Note shall bear interest at a rate equal to 18% per annum, or the maximum legal rate allowed by applicable state law if this rate is in excess of the maximum rate Lender is permitted to charge.

**7.      ANNUAL FINANCIAL STATEMENTS**

Borrowers agree to provide Lender with updated financial statements and other requested financial reports, including tax returns on or before May 31st of each year. The failure of Borrowers to provide annual financial statements or other requested reports within a reasonable time may be declared to be a default of this Note by Lender and Lender may exercise all remedies under Section 14 of this Note or as provided elsewhere in this Note.

**8.      DISSEMINATION OF INFORMATION**

If Lender determines at any time to sell, transfer or assign this Note, the Security Instrument, as defined below, and any other security instruments, and any or all servicing rights with respect thereto, or to grant participations therein ("Participations") or issue, in a public offering or private placement, mortgage pass-through certificates or other securities evidencing a beneficial interest in the loan ("Securities"), Lender may forward to each purchaser, transferee, assignee, servicer, participant, investor, or their respective successors in such Participations and/or Securities ("collectively, the "Investor"), any rating agency rating such Securities and each prospective Investor, all documents and information which Lender now has or may hereafter acquire relating to the Indebtedness and to Borrowers, any guarantor, any indemnitors and the Property, which shall have been furnished by Borrowers, any guarantor or any indemnitors, as Lender determines necessary or desirable. All information furnished by Borrowers shared with each prospective Investor shall be shared on a confidential basis and, excepting information shared with the Federal Agricultural Mortgage Corporation and any of its affiliates, which Borrowers hereby consent without further notice, Borrowers shall receive notice thereof.

**9.      LENDER ADVANCES**

Lender may make advances under the Security Instrument, as defined below, providing security for this Note, to protect the Lender's interest in the Security Instrument or other instrument providing security for this Note from loss of value or damage. Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate stated in Section 6 of this Note shall become an obligation due and owing under the terms of this Note immediately upon the date advanced by Lender and is an obligation of Borrowers secured by the Security Instrument or other instrument providing security for this Note.

**10.     GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to Borrowers under this Note will be given by delivering it or by mailing it by first class mail to Borrowers at **1306 W Herndon Ave #101, Fresno, CA 93711**, or at a different address if Borrowers give Lender a notice of Borrowers' different address.

Any notice that must be given to Lender under this Note will be given by delivering it or by mailing it by first class mail to Lender at the address stated in Section 3(B) above or at a different address if Borrowers are given a notice of that different address.

**11.     WAIVERS**

**MULTISTATE ADJUSTABLE RATE NOTE**
**Farmer Mac UNIFORM INSTRUMENT**

4

Borrowers and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require Lender to demand payment of amounts due. "Notice of Dishonor" means the right to require Lender to give notice to other persons that amounts due have not been paid.

**12.    UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Lender under this Note, one or more mortgages (each a "Security Instrument" and collectively, the "Security Instrument") dated the same date as this Note, protects the Lender from possible losses which might result if Borrowers do not keep the promises which Borrowers make in this Note. That Security Instrument describes how and under what conditions Borrowers may be required to make immediate payment in full of all amounts Borrowers owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred to a third party not under common control of one or more of the Guarantors (or if any of the Borrowers is not a natural person and a beneficial interest in any of the Borrowers of more than ten percent (10%) is sold or transferred, excluding transfer to trusts for estate planning purposes) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

**13.    USURY**

The parties to this Note intend and agree that the indebtedness evidenced by this Note and any related documents shall remain in compliance with any usury provisions of the state within which this Note was made by Borrowers. This Note and any related documents are subject to the express condition that at no time shall the Borrowers be obligated, or required, to pay interest on the principal balance at a rate that could subject Lender to either civil or criminal liability as a result of such rate being in excess of the maximum rate which Lender is permitted to charge. If, by the terms of this Note, Borrowers are, at any time, required or obligated to pay interest on the principal balance at a rate in excess of such maximum rate, then the rate of interest under this Note shall be deemed to be immediately reduced to such maximum rate, and interest payable hereunder shall be computed at such maximum rate, and any portion of all prior Interest payments in excess of such maximum rate shall be applied, and/or shall retroactively be deemed to have been payments made, in reduction of the principal balance.

**14.    DEFAULT AND BORROWERS' FAILURE TO PAY AS REQUIRED**
**(A)    Event of Default**

The occurrence of any one or more of the following shall constitute an "Event of Default" under this Note, the Security Instrument, and any related loan documents, as such term is used herein:

(1)    If Borrowers fail to repay any interest or Principal under the Note when due;

(2)    If any of the Borrowers default in any material respect in the performance of any of the other covenants, agreements and obligations of the Borrowers under the Security Instrument or any related loan documents involving the payment of money and fails to cure such default within ten (10) days;

(3)    If any of the Borrowers defaults in any material respect in the performance of any of such Borrowers' non-monetary covenants, agreements and obligations under this Note, the Security Instrument or any related loan documents and fails to cure such default within thirty (30) days after written notice thereof from Lender;

(4)    If any representation or warranty, statement, report or certificate now or hereafter made by any of the Borrowers, was not true and correct in any material respect when made;

(5)    If any bankruptcy or insolvency petition is filed by or against any of the Borrowers under the Federal Bankruptcy Code or any similar state or federal Law, whether now or hereafter existing (and, in the

case of involuntary proceedings, failure to cause the same to be vacated, stayed or set aside within thirty (30) days after filing);

        **(6)**      If a default occurs under the Security Instrument or any of the related loan documents and continues beyond the applicable grace period, if any, contained therein;

        **(7)**      If any of the Borrowers transfers any interest in the Property in violation of Section 15 of the Security Instrument; provided, however, that Borrowers shall have the right to prepay the Principal balance of the Note, in whole or in part, subject to the prepayment conditions and any other applicable costs and fees, as further set forth in this Note.

**(B)**    **Late Charge for Overdue Payments**

If any installment of Principal or interest is not received by the Lender by the end of the 10th calendar day after the date it is due, a late fee shall be payable on such defaulted payment at a rate which is equal to 5% per annum above the current rate of interest under this note, subject to a minimum interest charge of 5% of such defaulted payment.

**(C)**    **Notice of Default**

Upon the occurrence and during the continuance of any Event of Default under this Note, and if allowed by applicable law, Lender will send Borrowers a written notice telling Borrowers that if Borrowers do not pay the overdue amount or otherwise cure the Event of Default within thirty (30) days after receipt of written notice from Lender specifying the nature of the Event of Default, Lender may require Borrowers to pay immediately the full amount of Principal which has not been paid and all the interest and any applicable fees and costs that Borrowers owe on that amount.

**(D)**    **No Waiver By Lender**

Even if after and during the continuance of any Event of Default, Lender does not require Borrowers to pay immediately in full as described above, Lender will still have the right to do so if an Event of Default occurs or is continuing at any later time.

**(E)**    **Payment of Lender's Costs and Expenses**

Upon the occurrence of any Event of Default under this Note or if Lender has required Borrowers to pay immediately in full as described above, Lender will have the right to be paid back by Borrowers for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law.  If allowed by applicable law, those expenses include, for example, reasonable attorneys' fees.

**NOTICE IS HEREBY GIVEN TO MAKER THAT ORAL AGREEMENTS OR ORAL COMMITMENTS TO LEND MONEY, EXTEND CREDIT, MODIFY LOAN TERMS OR FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER CALIFORNIA LAW.**

*[remainder intentionally left blank – signature page follows]*

**MULTISTATE ADJUSTABLE RATE NOTE**
**Farmer Mac UNIFORM INSTRUMENT**

**BORROWERS:**

**COPPER AVENUE INVESTMENTS, LLC,**
a California limited liability company

By: Darius Assemi
Its: Manager

**ASHLAN & HAYES INVESTMENTS, LLC,**
a California limited liability company

By: Darius Assemi
Its: Manager

**MARICOPA ORCHARDS, LLC,**
a California limited liability company

By: Darius Assemi
Its: General Manager

**ACAP HOLDINGS, LLC,**
a California limited liability company
  By: Amended and Restated Farid Assemi Revocable
      Trust, its Member

      By: Farid Assemi, its Trustee

  By: Amended and Restated Darius Assemi Revocable
      Trust, its Member

      By: Darius Assemi, its Trustee

  By: Amended and Restated Farshid Assemi and
      Sonia Rosemary Assemi Revocable Trust,
      its Member

      By: Farshid Assemi, its Co-Trustee

      By: Sonia Assemi, its Co-Trustee

PAY TO THE ORDER OF
**U.S. Bank National Association, as** Custodian/Trustee for Federal Agricultural Mortgage Corporation programs
WITHOUT RECOURSE

Conterra Agricultural Capital, LLC

Signature
**Mark A. Smith,** COO & General Counsel

## FIRST AMENDMENT TO NOTE

Loan #<sup>REDACTED</sup>1674

This FIRST AMENDMENT TO NOTE (this "Amendment") is made and entered into as of the _2nd_ day of _February_, 2023 (the "Effective Date"), by and between Maricopa Orchards, LLC, a California limited liability company, Copper Avenue Investments, LLC, a California limited liability company, Ashlan & Hayes Investments, LLC, a California limited liability company and ACAP Holdings, LLC, a California limited liability company (individually and collectively, "Borrowers"), Lincoln Grantor Farms, LLC, a California limited liability company ("Purchaser 1'), and ACAP Farms, LLC, a California limited liability company ("Purchaser 2") and U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs ("Lender").

### RECITALS

WHEREAS, Borrowers executed a promissory note dated October 11, 2019, in the original principal amount of $10,258,632.00 payable to Conterra Agricultural Capital, LLC (the "Note"), and subsequently endorsed to Lender, which is secured by a Deed of Trust Security Agreement, Assignment of Rents and Fixture Filing dated October 11, 2019 (the "Security Instrument"), and recorded with the Kings County, California Clerk-Recorder as Document Number 1917421 on October 15, 2019, and recorded with the Fresno County, California Recorder as Document Number 2019-0123387 on October 15, 2019, as further affected by an Assignment of Deed of Trust dated October 11, 2019, and recorded as Document Number 1917422 with the Kings County, California Clerk – Recorder on October 15, 2019, and as Document Number 2019-0123388 with the Fresno County, California Recorder on October 15, 2019.

WHEREAS, Borrower, Ashlan & Hayes Investments, LLC desires to convey its interests in the Property encumbered by the Security Instrument to Purchaser 1;

WHEREAS, the Security Instrument expressly prohibits the conveyance of the Property without the express written consent of the Lender;

WHEREAS, the Borrower, ACAP Holdings, LLC transferred its interest in the Property encumbered by the Security Instrument to Purchaser 2, a limited liability company owned and managed by Borrower, by Grant Deed dated October 22, 2020 and recorded with the Fresno County, California Recorder, on November 2, 2020 as Document Number 2020-01567, which constitutes a default under the Security Instrument (the "Default");

WHEREAS, the Lender is willing to (i) provide its consent to the transfer of the Property to Purchaser 1 (ii) waive the Default and consent to the transfer of the Property to Purchaser 2 (collectively, the "Purchasers") on condition that Purchasers assume the obligations under the Security Instrument and agree to perform all of the covenants and conditions contained in the Security Instrument, the Note, and related loan documents (collectively, the "Loan Documents");

WHEREAS, as part of the consideration for acquiring the Property and Lender's consent to acquisition of the Property, Purchaser 1 agrees to assume all rights, responsibilities, and obligations of Ashlan & Hayes Investments, LLC under the Note and Security Instrument and perform all of the covenants and conditions contained in the Loan Documents; and

WHEREAS, as part of the consideration for acquiring the Property and Lender's waiver of the Default and consent to acquisition of the Property, Purchaser 2 agrees to assume all rights, responsibilities, and obligations of ACAP Holdings, LLC under the Note and Security Instrument and perform all of the

**First Amendment to Note**
**Page 2 of 4**

covenants and conditions contained in the Loan Documents;

NOW, THEREFORE, for and in consideration of the mutual agreements contained in this Amendment, Purchasers, Lender, and Borrowers (each a "Party" and collective, the "Parties") agree as follows:

<div align="center">

**AGREEMENT**

</div>

**1.    AMENDMENT TO NOTE**

The Parties agree that the recitals set forth above are true and accurate and are hereby incorporated in and made a part of this Agreement. The Note is hereby amended by the following:

    a. Lincoln Grantor Farms LLC, a California limited liability company, is added as a Borrower to the Note and hereby assumes and agrees to all terms under the Note, Security Instrument, this Amendment and the Loan Documents;

    b. Ashlan &Hayes Investments, LLC is removed as a Borrower to the Note;

    c. ACAP Farms, LLC, a California limited liability company, is added as a Borrower to the Note and hereby assumes and agrees to all terms under the Note, Security Instrument, this Amendment and the Loan Documents;

    d. ACAP Holdings, LLC is removed as a Borrower to the Note.

**2.    TERMS OF NOTE**

Capitalized terms used in this Amendment that are not defined shall have the meaning assigned to such terms in the Note and Security Instrument. Except as set forth in this Amendment, all of the provisions of the Note shall remain unchanged, shall continue in full force and effect, and are hereby ratified and confirmed in all respects by the Parties.

**NOTICE IS HEREBY GIVEN TO MAKER THAT ORAL AGREEMENTS OR ORAL COMMITMENTS TO LEND MONEY, EXTEND CREDIT, MODIFY LOAN TERMS OR FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER CALIFORNIA LAW.**

<div align="center">

*[remainder of page intentionally left blank – signature page follows]*

</div>

**First Amendment to Note**
**Page 3 of 4**

IN WITNESS WHEREOF, the Parties, intending to be legally bound, have executed this Amendment as of the Effective Date.

**"BORROWERS"**

**COPPER AVENUE INVESTMENTS, LLC,**
A California limited liability company

By: Darius Assemi
Its: Manager

**ASHLAN & HAYES INVESTMENTS, LLC,**
A California limited liability company

By: Darius Assemi
Its: Manager

**MARICOPA ORCHARDS, LLC,**
A California limited liability company

By: Farshid Assemi
Its: General Manager

**ACAP HOLDINGS, LLC,**
A California limited liability company
By Amended and Restated Farid Assemi Revocable Trust, its Member

By: Farid Assemi
Its: Trustee

By Amended and Restated Darius Assemi Revocable Trust, its Member

By: Darius Assemi
Its: Trustee

By Amended and Restated Farshid Assemi and Sonia Rosemary Assemi Revocable Trust, its Member

By: Farshid Assemi
Its: Co-Trustee

By: Sonia Assemi
Its: Co-Trustee

**First Amendment to Note**
**Page 4 of 4**


"PURCHASER 1"

**LINCOLN GRANTOR FARMS LLC,**
a California limited liability company

By:  Neema Assemi
Its:  Manager

"PURCHASER 2"

**ACAP FARMS, LLC,**
a California limited liability company

By:  Farshid Assemi
Its:  Manager



"LENDER"

**U.S. Bank National Association,**
**as Custodian/Trustee for Federal Agricultural Mortgage Corporation** programs

By:  Heather Wright Manager   Closing & Servicing of Federal Agricultural Mortgage Corporation
Attorney-In-Fact for U.S. Bank, National Association for Federal Agricultural Mortgage Corporation
programs, under Limited Power of Attorney dated August 25, 2021

# Allonge to Promissory Note

Loan #<sup>REDACTED</sup>1674

For purposes of further endorsement of the following described Note, this Allonge is affixed and becomes a permanent part of said Note:

Note Date: **October 11, 2019**

Original Amount: **$10,258,632.00**

Borrower Name(s): **Maricopa Orchards, LLC, Copper Avenue Investments, LLC, Ashlan & Hayes Investments, LLC, and ACAP Holdings, LLC**

Property Address: **1,110 +/- Acres, Kings County and Fresno County, California**

PAY TO THE ORDER OF

**U.S. Bank National Association**, as Custodian/Trustee for **Federal Agricultural Mortgage Corporation programs**

WITHOUT RECOURSE

**Conterra Agricultural Capital, LLC**

By: _____

Name: Mark A. Smith

Title: COO & General Counsel

Allonge to Promissory Note

1

# ADJUSTABLE RATE RIDER

Loan<sup>REDACTED</sup>1674

THIS ADJUSTABLE RATE RIDER is made this _2nd_ day of _February_ , 2023, and is incorporated into and shall be deemed to amend and supplement the amended and restated Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned Borrowers and Grantors to secure the adjustable rate Note (the "Note") to **U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs** (the "Lender") dated January 11, 2019 and covering the property described in the Security Instrument and located at:

**1,110 +/- Acres**
**Kings County and Fresno County, California**
[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE PERIODIC PAYMENT**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrowers, Grantors, and Lender further covenant and agree as follows:

The Note has the following terms which provide for changes in the interest rate and periodic payments, as follows:

2.      **INTEREST**
Prior to default, interest will be charged on unpaid principal until the full amount of Principal has been paid. Borrowers will pay interest at a yearly rate of 3.72%. The interest rate Borrowers will pay will change in accordance with this Section 2.

| | |
|---|---|
| **INITIAL ADJUSTMENT DATE** | **November 1, 2019** |
| **ORIGINAL AMORTIZATION TERM** | **20 years** |
| **ADJUSTMENT FREQUENCY PERIOD** | **monthly** |
| **MARGIN** | **1.70%** |

**ADJUSTABLE RATE PROVISION.** The interest rate stated in this Note is subject to adjustment by the Lender or any subsequent holder of this Note on the Initial Adjustment Date and on subsequent dates established by the Adjustment Frequency Period thereafter. Any such change in the interest rate shall be made automatically but in no event shall the adjusted interest rate exceed the maximum interest rate then permitted by law. When the rate is adjusted the remaining current principal balance of the Note will be reamortized over the remaining amortization term to determine subsequent payment amounts. Lender reserves the right to not adjust the loan in the event of default. Notice of the adjusted rate and the new amortized payment will be sent to the Borrowers after each interest rate adjustment.

CALIFORNIA–Farmer Mac UNIFORM INSTRUMENT (Open End)

1

**INDEX.** Beginning with the Initial Adjustment Date, the adjustable interest rate will be based on an Index. The "Index" is the *one-month London Interbank Offered Rate ("LIBOR")* as published in the Wall Street Journal 2 business days before the applicable rate change date, rounded to 2 decimal places. The Index percentage will be added to the Margin to determine the adjustable rate.

**LIBOR INDEX RATE SUBSTITUTION.** If Lender determines, in its sole discretion, that the LIBOR base rate ("Index") (i) has been or imminently will be discontinued, (ii) is no longer an industry-accepted reference rate for loans of a similar type to the Loan and/or has been superseded by an alternative reference rate, or (iii) is no longer representative or may not be used pursuant to a public statement by the administrator of the Index or other regulatory authority (e.g., the Federal Reserve), in each case with respect to any type of loan or transaction, then Lender may select an alternative reference rate, which may reflect adjustments to the related spread or margin (collectively, the "Substitute Index Rate"), to be used in lieu of the LIBOR-based interest rate set forth in the Note and/or this Agreement (the "Pre-Substitute Rate").

Lender and Borrowers acknowledge that the discontinuation of the Index is a future event over which neither Lender nor Borrowers has influence but which will necessarily affect the Pre-Substitute Rate. Accordingly, Lender shall use reasonable efforts to select a Substitute Index Rate that Lender in good faith believes is a practical means of preserving the parties' intent relative to the economics of the Pre-Substitute Rate. Notwithstanding the foregoing, the parties acknowledge that, initially and/or over time, the Substitute Index Rate will differ from the Pre-Substitute Rate. In selecting the Substitute Index Rate, Lender shall consider to what extent and the manner in which industry-accepted substitutes for the Index have been established, and the parties acknowledge that different Substitute Index Rates may be selected for different types of loans and transactions. Borrowers agree that Lender shall not be liable in any manner for its selection of a Substitute Index Rate, provided that Lender makes such selection in good faith.

The Substitute Index Rate shall be used in lieu of the Pre-Substitute Rate, and all references in this Note to the Pre-Substitute Rate shall be deemed to refer to the Substitute Index Rate, effective as of the date specified by Lender in a written notice given by Lender to Borrowers. To the extent practicable, such notice shall be given at least 30 days prior to the effective date. The Substitute Index Rate shall remain in effect from the effective date set forth in such notice until the Maturity Date, as such may be extended, unless such an instance occurs where the Substitute Index Rate is no longer available, in which case the provisions of this section will again apply for purposes of replacing the Substitute Index Rate.

**CONVERSION OPTION.** On any payment date the Borrowers may exercise the Conversion Option to convert this loan to another ARM or Fixed Rate loan product. The loan products which may be elected will be those in effect at the time of conversion. The Borrowers must provide their notice of conversion 21 days prior to the conversion date. Conversion will modify the Adjustment Dates, Adjustment Frequency Period, Interest Rate Margin, and the Payment. If the Borrowers convert this loan to a fixed-rate loan, it may then be subject to loan

provisions, Yield Maintenance for Fixed-Rate Loans, Partial Open Prepayment Fee, prepayment penalties or other payment limitation. The conversion will be made only if the loan is not in default. The Borrowers will pay a conversion fee equivalent to the greater of $1,000 or .5% of the outstanding principal balance at the time the Conversion Option is requested; however, such conversion fee shall not exceed $5,000. The Borrowers may be required to execute any documents the Lender requires to effect the conversion. The converted loan product selected for conversion must be a different than the current loan product.

---

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

The converted interest rate in effect as of the Conversion Date will be equal to the Federal Agricultural Mortgage Corporation's required net yield as of noon Eastern Time, 7 days prior to the Conversion Date plus **1.700%**.

**3.    SCHEDULED PAYMENTS**
**(A)    Time and Amount of Payments**
1 interest payment on January 1, 2020, with interest calculated from the date of closing on the unpaid Principal balance at the applicable interest rate under this Note; 38 consecutive semi-annual principal and interest payments of $365,865.66 each, beginning July 1, 2020, and the final payment of all remaining Principal, accrued interest, and any applicable fees and costs on October 11, 2039, which is called the "Maturity Date."
**(B)    Place of Payments**
Borrowers will make payments at **9169 Northpark Dr., Johnston, IA 50131** or at a different place if required by Lender.

*[remainder intentionally left blank – signature page follows]*

**CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)**

Dated effective this 2nd day of ~~January~~ February 2023

**BORROWERS:**

**COPPER AVENUE INVESTMENTS, LLC,**
a California limited liability company

By: Darius Assemi
Its: Manager

**CANTUA ORCHARDS, LLC**
a California limited liability company

By: Farshid Assemi 1997 Ranch Trust, its Member

Farid Assemi, its Trustee

By: Farid Assemi 1997 Ranch Trust, its Member

Farshid Assemi, its Trustee

By: Farid Assemi Revocable Trust dated January 24, 2007, its Member

Farid Assemi, its Trustee

By: Darius Assemi Revocable Trust dated January 30, 2007

Darius Assemi, its Trustee

By: Farshid Assemi and Sonia Rosemary Assemi Revocable Trust dated January 31, 2007, its Member

By: Farshid Assemi, its Co-Trustee

By: Sonia Assemi, its Co-Trustee

**LINCOLN GRANTOR FARMS, LLC,**
a California limited liability company

By: Neema Assemi
Its: Manager

---

**CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)**

4

**GRADON FARMS, LLC,**
a California limited liability company

By: Darius Assemi
Its: Manager

**ACAP FARMS, LLC,**
a California limited liability company

By: Farshid Assemi
Its: Manager

# CROSS COLLATERALIZATION RIDER

Loan [REDACTED]1674

THIS CROSS COLLATERALIZATION RIDER is made this *February 2*, 2023, and is incorporated into and shall be deemed to amend and supplement the ~~amended and/restated~~ Amended and Restated Open-End Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing (the "Security Instrument") of the same date, given by the undersigned Borrowers and Grantors to secure a Note to **U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs** (the "Lender") dated October 11, 2019 and covering the Property described in the Security Instrument and located at:

**1,110 +/- Acres**
**Kings County and Fresno County, California**
[Property Address]

In addition to the covenants and agreements made in the Security Instrument, Borrowers, Grantors, and Lender further covenant and agree that on the date hereof the following other loans have been sold to Federal Agricultural Mortgage Corporation:

| Borrowers/Grantors Names | Date | Loan Amount/Loan No. |
|---|---|---|
| Copper Avenue Investments, LLC, ACAP Farms, LLC, Gradon Farms, LLC & Lincoln Grantor Farms, LLC, Maricopa Orchards, LLC & Cantua Orchards, LLC | 10/11/2019 | $5,297,232.00/[REDACTED]1673 |
| C&A Farms, LLC & Whitebridge Farms, LLC | 01/08/2018 | $5,500,000.00/[REDACTED]1725 |
| C&A Farms, LLC & Whitebridge Farms, LLC | 01/08/2018 | $1,500,000.00/[REDACTED]1728 |
| Assemi Brothers, LLC, C&A Farms, LLC, Whitebridge Farms, LLC, Maricopa Orchards, LLC & Willow Avenue Investments, LLC | 12/14/2020 | $12,500,000.00/[REDACTED]2676 |
| Assemi Brothers, LLC, C&A Farms, LLC, Whitebridge Farms, LLC, Maricopa Orchards, LLC & Willow Avenue Investments, LLC | 12/14/2020 | $12,500,000.00/[REDACTED]2678 |
| C & A Farms, LLC, Willow Avenue Investments, LLC, Gradon Farms, LLC, Cantua Orchards, LLC, Copper Avenue Investments, LLC, Lincoln Grantor Farms, LLC, ACAP Farms, LLC and Maricopa Orchards, LLC | 2/2/2023 | $7,400,000.00/[REDACTED]1004 |

each of which is evidenced by a separate promissory note (the "Other Notes"), and each of which is secured by a separate mortgage, deed of trust, or security deed (the "Other Security Instruments"). It is agreed that in addition to the Note, this Security Instrument secures the obligations, debts, and liabilities evidenced by the Other Notes and Other Security Instruments referenced herein, plus interest thereon, which is payable to Lender and/or Federal Agricultural Mortgage Corporation.

BY SIGNING BELOW, Borrowers and Grantors accept and agree to the terms and covenants contained in this Cross Collateralization Rider.

**Farmer Mac Cross-Collateralization Rider**

1

Dated effective this _2nd_ day of ~~January~~ 2023 *February*

**BORROWERS:**

**COPPER AVENUE INVESTMENTS, LLC,**
a California limited liability company

By: Darius Assemi
Its: Manager

**CANTUA ORCHARDS, LLC**
a California limited liability company
By: Farshid Assemi 1997 Ranch Trust, its Member

Farid Assemi, its Trustee
By: Farid Assemi 1997 Ranch Trust, its Member

Farshid Assemi, its Trustee
By: Farid Assemi Revocable Trust dated January 24, 2007, its Member

Farid Assemi, its Trustee
By: Darius Assemi Revocable Trust dated January 30, 2007

Darius Assemi, its Trustee
By: Farshid Assemi and Sonia Rosemary Assemi Revocable Trust dated January 31, 2007, its Member

By: Farshid Assemi, its Co-Trustee

By: Sonia Assemi, its Co-Trustee

**LINCOLN GRANTOR FARMS, LLC,**
a California limited liability company

By: Neema Assemi
Its: Manager

Farmer Mac Cross-Collateralization Rider

**GRADON FARMS, LLC,**
a California limited liability company

By: Darius Assemi
Its: Manager

**ACAP FARMS, LLC,**
a California limited liability company

By: Farshid Assemi

Its: Manager

**Maricopa Orchards, LLC,**
a California limited liability company

By: Farshid Assemi
Its: General Manager

**Farmer Mac Cross-Collateralization Rider**

3

# CROSS DEFAULT RIDER

Loan REDACTED**1674**

THIS CROSS DEFAULT RIDER is made this *February 2*, **2023,** and is incorporated into and shall be deemed to amend and supplement the amended and restated Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date, given by the undersigned Borrower and Grantors to secure a Note to **U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs** (the "Lender") dated October 11, 2019 and covering the Property described in the Security Instrument and located at: **1,110 +/- Acres**
**Kings County and Fresno County, California**
[Property Address]

In addition to the covenants and agreements made in the Security Instrument, Borrowers, Grantors and Lender further covenant and agree that on the date hereof the following other loans have been sold to Federal Agricultural Mortgage Corporation:

| Grantors/Borrowers Names | Date | Loan Amount/Loan No. |
|---|---|---|
| Copper Avenue Investments, LLC, ACAP Farms, LLC, Gradon Farms, LLC, Lincoln Grantor Farms, LLC, Maricopa Orchards, LLC & Cantua Orchards, LLC | 10/11/2019 | $5,297,232.00/REDACTED**1673** |
| C&A Farms, LLC & Whitebridge Farms, LLC | 01/08/2018 | $5,500,000.00/REDACTED**1725** |
| C&A Farms, LLC & Whitebridge Farms, LLC | 01/08/2018 | $1,500,000.00/REDACTED**1728** |
| Assemi Brothers, LLC, C&A Farms, LLC, Whitebridge Farms, LLC, Maricopa Orchards, LLC & Willow Avenue Investments, LLC | 12/14/2020 | $12,500,000.0 REDACTED**2676** |
| Assemi Brothers, LLC, C&A Farms, LLC, Whitebridge Farms, LLC, Maricopa Orchards, LLC & Willow Avenue Investments, LLC | 12/14/2020 | $12,500,000.00/REDACTED**2678** |
| C & A Farms, LLC, Willow Avenue Investments, LLC, Gradon Farms, LLC, Cantua Orchards, LLC, Copper Avenue Investments, LLC, Lincoln Grantor Farms, LLC, ACAP Farms, LLC and Maricopa Orchards, LLC | 2/2/2023 | $7,400,000.00/REDACTED**1004** |

each of which is evidenced by a separate promissory note (the "Other Notes"), and each of which is secured by a separate mortgage, deed of trust, or security deed (the "Other Security Instruments"). It is agreed that any default under this Security Instrument or this Note shall be deemed a default under the Other Notes and Other Security Instruments; and any default under any or all of the Other Notes or Other Security Instruments shall be deemed to be a default under this Note and this Security Instrument.

BY SIGNING BELOW, Borrowers and Grantors accept and agree to the terms and covenants contained in this Cross Default Rider.

**FARMER MAC MULTISTATE CROSS DEFAULT RIDER**

1

Dated effective this 2ⁿᵈ day of January, 2023

**BORROWERS:**

**COPPER AVENUE INVESTMENTS, LLC,**
a California limited liability company

By: Darius Assemi
Its: Manager

**CANTUA ORCHARDS, LLC**
a California limited liability company
    By: Farshid Assemi 1997 Ranch Trust, its Member

    Farid Assemi, its Trustee
    By: Farid Assemi 1997 Ranch Trust, its Member

    Farshid Assemi, its Trustee
    By: Farid Assemi Revocable Trust dated January 24, 2007, its Member

    Farid Assemi, its Trustee
    By: Darius Assemi Revocable Trust dated January 30, 2007

    Darius Assemi, its Trustee
    By: Farshid Assemi and Sonia Rosemary Assemi Revocable Trust dated January 31, 2007, its Member

    By: Farshid Assemi, its Co-Trustee

    By: Sonia Assemi, its Co-Trustee

---

**FARMER MAC MULTISTATE CROSS DEFAULT RIDER**

2

**LINCOLN GRANTOR FARMS, LLC,**
a California limited liability company

By:  Neema Assemi
Its:  Manager

**GRADON FARMS, LLC,**
a California limited liability company

By: Darius Assemi
Its: Manager

**ACAP FARMS, LLC,**
a California limited liability company

By: Farshid Assemi

Its: Manager

**Maricopa Orchards, LLC,**
a California limited liability company

By: Farshid Assemi
Its: General Manager

Exhibit G

**Recording Requested By:**
**Farmer Mac**

**After Recording Return to:**
**Farmer Mac**
**9169 Northpark Dr.**
**Johnston, IA 50131**
**Attn: Megan Spalding**

## ASSUMPTION AGREEMENT

Loan <sup>REDACTED</sup> 1674

This ASSUMPTION AGREEMENT (this "Agreement") is made and entered into as of this 2nd day of _February_ , 2023, by and between ACAP Farms, LLC, a California limited liability company ("Purchaser"), and U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs of St. Paul, Minnesota, ("Lender"), and Copper Avenue Investment, LLC, a California limited liability company, ACAP Holdings, LLC, a California limited liability company, Lincoln Grantor Farms LLC, a California limited liability company and Maricopa Orchards, LLC, a California limited liability company (collectively, "Borrowers").

### RECITALS

WHEREAS, Borrowers are indebted to Lender under a note dated October 11, 2019, in the principal amount of $10,258,632.00 (the "Note"), which is secured by an Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing of the same date, recorded with the Kings County, California Clerk-Recorder Document Number 1917421, on October 15, 2019 and recorded with the Fresno County, California Recorder on October 15, 2019 as Document Number 2019-0123387 (the "Security Instrument"), encumbering the real property as described therein (the "Property"); Said Security Instrument was assigned to U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs on October 11, 2019, and recorded as Document Number 1917422 on October 15, 2019 with the Kings County, California Clerk – Recorder and as Document Number 2019-0123388 on October 15, 2019 with the Fresno County, California Recorder.

WHEREAS, the Security Instrument expressly prohibits the conveyance of the Property without the express written consent of the Lender;

WHEREAS, Borrower, **ACAP Holdings, LLC** (the "Transferring Borrower") transferred its interest in the Property encumbered by the Security Instrument to Purchaser, a limited liability company owned and managed by Borrower, by Grant Deed dated October 22, 2020 and recorded with the Fresno County, California Recorder on November 2, 2020 as Document Number 2020-01567, which constitutes a default under the Security Instrument (the "Default");

WHEREAS, the Lender is willing to provide its waiver of the Default and consent to the transfer of the Property to Purchaser on condition that Purchaser assumes the obligations under the Security Instrument and agrees to perform all of the covenants and conditions contained in the Security Instrument, the Note, and related loan documents (collectively, the "Loan Documents"); and

1

WHEREAS, as part of the consideration for acquiring the Property and Lender's waiver of the Default and consent to acquisition of the Property, Purchaser agrees to assume all rights, responsibilities, and obligations of the Transferring Borrower under the Note and Security Instrument and perform all of the covenants and conditions contained in the Loan Documents;

NOW, THEREFORE, for and in consideration of the mutual agreements contained in this Agreement and on condition that the lien of the Security Instrument held by Lender is a valid, first, and submitting lien on the Property and that the execution of this Agreement will not impair the lien of the Security Instrument, Purchaser, Lender, and Borrower (each a "Party" and collective, the "Parties") agree as follows:

<div align="center">

**AGREEMENT**

</div>

1.      **Assumption.** The Parties agree that the foregoing recitals are true and correct and are hereby incorporated fully by reference. Purchaser expressly assumes the Security Instrument and agrees to enter into an Amended and Restated Security Instrument and Amendment to Note, and agrees to perform all covenants, conditions, duties and obligations of Borrowers under the Loan Documents in accordance with the terms thereof.

2.      **Waiver of Default and Consent to Conveyance.** Lender hereby waives the Default and consents to the transfer of the Property from Borrower to Purchaser, but Lender expressly reserves the right to withhold its consent to any future sale or transfer of the Property, as provided for in the Security Instrument.

3.      **Warranties and Representations.** Purchaser and Borrower affirm, warrant, represent and covenant that neither Purchaser nor Borrower has any defenses or rights of set-off against Lender or against the payment, collection or enforcement of the indebtedness evidenced by the Note and secured by the Security Instrument. Purchaser and Borrower further warrant and represent as follows:

a.      Neither Purchaser nor Borrower has done any acts or omitted to do any act which might prevent Lender from, or limit Lender in, acting upon or under any of the provisions herein, in the Security Instrument, in the Note or any other Loan Documents;

b.      Neither Purchaser nor Borrower is prohibited under any other agreement with any other person or any judgment or decree, from the execution and delivery of this Agreement, the performance of each and every covenant hereunder or under the Security Instrument, Note or any other Loan Documents;

c.      No action has been brought or threatened which would in any way interfere with the right of Purchaser or Borrower to execute this Agreement and perform all of Purchaser's or Borrower's obligations contained herein, in the Note, in the Mortgage, or in any other Loan Document;

d.      All financial statements of Purchaser and Borrower are true and correct in all respects, fairly present the respective financial conditions of the subjects thereof, as of the respective dates thereof and no material adverse change has occurred that would affect Purchaser's or Borrower's ability to repay the indebtedness evidenced by the Note and secured by the Security Instrument;

<div align="center">

2

</div>

e.    Purchaser is duly formed, validly existing and in good standing under the laws of the State of California and has full power and authority to consummate the transactions contemplated under this Agreement.

**4.    Acknowledgements.** Borrower acknowledges that:

a.    The Loan Documents are in full force and effect; and,

b.    The principal balance of the Note as of December 27, 2022, is NINE MILLION ONE HUNDRED EIGHTY-NINE THOUSAND TWENTY-SIX and 77/100 DOLLARS ($9,189,026.77), and principal and interest are unconditionally due and owing to the Lender as provided in the Note.

**5.    Costs.** Purchaser shall pay all costs of the transfer of the Property and assumption made under this Agreement, to include without limitation, attorneys' fees and recording costs, as well as the cost of an endorsement to Lender's title insurance policy insuring the lien of the Security Instrument after the recording of this Agreement. Such costs shall be due at closing hereunder and the payment thereof shall be a condition precedent to Lender's consent to the transfer of the Property to Purchaser. In the event that it is determined that additional costs relating to this transaction are due, Purchaser agrees to pay such costs immediately upon demand.

**6.    Assumption Fee.** In consideration of Lender's waiving the Default and consenting to the conveyance of the Property to the Purchaser, Lender is entitled to, and has earned, an assumption fee in the amount of $750.00. Said fee shall be due and payable upon the execution and delivery of this Agreement. Borrower hereby agrees and acknowledges that said fee is being charged solely for costs relating to the assumption of the Security Instrument and not as interest for the forbearance or use of money.

**7.    Paragraph Headings.** The paragraph headings used herein are for convenience of reference only and shall not be used in the interpretation or construction hereof.

**8.    Governing Law.** This Agreement shall be governed, interpreted and construed by, through and under the laws of the State of California.

**9.    Attorneys' Fees.** All costs incurred by Lender in enforcing this Agreement and in collection of sums due Lender from Purchaser and Borrower, to include, without limitation, reasonable attorneys' fees through all trials, appeals, and proceedings, to include, without limitation, any proceedings pursuant to the bankruptcy laws of the United States.

**10.    Binding Effect.** This Agreement shall inure to the benefit of and be binding upon the parties hereto as well as their successors and assigns, heirs and personal representatives.

*[remainder of page intentionally left blank – signature page follows]*

3

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**"BORROWERS"**

**COPPER AVENUE INVESTMENTS, LLC,**
A California limited liability company

By: Darius Assemi
Its: Manager

**LINCOLN GRANTOR FARMS LLC,**
a California limited liability company

By: Neema Assemi
Its: Manager

**MARICOPA ORCHARDS, LLC,**
A California limited liability company

By: Farshid Assemi
Its: General Manager

**ACAP HOLDINGS, LLC,**
A California limited liability company
By Amended and Restated Farid Assemi Revocable Trust, its Member

By: Farid Assemi
Its: Trustee

By Amended and Restated Darius Assemi Revocable Trust, its Member

By: Darius Assemi
Its: Trustee

By Amended and Restated Farshid Assemi and Sonia Rosemary Assemi Revocable Trust, its Member

By: Farshid Assemi
Its: Co-Trustee

By: Sonia Assemi
Its: Co-Trustee

4

**"PURCHASER"**

**ACAP FARMS LLC,**
a California limited liability company

By:  Farshid Assemi
Its:  Manager


**"LENDER"**

**U.S. Bank National Association,**
**as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs**

By:  Heather Wright Manager – Closing & Servicing of Federal Agricultural Mortgage Corporation
Attorney-In-Fact for U.S. Bank, National Association for Federal Agricultural Mortgage Corporation
programs, under Limited Power of Attorney dated August 25, 2021

**Recording Requested By:**
**Conterra**

**After Recording Return to:**
**Conterra**
**5465 Mills Civic Pky, Ste. 201**
**West Des Moines, IA 50266**
**Attn: Alison**

### ASSUMPTION AGREEMENT

Loan REDACTED1674

     This ASSUMPTION AGREEMENT (this "Agreement") is made and entered into as of this 2ⁿᵈ day of ___February___, 2023, by and between Lincoln Grantor Farms LLC, a California limited liability company ("Purchaser"), and U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs of St. Paul, Minnesota, ("Lender"), and Copper Avenue Investment, LLC, a California limited liability company, ACAP Holdings, LLC, a California limited liability company, Ashlan & Hayes Investments, LLC, a California limited liability company and Maricopa Orchards, LLC, a California limited liability company (collectively, "Borrowers").

### RECITALS

     WHEREAS, Borrowers are indebted to Lender under a note dated October 11, 2019, in the principal amount of $10,258,632.00 (the "Note"), which is secured by an Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing of the same date, recorded with the Kings County, California Clerk-Recorder Document Number 1917421, on October 15, 2019 and recorded with the Fresno County, California Recorder on October 15, 2019 as Document Number 2019-0123387 (the "Security Instrument"), encumbering the real property as described therein (the "Property"); Said Security Instrument was assigned to U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs on October 11, 2019, and recorded as Document Number 1917422 on October 15, 2019 with the Kings County, California Clerk – Recorder and as Document Number 2019-0123388 on October 15, 2019 with the Fresno County, California Recorder.

     WHEREAS, Borrower, Ashlan & Hayes Investments, LLC, (the "Transferring Borrower") desires to convey their interest in the Property encumbered by the Security Instrument to Purchaser, a limited liability company owned and managed by Borrower;

     WHEREAS, the Security Instrument expressly prohibits the conveyance of the Property without the express written consent of the Lender;

     WHEREAS, the Lender is willing to provide its consent to the transfer of the Property to Purchaser on condition that Purchaser assumes the obligations under the Security Instrument and agrees to perform all of the covenants and conditions contained in the Security Instrument, the Note, and related loan documents (collectively, the "Loan Documents");

     WHEREAS, as part of the consideration for acquiring the Property and Lender's consent to

1

acquisition of the Property, Purchaser agrees to assume all rights, responsibilities, and obligations of the Transferring Borrower under the Note and Security Instrument and perform all of the covenants and conditions contained in the Loan Documents;

NOW, THEREFORE, for and in consideration of the mutual agreements contained in this Agreement and on condition that the lien of the Security Instrument held by Lender is a valid, first, and submitting lien on the Property and that the execution of this Agreement will not impair the lien of the Security Instrument, Purchaser, Lender, and Borrower (each a "Party" and collective, the "Parties") agree as follows:

## AGREEMENT

1.      **Assumption.** The Parties agree that the foregoing recitals are true and correct and are hereby incorporated fully by reference. Purchaser expressly assumes the Security Agreement, agrees to enter into an Amended and Restated Security Agreement and Guaranty of Note, and agrees to perform all covenants, conditions, duties and obligations of Borrower under the Loan Documents in accordance with the terms thereof. The Parties agree that the Note is hereby amended by substituting Purchaser for the Transferring Borrower, as borrower thereunder.

2.      **Consent to Conveyance.** Lender hereby consents to the transfer of the Property from Borrower to Purchaser, but Lender expressly reserves the right to withhold its consent to any future sale or transfer of the Property, as provided for in the Security Instrument.

3.      **Warranties and Representations.** Purchaser and Borrower affirm, warrant, represent and covenant that neither Purchaser nor Borrower has any defenses or rights of set-off against Lender or against the payment, collection or enforcement of the indebtedness evidenced by the Note and secured by the Security Instrument. Purchaser and Borrower further warrant and represent as follows:

a.      Neither Purchaser nor Borrower has done any acts or omitted to do any act which might prevent Lender from, or limit Lender in, acting upon or under any of the provisions herein, in the Security Instrument, in the Note or any other Loan Documents;

b.      Neither Purchaser nor Borrower is prohibited under any other agreement with any other person or any judgment or decree, from the execution and delivery of this Agreement, the performance of each and every covenant hereunder or under the Security Instrument, Note or any other Loan Documents;

c.      No action has been brought or threatened which would in any way interfere with the right of Purchaser or Borrower to execute this Agreement and perform all of Purchaser's or Borrower's obligations contained herein, in the Note, in the Mortgage, or in any other Loan Document;

d.      All financial statements of Purchaser and Borrower are true and correct in all respects, fairly present the respective financial conditions of the subjects thereof, as of the respective dates thereof and no material adverse change has occurred that would affect Purchaser's or Borrower's ability to repay the indebtedness evidenced by the Note and secured by the Security Instrument;

e.      Purchaser is duly formed, validly existing and in good standing under the laws

2

of the State of California and has full power and authority to consummate the transactions contemplated under this Agreement.

4.    **Acknowledgements.** Borrower acknowledges that:

        a.    The Loan Documents are in full force and effect; and,

        b.    The principal balance of the Note as of the December 27, 2022 is NINE MILLION, ONE HUNDRED EIGHTY NINE THOUSAND TWENTY SIX & 77/100 DOLLARS ($ 9,189,026.77) and principal and interest are unconditionally due and owing to the Lender as provided in the Note.

    5.    **Costs.** Purchaser shall pay all costs of the transfer of the Property and assumption made under this Agreement, to include without limitation, attorneys' fees and recording costs, as well as the cost of an endorsement to Lender's title insurance policy insuring the lien of the Security Instrument after the recording of this Agreement. Such costs shall be due at closing hereunder and the payment thereof shall be a condition precedent to Lender's consent to the transfer of the Property to Purchaser. In the event that it is determined that additional costs relating to this transaction are due, Purchaser agrees to pay such costs immediately upon demand.

    6.    **Assumption Fee.** In consideration of Lender's consenting to the conveyance of the Property to the Purchaser, Lender is entitled to, and has earned, an assumption fee in the amount of $750.00. Said fee shall be due and payable upon the execution and delivery of this Agreement. Borrower hereby agrees and acknowledges that said fee is being charged solely for costs relating to the assumption of the Security Instrument and not as interest for the forbearance or use of money.

    7.    **Paragraph Headings.** The paragraph headings used herein are for convenience of reference only and shall not be used in the interpretation or construction hereof.

    8.    **Governing Law.** This Agreement shall be governed, interpreted and construed by, through and under the laws of the State of California.

    9.    **Attorneys' Fees.** All costs incurred by Lender in enforcing this Agreement and in collection of sums due Lender from Purchaser and Borrower, to include, without limitation, reasonable attorneys' fees through all trials, appeals, and proceedings, to include, without limitation, any proceedings pursuant to the bankruptcy laws of the United States.

    10.    **Binding Effect.** This Agreement shall inure to the benefit of and be binding upon the parties hereto as well as their successors and assigns, heirs and personal representatives.

3

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**"BORROWERS"**

**COPPER AVENUE INVESTMENTS, LLC,**
A California limited liability company

By:  Darius Assemi
Its: Manager

**ASHLAN & HAYES INVESTMENTS, LLC,**
A California limited liability company

By:  Darius Assemi
Its: Manager

**MARICOPA ORCHARDS, LLC,**
A California limited liability company

By:  Farshid Assemi
Its: General Manager

**ACAP HOLDINGS, LLC,**
A California limited liability company
By Amended and Restated Farid Assemi Revocable Trust, its Member

By:  Farid Assemi
Its: Trustee

By Amended and Restated Darius Assemi Revocable Trust, its Member

By:  Darius Assemi
Its: Trustee

By Amended and Restated Farshid Assemi and Sonia Rosemary Assemi Revocable Trust, its Member

By:  Farshid Assemi
Its: Co-Trustee

By:  Sonia Assemi
Its: Co-Trustee

4

**"PURCHASER"**

**LINCOLN GRANTOR FARMS LLC,**
a California limited liability company

By:  Neema Assemi
Its:  Manager

**"LENDER"**

**U.S. Bank National Association,**
**as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs**

By:  Heather Wright Manager – Closing & Servicing of Federal Agricultural Mortgage Corporation
Attorney-In-Fact for U.S. Bank, National Association for Federal Agricultural Mortgage Corporation
programs, under Limited Power of Attorney dated August 25, 2021

5

# Exhibit H

# NOTE

Loan #<sup>REDACTED</sup>2676

| | | |
|---|---|---|
| December 14, 2020 | Fresno, | CA |
| [Date] | [City] | [State] |

**6,045 +/- Acres, Kern County, California**
[Property Address]

## 1.      BORROWERS' PROMISE TO PAY

In return for a loan that **Assemi Brothers, LLC**, a California limited liability company, **Maricopa Orchards, LLC**, a California limited liability company, **C & A Farms, LLC**, a California limited liability company, **Willow Avenue Investments, LLC**, a California limited liability company, and **Whitesbridge Farms, LLC**, a California limited liability company (Assemi Brothers, LLC, Maricopa Orchards, LLC, C&A Farms, LLC, Willow Avenue Investments, LLC, and Whitesbridge Farms, LLC are collectively referred to herein as, the "Borrowers"), have received, Borrowers promise to pay U.S. **$12,500,000.00** (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **Conterra Agricultural Capital, LLC, an Iowa limited liability company**. Borrowers will make all payments under this Note in the form of cash, check or money order.

Borrowers understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is also called the "Lender", "Note holder" or "holder of the Note".

## 2.      LINE OF CREDIT

Prior to the expiration of the Draw Period ("Draw Period") as calculated in accordance with this Section 2, this Promissory Note ("Note") evidences a revolving line of credit loan ("Loan") under which advances may from time to time be extended to Borrowers.  Advances shall be in the minimum amount of $2,500 and shall be in amounts which are multiples of $100.  Upon receipt of a verified funds request by Borrowers to a telephone number provided from time to time by Lender, **or by such other funds request method as the Lender may establish,** and provided all conditions for an advance have been met, Lender shall promptly deliver the requested funds directly to Borrowers' account at Borrowers' bank ("Bank Account") as designated in the original Loan application or by separate written notice on forms to be provided by Lender. In most cases, if a valid funds request is received by Lender at its designated telephone number at or before 12:00 noon (all times in this Note refer to the time in Louisville, Kentucky (Eastern Standard Time EST), the requested funds will be delivered on the business day following receipt of the funds request (e.g., if the funds request is received at 11:00 a.m. on Monday, the funds will usually be delivered on Tuesday; if the funds request is received at 2:00 p.m. on Tuesday, the funds will usually be delivered on Thursday). A valid funds request shall be verified by one or more of the persons obligated to pay this Note on behalf of all persons obligated to pay this Note in a manner to be designated by the Lender. A valid designation of the Bank Account to which funds are to be advanced shall be signed by one or more of the persons obligated to pay this Note on behalf of all persons obligated to pay this Note.  Lender shall be entitled to rely on the statements in any (i) verified funds request and/or (ii) signed designation of Bank Account, to the effect that the person who signed such instrument was fully authorized to do so by all of the persons obligated to pay this Note and all persons who are obligated to pay this Note hereby release any and all claims against Lender based on Lender's reliance on such statements.

Advances may be made without payment of a transaction fee.

The Draw Period referenced above shall terminate and expire upon the earlier of the date set forth in Section 9(A)(7) or at such date as determined by the Lender, in its sole discretion.

## 3.      REVOLVING FEATURE

During the Draw Period, Borrowers may borrow, repay and reborrow under this Note at any time, up to the principal amount of this Note, subject to the terms and conditions of this Note (the "Revolving Loan provisions"), so long as no Event of Default exists under this Note or any other documents executed in connection with this Loan

**MULTISTATE REVOLVING LINE OF CREDIT NOTE**

(collectively, the "Loan Documents").  The unpaid principal balance owing on this Note at any time during the Draw Period will be evidenced by Lender's internal records and the amount advanced and outstanding may not exceed at any one time the face amount of this Note.  Lender shall not be obligated to make any advance to Borrowers following occurrence of an Event of Default.

4.     **PAYMENTS**
       A. During the Draw Period
       During the Draw Period, Borrowers will be billed in arrears twice a year for interest accrued.  Notwithstanding any provision in this Note to the contrary, during the Draw Period Borrowers may make, free of penalty or minimum interest charge, any number of principal payments on any business day.  Required interest payments may be made from a funds advance, provided the verified funds request for such advance specifies such a purpose in whole or in part for the requested funds. In addition, the periodic payment will include any late charges and other charges authorized by this Note, including, without limitation, any expenses or advances incurred by Lender under the security instrument.
       Notwithstanding the foregoing, all amounts other than interest accruing over the period from the last date through which interest was last billed due under the terms of this Note, including but not limited to principal and all other interest, shall be due and payable in full upon the earlier of Lender's billing or the Maturity Date.  Interest accruing over the period from the last date through which interest was billed until the later of (a) the actual date of payment of all other amounts or (b) the Maturity Date shall be billed promptly after all such other amounts have been received by Lender.

       B. After the Draw Period
       Unless Borrowers have exercised Borrowers' conversion option set forth in Section 9(C) of this Note, the day after the Draw Period ends the repayment period ("Repayment Period") begins. Borrowers must then repay the unpaid and outstanding loan account balance in the manner described in this Section.  Borrowers must repay this amount in substantially equal periodic installments with interest at the then-current annual interest rate, as set forth in Section 9(A)(1) of this Note.  The periodic payment will be an amount that would be sufficient to repay the unpaid and outstanding loan account balance in full by the Maturity Date indicated in Section 9(A)(7) of this Note. The amount of the periodic payment may change as a result of changes in the Current Index indicated in Section 9(A)(7) of this Note. In addition, the periodic payment will include any late charges and other charges authorized by this Note, including, without limitation, any expenses or advances incurred by Lender under the security instrument.

       C. Prepayments after the Draw Period
       Any prepayments of scheduled installments that are made on a date that is not an installment payment date must be accompanied by interest to the next installment payment date and that such prepayment will not be credited to the Borrowers' account until such installment payment date.

       Any prepayments, partial or in whole, other than scheduled installment payments must be accompanied by unpaid interest accrued on such principal amount from the date to which interest was last paid to the next installment payment date, and such prepayment shall not be considered as having been received and will not be credited to the Borrowers' account until such installment payment date. If the Borrowers make a prepayment there will be no delays in the due dates of Borrowers' installment payments unless the Lender agrees in writing to those delays and that unless the Borrowers and Lender agree otherwise, the Lender at its sole discretion may reamortize the Note on the basis of the new principal balance; otherwise the making of a prepayment will operate only to discharge the Note at an earlier date.

5.     **APPLICATION OF PAYMENTS**
       A.     During the Draw Period
       Notwithstanding any provision in this Note to the contrary, all payments during the Draw Period, other than a regularly scheduled payment of interest, will be applied first to:

              (1)     Accrued interest; and then to
              (2)     All other amounts owed other than late changes; and then to
              (3)     Late charges; and then to

**MULTISTATE REVOLVING LINE OF CREDIT NOTE**

    (4)    Principal.

**B.**    After the Draw Period
All payments received after termination of the Draw Period will be applied first to:
    (1)    collection expenses and protective advances, if any; and then to
    (2)    Interest due; and then to
    (3)    Principal; and then to
    (4)    Late charges

The term "late charges" is intended to include both flat fees associated with late payments, if any.

## 6.    EARLY TERMINATION

So long as no Event of Default exists under this Note, during the Draw Period, Borrowers may terminate the revolving line of credit Loan represented by this Note by (i) providing written notice to Lender of the intent to do so, (ii) paying the outstanding principal balance in full and by (iii) agreeing to pay accrued but unbilled interest promptly upon being billed. Borrowers will be billed for the amount of accrued interest and all other amounts owed (if any) other than interest within fifteen (15) days after the later of Lender's receipt of the notice terminating the Loan and the payment in full of the principal. The recorded Loan Documents including the Security Instrument will then be released of record upon receipt of the final payment of all amounts owed under this Note. Amounts that might be owed other than interest include, but are not limited to, late charges, standby fees, taxes and other amounts advanced by Lender and attorney fees. So long as no Event of Default exists or is continuing under this Note, the Loan will not terminate simply because the outstanding principal balance may be zero at any given time. Notwithstanding any provision in this Note to the contrary, no prepayment penalty or minimum interest charge shall be due in the event of early termination as provided in this Section 6.

## 7.    PROTECTIVE COVENANTS

Borrowers agree to provide Lender with updated financial statements and other requested financial reports, including tax returns on or before May 31st of each year.

## 8.    GENERAL PROVISIONS

**A.**    Notwithstanding any provision of this Note to the contrary, any choice of law provision includes applicable Federal law and such provision is not intended to prevent the application of Federal law. In addition to any other statutory authority listed in this Note, the terms of this Note and the interest rate and fees set forth herein are authorized by Title 12 of the United States Code, section 2279aa-12 as amended from time to time.

**B.**    Notwithstanding any provision of this Note to the contrary, interest will be calculated in any reasonable manner determined solely by the holder of this Note based on an assumed 30 day month, and a 360-day year.

**C.**    Notwithstanding any provision of this Note to the contrary, the whole of the principal sum and any accrued interest and any other sums advanced to protect and/or enforce the Note holder's interest in this Note and the Security Instrument (including reasonable costs of recovery and attorney's fees and expenses) shall bear interest from and after maturity, whether or not resulting from acceleration, at a rate equal to eighteen percent (18.00%) per annum, subject to a minimum interest charge of five percent (5.00%) of such defaulted amount.

**D.**    During the Draw Period, notwithstanding any provision of this Note to the contrary, in the event any scheduled payment of principal or interest shall not be received by the fifteenth day of the month in which it is due and payable, interest shall be payable on such defaulted payment at a rate which is equal to eighteen percent (18.00%) per annum, subject to a minimum interest charge of five percent (5.00%) of such defaulted payment.

After the Draw Period, notwithstanding any provision of this Note to the contrary, in the event any scheduled payment of principal or interest shall not be received by the tenth day of the month in which it is due and payable, interest shall be payable on such defaulted payment at a rate which is equal to eighteen percent (18.00%) per annum, subject to a minimum interest charge of five percent (5.00%) of such defaulted payment.

**E.**    Borrowers shall, as required by Section 7, provide current financial statements to the holder of this Note. If Borrowers obtain financial statements which are audited or reviewed by an independent certified public

MULTISTATE REVOLVING LINE OF CREDIT NOTE

accountant for the relevant period, such financial statements provided hereunder shall be such reviewed or audited statements. Borrowers authorize Note holder to make or have made any credit inquiries Note holder feels are necessary. Borrowers also authorize the person or agencies to whom Note holder makes these inquiries to supply Note holder with the information Note holder requests.

   F.  If Lender determines at any time to sell, transfer or assign this Note, the Security Instrument and any other security instruments, and/or any or all servicing rights with respect thereto, or to grant participations therein ("Participations"), or issue, in a public offering or private placement, mortgage pass-through certificates or other securities evidencing a beneficial interest in the loan ("Securities"), Lender may forward to each prospective purchaser, transferee, assignee, servicer, participant, investor, or their respective successors in such Participations and/or Securities ("collectively, the "Investor"), any rating agency rating related to such Securities and all documents and information which Lender now has or may hereafter acquire relating to the indebtedness under this Note and to Borrowers, any guarantor, any indemnitors and the Property, as Lender determines necessary or desirable. All information furnished by Borrowers, any guarantor, or any indemnitor that shall be shared with any prospective Investor shall be shared on a confidential basis and, excepting information shared with the Federal Agricultural Mortgage Corporation and any of its affiliates, which Borrowers hereby consent without further notice, Borrowers shall receive notice thereof.

   G.  Upon the occurrence of any Event of Default under the Note, or in the event any action is brought to enforce the terms of this Note or any document related thereto, or in the event of the bankruptcy of any of the Borrowers, then the holder of this Note shall be entitled to recover all attorneys' fees and costs incurred as a result of such Event of Default and/or enforcing the terms of this Note and related documents.

   H.  The Borrowers represent and agree that at the time of making any and all requests for funds hereunder that none of the Borrowers, guarantors and owners of the real and personal property security will be delinquent on any taxes (federal, state, or local) of any kind. This representation is material to the making of each advance.

   I.  The Borrowers represent and agree that any and all requests for funds hereunder will be used only for agricultural or other business purposes and not for personal, family, or household purposes.

   J.  The making of any false or misleading representation will constitute an Event of Default, entitling Lender to exercise remedies for default, including but not limited to acceleration of the indebtedness.

   K.  Borrowers will make payments at **7755 Office Plaza Dr. North, Suite 195, West Des Moines, IA 50266** or at a different place if required by Lender.

   L.  If Borrowers do not pay the full amount of each installment on the date it is due, Borrowers will be in default.

   M.  Upon the occurrence and during the continuance of any Event of Default under this Note, and if allowed by applicable law, Lender may send Borrowers a written notice telling Borrowers that if Borrowers do not pay the overdue amount by a certain date Lender may require Borrowers to pay immediately the full amount of Principal which has not been paid and all the interest and any applicable fees and costs that Borrowers owe on that amount.

   N.  Even if after and during the continuance of any Event of Default under this Note, Lender does not require Borrowers to pay immediately in full as described above, Lender will still have the right to do so if an Event of Default occurs or is continuing at any later time.

   O.  Upon the occurrence of any default under this Note or if Lender has required Borrowers to pay immediately in full as described above, Lender will have the right to be paid back by Borrowers for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. If allowed by applicable law those expenses include, for example, reasonable attorneys' fees.

## 9.  REVOLVING LINE OF CREDIT VARIABLE RATE PROVISIONS
   A.  **Payment of Principal and Interest.**
      (1)  So long as no Event of Default exists under this Note, interest shall accrue on the unpaid balance of this Note until the Loan is repaid in full or until the Borrowers exercise the option to convert the variable rate to another rate as provided in subsection (9C) below.

      (2)  The Initial Variable Rate (defined below) will be established at loan registration and upon the receipt of the Commitment to Purchase – AgEquity. Thereafter, the Variable Rate shall change according to the Rate Change Date at a rate equal to the sum of (i) the Current Index (defined below) and (ii) the Margin (defined below) (the

MULTISTATE REVOLVING LINE OF CREDIT NOTE

"Variable Rate").

     (3)    A payment of interest calculated at the Variable Rate on the outstanding principal balance represented under this Note from the date of the first advance hereunder shall be due on the First Interest Payment Date. Thereafter, consecutive semi-annual installments of interest, each in the amount required to pay the unpaid interest accruing through the applicable period, shall be due on each January 1 and July 1 at the Variable Rate until the Maturity Date (as defined below) or the Conversion Date (as defined below) as the case may be. Any remaining indebtedness, if not sooner paid, shall be due and payable on the Maturity Date (as defined below).

     (4)    If Lender at any time determines, in its sole but reasonable discretion, that it has miscalculated the amount of any interest payment (whether because of a miscalculation of the Variable Rate or otherwise), then Lender shall give notice to Borrowers of the corrected amount of the interest payment (and the corrected Variable Rate, if applicable) and (i) if the corrected amount of the installment payment represents an increase, then Borrowers shall, within 30 calendar days thereafter, pay to Lender any sums that Borrowers would have otherwise been obligated under this Note to pay to Lender had the amount of the installment payment not been miscalculated, or (ii) if the corrected amount of the installment payment represents a decrease thereof and Borrowers are not otherwise in breach or default under any of the terms and provisions of this Note, the security instrument or any other Loan Document evidencing or securing this Note, then Borrowers shall thereafter be paid the sums that Borrowers would not have otherwise been obligated to pay to Lender had the amount of the installment payment not been miscalculated.

     (5)    Borrowers may make payments of principal in any amount on any business day of Lender during such time as the principal is accruing interest at the Variable Rate.

     (6)    If Borrowers timely exercises Borrowers' option to (i) convert the interest rate on this Note to another rate and (ii) cancel the Revolving Line of Credit provisions of this Note pursuant to Section C ("Conversion Option") of this Note, the applicable interest rate under this Note, beginning on the date the conversion becomes effective and continuing until the Maturity Date, shall not be the rate determined in accordance with subsection (1) of this Section A above, but shall be the rate established in accordance with Section C "Conversion Option" below. Such rate shall be reflected in an "Agreement to Convert" substantially in the form attached as Exhibit A to this Note. If Borrowers have not earlier exercised the Conversion Option, the Revolving Line of Credit Provisions will expire on **January 1, 2026** and the Conversion Option will be deemed to be exercised by selecting the loan terms indicated in subparagraph **(7)** below.

     (7)    The following definitions shall apply to this Note:

     **Current Index:** 1-month *VRM servicing released net yield for 8-week delivery* then being required by the Federal Agricultural Mortgage Corporation.

     **Index.** Beginning with the Rate Change Date, The variable interest rate shall change to a rate that shall be determined 2 business days prior to the Rate Change Date and any subsequent Rate Change Dates and be based upon the 1-month *AgEquity VRM servicing released net yield for 8-week delivery* then being required by the Federal Agricultural Mortgage Corporation, adjusted for credit quality, plus **0.600%** field servicing fee. If the Index is no longer available, the Note Holder will choose a new index that is based on comparable information.

     **First Interest Payment Date: January 1, 2021**

     **Revolving Loan Provisions Termination Date: January 1, 2026**

     **First Principal Payment Date: January 1, 2026**

     **Maturity Date: January 1, 2026**

     **Rate Change Date: 01/01/2021 and on the 1ˢᵗ of every month thereafter**

     **Initial Variable Rate: 5.000%**

MULTISTATE REVOLVING LINE OF CREDIT NOTE

5

**B.**     **Prepayment.**

Prior to the Conversion Date (as defined below), Borrowers may prepay all or part of the unpaid principal balance of this Note on any business day.

**C.**     **Interest Rate Conversion Option.**

**(1)  Option to Cancel Multiple Advance Provisions and Convert to Another Interest Rate.** Borrowers may exercise the Conversion Option unless Borrowers are in default under this Note or the security instrument if the conditions of this Section 9(C)(1) are met. Borrowers will be conclusively deemed to have exercised the Conversion Option upon the date of the Revolving Loan Provisions Termination Date. The "Conversion Option" is the Borrowers' option to (i) cancel and convert the interest rate specified in this Note from a variable rate with no interest rate limits to the rate calculated under Section 9(C)(2) below; and (ii) terminate and cancel the Revolving Loan provisions.

The conversion can only take place on a date a scheduled payment is due.  The date on which the Borrowers convert the variable interest rate to the converted rate is called the "Conversion Date."

The Borrowers' ability to exercise the Conversion Option is conditioned upon and no conversion shall be effective without: (i) the Borrowers giving the Lender written notice at least 21 days prior to the Conversion Date (at 11:00 a.m. Louisville, Kentucky time) that the Borrowers want to exercise the Conversion Option; (ii) at the Conversion Date, the Borrowers must not be in default under the terms of this Note or the security instrument; (iii) payment to the Lender at or prior to the Conversion Date of all of Lender's out of pocket expense of completing such Conversion while maintaining its lien priority, and (iv) the Borrowers' completion and execution of any documents the Lender requires to effect the conversion.

**(2)  Calculation of Converted Rate.**  Upon request from the Borrowers, the Lender shall provide a list of the loan products then offered by the Federal Agricultural Mortgage Corporation ("Farmer Mac") with a maturity date similar to the Maturity Date of this Note subject to a four week mandatory delivery commitment, including any prepayment restrictions and yield maintenance provision applicable to such products.  The description of loan products shall contain the then current rates applicable to such products, but the actual rate may be higher or lower and will be set as described in this Section 9.  The Borrowers may then give written notice of the Borrowers' election to convert this Note to one of those products for the remaining term of this Note to the Maturity Date by selecting one of the listed products and requesting conversion of this Note to the selected product.  The interest rate in effect for this Note after Conversion ("Converted Rate") will be an interest rate equal to the Farmer Mac required net yield for the selected loan product with a maturity similar to the Maturity Date of this Note subject to a four week mandatory delivery commitment, plus **2.930%** (the "Modification Note Rate"), subject to any yield maintenance provision applicable to such product. The converted rate in effect as of the Conversion Date will be equal to the rate calculated in the immediately preceding sentence as of 11:00 a.m. Louisville, Kentucky time, on the later of (a) the date which is four weeks prior to the Conversion Date and (b) the day lender receives Borrowers' election to convert this Note. If this required net yield is not available, the Lender will determine the Converted Rate by using comparable information.

If Borrowers elect to convert this Note, or are required to convert this Note by the terms hereof, but do not select a particular product from the list of available products by the date specified in the list of products, the product designated by Lender as the Default Product on the list of available products will be deemed to have been selected by Borrowers.

**(3)  Calculation of New Payment.**  Upon the Borrowers' exercise of the Conversion Option, the Lender will determine the amount and payment schedule of the installments, which will be calculated to repay the unpaid principal (net of any principal payment due on the Conversion Date) in full over the period from the Conversion Date to the Final Amortization Date at the new interest rate in substantially equal payments applied first to interest and then to principal. Any remaining indebtedness, if not sooner paid, shall be due and payable on the Maturity Date.

---

MULTISTATE REVOLVING LINE OF CREDIT NOTE

**10.    LENDER ADVANCES**

Lender may make advances under the Security Instrument, as defined below, providing security for this Note, to protect the Lender's interest in the Security Instrument or other instrument providing security for this Note from loss of value or damage.  Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate stated in Section 8(D) of this Note shall become an obligation due and owing under the terms of this Note immediately upon the date advanced by Lender and is an obligation of Borrowers secured by the Security Instrument or other instrument providing security for this Note.

**11.    GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to Borrowers under this Note will be given by delivering it or by mailing it by first class mail to Borrowers at **1306 W Herndon Ave #101, Fresno, CA 93711,** or at a different address if Borrowers give Lender a notice of Borrowers' different address.

Any notice that must be given to Lender under this Note will be given by delivering it or by mailing it by first class mail to Lender at the address stated in Section 8(K) above or at a different address if Borrowers are given a notice of that different address.

**12.    OBLIGATIONS OF PERSONS UNDER THIS NOTE**

Each of the Borrowers, and each person executing this Note on each of the Borrowers' behalf, represents and warrants to Lender that by its execution below, each of the Borrowers is duly organized, is in good standing, and has the full power, authority and legal right to execute and deliver this Note, and is obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed and any additional amounts incurred under the terms of this Note.  Each of the Borrowers also represent and warrant that any person who is a guarantor, surety or endorser of this Note is also obligated to keep all promises made in this Note, including the promise to pay the full amount owed and any additional amounts incurred under the terms of this Note.  Lender may enforce its rights under this Note against each of the Borrowers and each person executing or guaranteeing this Note on each of the Borrowers' behalves, individually or against all such persons together.  Any one of the Borrowers or any person guaranteeing this Note on any of the Borrowers' behalves may be required to pay all amounts due or incurred under this Note.

**13.    WAIVERS**

Borrowers and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor.  "Presentment" means the right to require Lender to demand payment of amounts due.  "Notice of Dishonor" means the right to require Lender to give notice to other persons that amounts due have not been paid.

**14.    UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions.  In addition to the protections given to the Lender under this Note, one or more deeds of trust (each a "Security Instrument" and collectively, the "Security Instrument") dated the same date as this Note, protects the Lender from possible losses which might result if Borrowers do not keep the promises which Borrowers makes in this Note.  That Security Instrument describes how and under what conditions Borrowers may be required to make immediate payment in full of all amounts Borrowers owe under this Note.  Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if any of the Borrowers is not a natural person and a beneficial interest in any of the Borrowers is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

**15.    USURY**

The parties to this Note intend and agree that the indebtedness evidenced by this Note and any related documents shall remain in compliance with any usury provisions of the state within which this Note was made by

**MULTISTATE REVOLVING LINE OF CREDIT NOTE**

Borrowers. This Note and any related documents are subject to the express condition that at no time shall the Borrowers be obligated, or required, to pay interest on the principal balance at a rate that could subject Lender to either civil or criminal liability as a result of such rate being in excess of the maximum rate which Lender is permitted to charge. If, by the terms of this Note, Borrowers are, at any time, required or obligated to pay interest on the principal balance at a rate in excess of such maximum rate, then the rate of interest under this Note shall be deemed to be immediately reduced to such maximum rate, and interest payable hereunder shall be computed at such maximum rate, and any portion of all prior Interest payments in excess of such maximum rate shall be applied, and/or shall retroactively be deemed to have been payments made, in reduction of the principal balance.

**16.     EVENT OF DEFAULT**

The occurrence of any one or more of the following shall constitute an "Event of Default" under this Note, the Security Instrument, and any related Loan Documents, as such term is used herein:

(A)     If Borrowers fail to repay any interest or Principal under the Note when due;

(B)     If any of the Borrowers defaults in any material respect in the performance of any of the other covenants, agreements and obligations of the Borrowers under the Security Instrument or any related Loan Documents involving the payment of money and fails to cure such default within ten (10) days;

(C)     If any of the Borrowers defaults in any material respect in the performance of any of the Borrowers' non-monetary covenants, agreements and obligations under this Note, the Security Instrument or any related Loan Documents and fails to cure such default within thirty (30) days after written notice thereof from Lender;

(D)     If any representation or warranty, statement, report or certificate now or hereafter made by any of the Borrowers, was not true and correct in any material respect when made;

(E)     If any bankruptcy or insolvency petition is filed by or against any of the Borrowers under the Federal Bankruptcy Code or any similar state or federal Law, whether now or hereafter existing (and, in the case of involuntary proceedings, failure to cause the same to be vacated, stayed or set aside within thirty (30) days after filing);

(F)     If a default occurs under the Security Instrument or any of the related Loan Documents and continues beyond the applicable grace period, if any, contained therein;

(G)     If any of the Borrowers transfer any interest in the Property in violation of Section 15 of the Security Instrument; provided, however, that Borrowers shall have the right to prepay the Principal balance of the Note, in whole or in part, subject to the prepayment conditions and any other applicable costs and fees, as further set forth in this Note.

**NOTICE IS HEREBY GIVEN TO MAKER THAT ORAL AGREEMENTS OR ORAL COMMITMENTS TO LEND MONEY, EXTEND CREDIT, MODIFY LOAN TERMS OR FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER CALIFORNIA LAW.**

---

**MULTISTATE REVOLVING LINE OF CREDIT NOTE**

**BORROWERS:**

**Assemi Brothers, LLC,**
a California limited liability company

By: Farshid Assemi
Its: General Manager

**C & A Farms, LLC,**
a California limited liability company

By: Farshid Assemi
Its: General Manager

**Whitesbridge Farms, LLC**
a California limited liability company

By: Neema Assemi
Its:  General Manager

**Maricopa Orchards, LLC,**
a California limited liability company

By: Farshid Assemi
Its:  General Manager

**Willow Avenue Investments, LLC**
a California limited liability company

By: Neema Assemi
Its:  General Manager

*[Sign Originals Only]*

**MULTISTATE REVOLVING LINE OF CREDIT NOTE**

9

PAY TO THE ORDER OF
**U.S. Bank National Association, as Custo**dian/Trustee for Federal Agricultural Mortgage Corporation
**programs**
WITHOUT RECOURSE

**Conterra Agricultural Capital, LLC**

Signature

**Mark A. Smith, COO & General** Counsel

# CROSS DEFAULT RIDER

RE: ᴿᴱᴰᴬᶜᵀᴱ2676

THIS CROSS DEFAULT RIDER is made this ̲F̲e̲b̲r̲u̲a̲r̲y̲ ̲2̲ , **2023,** and is incorporated into and shall be deemed to amend and supplement the amended and restated Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date, given by the undersigned Borrowers and Grantors to secure a Note to **U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs** (the "Lender") dated January 8, 2018 and covering the Property described in the Security Instrument and located at:

**2,915.23 +/- Acres**
**Kern County, California**
[Property Address]

In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree that on the date hereof the following other loans have been sold to Federal Agricultural Mortgage Corporation:

| **Borrowers/Co-Signers' Names** | **Date** | **Loan Amount/Loan No.** |
|---|---|---|
| **Copper Avenue Investments, LLC, ACAP Farms, LLC, Gradon Farms, LLC, Lincoln Grantor Farms, LLC, Maricopa Orchards, LLC & Cantua Orchards, LLC** | **10/11/2019** | **$10,258,632.00/**ᴿᴱᴰᴬᶜᵀᴱ**1674** |
| **Copper Avenue Investments, LLC, ACAP Farms, LLC, Gradon Farms, LLC, Lincoln Grantor Farms, LLC, Maricopa Orchards, LLC & Cantua Orchards, LLC** | 10/11/2019 | **$5,297,232.00/**ᴿᴱᴰᴬᶜᵀᴱ**1673** |
| **C&A Farms, LLC & Whitebridge Farms, LLC** | **01/08/2018** | **$5,500,000.00/**ᴿᴱᴰᴬᶜᵀᴱ**1725** |
| **C&A Farms, LLC & Whitebridge Farms, LLC** | **1/08/2018** | **$1,500,000.00/**ᴿᴱᴰᴬᶜᵀᴱ**1728** |
| **Assemi Brothers, LLC, C&A Farms, LLC, Whitebridge Farms, LLC, Maricopa Orchards, LLC & Willow Avenue Investments, LLC** | **12/14/2020** | **$12,500,000.00/**ᴿᴱᴰᴬᶜᵀᴱ**2678** |
| **C & A Farms, LLC, Willow Avenue Investments, LLC, Gradon Farms, LLC, Cantua Orchards, LLC, Copper Avenue Investments, LLC, Lincoln Grantor Farms, LLC, ACAP Farms, LLC and Maricopa Orchards, LLC** | **2/2/2023** | **$7,400,000.00/**ᴿᴱᴰᴬᶜᵀᴱ**1004** |

---

**FARMER MAC MULTISTATE CROSS DEFAULT RIDER**

1

©PeirsonPatterson, LLP.-Arlington, Texas  2016
1538050917 [Doc Id 2424 M01142014]

each of which is evidenced by a separate promissory note (the "Other Notes"), and each of which is secured by a separate mortgage, deed of trust, or security deed (the "Other Security Instruments"). It is agreed that any default under this Security Instrument or this Note shall be deemed a default under the Other Notes and Other Security Instruments; and any default under any or all of the Other Notes or Other Security Instruments shall be deemed to be a default under this Note and this Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Cross Default Rider.

**Maricopa Orchards, LLC,**
a California limited liability company

By: Farshid Assemi
Its:  General Manager

**C & A Farms, LLC,**
a California limited liability company

By: Farshid Assemi
Its: General Manager

**Willow Avenue Investments, LLC**
a California limited liability company

By: Neema Assemi
Its:  General Manager

**Assemi Brothers, LLC,**
a California limited liability company

By: Farshid Assemi
Its: General Manager

**Whitesbridge Farms, LLC,**
a California limited liability company

By: Neema Assemi
Its: General Manager

---

**FARMER MAC MULTISTATE CROSS DEFAULT RIDER**

2

©PeirsonPatterson, LLP.-Arlington, Texas  2016
1538050917 [Doc Id 2424 M01142014]

# CROSS COLLATERALIZATION RIDER

RE: <sup>REDACTED</sup>2676

THIS CROSS COLLATERALIZATION RIDER is made this February 2, 2023, and is incorporated into and shall be deemed to amend and supplement the amended and restated Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date, given by the undersigned Borrowers and Grantors to secure a Note to **U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs** (the "Lender") dated January 8, 2018 and covering the Property described in the Security Instrument and located at:

**350.37 Acres Devoted to an Almond Orchard**
**Fresno County, CA**
[Property Address]

In addition to the covenants and agreements made in the Security Instrument, Borrower Parties further covenant and agree that on the date hereof the following other loans have been sold to Federal Agricultural Mortgage Corporation:

| Borrowers/Co-Signers' Names | Date | Loan Amount/Loan No. |
|---|---|---|
| **Copper Avenue Investments, LLC, ACAP Farms, LLC, Gradon Farms, LLC, Lincoln Grantor Farms, LLC, Maricopa Orchards, LLC & Cantua Orchards, LLC** | **10/11/2019** | **10,258,632.00/**<sup>REDACTED</sup>**1674** |
| **Copper Avenue Investments, LLC, ACAP Farms, LLC, Gradon Farms, LLC, Lincoln Grantor Farms, LLC, Maricopa Orchards, LLC & Cantua Orchards, LLC** | 10/11/2019 | $5.297.232.00 /<sup>REDACTED</sup>1673 |
| **C&A Farms, LLC & Whitebridge Farms, LLC** | 01/08/2018 | $5.500.000.00/<sup>REDACTED</sup>1725 |
| **C&A Farms, LLC & Whitebridge Farms, LLC** | 1/08/2018 | $1,500,000.00/<sup>REDACTED</sup>1728 |
| **Assemi Brothers, LLC, C&A Farms, LLC, Whitebridge Farms, LLC, Maricopa Orchards, LLC & Willow Avenue Investments, LLC** | 12/14/2020 | $12,500,000.00/<sup>REDACTED</sup>2678 |
| **C & A Farms, LLC, Willow Avenue Investments, LLC, Gradon Farms, LLC, Cantua Orchards, LLC, Copper Avenue Investments, LLC, Lincoln Grantor Farms, LLC, ACAP Farms, LLC and Maricopa Orchards, LLC** | 2/2/2023 | $7,400,000.00/<sup>REDACTED</sup>1004 |

---

**Farmer Mac Cross-Collateralization Rider**

1

©PeirsonPatterson, LLP.-Arlington, Texas  2016
1537050917 [Doc Id 2448 M01222014]

each of which is evidenced by a separate promissory note (the "Other Notes"), and each of which is secured by a separate mortgage, deed of trust, or security deed (the "Other Security Instruments").  It is agreed that in addition to Borrower's Note, this Security Instrument secures the obligations, debts, and liabilities evidenced by the Other Notes and Other Security Instruments referenced herein, plus interest thereon, which is payable by Grantor to Lender and/or Federal Agricultural Mortgage Corporation.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Cross Collateralization Rider.

**Maricopa Orchards, LLC,**
a California limited liability company


By: Farshid Assemi
Its:  General Manager

**C & A Farms, LLC,**
a California limited liability company


By: Farshid Assemi
Its: General Manager

**Willow Avenue Investments, LLC**
a California limited liability company


By: Neema Assemi
Its:  General Manager

**Assemi Brothers, LLC,**
a California limited liability company


By: Farshid Assemi
Its: General Manager

**Whitesbridge Farms, LLC,**
a California limited liability company


By: Neema Assemi
Its: General Manager

*[Sign Originals Only]*

Farmer Mac Cross-Collateralization Rider

©PeirsonPatterson, LLP.-Arlington, Texas  2016
1537050917 [Doc Id 2448 M01222014]

# EXHIBIT A TO NOTE
# FORM OF AGREEMENT TO CONVERT
### [To be Completed at Exercise of Conversion Option]

This Agreement is made this_____day of_____, by and between **Conterra Agricultural Capital, LLC** (the "Lender") and **Assemi Brothers, LLC**, a California limited liability company, **Maricopa Orchards, LLC**, a California limited liability company, **C & A Farms, LLC**, a California limited liability company, **Willow Avenue Investments, LLC**, a California limited liability company, and **Whitesbridge Farms, LLC**, a California limited liability company (Assemi Brothers, LLC, Maricopa Orchards, LLC, C&A Farms, LLC, Willow Avenue Investments, LLC, and Whitesbridge Farms, LLC are collectively referred to herein as, the "Borrowers") and modifies and amends certain terms of Borrower's indebtedness evidenced by a Promissory Note (the "Note") to Lender dated December 14, 2020, which is secured by a mortgage, deed of trust or security deed or similar instrument (the "Security Instrument") of the same date and covering the property described in the Security Instrument (the "Property") and located at:

<div align="center">

**6,045 +/- Acres, Kern County, California**
[Property Address]

</div>

In consideration of Borrowers' exercise of Borrowers' option to convert Borrowers' variable interest rate revolving line of credit Loan to another interest rate loan without revolving line of credit provisions pursuant to the provisions of the Note and to the Security Instrument, the Note is hereby modified and amended as follows:

I        Sections 9A and 9C of the "Revolving Line of Credit Variable Rate Provisions" of the Note are deleted in full and the following is inserted in its place:

[Insert interest rate provisions of the applicable loan product.]

II       Section 9B is changed to read:

2.       Prepayment.

[Select and insert the appropriate provision associated with the applicable loan product]

In addition to the modifications to the Note stated above, Borrowers understand that, upon Borrowers' signing of this Agreement, Lender will have the option to require immediate payment in full of all sums secured by the Security Instrument if all or any part of the Property or any interest in it is sold or transferred without Lender's prior written consent, as provided in the Security Instrument.

Except as stated in this Agreement, Borrowers' promise to pay and the covenants and agreements under the Note and under the Security Instrument continue without change.

<div align="center">

*[remainder intentionally left blank – signature page follows]*

</div>

---

MULTISTATE REVOLVING LINE OF CREDIT NOTE

IN WITNESS WHEREOF, Borrowers and Lender have executed this Agreement.

**BORROWERS:**

**Assemi Brothers, LLC,**
a California limited liability company

**Maricopa Orchards, LLC,**
a California limited liability company

_____

By: Farshid Assemi
Its: General Manager

_____

By: Farshid Assemi
Its: General Manager

**C & A Farms, LLC,**
a California limited liability company

**Willow Avenue Investments, LLC**
a California limited liability company

_____

By: Farshid Assemi
Its: General Manager

_____

By: Neema Assemi
Its: General Manager

**Whitesbridge Farms, LLC**
a California limited liability company

_____

By: Farshid Assemi
Its: General Manager

*[Sign Originals Only]*

**LENDER:**

**Conterra Agricultural Capital, LLC**

_____
Signature
**Mark A. Smith, COO & General Counsel**

**MULTISTATE REVOLVING LINE OF CREDIT NOTE**

2

# Exhibit I

# NOTE

|  |  | Loan <sup>REDACTED</sup>02678 |
|---|---|---|
| December 14, 2020 | Fresno, | CA |
| [Date] | [City] | [State] |

**6,045 +/- Acres, Kern County, California**
[Property Address]

## 1.   BORROWERS' PROMISE TO PAY

In return for a loan that **Assemi Brothers, LLC**, a California limited liability company, **Maricopa Orchards, LLC**, a California limited liability company, **C & A Farms, LLC**, a California limited liability company, **Willow Avenue Investments, LLC**, a California limited liability company, and **Whitesbridge Farms, LLC**, a California limited liability company (Assemi Brothers, LLC, Maricopa Orchards, LLC, C&A Farms, LLC, Willow Avenue Investments, LLC, and Whitesbridge Farms, LLC are collectively referred to herein as, the "Borrowers"), have received, Borrowers promise to pay U.S. **$12,500,000.00** (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **Conterra Agricultural Capital, LLC, an Iowa limited liability company**. Borrowers will make all payments under this Note in the form of cash, check or money order.

Borrowers understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is also called the "Lender", "Note holder" or "holder of the Note".

## 2.   LINE OF CREDIT

Prior to the expiration of the Draw Period ("Draw Period") as calculated in accordance with this Section 2, this Promissory Note ("Note") evidences a revolving line of credit loan ("Loan") under which advances may from time to time be extended to Borrowers. Advances shall be in the minimum amount of $2,500 and shall be in amounts which are multiples of $100. Upon receipt of a verified funds request by Borrowers to a telephone number provided from time to time by Lender, **or by such other funds request method as the Lender may establish**, and provided all conditions for an advance have been met, Lender shall promptly deliver the requested funds directly to Borrowers' account at Borrowers' bank ("Bank Account") as designated in the original Loan application or by separate written notice on forms to be provided by Lender. In most cases, if a valid funds request is received by Lender at its designated telephone number at or before 12:00 noon (all times in this Note refer to the time in Louisville, Kentucky (Eastern Standard Time EST), the requested funds will be delivered on the business day following receipt of the funds request (e.g., if the funds request is received at 11:00 a.m. on Monday, the funds will usually be delivered on Tuesday; if the funds request is received at 2:00 p.m. on Tuesday, the funds will usually be delivered on Thursday). A valid funds request shall be verified by one or more of the persons obligated to pay this Note on behalf of all persons obligated to pay this Note in a manner to be designated by the Lender. A valid designation of the Bank Account to which funds are to be advanced shall be signed by one or more of the persons obligated to pay this Note on behalf of all persons obligated to pay this Note. Lender shall be entitled to rely on the statements in any (i) verified funds request and/or (ii) signed designation of Bank Account, to the effect that the person who signed such instrument was fully authorized to do so by all of the persons obligated to pay this Note and all persons who are obligated to pay this Note hereby release any and all claims against Lender based on Lender's reliance on such statements.

Advances may be made without payment of a transaction fee.

The Draw Period referenced above shall terminate and expire upon the earlier of the date set forth in Section 9(A)(7) or at such date as determined by the Lender, in its sole discretion.

## 3.   REVOLVING FEATURE

During the Draw Period, Borrowers may borrow, repay and reborrow under this Note at any time, up to the principal amount of this Note, subject to the terms and conditions of this Note (the "Revolving Loan provisions"), so long as no Event of Default exists under this Note or any other documents executed in connection with this Loan

---

MULTISTATE REVOLVING LINE OF CREDIT NOTE

(collectively, the "Loan Documents"). The unpaid principal balance owing on this Note at any time during the Draw Period will be evidenced by Lender's internal records and the amount advanced and outstanding may not exceed at any one time the face amount of this Note. Lender shall not be obligated to make any advance to Borrowers following occurrence of an Event of Default.

4.      **PAYMENTS**
        A. During the Draw Period
        During the Draw Period, Borrowers will be billed in arrears twice a year for interest accrued. Notwithstanding any provision in this Note to the contrary, during the Draw Period Borrowers may make, free of penalty or minimum interest charge, any number of principal payments on any business day. Required interest payments may be made from a funds advance, provided the verified funds request for such advance specifies such a purpose in whole or in part for the requested funds. In addition, the periodic payment will include any late charges and other charges authorized by this Note, including, without limitation, any expenses or advances incurred by Lender under the security instrument.
        Notwithstanding the foregoing, all amounts other than interest accruing over the period from the last date through which interest was last billed due under the terms of this Note, including but not limited to principal and all other interest, shall be due and payable in full upon the earlier of Lender's billing or the Maturity Date. Interest accruing over the period from the last date through which interest was billed until the later of (a) the actual date of payment of all other amounts or (b) the Maturity Date shall be billed promptly after all such other amounts have been received by Lender.

        B. After the Draw Period
        Unless Borrowers have exercised Borrowers' conversion option set forth in Section 9(C) of this Note, the day after the Draw Period ends the repayment period ("Repayment Period") begins. Borrowers must then repay the unpaid and outstanding loan account balance in the manner described in this Section. Borrowers must repay this amount in substantially equal periodic installments with interest at the then-current annual interest rate, as set forth in Section 9(A)(1) of this Note. The periodic payment will be an amount that would be sufficient to repay the unpaid and outstanding loan account balance in full by the Maturity Date indicated in Section 9(A)(7) of this Note. The amount of the periodic payment may change as a result of changes in the Current Index indicated in Section 9(A)(7) of this Note. In addition, the periodic payment will include any late charges and other charges authorized by this Note, including, without limitation, any expenses or advances incurred by Lender under the security instrument.

        C. Prepayments after the Draw Period
        Any prepayments of scheduled installments that are made on a date that is not an installment payment date must be accompanied by interest to the next installment payment date and that such prepayment will not be credited to the Borrowers' account until such installment payment date.

        Any prepayments, partial or in whole, other than scheduled installment payments must be accompanied by unpaid interest accrued on such principal amount from the date to which interest was last paid to the next installment payment date, and such prepayment shall not be considered as having been received and will not be credited to the Borrowers' account until such installment payment date. If the Borrowers make a prepayment there will be no delays in the due dates of Borrowers' installment payments unless the Lender agrees in writing to those delays and that unless the Borrowers and Lender agree otherwise, the Lender at its sole discretion may reamortize the Note on the basis of the new principal balance; otherwise the making of a prepayment will operate only to discharge the Note at an earlier date.

5.      **APPLICATION OF PAYMENTS**
        A.      During the Draw Period
                Notwithstanding any provision in this Note to the contrary, all payments during the Draw Period, other than a regularly scheduled payment of interest, will be applied first to:

                        (1)      Accrued interest; and then to
                        (2)      All other amounts owed other than late changes; and then to
                        (3)      Late charges; and then to

**MULTISTATE REVOLVING LINE OF CREDIT NOTE**

      (4)      Principal.

**B.**      After the Draw Period

All payments received after termination of the Draw Period will be applied first to:

      (1)      collection expenses and protective advances, if any; and then to

      (2)      Interest due; and then to

      (3)      Principal; and then to

      (4)      Late charges

The term "late charges" is intended to include both flat fees associated with late payments, if any.

## 6.    EARLY TERMINATION

So long as no Event of Default exists under this Note, during the Draw Period, Borrowers may terminate the revolving line of credit Loan represented by this Note by (i) providing written notice to Lender of the intent to do so, (ii) paying the outstanding principal balance in full and by (iii) agreeing to pay accrued but unbilled interest promptly upon being billed. Borrowers will be billed for the amount of accrued interest and all other amounts owed (if any) other than interest within fifteen (15) days after the later of Lender's receipt of the notice terminating the Loan and the payment in full of the principal. The recorded Loan Documents including the Security Instrument will then be released of record upon receipt of the final payment of all amounts owed under this Note. Amounts that might be owed other than interest include, but are not limited to, late charges, standby fees, taxes and other amounts advanced by Lender and attorney fees. So long as no Event of Default exists or is continuing under this Note, the Loan will not terminate simply because the outstanding principal balance may be zero at any given time. Notwithstanding any provision in this Note to the contrary, no prepayment penalty or minimum interest charge shall be due in the event of early termination as provided in this Section 6.

## 7.    PROTECTIVE COVENANTS

Borrowers agree to provide Lender with updated financial statements and other requested financial reports, including tax returns on or before May 31st of each year.

## 8.    GENERAL PROVISIONS

    **A.**      Notwithstanding any provision of this Note to the contrary, any choice of law provision includes applicable Federal law and such provision is not intended to prevent the application of Federal law. In addition to any other statutory authority listed in this Note, the terms of this Note and the interest rate and fees set forth herein are authorized by Title 12 of the United States Code, section 2279aa-12 as amended from time to time.

    **B.**      Notwithstanding any provision of this Note to the contrary, interest will be calculated in any reasonable manner determined solely by the holder of this Note based on an assumed 30 day month, and a 360-day year.

    **C.**      Notwithstanding any provision of this Note to the contrary, the whole of the principal sum and any accrued interest and any other sums advanced to protect and/or enforce the Note holder's interest in this Note and the Security Instrument (including reasonable costs of recovery and attorney's fees and expenses) shall bear interest from and after maturity, whether or not resulting from acceleration, at a rate equal to eighteen percent (18.00%) per annum, subject to a minimum interest charge of five percent (5.00%) of such defaulted payment.

    **D.**      During the Draw Period, notwithstanding any provision of this Note to the contrary, in the event any scheduled payment of principal or interest shall not be received by the fifteenth day of the month in which it is due and payable, interest shall be payable on such defaulted payment at a rate which is equal to eighteen percent (18.00%) per annum, subject to a minimum interest charge of five percent (5.00%) of such defaulted payment.

After the Draw Period, notwithstanding any provision of this Note to the contrary, in the event any scheduled payment of principal or interest shall not be received by the tenth day of the month in which it is due and payable, interest shall be payable on such defaulted payment at a rate which is equal to eighteen percent (18.00%) per annum, subject to a minimum interest charge of five percent (5.00%) of such defaulted payment.

    **E.**      Borrowers shall, as required by Section 7, provide current financial statements to the holder of this Note. If Borrowers obtain financial statements which are audited or reviewed by an independent certified public

MULTISTATE REVOLVING LINE OF CREDIT NOTE

accountant for the relevant period, such financial statements provided hereunder shall be such reviewed or audited statements. Borrowers authorize Note holder to make or have made any credit inquiries Note holder feels are necessary. Borrowers also authorize the person or agencies to whom Note holder makes these inquiries to supply Note holder with the information Note holder requests.

F.     If Lender determines at any time to sell, transfer or assign this Note, the Security Instrument and any other security instruments, and/or any or all servicing rights with respect thereto, or to grant participations therein ("Participations"), or issue, in a public offering or private placement, mortgage pass-through certificates or other securities evidencing a beneficial interest in the loan ("Securities"), Lender may forward to each prospective purchaser, transferee, assignee, servicer, participant, investor, or their respective successors in such Participations and/or Securities ("collectively, the "Investor"), any rating agency rating related to such Securities and all documents and information which Lender now has or may hereafter acquire relating to the indebtedness under this Note and to Borrowers, any guarantor, any indemnitors and the Property, as Lender determines necessary or desirable.  All information furnished by Borrowers, any guarantor, or any indemnitor that shall be shared with any prospective Investor shall be shared on a confidential basis and, excepting information shared with the Federal Agricultural Mortgage Corporation and any of its affiliates, which Borrowers hereby consent without further notice, Borrowers shall receive notice thereof.

G.     Upon the occurrence of any Event of Default under the Note, or in the event any action is brought to enforce the terms of this Note or any document related thereto, or in the event of the bankruptcy of any of the Borrowers, then the holder of this Note shall be entitled to recover all attorneys' fees and costs incurred as a result of such Event of Default and/or enforcing the terms of this Note and related documents.

H.     The Borrowers represent and agree that at the time of making any and all requests for funds hereunder that none of the Borrowers, guarantors and owners of the real and personal property security will be delinquent on any taxes (federal, state, or local) of any kind.  This representation is material to the making of each advance.

I.     The Borrowers represent and agree that any and all requests for funds hereunder will be used only for agricultural or other business purposes and not for personal, family, or household purposes.

J.     The making of any false or misleading representation will constitute an Event of Default, entitling Lender to exercise remedies for default, including but not limited to acceleration of the indebtedness.

K.     Borrowers will make payments at **7755 Office Plaza Dr. North, Suite 195, West Des Moines, IA 50266** or at a different place if required by Lender.

L.     If Borrowers do not pay the full amount of each installment on the date it is due, Borrowers will be in default.

M.     Upon the occurrence and during the continuance of any Event of Default under this Note, and if allowed by applicable law, Lender may send Borrowers a written notice telling Borrowers that if Borrowers do not pay the overdue amount by a certain date Lender may require Borrowers to pay immediately the full amount of Principal which has not been paid and all the interest and any applicable fees and costs that Borrowers owe on that amount.

N.     Even if after and during the continuance of any Event of Default under this Note, Lender does not require Borrowers to pay immediately in full as described above, Lender will still have the right to do so if an Event of Default occurs or is continuing at any later time.

O.     Upon the occurrence of any default under this Note or if Lender has required Borrowers to pay immediately in full as described above, Lender will have the right to be paid back by Borrowers for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law.  If allowed by applicable law those expenses include, for example, reasonable attorneys' fees.

## 9.   REVOLVING LINE OF CREDIT VARIABLE RATE PROVISIONS
### A.   Payment of Principal and Interest.
(1)     So long as no Event of Default exists under this Note, interest shall accrue on the unpaid balance of this Note until the Loan is repaid in full or until the Borrowers exercise the option to convert the variable rate to another rate as provided in subsection (9C) below.

(2)     The Initial Variable Rate (defined below) will be established at loan registration and upon the receipt of the Commitment to Purchase – AgEquity.  Thereafter, the Variable Rate shall change according to the Rate Change Date at a rate equal to the sum of (i) the Current Index (defined below) and (ii) the Margin (defined below) (the

MULTISTATE REVOLVING LINE OF CREDIT NOTE

4

"Variable Rate").

(3)     A payment of interest calculated at the Variable Rate on the outstanding principal balance represented under this Note from the date of the first advance hereunder shall be due on the First Interest Payment Date. Thereafter, consecutive semi-annual installments of interest, each in the amount required to pay the unpaid interest accruing through the applicable period, shall be due on each January 1 and July 1 at the Variable Rate until the Maturity Date (as defined below) or the Conversion Date (as defined below) as the case may be. Any remaining indebtedness, if not sooner paid, shall be due and payable on the Maturity Date (as defined below).

(4)     If Lender at any time determines, in its sole but reasonable discretion, that it has miscalculated the amount of any interest payment (whether because of a miscalculation of the Variable Rate or otherwise), then Lender shall give notice to Borrowers of the corrected amount of the interest payment (and the corrected Variable Rate, if applicable) and (i) if the corrected amount of the installment payment represents an increase, then Borrowers shall, within 30 calendar days thereafter, pay to Lender any sums that Borrowers would have otherwise been obligated under this Note to pay to Lender had the amount of the installment payment not been miscalculated, or (ii) if the corrected amount of the installment payment represents a decrease thereof and Borrowers are not otherwise in breach or default under any of the terms and provisions of this Note, the security instrument or any other Loan Document evidencing or securing this Note, then Borrowers shall thereafter be paid the sums that Borrowers would not have otherwise been obligated to pay to Lender had the amount of the installment payment not been miscalculated.

(5)     Borrowers may make payments of principal in any amount on any business day of Lender during such time as the principal is accruing interest at the Variable Rate.

(6)     If Borrowers timely exercises Borrowers' option to (i) convert the interest rate on this Note to another rate and (ii) cancel the Revolving Line of Credit provisions of this Note pursuant to Section C ("Conversion Option") this Note, the applicable interest rate under this Note, beginning on the date the conversion becomes effective and continuing until the Maturity Date, shall not be the rate determined in accordance with subsection (1) of this Section A above, but shall be the rate established in accordance with Section C "Conversion Option" below. Such rate shall be reflected in an "Agreement to Convert" substantially in the form attached as Exhibit A to this Note. If Borrowers have not earlier exercised the Conversion Option, the Revolving Line of Credit Provisions will expire on **January 1, 2026** and the Conversion Option will be deemed to be exercised by selecting the loan terms indicated in subparagraph (7) below.

(7)     The following definitions shall apply to this Note:

**Current Index:** 1-month *VRM servicing released net yield for 8-week delivery* then being required by the Federal Agricultural Mortgage Corporation.

**Index.** Beginning with the Rate Change Date, The variable interest rate shall change to a rate that shall be determined 2 business days prior to the Rate Change Date and any subsequent Rate Change Dates and be based upon the 1-month *AgEquity VRM servicing released net yield for 8-week delivery* then being required by the Federal Agricultural Mortgage Corporation, adjusted for credit quality, plus **0.600%** field servicing fee. If the Index is no longer available, the Note Holder will choose a new index that is based on comparable information.

**First Interest Payment Date: January 1, 2021**

**Revolving Loan Provisions Termination Date: January 1, 2026**

**First Principal Payment Date: January 1, 2026**

**Maturity Date: January 1, 2026**

**Rate Change Date:  01/01/2021 and on the 1ˢᵗ of every month thereafter**

**Initial Variable Rate: 5.000%**

---

**MULTISTATE REVOLVING LINE OF CREDIT NOTE**

**B.      Prepayment.**

Prior to the Conversion Date (as defined below), Borrowers may prepay all or part of the unpaid principal balance of this Note on any business day.

**C.      Interest Rate Conversion Option.**

**(1) Option to Cancel Multiple Advance Provisions and Convert to Another Interest Rate.** Borrowers may exercise the Conversion Option unless Borrowers are in default under this Note or the security instrument if the conditions of this Section 9(C)(1) are met. Borrowers will be conclusively deemed to have exercised the Conversion Option upon the date of the Revolving Loan Provisions Termination Date. The "Conversion Option" is the Borrowers' option to (i) cancel and convert the interest rate specified in this Note from a variable rate with no interest rate limits to the rate calculated under Section 9(C)(2) below; and (ii) terminate and cancel the Revolving Loan provisions.

The conversion can only take place on a date a scheduled payment is due. The date on which the Borrowers convert the variable interest rate to the converted rate is called the "Conversion Date."

The Borrowers' ability to exercise the Conversion Option is conditioned upon and no conversion shall be effective without: (i) the Borrowers giving the Lender written notice at least 21 days prior to the Conversion Date (at 11:00 a.m. Louisville, Kentucky time) that the Borrowers want to exercise the Conversion Option; (ii) at the Conversion Date, the Borrowers must not be in default under the terms of this Note or the security instrument; (iii) payment to the Lender at or prior to the Conversion Date of all of Lender's out of pocket expense of completing such Conversion while maintaining its lien priority, and (iv) the Borrowers' completion and execution of any documents the Lender requires to effect the conversion.

**(2) Calculation of Converted Rate.** Upon request from the Borrowers, the Lender shall provide a list of the loan products then offered by the Federal Agricultural Mortgage Corporation ("Farmer Mac") with a maturity date similar to the Maturity Date of this Note subject to a four week mandatory delivery commitment, including any prepayment restrictions and yield maintenance provision applicable to such products. The description of loan products shall contain the then current rates applicable to such products, but the actual rate may be higher or lower and will be set as described in this Section 9. The Borrowers may then give written notice of the Borrowers' election to convert this Note to one of those products for the remaining term of this Note to the Maturity Date by selecting one of the listed products and requesting conversion of this Note to the selected product. The interest rate in effect for this Note after Conversion ("Converted Rate") will be an interest rate equal to the Farmer Mac required net yield for the selected loan product with a maturity similar to the Maturity Date of this Note subject to a four week mandatory delivery commitment, plus **2.930%** (the "Modification Note Rate"), subject to any yield maintenance provision applicable to such product. The converted rate in effect as of the Conversion Date will be equal to the rate calculated in the immediately preceding sentence as of 11:00 a.m. Louisville, Kentucky time, on the later of (a) the date which is four weeks prior to the Conversion Date and (b) the day lender receives Borrowers' election to convert this Note. If this required net yield is not available, the Lender will determine the Converted Rate by using comparable information.

If Borrowers elect to convert this Note, or are required to convert this Note by the terms hereof, but do not select a particular product from the list of available products by the date specified in the list of products, the product designated by Lender as the Default Product on the list of available products will be deemed to have been selected by Borrowers.

**(3) Calculation of New Payment.** Upon the Borrowers' exercise of the Conversion Option, the Lender will determine the amount and payment schedule of the installments, which will be calculated to repay the unpaid principal (net of any principal payment due on the Conversion Date) in full over the period from the Conversion Date to the Final Amortization Date at the new interest rate in substantially equal payments applied first to interest and then to principal. Any remaining indebtedness, if not sooner paid, shall be due and payable on the Maturity Date.

**MULTISTATE REVOLVING LINE OF CREDIT NOTE**

10.   **LENDER ADVANCES**
        Lender may make advances under the Security Instrument, as defined below, providing security for this Note, to protect the Lender's interest in the Security Instrument or other instrument providing security for this Note from loss of value or damage. Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate stated in Section 8(D) of this Note shall become an obligation due and owing under the terms of this Note immediately upon the date advanced by Lender and is an obligation of Borrowers secured by the Security Instrument or other instrument providing security for this Note.

11.   **GIVING OF NOTICES**
        Unless applicable law requires a different method, any notice that must be given to Borrowers under this Note will be given by delivering it or by mailing it by first class mail to Borrowers at **1306 W Herndon Ave #101, Fresno, CA 93711**, or at a different address if Borrowers give Lender a notice of Borrowers' different address.
        Any notice that must be given to Lender under this Note will be given by delivering it or by mailing it by first class mail to Lender at the address stated in Section 8(K) above or at a different address if Borrowers are given a notice of that different address.

12.   **OBLIGATIONS OF PERSONS UNDER THIS NOTE**
        Each of the Borrowers, and each person executing this Note on each of the Borrowers' behalf, represents and warrants to Lender that by its execution below, each of the Borrowers is duly organized, is in good standing, and has the full power, authority and legal right to execute and deliver this Note, and is obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed and any additional amounts incurred under the terms of this Note. Each of the Borrowers also represent and warrant that any person who is a guarantor, surety or endorser of this Note is also obligated to keep all promises made in this Note, including the promise to pay the full amount owed and any additional amounts incurred under the terms of this Note. Lender may enforce its rights under this Note against each of the Borrowers and each person executing or guaranteeing this Note on each of the Borrowers' behalves, individually or against all such persons together. Any one of the Borrowers or any person guaranteeing this Note on any of the Borrowers' behalves may be required to pay all amounts due or incurred under this Note.

13.   **WAIVERS**
        Borrowers and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require Lender to demand payment of amounts due. "Notice of Dishonor" means the right to require Lender to give notice to other persons that amounts due have not been paid.

14.   **UNIFORM SECURED NOTE**
        This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Lender under this Note, one or more deeds of trust (each a "Security Instrument" and collectively, the "Security Instrument") dated the same date as this Note, protects the Lender from possible losses which might result if Borrowers do not keep the promises which Borrowers makes in this Note. That Security Instrument describes how and under what conditions Borrowers may be required to make immediate payment in full of all amounts Borrowers owe under this Note. Some of those conditions are described as follows:

        If all or any part of the Property or any Interest in the Property is sold or transferred (or if any of the Borrowers is not a natural person and a beneficial interest in any of the Borrowers is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

15.   **USURY**
        The parties to this Note intend and agree that the indebtedness evidenced by this Note and any related documents shall remain in compliance with any usury provisions of the state within which this Note was made by

**MULTISTATE REVOLVING LINE OF CREDIT NOTE**

Borrowers. This Note and any related documents are subject to the express condition that at no time shall the Borrowers be obligated, or required, to pay interest on the principal balance at a rate that could subject Lender to either civil or criminal liability as a result of such rate being in excess of the maximum rate which Lender is permitted to charge. If, by the terms of this Note, Borrowers are, at any time, required or obligated to pay interest on the principal balance at a rate in excess of such maximum rate, then the rate of interest under this Note shall be deemed to be immediately reduced to such maximum rate, and interest payable hereunder shall be computed at such maximum rate, and any portion of all prior Interest payments in excess of such maximum rate shall be applied, and/or shall retroactively be deemed to have been payments made, in reduction of the principal balance.

**16.   EVENT OF DEFAULT**
The occurrence of any one or more of the following shall constitute an "Event of Default" under this Note, the Security Instrument, and any related Loan Documents, as such term is used herein:

**(A)**    If Borrowers fail to repay any interest or Principal under the Note when due;

**(B)**    If any of the Borrowers defaults in any material respect in the performance of any of the other covenants, agreements and obligations of the Borrowers under the Security Instrument or any related Loan Documents involving the payment of money and fails to cure such default within ten (10) days;

**(C)**    If any of the Borrowers defaults in any material respect in the performance of any of the Borrowers' non-monetary covenants, agreements and obligations under this Note, the Security Instrument or any related Loan Documents and fails to cure such default within thirty (30) days after written notice thereof from Lender;

**(D)**    If any representation or warranty, statement, report or certificate now or hereafter made by any of the Borrowers, was not true and correct in any material respect when made;

**(E)**    If any bankruptcy or insolvency petition is filed by or against any of the Borrowers under the Federal Bankruptcy Code or any similar state or federal Law, whether now or hereafter existing (and, in the case of involuntary proceedings, failure to cause the same to be vacated, stayed or set aside within thirty (30) days after filing);

**(F)**    If a default occurs under the Security Instrument or any of the related Loan Documents and continues beyond the applicable grace period, if any, contained therein;

**(G)**    If any of the Borrowers transfer any interest in the Property in violation of Section 15 of the Security Instrument; provided, however, that Borrowers shall have the right to prepay the Principal balance of the Note, in whole or in part, subject to the prepayment conditions and any other applicable costs and fees, as further set forth in this Note.

**NOTICE IS HEREBY GIVEN TO MAKER THAT ORAL AGREEMENTS OR ORAL COMMITMENTS TO LEND MONEY, EXTEND CREDIT, MODIFY LOAN TERMS OR FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER CALIFORNIA LAW.**

MULTISTATE REVOLVING LINE OF CREDIT NOTE

8

**BORROWERS:**

**Assemi Brothers, LLC,**
a California limited liability company

By: Farshid Assemi
Its: General Manager

**C & A Farms, LLC,**
a California limited liability company

By: Farshid Assemi
Its: General Manager

**Whitesbridge Farms, LLC**
a California limited liability company

By: Neema Assemi
Its:  General Manager

**Maricopa Orchards, LLC,**
a California limited liability company

By: Farshid Assemi
Its:  General Manager

**Willow Avenue Investments, LLC**
a California limited liability company

By: Neema Assemi
Its:  General Manager

*[Sign Originals Only]*

MULTISTATE REVOLVING LINE OF CREDIT NOTE

PAY TO THE ORDER OF
**U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs**
WITHOUT RECOURSE

**Conterra Agricultural Capital, LLC**

Signature

**Mark A. Smith, COO & General Counsel**

MULTISTATE REVOLVING LINE OF CREDIT NOTE

10

# CROSS COLLATERALIZATION RIDER

RE: <sup>REDACTED</sup>2678

THIS CROSS COLLATERALIZATION RIDER is made this February 2, 2023, and is incorporated into and shall be deemed to amend and supplement the amended and restated Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date, given by the undersigned Borrowers and Grantors to secure a Note to **U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs** (the "Lender") dated January 8, 2018 and covering the Property described in the Security Instrument and located at:

**350.37 Acres Devoted to an Almond Orchard**
**Fresno County, CA**
[Property Address]

In addition to the covenants and agreements made in the Security Instrument, Borrower Parties further covenant and agree that on the date hereof the following other loans have been sold to Federal Agricultural Mortgage Corporation:

| Borrowers/Co-Signers' Names | Date | Loan Amount/Loan No. |
|---|---|---|
| **Copper Avenue Investments, LLC, ACAP Farms, LLC, Gradon Farms, LLC, Lincoln Grantor Farms, LLC, Maricopa Orchards, LLC & Cantua Orchards, LLC** | **10/11/2019** | **10,258,632.00/**REDACTED**1674** |
| **Copper Avenue Investments, LLC, ACAP Farms, LLC, Gradon Farms, LLC, Lincoln Grantor Farms, LLC, Maricopa Orchards, LLC & Cantua Orchards, LLC** | 10/11/2019 | **$5,297,232.00 /**REDACTED**1673** |
| **C&A Farms, LLC & Whitebridge Farms, LLC** | 01/08/2018 | **$5,500,000.00/**REDACTED**1725** |
| **C&A Farms, LLC & Whitebridge Farms, LLC** | 1/08/2018 | **$1,500,000.00/**REDACTED**1728** |
| **Assemi Brothers, LLC, C&A Farms, LLC, Whitebridge Farms, LLC, Maricopa Orchards, LLC & Willow Avenue Investments, LLC** | 12/14/2020 | **$12,500,000.00/**REDACTED**2676** |
| **C & A Farms, LLC, Willow Avenue Investments, LLC, Gradon Farms, LLC, Cantua Orchards, LLC, Copper Avenue Investments, LLC, Lincoln Grantor Farms, LLC, ACAP Farms, LLC and Maricopa Orchards, LLC** | 2/2/2023 | **$7,400,000.00/**REDACTED**1004** |

**Farmer Mac Cross-Collateralization Rider**

1

©PeirsonPatterson, LLP.-Arlington, Texas  2016
1537050917 [Doc Id 2448 M01222014]

each of which is evidenced by a separate promissory note (the "Other Notes"), and each of which is secured by a separate mortgage, deed of trust, or security deed (the "Other Security Instruments"). It is agreed that in addition to Borrower's Note, this Security Instrument secures the obligations, debts, and liabilities evidenced by the Other Notes and Other Security Instruments referenced herein, plus interest thereon, which is payable by Grantor to Lender and/or Federal Agricultural Mortgage Corporation.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Cross Collateralization Rider.

**Maricopa Orchards, LLC,**
a California limited liability company


By: Farshid Assemi
Its:  General Manager

**C & A Farms, LLC,**
a California limited liability company


By: Farshid Assemi
Its: General Manager

**Willow Avenue Investments, LLC**
a California limited liability company


By: Neema Assemi
Its:  General Manager

**Assemi Brothers, LLC,**
a California limited liability company


By: Farshid Assemi
Its: General Manager

**Whitesbridge Farms, LLC,**
a California limited liability company


By: Neema Assemi
Its: General Manager

*[Sign Originals Only]*

---

**Farmer Mac Cross-Collateralization Rider**

2

©PeirsonPatterson, LLP.-Arlington, Texas  2016
1537050917 [Doc Id 2448 M01222014]

# CROSS DEFAULT RIDER

RE: <sup>REDACTED</sup>2678

THIS CROSS DEFAULT RIDER is made this February 2 , **2023,** and is incorporated into and shall be deemed to amend and supplement the amended and restated Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date, given by the undersigned Borrowers and Grantors to secure a Note to **U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs** (the "Lender") dated January 8, 2018 and covering the Property described in the Security Instrument and located at:

**2,915.23 +/- Acres**
**Kern County, California**
[Property Address]

In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree that on the date hereof the following other loans have been sold to Federal Agricultural Mortgage Corporation:

| Borrowers/Co-Signers' Names | Date | Loan Amount/Loan No. |
|---|---|---|
| **Copper Avenue Investments, LLC, ACAP Farms, LLC, Gradon Farms, LLC, Lincoln Grantor Farms, LLC, Maricopa Orchards, LLC & Cantua Orchards, LLC** | **10/11/2019** | **$10,258,632.00/**<sup>REDACTED</sup>**1674** |
| **Copper Avenue Investments, LLC, ACAP Farms, LLC, Gradon Farms, LLC, Lincoln Grantor Farms, LLC, Maricopa Orchards, LLC & Cantua Orchards, LLC** | 10/11/2019 | **$5,297,232.00/**<sup>REDACTED</sup>**1673** |
| **C&A Farms, LLC & Whitebridge Farms, LLC** | **01/08/2018** | **$5,500,000.00/**<sup>REDACTED</sup>**1725** |
| **C&A Farms, LLC & Whitebridge Farms, LLC** | **1/08/2018** | **$1,500,000.00/**<sup>REDACTED</sup>**1728** |
| **Assemi Brothers, LLC, C&A Farms, LLC, Whitebridge Farms, LLC, Maricopa Orchards, LLC & Willow Avenue Investments, LLC** | **12/14/2020** | **$12,500,000.00/**<sup>REDACTED</sup>**2676** |
| **C & A Farms, LLC, Willow Avenue Investments, LLC, Gradon Farms, LLC, Cantua Orchards, LLC, Copper Avenue Investments, LLC, Lincoln Grantor Farms, LLC, ACAP Farms, LLC and Maricopa Orchards, LLC** | **2/2/2023** | **$7,400,000.00/**<sup>REDACTED</sup>**1004** |

**FARMER MAC MULTISTATE CROSS DEFAULT RIDER**

1

©PeirsonPatterson, LLP.-Arlington, Texas  2016
1538050917 [Doc Id 2424 M01142014]

each of which is evidenced by a separate promissory note (the "Other Notes"), and each of which is secured by a separate mortgage, deed of trust, or security deed (the "Other Security Instruments"). It is agreed that any default under this Security Instrument or this Note shall be deemed a default under the Other Notes and Other Security Instruments; and any default under any or all of the Other Notes or Other Security Instruments shall be deemed to be a default under this Note and this Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Cross Default Rider.

**Maricopa Orchards, LLC,**
a California limited liability company

By: Farshid Assemi
Its:  General Manager

**C & A Farms, LLC,**
a California limited liability company

By: Farshid Assemi
Its: General Manager

**Willow Avenue Investments, LLC**
a California limited liability company

By: Neema Assemi
Its:  General Manager

**Assemi Brothers, LLC,**
a California limited liability company

By: Farshid Assemi
Its: General Manager

**Whitesbridge Farms, LLC,**
a California limited liability company

By: Neema Assemi
Its: General Manager

---

**FARMER MAC MULTISTATE CROSS DEFAULT RIDER**

©PeirsonPatterson, LLP.-Arlington, Texas  2016
1538050917 [Doc Id 2424 M01142014]

# EXHIBIT A TO NOTE
# FORM OF AGREEMENT TO CONVERT
### [To be Completed at Exercise of Conversion Option]

This Agreement is made this_____day of_____, by and between **Conterra Agricultural Capital, LLC** (the "Lender") and **Assemi Brothers, LLC**, a California limited liability company, **Maricopa Orchards, LLC**, a California limited liability company, **C & A Farms, LLC**, a California limited liability company, **Willow Avenue Investments, LLC**, a California limited liability company, and **Whitesbridge Farms, LLC**, a California limited liability company (Assemi Brothers, LLC, Maricopa Orchards, LLC, C&A Farms, LLC, Willow Avenue Investments, LLC, and Whitesbridge Farms, LLC are collectively referred to herein as, the "Borrowers") and modifies and amends certain terms of Borrower's indebtedness evidenced by a Promissory Note (the "Note") to Lender dated December 14, 2020, which is secured by a mortgage, deed of trust or security deed or similar instrument (the "Security Instrument") of the same date and covering the property described in the Security Instrument (the "Property") and located at:

### 6,045 +/- Acres, Kern County, California
### [Property Address]

In consideration of Borrowers' exercise of Borrowers' option to convert Borrowers' variable interest rate revolving line of credit Loan to another interest rate loan without revolving line of credit provisions pursuant to the provisions of the Note and to the Security Instrument, the Note is hereby modified and amended as follows:

I        Sections 9A and 9C of the "Revolving Line of Credit Variable Rate Provisions" of the Note are deleted in full and the following is inserted in its place:

[Insert interest rate provisions of the applicable loan product.]

II        Section 9B is changed to read:

2.        Prepayment.

[Select and insert the appropriate provision associated with the applicable loan product]

In addition to the modifications to the Note stated above, Borrowers understand that, upon Borrowers' signing of this Agreement, Lender will have the option to require immediate payment in full of all sums secured by the Security Instrument if all or any part of the Property or any interest in it is sold or transferred without Lender's prior written consent, as provided in the Security Instrument.

Except as stated in this Agreement, Borrowers' promise to pay and the covenants and agreements under the Note and under the Security Instrument continue without change.

*[remainder intentionally left blank – signature page follows]*

---

**MULTISTATE REVOLVING LINE OF CREDIT NOTE**

IN WITNESS WHEREOF, Borrowers and Lender have executed this Agreement.

**BORROWERS:**

**Assemi Brothers, LLC,**
a California limited liability company

**Maricopa Orchards, LLC,**
a California limited liability company

_____

_____

By: Farshid Assemi
Its: General Manager

By: Farshid Assemi
Its: General Manager

**C & A Farms, LLC,**
a California limited liability company

**Willow Avenue Investments, LLC**
a California limited liability company

_____

_____

By: Farshid Assemi
Its: General Manager

By: Neema Assemi
Its: General Manager

**Whitesbridge Farms, LLC**
a California limited liability company

_____

By: Neema Assemi
Its: General Manager

*[Sign Originals Only]*

**LENDER:**

**Conterra Agricultural Capital, LLC**

_____
Signature
**Mark A. Smith, COO & General Counsel**

**MULTISTATE REVOLVING LINE OF CREDIT NOTE**

2

Exhibit J

# NOTE

Loan <sup>REDACTED</sup>1004

| | | |
|---|---|---|
| **February 2, 2023** | **Fresno,** | **CA** |
| [Date] | [City] | [State] |

**4,357 +/- Acres**
**Fresno, Kings, and Kern Counties, California**
[Property Address]

## 1.    BORROWERS' PROMISE TO PAY

In return for a loan that **Maricopa Orchards, LLC**, a California limited liability company, **Copper Avenue Investments, LLC**, a California limited liability company, **C & A Farms, LLC**, a California limited liability company, **ACAP Farms, LLC**, a California limited liability company, **Willow Avenue Investments, LLC**, a California limited liability company, **Lincoln Grantor Farms, LLC**, a California limited liability company, **Cantua Orchards, LLC**, a California limited liability company, and **Gradon Farms, LLC**, a California limited liability company (collectively, the "Borrowers"), have received, Borrowers promise to pay U.S. **$7,400,000.00** (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **Conterra Agricultural Capital, LLC**. Borrowers will make all payments under this Note in the form of cash, check or money order.

Borrowers understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is also called the "Lender", "Note holder" or "holder of the Note".

## 2.    INTEREST

So long as no Event of Default exists under this Note, interest will be charged on unpaid Principal until the full amount of Principal has been paid. Borrowers will pay interest at a yearly rate of **6.48804%**. The interest rate Borrowers will pay will change in accordance with this Section 2.

| | |
|---|---|
| **INITIAL ADJUSTMENT DATE** | **March 1, 2023** |
| **ORIGINAL AMORTIZATION TERM** | **20 years** |
| **ADJUSTMENT FREQUENCY PERIOD** | **monthly** |
| **SOFR RATE MARGIN** | **1.9500%** |

**ADJUSTABLE RATE PROVISION.** The interest rate stated in this Note is subject to adjustment by the Lender or any subsequent holder of this Note on the Initial Adjustment Date and on subsequent dates established by the Adjustment Frequency Period thereafter. Any such change in the interest rate shall be made automatically but in no event shall the adjusted interest rate exceed the maximum interest rate then permitted by law. When the rate is adjusted the remaining current Principal balance of the Note will be reamortized over the remaining amortization term to determine subsequent payment amounts. Lender reserves the right to not adjust the loan during any Event of Default. Notice of the adjusted rate will be sent to the Borrowers after each interest rate adjustment. This is a CME SOFR[1] Rate Based Loan, and the applicable interest rate shall be equal

---

1 The market data is the property of Chicago Mercantile Exchange Inc. ("CME") or its licensors as applicable. All rights reserved, or otherwise licensed by CME.

to the sum of the (1) SOFR Base Rate, and (2) SOFR Rate Margin, determined and adjusted monthly as follows:

CME 1-Month Term SOFR Based Rate: The "SOFR Base Rate" is an interest rate per annum equal to the CME 1- Month Term SOFR. The interest rate shall be adjusted monthly on the first day of the month. The index for adjustments is the CME 1-Month Term SOFR Index published by CME at https://www.cmegroup.com/market-data/cme-group-benchmark-administration/term-sofr.html?redirect=/termsofr two (2) business days before the applicable interest rate change date. In the event that CME 1-Month Term SOFR Index is less than zero percent per annum the index shall be deemed to be zero percent (0.0000%) per annum. If the CME 1-Month Term SOFR Index is not reported two business days prior to the first day of the immediately succeeding month, the Index reported on the first Business Day preceding such day will be used. If this index is no longer available for any reason, is no longer posted through electronic transmission or through a source providing such information, or the Lender determines that the index is unreliable or no longer adequately covers Lender's costs of making loans using this index, Lender will select a replacement index in its sole discretion which index may be based upon comparable information and may include an interest rate spread or other price adjustment to compensate Lender for costs incurred in making or maintaining the loan.

SOFR Rate Margin: The initial annual rate of margin to be added on the SOFR Base Rate (the "SOFR Rate Margin") is equal to 1.9500% per annum. Lender, in its sole and absolute discretion, may modify and change the SOFR Rate Margin annually, with the first adjustment occurring on the first anniversary of the Closing Date, effective as of the first day of the anniversary month and each subsequent adjustment occurring annually thereafter. Lender may however modify the Rate Margin more frequently than annually in the event that an Event of Default has occurred.

After and during the continuance of an Event of Default, interest will be charged on unpaid Principal at the interest rate stated in Section 6 of this Note.

3.    **SCHEDULED PAYMENTS**
      **(A)    Time and Amount of Payments**
      **1 interest only payment on July 1, 2023, with interest calculated from the date of closing on the unpaid Principal balance at the applicable interest rate under this Note; 9 consecutive semi-annual Principal and interest payments, beginning January 1, 2024, and the final payment of all remaining Principal, accrued and unpaid interest, and any applicable fees and costs on February 2, 2028, which is called the "Maturity Date."**
      **(B)    Place of Payments**
      Borrowers will make payments at **5465 Mills Civic Parkway, Suite 201, West Des Moines, IA 50266** or at a different place if required by Lender.

If Lender at any time determines, in its sole but reasonable discretion, that it has miscalculated the amount of any installment payment (whether because of a miscalculation of the interest rate or otherwise), then Lender shall give notice to Borrowers of the corrected amount of the installment payment (and the corrected interest rate, if applicable) and: (i) if the corrected amount of the installment payment represents an increase, then Borrowers shall, within 30 calendar days thereafter, pay to Lender any sums that Borrowers would have otherwise been obligated under this Note to pay to Lender had the amount of the installment payment not been miscalculated, or (ii) if the corrected amount of the installment payment represents a decrease thereof and an Event of Default does not exist under this Note, the Security Instrument, as defined below, or any other loan document evidencing or securing this Note, then Borrowers shall thereafter be paid the sums that Borrowers would not have otherwise been obligated to pay to Lender had the amount of

the installment payment not been miscalculated.

## 4.    INTEREST CALCULATION

Interest on this Note is computed on a 30/360 simple interest basis; that is, with exception of the month in which the loan settlement occurs, monthly interest is calculated by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding unpaid Principal balance, multiplied by a month of 30 days.   The month in which the loan settlement date occurs, interest shall accrue on a "30/360" basis from and including the settlement date to and including the last day of such month, calculated as if such month had 30 days. (For example, if this Note had settled on either February 15 or March 15, in either case, there would be 15 days of interest for the remainder of that first month.) Unless required by applicable law, payments will be applied first to collection expenses and protective advances, second to interest, third to unpaid Principal, and finally to late charges.

## 5.    PREPAYMENTS

Any prepayments of scheduled installments that are made on a date that is not an installment payment date must be accompanied by interest to the next installment payment date and that such prepayment will not be credited to the Borrowers' account until such installment payment date.

Any prepayments, partial or in whole, other than scheduled installment payments must be accompanied by unpaid interest accrued on such Principal amount from the date to which interest was last paid to the next installment payment date, and such prepayment shall not be considered as having been received and will not be credited to the Borrowers' account until such installment payment date. If the Borrowers make a prepayment there will be no delays in the due dates of Borrowers' installment payments unless the Lender agrees in writing to those delays and that unless the Borrowers and Lender agree otherwise, the Lender at its sole discretion may reamortize the Note on the basis of the new Principal balance; otherwise the making of a prepayment will operate only to discharge the Note at an earlier date. Excepting the requirement that Borrowers shall pay all interest to the next installment payment date with any prepayment, there shall be no additional prepayment penalties, fees, or premium charged to Borrowers for early payment of this Note.

## 6.    INTEREST AFTER DEFAULT

Upon the occurrence and during the continuance of any Event of Default under this Note, including failure to pay this Note upon final maturity, at Lender's option, Lender may add any unpaid interest and any applicable costs and expenses to Principal then due under the Note and such sum will bear interest therefrom until paid at the rate provided in this Note (including any increased interest rate).   From and after the occurrence of any Event of Default, whether by nonpayment, maturity, acceleration, nonperformance or otherwise, and until such Event of Default has been cured, all outstanding amounts due under this Note shall bear interest at a rate equal to 18% per annum, or the maximum legal rate allowed by applicable state law if this rate is in excess of the maximum rate Lender is permitted to charge.

## 7.    ANNUAL FINANCIAL STATEMENTS

Borrowers agree to provide Lender with updated financial statements and other requested financial reports, including tax returns on or before May 31st of each year.  The failure of Borrowers to provide annual financial statements or other requested reports within a reasonable time may be declared to be an Event of Default of this Note by Lender and Lender may exercise all remedies under Section 14 of this Note or as provided elsewhere in this Note.

## 8.    DISSEMINATION OF INFORMATION

If Lender determines at any time to sell, transfer or assign this Note, the Security Instrument, as defined below, and any other security instruments, and any or all servicing rights with respect thereto, or to grant participations therein ("Participations") or issue, in a public offering or private placement, mortgage pass-through certificates or other securities evidencing a beneficial interest in the loan ("Securities"), Lender may forward to each purchaser, transferee,

MULTISTATE ADJUSTABLE RATE NOTE
Farmer Mac UNIFORM INSTRUMENT

3

assignee, servicer, participant, investor, or their respective successors in such Participations and/or Securities ("collectively, the "Investor"), any rating agency rating such Securities and each prospective Investor, all documents and information which Lender now has or may hereafter acquire relating to the Indebtedness and to Borrowers, any guarantor, any indemnitors and the Property, which shall have been furnished by Borrowers, any guarantor or any indemnitors, as Lender determines necessary or desirable. All information furnished by Borrowers shared with each prospective Investor shall be shared on a confidential basis and, excepting information shared with the Federal Agricultural Mortgage Corporation and any of its affiliates, which Borrowers hereby consent without further notice, Borrowers shall receive notice thereof.

**9.      LENDER ADVANCES**
Lender may make advances under the Security Instrument, as defined below, providing security for this Note, to protect the Lender's interest in the Security Instrument or other instrument providing security for this Note from loss of value or damage. Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate stated in Section 6 of this Note shall become an obligation due and owing under the terms of this Note immediately upon the date advanced by Lender and is an obligation of Borrowers secured by the Security Instrument or other instrument providing security for this Note.

**10.     GIVING OF NOTICES**
Unless applicable law requires a different method, any notice that must be given to Borrowers under this Note will be given by delivering it or by mailing it by first class mail to Borrowers at **5260 N. Palm Ave., Ste. 421, Mail Stop M, Fresno, CA 93704**, or at a different address if Borrowers give Lender a notice of Borrowers' different address.

Any notice that must be given to Lender under this Note will be given by delivering it or by mailing it by first class mail to Lender at the address stated in Section 3(B) above or at a different address if Borrowers are given a notice of that different address.

**11.     WAIVERS**
Borrowers and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require Lender to demand payment of amounts due. "Notice of Dishonor" means the right to require Lender to give notice to other persons that amounts due have not been paid.

**12.     UNIFORM SECURED NOTE**
This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Lender under this Note, one or more deeds of trust (each a "Security Instrument" and collectively, the "Security Instrument") dated the same date as this Note, protects the Lender from possible losses which might result if Borrowers do not keep the promises which Borrowers make in this Note. That Security Instrument describes how and under what conditions Borrowers may be required to make immediate payment in full of all amounts Borrowers owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred to a third party not under common control of one or more of the Guarantors (or if any of the Borrowers is not a natural person and a beneficial interest in such of the Borrowers of more than ten percent (10%) is sold or transferred, excluding transfer to trusts for estate planning purposes or which occur as a result of the administration of trusts following the death of a grantor of such trusts) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

**13.     USURY**

---

MULTISTATE ADJUSTABLE RATE NOTE
Farmer Mac UNIFORM INSTRUMENT

4

The parties to this Note intend and agree that the indebtedness evidenced by this Note and any related documents shall remain in compliance with any usury provisions of the state within which this Note was made by Borrowers. This Note and any related documents are subject to the express condition that at no time shall Borrowers be obligated, or required, to pay interest on the unpaid Principal balance at a rate that could subject Lender to either civil or criminal liability as a result of such rate being in excess of the maximum rate which Lender is permitted to charge. If, by the terms of this Note, Borrowers are, at any time, required or obligated to pay interest on the unpaid Principal balance at a rate in excess of such maximum rate, then the rate of interest under this Note shall be deemed to be immediately reduced to such maximum rate, and interest payable hereunder shall be computed at such maximum rate, and any portion of all prior Interest payments in excess of such maximum rate shall be applied, and/or shall retroactively be deemed to have been payments made, in reduction of the Principal balance.

## 14.    DEFAULT AND BORROWERS' FAILURE TO PAY AS REQUIRED
### (A)    Event of Default
The occurrence of any one or more of the following shall constitute an "Event of Default" under this Note, the Security Instrument, and any related loan documents, as such term is used herein:

      (1)    If Borrowers fail to repay any interest or Principal under the Note when due;

      (2)    If Borrowers default in any material respect in the performance of any of the other covenants, agreements and obligations of Borrowers under the Security Instrument or any related loan document involving the payment of money and fails to cure such default within ten (10) days;

      (3)    If Borrowers default in any material respect in the performance of any of such Borrowers' non-monetary covenants, agreements and obligations under this Note, the Security Instrument or any related loan document and fails to cure such default within sixty (60) days after written notice thereof from Lender, provided however if the default is one which is not susceptible to cure within sixty (60) days and Borrower commences to cure and diligently pursues the cure to completion, then there shall be no Event of Default so long as the cure process continues and is timely completed;

      (4)    If any representation or warranty, statement, report or certificate now or hereafter made by any of the Borrowers, was not true and correct in any material respect when made;

      (5)    If any bankruptcy or insolvency petition is filed by or against any of the Borrowers under the Federal Bankruptcy Code or any similar state or federal Law, whether now or hereafter existing (and, in the case of involuntary proceedings, failure to cause the same to be vacated, stayed or set aside within sixty (60) days after filing);

      (6)    If a default occurs under the Security Instrument or any of the related loan documents and continues beyond the applicable grace period, if any, contained therein;

      (7)    If Borrowers or any grantor or any other obligated party under the Security Instrument transfer any interest in the Property in violation of Section 15 of the Security Instrument; provided, however, that Borrowers shall have the right to prepay the Principal balance of the Note, in whole or in part, subject to the prepayment conditions and any other applicable costs and fees, as further set forth in this Note.

### (B)    Late Charge for Overdue Payments
If any installment of Principal or interest is not received by the Lender by the end of the 10th calendar day after the date it is due, a late fee shall be payable on such defaulted payment equal to 5% of such defaulted payment then due.

### (C)    Notice of Default
Upon the occurrence and during the continuance of any Event of Default under this Note, and if allowed by applicable law, Lender will send Borrowers a written notice telling Borrowers that if Borrowers do not pay the overdue amount or otherwise cure the Event of Default within thirty (30) days after receipt of written notice from Lender specifying the nature of the Event of Default, Lender may require Borrowers to pay immediately the full amount of Principal which has not been paid and all the interest and any applicable fees and costs that Borrowers owe on that amount.

### (D)    No Waiver By Lender

---

**MULTISTATE ADJUSTABLE RATE NOTE**
**Farmer Mac UNIFORM INSTRUMENT**

Even if after and during the continuance of any Event of Default, Lender does not require Borrowers to pay immediately in full as described above, Lender will still have the right to do so if an Event of Default occurs or is continuing at any later time.

  (E)  **Payment of Lender's Costs and Expenses**

  Upon the occurrence of any Event of Default under this Note or if Lender has required Borrowers to pay immediately in full as described above, Lender will have the right to be paid back by Borrowers for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. If allowed by applicable law, those expenses include, for example, reasonable attorneys' fees.

**15.**  **CHOICE OF LAW**

  This Note shall be governed by and construed and interpreted in accordance with the laws of the United States of America and the State of California.

**16.**  **CROSS-DEFAULT PROVISION**

  Borrowers' default or breach under any note or agreement in which Lender has an interest shall be a breach under this Note, the Security Instrument, and any other agreements or documents securing this loan from Lender to Borrowers, and Lender may invoke any of the remedies permitted by the Security Instrument.

**NOTICE IS HEREBY GIVEN TO MAKER THAT ORAL AGREEMENTS OR ORAL COMMITMENTS TO LEND MONEY, EXTEND CREDIT, MODIFY LOAN TERMS OR FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER CALIFORNIA LAW.**

    *[remainder intentionally left blank – signature page follows]*

---

MULTISTATE ADJUSTABLE RATE NOTE
Farmer Mac UNIFORM INSTRUMENT

**BORROWERS:**

**MARICOPA ORCHARDS, LLC,**
a California limited liability company

By: Farshid Assemi
Its: General Manager

**C & A FARMS, LLC,**
a California limited liability company

By: Farshid Assemi
Its: Manager

**WILLOW AVENUE INVESTMENTS, LLC,**
a California limited liability company

By: Neema Assemi
Its: Manager

**LINCOLN GRANTOR FARMS, LLC,**
a California limited liability company

By: Neema Assemi
Its: Manager

**COPPER AVENUE INVESTMENTS, LLC,**
a California limited liability company

By: Farshid Assemi
Its: Manager

**ACAP FARMS, LLC,**
a California limited liability company

By: Farshid Assemi
Its: Manager

**GRADON FARMS, LLC,**
a California limited liability company

By: Neema Assemi
Its: Manager

**CANTUA ORCHARDS, LLC,**
a California limited liability company

By: Farshid Assemi
Its: Manager

MULTISTATE ADJUSTABLE RATE NOTE
Farmer Mac UNIFORM INSTRUMENT

PAY TO THE ORDER OF

**U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs**
WITHOUT RECOURSE

**Conterra Agricultural Capital, LLC**

Signature

**Mark A. Smith, COO & General Counsel**

# CROSS COLLATERALIZATION RIDER

Loan <sup>REDACTED</sup>1004

THIS CROSS COLLATERALIZATION RIDER is made this February 2nd, 2023 and is incorporated into and shall be deemed to amend and supplement the Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing (the "Security Instrument") of the same date, given by Copper Avenue Investments, LLC, a California limited liability company, C & A Farms, LLC, a California limited liability company, ACAP Farms, LLC, a California limited liability company, Willow Avenue Investments, LLC, a California limited liability company, Cantua Orchards, LLC, a California limited liability company, Gradon Farms, LLC, a California limited liability company, and Lincoln Grantor Farms, LLC, a California limited liability company (collectively, "Borrowers"), to secure a promissory note (the "Note") signed by Borrowers and Maricopa Orchards, LLC, a California limited liability company (with Borrowers, collectively, the "Borrower Parties"), to **Conterra Agricultural Capital, LLC** (the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

**4,357 +/- Acres, Fresno, Kings, and Kern Counties, California**

[Property Address]

In addition to the covenants and agreements made in the Security Instrument, Borrower Parties further covenant and agree that on the date hereof the following other loans have been sold to Federal Agricultural Mortgage Corporation:

| Borrowers/Grantors Names | Date | Loan Amount/Loan No. |
|---|---|---|
| **C&A Farms, LLC**<br>**Whitesbridge Farms, LLC** | **1/8/2018** | $5,500,000.00.<sup>REDACTED</sup>1725 |
| **C&A Farms, LLC**<br>**Whitesbridge Farms, LLC** | **1/8/2018** | $1,500,000.00/<sup>REDACTED</sup>1728 |
| **Maricopa Orchards, LLC**<br>**Copper Avenue Investments, LLC**<br>**ACAP Farms, LLC**<br>**Gradon Farms, LLC**<br>**Lincoln Grantor Farms, LLC**<br>**Cantua Orchards, LLC** | **10/11/2019** | $5,297,232.00/<sup>REDACTED</sup>1673 |

Farmer Mac Cross-Collateralization Rider

1

| | | |
|---|---|---|
| **Maricopa Orchards, LLC**<br>**Copper Avenue Investments, LLC**<br>**ACAP Farms, LLC**<br>**Gradon Farms, LLC**<br>**Lincoln Grantor Farms, LLC**<br>**Cantua Orchards, LLC** | **10/11/2019** | $10,258,632.00/ REDACTED 1674 |
| **Maricopa Orchards, LLC**<br>**C&A Farms, LLC**<br>**Willow Avenue Investments, LLC**<br>**Whitesbridge Farms, LLC**<br>**Assemi Brothers, LLC** | **12/14/2020** | $12,500,000.00/ REDACTED 2676 |
| **Maricopa Orchards, LLC**<br>**C&A Farms, LLC**<br>**Willow Avenue Investments, LLC**<br>**Whitesbridge Farms, LLC**<br>**Assemi Brothers, LLC** | **12/14/2020** | $12,500,000.00 REDACTED 2678 |

each of which is evidenced by a separate promissory note (the "Other Notes"), and each of which is secured by a separate mortgage, deed of trust, or security deed (the "Other Security Instruments"). It is agreed that in addition to the Note, this Security Instrument secures the obligations, debts, and liabilities evidenced by the Other Notes and Other Security Instruments referenced herein, plus interest thereon, which is payable to Lender and/or Federal Agricultural Mortgage Corporation.

BY SIGNING BELOW, Borrower Parties accept and agree to the terms and covenants contained in this Cross Collateralization Rider.

*[remainder intentionally left blank – signature page follows]*

DATED effective this 2nd day of February 2023

**BORROWER PARTIES:**

**COPPER AVENUE INVESTMENTS, LLC,**
a California limited liability company

By: Farshid Assemi
Its: Manager

**MARICOPA ORCHARDS, LLC,**
a California limited liability company

By: Farshid Assemi
Its: General Manager

**LINCOLN GRANTOR FARMS, LLC,**
**a California limited liability company**

By: Nader Assemi
Its: Manager

**GRADON FARMS, LLC,**
a California limited liability company

By: Neema Assemi
Its: Manager

**ACAP FARMS, LLC,**
a California limited liability company

By: Farshid Assemi
Its: Manager

**C & A FARMS, LLC,**
a California limited liability company

By: Farshid Assemi
Its: Manager

**WILLOW AVENUE INVESTMENTS, LLC,**
a California limited liability company

By: Neema Assemi
Its: Manager

**CANTUA ORCHARDS, LLC,**
a California limited liability company

By: Farshid Assemi
Its: Manager

Farmer Mac Cross-Collateralization Rider

3

# CROSS DEFAULT RIDER

Loan <sup>REDACTED</sup> 1004

THIS CROSS DEFAULT RIDER is made this **February 2, 2023,** and is incorporated into and shall be deemed to amend and supplement the Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing (the "Security Instrument") of the same date, given by Copper Avenue Investments, LLC, a California limited liability company, C & A Farms, LLC, a California limited liability company, ACAP Farms, LLC, a California limited liability company, Willow Avenue Investments, LLC, a California limited liability company, Cantua Orchards, LLC, a California limited liability company, Gradon Farms, LLC, a California limited liability company, and Lincoln Grantor Farms, LLC, a California limited liability company (collectively, "Borrowers"), to secure a promissory note (the "Note") signed by Borrowers and Maricopa Orchards, LLC, a California limited liability company (with Borrowers, collectively, the "Borrower Parties"), to **Conterra Agricultural Capital, LLC** (the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

**4,357 +/- Acres, Fresno, Kings, and Kern Counties, California**
[Property Address]

In addition to the covenants and agreements made in the Security Instrument, Borrower Parties further covenant and agree that on the date hereof the following other loans have been sold to Federal Agricultural Mortgage Corporation:

| **Borrowers/Grantors Names** | **Date** | **Loan Amount/Loan No.** |
|---|---|---|
| **C&A Farms, LLC**<br>**Whitesbridge Farms, LLC** | **1/8/2018** | $5,500,000.00/<sup>REDACTE</sup>1725 |
| **C&A Farms, LLC**<br>**Whitesbridge Farms, LLC** | **1/8/2018** | $1,500,000.00<sup>REDACTE</sup>1728 |
| **Maricopa Orchards, LLC**<br>**Copper Avenue Investments, LLC**<br>**ACAP Farms, LLC**<br>**Gradon Farms, LLC**<br>**Lincoln Grantor Farms, LLC**<br>**Cantua Orchards, LLC** | **10/11/2019** | $5,297,232.00<sup>REDACTED</sup>1673 |

| | | |
|---|---|---|
| **Maricopa Orchards, LLC**<br>**Copper Avenue Investments, LLC**<br>**ACAP Farms, LLC**<br>**Gradon Farms, LLC**<br>**Lincoln Grantor Farms, LLC**<br>**Cantua Orchards, LLC** | **10/11/2019** | $10,258,632.00<sup>REDACTED</sup>1674 |
| **Maricopa Orchards, LLC**<br>**C&A Farms, LLC**<br>**Willow Avenue Investments, LLC**<br>**Whitesbridge Farms, LLC**<br>**Assemi Brothers, LLC** | **12/14/2020** | $12,500,000.00/<sup>REDACTE</sup>2676 |
| **Maricopa Orchards, LLC**<br>**C&A Farms, LLC**<br>**Willow Avenue Investments, LLC**<br>**Whitesbridge Farms, LLC**<br>**Assemi Brothers, LLC** | **12/14/2020** | $12,500,000.00/<sup>REDACTE</sup>2678 |

each of which is evidenced by a separate promissory note (the "Other Notes"), and each of which is secured by a separate mortgage, deed of trust, or security deed (the "Other Security Instruments"). It is agreed that any default under this Security Instrument or this Note shall be deemed a default under the Other Notes and Other Security Instruments; and any default under any or all of the Other Notes or Other Security Instruments shall be deemed to be a default under the Note and the Security Instrument.

BY SIGNING BELOW, Borrower Parties accept and agree to the terms and covenants contained in this Cross Default Rider.

*[remainder intentionally left blank – signature page follows]*

DATED effective this 2nd day of February 2023.

**BORROWER PARTIES:**

**COPPER AVENUE INVESTMENTS, LLC,**

a California limited liability company

By:  Farshid Assemi
Its:  Manager

**MARICOPA ORCHARDS, LLC,**
a California limited liability company

By:  Farshid Assemi
Its:  General Manager

**LINCOLN GRANTOR FARMS, LLC,**
**a California limited liability company**

By:  Neema Assemi
Its: Manager

**GRADON FARMS, LLC,**
a California limited liability company

By:  Neema Assemi
Its:  Manager

**ACAP FARMS, LLC,**
a California limited liability company

By:  Farshid Assemi
Its:  Manager

**C & A FARMS, LLC,**
a California limited liability company

By:  Farshid Assemi
Its:  Manager

**WILLOW AVENUE INVESTMENTS, LLC,**
a California limited liability company

By:  Neema Assemi
Its:  Manager

**CANTUA ORCHARDS, LLC,**
a California limited liability company

By:  Farshid Assemi
Its:  Manager

# FINANCIAL INFORMATION AND COVENANTS RIDER

Loan <sup>REDACTED</sup>1004

THIS FINANCIAL INFORMATION AND COVENANTS RIDER is made this **2ⁿᵈ day of February, 2023**, and is incorporated into and shall be deemed to amend and supplement the Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing (the "Security Instrument") of the same date, given by Copper Avenue Investments, LLC, a California limited liability company, C & A Farms, LLC, a California limited liability company, ACAP Farms, LLC, a California limited liability company, Willow Avenue Investments, LLC, a California limited liability company, Gradon Farms, LLC, a California limited liability company, Cantua Orchards, LLC, a California limited liability company and Lincoln Grantor Farms, LLC, a California limited liability company (collectively, "Borrowers), to secure an adjustable rate promissory note (the "Note") signed by Borrowers and Maricopa Orchards, LLC, a California limited liability company (with Borrowers, collectively, the "Borrower Parties"), to **Conterra Agricultural Capital, LLC** (the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

### 4,357 +/- Acres
### Fresno, Kings, and Kern Counties, California

**FINANCIAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument by Borrower, Borrower Parties further covenant and agree that Borrower Parties will prepare and maintain Borrower Parties' financial records using consistently applied generally accepted accounting principles then in effect. Borrower Parties will provide Lender with financial information in a form acceptable to Lender and under the following terms:

(If "X"ed the following terms are agreed to.)

☒      **Financials.** Annually, Lender will be provided CPA reviewed consolidated and consolidating financial statements for The Assemi Group, as defined below, within **150** days after the close of each fiscal year. Financial statements provided to Lender shall include market value balance sheets for The Assemi Group and an entity-by-entity breakdown of any and all related-party accounts/notes, both payable and receivable.

☒      **Guarantor Market Value Balance Sheets.** Annually, Lender will be provided market value balance sheets for each and every guarantor of the Notes within 150 days after the close of each fiscal year.

☒      **Current Ratio.** The Assemi Group, as defined below, shall always maintain a current ratio, as determined in Lender's sole discretion, of not less than 1.50:1, when measured with the December 31 cost basis CPA reviewed financial statements and annually thereafter during the term of the Loan. Current ratio is computed, as of any date of determination, by dividing current assets by current liabilities.

☒      **Debt Service Coverage Ratio.** The Assemi Group, as defined below, shall maintain at all times a debt service coverage ratio greater than or equal to 1.25:1. Debt Service Coverage Ratio shall be as determined in Lender's sole discretion and based on the December 31 financial statements for The Assemi Group, as defined below, during the applicable term on a consolidated basis. The debt service ratio is computed, as of any date of determination, by dividing

Farmer Mac – Financial Info & Covenants Rider

Net Funds Available by total Annual Debt Service Requirements. Net Funds Available means net income, plus depreciation, plus interest expense. Annual Debt Service Requirements means of all scheduled principal (excluding prepayments and/or paydowns of revolving debt) and interest paid during the year on any loans or leases outstanding to Lender or any third-party lender.

☒　　　　**Total Liabilities/Total Assets.** The Assemi Group, as defined below, on a consolidated basis shall maintain Total Liabilities to Total Assets of no more than 60%, as measured as of December 31 each year using market basis financial statements.

☒　　　　**Transfer of Ownership.** No equity interests of the Borrower Parties shall, without Lenders' prior written consent, be conveyed, transferred, or pledged to any other person, except for transfers to entities within the Assemi Group.

☒　　　　**Covenant Compliance Certificates.** Annually, Borrower Parties shall provide covenant compliance certificates, in a form reasonably acceptable to Lender, within **150** days after the close of each fiscal year.

☒　　　　**Title Policy and Subordination Agreements.** No later than 60 days after the date hereof, Borrower Parties shall provide to Lender (i) a Title Policy in the full amount of the Note, issued by Old Republic Title Company, insuring the Security Instrument as a valid and subsisting encumbrance on the Property and all appurtenant easements as required by Lender, and (ii) Subordination Agreements as required by Lender. As used herein, "Title Policy" means an ALTA Loan Policy of Title Insurance or other policy of title insurance acceptable to Lender in Lender's sole discretion. As used herein, "Subordination Agreements" means one or more subordination agreements in form and substance acceptable to Lender, executed by one or more persons having a leasehold interest and/or security interest in the Property, which subordinates such leasehold and/or security interest to the Security Instrument.

For purposes of this Financial Information and Covenants Rider, "The Assemi Group" means entities primarily owned by members of the Assemi family and identified and consolidated within the annual accountant reviewed financial statements titled "The Assemi Group."

*[remainder of page intentionally left blank – signature page follows]*

BY SIGNING BELOW, Borrower Parties accept and agree to the terms and covenants contained in this Financial Information and Covenants Rider.

**BORROWER PARTIES:**

**C & A FARMS, LLC,**
a California limited liability company

By:  Farshid Assemi
Its:  Manager

**COPPER AVENUE INVESTMENTS, LLC,**
a California limited liability company

By:  Farshid Assemi
Its:  Manager

**WILLOW AVENUE INVESTMENTS, LLC,**
a California limited liability company

By:  Neema Assemi
Its:  Manager

**ACAP FARMS, LLC,**
a California limited liability company

By:  Farshid Assemi
Its:  Manager

**GRADON FARMS, LLC,**
a California limited liability company

By:  Neema Assemi
Its:  Manager

**MARICOPA ORCHARDS, LLC,**
a California limited liability company

By:  Farshid Assemi
Its:  Manager

**CANTUA ORCHARDS, LLC,**
a California limited liability company

By:  Farshid Assemi
Its:  Manager

**LINCOLN GRANTOR FARMS, LLC,**
a California limited liability company

By:  Neema Assemi
Its:  Manager

Farmer Mac – Financial Info & Covenants Rider

# Exhibit K

Fresno County Recorder
Paul Dictos, CPA

# 2023-0011222

Recorded at the request of:
CSC, LOGAN

02/08/2023 09:51 31
Titles: 1        Pages: 25
Fees: $91.00
CA SB2 Fees:$75.00
Taxes: $0.00
Total: $166.00

Recording Requested By:

**Conterra Agricultural Capital, LLC**

After Recording Return To:

**Conterra Agricultural Capital, LLC**
**5465 Mills Civic Pkwy, Ste 201**
**West Des Moines, IA 50266**
**Attn: Alison Werts**

[Space Above This Line For Recording Data]

# AMENDED AND RESTATED DEED OF TRUST
## Security Agreement, Assignment of Rents and Fixture Filing

Loan <span style="color:red">REDACTED</span>1725

This Amended and Restated Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing (this "Amendment", and, as further defined below, this **"Security Instrument"**) is made and entered into as of *february 2*, 2023, is granted C&A Farms, LLC, a California limited liability company, the grantor and trustor under this Security Instrument whose address is **5260 N. Palm Ave., Ste 421, Mail Stop M, Fresno, CA 93704** **("Borrower")**, in favor of Old Republic Title Company **("Trustee")**, for the benefit of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs, whose address is 1133 Rankin Street, Suite 100, St. Paul, Minnesota 55116 **("Lender")**, and amends and restates the Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing dated as of January 8, 2018, and recorded as Document No. 2018001138300 on January 31, 2018, with the Fresno County Clerk - Recorder in the Official Records, Fresno County, as affected by the Assignment of Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing dated as of January 8, 2018, and recorded as Document No. 2018001138400 on January 31, 2018 **with the Fresno County Clerk - Recorder in the Official Records, Fresno County,**

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in certain Sections of this document. Certain rules regarding the usage of words used in this document are also provided in Section 13.

**(A) "Security Instrument"** means this document, together with all Riders, if any, to this document.

**(B) "Borrower"** is C&A Farms, LLC, a California limited liability company. Borrower is the grantor and trustor under this Security Instrument. Borrower's address is **5260 N. Palm Ave., Ste 421, Mail Stop M, Fresno, CA 93704. "Borrower Parties"** are Borrower and Whitesbridge Farms, LLC, a California limited liability company. Borrower Parties' address is **1306 W Herndon Ave #101, Fresno, CA 93711.**

---

**CALIFORNIA–Farmer Mac UNIFORM INSTRUMENT**                     Form 5000.05 4/23/07

1                ©PeirsonPatterson, LLP.-Arlington, Texas 2016
1720110117 [Doc Id 9660 M03182016]

(C) **"Lender"** is U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs, whose address is 1133 Rankin Street, Suite 100, St. Paul, MN 55116. Lender is the beneficiary under this Security Instrument.

(D) **"Trustee"** is Old Republic Title Company.

(E) **"Note"** means (i) Borrower Parties' open ended promissory note dated January 8, 2018, maturing on July 1, 2033, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of up to $5,500,000, plus interest; (ii) Borrower Parties' open ended promissory note dated January 8, 2018, and subsequently converted on June 27, 2018, maturing on July 1, 2038, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of up to $1,500,000.00, (iii) an open ended promissory note made by Maricopa Orchards, LLC, Copper Avenue Investments, LLC, ACAP Farms, LLC and Lincoln Grantor Farms, LLC dated October 11, 2019, maturing on October 11, 2044, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of up to $5,297,232.00, plus interest; (iv) a promissory note made by Maricopa Orchards, LLC, Copper Avenue Investments, LLC, ACAP Farms, LLC and Lincoln Grantor Farms, LLC dated October 11, 2019, maturing on October 11, 2039, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of $10,258,632.00, plus interest; (v) an open ended promissory note made by Maricopa Orchards, LLC, C&A Farms, LLC, Willow Avenue Investments, LLC, Assemi Brothers, LLC, a California limited liability company and Whitesbridge Farms, LLC dated December 14, 2020, maturing on January 1, 2026, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of up to $12,500,000.00, plus interest; and (vi) an open ended promissory note made by Maricopa Orchards, LLC, C&A Farms, LLC, Willow Avenue Investments, LLC, Assemi Brothers, LLC, a California limited liability company and Whitesbridge Farms, LLC dated December 14, 2020, maturing on January 1, 2026, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of up to $12,500,000.00, plus interest; and (vii) a promissory note made by Maricopa Orchards, LLC, C & A Farms, LLC, Willow Investments, LLC, Copper Avenue Investments, LLC, ACAP Farms, LLC, Lincoln Grantor Farms, LLC, Cantua Orchards, LLC, Gradon Farms, LLC, dated January 27, 2023, maturing on January 13, 2026, in the original principal amount of $7,400,000.00, plus interest. Borrower Parties have promised to pay this debt in regular Periodic Payments and to pay Notes in full not later than maturity date of each Note.

(F) **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

(G) **"Loans"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest

(H) **"Riders"** mean all Riders to this Security Instrument that are executed by Borrower whether recorded or unrecorded. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Irrigation Equipment Rider       ☐ Water Rights Rider

☐ Financial Information and Covenants Rider       ☐ Permitted Prior Encumbrance Rider

☐ Mortgage Insurance Rider       ☐ Adjustable Rate Rider

☐ Other(s):

(I) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT          Form 5000.05 4/23/07

©PeirsonPatterson, LLP.-Arlington, Texas 2016
1720110117 [Doc Id 9660 M03182016]

administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 4) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(L) "Periodic Payment"** means the regularly scheduled amount due for principal and interest under the Note.

**(M) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

**TRANSFER OF RIGHTS IN THE PROPERTY**
This Security Instrument secures to Lender: (i) the repayment of the Loans, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the **County** [Type of Recording Jurisdiction] of **Fresno** [Name of Recording Jurisdiction]:

   **See Exhibit "A" attached hereto and made a part hereof.**

which currently has the address of :

<div align="center">

**350.37 Acres Devoted to an Almond Orchard**
**Fresno County, California**
("Property Address")

</div>

subject only to those matters set forth in the Permitted Prior Encumbrance Rider, if said rider is attached (hereafter "Permitted Prior Encumbrances");

**TOGETHER WITH** all buildings, improvements, equipment, fixtures and permanent plantings affixed, attached to or incorporated in the real property, and all additions, replacements, and improvements hereafter made thereto or placed therein or thereon; all rights-of-way, easements, rents, issues, profits, income, proceeds and general intangibles there from, tenements, hereditaments, remainders, reversions, privileges and appurtenances thereunto belonging, however evidenced, which are used or enjoyed in connection with the real property now or hereafter owned or belonging to the Borrower or which hereafter may be acquired by Borrower. excluding, however, the growing crop;

   **TOGETHER WITH** all water rights appurtenant to the real property, whether such water rights are riparian, appropriative or otherwise, along with all ditch and ditch rights and any shares of stock, licenses, permits and contracts evidencing such water or ditch rights appurtenant to the real property, and all wells, reservoirs, dams, embankments or fixtures located on the real property;

---

**CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT**                **Form 5000.05 4/23/07**

            ©Peirson Patterson, LLP.-Arlington, Texas 2016

                          1720110117 [Doc Id 9660 M03182016]

**TOGETHER WITH** all windmills, pumps, irrigation equipment, motors, engines, and devices of every kind, with the exception of rolling stock, now or hereafter attached or affixed to the real property, or for stock watering or domestic purposes thereon, and all grain bins and storage bins, which are owned by Borrower and which are attached or affixed to the real property in **Fresno County, California**, described above, together with all additional accessions, replacements, improvements, repairs and substitutions to said property and the proceeds thereof and all other fixtures now or hereafter attached or affixed to the real property, all of which are declared to be appurtenant to said real property, or incident to the ownership thereof;

**TOGETHER WITH** all judgments, awards of damages, settlements and payments or security (i) hereafter made as a result of or in lieu of any taking of all or any part of the real property under the power of eminent domain or for any damage to the real property and/or the improvements located thereon, or any part thereof, and (ii) hereafter made for any damage to the real property and/or the improvements located thereon, or any part thereof resulting from exercise of or attempted exercise of mining rights or claims, however reserved or asserted, and resulting from the disturbance of any of the surface of the real property. Borrower does hereby covenant and agree that Borrower will not give such consent as may be required of the owner for mining or other surface disturbance by the terms of any patent, deed, statute, law or otherwise, without the prior written consent of Lender;

**TOGETHER WITH** all proceeds of and any unearned premiums on any insurance policies covering the real property and/or the improvements located thereon, including, without limitation, the right to receive and apply the proceeds of any insurance judgments, or settlements made in lieu thereof, for damage to the real property and/or the improvements located thereon or the indebtedness secured thereby;

**TOGETHER WITH** all contract rights, chattel paper, documents, accounts and general intangibles, rights to performance, entitlement to payment in cash or in kind, or any other benefits under any current or future governmental program which pertain to the real property, whether now or hereafter existing or acquired, excluding crop receivables;

**TOGETHER WITH** all cash and noncash proceeds of the conversion, voluntary or involuntary, of any of the foregoing;

**TOGETHER WITH** any and all of Borrower's right, title, and/or interest in any and all system memberships and/or ownership certificates in any non-municipal water sewer systems now or in the future serving said property.

All replacements and additions shall also be covered by this Security Instrument.

All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record and specifically those permitted prior encumbrances, if any, set forth in the Permitted Prior Encumbrances Rider if said rider is attached to this Security Instrument. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property, and fixtures.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any yield maintenance premiums, any prepayment charges and late charges due under the Note. Payments due under the Note and this Security Instrument shall be made in

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT                                                    Form 5000.05 4/23/07

4

©PeirsonPatterson, LLP.-Arlington, Texas 2016

1720110117 [Doc Id 9660 M03182016]

U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender:
(a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 12. Lender may return any payment or partial payment if the payment or partial payment is insufficient to bring the Loans current. Lender may accept any payment or partial payment insufficient to bring the Loans current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payment in the future. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Unless required by Applicable Law, payments will be applied first to accrued unpaid interest, then second to principal, third to advances under this Security Instrument, and finally to late charges. Such payments shall be applied to each Periodic Payment in the order in which it became due.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Charges; Liens.** Excluding liens associated with operating lines of credit that are secured by the growing crop and other personal property ("Crop Loan"), Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any. Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a)
agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 3.

Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender, defined below, on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with the Loans.

**4. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loans. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with the Loans, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings

**CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT**                                                      **Form 5000.05 4/23/07**

©PeirsonPatterson, LLP.-Arlington, Texas 2016

1720110117 [Doc Id 9660 M03182016]

or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, such failure shall constitute a default under the terms of this Security Instrument and the Loans. Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 4 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**5. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property, excluding ordinary wear and tear, ordinary farming practices and normal maturity of any permanent crop. Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 4 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or

CALIFORNIA–Farmer Mac UNIFORM INSTRUMENT                                Form 5000.05 4/23/07

©PeirsonPatterson, LLP.-Arlington, Texas 2016
1720110117 [Doc Id 9660 M03182016]

in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Borrower will operate the Property in a good and workmanlike manner and in accordance with all Applicable Law and will pay all fees and charges of any kind in connection therewith. Borrower will use good farming and animal husbandry practices.

Lender or its agent may make reasonable entries upon and inspections of the Property with forty-eight (48) hours' advance written notice. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**6. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loans.

**7. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** Subject to any subordination or intercreditor agreement entered into between Lender and the Crop Loan lender, and provided notice pursuant to Section 23 has been given to Borrower, If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding, (d) perform any farming operations related to the planting, growing, maintenance, and harvesting of crops located on the Property, and (e) perform any ranching operations related to any animals located on the Property. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 7, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 7. Lender may perform these or any other actions it deems necessary in Lender's sole discretion to preserve the value of the Property, and/or assign to others the right to do same on behalf of Lender. Lender may make advances under this security instrument or other instrument providing security for the Note, to protect the Lender's interest in this security instrument or other instrument providing security for the Note from loss of value or damage. Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate indicated in the Note shall become an obligation due and owing under the terms of the Note immediately upon the date advanced by Lender and is an obligation of the Borrower secured by the security instrument or other instrument providing security for the Note.

Any amounts disbursed by Lender under this Section 7 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**8. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT                                    Form 5000.05 4/23/07

©PeirsonPatterson, LLP.-Arlington, Texas 2016

1720110117 |Doc Id 9660 M03182016|

period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or material impairment to the value of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 16, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**9. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**10. Joint and Several Liability; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. Subject to the provisions of Section 15, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender,

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT                                                          Form 5000.05 4/23/07

©PeirsonPatterson, LLP.-Arlington, Texas 2016
                                                           1720110117 [Doc Id 9660 M03182016]

shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 17) and benefit the successors and assigns of Lender.

**11. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loans are subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loans exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**12. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Borrower's address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**13. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**14. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**15. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 15, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser, excluding, however, easements granted by Borrower in the ordinary course of business.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may

**CALIFORNIA–Farmer Mac UNIFORM INSTRUMENT**                                                      **Form 5000.05 4/23/07**

9

©Peirson Patterson, LLP.-Arlington, Texas 2016
1720110117 [Doc Id 9660 M03182016]

require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 12 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Borrower may request Lender to release one or more parcels that make up the Property, from time to time, from the lien of the Deed of Trust (the "Partial Release") and Lender agrees to not unreasonably withhold its consent to the Partial Release, subject to the prior satisfaction of the condition that Borrower shall submit a formal written request for the Partial Release (the "Request") not less than forty-five (45) days prior to the date upon which Borrower desires to close the transfer of the parcel subject to the Partial Release (the "Release Parcel"). No more than three (3) Requests shall be made per calendar year. The Request shall be sufficiently detailed and include all necessary documentation so as to allow Lender adequate time to process the Partial Release.

Notwithstanding the foregoing, upon the written request of Borrower, Lender will subordinate its interest in any personal property, crops growing or to be grown on the Property, crop receivables, and all governmental payments relating to such crops (the "Crops"), but not to trees, irrigation equipment, water rights and permanent plantings, to the security interest of an institutional lender (a "Crop Lender") for one or more loans made to Borrowers to finance the production of crops on all or any portion of the Property ("Operating Financing"). Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances.

**16. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 15.

**17. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 12) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower

pursuant to Section 25 and the notice of acceleration given to Borrower pursuant to Section 15 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 17.

**18. Hazardous Substances.** As used in this Section 18: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property other than the presence, use, storage and disposal of Hazardous Substances in quantities as necessary for Borrower's normal farming operations located on the Property, all of which Buyer covenants have and will be used, stored and disposed of in accordance with commercially reasonable farming practices and all applicable environmental laws. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal farming and residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**19. Additional Property Subject To The Security Instrument.** This Security Instrument also constitutes a security agreement within the meaning of the Uniform Commercial Code as adopted in the State of **California** (the "UCC"). In addition to the Property described in the Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument:  building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling, attached floor coverings, irrigation pipes and pumps, livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins and specifically: **All water rights now owned or hereafter acquired that are appurtenant to the Property, whether such water and water rights are riparian, appropriative or otherwise and appurtenant to the Property, all ditch/pond and ditch/pond rights and any shares of stock, licenses, permits and contracts evidencing such water or ditch rights, and all wells, reservoirs, dams, embankments or fixtures relating thereto, which are appurtenant to the Property.**

**All irrigation equipment of every kind and nature, including but not limited to center irrigation pivots, pumps, pvc pipe, sprinklers, motors, well equipment, pumps and power units, now owned or hereafter acquired by Borrower and now or hereafter affixed to the Property, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom** , all of which, including replacements and additions thereto, shall be deemed to

be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this Security Instrument as the "Property."

**20. Fixture Filing.** This Security Instrument constitutes a "fixture filing" for the purposes of the UCC against all of the Property which is or is to become fixtures per the UCC.

**21. Use of Property; Compliance With Law.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**22. Assignment of Leases.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**23. Assignment of Rents; Appointment of Receiver; Lender In Possession.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to Sections 12 and 25 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notices of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorneys' fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 7 of the Security Instrument.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**24. Cross-Collateralization.** In addition to the Notes, all liens, security interests, assignments, suretyship obligations, stock pledges, rights and remedies granted to Lender in any loan document or agreement secure all obligations, debts and liabilities, plus interest thereon, of any or all Borrowers to Lender, as well as claims by Lender against any or all Borrowers, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Notes, whether voluntary or otherwise, whether due or not due, direct or indirect, absolute or contingent, whether any or all Borrowers may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT                                    Form 5000.05 4/23/07

©PeirsonPatterson, LLP.-Arlington, Texas 2016
1720110117 [Doc Id 9660 M03182016]

**25. Cross-Default Provision.** Borrower's default or breach under any note or agreement in which Lender has an interest, including but not limited to the Notes, shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**26. Acceleration; Remedies. Following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 15 unless Applicable Law provides otherwise) and prior to acceleration or Lender's exercise of any remedy, Lender shall give at least sixty (60) days written notice to Borrower prior to exercising any remedy, unless otherwise provided under this Deed of Trust; provided, however, if such default cannot be cured within the 60-day period and Borrower has commenced and diligently pursues the cure of the related default, Borrower shall have such time as is commercially reasonably necessary for Borrower to complete the cure, provided Lender is not materially prejudiced from such delay. Lender shall use commercially reasonable standards to determine if it is materially prejudiced by the delay. The notice shall specify: (a) the default; (b) the action required to cure the default; (c) the date by which the default must be cured. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice or such extended period for defaults which cannot be cured within the 60-day period, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 25, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**27. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**28. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT**                                           **Form 5000.05 4/23/07**

©PeirsonPatterson, LLP.-Arlington, Texas 2016

1720110117 [Doc Id 9660 M03182016]

**29. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

**30. Other California State Specific Provisions.**

(a) In addition to the provisions of any loan agreement, Borrower further agrees that, if Lender accepts a guaranty of only a portion of the Indebtedness, Borrower waives any right under California Civil Code Section 2822(a) to designate the portion of the Indebtedness which shall be satisfied by a guarantor's partial payment.

(b) Except for matters covered by an O&M Program or matters described in any environmental indemnity agreement, Borrower shall not cause or permit any lien (whether or not such lien has priority over the lien created by this Security Instrument) upon the Property imposed pursuant to any Environmental Laws. Any such lien shall be considered a Prohibited Activity or Condition (as may also be contemplated in any environmental indemnity agreement).

(c) Borrower represents and warrants to Lender that, except as previously disclosed by Borrower or Borrower Parties to Lender in writing:

(1)       at the time of acquiring the Property, Borrower undertook all appropriate inquiry into the previous ownership and uses of the Property consistent with good commercial or customary practice and no evidence or is now being used for any Prohibited Activates or Conditions; and

(2)       the Property has not been designated as "hazardous waste property" or "border zone property" pursuant to Section 25220, et seq., of the California Health and Safety Code.

The representations and warranties in this Security Instrument shall be continuing representations and warranties that shall be deemed to be made by Borrower throughout the term of the Loans, until the Indebtedness has been paid in full.

(d) Without limiting any of the remedies provided in this Security Instrument, Borrower acknowledges and agrees that certain provisions in this Security Instrument are environmental provisions (as defined in Section 736(f)(2) of the California Code of Civil Procedure) made by Borrower relating to the real property security (the **"Environmental Provisions"**), and that to the extent applicable, Borrower's failure to comply with any of the Environmental Provisions will be a breach of contract that will entitle Lender to pursue the remedies provided by Section 736 of the California Code of Civil Procedure for the recovery of damages and for the enforcement of the Environmental Provisions.

Except as otherwise stated herein, nothing in the provisions of this Amendment shall be deemed in any way to affect the priority of the Original Deed of Trust over any other lien, charge, encumbrance or conveyance, or to release or change the liability of any party who may be liable under the Note.

*[remainder intentionally left blank – signature page follows]*

BY SIGNING BELOW, Borrower accepts and agree to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower.

"BORROWER"

C&A Farms, LLC, a California limited liability company

By: Farid Assemi
Its: General Manager

*[Sign Originals Only]*

LENDER:
U.S. Bank National Association, as
Custodian/Trustee for Federal Agricultural
Mortgage Corporation programs

By: Heather Wright, Manager- Closing & Servicing of
Federal Agricultural Mortgage Corporation Attorney-in-Fact
for U.S. Bank National Association, as Custodian/Trustee for
Federal Agricultural Mortgage Corporation programs

# ACKNOWLEDGMENT

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of _____ Fresno _____ )

On _____ 2\2\2023 _____ before me, _L. Diaz, Notary Public_

(insert name and title of the officer)

personally appeared _____ Farid Asseni _____,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

L. DIAZ
Notary Public - California
Fresno County
Commission # 2398671
My Comm. Expires Apr 30, 2026

Signature _____ S. Diaz _____ (Seal)

A notary public or other officer completing this
certificate verifies only the identity of the individual
who signed the document to which this certificate
is attached, and not the truthfulness, accuracy, or
validity of that document.

STATE OF IOWA
COUNTY OF Polk

On Feb 3, 2023 before me, Megan Spalding, personally appeared
**Heather Wright, Manager- Closing & Servicing of Federal Agricultural Mortgage Corporation Attorney-in-
Fact for U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation
programs,** who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed
to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his
signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the
instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

Signature Megan Spalding (Seal)

Notary Public
Printed Name: Megan Spalding
My commission expires: 6/3/23

MEGAN SPALDING
Commission Number 716793
My Commission Expires
June 03, 2023
NOTARIAL SEAL
IOWA

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT                    Form 5000.05 4/23/07

17                    ©PeirsonPatterson,LLP.-Arlington, Texas 2016
                      1720116117 [Doc Id 9660 M03182016]

# EXHIBIT A

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

TRACT ONE:

PARCEL ONE:

The East half of the Northwest quarter of the Northeast quarter of the Northwest quarter; the West half of the Northeast quarter of the Northeast of the Northwest quarter; and the East half of the Northeast quarter of the Northeast quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the East 420.9 feet of the North half of the Northeast quarter of the Northeast quarter of the Northwest quarter of said Section 7.

ALSO EXCEPTING THEREFROM commencing at the Northwest corner of the East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7, running thence East along the North boundary line of said Section 7; 4.09 feet; thence in a Southerly direction in a straight line to a point on the South boundary line of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7, said point being 17 feet East of the Southwest corner of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7; thence West along the South boundary line of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7; 17 feet to the Southwest corner of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7; thence North along the West boundary line of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7 to the said Northwest corner of the said East half of the Northwest quarter of the Northeast quarter of the Northeast quarter of said Section 7.

APN:   464-20-07

PARCEL TWO:

The West 161 feet of the East 420.9 feet of the North half of the Northeast quarter of the Northeast quarter of the Northwest quarter of Section 17, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:   464-020-08

PARCEL THREE:

The North half of the East 259.9 feet of the East half of the Northeast quarter of the Northeast quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof; said 259.9 feet measured from the East line of said Northwest quarter of said section.

APN:  464-020-09

PARCEL FOUR:

The North half of the Northeast quarter of the Southeast quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:  464-020-12

PARCEL FIVE:

The North half of the Northwest quarter of the Southeast quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:  464-020-13

PARCEL SIX:

The South one-half of the Northeast one-quarter of the Northwest one-quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the East 195 feet of the South 114 feet thereof.

ALSO EXCEPTING THEREFROM that portion lying within Parcel Map No. 82-33, according to the Map thereof recorded in Book 44, Pages 2 and 3 of Parcel Maps, Fresno County Records.

APN:  464-020-15

PARCEL SEVEN:

The East 195 feet of the South 114 feet of the South one-half of the Northeast one-quarter of the Northwest one-quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:  464-020-16

PARCEL EIGHT:

The Southwest quarter of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:   464-020-19

PARCEL NINE:

The South three-fourths of the Southeast quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the South 351 feet of the East 340 feet thereof.

APN:   464-020-25

PARCEL TEN:

Parcel "A" of Parcel Map No. 82-33, according to the Map thereof recorded in Book 44, Pages 2 and 3 of Parcel Maps, Fresno County Records.

APN:   464-020-26

PARCEL TEN-A:

A right of way for road purposes over the Westerly 30 feet of the East 330 feet of the East half of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM that portion lying within Parcel Ten described therein.

PARCEL ELEVEN:

The fractional Southwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the East 990 feet thereof.

APN:   464-020-28

PARCEL TWELVE:

The West 330 feet of the East 990 feet of the fractional Southwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:   464-020-29

PARCEL THIRTEEN:

The West 330 feet of the East 660 feet of the fractional Southwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:   464-020-30

PARCEL FOURTEEN:

The East 330 feet of the fractional Southwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:   464-020-31

PARCEL FIFTEEN:

Parcel B of Parcel Map No. 82-33, according to the Map thereof recorded in Book 44, Pages 2 and 3 of Parcel Maps, Fresno County Records.

APN:   464-020-34

PARCEL SIXTEEN:

The East 125 feet of the Northwest quarter of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM that portion conveyed to the State of California, by Deed recorded July 31, 2003, as Document No. 2003-0173909, Official Records.

APN:   464-020-35

PARCEL SEVENTEEN:

The East half of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the East 330 feet thereof.

ALSO EXCEPTING THEREFROM that portion of said land as conveyed to the State of California by Grant Deed recorded July 31, 2003, as Document No. 2003-0173909, Official Records.

APN:   464-020-36

PARCEL EIGHTEEN:

The Northwest quarter of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the West 200 feet thereof.

EXCEPTING THEREFROM the East 125 feet thereof.

ALSO EXCEPTING THEREFROM that portion conveyed to the State of California in the Deed recorded January 12, 2004, as Document No. 2004-0007899, Official Records.

APN:   464-020-37

PARCEL NINETEEN:

INTENTIONALLY DELETED

PARCEL TWENTY:

All of Briscoe Tract, a Subdivision of the East half of the Southwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, unincorporated area, County of Fresno, State of California, except Lot 3 of Briscoe Tract, the same being in Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, unincorporated area, County of Fresno, State of California.

ALSO EXCEPTING THEREFROM that portion conveyed to the Fresno Irrigation District by Deed recorded February 13, 2006, as Instrument No. 2006-0031312 of Official Records.

APN:   464-060-17

PARCEL TWENTY-ONE:

Lots 13, 14, 15 and 16 of Pleasant Dale, in the City of Fresno, County of Fresno, State of California, according to the Map thereof recorded in Book 2, Page 38 of Plats, in the Office of the County Recorder of said County.

TOGETHER WITH that portion of abandoned South Pleasant Avenue, which would pass by operation of law

APN:   477-021-09

PARCEL TWENTY-TWO:

The South half of Lot 2, all of Lot 3 and the North half of Lot 4 of Pleasant Dale, according to the Map thereof recorded December 30, 1887, in Book 2, Page 38 of Plats, Fresno County Records.

PARCEL TWENTY-TWO-A:

An easement for a right of way or right to maintain, repair and replace an underground water pipe system as created in that certain Grant of Easement (Agreement) by and between Henry N. Tsuruoka and Lily V. Tsuruoka, husband and wife, and Albert Medzadoorian, recorded March 23, 1979 in Book 7246 of Official Records, Page 579, Instrument No. 34238, and being further described as follows:

That certain 10-foot strip of land lying 5 feet on each side of the following described centerline:

Commencing at the North corner of Section 18, Township 14 South, Range 20 East, M.D.B.M.; thence South along the East line of the Northwest ¼ of said Section 18, a distance of 32.96 feet; thence West a distance of 77.95 feet to the true point of beginning; thence South 75° 33' 40" East, a distance of 18.00 feet; thence South 39° 51' 05" East, a distance of 38.13 feet; thence South 00° 58' 30", a distance of 447.09 feet to the North line of the South ½ of Lot 2 of Pleasant Dale, Plats Book 2, Page 38, Fresno County Records.

APN:   477-021-11

PARCEL TWENTY-THREE:

The Easterly 200.00 feet of the Southerly 270.00 feet of Lot 9 of Pleasant Dale, according to the Map thereof recorded in Book 2, Page 38 of Plats, Fresno County Records.

APN:   477-021-18

PARCEL TWENTY-THREE-A:

A non-exclusive easement thirty (30) foot wide road right of way being described as follows:

The South 30.00 feet of the West 120.00 feet of the East 320.00 feet of Lot 9 of Pleasant Dale according to the Map thereof recorded in Book 2, Page 38 of Plats, Fresno County Records.

PARCEL TWENTY-THREE-B:

A non-exclusive five (5) foot wide right of way for maintenance, repairs, operations, additions, alterations and betterments for a water pipeline, the centerline of said right of way being described as follows:

Commencing at a point on the Westerly line of that certain parcel of land, said point bearing South 89° 14' 00" West, 200.00 feet and North 0° 21' 43" East, 32.70 feet from the Southeast corner of Lot 9 of Pleasant Dale according to the Map thereof recorded in Book 2, Page 38 of Plats, Fresno County Records; thence South 89° 14' 00" West, 67.74 feet; thence South 0° 21' 45" West, 6.50 feet to a point South 0° 21' 45" West, 2.50 feet from an existing domestic water well.

PARCEL TWENTY-FOUR:

Lots 9, 10, 11 and 12 of Pleasant Dale, according to the Map thereof recorded in Book 2, Page 38 of Plats, Fresno County Records.

EXCEPTING THEREFROM the Easterly 200.00 feet of the Southerly 270.00 feet of said Lot 9.

ALSO EXCEPTING THEREFROM the Westerly 170.00 feet of the Southerly 270.00 feet of said Lot 9.

APN:   477-021-19

PARCEL TWENTY-FIVE:

The un-numbered Lot lying West of, and adjoining, Lots 21, 22, 23 and 234 of Pleasant Dale, according to the Map thereof, recorded in Book 2, Page 38 of Plats, Fresno County Records.

Said property is also described as the West one-half of the Southwest quarter of the fractional Northwest quarter of Section 18, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the North 214.29 feet of the South 627.7 feet to the West 280.00 feet thereof.

and

Lots 21, 22, 23 and 24 of pleasant dale according to the Map thereof recorded December 30, 1887, in Book 2, Page 38 of Plats, Fresno County Records.

APN:   477-021-20

PARCEL TWENTY-SIX:

The West 330 feet of the West one-half of the Northwest quarter of the Northwest quarter of Section 18, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM that portion described in the Deed to the City of Fresno recorded November 14, 2003, as Document No. 2003-0276316, Official Records.

and

Lot 20 of Pleasant Dale, according to the Map thereof recorded in Book 2, Page 38 of Plats, Fresno County Records.

EXCEPTING THEREFROM that portion described in the Deed to the City of Fresno recorded November 14, 2003, as Document No. 2003-0276316, Official Records.

and

Beginning at a point on the North line of the Northwest quarter of Section 18, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof, 1980 feet West of the Northeast corner of the Northwest quarter of said Section; thence South 0° 35′ East, 1321 feet to a point on the South line of the North half of the Northwest quarter of said Section distant 1970.5 feet South 89° 55′ West from the Southeast corner of the Northeast quarter of the Northwest quarter of said Section; thence West along the South line of the North half of the Northwest quarter of said section to the West line of said section; thence North along said West line to the Northwest corner of said section; thence East along the North line of said section to the point of beginning.

EXCEPTING THEREFROM the West 330 feet thereof.

ALSO EXCEPTING THEREFROM that portion described in the Deed to the City of Fresno, recorded November 14, 2003, as Document No. 2003-0276316, Official Records.

APN:    477-021-25

TRACT TWO:

Lots 3, 4, 5 and 6 of West Villa Tract, according to the Map thereof, filed for record in Book 2, Page 49 of Plats, Fresno County Records.

APN: 464-070-10; and
        464-070-11

TRACT THREE:

The Northwest quarter of the Southwest quarter of the Southeast quarter and the West half of the Northeast quarter of Southwest quarter of Southeast quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, in the County of Fresno, State of California, according to the United States Government Township Plats.

EXCEPTING THEREFROM that portion described in Grant Deed recorded September 8, 1982, as Instrument No. 82-77115, in Book 7969, Page 387 of Official Records.

APN: 464-101-23

Exhibit L

Fresno County Recorder
Paul Dictos, CPA

**2023-0011223**

Recorded at the request of:
CSC, LOGAN

02/08/2023 09:55 07
Titles: 3        Pages: 25
Fees: $129.00
CA SB2 Fees:$225.00
Taxes:  $0.00
Total:  $354.00

Recording Requested By:

**Conterra Agricultural Capital, LLC**

After Recording Return To:

**Conterra Agricultural Capital, LLC**
**5465 Mills Civic Pkwy, Ste 201**
**West Des Moines, IA 50266**
**Attn: Alison Werts**

[Space Above This Line For Recording Data]

# AMENDED AND RESTATED OPEN-END DEED OF TRUST
## (With Future Advance Clause)
## Security Agreement, Assignment of Rents and Fixture Filing

REDACTED
Loan :        1728

This Amended and Restated Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing (this "Amendment", and, as further defined below, this "**Security Instrument**") is made and entered into as of *February  2*, 2023, is granted C&A Farms, LLC, a California limited liability company, the grantor and trustor under this Security Instrument whose address is **5260 N. Palm Ave., Ste. 421, Mail Stop M, Fresno, CA 93704 ("Borrower")**, in favor of Michael H. Patterson ("**Trustee**"), for the benefit of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs, whose address is 1133 Rankin Street, Suite 100, St. Paul, Minnesota 55116 ("**Lender**"), and amends and restates the **Open-Ended** Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing dated as of January 8, 2018, and recorded as Document No. 2018001138500 on January 31, 2018, with the Fresno County Clerk - Recorder in the Official Records, Fresno County, as affected by the Assignment of Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing dated as of January 8, 2018, and recorded as Document No. 2018001138600 on January 31, 2018 **with the Fresno County Clerk - Recorder in the Official Records, Fresno County,**

**DEFINITIONS**

Words used in multiple sections of this document are defined below and other words are defined in certain Sections of this document. Certain rules regarding the usage of words used in this document are also provided in Section 13.

**(A) "Security Instrument"** means this document, together with all Riders, if any, to this document.

**(B) "Borrower" is C&A Farms, LLC, a California limited liability company.** Borrower is the grantor and trustor under this Security Instrument. Borrower's address is **5260 N. Palm Ave., Ste. 421, Mail Stop M, Fresno, CA 93704. "Borrower Parties"** are Borrower and **Whitesbridge Farms, LLC, a California limited liability company.** Borrower Parties' address is **1306 W Herndon Ave #101, Fresno, CA 93711.**

**CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)** | Form 5000.05 4/23/07

1

³·PensonPatterson, LLP.-Arlington, Texas  2016
0901131017 [Doc Id 2208 M031182016]

**(C)** "**Lender**" is U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs, whose address is 1133 Rankin Street, Suite 100, St. Paul, MN 55116. Lender is the beneficiary under this Security Instrument.

**(D)** "**Trustee**" is Michael H. Patterson.

**(E)** "**Note**" means (i) Borrower Parties' open ended promissory note dated January 8, 2018, maturing on July 1, 2028, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of up to $1,500,000, plus interest, (ii) Borrower Parties' open ended promissory note dated January 8, 2018, and subsequently converted on June 27, 2018, maturing on July 1, 2038, maturing on July 1, 2033, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of up to $5,500,000, plus interest, (iii) an open ended promissory note made by Maricopa Orchards, LLC, Copper Avenue Investments, LLC, ACAP Farms, LLC and Lincoln Grantor Farms, LLC dated October 11, 2019, maturing on October 11, 2044, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of up to $5,297,232.00, plus interest; (iv) a promissory note made by Maricopa Orchards, LLC, Copper Avenue Investments, LLC, ACAP Farms, LLC and Lincoln Grantor Farms, LLC dated October 11, 2019, maturing on October 11, 2039, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of $10,258,632.00, plus interest; (v) an open ended promissory note made by Maricopa Orchards, LLC, C&A Farms, LLC, Willow Avenue Investments, LLC, Assemi Brothers, LLC, a California limited liability company and Whitesbridge Farms, LLC dated December 14, 2020, maturing on January 1, 2026, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of up to $12,500,000.00, plus interest; and (vi) an open ended promissory note made by Maricopa Orchards, LLC, C&A Farms, LLC, Willow Avenue Investments, LLC, Assemi Brothers, LLC, a California limited liability company and Whitesbridge Farms, LLC dated December 14, 2020, maturing on January 1, 2026, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of up to $12,500,000.00, plus interest; and (vii) a promissory note made by Maricopa Orchards, LLC, C & A Farms, LLC, Willow Investments, LLC, Copper Avenue Investments, LLC, ACAP Farms, LLC, Lincoln Grantor Farms, LLC, Cantua Orchards, LLC, Gradon Farms, LLC, dated January 27, 2023, maturing on January 13, 2026, in the original principal amount of $7,400,000.00, plus interest. Borrower Parties have promised to pay this debt in regular Periodic Payments and to pay Notes in full not later than **maturity date of each Note.**

**(F)** "**Property**" means the property that is described below under the heading "Transfer of Rights in the Property."

**(G)** "**Loans**" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(H)** "**Riders**" mean all Riders to this Security Instrument that are executed by Borrower, whether recorded or unrecorded. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Irrigation Equipment Rider      ☐ Water Rights Rider

☐ Financial Information and Covenants Rider      ☐ Permitted Prior Encumbrance Rider

☐ Mortgage Insurance Rider      ☐ Adjustable Rate Rider

☐ Other(s):

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)      Form 5000.05 4/23/07

2

©Peirson Patterson, LLP.-Arlington, Texas 2016

0901131017 [Doc Id 2208 M03182016]

**(I)** **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J)** **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K)** **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 4) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(L)** **"Periodic Payment"** means the amount due for principal and interest under the Note.

**(M)** **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

**Open-End Mortgage.** This Security Instrument is given to secure the payment of the initial advance, with interest as provided in the Open-Ended Promissory Note dated January 8, 2018, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of up to **$1,500,000.** Upon request of the Borrowers the Lender may hereafter at any time after the Security Instrument is recorded and before the release and cancellation of this Security Instrument, make further advances to the Borrowers to the extent that the total unpaid loan indebtedness, exclusive of interest thereon, does not exceed the maximum amount of **$1,500,000.00** which may be outstanding; and any such further advances, with interest, shall be secured by this Security Instrument and shall be evidenced by the Open-Ended Note. Provided, however, that the amount of principal secured by this Security Instrument and remaining unpaid shall not at the time of and including any such advance exceed the original principal sum secured hereby. Provided, further, that nothing herein stipulated shall limit the amounts that shall be secured hereby when advanced to protect the security or in accordance with covenants contained in this Security Instrument. The Borrowers individually covenant with the Lender to repay all such advances aforesaid, with interest, and to apply all other covenants and conditions of this Security Instrument to such future advances. Nothing in this paragraph shall be deemed to limit the terms of the paragraph below titled "Transfer of Rights in the Property," including the description therein of the Loans and other obligations secured by this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loans, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the **County** [Type of Recording Jurisdiction] of **Fresno** [Name of Recording Jurisdiction]:

     See Exhibit "A" attached hereto and made a part hereof.

which currently has the address of :

CALIFORNIA–Farmer Mac UNIFORM INSTRUMENT (Open End)                 Form 5000.05 4/23/07

©PeirsonPatterson, LLP.-Arlington, Texas 2016

0901131017 [Doc Id 2208 M03182016]

**350.37 Acres Devoted to an Almond Orchard**
**Fresno County, California**
("Property Address"):

subject only to those matters set forth in the Permitted Prior Encumbrance Rider, if said rider is attached (hereafter "Permitted Prior Encumbrances");

**TOGETHER WITH** all buildings, improvements, equipment, fixtures and permanent plantings affixed, attached to or incorporated in the real property, and all additions, replacements, and improvements hereafter made thereto or placed therein or thereon; all rights-of-way, easements, rents, issues, profits, income, proceeds and general intangibles there from, tenements, hereditaments, remainders, reversions, privileges and appurtenances thereunto belonging, however evidenced, which are used or enjoyed in connection with the real property now or hereafter owned or belonging to the Borrower or which hereafter may be acquired by Borrower, excluding, however, the growing crop;

**TOGETHER WITH** all water rights appurtenant to the real property, whether such water rights are riparian, appropriative or otherwise, along with all ditch and ditch rights and any shares of stock, licenses, permits and contracts evidencing such water or ditch rights appurtenant to the property, and all wells, reservoirs, dams, embankments or fixtures located on the real property;

**TOGETHER WITH** all windmills, pumps, irrigation equipment, motors, engines, and devices of every kind, with the exception of rolling stock, now or hereafter attached or affixed to the real property, or for stock watering or domestic purposes thereon, and all grain bins and storage bins, which are owned by Borrower and which are attached or affixed to the real property in **Fresno County, California,** described above together with all additional accessions, replacements, improvements, repairs and substitutions to said property and the proceeds thereof and all other fixtures now or hereafter attached or affixed to the real property, all of which are declared to be appurtenant to said real property, or incident to the ownership thereof;

**TOGETHER WITH** all judgments, awards of damages, settlements and payments or security (i) hereafter made as a result of or in lieu of any taking of all or any part of the real property under the power of eminent domain or for any damage to the real property and/or the improvements located thereon, or any part thereof, and (ii) hereafter made for any damage to the real property and/or the improvements located thereon, or any part thereof resulting from exercise of or attempted exercise of mining rights or claims, however reserved or asserted, and resulting from the disturbance of any of the surface of the real property. Borrower does hereby covenant and agree that Borrower will not give such consent as may be required of the owner for mining or other surface disturbance by the terms of any patent, deed, statute, law or otherwise, without the prior written consent of Lender;

**TOGETHER WITH** all proceeds of and any unearned premiums on any insurance policies covering the real property and/or the improvements located thereon, including, without limitation, the right to receive and apply the proceeds of any insurance judgments, or settlements made in lieu thereof, for damage to the real property and/or the improvements located thereon or the indebtedness secured thereby;

**TOGETHER WITH** all contract rights, chattel paper, documents, accounts and general intangibles, rights to performance, entitlement to payment in cash or in kind, or any other benefits under any current or future governmental program which pertain to the real property, whether now or hereafter existing or acquired, excluding crop receivables;

**TOGETHER WITH** all cash and noncash proceeds of the conversion, voluntary or involuntary, of any of the foregoing;

---

CALIFORNIA—Farmer Mac UNIFORM INSTRUMENT (Open End)                    Form 5000.05 4/23/07

©PeirsonPatterson, LLP.-Arlington, Texas  2016

                    0901131017 [Doc Id 2208 M03182016]

**TOGETHER WITH** any and all of Borrower's right, title, and/or interest in any and all system memberships and/or ownership certificates in any non-municipal water sewer systems now or in the future serving said property.

All replacements and additions shall also be covered by this Security Instrument.

All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record and specifically those permitted prior encumbrances, if any, set forth in the Permitted Prior Encumbrances Rider if said rider is attached to this Security Instrument. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property and fixtures.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Prepayment Charges, Yield Maintenance Premiums and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any yield maintenance premiums, any prepayment charges and late charges due under the Note. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 12. Lender may return any payment or partial payment if the payment or partial payment is insufficient to bring the Loans current. Lender may accept any payment or partial payment insufficient to bring the Loans current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payment in the future. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Unless required by Applicable Law, payments will be applied first to accrued unpaid interest, then second to principal, third to advances under this Security Instrument, and finally to late charges. Such payments shall be applied to each Periodic Payment in the order in which it became due.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Charges; Liens.** Excluding liens associated with operating lines of credit that are secured by the growing crop and other personal property ("Crop Loan"), Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so

---

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)                                      Form 5000.05 4/23/07

©PeirsonPatterson, LLP.-Arlington, Texas 2016

0901131017 [Doc Id 2208 M03182016]

long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 3.

Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender, defined below, on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances. Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with the Loans.

**4. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loans. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with the Loans, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, such failure shall constitute a default under the terms of this Security Instrument and the Loans. Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 4 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible

or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 25 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**5. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property, excluding ordinary wear and tear, ordinary farming practices and normal maturity of any permanent crop. Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 4 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Borrower will operate the Property in a good and workmanlike manner and in accordance with all Applicable Law and will pay all fees and charges of any kind in connection therewith. Borrower will use good farming and animal husbandry practices.

Lender or its agent may make reasonable entries upon and inspections of the Property with forty-eight (48) hours' advance written notice. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**6. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loans.

**7. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** Subject to any subordination or intercreditor agreement entered into between Lender and the Crop Loan lender, and provided notice pursuant to Section 23 has been given to Borrower, if (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding, (d) perform any farming operations related to the planting, growing, maintenance, and harvesting of crops located on the Property, and (e) perform any ranching operations related to any animals located on the Property. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)                                    Form 5000.05 4/23/07

©PeirsonPatterson, LLP.-Arlington, Texas 2016

0901131017 [Doc Id 2208 M03182016]

action under this Section 7, Lender does not have to do so and is not under any duty or obligation to do so.  It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 7.  Lender may perform these or any other actions it deems necessary in Lender's sole discretion to preserve the value of the Property, and/or assign to others the right to do same on behalf of Lender. Lender may make advances under this security instrument or other instrument providing security for the Note, to protect the Lender's interest in this security instrument or other instrument providing security for the Note from loss of value or damage.  Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate indicated in the Note shall become an obligation due and owing under the terms of the Note immediately upon the date advanced by Lender and is an obligation of the Borrower secured by the security instrument or other instrument providing security for the Note.

Any amounts disbursed by Lender under this Section 7 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease.  If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**8. Assignment of Miscellaneous Proceeds; Forfeiture.**  All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed.  Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.  Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

---

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)                                    Form 5000.05 4/23/07

©PersonPatterson, LLP.-Arlington, Texas  2016

                                            0901131017 [Doc Id 2208 M03182016]

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or material impairment to the value of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 16, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**9. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**10. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. Subject to the provisions of Section 15, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 17) and benefit the successors and assigns of Lender.

**11. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loans are subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loans exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**12. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Borrower's Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)                     Form 5000.05 4/23/07

PeirsonPatterson, LLP.-Arlington, Texas  2016

0901131017 [Doc Id 2208 M03182016]

shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**13. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**14. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**15. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 15, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser, excluding, however, easements granted by Borrower in the ordinary course of business.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 12 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Borrower may request Lender to release one or more parcels that make up the Property, from time to time, from the lien of the Deed of Trust (the "Partial Release") and Lender agrees to not unreasonably withhold its consent to the Partial Release, subject to the prior satisfaction of the condition that Borrower shall submit a formal written request for the Partial Release (the "Request") not less than forty-five (45) days prior to the date upon which Borrower desires to close the transfer of the parcel subject to the Partial Release (the "Release Parcel"). No more than three (3) Requests shall be made per calendar year. The Request shall be sufficiently detailed and include all necessary documentation so as to allow Lender adequate time to process the Partial Release.

Notwithstanding the foregoing, upon the written request of Borrower, Lender will subordinate its interest in any personal property, crops growing or to be grown on the Property, crop receivables, and all governmental payments relating to such crops (the "Crops"), but not to trees, irrigation equipment, water rights and permanent plantings, to the security interest of an institutional lender (a "Crop Lender") for one or more loans made to Borrowers to finance the production of crops on all or any portion of the Property ("Operating Financing"). Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances.

**16. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited

to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged.  Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer.  Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred.  However, this right to reinstate shall not apply in the case of acceleration under Section 15.

    **17.  Sale of Note; Change of Loan Servicer; Notice of Grievance.**  The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower.

    Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 12) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action.  If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph.  The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 25 and the notice of acceleration given to Borrower pursuant to Section 15 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 17.

    **18.  Hazardous Substances.**  As used in this Section 18:  (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

    Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property, other than the presence, use, storage and disposal of Hazardous Substances in quantities as necessary for Borrower's normal farming operations located on the Property, all of which Borrower covenants have and will be used, stored, and disposed of in accordance with commercially reasonable farming practices and all applicable environmental laws.  Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property.  The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal farming and residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

    Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge,  (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property.  If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.  Nothing herein shall create any obligation on Lender for an Environmental Cleanup.  Borrower agrees to indemnify and hold Lender free and harmless from and against all loss, costs (including attorneys' fees and costs), damage (including consequential damages), and expenses Lender may

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)                  Form 5000.05 4/23/07

©PeirsonPatterson, LLP--Arlington, Texas  2016

0901131017 [Doc Id 2208 M03182016]

sustain by reason of the assertion against Lender by any third-party of any claim in connection with Hazardous Substances on, in or affecting the Property. Borrower further agrees that Lender shall have the right to join and participate in, as a party if it so elects, any legal proceedings or actions initiated in connection with any claims related to Hazardous Substances on, in or affecting the Property, and shall pay any such attorney fees and expenses Lender incurs in connection therewith.

**19. Additional Property Subject To The Security Instrument.** This Security Instrument also constitutes a security agreement within the meaning of the Uniform Commercial Code as adopted in the State of **California** (the "UCC"). In addition to the Property described in the Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument:  building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling, attached floor coverings, irrigation pipes and pumps, livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins and specifically: **All water rights now owned or hereafter acquired that are appurtenant to the Property, whether such water rights are riparian, appropriative or otherwise, and all ditch/pond and ditch/pond rights and any shares of stock, licenses, permits and contracts evidencing such water or ditch rights, and all wells, reservoirs, dams, embankments or fixtures relating thereto, which are appurtenant to the Property.**

**All irrigation equipment of every kind and nature, including but not limited to center irrigation pivots, pumps, pvc pipe, sprinklers, motors, well equipment, pumps and power units, now owned or hereafter acquired by Borrower and now or hereafter affixed to the Property, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom. ,** all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this Security Instrument as the "Property."

**20. Fixture Filing.** This Security Instrument constitutes a "fixture filing" for the purposes of the UCC against all of the Property which is or is to become fixtures per the UCC.

**21. Use of Property; Compliance With Law.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**22. Assignment of Leases.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph , the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**23. Assignment of Rents; Appointment of Receiver; Lender In Possession.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to Sections 12 and 25 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notices of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorneys' fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and

other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 7 of the Security Instrument.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**24. Cross-Collateralization.** In addition to the Notes, all liens, security interests, assignments, suretyship obligations, stock pledges, rights and remedies granted to Lender in any loan document or agreement secure all obligations, debts and liabilities, plus interest thereon, of any or all Borrowers to Lender, as well as claims by Lender against any or all Borrowers, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Notes, whether voluntary or otherwise, whether due or not due, direct or indirect, absolute or contingent, whether any or all Borrowers may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

**25. Cross-Default Provision.** Borrower's default or breach under any note or agreement in which Lender has an interest, including but not limited to the Notes, shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**26. Acceleration; Remedies. Following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 15 unless Applicable Law provides otherwise) and prior to acceleration or Lender's exercise of any remedy, Lender shall give at least sixty (60) days written notice to Borrower prior to exercising any remedy, unless otherwise provided under this Deed of Trust; provided, however, if such default cannot be cured within the 60-day period and Borrower has commenced and diligently pursues the cure of the related default, Borrower shall have such time as is commercially reasonably necessary for Borrower to complete the cure, provided Lender is not materially prejudiced from such delay.  Lender shall use commercially reasonable standards to determine if it is materially prejudiced by the delay.  The notice shall specify: (a) the default; (b) the action required to cure the default; (c) the date by which the default must be cured. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice or such extended period for defaults which cannot be cured within the 60-day period, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law.  Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 25, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located.  Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by**

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)                          Form 5000.05 4/23/07

©PeirsonPatterson, LLP.-Arlington, Texas  2016
                                                         0901131017 [Doc Id 2208 M03182016]

**Applicable Law.** After the time required by Applicable Law, Trustee, without demand on Borrower, **shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

27. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

28. **Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

29. **Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

30. **Other California State Specific Provisions.**

(a)  In addition to the provisions of the loan Agreement, Borrower further agrees that, if Lender accepts a guaranty of only a portion of the Indebtedness, Borrower waives its right under California Civil Code Section 2822(a) to designate the portion of the Indebtedness which shall be satisfied by a guarantor's partial payment.

(b)  Except for matters covered by an O&M Program or matters described in the Environmental Indemnity Agreement, Borrower shall not cause or permit any lien (whether or not such lien has priority over the lien created by this Security Instrument) upon the Mortgaged Property imposed pursuant to any Environmental Laws. Any such lien shall be considered a Prohibited Activity or Condition (as contemplated in the Environmental Indemnity Agreement).

(c)  Borrower represents and warrants to Lender that, except as previously disclosed by Borrower to Lender in writing:

(1)  at the time of acquiring the Mortgaged Property, Borrower undertook all appropriate inquiry into the previous ownership and uses of the Mortgaged Property consistent with good commercial or customary practice and no evidence or indication came to light which would suggest that the Mortgaged Property has been or is now being used for any Prohibited Activities or Conditions; and

(2)  the Mortgaged Property has not been designated as "hazardous waste property" or "border zone property" pursuant to Section 25220, et seq., of the California Health and Safety Code.

The representations and warranties in this Security Instrument shall be continuing representations and warranties that shall be deemed to be made by Borrower throughout the term of Loans, until the Indebtedness has been paid in full.

(d)    Without limiting any of the remedies provided in this Security Instrument, Borrower acknowledges and agrees that certain provisions in this Security Instrument are environmental provisions (as defined in Section 736(f)(2) of the California Code of Civil Procedure) made by Borrower relating to the real property security (the "**Environmental Provisions**"), and that to the extent applicable, Borrower's failure to comply with any of the Environmental Provisions will be a breach of contract that will entitle Lender to pursue the remedies provided by Section 736 of the California Code of Civil Procedure for the recovery of damages and for the enforcement of the Environmental Provisions.

Except as otherwise stated herein, nothing in the provisions of this Amendment shall be deemed in any way to affect the priority of the Original Deed of Trust over any other lien, charge, encumbrance or conveyance, or to release or change the liability of any party who may be liable under the Note.

*[remainder intentionally left blank    signature page follows]*

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower.

C&A Farms, LLC, a California limited liability company

**Farid Assemi, General Manager**

*[Sign Original Only]*

LENDER:
U.S. Bank National Association, as
Custodian/Trustee for Federal Agricultural
Mortgage Corporation programs

By: Heather Wright, Manager- Closing & Servicing of
Federal Agricultural Mortgage Corporation Attorney-in-Fact
for U.S. Bank National Association, as Custodian/Trustee for
Federal Agricultural Mortgage Corporation programs

A notary public or other officer completing this
certificate verifies only the identity of the individual
who signed the document to which this certificate
is attached, and not the truthfulness, accuracy, or
validity of that document

STATE OF CALIFORNIA
COUNTY OF

On _____ before me, _____, personally appeared _____, **on behalf of said limited liability company**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____          (Seal)

Notary Public
Printed Name:
My commission expires:

---

A notary public or other officer completing this
certificate verifies only the identity of the individual
who signed the document to which this certificate
is attached, and not the truthfulness, accuracy, or
validity of that document.

STATE OF IOWA
COUNTY OF *Polk*

On *Feb 3, 2023* before me, *Megan Spalding*, personally appeared **Heather Wright, Manager- Closing & Servicing of Federal Agricultural Mortgage Corporation Attorney-in-Fact for U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature *Megan Spalding* (Seal)

Notary Public
Printed Name: *Megan Spalding*
My commission expires: *6/3/23*

NOTARIAL SEAL
IOWA
MEGAN SPALDING
Commission Number 716793
My Commission Expires
June 03, 2023

**CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)**                Form 5000.05 4/23/07

\\PeirsonPatterson, LLP.-Arlington, Texas  2016
090113101? [Doc Id 2208-M03182016]

# ACKNOWLEDGMENT

A notary public or other officer completing this
certificate verifies only the identity of the individual
who signed the document to which this certificate is
attached, and not the truthfulness, accuracy, or
validity of that document.

State of California
County of _____ Fresno _____ )

On ___2/2/2023___ before me, __L. Diaz, Notary Public__
(insert name and title of the officer)

personally appeared ___Farid Assemi___,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

L. DIAZ
Notary Public - California
Fresno County
Commission # 2398671
My Comm. Expires Apr 20, 2026

Signature _____ **(Seal)**

# EXHIBIT A

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

TRACT ONE:

PARCEL ONE:

The East half of the Northwest quarter of the Northeast quarter of the Northwest quarter; the West half of the Northeast quarter of the Northeast of the Northwest quarter; and the East half of the Northeast quarter of the Northeast quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the East 420.9 feet of the North half of the Northeast quarter of the Northeast quarter of the Northwest quarter of said Section 7.

ALSO EXCEPTING THEREFROM commencing at the Northwest corner of the East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7, running thence East along the North boundary line of said Section 7; 4.09 feet; thence in a Southerly direction in a straight line to a point on the South boundary line of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7, said point being 17 feet East of the Southwest corner of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7; thence West along the South boundary line of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7; 17 feet to the Southwest corner of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7; thence North along the West boundary line of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7 to the said Northwest corner of the said East half of the Northwest quarter of the Northeast quarter of the Northeast quarter of said Section 7.

APN:   464-20-07

PARCEL TWO:

The West 161 feet of the East 420.9 feet of the North half of the Northeast quarter of the Northeast quarter of the Northwest quarter of Section 17, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:   464-020-08

PARCEL THREE:

The North half of the East 259.9 feet of the East half of the Northeast quarter of the Northeast quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof; said 259.9 feet measured from the East line of said Northwest quarter of said section.

APN:   464-020-09

PARCEL FOUR:

The North half of the Northeast quarter of the Southeast quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:   464-020-12

PARCEL FIVE:

The North half of the Northwest quarter of the Southeast quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:   464-020-13

PARCEL SIX:

The South one-half of the Northeast one-quarter of the Northwest one-quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the East 195 feet of the South 114 feet thereof.

ALSO EXCEPTING THEREFROM that portion lying within Parcel Map No. 82-33, according to the Map thereof recorded in Book 44, Pages 2 and 3 of Parcel Maps, Fresno County Records.

APN:   464-020-15

PARCEL SEVEN:

The East 195 feet of the South 114 feet of the South one-half of the Northeast one-quarter of the Northwest one-quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:   464-020-16

PARCEL EIGHT:

The Southwest quarter of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:  464-020-19

PARCEL NINE:

The South three-fourths of the Southeast quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the South 351 feet of the East 340 feet thereof.

APN:  464-020-25

PARCEL TEN:

Parcel "A" of Parcel Map No. 82-33, according to the Map thereof recorded in Book 44, Pages 2 and 3 of Parcel Maps, Fresno County Records.

APN:  464-020-26

PARCEL TEN-A:

A right of way for road purposes over the Westerly 30 feet of the East 330 feet of the East half of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM that portion lying within Parcel Ten described therein.

PARCEL ELEVEN:

The fractional Southwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the East 990 feet thereof.

APN:  464-020-28

PARCEL TWELVE:

The West 330 feet of the East 990 feet of the fractional Southwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:  464-020-29

PARCEL THIRTEEN:

The West 330 feet of the East 660 feet of the fractional Southwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:   464-020-30

PARCEL FOURTEEN:

The East 330 feet of the fractional Southwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:   464-020-31

PARCEL FIFTEEN:

Parcel B of Parcel Map No. 82-33, according to the Map thereof recorded in Book 44, Pages 2 and 3 of Parcel Maps, Fresno County Records.

APN:   464-020-34

PARCEL SIXTEEN:

The East 125 feet of the Northwest quarter of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM that portion conveyed to the State of California, by Deed recorded July 31, 2003, as Document No. 2003-0173909, Official Records.

APN:   464-020-35

PARCEL SEVENTEEN:

The East half of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the East 330 feet thereof.

ALSO EXCEPTING THEREFROM that portion of said land as conveyed to the State of California by Grant Deed recorded July 31, 2003, as Document No. 2003-0173909, Official Records.

APN:   464-020-36

PARCEL EIGHTEEN:

The Northwest quarter of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the West 200 feet thereof.

EXCEPTING THEREFROM the East 125 feet thereof.

ALSO EXCEPTING THEREFROM that portion conveyed to the State of California in the Deed recorded January 12, 2004, as Document No. 2004-0007899, Official Records.

APN:   464-020-37

PARCEL NINETEEN:

INTENTIONALLY DELETED

PARCEL TWENTY:

All of Briscoe Tract, a Subdivision of the East half of the Southwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, unincorporated area, County of Fresno, State of California, except Lot 3 of Briscoe Tract, the same being in Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, unincorporated area, County of Fresno, State of California.

ALSO EXCEPTING THEREFROM that portion conveyed to the Fresno Irrigation District by Deed recorded February 13, 2006, as Instrument No. 2006-0031312 of Official Records.

APN:   464-060-17

PARCEL TWENTY-ONE:

Lots 13, 14, 15 and 16 of Pleasant Dale, in the City of Fresno, County of Fresno, State of California, according to the Map thereof recorded in Book 2, Page 38 of Plats, in the Office of the County Recorder of said County.

TOGETHER WITH that portion of abandoned South Pleasant Avenue, which would pass by operation of law

APN:   477-021-09

PARCEL TWENTY-TWO:

The South half of Lot 2, all of Lot 3 and the North half of Lot 4 of Pleasant Dale, according to the Map thereof recorded December 30, 1887, in Book 2, Page 38 of Plats, Fresno County Records.

PARCEL TWENTY-TWO-A:

An easement for a right of way or right to maintain, repair and replace an underground water pipe system as created in that certain Grant of Easement (Agreement) by and between Henry N. Tsuruoka and Lily V. Tsuruoka, husband and wife, and Albert Medzadooorian, recorded March 23, 1979 in Book 7246 of Official Records, Page 579, Instrument No. 34238, and being further described as follows:

That certain 10-foot strip of land lying 5 feet on each side of the following described centerline:

Page 5 of 8

Commencing at the North corner of Section 18, Township 14 South, Range 20 East, M.D.B.M.; thence South along the East line of the Northwest ¼ of said Section 18, a distance of 32.96 feet; thence West a distance of 77.95 feet to the true point of beginning; thence South 75° 33' 40" East, a distance of 18.00 feet; thence South 39° 51' 05" East, a distance of 38.13 feet; thence South 00° 58' 30", a distance of 447.09 feet to the North line of the South ½ of Lot 2 of Pleasant Dale, Plats Book 2, Page 38, Fresno County Records.

APN:   477-021-11

PARCEL TWENTY-THREE:

The Easterly 200.00 feet of the Southerly 270.00 feet of Lot 9 of Pleasant Dale, according to the Map thereof recorded in Book 2, Page 38 of Plats, Fresno County Records.

APN:   477-021-18

PARCEL TWENTY-THREE-A:

A non-exclusive easement thirty (30) foot wide road right of way being described as follows:

The South 30.00 feet of the West 120.00 feet of the East 320.00 feet of Lot 9 of Pleasant Dale according to the Map thereof recorded in Book 2, Page 38 of Plats, Fresno County Records.

PARCEL TWENTY-THREE-B:

A non-exclusive five (5) foot wide right of way for maintenance, repairs, operations, additions, alterations and betterments for a water pipeline, the centerline of said right of way being described as follows:

Commencing at a point on the Westerly line of that certain parcel of land, said point bearing South 89° 14' 00" West, 200.00 feet and North 0° 21' 43" East, 32.70 feet from the Southeast corner of Lot 9 of Pleasant Dale according to the Map thereof recorded in Book 2, Page 38 of Plats, Fresno County Records; thence South 89° 14' 00" West, 67.74 feet; thence South 0° 21' 45" West, 6.50 feet to a point South 0° 21' 45" West, 2.50 feet from an existing domestic water well.

PARCEL TWENTY-FOUR:

Lots 9, 10, 11 and 12 of Pleasant Dale, according to the Map thereof recorded in Book 2, Page 38 of Plats, Fresno County Records.

EXCEPTING THEREFROM the Easterly 200.00 feet of the Southerly 270.00 feet of said Lot 9.

ALSO EXCEPTING THEREFROM the Westerly 170.00 feet of the Southerly 270.00 feet of said Lot 9.

APN:   477-021-19

PARCEL TWENTY-FIVE:

The un-numbered Lot lying West of, and adjoining, Lots 21, 22, 23 and 234 of Pleasant Dale, according to the Map thereof, recorded in Book 2, Page 38 of Plats, Fresno County Records.

Said property is also described as the West one-half of the Southwest quarter of the fractional Northwest quarter of Section 18, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the North 214.29 feet of the South 627.7 feet to the West 280.00 feet thereof.

and

Lots 21, 22, 23 and 24 of pleasant dale according to the Map thereof recorded December 30, 1887, in Book 2, Page 38 of Plats, Fresno County Records.

APN:   477-021-20

PARCEL TWENTY-SIX:

The West 330 feet of the West one-half of the Northwest quarter of the Northwest quarter of Section 18, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM that portion described in the Deed to the City of Fresno recorded November 14, 2003, as Document No. 2003-0276316, Official Records.

and

Lot 20 of Pleasant Dale, according to the Map thereof recorded in Book 2, Page 38 of Plats, Fresno County Records.

EXCEPTING THEREFROM that portion described in the Deed to the City of Fresno recorded November 14, 2003, as Document No. 2003-0276316, Official Records.

and

Beginning at a point on the North line of the Northwest quarter of Section 18, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof, 1980 feet West of the Northeast corner of the Northwest quarter of said Section; thence South 0° 35' East, 1321 feet to a point on the South line of the North half of the Northwest quarter of said Section distant 1970.5 feet South 89° 55' West from the Southeast corner of the Northeast quarter of the Northwest quarter of said Section; thence West along the South line of the North half of the Northwest quarter of said section to the West line of said section; thence North along said West line to the Northwest corner of said section; thence East along the North line of said section to the point of beginning.

EXCEPTING THEREFROM the West 330 feet thereof.

ALSO EXCEPTING THEREFROM that portion described in the Deed to the City of Fresno, recorded November 14, 2003, as Document No. 2003-0276316, Official Records.

APN:   477-021-25

TRACT TWO:

Lots 3, 4, 5 and 6 of West Villa Tract, according to the Map thereof, filed for record in Book 2, Page 49 of Plats, Fresno County Records.

APN: 464-070-10; and
      464-070-11

TRACT THREE:

The Northwest quarter of the Southwest quarter of the Southeast quarter and the West half of the Northeast quarter of Southwest quarter of Southeast quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, in the County of Fresno, State of California, according to the United States Government Township Plats.

EXCEPTING THEREFROM that portion described in Grant Deed recorded September 8, 1982, as Instrument No. 82-77115, in Book 7969, Page 387 of Official Records.

APN: 464-101-23

Exhibit M

DOC NBR: 2303339     03/03/2023 08:35:27 AM
Kristine Lee, Clerk-Recorder,
RECORDING FEE: $349.00
COUNTY TAX: $0.00
CITY TAX: $0.00

Recording Requested By:
**Conterra Ag Capital**

After Recording Return To:

**Att: Alison**
**Conterra Ag Capital**
**5465 Mills Civic Parkway, Ste. 201**
**West Des Moines, IA 50266**
**515-564-5147**



CONTERRA HOLDINGS LLC

TITLE: 3
DOC TYPE: 08
23 PGS
R066

_____ [Space Above This Line For Recording Data] _____

## AMENDED AND RESTATED OPEN-END DEED OF TRUST
### (With Future Advance Clause)
## Security Agreement, Assignment of Rents and Fixture Filing

Loan <sup>REDACTED</sup> 1673

This Amended and Restated Open-End Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing (this "Amendment", and, as further defined below, this "Security Instrument") is made and entered into as of *February 2* ____, 2023, is granted by Copper Avenue Investments, LLC, a California limited liability company, ACAP Farms, LLC, a California limited liability company, Lincoln Grantor Farms, LLC, a California limited liability company, Gradon Farms, LLC, a California limited liability company, and Cantua Orchards, LLC, a California limited liability company, whose address is 5260 N. Palm Avenue, Suite 421 Mail Stop M, Fresno CA 93704 the trustors under this Security Instrument, ("Borrower"), in favor of Old Republic Title Company ("Trustee"), for the benefit of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs, whose address is 1133 Rankin Street, Suite 100, St. Paul, Minnesota 55116 ("Lender"), and amends and restates the Open-Ended Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing dated as of October 11, 2019, and recorded as Document No. 20190123389 on October 15, 2019, with the Fresno County Clerk - Recorder in the Official Records, Fresno County, as affected by the Assignment of Deed of dated as of October 11, 2019, and recorded as Document No. 20190123390 on October 15, 2019 with the Fresno County Clerk - Recorder in the Official Records, Fresno County, the Open-Ended Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing dated as of October 11, 2019, and recorded as Document No. 1917423 on October 15, 2019, with the Kings County Clerk - Recorder in the Official Records, Kings County, as affected by the Assignment of Deed of Trust dated as of October 11, 2019, and recorded as Document No. 1917424 on October 15, 2019 with the Kings County Clerk - Recorder in the Official Records, Kings County.

**DEFINITIONS**

Words used in multiple sections of this document are defined below and other words are defined in certain Sections of this document. Certain rules regarding the usage of words used in this document are also provided in Section 13.

(A) **"Security Instrument"** means this document, which is dated *February 2* ____, 2023, together with all Riders to this document.

(B) **"Lender"** is U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs. Lender's address is **1133 Rankin Street, Ste. 100, St Paul, MN 55116**. Lender is the

_____
CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

1

grantee under this Security Instrument.

**(C)** "**Borrowers**" **are Copper Avenue Investments, LLC, a California limited liability company, ACAP Farms, LLC, a California limited liability company, Lincoln Grantor Farms, LLC, a California limited liability company Gradon Farms, LLC, a California limited liability company, and Cantua Orchards, LLC, a California limited liability company.   Borrowers are trustors under this Security Instrument. "Borrower Parties" are Borrowers and Maricopa Orchards, LLC, a California limited liability company.   Borrower Parties' address is** 5260 N. Palm Avenue, Suite 421 Mail Stop M, Fresno CA 93704.

**(D)** "**Trustee**" is **Old Republic Title Company**.

**(E)** "**Note**" means (i) Borrower Parties promissory note dated October 11, 2019, maturing on October 11, 2039, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of $10,258,632, plus interest, (ii) Borrower Parties promissory note dated October 11, 2019, maturing on October 11, 2044, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of $5,297,232, plus interest; (iii) a promissory note made by C&A Farms, LLC and Whitesbridge Farms, LLC dated January 8, 2018, maturing on July 1, 2033,  payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal of $5,500,000.00, plus interest; (iv) an open ended promissory note made by C&A Farms, LLC and Whitesbridge Farms, LLC dated January 8, 2018, and subsequently converted on June 27, 2018, maturing on July 1, 2038, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of up to $1,500,000.00, plus interest; (v) an open ended promissory note made by Maricopa Orchards, LLC, C&A Farms, LLC, Willow Avenue Investments, LLC, Assemi Brothers, LLC, a California limited liability company and Whitesbridge Farms, LLC dated December 14, 2020, maturing on January 1, 2026, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of up to $12,500,000.00, plus interest; and (vi) an open ended promissory note made by Maricopa Orchards, LLC, C&A Farms, LLC, Willow Avenue Investments, LLC, Assemi Brothers, LLC, a California limited liability company and Whitesbridge Farms, LLC dated December 14, 2020, maturing on January 1, 2026, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of up to $12,500,000.00, plus interest; and (vii) a promissory note made by Maricopa Orchards, LLC, C & A Farms, LLC, Willow Investments, LLC, Copper Avenue Investments, LLC, ACAP Farms, LLC, Lincoln Grantor Farms, LLC, Cantua Orchards, LLC, Gradon Farms, LLC, dated January 27, 2023, maturing on January 13, 2026, in the original principal amount of $7,400,000.00, plus interest.  Borrower Parties have promised to pay this debt in regular Periodic Payments and to pay Notes in full not later than **maturity date of each Note.**

**(F)** "**Property**" means the property that is described below under the heading "Transfer of Rights in the Property."

**(G)** "**Loan**" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(H)** "**Riders**" mean all Riders to this Security Instrument that are executed by Grantors and Borrowers whether recorded or unrecorded.  The following Riders are to be executed by Grantors and Borrowers:

☐ Irrigation Equipment Rider            ☐ Water Rights Rider

☐ Financial Information and Covenants Rider    ☐ Permitted Prior Encumbrance Rider

☐ Mortgage Insurance Rider             ☐ Adjustable Rate Rider

---

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

☐   Other(s): **Convertible Revolving Line of Credit Variable Rate Rider; Cross Default Rider, Cross Collateralization Rider**

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 4) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(L) "Periodic Payment"** means the amount due for principal and interest under the Note.

**(M) "Successor in Interest of Grantors and Borrowers"** means any party that has taken title to the Property, whether or not that party has assumed obligations of any of the Grantors or Borrowers under this Security Instrument or of Borrower Parties under the Note.

---

**Open-End Deed of Trust.** This Security Instrument is given to secure the payment of the initial advance, with interest as provided in the Note dated **October 11, 2019,** with additional advances as hereinafter specified. Upon request of the Grantors and Borrowers, the Lender may hereafter at any time after the Security Instrument is recorded and before the release and cancellation of this Security Instrument, make further advances to the Borrower to the extent that the total unpaid loan indebtedness, exclusive of interest thereon, does not exceed the maximum amount of **$5,297,232.00** which may be outstanding; and any such further advances, with interest, shall be secured by this Security Instrument and shall be evidenced by the Note. Provided, however, that the amount of principal secured by this Security Instrument and remaining unpaid shall not at the time of and including any such advance exceed the original principal sum secured hereby. Provided, further, that nothing herein stipulated shall limit the amounts that shall be secured hereby when advanced to protect the security or in accordance with covenants contained in this Security Instrument. The Grantors and Borrowers jointly and individually covenant with the Lender to repay all such advances aforesaid, with interest, and to apply all other covenants and conditions of this Security Instrument to such future advances. Nothing in this paragraph shall be deemed to limit the terms of the paragraph below titled "Transfer of Rights in the Property," including the description therein of the Loans and other obligations secured by the Security Instrument.

**TRANSFER OF RIGHTS IN THE PROPERTY**
This Security Instrument secures to Lender:  (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Grantors' and Borrowers' covenants and agreements  under this  Security  Instrument  and  of Borrower Parties under the  Note.  For this purpose, Grantors and Borrowers irrevocably grant and convey to Trustee, in trust, with power of sale, the following described property located in the **Counties** of **Kings and Fresno, California:**

> See Exhibit "A" attached hereto and made a part hereof.

which currently has the address of:

**1,110 +/- Acres**
**Kings County and Fresno County, California**
("Property Address"):

subject only to those matters set forth in the Permitted Prior Encumbrance Rider, if said rider is attached (hereafter "Permitted Prior Encumbrances");

**TOGETHER WITH** all buildings, improvements, equipment, fixtures and permanent plantings affixed, attached to or incorporated in the real property, and all additions, replacements, and improvements hereafter made thereto or placed therein or thereon; all rights-of-way, easements, rents, issues, profits, income, proceeds and general intangibles there from, tenements, hereditaments, remainders, reversions, privileges and appurtenances thereunto belonging, however evidenced, which are used or enjoyed in connection with the real property now or hereafter owned or belonging to the Grantors or Borrowers or which hereafter may be acquired by Grantors or Borrowers, excluding, however, the growing crop;

**TOGETHER WITH** all water rights appurtenant to the real property, whether such water rights are riparian, appropriative or otherwise, along with all ditch and ditch rights and any shares of stock, licenses, permits and contracts evidencing such water or ditch rights appurtenant to the property, and all wells, reservoirs, dams, embankments or fixtures located on the real property;

**TOGETHER WITH** all windmills, pumps, irrigation equipment, motors, engines, and devices of every kind, with the exception of rolling stock, now or hereafter attached or affixed to the real property, or for stock watering or domestic purposes thereon, and all grain bins and storage bins, which are owned by Grantors or Borrowers and which are attached or affixed to the  real property in **Kings and Fresno Counties, California**, described above together with all additional accessions, replacements, improvements, repairs and substitutions to said property and the proceeds thereof and all other fixtures now or hereafter attached or affixed to the real property, all of which are declared to be appurtenant to said real property, or incident to the ownership thereof;

**TOGETHER WITH** all judgments, awards of damages, settlements and payments or security (i) hereafter made as a result of or in lieu of any taking of all or any part of the real property under the power of eminent domain or for any damage to the real property and/or the improvements located thereon, or any part thereof, and (ii) hereafter made for any damage to the real property and/or the improvements located thereon, or any part thereof resulting from exercise of or attempted exercise of mining rights or claims, however reserved or asserted, and resulting from the disturbance of any of the surface of the real property.  Grantors and Borrowers do hereby covenant and agree that neither Grantors nor Borrowers will not give such consent as may be required of the owner for mining or other surface disturbance by the terms of any patent, deed, statute, law or otherwise, without the prior written consent of Lender;

**TOGETHER WITH** all proceeds of and any unearned premiums on any insurance policies covering the real property and/or the improvements located thereon, including, without limitation, the right to receive and apply the proceeds of any insurance judgments, or settlements made in lieu thereof, for damage to the real property and/or the improvements located thereon or the indebtedness secured thereby;

**TOGETHER WITH** all contract rights, chattel paper, documents, accounts and general intangibles, rights to performance, entitlement to payment in cash or in kind, or any other benefits under any current or future governmental program which pertain to the real property, whether now or hereafter existing or acquired, excluding crop receivables;

**TOGETHER WITH** all cash and noncash proceeds of the conversion, voluntary or involuntary, of any of the foregoing;

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

4

**TOGETHER WITH** any and all of Grantors' or Borrowers' right, title, and/or interest in any and all system memberships and/or ownership certificates in any non-municipal water sewer systems now or in the future serving said property.

All replacements and additions shall also be covered by this Security Instrument.

All of the foregoing is referred to in this Security Instrument as the "Property."

GRANTORS AND BORROWERS COVENANT that Grantors and Borrowers are lawfully seized of the estate hereby conveyed and have the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record and specifically those permitted prior encumbrances, if any, set forth in the Permitted Prior Encumbrances Rider, if said rider is attached to this Security Instrument. Grantors and Borrowers warrant and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property and fixtures.

UNIFORM COVENANTS. Grantors, Borrowers, and Lender covenant and agree as follows:
**1. Payment of Principal, Interest, Prepayment Charges, Yield Maintenance Premiums and Late Charges.** Grantors, Borrowers, and/or Borrower Parties shall pay when due the principal of, and interest on, the debt evidenced by the Note and any yield maintenance premiums, any prepayment charges and late charges due under the Note. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 12. Lender may return any payment or partial payment if the payment or partial payment is insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payment in the future. No offset or claim which Grantors or Borrowers might have now or in the future against Lender shall relieve Grantors or Borrowers from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Unless required otherwise by Applicable Law, payments will be applied as set forth under the Note.

If Lender receives a payment from Grantors, Borrowers and/or Borrower Parties for a delinquent Periodic Payment that includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Grantors, Borrowers and/or Borrower Parties to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Charges; Liens.** Excluding liens associated with operating lines of credit that are secured by the growing crop and other personal property ("Crop Loan"), Grantors and Borrowers shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

payments or ground rents on the Property, if any.

    Grantors and Borrowers shall promptly discharge any lien which has priority over this Security Instrument unless Grantors and Borrowers: (a) agree in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Grantors and Borrowers are performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Grantors and Borrowers a notice identifying the lien. Within 10 days of the date on which that notice is given, Grantors and Borrowers shall satisfy the lien or take one or more of the actions set forth above in this Section 3.

    Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender, defined below, on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances. Lender may require Grantors, Borrowers and/or Borrower Parties to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

    **4. Property Insurance.** Grantors and Borrowers shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Grantors and Borrowers subject to Lender's right to disapprove Grantors' and Borrowers' choice, which right shall not be exercised unreasonably. Lender may require Grantors and Borrowers to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Grantors and Borrowers shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Grantors and Borrowers.

    If Grantors or Borrowers fail to maintain any of the coverages described above, such failure shall constitute a default under the terms of this Security Instrument and the Loan. Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Grantors or Borrowers, Grantors' or Borrowers' equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Grantors and Borrowers acknowledge that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Grantors or Borrowers could have obtained. Any amounts disbursed by Lender under this Section 4 shall become additional debt of Grantors, Borrowers, and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Grantors and Borrowers requesting payment.

    All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Grantors and Borrowers shall promptly give to Lender all receipts of paid premiums and renewal notices. If Grantors or Borrowers obtain any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

    In the event of loss, Grantors and Borrowers shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Grantors or Borrowers. Unless Lender and Grantors and Borrowers otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible

**CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)**

and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Grantors, Borrowers or Borrower Parties any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Grantors, Borrowers, or Borrower Parties shall not be paid out of the insurance proceeds and shall be the sole obligation of Grantors, Borrowers, and Borrower Parties. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Grantors, Borrowers, and Borrower Parties. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Grantors or Borrowers abandon the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If neither Grantors nor Borrowers respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 25 or otherwise, Grantors and Borrowers hereby assign to Lender (a) Grantors', Borrowers', and Borrower Parties' rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Grantors' or Borrowers' rights (other than the right to any refund of unearned premiums paid by Grantors, Borrowers, or Borrower Parties) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument; whether or not then due.

**5. Preservation, Maintenance and Protection of the Property; Inspections.** Grantors and Borrowers shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property, excluding ordinary wear and tear, ordinary farming practices and normal maturity of any permanent crop. Grantors and Borrowers shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 4 that repair or restoration is not economically feasible, Grantors and Borrowers shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Grantors and Borrowers shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Grantors and Borrowers are not relieved of Grantors' or Borrowers' obligations for the completion of such repair or restoration.

Grantors and Borrowers will operate the Property in a good and workmanlike manner and in accordance with all Applicable Law and will pay all fees and charges of any kind in connection therewith. Grantors and Borrowers will use good farming and animal husbandry practices.

Lender or its agent may make reasonable entries upon and inspections of the Property with forty-eight (48) hours' advance written notice. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Grantors and Borrowers notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**6. Loan Application.** Grantors and Borrowers shall be in default if, during the Loan application process, Grantors, Borrowers, or Borrower Parties or any persons or entities acting at the direction of Grantors, Borrowers, or Borrower Parties or with Grantors', Borrowers', or Borrower Parties' knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan.

**7. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** Subject to any subordination or Intercreditor agreement entered into between Lender and the Crop Loan lender, and provided notice pursuant to Section 23 has been given to Grantors and Borrowers, if (a) Grantors or Borrowers fail to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Grantors or Borrowers have abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property.  Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding, (d) perform any farming operations related to the planting, growing, maintenance, and harvesting of crops located on the Property, and (e) perform any ranching operations related to any animals located on the Property.  Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off.  Although Lender may take action under this Section 7, Lender does not have to do so and is not under any duty or obligation to do so.  It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 7.  Lender may perform these or any other actions it deems necessary in Lender's sole discretion to preserve the value of the Property, and/or assign to others the right to do same on behalf of Lender. Lender may make advances under this security instrument or other instrument providing security for the Note, to protect the Lender's interest in this security instrument or other instrument providing security for the Note from loss of value or damage.  Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate indicated in the Note shall become an obligation due and owing under the terms of the Note immediately upon the date advanced by Lender and is an obligation of the Borrower secured by the security instrument or other instrument providing security for the Note.

Any amounts disbursed by Lender under this Section 7 shall become additional debt of Grantors, Borrowers, and Borrower Parties secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Grantors, Borrowers and/or Borrower Parties requesting payment.

If this Security Instrument is on a leasehold, Grantors and Borrowers shall comply with all the provisions of the lease.  Grantors and Borrowers shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease.  Grantors and Borrowers shall not, without the express written consent of Lender, alter or amend the ground lease.  If Grantors or Borrowers acquire fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**8. Assignment of Miscellaneous Proceeds; Forfeiture.**  All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly.  Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed.  Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Grantors, Borrower, or Borrower Parties any interest or earnings on such Miscellaneous Proceeds.  If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Grantors, Borrowers, or Borrower Parties.  Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Grantors, Borrowers, or Borrower Parties.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Grantors and Borrowers and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount

**CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)**

8

of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Grantors and Borrowers.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Grantors, Borrowers, Borrower Parties, and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Grantors or Borrowers, or if, after notice by Lender to Grantors and Borrowers that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Grantors, Borrowers, and Borrower Parties fail to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Grantors, Borrowers, or Borrower Parties Miscellaneous Proceeds or the party against whom Grantors, Borrowers or Borrower Parties has a right of action in regard to Miscellaneous Proceeds.

Grantors, Borrowers, and Borrower Parties shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or material impairment to the value of Lender's interest in the Property or rights under this Security Instrument. Grantors, Borrowers, and Borrower Parties can cure such a default and, if acceleration has occurred, reinstate as provided in Section 16, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**9. Grantors and Borrowers Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Grantors and Borrowers or any Successor in Interest of Grantors and Borrowers shall not operate to release the liability of Grantors and Borrowers or any Successors in Interest of Grantors and Borrowers. Lender shall not be required to commence proceedings against any Successor in Interest of Grantors and Borrowers or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Grantors and Borrowers or any Successors in Interest of Grantors and Borrowers. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from Borrower, third persons, entities or Successors in Interest of Guarantors or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**10. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Grantors and Borrowers covenant and agree that Grantors' and Borrowers' obligations and liability shall be joint and several. Subject to the provisions of Section 15, any Successor in Interest of Grantors and Borrowers who assumes Grantors' and Borrowers' obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Grantors' and Borrowers' rights and benefits under this Security Instrument. Grantors and Borrowers shall not be released from Grantors' and Borrowers' obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 17) and benefit the successors and assigns of Lender.

**11. Loan Charges.** Lender may charge Grantors and Borrowers fees for services performed in connection with Grantors', Borrowers' and Borrower Parties' default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Grantors and Borrowers shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits,

**CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)**

9

then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Grantors and Borrowers which exceeded permitted limits will be refunded to Grantors and Borrowers.  Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Grantors, Borrowers or Borrower Parties.  If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Grantors', Borrowers', or Borrower Parties' acceptance of any such refund made by direct payment to Grantors, Borrowers, or Borrower Parties will constitute a waiver of any right of action Grantors, Borrowers, or Borrower Parties might have arising out of such overcharge.

**12. Notices.** All notices given by Grantors, Borrowers, Borrower Parties, or Lender in connection with this Security Instrument must be in writing.  Any notice to Grantors, Borrowers, or Borrower Parties' in connection with this Security Instrument shall be deemed to have been given to such party when mailed by first class mail or when actually delivered to Borrowers' notice address if sent by other means.  Notice to any one Grantor or Borrower shall constitute notice to all Grantors and Borrowers unless Applicable Law expressly requires otherwise.  The notice address shall be the Borrowers' Address unless Borrowers have designated a substitute notice address by notice to Lender.  Grantors and Borrowers shall promptly notify Lender of Borrowers' change of address.  If Lender specifies a procedure for reporting Borrowers' change of address, then Grantors or Borrowers shall only report a change of address through that specified procedure.  There may be only one designated notice address under this Security Instrument at any one time.  Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Grantors and Borrowers. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender.  If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**13. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located.  All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law.  Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract.  In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**14. Grantors' and Borrowers' Copy.** Grantors, Borrowers, and Borrower Parties shall be given one copy of the Note and of this Security Instrument.

**15. Transfer of the Property or a Beneficial Interest in Grantors, Borrowers, or Borrower Parties.** As used in this Section 15, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Grantors or Borrowers at a future date to a purchaser, excluding, however, easements granted by Grantors and Borrowers in the ordinary course of business.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Grantors, Borrowers, or Borrower Parties are not a natural person and a beneficial interest in Grantors, Borrowers, or Borrower Parties is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Grantors and Borrowers notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 12 within which Grantors, Borrowers, or Borrower Parties must pay all sums secured by this Security Instrument.  If Grantors, Borrowers, or Borrower Parties fail to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Grantors, Borrowers, or Borrower Parties.

---

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

10

Grantors and Borrowers may request Lender to release one or more parcels that make up the Property, from time to time, from the lien of the Deed of Trust (the "Partial Release") and Lender agrees to not unreasonably withhold its consent to the Partial Release, subject to the prior satisfaction of the condition that Grantors and Borrowers shall submit a formal written request for the Partial Release (the "Request") not less than forty-five (45) days prior to the date upon which Grantors and Borrowers desire to close the transfer of the parcel subject to the Partial Release (the "Release Parcel"). No more than three (3) Requests shall be made per calendar year. The Request shall be sufficiently detailed and include all necessary documentation so as to allow Lender adequate time to process the Partial Release.

Notwithstanding the foregoing,  upon the written request of Grantors and Borrowers, Lender will subordinate its interest in any personal property, crops growing or to be grown on the Property, crop receivables, and all governmental payments relating to such crops (the "Crops"), but not to trees, irrigation equipment, water rights and permanent plantings, to the security interest of an institutional lender (a "Crop Lender") for one or more loans made to Grantors, Borrowers, or Borrower Parties to finance the production of crops on all or any portion of the Property ("Operating Financing"). Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances.

**16. Right to Reinstate After Acceleration.** If Grantors, Borrowers, and Borrower Parties meet certain conditions, Grantors and Borrowers shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Grantors' or Borrowers' right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Grantors, Borrowers, and Borrower Parties: (a) pay Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cure any default of any other covenants or agreements; (c) pay all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) take such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Grantors', Borrowers' and Borrower Parties' obligations to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Grantors, Borrowers, and Borrower Parties pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Grantors and Borrowers, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 15.

**17. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Grantors, Borrowers, or Borrower Parties.

Grantors, Borrowers, Borrower Parties, nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Grantors, Borrowers, Borrower Parties or Lender has notified the other parties (with such notice given in compliance with the requirements of Section 12) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 25 and the notice of acceleration given to Grantors, Borrowers, and Borrower Parties pursuant to Section 15 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 17.

**18. Hazardous Substances.** As used in this Section 18: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances:

gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials;  (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Grantors, Borrowers, and Borrower Parties shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property, other than the presence, use, storage and disposal of Hazardous Substances in quantities as necessary for Grantors', Borrowers' and Borrower Parties' normal farming operations located on the Property, all of which Grantors and Borrowers covenant have and will be used, stored, and disposed of in accordance with commercially reasonable farming practices and all applicable environmental laws. Grantors, Borrowers, and Borrower Parties shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property.  The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal farming and residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Grantors, Borrowers, and Borrower Parties shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Grantors, Borrowers, or Borrower Parties have actual knowledge,  (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property.  If Grantors, Borrowers or Borrower Parties learn, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Grantors, Borrowers, and Borrower Parties shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.  Grantors and Borrowers agree to indemnify and hold Lender free and harmless from and against all loss, costs (including attorneys' fees and costs), damage (including consequential damages), and expenses Lender may sustain by reason of the assertion against Lender by any third-party of any claim in connection with Hazardous Substances on, in or affecting the Property. Grantors and Borrowers further agree that Lender shall have the right to join and participate in, as a party if it so elects, any legal proceedings or actions initiated in connection with any claims related to Hazardous Substances on, in or affecting the Property, and shall pay any such attorney fees and expenses Lender incurs in connection therewith.

**19.  Additional Property Subject To The Security Instrument.**  This Security Instrument also constitutes a security agreement within the meaning of the Uniform Commercial Code as adopted in the **State of California** (the "UCC").  In addition to the Property described in the Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in or on the Listed Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling,  attached floor coverings, irrigation equipment (including, but not limited to, irrigation pipes and pumps, center irrigation pivots, pvc pipe, sprinklers, motors, well equipment, pumps and power units), livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom, and any substitutions or replacements therefore, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale,

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

lease or other disposition of any of the foregoing, and any rights of Grantors or Borrowers to collect or enforce payment thereof, as well as to enforce any guarantees of the foregoing and security therefor, and all of Grantors' and Borrowers' present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this Security Instrument as the "Property."

**20. Fixture Filing.** This Security Instrument constitutes a "fixture filing" for the purposes of the UCC against all of the Property which is or is to become fixtures per the UCC.

**21. Use of Property; Compliance With Law.** Grantors, Borrowers, or Borrower Parties shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Grantors and Borrowers shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**22. Assignment of Leases.** Upon Lender's request after default, Grantors and Borrowers shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**23. Assignment of Rents; Appointment of Receiver; Lender In Possession.** Grantors and Borrowers absolutely and unconditionally assign and transfer to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Grantors and Borrowers authorize Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Grantors, Borrowers, or Borrower Parties shall receive the Rents until (i) Lender has given Grantors, Borrowers, and Borrower Parties notice of default pursuant to Sections 12 and 25 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notices of default to Grantors, Borrowers or Borrower Parties: (i) all Rents received by Grantors, Borrowers, or Borrower Parties shall be held by Grantors or Borrowers as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Grantors and Borrowers agree that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorneys' fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Grantors, Borrowers, and Borrower Parties to Lender secured by the Security Instrument pursuant to Section 7 of the Security Instrument.

Grantors and Borrowers represent and warrant that none of Grantors, Borrowers, or Borrower Parties have executed any prior assignment of the Rents and have not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Grantors, Borrowers or Borrower Parties. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

**24. Cross-Collateralization.** In addition to the Notes, all liens, security interests, assignments, suretyship obligations, stock pledges, rights and remedies granted to Lender in any loan document or agreement secure all obligations, debts and liabilities, plus interest thereon, of any or all Borrowers to Lender, as well as claims by Lender against any or all Borrowers, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Notes, whether voluntary or otherwise, whether due or not due, direct or indirect, absolute or contingent, whether any or all Borrowers may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

**25 Cross-Default Provision.** Grantors', Borrowers', or Borrower Parties' default or breach under any note or agreement in which Lender has an interest, including but not limited to the Notes, shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

NON-UNIFORM COVENANTS.  Grantors, Borrowers, and Lender further covenant and agree as follows:

**26. Acceleration; Remedies.  Following Grantors', Borrowers', or Borrower Parties' breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 15 unless Applicable Law provides otherwise) and prior to acceleration or Lender's exercise of any remedy, Lender shall give at least sixty (60) days written notice to Grantors, Borrowers, and Borrower Parties prior to exercising any remedy, unless otherwise provided under this Deed of Trust; provided, however, if such default cannot be cured within the 60-day period and Grantors, Borrowers, or Borrower Parties have commenced and diligently pursues the cure of the related default, Grantors, Borrowers, and Borrower Parties shall have such time as is commercially reasonably necessary for Grantors, Borrowers, and Borrower Parties to complete the cure, provided Lender is not materially prejudiced from such delay.  Lender shall use commercially reasonable standards to determine if it is materially prejudiced by the delay.  The notice shall specify: (a) the default; (b) the action required to cure the default; (c) the date by which the default must be cured. The notice shall further inform Grantors, Borrowers, and Borrower Parties of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Grantors, Borrowers, or Borrower Parties to acceleration and sale.  If the default is not cured on or before the date specified in the notice or such extended period for defaults which cannot be cured within the 60-day period, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law.  Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 25, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold.  Trustee shall cause this notice to be recorded in each county in which any part of the Property is located.  Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Grantors and Borrowers and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law.  After the time required by Applicable Law, Trustee, without demand on Grantors and Borrowers, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale.  Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied.  The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein.  Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**27. Reconveyance.**  Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

14

by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**28. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Grantors/Borrowers, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**29. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

**30. Other California State Specific Provisions.**

(a)     In addition to the provisions of any Loan agreement, Grantors and Borrowers further agree that, if Lender accepts a guaranty of only a portion of the Indebtedness, Grantors and Borrowers waive any right under California Civil Code Section 2822(a) to designate the portion of the Indebtedness which shall be satisfied by a guarantor's partial payment.

(b)     Except for matters covered by an O&M Program or matters described in the Environmental Indemnity Agreement, Grantors and Borrowers shall not cause or permit any lien (whether or not such lien has priority over the lien created by this Security Instrument) upon the Property imposed pursuant to any Environmental Laws. Any such lien shall be considered a Prohibited Activity or Condition (as may also be contemplated in any environmental indemnity agreement).

(c)     Grantors and Borrowers represent and warrant to Lender that, except as previously disclosed by Grantors, Borrowers, or Borrower Parties to Lender in writing:

(1)     at the time of acquiring the Property, Grantors and Borrowers undertook all appropriate inquiry into the previous ownership and uses of the Property consistent with good commercial or customary practice and no evidence or indication came to light which would suggest that the Property has been or is now being used for any Prohibited Activities or Conditions; and

(2)     the Property has not been designated as "hazardous waste property" or "border zone property" pursuant to Section 25220, et seq., of the California Health and Safety Code.

The representations and warranties in this Security Instrument shall be continuing representations and warranties that shall be deemed to be made by Grantors and Borrowers throughout the term of the Loan, until the Indebtedness has been paid in full.

(d)     Without limiting any of the remedies provided in this Security Instrument, Grantors and Borrowers acknowledge and agree that certain provisions in this Security Instrument are environmental provisions (as defined in Section 736(f)(2) of the California Code of Civil Procedure) made by Grantors and Borrowers relating to the real property security (the "**Environmental Provisions**"), and that to the extent applicable, Grantor's failure to comply with any of the Environmental Provisions will be a breach of contract that will entitle Lender to pursue the remedies provided by Section 736 of the California Code of Civil Procedure for the recovery of damages and for the enforcement of the Environmental Provisions.

**31. Recourse.** Each of the Grantors, Borrowers, and Borrower Parties shall be fully and individually liable on a joint and several basis for the full repayment of all amounts due under the Loan. However, in the event of foreclosure of this Security Agreement or other enforcement of the Note or Loan, Lender, and any subsequent holder of this Security Agreement, shall not be able to pursue or obtain any deficiency against any of the Grantors with respect to the Loan.

Except as otherwise stated herein, nothing in the provisions of this Amendment shall be deemed in any way to affect the priority of the Original Security Instrument over any other lien, charge, encumbrance or conveyance, or

**CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)**



to release or change the liability of any party who may be liable under the Note.

IN WITNESS WHEREOF, Borrower has signed and sealed this Security Instrument.

*[remainder of page intentionally left blank – signature page follows]*

BY SIGNING BELOW, Grantors and Borrowers accept and agree to the terms and covenants contained in this Security Instrument and in any Rider executed by Grantors and Borrowers.

**BORROWERS:**

**COPPER AVENUE INVESTMENTS, LLC,**
a California limited liability company

By: Farshid Assemi
Its: Manager

**CANTUA ORCHARDS, LLC**
a California limited liability company

By: Farshid Assemi 1997 Ranch Trust, its Member

Farid Assemi, its Trustee

By: Farid Assemi 1991 Ranch Trust, its Member

Farshid Assemi, its Trustee

By: Farid Assemi Revocable Trust dated January 24, 2007, its Member

Farid Assemi, its Trustee

By: Darius Assemi Revocable Trust dated January 30, 2007

Darius Assemi, its Trustee

By: Farshid Assemi and Sonia Rosemary Assemi Revocable Trust dated January 31, 2007, its Member

By: Farshid Assemi, its Co-Trustee

By: Sonia Assemi, its Co-Trustee

**LINCOLN GRANTOR FARMS, LLC,**
a California limited liability company

By: Neema Assemi
Its: Manager

**GRADON FARMS, LLC,**
a California limited liability company

By: Darius Assemi
Its: Manager

**ACAP FARMS, LLC,**
a California limited liability company

By: Farshid Assemi
Its: Manager

**LENDER:**
**U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs**

By: Heather Wright, Manager- Closing & Servicing of Federal Agricultural Mortgage Corporation Attorney-in-Fact for U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

17

# ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of _____Fresno_____ )

On _Feb. 3, 2023_ before me, L. Diaz, Notary Public
_____
(insert name and title of the officer)

personally appeared _Darius Assemi, Farid Assemi, Farshid Assemi_,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

L. DIAZ
Notary Public · California
Fresno County
Commission # 2398671
My Comm. Expires Apr 20, 2026

Signature _____ **(Seal)**

*18*

# ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of _____Fresno_____ )

On ___Feb 3, 2023___ before me, __L. Diaz, Notary Public_____
(insert name and title of the officer)

personally appeared ___Sonia Assemi, Neema Assemi_____ ,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

L. DIAZ
Notary Public - California
Fresno County
Commission # 2398671
My Comm. Expires Apr 20, 2026

Signature _____   **(Seal)**

19

STATE OF CALIFORNIA
COUNTY OF _____

On _____ before me, _____, personally appeared **Neema Assemi, Manager of Lincoln Grantor Farms, LLC,** who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)
_____
Notary Public
Printed Name: _____
My commission expires: _____

| |
|---|
| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |

STATE OF IOWA
COUNTY OF _____Polk_____

On __February 3, 2023__ before me, __Megan Spalding_____, personally appeared **Heather Wright, Manager- Closing & Servicing of Federal Agricultural Mortgage Corporation Attorney-in-Fact for U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs,** who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Megan Spalding_ (Seal)
_____
Notary Public
Printed Name: __Megan Spalding_____
My commission expires: __6/3/2023_____

MEGAN SPALDING
Commission Number 716793
My Commission Expires
June 03, 2023
NOTARIAL SEAL / IOWA

20

Exhibit "A"

Legal Description of Land

PARCEL 1:

The West 20.15 acres of that portion of Lot 10 lying South of Laguna Canal, and all of Lots 11, 12, 13 in Section 10, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, in the County of Kings, State of California, as per map of the Laguna de Tache Grant thereof recorded in the Office of the County Recorder of Fresno County in Book 3 at Page 11 of Record of Surveys, together with that portion of 25th Avenue (abandoned) and 24 1/2 Avenue (abandoned) which would pass by a conveyance of said land under Sections 831 and 1112 of the Civil Code.

EXCEPTING THEREFROM such interest in a strip of land 50 feet wide lying between the Old Crescent Canal right of way and Lots 7 and 8 in said Section 10, as conveyed to Crescent Canal Company, a corporation, by Deed dated January 7, 1913 and recorded April 7, 1913 in Book 51 at Page 78 of Deeds, Kings County Records.

APN:  004-130-030

PARCEL 2:

Lots 1 and 2 lying North of the by-pass of Tulare Lake Basin Water Storage District, in Section 15, Township 18, Range 19 East, Mount Diablo Base and Meridian, as per map of Laguna De Tache Grant thereof recorded in the office of the County Recorder of Fresno County in Book 3 at Page 9 of Record of Surveys.

EXCEPTING THEREFROM any portion thereof lying within San Jose Subdivision as shown on that certain map recorded in Book 3 Page 4 of Licensed Surveyor Plats.

APN:  004-140-012 (Portion)

PARCEL 3:

Those portions of Lots 2 and 3 lying West of canal, all of Lots 3A, 3B, 4, 5, 6, 6A, the well reserved in the Northeast corner of said Lot 6, all of Lots 12, 13 and 13A, in Section 15, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of San Jose Subdivision, recorded March 11, 1930 in Book 3 Page 4, of Licensed Surveyor Plats, Kings County Records.

EXCEPTING THEREFROM all oil, gas and other hydrocarbon substances in or under said property as previously reserved of record.

APN:  004-140-012 (Portion)

Parcel 3A: One acre in the Northwest corner North & West of Kings River Bypass Canal, in Lot 7 in Section 15, T18S, R19E, Mount Diablo Base and Meridian, as shown on Map Laguna de Teche Grant on file with the office of the Kings County Surveyor in Map Book 70.

PARCEL 4:

Lots 14, 15 and 16, and that portion of Lot 17 lying North of the bypass of Tulare Lake Basin Water Storage District, in Section 10, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, as per map of the Laguna de Tache Grant thereof recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 11 of Record of Surveys.

EXCEPTING THEREFROM all oil, gas and other hydrocarbon substances in or under said property as previously reserved of record.

APN:  004-140-002

21

PARCEL 5:

The Westerly 361.5 feet of the Southerly 361.5 feet of Lot 14 in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of Laguna de Tache Grant recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 10, of Record of Surveys.

APN: 004-230-014

PARCEL 6:

Lots 5, 6, 6A, 11 and 12, in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of San Jose Subdivision, recorded March 11, 1930 in Book 3 at Page 4 of Licensed Surveyor Plats, Kings County Records.

EXCEPTING THEREFROM all oil, gas and other hydrocarbons minerals now or at any time hereafter situate therein and thereunder said land, as saved, excepted and reserved in Deed recorded May 22, 1945 in Book 329, Page 29, Official Records, as Document No. 3227.

APN: 004-230-026 (Portion)

PARCEL 7:

Lots 13 and 14 in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of Laguna de Tache Grant recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 10, of Record of Surveys, Fresno County Records, lying West of the strip of land described in the Deed from Summit Lake Investment Company, a corporation to Tulare Basin Water Storage District, recorded August 8, 1928 in Book 35 at Page 433, of Official Records, Kings County Records.

EXCEPTING THEREFROM the Westerly 361.5 feet of the Southerly 361.5 feet of Lot 14.

ALSO EXCEPTING THEREFROM such interest in a portion of said Lot 13, conveying to the County of Kings, by Deed dated June 13, 1960 and recorded August 18, 1960 in Book 763 Page 880, of Official Records, as Document No. 8922, described as follows:

Beginning at a point distant North 84° 30' 08" East 860.48 feet from the Southwest corner of said Section 22; thence North 3° 29' 59" West 10 feet; thence along a curve to the right, with a radius of 760.00 feet, through an angle of 94° 48' a distance of 1257.48 feet, with a chord that bears North 46° 05' 59" West, 1118.87 feet; thence South 1° 18' 01" West, 550.00 feet; thence South 88° 41' 59" East 125.10 feet; thence, a long curve to the left, with a radius of 840.00 feet, through an angle of 12° 59' 48" a distance of 190.54 feet, with a cord that bears South 46° 05' 59" East, 190.13 feet; thence South 3° 29' 59" East, 135.10 feet; thence North 86° 30' 01" East, 550.00 feet to a point of beginning.

APN: 004-230-026 (Portion)
    004-230-027

PARCEL 8:

That portion of Lot 15 in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, in the County of Kings, State of California, according to Map of Laguna de Tache Grant recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 10, of Record of Surveys, lying West of the strip of land described in the Deed from Summit Lake Investment Company, a corporation to Tulare Basin Water Storage District, recorded August 8, 1928 in Book 35 at Page 433, of Official Records, Kings County Records.

APN: 004-230-013

The land referred to below is situated in the unincorporated area of the County of Fresno, State of California:

PARCEL 9:

The North half of the Norhteast Quarter of Section 22, Township 16 South, Range 14 East, Mount Diablo Base and Meridian, according to the Plat thereof.

EXCEPTING THEREFROM the North 50 feet, as conveyed to the County of Fresno in Deed recorded April 22, 1970 in Book 5780, Page 78 of Official Records.

APN: 038-141-21S

PARCEL 10:

The Northwest quarter of Section 8, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof;

EXCEPTING THEREFROM an undivided one-half interest in and to all oil, gas, minerals and other hydrocarbon substances now or at any time situate in and under said land, as reserved in the deed from R. T. Hughes and Bess L. Hughes, husband and wife, to John H. Edgar and Ruby Dale Edgar, husband and wife, as joint tenants, July 10, 1950, recorded January 24, 1950 in Book 2829 Page 69 of Official Records, Document No. 4385.

ALSO EXCEPTING THEREFROM an undivided one-fourth interest in and to all oil, gas and other hydrocarbons and minerals now or at any time hereinafter situate therein and thereunder, together with all easements and rights necessary or convenient for the production, storage and transportation thereof and the exploration and testing of the said real property, and also the right to drill for, produce and use water from the said real property in connection with drilling or mining operations thereon, as reserved in the deed from Raymond Dale Johnson to Bernie Thurman and James V. Gregory, as Trustees for Tanya Marie Marshall under that certain irrevocable Trust Agreement dated May 30, 1974, recorded on June 25, 1974 as Document No. 47802.

APN: 040-020-18-S

Fresno County Recorder
Paul Dictos, CPA

# 2023-0011386

Recorded at the request of:
CSC, LOGAN

02/08/2023 02:19 09
Titles: 1        Pages: 24
Fees: $88.00
CA SB2 Fees:$75.00
Taxes:  $0.00
Total:  $163.00

Recording Requested By:
**Conterra Ag Capital**

After Recording Return To:

**Att: Alison**
**Conterra Ag Capital**
**5465 Mills Civic Parkway, Ste. 201**
**West Des Moines, IA 50266**
**515-564-5147**

---

[Space Above This Line For Recording Data]

## AMENDED AND RESTATED OPEN-END DEED OF TRUST
### (With Future Advance Clause)
## Security Agreement, Assignment of Rents and Fixture Filing

Loan REDACTED 1673

This Amended and Restated Open-End Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing (this "Amendment", and, as further defined below, this "Security Instrument") is made and entered into as of *February 2*_____, 2023, is granted by Copper Avenue Investments, LLC, a California limited liability company, ACAP Farms, LLC, a California limited liability company, Lincoln Grantor Farms, LLC, a California limited liability company, Gradon Farms, LLC, a California limited liability company, and Cantua Orchards, LLC, a California limited liability company, whose address is 5260 N. Palm Avenue, Suite 421 Mail Stop M, Fresno CA 93704 the trustors under this Security Instrument, ("Borrower"), in favor of Old Republic Title Company ("Trustee"), for the benefit of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs, whose address is 1133 Rankin Street, Suite 100, St. Paul, Minnesota 55116 ("Lender"), and amends and restates the Open-Ended Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing dated as of October 11, 2019, and recorded as Document No. 20190123389 on October 15, 2019, with the Fresno County Clerk - Recorder in the Official Records, Fresno County, as affected by the Assignment of Deed of dated as of October 11, 2019, and recorded as Document No. 20190123390 on October 15, 2019 with the Fresno County Clerk - Recorder in the Official Records, Fresno County, the Open-Ended Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing dated as of October 11, 2019, and recorded as Document No. 1917423 on October 15, 2019, with the Kings County Clerk - Recorder in the Official Records, Kings County, as affected by the Assignment of Deed of Trust dated as of October 11, 2019, and recorded as Document No. 1917424 on October 15, 2019 with the Kings County Clerk - Recorder in the Official Records, Kings County.

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in certain Sections of this document. Certain rules regarding the usage of words used in this document are also provided in Section 13.

**(A) "Security Instrument"** means this document, which is dated *February 2*____,2023, together with all Riders to this document.

**(B) "Lender"** is U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs. Lender's address is 1133 Rankin Street, Ste. 100, St Paul, MN 55116. Lender is the

---

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

1

grantee under this Security Instrument.

**(C)** "**Borrowers**" are Copper Avenue Investments, LLC, a California limited liability company, ACAP Farms, LLC, a California limited liability company, Lincoln Grantor Farms, LLC, a California limited liability company Gradon Farms, LLC, a California limited liability company, and Cantua Orchards, LLC, a California limited liability company.  Borrowers are trustors under this Security Instrument.  "Borrower Parties" are Borrowers and Maricopa Orchards, LLC, a California limited liability company.  Borrower Parties' address is 5260 N. Palm Avenue, Suite 421 Mail Stop M, Fresno CA 93704.

**(D)** "**Trustee**" is Old Republic Title Company.

**(E)** "**Note**" means (i) Borrower Parties promissory note dated October 11, 2019, maturing on October 11, 2039, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of $10,258,632, plus interest, (ii) Borrower Parties promissory note dated October 11, 2019, maturing on October 11, 2044, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of $5,297,232, plus interest; (iii) a promissory note made by C&A Farms, LLC and Whitesbridge Farms, LLC dated January 8, 2018, maturing on July 1, 2033,  payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal of $5,500,000.00, plus interest; (iv) an open ended promissory note made by C&A Farms, LLC and Whitesbridge Farms, LLC dated January 8, 2018, and subsequently converted on June 27, 2018, maturing on July 1, 2038, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of up to $1,500,000.00, plus interest; (v) an open ended promissory note made by Maricopa Orchards, LLC, C&A Farms, LLC, Willow Avenue Investments, LLC, Assemi Brothers, LLC, a California limited liability company and Whitesbridge Farms, LLC dated December 14, 2020, maturing on January 1, 2026, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of up to $12,500,000.00, plus interest; and (vi) an open ended promissory note made by Maricopa Orchards, LLC, C&A Farms, LLC, Willow Avenue Investments, LLC, Assemi Brothers, LLC, a California limited liability company and Whitesbridge Farms, LLC dated December 14, 2020, maturing on January 1, 2026, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of up to $12,500,000.00, plus interest; and (vii) a promissory note made by Maricopa Orchards, LLC, C & A Farms, LLC, Willow Investments, LLC, Copper Avenue Investments, LLC, ACAP Farms, LLC, Lincoln Grantor Farms, LLC, Cantua Orchards, LLC, Gradon Farms, LLC, dated January 27, 2023, maturing on January 13, 2026, in the original principal amount of $7,400,000.00, plus interest.  Borrower Parties have promised to pay this debt in regular Periodic Payments and to pay Notes in full not later than maturity date of each Note.

**(F)** "**Property**" means the property that is described below under the heading "Transfer of Rights in the Property."

**(G)** "**Loan**" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(H)** "**Riders**" mean all Riders to this Security Instrument that are executed by Grantors and Borrowers whether recorded or unrecorded.  The following Riders are to be executed by Grantors and Borrowers:

| | | |
|---|---|---|
| ☐ Irrigation Equipment Rider | ☐ Water Rights Rider | |
| ☐ Financial Information and Covenants Rider | ☐ Permitted Prior Encumbrance Rider | |
| ☐ Mortgage Insurance Rider | ☐ Adjustable Rate Rider | |

---

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

2

☐ Other(s): **Convertible Revolving Line of Credit Variable Rate Rider; Cross Default Rider, Cross Collateralization Rider**

**(I)** **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J)** **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K)** **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 4) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(L)** **"Periodic Payment"** means the amount due for principal and interest under the Note.

**(M)** **"Successor in Interest of Grantors and Borrowers"** means any party that has taken title to the Property, whether or not that party has assumed obligations of any of the Grantors or Borrowers under this Security Instrument or of Borrower Parties under the Note.

———————

**Open-End Deed of Trust.** This Security Instrument is given to secure the payment of the initial advance, with interest as provided in the Note dated **October 11, 2019**, with additional advances as hereinafter specified. Upon request of the Grantors and Borrowers, the Lender may hereafter at any time after the Security Instrument is recorded and before the release and cancellation of this Security Instrument, make further advances to the Borrower to the extent that the total unpaid loan indebtedness, exclusive of interest thereon, does not exceed the maximum amount of **$5,297,232.00** which may be outstanding; and any such further advances, with interest, shall be secured by this Security Instrument and shall be evidenced by the Note. Provided, however, that the amount of principal secured by this Security Instrument and remaining unpaid shall not at the time of and including any such advance exceed the original principal sum secured hereby. Provided, further, that nothing herein stipulated shall limit the amounts that shall be secured hereby when advanced to protect the security or in accordance with covenants contained in this Security Instrument. The Grantors and Borrowers jointly and individually covenant with the Lender to repay all such advances aforesaid, with interest, and to apply all other covenants and conditions of this Security Instrument to such future advances. Nothing in this paragraph shall be deemed to limit the terms of the paragraph below titled "Transfer of Rights in the Property," including the description therein of the Loans and other obligations secured by the Security Instrument.

**TRANSFER OF RIGHTS IN THE PROPERTY**
This Security Instrument secures to Lender:  (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Grantors' and Borrowers' covenants and agreements  under this  Security  Instrument  and  of Borrower Parties under the  Note.  For this purpose, Grantors and Borrowers irrevocably grant and convey to Trustee, in trust, with power of sale, the following described property located in the **Counties of Kings and Fresno, California:**

    **See Exhibit "A" attached hereto and made a part hereof.**

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

which currently has the address of:

<div align="center">

**1,110 +/- Acres**
**Kings County and Fresno County, California**
("Property Address"):

</div>

subject only to those matters set forth in the Permitted Prior Encumbrance Rider, if said rider is attached (hereafter "Permitted Prior Encumbrances");

**TOGETHER WITH** all buildings, improvements, equipment, fixtures and permanent plantings affixed, attached to or incorporated in the real property, and all additions, replacements, and improvements hereafter made thereto or placed therein or thereon; all rights-of-way, easements, rents, issues, profits, income, proceeds and general intangibles there from, tenements, hereditaments, remainders, reversions, privileges and appurtenances thereunto belonging, however evidenced, which are used or enjoyed in connection with the real property now or hereafter owned or belonging to the Grantors or Borrowers or which hereafter may be acquired by Grantors or Borrowers, excluding, however, the growing crop;

**TOGETHER WITH** all water rights appurtenant to the real property, whether such water rights are riparian, appropriative or otherwise, along with all ditch and ditch rights and any shares of stock, licenses, permits and contracts evidencing such water or ditch rights appurtenant to the property, and all wells, reservoirs, dams, embankments or fixtures located on the real property;

**TOGETHER WITH** all windmills, pumps, irrigation equipment, motors, engines, and devices of every kind, with the exception of rolling stock, now or hereafter attached or affixed to the real property, or for stock watering or domestic purposes thereon, and all grain bins and storage bins, which are owned by Grantors or Borrowers and which are attached or affixed to the  real property in **Kings and Fresno Counties, California**, described above together with all additional accessions, replacements, improvements, repairs and substitutions to said property and the proceeds thereof and all other fixtures now or hereafter attached or affixed to the real property, all of which are declared to be appurtenant to said real property, or incident to the ownership thereof;

**TOGETHER WITH** all judgments, awards of damages, settlements and payments or security (i) hereafter made as a result of or in lieu of any taking of all or any part of the real property under the power of eminent domain or for any damage to the real property and/or the improvements located thereon, or any part thereof, and (ii) hereafter made for any damage to the real property and/or the improvements located thereon, or any part thereof resulting from exercise of or attempted exercise of mining rights or claims, however reserved or asserted, and resulting from the disturbance of any of the surface of the real property.  Grantors and Borrowers do hereby covenant and agree that neither Grantors nor Borrowers will not give such consent as may be required of the owner for mining or other surface disturbance by the terms of any patent, deed, statute, law or otherwise, without the prior written consent of Lender;

**TOGETHER WITH** all proceeds of and any unearned premiums on any insurance policies covering the real property and/or the improvements located thereon, including, without limitation, the right to receive and apply the proceeds of any insurance judgments, or settlements made in lieu thereof, for damage to the real property and/or the improvements located thereon or the indebtedness secured thereby;

**TOGETHER WITH** all contract rights, chattel paper, documents, accounts and general intangibles, rights to performance, entitlement to payment in cash or in kind, or any other benefits under any current or future governmental program which pertain to the real property, whether now or hereafter existing or acquired, excluding crop receivables;

**TOGETHER WITH** all cash and noncash proceeds of the conversion, voluntary or involuntary, of any of the foregoing;

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

<div align="center">4</div>

**TOGETHER WITH** any and all of Grantors' or Borrowers' right, title, and/or interest in any and all system memberships and/or ownership certificates in any non-municipal water sewer systems now or in the future serving said property.

All replacements and additions shall also be covered by this Security Instrument.

All of the foregoing is referred to in this Security Instrument as the "Property."

GRANTORS AND BORROWERS COVENANT that Grantors and Borrowers are lawfully seized of the estate hereby conveyed and have the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record and specifically those permitted prior encumbrances, if any, set forth in the Permitted Prior Encumbrances Rider, if said rider is attached to this Security Instrument. Grantors and Borrowers warrant and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property and fixtures.

UNIFORM COVENANTS. Grantors, Borrowers, and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Prepayment Charges, Yield Maintenance Premiums and Late Charges.** Grantors, Borrowers, and/or Borrower Parties shall pay when due the principal of, and interest on, the debt evidenced by the Note and any yield maintenance premiums, any prepayment charges and late charges due under the Note. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 12. Lender may return any payment or partial payment if the payment or partial payment is insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payment in the future. No offset or claim which Grantors or Borrowers might have now or in the future against Lender shall relieve Grantors or Borrowers from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Unless required otherwise by Applicable Law, payments will be applied as set forth under the Note.

If Lender receives a payment from Grantors, Borrowers and/or Borrower Parties for a delinquent Periodic Payment that includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Grantors, Borrowers and/or Borrower Parties to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Charges; Liens.** Excluding liens associated with operating lines of credit that are secured by the growing crop and other personal property ("Crop Loan"), Grantors and Borrowers shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold

**CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)**

5

payments or ground rents on the Property, if any.

Grantors and Borrowers shall promptly discharge any lien which has priority over this Security Instrument unless Grantors and Borrowers: (a) agree in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Grantors and Borrowers are performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Grantors and Borrowers a notice identifying the lien. Within 10 days of the date on which that notice is given, Grantors and Borrowers shall satisfy the lien or take one or more of the actions set forth above in this Section 3.

Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender, defined below, on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances. Lender may require Grantors, Borrowers and/or Borrower Parties to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**4. Property Insurance.** Grantors and Borrowers shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Grantors and Borrowers subject to Lender's right to disapprove Grantors' and Borrowers' choice, which right shall not be exercised unreasonably. Lender may require Grantors and Borrowers to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Grantors and Borrowers shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Grantors and Borrowers.

If Grantors or Borrowers fail to maintain any of the coverages described above, such failure shall constitute a default under the terms of this Security Instrument and the Loan. Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Grantors or Borrowers, Grantors' or Borrowers' equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Grantors and Borrowers acknowledge that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Grantors or Borrowers could have obtained. Any amounts disbursed by Lender under this Section 4 shall become additional debt of Grantors, Borrowers, and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Grantors and Borrowers requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Grantors and Borrowers shall promptly give to Lender all receipts of paid premiums and renewal notices. If Grantors or Borrowers obtain any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Grantors and Borrowers shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Grantors or Borrowers. Unless Lender and Grantors and Borrowers otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Grantors, Borrowers or Borrower Parties any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Grantors, Borrowers, or Borrower Parties shall not be paid out of the insurance proceeds and shall be the sole obligation of Grantors, Borrowers, and Borrower Parties. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Grantors, Borrowers, and Borrower Parties. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Grantors or Borrowers abandon the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If neither Grantors nor Borrowers respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 25 or otherwise, Grantors and Borrowers hereby assign to Lender (a) Grantors', Borrowers', and Borrower Parties' rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Grantors' or Borrowers' rights (other than the right to any refund of unearned premiums paid by Grantors, Borrowers, or Borrower Parties) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**5. Preservation, Maintenance and Protection of the Property; Inspections.** Grantors and Borrowers shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property, excluding ordinary wear and tear, ordinary farming practices and normal maturity of any permanent crop. Grantors and Borrowers shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 4 that repair or restoration is not economically feasible, Grantors and Borrowers shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Grantors and Borrowers shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Grantors and Borrowers are not relieved of Grantors' or Borrowers' obligations for the completion of such repair or restoration.

Grantors and Borrowers will operate the Property in a good and workmanlike manner and in accordance with all Applicable Law and will pay all fees and charges of any kind in connection therewith. Grantors and Borrowers will use good farming and animal husbandry practices.

Lender or its agent may make reasonable entries upon and inspections of the Property with forty-eight (48) hours' advance written notice. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Grantors and Borrowers notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**6. Loan Application.** Grantors and Borrowers shall be in default if, during the Loan application process, Grantors, Borrowers, or Borrower Parties or any persons or entities acting at the direction of Grantors, Borrowers, or Borrower Parties or with Grantors', Borrowers', or Borrower Parties' knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan.

**7. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** Subject to any subordination or intercreditor agreement entered into between Lender and the Crop Loan lender, and provided notice pursuant to Section 23 has been given to Grantors and Borrowers, if (a) Grantors or Borrowers fail to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Grantors or Borrowers have abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding, (d) perform any farming operations related to the planting, growing, maintenance, and harvesting of crops located on the Property, and (e) perform any ranching operations related to any animals located on the Property. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 7, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 7. Lender may perform these or any other actions it deems necessary in Lender's sole discretion to preserve the value of the Property, and/or assign to others the right to do same on behalf of Lender. Lender may make advances under this security instrument or other instrument providing security for the Note, to protect the Lender's interest in this security instrument or other instrument providing security for the Note from loss of value or damage. Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate indicated in the Note shall become an obligation due and owing under the terms of the Note immediately upon the date advanced by Lender and is an obligation of the Borrower secured by the security instrument or other instrument providing security for the Note.

Any amounts disbursed by Lender under this Section 7 shall become additional debt of Grantors, Borrowers, and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Grantors, Borrowers and/or Borrower Parties requesting payment.

If this Security Instrument is on a leasehold, Grantors and Borrowers shall comply with all the provisions of the lease. Grantors and Borrowers shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Grantors and Borrowers shall not, without the express written consent of Lender, alter or amend the ground lease. If Grantors or Borrowers acquire fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**8. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Grantors, Borrower, or Borrower Parties any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Grantors, Borrowers, or Borrower Parties. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Grantors, Borrowers, or Borrower Parties.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Grantors and Borrowers and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Grantors and Borrowers.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Grantors, Borrowers, Borrower Parties, and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Grantors or Borrowers, or if, after notice by Lender to Grantors and Borrowers that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Grantors, Borrowers, and Borrower Parties fail to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Grantors, Borrowers, or Borrower Parties Miscellaneous Proceeds or the party against whom Grantors, Borrowers or Borrower Parties has a right of action in regard to Miscellaneous Proceeds.

Grantors, Borrowers, and Borrower Parties shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or material impairment to the value of Lender's interest in the Property or rights under this Security Instrument. Grantors, Borrowers, and Borrower Parties can cure such a default and, if acceleration has occurred, reinstate as provided in Section 16, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**9. Grantors and Borrowers Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Grantors and Borrowers or any Successor in Interest of Grantors and Borrowers shall not operate to release the liability of Grantors and Borrowers or any Successors in Interest of Grantors and Borrowers. Lender shall not be required to commence proceedings against any Successor in Interest of Grantors and Borrowers or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Grantors and Borrowers or any Successors in Interest of Grantors and Borrowers. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from Borrower, third persons, entities or Successors in Interest of Guarantors or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**10. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Grantors and Borrowers covenant and agree that Grantors' and Borrowers' obligations and liability shall be joint and several. Subject to the provisions of Section 15, any Successor in Interest of Grantors and Borrowers who assumes Grantors' and Borrowers' obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Grantors' and Borrowers' rights and benefits under this Security Instrument. Grantors and Borrowers shall not be released from Grantors' and Borrowers' obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 17) and benefit the successors and assigns of Lender.

**11. Loan Charges.** Lender may charge Grantors and Borrowers fees for services performed in connection with Grantors', Borrowers' and Borrower Parties' default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Grantors and Borrowers shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits,

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Grantors and Borrowers which exceeded permitted limits will be refunded to Grantors and Borrowers. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Grantors, Borrowers or Borrower Parties. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Grantors', Borrowers', or Borrower Parties' acceptance of any such refund made by direct payment to Grantors, Borrowers, or Borrower Parties will constitute a waiver of any right of action Grantors, Borrowers, or Borrower Parties might have arising out of such overcharge.

**12. Notices.** All notices given by Grantors, Borrowers, Borrower Parties, or Lender in connection with this Security Instrument must be in writing. Any notice to Grantors, Borrowers, or Borrower Parties' in connection with this Security Instrument shall be deemed to have been given to such party when mailed by first class mail or when actually delivered to Borrowers' notice address if sent by other means. Notice to any one Grantor or Borrower shall constitute notice to all Grantors and Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Borrowers' Address unless Borrowers have designated a substitute notice address by notice to Lender. Grantors and Borrowers shall promptly notify Lender of Borrowers' change of address. If Lender specifies a procedure for reporting Borrowers' change of address, then Grantors or Borrowers shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Grantors and Borrowers. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**13. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**14. Grantors' and Borrowers' Copy.** Grantors, Borrowers, and Borrower Parties shall be given one copy of the Note and of this Security Instrument.

**15. Transfer of the Property or a Beneficial Interest in Grantors, Borrowers, or Borrower Parties.** As used in this Section 15, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Grantors or Borrowers at a future date to a purchaser, excluding, however, easements granted by Grantors and Borrowers in the ordinary course of business.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Grantors, Borrowers, or Borrower Parties are not a natural person and a beneficial interest in Grantors, Borrowers, or Borrower Parties is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Grantors and Borrowers notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 12 within which Grantors, Borrowers, or Borrower Parties must pay all sums secured by this Security Instrument. If Grantors, Borrowers, or Borrower Parties fail to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Grantors, Borrowers, or Borrower Parties.

---

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

Grantors and Borrowers may request Lender to release one or more parcels that make up the Property, from time to time, from the lien of the Deed of Trust (the "Partial Release") and Lender agrees to not unreasonably withhold its consent to the Partial Release, subject to the prior satisfaction of the condition that Grantors and Borrowers shall submit a formal written request for the Partial Release (the "Request") not less than forty-five (45) days prior to the date upon which Grantors and Borrowers desire to close the transfer of the parcel subject to the Partial Release (the "Release Parcel"). No more than three (3) Requests shall be made per calendar year. The Request shall be sufficiently detailed and include all necessary documentation so as to allow Lender adequate time to process the Partial Release.

Notwithstanding the foregoing, upon the written request of Grantors and Borrowers, Lender will subordinate its interest in any personal property, crops growing or to be grown on the Property, crop receivables, and all governmental payments relating to such crops (the "Crops"), but not to trees, irrigation equipment, water rights and permanent plantings, to the security interest of an institutional lender (a "Crop Lender") for one or more loans made to Grantors, Borrowers, or Borrower Parties to finance the production of crops on all or any portion of the Property ("Operating Financing"). Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances.

**16. Right to Reinstate After Acceleration.** If Grantors, Borrowers, and Borrower Parties meet certain conditions, Grantors and Borrowers shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Grantors' or Borrowers' right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Grantors, Borrowers, and Borrower Parties: (a) pay Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cure any default of any other covenants or agreements; (c) pay all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) take such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Grantors', Borrowers' and Borrower Parties' obligations to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Grantors, Borrowers, and Borrower Parties pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Grantors and Borrowers, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 15.

**17. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Grantors, Borrowers, or Borrower Parties.

Grantors, Borrowers, Borrower Parties, nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Grantors, Borrowers, Borrower Parties or Lender has notified the other parties (with such notice given in compliance with the requirements of Section 12) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 25 and the notice of acceleration given to Grantors, Borrowers, and Borrower Parties pursuant to Section 15 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 17.

**18. Hazardous Substances.** As used in this Section 18: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances:

CALIFORNIA–Farmer Mac UNIFORM INSTRUMENT (Open End)

gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Grantors, Borrowers, and Borrower Parties shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property, other than the presence, use, storage and disposal of Hazardous Substances in quantities as necessary for Grantors', Borrowers' and Borrower Parties' normal farming operations located on the Property, all of which Grantors and Borrowers covenant have and will be used, stored, and disposed of in accordance with commercially reasonable farming practices and all applicable environmental laws. Grantors, Borrowers, and Borrower Parties shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal farming and residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Grantors, Borrowers, and Borrower Parties shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Grantors, Borrowers, or Borrower Parties have actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Grantors, Borrowers or Borrower Parties learn, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Grantors, Borrowers, and Borrower Parties shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup. Grantors and Borrowers agree to indemnify and hold Lender free and harmless from and against all loss, costs (including attorneys' fees and costs), damage (including consequential damages), and expenses Lender may sustain by reason of the assertion against Lender by any third-party of any claim in connection with Hazardous Substances on, in or affecting the Property. Grantors and Borrowers further agree that Lender shall have the right to join and participate in, as a party if it so elects, any legal proceedings or actions initiated in connection with any claims related to Hazardous Substances on, in or affecting the Property, and shall pay any such attorney fees and expenses Lender incurs in connection therewith.

**19. Additional Property Subject To The Security Instrument.** This Security Instrument also constitutes a security agreement within the meaning of the Uniform Commercial Code as adopted in the State of California (the "UCC"). In addition to the Property described in the Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in or on the Listed Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling, attached floor coverings, irrigation equipment (including, but not limited to, irrigation pipes and pumps, center irrigation pivots, pvc pipe, sprinklers, motors, well equipment, pumps and power units), livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom, and any substitutions or replacements therefore, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale,

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

12

lease or other disposition of any of the foregoing, and any rights of Grantors or Borrowers to collect or enforce payment thereof, as well as to enforce any guarantees of the forgoing and security therefor, and all of Grantors' and Borrowers' present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this Security Instrument as the "Property."

**20. Fixture Filing.** This Security Instrument constitutes a "fixture filing" for the purposes of the UCC against all of the Property which is or is to become fixtures per the UCC.

**21. Use of Property; Compliance With Law.** Grantors, Borrowers, or Borrower Parties shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Grantors and Borrowers shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**22. Assignment of Leases.** Upon Lender's request after default, Grantors and Borrowers shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**23. Assignment of Rents; Appointment of Receiver; Lender In Possession.** Grantors and Borrowers absolutely and unconditionally assign and transfer to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Grantors and Borrowers authorize Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Grantors, Borrowers, or Borrower Parties shall receive the Rents until (i) Lender has given Grantors, Borrowers, and Borrower Parties notice of default pursuant to Sections 12 and 25 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notices of default to Grantors, Borrowers or Borrower Parties: (i) all Rents received by Grantors, Borrowers, or Borrower Parties shall be held by Grantors or Borrowers as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Grantors and Borrowers agree that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorneys' fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Grantors, Borrowers, and Borrower Parties to Lender secured by the Security Instrument pursuant to Section 7 of the Security Instrument.

Grantors and Borrowers represent and warrant that none of Grantors, Borrowers, or Borrower Parties have executed any prior assignment of the Rents and have not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Grantors, Borrowers or Borrower Parties. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

**24. Cross-Collateralization.** In addition to the Notes, all liens, security interests, assignments, suretyship obligations, stock pledges, rights and remedies granted to Lender in any loan document or agreement secure all obligations, debts and liabilities, plus interest thereon, of any or all Borrowers to Lender, as well as claims by Lender against any or all Borrowers, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Notes, whether voluntary or otherwise, whether due or not due, direct or indirect, absolute or contingent, whether any or all Borrowers may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

**25 Cross-Default Provision.** Grantors', Borrowers', or Borrower Parties' default or breach under any note or agreement in which Lender has an interest, including but not limited to the Notes, shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

**NON-UNIFORM COVENANTS.** Grantors, Borrowers, and Lender further covenant and agree as follows:

**26. Acceleration; Remedies.** Following Grantors', Borrowers', or Borrower Parties' breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 15 unless Applicable Law provides otherwise) and prior to acceleration or Lender's exercise of any remedy, Lender shall give at least sixty (60) days written notice to Grantors, Borrowers, and Borrower Parties prior to exercising any remedy, unless otherwise provided under this Deed of Trust; provided, however, if such default cannot be cured within the 60-day period and Grantors, Borrowers, or Borrower Parties have commenced and diligently pursues the cure of the related default, Grantors, Borrowers, and Borrower Parties shall have such time as is commercially reasonably necessary for Grantors, Borrowers, and Borrower Parties to complete the cure, provided Lender is not materially prejudiced from such delay. Lender shall use commercially reasonable standards to determine if it is materially prejudiced by the delay. The notice shall specify: (a) the default; (b) the action required to cure the default; (c) the date by which the default must be cured. The notice shall further inform Grantors, Borrowers, and Borrower Parties of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Grantors, Borrowers, or Borrower Parties to acceleration and sale. If the default is not cured on or before the date specified in the notice or such extended period for defaults which cannot be cured within the 60-day period, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 25, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Grantors and Borrowers and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Grantors and Borrowers, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**27. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

    **28. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Grantors/Borrowers, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

    **29. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

    **30. Other California State Specific Provisions.**

        (a)    In addition to the provisions of any Loan agreement, Grantors and Borrowers further agree that, if Lender accepts a guaranty of only a portion of the Indebtedness, Grantors and Borrowers waive any right under California Civil Code Section 2822(a) to designate the portion of the Indebtedness which shall be satisfied by a guarantor's partial payment.

        (b)    Except for matters covered by an O&M Program or matters described in the Environmental Indemnity Agreement, Grantors and Borrowers shall not cause or permit any lien (whether or not such lien has priority over the lien created by this Security Instrument) upon the Property imposed pursuant to any Environmental Laws. Any such lien shall be considered a Prohibited Activity or Condition (as may also be contemplated in any environmental indemnity agreement).

        (c)    Grantors and Borrowers represent and warrant to Lender that, except as previously disclosed by Grantors, Borrowers, or Borrower Parties to Lender in writing:

            (1)    at the time of acquiring the Property, Grantors and Borrowers undertook all appropriate inquiry into the previous ownership and uses of the Property consistent with good commercial or customary practice and no evidence or indication came to light which would suggest that the Property has been or is now being used for any Prohibited Activities or Conditions; and

            (2)    the Property has not been designated as "hazardous waste property" or "border zone property" pursuant to Section 25220, et seq., of the California Health and Safety Code.

The representations and warranties in this Security Instrument shall be continuing representations and warranties that shall be deemed to be made by Grantors and Borrowers throughout the term of the Loan, until the Indebtedness has been paid in full.

        (d)    Without limiting any of the remedies provided in this Security Instrument, Grantors and Borrowers acknowledge and agree that certain provisions in this Security Instrument are environmental provisions (as defined in Section 736(f)(2) of the California Code of Civil Procedure) made by Grantors and Borrowers relating to the real property security (the "**Environmental Provisions**"), and that to the extent applicable, Grantor's failure to comply with any of the Environmental Provisions will be a breach of contract that will entitle Lender to pursue the remedies provided by Section 736 of the California Code of Civil Procedure for the recovery of damages and for the enforcement of the Environmental Provisions.

    **31. Recourse.** Each of the Grantors, Borrowers, and Borrower Parties shall be fully and individually liable on a joint and several basis for the full repayment of all amounts due under the Loan. However, in the event of foreclosure of this Security Agreement or other enforcement of the Note or Loan, Lender, and any subsequent holder of this Security Agreement, shall not be able to pursue or obtain any deficiency against any of the Grantors with respect to the Loan.

    Except as otherwise stated herein, nothing in the provisions of this Amendment shall be deemed in any way to affect the priority of the Original Security Instrument over any other lien, charge, encumbrance or conveyance, or

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

to release or change the liability of any party who may be liable under the Note.

IN WITNESS WHEREOF, Borrower has signed and sealed this Security Instrument.

*[remainder of page intentionally left blank -- signature page follows]*

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

16

BY SIGNING BELOW, Grantors and Borrowers accept and agree to the terms and covenants contained in this Security Instrument and in any Rider executed by Grantors and Borrowers.

**BORROWERS:**

**COPPER AVENUE INVESTMENTS, LLC,**
a California limited liability company

By: Farshid Assemi
Its: Manager

**CANTUA ORCHARDS, LLC**
a California limited liability company

By: Farshid Assemi 1997 Ranch Trust, its
Member

Farid Assemi, its Trustee

By: Farid Assemi 1991 Ranch Trust, its Member

Farshid Assemi, its Trustee

By: Farid Assemi Revocable Trust dated January
24, 2007, its Member

Farid Assemi, its Trustee

By: Darius Assemi Revocable Trust dated January
30, 2007

Darius Assemi, its Trustee

By: Farshid Assemi and Sonia Rosemary Assemi
Revocable Trust dated January 31, 2007, its
Member
By: Farshid Assemi, its Co-Trustee

By: Sonia Assemi, its Co-Trustee

**LINCOLN GRANTOR FARMS, LLC,**
a California limited liability company

By: Neema Assemi
Its: Manager

**GRADON FARMS, LLC,**
a California limited liability company

By: Darius Assemi
Its: Manager

**ACAP FARMS, LLC,**
a California limited liability company

By: Farshid Assemi
Its: Manager

**LENDER:**
**U.S. Bank National Association, as**
**Custodian/Trustee for Federal Agricultural**
**Mortgage Corporation programs**

By: Heather Wright, Manager-Closing & Servicing
of Federal Agricultural Mortgage Corporation
Attorney-in-Fact for U.S. Bank National Association,
as Custodian/Trustee for Federal Agricultural
Mortgage Corporation programs

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

17

STATE OF CALIFORNIA
COUNTY OF _____

On _____ before me, _____, personally appeared
Neema Assemi, Manager of Lincoln Grantor Farms, LLC, who proved to me on the basis of satisfactory evidence
to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he executed
the same in his authorized capacity, and that by his signature(s) on the instrument the person(s), or the entity upon
behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws
of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)
_____
Notary Public
Printed Name:_____
My commission expires:_____

┌─────────────────────────────────────┐
│ A notary public or other officer completing this │
│ certificate verifies only the identity of the individual │
│ who signed the document to which this certificate │
│ is attached, and not the truthfulness, accuracy, or │
│ validity of that document. │
└─────────────────────────────────────┘

STATE OF IOWA
COUNTY OF Polk

On Feb 3 2023 before me, Megan Spalding, personally appeared
Heather Wright, Manager- Closing & Servicing of Federal Agricultural Mortgage Corporation Attorney-in-
Fact for U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation
programs, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed
to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his
signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the
instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Megan Spalding_ (Seal)
_____
Notary Public
Printed Name: Megan Spalding
My commission expires: Feb 3 2023

┌─────────────────────────────────────┐
│    NOTARIAL SEAL        MEGAN SPALDING │
│    IOWA      Commission Number 716793 │
│             My Commission Expires │
│                June 03, 2023 │
└─────────────────────────────────────┘

20

## ACKNOWLEDGMENT

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of ___Fresno___ )

On __Feb. 3, 2023__ before me, __L. Diaz, Notary Public__

(insert name and title of the officer)

personally appeared __Darius Assemi , Farid Assemi , Farshid Assemi__ ,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

L. DIAZ
Notary Public · California
Fresno County
Commission # 2398671
My Comm. Expires Apr 20, 2026

Signature _____   (Seal)

# ACKNOWLEDGMENT

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of _____Fresno_____)

On ___Feb 3, 2023___ before me, L. Diaz, Notary Public _____
                                      (insert name and title of the officer)

personally appeared __Sonia Asseni, Neema Asseni_____,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

L. DIAZ
Notary Public - California
Fresno County
Commission # 2398671
My Comm. Expires Apr 20, 2026

Signature _____   (Seal)

## EXHIBIT "A"
## Legal Description of Land

PARCEL 1:

The West 20.15 acres of that portion of Lot 10 lying South of Laguna Canal, and all of Lots 11, 12, 13 in Section 10, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, in the County of Kings, State of California, as per map of the Laguna de Tache Grant thereof recorded in the Office of the County Recorder of Fresno County in Book 3 at Page 11 of Record of Surveys, together with that portion of 25th Avenue (abandoned) and 24 1/2 Avenue (abandoned) which would pass by a conveyance of said land under Sections 831 and 1112 of the Civil Code.

EXCEPTING THEREFROM such interest in a strip of land 50 feet wide lying between the Old Crescent Canal right of way and Lots 7 and 8 in said Section 10, as conveyed to Crescent Canal Company, a corporation, by Deed dated January 7, 1913 and recorded April 7, 1913 in Book 51 at Page 78 of Deeds, Kings County Records.


APN: 004-130-030

PARCEL 2:

Lots 1 and 2 lying North of the by-pass of Tulare Lake Basin Water Storage District, in Section 15, Township 18, Range 19 East, Mount Diablo Base and Meridian, as per map of Laguna De Tache Grant thereof recorded in the office of the County Recorder of Fresno County in Book 3 at Page 9 of Record of Surveys.

EXCEPTING THEREFROM any portion thereof lying within San Jose Subdivision as shown on that certain map recorded in Book 3 Page 4 of Licensed Surveyor Plats.

APN: 004-140-012 (Portion)

PARCEL 3:

Those portions of Lots 2 and 3 lying West of canal, all of Lots 3A, 3B, 4, 5, 6, 6A, the well reserved in the Northeast corner of said Lot 6, all of Lots 12, 13 and 13A, in Section 15, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of San Jose Subdivision, recorded March 11, 1930 in Book 3 Page 4, of Licensed Surveyor Plats, Kings County Records.

EXCEPTING THEREFROM all oil, gas and other hydrocarbon substances in or under said property as previously reserved of record.

APN: 004-140-012 (Portion)

PARCEL 3A:

One acre in the Northwest corner North and West of Kings River Bypass Canal, in Lot 7 in Section 15, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, as shown on Map of Laguna de Teche Grant on file with the office of the Kings County Surveyor in Map Book Page 70.

APN: 004-140-005

PARCEL 4:

Lots 14, 15 and 16, and that portion of Lot 17 lying North of the bypass of Tulare Lake Basin Water Storage District, in Section 10, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, as per map of the Laguna de Tache Grant thereof recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 11 of Record of Surveys.

EXCEPTING THEREFROM all oil, gas and other hydrocarbon substances in or under said property as previously reserved of record.

APN:  004-140-002

PARCEL 5:

The Westerly 361.5 feet of the Southerly 361.5 feet of Lot 14 in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of Laguna de Tache Grant recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 10, of Record of Surveys.

APN:  004-230-014

PARCEL 6:

Lots 5, 6, 6A, 11 and 12, in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of San Jose Subdivision, recorded March 11, 1930 in Book 3 at Page 4 of Licensed Surveyor Plats, Kings County Records.

EXCEPTING THEREFROM all oil, gas and other hydrocarbons minerals now or at any time hereafter situate therein and thereunder said land, as saved, excepted and reserved in Deed recorded May 22, 1945 in Book 329, Page 29, Official Records, as Document No. 3227.

APN:  004-230-026 (Portion)

PARCEL 7:

Lots 13 and 14 in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of Laguna de Tache Grant recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 10, of Record of Surveys, Fresno County Records, lying West of the strip of land described in the Deed from Summit Lake Investment Company, a corporation to Tulare Basin Water Storage District, recorded August 8, 1928 in Book 35 at Page 433, of Official Records, Kings County Records.

EXCEPTING THEREFROM the Westerly 361.5 feet of the Southerly 361.5 feet of Lot 14.

ALSO EXCEPTING THEREFROM such interest in a portion of said Lot 13, conveying to the County of Kings, by Deed dated June 13, 1960 and recorded August 18, 1960 in Book 763 Page 880, of Official Records, as Document No. 8922, described as follows:

Beginning at a point distant North 84° 30' 08" East 860.48 feet from the Southwest corner of said Section 22; thence North 3° 29' 59" West 10 feet; thence along a curve to the right, with a radius of 760.00 feet, through an angle of 94° 48' a distance of 1257.48 feet, with a chord that bears North 46° 05' 59" West, 1118.87 feet; thence South 1° 18' 01" West, 550.00 feet; thence South 88° 41' 59" East 125.10 feet; thence, a long curve to the left, with a radius of 840.00 feet, through an angle of 12° 59' 48" a distance of 190.54 feet, with a cord that bears South 46° 05' 59" East, 190.13 feet; thence South 3° 29' 59" East, 135.10 feet; thence North 86° 30' 01" East, 550.00 feet to a point of beginning.

APN: 004-230-026 (Portion)
004-230-027

PARCEL 8:

That portion of Lot 15 in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, in the County of Kings, State of California, according to Map of Laguna de Tache Grant recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 10, of Record of Surveys, lying West of the strip of land described in the Deed from Summit Lake Investment Company, a corporation to Tulare Basin Water Storage District, recorded August 8, 1928 in Book 35 at Page 433, of Official Records, Kings County Records.

APN: 004-230-013

The land referred to below is situated in the unincorporated area of the County of Fresno, State of California:

PARCEL 9:

The North half of the Northeast Quarter of Section 22, Township 16 South, Range 14 East, Mount Diablo Base and Meridian, according to the Plat thereof.

EXCEPTING THEREFROM the North 50 feet, as conveyed to the County of Fresno in Deed recorded April 22, 1970 in Book 5780, Page 78 of Official Records.

APN: 038-141-21S

//

//

PARCEL 10:

The Northwest quarter of Section 8, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof;

EXCEPTING THEREFROM an undivided one-half interest in and to all oil, gas, minerals and other hydrocarbon substances now or at any time situate in and under said land, as reserved in the deed from R. T. Hughes and Bess L. Hughes, husband and wife, to John H. Edgar and Ruby Dale Edgar, husband and wife, as joint tenants, July 10, 1950, recorded January 24, 1950 in Book 2829 Page 69 of Official Records, Document No. 4385.

ALSO EXCEPTING THEREFROM an undivided one-fourth interest in and to all oil, gas and other hydrocarbons and minerals now or at any time hereinafter situate therein and thereunder, together with all easements and rights necessary or convenient for the production, storage and transportation thereof and the exploration and testing of the said real property, and also the right to drill for, produce and use water from the said real property in connection with drilling or mining operations thereon, as reserved in the deed from Raymond Dale Johnson to Bernie Thurman and James V. Gregory, as Trustees for Tanya Marie Marshall under that certain irrevocable Trust Agreement dated May 30, 1974, recorded on June 25, 1974 as Document No. 47802.


APN: 040-020-18-S

Exhibit N



DOC NBR: 2303348
OFFICIAL RECORDS OF Kings County
Kristine Lee, Clerk-Recorder
RECORDING FEE: $346.00
COUNTY TAX: $0.00
CITY TAX: $0.00

2/03/2023 08:35:27 AM

Recording Requested By:
Conterra Ag Capital

After Recording Return To:
Att: Alison
Conterra Ag Capital
**5465 Mills Civic Parkway, Ste. 201**
**West Des Moines, IA 50266**
**515-564-5147**



CONTERRA HOLDINGS LLC

TITLE: 3
DOC TYPE: 08
22 PGS
R066

_____ [Space Above This Line For Recording Data] _____

# AMENDED AND RESTATED DEED OF TRUST
## Security Agreement, Assignment of Rents and Fixture Filing

Loan <sup>REDACTED</sup> 1674

This Amended and Restated Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing (this "Amendment", and, as further defined below, this **"Security Instrument"**) is made and entered into as of _February 2_, 2023, is granted by Copper Avenue Investments, LLC, a California limited liability company, ACAP Farms, LLC, a California limited liability company, Lincoln Grantor Farms, LLC, a California limited liability company, Gradon Farms, LLC, a California limited liability company, and Cantua Orchards, LLC, a California limited liability company, whose address is 5260 N. Palm Avenue, Suite 421 Mail Stop M, Fresno CA 93704 the trustors under this Security Instrument, (**"Borrower"),** in favor of Old Republic Title Company (**"Trustee"),** for the benefit of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs, whose address is 1133 Rankin Street, Suite 100, St. Paul, Minnesota 55116 (**"Lender"),** and amends and restates the Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing dated as of October 11, 2019, and recorded as Document No. 20190123387 on October 15, 2019, with the Fresno County Clerk - Recorder in the Official Records, Fresno County, as affected by the Assignment of Deed of Trust dated as of October 11, 2019, and recorded as Document No. 20190123388 on October 15, 2019 **with the Fresno County Clerk - Recorder in the Official Records, Fresno County,** the Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing dated as of October 11, 2019, and recorded as Document No. 1917421 on October 15, 2019, with the Kings County Clerk - Recorder in the Official Records, Kings County, as affected by the Assignment of Deed of Trust dated as of October 11, 2019, and recorded as Document No. 1917422 on October 15, 2019 **with the Kings County Clerk - Recorder in the Official Records, Kings County.**

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in certain Sections of this document. Certain rules regarding the usage of words used in this document are also provided in Section 13.

**(A) "Security Instrument"** means this document, which is dated **February 2, 2023**, together with all Riders to this document.

**(B) "Lender"** is **U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs.** Lender's address is **1133 Rankin Street, Ste. 100, St Paul, MN 55116.** Lender is the grantee under this Security Instrument.

_____

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

1

**(C)** **"Borrowers"** are **Copper Avenue Investments, LLC, a California limited liability company**, **ACAP Farms, LLC, a California limited liability company**, **Lincoln Grantor Farms, LLC, a California limited liability company Gradon Farms, LLC, a California limited liability company, and Cantua Orchards, LLC, a California limited liability company**.  Borrowers are trustors under this Security Instrument.  **"Borrower Parties"** are **Borrowers** and **Maricopa Orchards, LLC, a California limited liability company**.  Borrower Parties' address is **5260 N. Palm Avenue, Suite 421 Mail Stop M, Fresno CA 93704.**

**(D)** "Trustee" is **Old Republic Title Company**.

**(E)** **"Note"** means (i) Borrower Parties promissory note dated October 11, 2019, maturing on October 11, 2039, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of $10,258,632, plus interest, (ii) Borrower Parties promissory note dated October 11, 2019, maturing on October 11, 2044, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of $5,297,232, plus interest, (iii) a promissory note made by C&A Farms, LLC and Whitesbridge Farms, LLC dated January 8, 2018, maturing on July 1, 2033,  payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal of $5,500,000.00, plus interest; (iv) an open ended promissory note made by C&A Farms, LLC and Whitesbridge Farms, LLC dated January 8, 2018, and subsequently converted on June 27, 2018, maturing on July 1, 2038, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of up to $1,500,000.00, plus interest; (v) an open ended promissory note made by Maricopa Orchards, LLC, C&A Farms, LLC, Willow Avenue Investments, LLC, Assemi Brothers, LLC, a California limited liability company and Whitesbridge Farms, LLC dated December 14, 2020, maturing on January 1, 2026, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of up to $12,500,000.00, plus interest; and (vi) an open ended promissory note made by Maricopa Orchards, LLC, C&A Farms, LLC, Willow Avenue Investments, LLC, Assemi Brothers, LLC, a California limited liability company and Whitesbridge Farms, LLC dated December 14, 2020, maturing on January 1, 2026, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of up to $12,500,000.00, plus interest; and (vii) a promissory note made by Maricopa Orchards, LLC**,** C & A Farms, LLC, Willow Investments, LLC, Copper Avenue Investments, LLC, ACAP Farms, LLC, Lincoln Grantor Farms, LLC, Cantua Orchards, LLC, Gradon Farms, LLC, dated January 27, 2023, maturing on January 13, 2026, in the original principal amount of $7,400,000.00, plus interest.  Borrower Parties have promised to pay this debt in regular Periodic Payments and to pay Notes in full not later than **maturity date of each Note.**

**(F)** **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(G)** **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(H)** **"Riders"** mean all Riders to this Security Instrument that are executed by Grantors and Borrowers Whether recorded or unrecorded.  The following Riders are to be executed by Grantors and Borrowers:

☐  Irrigation Equipment Rider          ☐  Water Rights Rider

☐  Financial Information and Covenants Rider          ☐  Permitted Prior Encumbrance Rider

☐  Mortgage Insurance Rider          ☐  Adjustable Rate Rider

☐  Other(s):  **Cross   Default   Rider,   Cross Collateralization Rider**

---

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

2

**(I)  "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J)  "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K)  "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 4) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(L)  "Periodic Payment"** means the amount due for principal and interest under the Note.

**(M)  "Successor in Interest of Grantors and Borrowers"** means any party that has taken title to the Property, whether or not that party has assumed obligations of any of the Grantors or Borrowers under this Security Instrument or of Borrower Parties under the Note.

**TRANSFER OF RIGHTS IN THE PROPERTY**
This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Grantors' and Borrowers' covenants and agreements under this Security Instrument and of Borrower Parties under the Note.  For this purpose, Grantors and Borrowers irrevocably grant and convey to Trustee, in trust, with power of sale, the following described property located in the **Counties** of **Kings and Fresno, California**:

> **See Exhibit "A" attached hereto and made a part hereof.**

which currently has the address of:

<div align="center">

**1,110 +/- Acres**
**Kings County and Fresno County, California**
("Property Address"):

</div>

subject only to those matters set forth in the Permitted Prior Encumbrance Rider, if said rider is attached (hereafter "Permitted Prior Encumbrances");

**TOGETHER WITH** all buildings, improvements, equipment, fixtures and permanent plantings affixed, attached to or incorporated in the real property, and all additions, replacements, and improvements hereafter made thereto or placed therein or thereon; all rights-of-way, easements, rents, issues, profits, income, proceeds and general intangibles there from, tenements, hereditaments, remainders, reversions, privileges and appurtenances thereunto belonging, however evidenced, which are used or enjoyed in connection with the real property now or hereafter owned or belonging to the Grantors or Borrowers or which hereafter may be acquired by Grantors or Borrowers, excluding, however, the growing crop;

**TOGETHER WITH** all water rights appurtenant to the real property, whether such water rights are riparian, appropriative or otherwise, along with all ditch and ditch rights and any shares of stock, licenses, permits and contracts

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

<div align="center">3</div>

evidencing such water or ditch rights appurtenant to the property, and all wells, reservoirs, dams, embankments or fixtures located on the real property;

**TOGETHER WITH** all windmills, pumps, irrigation equipment, motors, engines, and devices of every kind, with the exception of rolling stock, now or hereafter attached or affixed to the real property, or for stock watering or domestic purposes thereon, and all grain bins and storage bins, which are owned by Grantors or Borrowers and which are attached or affixed to the  real property in **Kings and Fresno Counties, California**, described above together with all additional accessions, replacements, improvements, repairs and substitutions to said property and the proceeds thereof and all other fixtures now or hereafter attached or affixed to the real property, all of which are declared to be appurtenant to said real property, or incident to the ownership thereof;

**TOGETHER WITH** all judgments, awards of damages, settlements and payments or security (i) hereafter made as a result of or in lieu of any taking of all or any part of the real property under the power of eminent domain or for any damage to the real property and/or the improvements located thereon, or any part thereof, and (ii) hereafter made for any damage to the real property and/or the improvements located thereon, or any part thereof resulting from exercise of or attempted exercise of mining rights or claims, however reserved or asserted, and resulting from the disturbance of any of the surface of the real property.  Grantors and Borrowers do hereby covenant and agree that neither Grantors nor Borrowers will not give such consent as may be required of the owner for mining or other surface disturbance by the terms of any patent, deed, statute, law or otherwise, without the prior written consent of Lender;

**TOGETHER WITH** all proceeds of and any unearned premiums on any insurance policies covering the real property and/or the improvements located thereon, including, without limitation, the right to receive and apply the proceeds of any insurance judgments, or settlements made in lieu thereof, for damage to the real property and/or the improvements located thereon or the indebtedness secured thereby;

**TOGETHER WITH** all contract rights, chattel paper, documents, accounts and general intangibles, rights to performance, entitlement to payment in cash or in kind, or any other benefits under any current or future governmental program which pertain to the real property, whether now or hereafter existing or acquired, excluding crop receivables;

**TOGETHER WITH** all cash and noncash proceeds of the conversion, voluntary or involuntary, of any of the foregoing;

**TOGETHER WITH** any and all of Grantors' or Borrowers' right, title, and/or interest in any and all system memberships and/or ownership certificates in any non-municipal water sewer systems now or in the future serving said property.

All replacements and additions shall also be covered by this Security Instrument.

All of the foregoing is referred to in this Security Instrument as the "Property."

GRANTORS AND BORROWERS COVENANT that Grantors and Borrowers are lawfully seized of the estate hereby conveyed and have the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record and specifically those permitted prior encumbrances, if any, set forth in the Permitted Prior Encumbrances Rider, if said rider is attached to this Security Instrument.  Grantors and Borrowers warrant and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property and fixtures.

---

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

4

UNIFORM COVENANTS.  Grantors, Borrowers, and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Prepayment Charges, Yield Maintenance Premiums and Late Charges.** Grantors, Borrowers, and/or Borrower Parties shall pay when due the principal of, and interest on, the debt evidenced by the Note and any yield maintenance premiums, any prepayment charges and late charges due under the Note. Payments due under the Note and this Security Instrument shall be made in U.S. currency.  However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 12.  Lender may return any payment or partial payment if the payment or partial payment is insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payment in the future.  No offset or claim which Grantors or Borrowers might have now or in the future against Lender shall relieve Grantors or Borrowers from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.**  Unless required otherwise by Applicable Law, payments will be applied as set forth under the Note.

If Lender receives a payment from Grantors, Borrowers and/or Borrower Parties for a delinquent Periodic Payment that includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Grantors, Borrowers and/or Borrower Parties to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full.  To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Charges; Liens.** Excluding liens associated with operating lines of credit that are secured by the growing crop and other personal property ("Crop Loan"), Grantors and Borrowers shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any.

Grantors and Borrowers shall promptly discharge any lien which has priority over this Security Instrument unless Grantors and Borrowers: (a) agree in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Grantors and Borrowers are performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument.  If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Grantors and Borrowers a notice identifying the lien.  Within 10 days of the date on which that notice is given, Grantors and Borrowers shall satisfy the lien or take one or more of the actions set forth above in this Section 3.

Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender, defined below, on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances.  Lender may require Grantors, Borrowers and/or Borrower Parties to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**4. Property Insurance.**  Grantors and Borrowers shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires.  What Lender requires pursuant to the preceding sentences

**CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)**

5

can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Grantors and Borrowers subject to Lender's right to disapprove Grantors' and Borrowers' choice, which right shall not be exercised unreasonably. Lender may require Grantors and Borrowers to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Grantors and Borrowers shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Grantors and Borrowers.

If Grantors or Borrowers fail to maintain any of the coverages described above, such failure shall constitute a default under the terms of this Security Instrument and the Loan. Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Grantors or Borrowers, Grantors' or Borrowers' equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Grantors and Borrowers acknowledge that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Grantors or Borrowers could have obtained. Any amounts disbursed by Lender under this Section 4 shall become additional debt of Grantors, Borrowers, and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Grantors and Borrowers requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Grantors and Borrowers shall promptly give to Lender all receipts of paid premiums and renewal notices. If Grantors or Borrowers obtain any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Grantors and Borrowers shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Grantors or Borrowers. Unless Lender and Grantors and Borrowers otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Grantors, Borrowers or Borrower Parties any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Grantors, Borrowers, or Borrower Parties shall not be paid out of the insurance proceeds and shall be the sole obligation of Grantors, Borrowers, and Borrower Parties. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Grantors, Borrowers, and Borrower Parties. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Grantors or Borrowers abandon the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If neither Grantors nor Borrowers respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 25 or otherwise, Grantors and Borrowers hereby assign to Lender (a) Grantors', Borrowers', and Borrower Parties' rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Grantors' or Borrowers' rights (other than the right to any refund of unearned premiums paid by Grantors, Borrowers, or Borrower Parties) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the

**CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)**

Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**5. Preservation, Maintenance and Protection of the Property; Inspections.** Grantors and Borrowers shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property, excluding ordinary wear and tear, ordinary farming practices and normal maturity of any permanent crop. Grantors and Borrowers shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 4 that repair or restoration is not economically feasible, Grantors and Borrowers shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Grantors and Borrowers shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Grantors and Borrowers are not relieved of Grantors' or Borrowers' obligations for the completion of such repair or restoration.

Grantors and Borrowers will operate the Property in a good and workmanlike manner and in accordance with all Applicable Law and will pay all fees and charges of any kind in connection therewith. Grantors and Borrowers will use good farming and animal husbandry practices.

Lender or its agent may make reasonable entries upon and inspections of the Property with forty-eight (48) hours' advance written notice. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Grantors and Borrowers notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**6. Loan Application.** Grantors and Borrowers shall be in default if, during the Loan application process, Grantors, Borrowers, or Borrower Parties or any persons or entities acting at the direction of Grantors, Borrowers, or Borrower Parties or with Grantors', Borrowers', or Borrower Parties' knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan.

**7. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** Subject to any subordination or Intercreditor agreement entered into between Lender and the Crop Loan lender, and provided notice pursuant to Section 23 has been given to Grantors and Borrowers, if (a) Grantors or Borrowers fail to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Grantors or Borrowers have abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding, (d) perform any farming operations related to the planting, growing, maintenance, and harvesting of crops located on the Property, and (e) perform any ranching operations related to any animals located on the Property. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 7, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 7. Lender may perform these or any other actions it deems necessary in Lender's sole discretion to preserve the value of the Property, and/or assign to others the right to do same on behalf of Lender. Lender may make advances under this security instrument or other instrument providing security for the Note, to protect the Lender's interest in this security instrument or other instrument providing security for the Note from loss of value or damage. Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate indicated in the Note shall become an obligation due and owing under the terms of the Note immediately upon the date advanced by Lender and is an obligation of the Borrower secured by the security instrument or other instrument providing security for the Note.

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

Any amounts disbursed by Lender under this Section 7 shall become additional debt of Grantors, Borrowers, and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Grantors, Borrowers and/or Borrower Parties requesting payment.

If this Security Instrument is on a leasehold, Grantors and Borrowers shall comply with all the provisions of the lease. Grantors and Borrowers shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Grantors and Borrowers shall not, without the express written consent of Lender, alter or amend the ground lease. If Grantors or Borrowers acquire fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**8. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Grantors, Borrower, or Borrower Parties any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Grantors, Borrowers, or Borrower Parties. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Grantors, Borrowers, or Borrower Parties.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Grantors and Borrowers and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Grantors and Borrowers.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Grantors, Borrowers, Borrower Parties, and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Grantors or Borrowers, or if, after notice by Lender to Grantors and Borrowers that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Grantors, Borrowers, and Borrower Parties fail to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Grantors, Borrowers, or Borrower Parties Miscellaneous Proceeds or the party against whom Grantors, Borrowers or Borrower Parties has a right of action in regard to Miscellaneous Proceeds.

Grantors, Borrowers, and Borrower Parties shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or material impairment to the value of Lender's interest in the Property or rights under this Security Instrument. Grantors, Borrowers, and Borrower Parties can cure such a default and, if acceleration has occurred, reinstate as provided in Section 16, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

8

of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**9. Grantors and Borrowers Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Grantors and Borrowers or any Successor in Interest of Grantors and Borrowers shall not operate to release the liability of Grantors and Borrowers or any Successors in Interest of Grantors and Borrowers. Lender shall not be required to commence proceedings against any Successor in Interest of Grantors and Borrowers or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Grantors and Borrowers or any Successors in Interest of Grantors and Borrowers. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from Borrower, third persons, entities or Successors in Interest of Guarantors or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**10. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Grantors and Borrowers covenant and agree that Grantors' and Borrowers' obligations and liability shall be joint and several. Subject to the provisions of Section 15, any Successor in Interest of Grantors and Borrowers who assumes Grantors' and Borrowers' obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Grantors' and Borrowers' rights and benefits under this Security Instrument. Grantors and Borrowers shall not be released from Grantors' and Borrowers' obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 17) and benefit the successors and assigns of Lender.

**11. Loan Charges.** Lender may charge Grantors and Borrowers fees for services performed in connection with Grantors', Borrowers' and Borrower Parties' default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Grantors and Borrowers shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Grantors and Borrowers which exceeded permitted limits will be refunded to Grantors and Borrowers. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Grantors, Borrowers or Borrower Parties. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Grantors', Borrowers', or Borrower Parties' acceptance of any such refund made by direct payment to Grantors, Borrowers, or Borrower Parties will constitute a waiver of any right of action Grantors, Borrowers, or Borrower Parties might have arising out of such overcharge.

**12. Notices.** All notices given by Grantors, Borrowers, Borrower Parties, or Lender in connection with this Security Instrument must be in writing. Any notice to Grantors, Borrowers, or Borrower Parties' in connection with this Security Instrument shall be deemed to have been given to such party when mailed by first class mail or when actually delivered to Borrowers' notice address if sent by other means. Notice to any one Grantor or Borrower shall constitute notice to all Grantors and Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Borrowers' Address unless Borrowers have designated a substitute notice address by notice to Lender. Grantors and Borrowers shall promptly notify Lender of Borrowers' change of address. If Lender specifies a procedure for reporting Borrowers' change of address, then Grantors or Borrowers shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Grantors and Borrowers. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**13. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**14. Grantors' and Borrowers' Copy.** Grantors, Borrowers, and Borrower Parties shall be given one copy of the Note and of this Security Instrument.

**15. Transfer of the Property or a Beneficial Interest in Grantors, Borrowers, or Borrower Parties.** As used in this Section 15, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Grantors or Borrowers at a future date to a purchaser, excluding, however, easements granted by Grantors and Borrowers in the ordinary course of business.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Grantors, Borrowers, or Borrower Parties are not a natural person and a beneficial interest in Grantors, Borrowers, or Borrower Parties is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Grantors and Borrowers notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 12 within which Grantors, Borrowers, or Borrower Parties must pay all sums secured by this Security Instrument. If Grantors, Borrowers, or Borrower Parties fail to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Grantors, Borrowers, or Borrower Parties.

Grantors and Borrowers may request Lender to release one or more parcels that make up the Property, from time to time, from the lien of the Deed of Trust (the "Partial Release") and Lender agrees to not unreasonably withhold its consent to the Partial Release, subject to the prior satisfaction of the condition that Grantors and Borrowers shall submit a formal written request for the Partial Release (the "Request") not less than forty-five (45) days prior to the date upon which Grantors and Borrowers desire to close the transfer of the parcel subject to the Partial Release (the "Release Parcel"). No more than three (3) Requests shall be made per calendar year. The Request shall be sufficiently detailed and include all necessary documentation so as to allow Lender adequate time to process the Partial Release.

Notwithstanding the foregoing,  upon the written request of Grantors and Borrowers, Lender will subordinate its interest in any personal property, crops growing or to be grown on the Property, crop receivables, and all governmental payments relating to such crops (the "Crops"), but not to trees, irrigation equipment, water rights and permanent plantings, to the security interest of an institutional lender (a "Crop Lender") for one or more loans made to Grantors, Borrowers, or Borrower Parties to finance the production of crops on all or any portion of the Property ("Operating Financing"). Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances.

**16. Right to Reinstate After Acceleration.** If Grantors, Borrowers, and Borrower Parties meet certain conditions, Grantors and Borrowers shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Grantors' or Borrowers' right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that

**CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)**

10

Grantors, Borrowers, and Borrower Parties: (a) pay Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cure any default of any other covenants or agreements; (c) pay all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) take such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Grantors', Borrowers' and Borrower Parties' obligations to pay the sums secured by this Security Instrument, shall continue unchanged.  Lender may require that Grantors, Borrowers, and Borrower Parties pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer.  Upon reinstatement by Grantors and Borrowers, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred.  However, this right to reinstate shall not apply in the case of acceleration under Section 15.

    **17.  Sale of Note; Change of Loan Servicer; Notice of Grievance.**  The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Grantors, Borrowers, or Borrower Parties.

    Grantors, Borrowers, Borrower Parties, nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Grantors, Borrowers, Borrower Parties or Lender has notified the other parties (with such notice given in compliance with the requirements of Section 12) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action.  If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph.  The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 25 and the notice of acceleration given to Grantors, Borrowers, and Borrower Parties pursuant to Section 15 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 17.

    **18.  Hazardous Substances.**  As used in this Section 18:  (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials;  (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

    Grantors, Borrowers, and Borrower Parties shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property, other than the presence, use, storage and disposal of Hazardous Substances in quantities as necessary for Grantors', Borrowers' and Borrower Parties' normal farming operations located on the Property, all of which Grantors and Borrowers covenant have and will be used, stored, and disposed of in accordance with commercially reasonable farming practices and all applicable environmental laws. Grantors, Borrowers, and Borrower Parties shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property.  The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal farming and residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

    Grantors, Borrowers, and Borrower Parties shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Grantors, Borrowers, or Borrower Parties have actual knowledge,  (b) any Environmental Condition, including but not limited to, any spilling, leaking,

**CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)**

discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Grantors, Borrowers or Borrower Parties learn, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Grantors, Borrowers, and Borrower Parties shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup. Grantors and Borrowers agree to indemnify and hold Lender free and harmless from and against all loss, costs (including attorneys' fees and costs), damage (including consequential damages), and expenses Lender may sustain by reason of the assertion against Lender by any third-party of any claim in connection with Hazardous Substances on, in or affecting the Property. Grantors and Borrowers further agree that Lender shall have the right to join and participate in, as a party if it so elects, any legal proceedings or actions initiated in connection with any claims related to Hazardous Substances on, in or affecting the Property, and shall pay any such attorney fees and expenses Lender incurs in connection therewith.

    **19. Additional Property Subject To The Security Instrument.** This Security Instrument also constitutes a security agreement within the meaning of the Uniform Commercial Code as adopted in the **State of California** (the "UCC"). In addition to the Property described in the Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in or on the Listed Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling, attached floor coverings, irrigation equipment (including, but not limited to, irrigation pipes and pumps, center irrigation pivots, pvc pipe, sprinklers, motors, well equipment, pumps and power units), livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom, and any substitutions or replacements therefore, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Grantors or Borrowers to collect or enforce payment thereof, as well as to enforce any guarantees of the forgoing and security therefor, and all of Grantors' and Borrowers' present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this Security Instrument as the "Property."

    **20. Fixture Filing.** This Security Instrument constitutes a "fixture filing" for the purposes of the UCC against all of the Property which is or is to become fixtures per the UCC.

    **21. Use of Property; Compliance With Law.** Grantors, Borrowers, or Borrower Parties shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Grantors and Borrowers shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

    **22. Assignment of Leases.** Upon Lender's request after default, Grantors and Borrowers shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

    **23. Assignment of Rents; Appointment of Receiver; Lender In Possession.** Grantors and Borrowers absolutely and unconditionally assign and transfer to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Grantors and Borrowers authorize Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

agents. However, Grantors, Borrowers, or Borrower Parties shall receive the Rents until (i) Lender has given Grantors, Borrowers, and Borrower Parties notice of default pursuant to Sections 12 and 25 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notices of default to Grantors, Borrowers or Borrower Parties:  (i) all Rents received by Grantors, Borrowers, or Borrower Parties shall be held by Grantors or Borrowers as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Grantors and Borrowers agree that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorneys' fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Grantors, Borrowers, and Borrower Parties to Lender secured by the Security Instrument pursuant to Section 7 of the Security Instrument.

Grantors and Borrowers represent and warrant that none of Grantors, Borrowers, or Borrower Parties have executed any prior assignment of the Rents and have not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Grantors, Borrowers or Borrower Parties. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**24. Cross-Collateralization.** In addition to the Notes, all liens, security interests, assignments, suretyship obligations, stock pledges, rights and remedies granted to Lender in any loan document or agreement secure all obligations, debts and liabilities, plus interest thereon, of any or all Borrowers to Lender, as well as claims by Lender against any or all Borrowers, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Notes, whether voluntary or otherwise, whether due or not due, direct or indirect, absolute or contingent, whether any or all Borrowers may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

**25. Cross-Default Provision.** Grantors', Borrowers', or Borrower Parties' default or breach under any note or agreement in which Lender has an interest, including but not limited to the Notes, shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

NON-UNIFORM COVENANTS.  Grantors, Borrowers, and Lender further covenant and agree as follows:

**26. Acceleration; Remedies.  Following Grantors', Borrowers', or Borrower Parties' breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 15 unless Applicable Law provides otherwise) and prior to acceleration or Lender's exercise of any remedy, Lender shall give at least sixty (60) days written notice to Grantors, Borrowers, and Borrower Parties prior to exercising any remedy, unless otherwise provided under this Deed of Trust; provided, however, if such default cannot be cured within the 60-day period and Grantors, Borrowers, or Borrower Parties have commenced and diligently pursues the cure of the related default, Grantors, Borrowers, and Borrower Parties shall have such time as is commercially reasonably necessary for Grantors, Borrowers, and Borrower Parties to complete the cure,**

CALIFORNIA–Farmer Mac UNIFORM INSTRUMENT (Open End)

13

provided Lender is not materially prejudiced from such delay. Lender shall use commercially reasonable standards to determine if it is materially prejudiced by the delay. The notice shall specify: (a) the default; (b) the action required to cure the default; (c) the date by which the default must be cured. The notice shall further inform Grantors, Borrowers, and Borrower Parties of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Grantors, Borrowers, or Borrower Parties to acceleration and sale. If the default is not cured on or before the date specified in the notice or such extended period for defaults which cannot be cured within the 60-day period, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 25, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Grantors and Borrowers and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Grantors and Borrowers, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**27. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**28. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Grantors/Borrowers, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**29. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

**30. Other California State Specific Provisions.**

(a)     In addition to the provisions of any Loan agreement, Grantors and Borrowers further agree that, if Lender accepts a guaranty of only a portion of the Indebtedness, Grantors and Borrowers waive any right under California Civil Code Section 2822(a) to designate the portion of the Indebtedness which shall be satisfied by a guarantor's partial payment.

(b)     Except for matters covered by an O&M Program or matters described in the Environmental Indemnity Agreement, Grantors and Borrowers shall not cause or permit any lien (whether or not such lien has priority over the lien created by this Security Instrument) upon the Property imposed pursuant to any Environmental Laws.

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

14

Any such lien shall be considered a Prohibited Activity or Condition (as may also be contemplated in any environmental indemnity agreement).

(c)    Grantors and Borrowers represent and warrant to Lender that, except as previously disclosed by Grantors, Borrowers, or Borrower Parties to Lender in writing:

(1)    at the time of acquiring the Property, Grantors and Borrowers undertook all appropriate inquiry into the previous ownership and uses of the Property consistent with good commercial or customary practice and no evidence or indication came to light which would suggest that the Property has been or is now being used for any Prohibited Activities or Conditions; and

(2)    the Property has not been designated as "hazardous waste property" or "border zone property" pursuant to Section 25220, et seq., of the California Health and Safety Code.

The representations and warranties in this Security Instrument shall be continuing representations and warranties that shall be deemed to be made by Grantors and Borrowers throughout the term of the Loan, until the Indebtedness has been paid in full.

(d)    Without limiting any of the remedies provided in this Security Instrument, Grantors and Borrowers acknowledge and agree that certain provisions in this Security Instrument are environmental provisions (as defined in Section 736(f)(2) of the California Code of Civil Procedure) made by Grantors and Borrowers relating to the real property security (the "**Environmental Provisions**"), and that to the extent applicable, Grantor's failure to comply with any of the Environmental Provisions will be a breach of contract that will entitle Lender to pursue the remedies provided by Section 736 of the California Code of Civil Procedure for the recovery of damages and for the enforcement of the Environmental Provisions.

**31. Recourse.** Each of the Grantors, Borrowers, and Borrower Parties shall be fully and individually liable on a joint and several basis for the full repayment of all amounts due under the Loan. However, in the event of foreclosure of this Security Agreement or other enforcement of the Note or Loan, Lender, and any subsequent holder of this Security Agreement, shall not be able to pursue or obtain any deficiency against any of the Grantors with respect to the Loan.

Except as otherwise stated herein, nothing in the provisions of this Amendment shall be deemed in any way to affect the priority of the Original Security Instrument over any other lien, charge, encumbrance or conveyance, or to release or change the liability of any party who may be liable under the Note.

IN WITNESS WHEREOF, Borrower has signed and sealed this Security Instrument.

*[remainder of page intentionally left blank – signature page follows]*

BY SIGNING BELOW, Grantors and Borrowers accept and agree to the terms and covenants contained in this Security Instrument and in any Rider executed by Grantors and Borrowers.

**BORROWERS:**

**COPPER AVENUE INVESTMENTS, LLC,**
a California limited liability company

By:  Darius Assemi
Its:  Manager

**CANTUA ORCHARDS, LLC**
a California limited liability company

By: Farshid Assemi 1997 Ranch Trust, its
Member

Farid Assemi, its Trustee

By: Farid Assemi 1997 Ranch Trust, its Member

Farshid Assemi, its Trustee

By: Farid Assemi Revocable Trust dated January
24, 2007, its Member

Farid Assemi, its Trustee

By: Darius Assemi Revocable Trust dated January
30, 2007

Darius Assemi, its Trustee

By: Farshid Assemi and Sonia Rosemary Assemi
Revocable Trust dated January 31, 2007, its
Member

By: Farshid Assemi, its Co-Trustee

By: Sonia Assemi, its Co-Trustee

**LINCOLN GRANTOR FARMS, LLC,**
a California limited liability company

By: Neema Assemi
Its: Manager

**GRADON FARMS, LLC,**
a California limited liability company

By: Darius Assemi
Its: Manager

**ACAP FARMS, LLC,**
a California limited liability company

By: Farshid Assemi
Its: Manager

**LENDER:**
**U.S. Bank National Association, as**
**Custodian/Trustee for Federal Agricultural**
**Mortgage Corporation programs**

By: Heather Wright, Manager–Closing & Servicing
of Federal Agricultural Mortgage Corporation
Attorney-in-Fact for U.S. Bank National Association,
as Custodian/Trustee for Federal Agricultural
Mortgage Corporation programs

---

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

# ACKNOWLEDGMENT

A notary public or other officer completing this
certificate verifies only the identity of the individual
who signed the document to which this certificate is
attached, and not the truthfulness, accuracy, or
validity of that document.

State of California
County of _____Fresno_____ )


On _Feb. 1, 2021_____ before me, _L. Diaz, Notary Public_____

(insert name and title of the officer)

personally appeared _Sonia Assemi, Darius Assemi_____,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

L. DIAZ
Notary Public - California
Fresno County
Commission # 2398671
My Comm. Expires Apr 20, 2026

Signature _____   **(Seal)**

17

# ACKNOWLEDGMENT

> A notary public or other officer completing this
> certificate verifies only the identity of the individual
> who signed the document to which this certificate is
> attached, and not the truthfulness, accuracy, or
> validity of that document.

State of California
County of _____ Fresno _____ )

On _Feb. 1, 2023_____ before me, _L. Diaz, Notary Public_____
                                   (insert name and title of the officer)

personally appeared _Farid Assemi, Farshid Assemi, Neema Assemi_,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

L. DIAZ
Notary Public - California
Fresno County
Commission # 2398671
My Comm. Expires Apr 20, 2026

Signature _____ **(Seal)**

18

A notary public or other officer completing this
certificate verifies only the identity of the individual
who signed the document to which this certificate
is attached, and not the truthfulness, accuracy, or
validity of that document.

STATE OF CALIFORNIA
COUNTY OF _____

On _____ before me, _____, personally appeared
**Neema Assemi, Manager of Lincoln Grantor Farms, LLC,** who proved to me on the basis of satisfactory evidence
to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he executed
the same in his authorized capacity, and that by his signature(s) on the instrument the person(s), or the entity upon
behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws
of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)
_____
Notary Public
Printed Name: _____
My commission expires: _____

A notary public or other officer completing this
certificate verifies only the identity of the individual
who signed the document to which this certificate
is attached, and not the truthfulness, accuracy, or
validity of that document.

STATE OF IOWA
COUNTY OF Polk

On Feb 3, 2023 before me, Megan Spalding , personally appeared
**Heather Wright, Manager- Closing & Servicing of Federal Agricultural Mortgage Corporation Attorney-In-
Fact for U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation
programs,** who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed
to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his
signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the
instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Megan Spalding_ (Seal)
_____
Notary Public
Printed Name: Megan Spalding
My commission expires: 6/3/2023

MEGAN SPALDING
Commission Number 716793
My Commission Expires
June 03, 2023

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

19

Exhibit "A"

Legal Description of Land

**PARCEL 1:**

. The West 20.15 acres of that portion of Lot 10 lying South of Laguna Canal, and all of Lots 11, 12, 13 in Section 10, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, in the County of Kings, State of California, as per map of the Laguna de Tache Grant thereof recorded in the Office of the County Recorder of Fresno County in Book 3 at Page 11 of Record of Surveys, together with that portion of 25th Avenue (abandoned) and 24 1/2 Avenue (abandoned) which would pass by a conveyance of said land under Sections 831 and 1112 of the Civil Code.

EXCEPTING THEREFROM such interest in a strip of land 50 feet wide lying between the Old Crescent Canal right of way and Lots 7 and 8 in said Section 10, as conveyed to Crescent Canal Company, a corporation, by Deed dated January 7, 1913 and recorded April 7, 1913 in Book 51 at Page 78 of Deeds, Kings County Records.

APN: 004-130-030

**PARCEL 2:**

Lots 1 and 2 lying North of the by-pass of Tulare Lake Basin Water Storage District, in Section 15, Township 18, Range 19 East, Mount Diablo Base and Meridian, as per map of Laguna De Tache Grant thereof recorded in the office of the County Recorder of Fresno County in Book 3 at Page 9 of Record of Surveys.

EXCEPTING THEREFROM any portion thereof lying within San Jose Subdivision as shown on that certain map recorded in Book 3 Page 4 of Licensed Surveyor Plats.

APN: 004-140-012 (Portion)

**PARCEL 3:**

Those portions of Lots 2 and 3 lying West of canal, all of Lots 3A, 3B, 4, 5, 6, 6A, the well reserved in the Northeast corner of said Lot 6, all of Lots 12, 13 and 13A, in Section 15, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of San Jose Subdivision, recorded March 11, 1930 in Book 3 Page 4, of Licensed Surveyor Plats, Kings County Records.

EXCEPTING THEREFROM all oil, gas and other hydrocarbon substances in or under said property as previously reserved of record.

APN: 004-140-012 (Portion)

Parcel 3A: One acre in the Northwest corner North & West of Kings River Bypass Canal, in Lot 7 in Section 15, T18S, R19E, Mount Diablo Base and Meridian, as shown on Map Laguna de Teche Grant on file with the office of the Kings County Surveyor in Map Book 70.

**PARCEL 4:**

Lots 14, 15 and 16, and that portion of Lot 17 lying North of the bypass of Tulare Lake Basin Water Storage District, in Section 10, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, as per map of the Laguna de Tache Grant thereof recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 11 of Record of Surveys.

EXCEPTING THEREFROM all oil, gas and other hydrocarbon substances in or under said property as previously reserved of record.

APN: 004-140-002

20

PARCEL 5:

The Westerly 361.5 feet of the Southerly 361.5 feet of Lot 14 in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of Laguna de Tache Grant recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 10, of Record of Surveys.

APN: 004-230-014

PARCEL 6:

Lots 5, 6, 6A, 11 and 12, in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of San Jose Subdivision, recorded March 11, 1930 in Book 3 at Page 4 of Licensed Surveyor Plats, Kings County Records.

EXCEPTING THEREFROM all oil, gas and other hydrocarbons minerals now or at any time hereafter situate therein and thereunder said land, as saved, excepted and reserved in Deed recorded May 22, 1945 in Book 329, Page 29, Official Records, as Document No. 3227.

APN: 004-230-026 (Portion)

PARCEL 7:

Lots 13 and 14 in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of Laguna de Tache Grant recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 10, of Record of Surveys, Fresno County Records, lying West of the strip of land described in the Deed from Summit Lake Investment Company, a corporation to Tulare Basin Water Storage District, recorded August 8, 1928 in Book 35 at Page 433, of Official Records, Kings County Records.

EXCEPTING THEREFROM the Westerly 361.5 feet of the Southerly 361.5 feet of Lot 14.

ALSO EXCEPTING THEREFROM such interest in a portion of said Lot 13, conveying to the County of Kings, by Deed dated June 13, 1960 and recorded August 18, 1960 in Book 763 Page 880, of Official Records, as Document No. 8922, described as follows:

Beginning at a point distant North 84° 30' 08" East 860.48 feet from the Southwest corner of said Section 22; thence North 3° 29' 59" West 10 feet; thence along a curve to the right, with a radius of 760.00 feet, through an angle of 94° 48' a distance of 1257.48 feet, with a chord that bears North 46° 05' 59" West, 1118.87 feet; thence South 1° 18' 01" West, 550.00 feet; thence South 88° 41' 59" East 125.10 feet; thence, a long curve to the left, with a radius of 840.00 feet, through an angle of 12° 59' 48" a distance of 190.54 feet, with a cord that bears South 46° 05' 59" East, 190.13 feet; thence South 3° 29' 59" East, 135.10 feet; thence North 86° 30' 01" East, 550.00 feet to a point of beginning.

APN: 004-230-026 (Portion)
        004-230-027

21

PARCEL 8:

That portion of Lot 15 in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, in the County of Kings, State of California, according to Map of Laguna de Tache Grant recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 10, of Record of Surveys, lying West of the strip of land described in the Deed from Summit Lake Investment Company, a corporation to Tulare Basin Water Storage District, recorded August 8, 1928 in Book 35 at Page 433, of Official Records, Kings County Records.

APN: 004-230-013

The land referred to below is situated in the unincorporated area of the County of Fresno, State of California:

PARCEL 9:

The North half of the Norhteast Quarter of Section 22, Township 16 South, Range 14 East, Mount Diablo Base and Meridian, according to the Plat thereof.

EXCEPTING THEREFROM the North 50 feet, as conveyed to the County of Fresno in Deed recorded April 22, 1970 in Book 5780, Page 78 of Official Records.

APN: 038-141-21S

PARCEL 10:

The Northwest quarter of Section 8, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof;

EXCEPTING THEREFROM an undivided one-half interest in and to all oil, gas, minerals and other hydrocarbon substances now or at any time situate in and under said land, as reserved in the deed from R. T. Hughes and Bess L. Hughes, husband and wife, to John H. Edgar and Ruby Dale Edgar, husband and wife, as joint tenants, July 10, 1950, recorded January 24, 1950 in Book 2829 Page 69 of Official Records, Document No. 4385.

ALSO EXCEPTING THEREFROM an undivided one-fourth interest in and to all oil, gas and other hydrocarbons and minerals now or at any time hereinafter situate therein and thereunder, together with all easements and rights necessary or convenient for the production, storage and transportation thereof and the exploration and testing of the said real property, and also the right to drill for, produce and use water from the said real property in connection with drilling or mining operations thereon, as reserved in the deed from Raymond Dale Johnson to Bernie Thurman and James V. Gregory, as Trustees for Tanya Marie Marshall under that certain irrevocable Trust Agreement dated May 30, 1974, recorded on June 25, 1974 as Document No. 47802.

APN: 040-020-18-S

22

Fresno County Recorder
Paul Dictos, CPA

**2023-0011359**

Recorded at the request of:
CSC, LOGAN

02/08/2023 01:45 36
Titles: 1      Pages: 23
Fees: $85.00
CA SB2 Fees:$75.00
Taxes:  $0.00
Total:  $160.00

Recording Requested By:
Conterra Ag Capital

After Recording Return To:
Att: Alison
Conterra Ag Capital
**5465 Mills Civic Parkway, Ste. 201
West Des Moines, IA 50266
515-564-5147**

[Space Above This Line For Recording Data]

# AMENDED AND RESTATED DEED OF TRUST
## Security Agreement, Assignment of Rents and Fixture Filing

Loan    1674

This Amended and Restated Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing (this "Amendment", and, as further defined below, this **"Security Instrument"**) is made and entered into as of _February_ _2_, 2023, is granted by Copper Avenue Investments, LLC, a California limited liability company, ACAP Farms, LLC, a California limited liability company, Lincoln Grantor Farms, LLC, a California limited liability company, Gradon Farms, LLC, a California limited liability company, and Cantua Orchards, LLC, a California limited liability company, whose address is 5260 N. Palm Avenue, Suite 421 Mail Stop M, Fresno CA 93704 the trustors under this Security Instrument, **("Borrower")**, in favor of Old Republic Title Company **("Trustee")**, for the benefit of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs, whose address is 1133 Rankin Street, Suite 100, St. Paul, Minnesota 55116 **("Lender")**, and amends and restates the Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing dated as of October 11, 2019, and recorded as Document No. 20190123387 on October 15, 2019, with the Fresno County Clerk - Recorder in the Official Records, Fresno County, as affected by the Assignment of Deed of Trust dated as of October 11, 2019, and recorded as Document No. 20190123388 on October 15, 2019 **with the Fresno County Clerk - Recorder in the Official Records, Fresno County,** the Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing dated as of October 11, 2019, and recorded as Document No. 1917421 on October 15, 2019, with the Kings County Clerk - Recorder in the Official Records, Kings County, as affected by the Assignment of Deed of Trust dated as of October 11, 2019, and recorded as Document No. 1917422 on October 15, 2019 **with the Kings County Clerk - Recorder in the Official Records, Kings County.**

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in certain Sections of this document.  Certain rules regarding the usage of words used in this document are also provided in Section 13.

**(A) "Security Instrument"** means this document, which is dated ~~January~~ _February_ _2_ 2023, together with all Riders to this document.

**(B) "Lender"** is **U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs.** Lender's address is **1133 Rankin Street, Ste. 100, St Paul, MN 55116.** Lender is the grantee under this Security Instrument.

---

CALIFORNIA–Farmer Mac UNIFORM INSTRUMENT (Open End)

1

(C) "**Borrowers**" are Copper Avenue Investments, LLC, a California limited liability company, ACAP Farms, LLC, a California limited liability company, Lincoln Grantor Farms, LLC, a California limited liability company Gradon Farms, LLC, a California limited liability company, and Cantua Orchards, LLC, a California limited liability company.  Borrowers are trustors under this Security Instrument.  "**Borrower Parties**" are Borrowers and Maricopa Orchards, LLC, a California limited liability company.  Borrower Parties' address is **5260 N. Palm Avenue, Suite 421 Mail Stop M, Fresno CA 93704.**

(D) "**Trustee**" is Old Republic Title Company.

(E) "**Note**" means (i) Borrower Parties promissory note dated October 11, 2019, maturing on October 11, 2039, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of $10,258,632, plus interest, (ii) Borrower Parties promissory note dated October 11, 2019, maturing on October 11, 2044,  payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of $5,297,232, plus interest, (iii) a promissory note made by C&A Farms, LLC and Whitesbridge Farms, LLC dated January 8, 2018, maturing on July 1, 2033,  payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal of $5,500,000.00, plus interest; (iv) an open ended promissory note made by C&A Farms, LLC and Whitesbridge Farms, LLC dated January 8, 2018, and subsequently converted on June 27, 2018, maturing on July 1, 2038, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of up to $1,500,000.00, plus interest; (v) an open ended promissory note made by Maricopa Orchards, LLC, C&A Farms, LLC, Willow Avenue Investments, LLC, Assemi Brothers, LLC, a California limited liability company and Whitesbridge Farms, LLC dated December 14, 2020, maturing on January 1, 2026, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of up to $12,500,000.00, plus interest; and (vi) an open ended promissory note made by Maricopa Orchards, LLC, C&A Farms, LLC, Willow Avenue Investments, LLC, Assemi Brothers, LLC, a California limited liability company and Whitesbridge Farms, LLC dated December 14, 2020, maturing on January 1, 2026, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of up to $12,500,000.00, plus interest; and (vii) a promissory note made by Maricopa Orchards, LLC, C & A Farms, LLC, Willow Investments, LLC, Copper Avenue Investments, LLC, ACAP Farms, LLC, Lincoln Grantor Farms, LLC, Cantua Orchards, LLC, Gradon Farms, LLC, dated January 27, 2023, maturing on January 13, 2026, in the original principal amount of $7,400,000.00, plus interest.  Borrower Parties have promised to pay this debt in regular Periodic Payments and to pay Notes in full not later than maturity date of each Note.

(F) "**Property**" means the property that is described below under the heading "Transfer of Rights in the Property."

(G) "**Loan**" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) "**Riders**" mean all Riders to this Security Instrument that are executed by Grantors and Borrowers Whether recorded or unrecorded.  The following Riders are to be executed by Grantors and Borrowers:

☐ Irrigation Equipment Rider                      ☐ Water Rights Rider
☐ Financial Information and Covenants Rider       ☐ Permitted Prior Encumbrance Rider
☐ Mortgage Insurance Rider                        ☐ Adjustable Rate Rider
☐ Other(s):   **Cross   Default   Rider,   Cross Collateralization Rider**

**(I)  "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J)  "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K)  "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 4) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(L)  "Periodic Payment"** means the amount due for principal and interest under the Note.

**(M)  "Successor in Interest of Grantors and Borrowers"** means any party that has taken title to the Property, whether or not that party has assumed obligations of any of the Grantors or Borrowers under this Security Instrument or of Borrower Parties under the Note.

**TRANSFER OF RIGHTS IN THE PROPERTY**
This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Grantors' and Borrowers' covenants and agreements under this Security Instrument and of Borrower Parties under the Note. For this purpose, Grantors and Borrowers irrevocably grant and convey to Trustee, in trust, with power of sale, the following described property located in the **Counties of Kings and Fresno, California:**

>       See Exhibit "A" attached hereto and made a part hereof.

which currently has the address of:

<div align="center">

**1,110 +/- Acres**
**Kings County and Fresno County, California**
("Property Address"):

</div>

subject only to those matters set forth in the Permitted Prior Encumbrance Rider, if said rider is attached (hereafter "Permitted Prior Encumbrances");

>       **TOGETHER WITH** all buildings, improvements, equipment, fixtures and permanent plantings affixed, attached to or incorporated in the real property, and all additions, replacements, and improvements hereafter made thereto or placed therein or thereon; all rights-of-way, easements, rents, issues, profits, income, proceeds and general intangibles there from, tenements, hereditaments, remainders, reversions, privileges and appurtenances thereunto belonging, however evidenced, which are used or enjoyed in connection with the real property now or hereafter owned or belonging to the Grantors or Borrowers or which hereafter may be acquired by Grantors or Borrowers, excluding, however, the growing crop;

>       **TOGETHER WITH** all water rights appurtenant to the real property, whether such water rights are riparian, appropriative or otherwise, along with all ditch and ditch rights and any shares of stock, licenses, permits and contracts

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

<div align="center">3</div>

evidencing such water or ditch rights appurtenant to the property, and all wells, reservoirs, dams, embankments or fixtures located on the real property;

**TOGETHER WITH** all windmills, pumps, irrigation equipment, motors, engines, and devices of every kind, with the exception of rolling stock, now or hereafter attached or affixed to the real property, or for stock watering or domestic purposes thereon, and all grain bins and storage bins, which are owned by Grantors or Borrowers and which are attached or affixed to the real property in **Kings and Fresno Counties, California**, described above together with all additional accessions, replacements, improvements, repairs and substitutions to said property and the proceeds thereof and all other fixtures now or hereafter attached or affixed to the real property, all of which are declared to be appurtenant to said real property, or incident to the ownership thereof;

**TOGETHER WITH** all judgments, awards of damages, settlements and payments or security (i) hereafter made as a result of or in lieu of any taking of all or any part of the real property under the power of eminent domain or for any damage to the real property and/or the improvements located thereon, or any part thereof, and (ii) hereafter made for any damage to the real property and/or the improvements located thereon, or any part thereof resulting from exercise of or attempted exercise of mining rights or claims, however reserved or asserted, and resulting from the disturbance of any of the surface of the real property. Grantors and Borrowers do hereby covenant and agree that neither Grantors nor Borrowers will not give such consent as may be required of the owner for mining or other surface disturbance by the terms of any patent, deed, statute, law or otherwise, without the prior written consent of Lender;

**TOGETHER WITH** all proceeds of and any unearned premiums on any insurance policies covering the real property and/or the improvements located thereon, including, without limitation, the right to receive and apply the proceeds of any insurance judgments, or settlements made in lieu thereof, for damage to the real property and/or the improvements located thereon or the indebtedness secured thereby;

**TOGETHER WITH** all contract rights, chattel paper, documents, accounts and general intangibles, rights to performance, entitlement to payment in cash or in kind, or any other benefits under any current or future governmental program which pertain to the real property, whether now or hereafter existing or acquired, excluding crop receivables;

**TOGETHER WITH** all cash and noncash proceeds of the conversion, voluntary or involuntary, of any of the foregoing;

**TOGETHER WITH** any and all of Grantors' or Borrowers' right, title, and/or interest in any and all system memberships and/or ownership certificates in any non-municipal water sewer systems now or in the future serving said property.

All replacements and additions shall also be covered by this Security Instrument.

All of the foregoing is referred to in this Security Instrument as the "Property."

GRANTORS AND BORROWERS COVENANT that Grantors and Borrowers are lawfully seized of the estate hereby conveyed and have the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record and specifically those permitted prior encumbrances, if any, set forth in the Permitted Prior Encumbrances Rider, if said rider is attached to this Security Instrument. Grantors and Borrowers warrant and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property and fixtures.

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

4

UNIFORM COVENANTS. Grantors, Borrowers, and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Prepayment Charges, Yield Maintenance Premiums and Late Charges.** Grantors, Borrowers, and/or Borrower Parties shall pay when due the principal of, and interest on, the debt evidenced by the Note and any yield maintenance premiums, any prepayment charges and late charges due under the Note. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 12. Lender may return any payment or partial payment if the payment or partial payment is insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payment in the future. No offset or claim which Grantors or Borrowers might have now or in the future against Lender shall relieve Grantors or Borrowers from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Unless required otherwise by Applicable Law, payments will be applied as set forth under the Note.

If Lender receives a payment from Grantors, Borrowers and/or Borrower Parties for a delinquent Periodic Payment that includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Grantors, Borrowers and/or Borrower Parties to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Charges; Liens.** Excluding liens associated with operating lines of credit that are secured by the growing crop and other personal property ("Crop Loan"), Grantors and Borrowers shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any.

Grantors and Borrowers shall promptly discharge any lien which has priority over this Security Instrument unless Grantors and Borrowers: (a) agree in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Grantors and Borrowers are performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Grantors and Borrowers a notice identifying the lien. Within 10 days of the date on which that notice is given, Grantors and Borrowers shall satisfy the lien or take one or more of the actions set forth above in this Section 3.

Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender, defined below, on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances. Lender may require Grantors, Borrowers and/or Borrower Parties to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**4. Property Insurance.** Grantors and Borrowers shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Grantors and Borrowers subject to Lender's right to disapprove Grantors' and Borrowers' choice, which right shall not be exercised unreasonably. Lender may require Grantors and Borrowers to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Grantors and Borrowers shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Grantors and Borrowers.

If Grantors or Borrowers fail to maintain any of the coverages described above, such failure shall constitute a default under the terms of this Security Instrument and the Loan. Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Grantors or Borrowers, Grantors' or Borrowers' equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Grantors and Borrowers acknowledge that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Grantors or Borrowers could have obtained. Any amounts disbursed by Lender under this Section 4 shall become additional debt of Grantors, Borrowers, and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Grantors and Borrowers requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Grantors and Borrowers shall promptly give to Lender all receipts of paid premiums and renewal notices. If Grantors or Borrowers obtain any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Grantors and Borrowers shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Grantors or Borrowers. Unless Lender and Grantors and Borrowers otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Grantors, Borrowers or Borrower Parties any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Grantors, Borrowers, or Borrower Parties shall not be paid out of the insurance proceeds and shall be the sole obligation of Grantors, Borrowers, and Borrower Parties. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Grantors, Borrowers, and Borrower Parties. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Grantors or Borrowers abandon the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If neither Grantors nor Borrowers respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 25 or otherwise, Grantors and Borrowers hereby assign to Lender (a) Grantors', Borrowers', and Borrower Parties' rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Grantors' or Borrowers' rights (other than the right to any refund of unearned premiums paid by Grantors, Borrowers, or Borrower Parties) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

6

Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**5. Preservation, Maintenance and Protection of the Property; Inspections.** Grantors and Borrowers shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property, excluding ordinary wear and tear, ordinary farming practices and normal maturity of any permanent crop. Grantors and Borrowers shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 4 that repair or restoration is not economically feasible, Grantors and Borrowers shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Grantors and Borrowers shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Grantors and Borrowers are not relieved of Grantors' or Borrowers' obligations for the completion of such repair or restoration.

Grantors and Borrowers will operate the Property in a good and workmanlike manner and in accordance with all Applicable Law and will pay all fees and charges of any kind in connection therewith. Grantors and Borrowers will use good farming and animal husbandry practices.

Lender or its agent may make reasonable entries upon and inspections of the Property with forty-eight (48) hours' advance written notice. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Grantors and Borrowers notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**6. Loan Application.** Grantors and Borrowers shall be in default if, during the Loan application process, Grantors, Borrowers, or Borrower Parties or any persons or entities acting at the direction of Grantors, Borrowers, or Borrower Parties or with Grantors', Borrowers', or Borrower Parties' knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan.

**7. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** Subject to any subordination or Intercreditor agreement entered into between Lender and the Crop Loan lender, and provided notice pursuant to Section 23 has been given to Grantors and Borrowers, if (a) Grantors or Borrowers fail to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Grantors or Borrowers have abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding, (d) perform any farming operations related to the planting, growing, maintenance, and harvesting of crops located on the Property, and (e) perform any ranching operations related to any animals located on the Property. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 7, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 7. Lender may perform these or any other actions it deems necessary in Lender's sole discretion to preserve the value of the Property, and/or assign to others the right to do same on behalf of Lender. Lender may make advances under this security instrument or other instrument providing security for the Note, to protect the Lender's interest in this security instrument or other instrument providing security for the Note from loss of value or damage. Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate indicated in the Note shall become an obligation due and owing under the terms of the Note immediately upon the date advanced by Lender and is an obligation of the Borrower secured by the security instrument or other instrument providing security for the Note.

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

7

Any amounts disbursed by Lender under this Section 7 shall become additional debt of Grantors, Borrowers, and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Grantors, Borrowers and/or Borrower Parties requesting payment.

If this Security Instrument is on a leasehold, Grantors and Borrowers shall comply with all the provisions of the lease. Grantors and Borrowers shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Grantors and Borrowers shall not, without the express written consent of Lender, alter or amend the ground lease. If Grantors or Borrowers acquire fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**8. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Grantors, Borrower, or Borrower Parties any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Grantors, Borrowers, or Borrower Parties. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Grantors, Borrowers, or Borrower Parties.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Grantors and Borrowers and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Grantors and Borrowers.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Grantors, Borrowers, Borrower Parties, and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Grantors or Borrowers, or if, after notice by Lender to Grantors and Borrowers that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Grantors, Borrowers, and Borrower Parties fail to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Grantors, Borrowers, or Borrower Parties Miscellaneous Proceeds or the party against whom Grantors, Borrowers or Borrower Parties has a right of action in regard to Miscellaneous Proceeds.

Grantors, Borrowers, and Borrower Parties shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or material impairment to the value of Lender's interest in the Property or rights under this Security Instrument. Grantors, Borrowers, and Borrower Parties can cure such a default and, if acceleration has occurred, reinstate as provided in Section 16, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds

CALIFORNIA—Farmer Mac UNIFORM INSTRUMENT (Open End)

8

of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**9. Grantors and Borrowers Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Grantors and Borrowers or any Successor in Interest of Grantors and Borrowers shall not operate to release the liability of Grantors and Borrowers or any Successors in Interest of Grantors and Borrowers. Lender shall not be required to commence proceedings against any Successor in Interest of Grantors and Borrowers or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Grantors and Borrowers or any Successors in Interest of Grantors and Borrowers. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from Borrower, third persons, entities or Successors in Interest of Guarantors or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**10. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Grantors and Borrowers covenant and agree that Grantors' and Borrowers' obligations and liability shall be joint and several. Subject to the provisions of Section 15, any Successor in Interest of Grantors and Borrowers who assumes Grantors' and Borrowers' obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Grantors' and Borrowers' rights and benefits under this Security Instrument. Grantors and Borrowers shall not be released from Grantors' and Borrowers' obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 17) and benefit the successors and assigns of Lender.

**11. Loan Charges.** Lender may charge Grantors and Borrowers fees for services performed in connection with Grantors', Borrowers' and Borrower Parties' default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Grantors and Borrowers shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Grantors and Borrowers which exceeded permitted limits will be refunded to Grantors and Borrowers. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Grantors, Borrowers or Borrower Parties. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Grantors', Borrowers', or Borrower Parties' acceptance of any such refund made by direct payment to Grantors, Borrowers, or Borrower Parties will constitute a waiver of any right of action Grantors, Borrowers, or Borrower Parties might have arising out of such overcharge.

**12. Notices.** All notices given by Grantors, Borrowers, Borrower Parties, or Lender in connection with this Security Instrument must be in writing. Any notice to Grantors, Borrowers, or Borrower Parties' in connection with this Security Instrument shall be deemed to have been given to such party when mailed by first class mail or when actually delivered to Borrowers' notice address if sent by other means. Notice to any one Grantor or Borrower shall constitute notice to all Grantors and Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Borrowers' Address unless Borrowers have designated a substitute notice address by notice to Lender. Grantors and Borrowers shall promptly notify Lender of Borrowers' change of address. If Lender specifies a procedure for reporting Borrowers' change of address, then Grantors or Borrowers shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Grantors and Borrowers. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

9

Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**13. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**14. Grantors' and Borrowers' Copy.** Grantors, Borrowers, and Borrower Parties shall be given one copy of the Note and of this Security Instrument.

**15. Transfer of the Property or a Beneficial Interest in Grantors, Borrowers, or Borrower Parties.** As used in this Section 15, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Grantors or Borrowers at a future date to a purchaser, excluding, however, easements granted by Grantors and Borrowers in the ordinary course of business.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Grantors, Borrowers, or Borrower Parties are not a natural person and a beneficial interest in Grantors, Borrowers, or Borrower Parties is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Grantors and Borrowers notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 12 within which Grantors, Borrowers, or Borrower Parties must pay all sums secured by this Security Instrument. If Grantors, Borrowers, or Borrower Parties fail to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Grantors, Borrowers, or Borrower Parties.

Grantors and Borrowers may request Lender to release one or more parcels that make up the Property, from time to time, from the lien of the Deed of Trust (the "Partial Release") and Lender agrees to not unreasonably withhold its consent to the Partial Release, subject to the prior satisfaction of the condition that Grantors and Borrowers shall submit a formal written request for the Partial Release (the "Request") not less than forty-five (45) days prior to the date upon which Grantors and Borrowers desire to close the transfer of the parcel subject to the Partial Release (the "Release Parcel"). No more than three (3) Requests shall be made per calendar year. The Request shall be sufficiently detailed and include all necessary documentation so as to allow Lender adequate time to process the Partial Release.

Notwithstanding the foregoing, upon the written request of Grantors and Borrowers, Lender will subordinate its interest in any personal property, crops growing or to be grown on the Property, crop receivables, and all governmental payments relating to such crops (the "Crops"), but not to trees, irrigation equipment, water rights and permanent plantings, to the security interest of an institutional lender (a "Crop Lender") for one or more loans made to Grantors, Borrowers, or Borrower Parties to finance the production of crops on all or any portion of the Property ("Operating Financing"). Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances.

**16. Right to Reinstate After Acceleration.** If Grantors, Borrowers, and Borrower Parties meet certain conditions, Grantors and Borrowers shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Grantors' or Borrowers' right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that

**CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)**

Grantors, Borrowers, and Borrower Parties: (a) pay Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred;  (b) cure any default of any other covenants or agreements; (c) pay all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) take such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Grantors', Borrowers' and Borrower Parties' obligations to pay the sums secured by this Security Instrument, shall continue unchanged.  Lender may require that Grantors, Borrowers, and Borrower Parties pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer.  Upon reinstatement by Grantors and Borrowers, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 15.

17. Sale of Note; Change of Loan Servicer; Notice of Grievance.  The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Grantors, Borrowers, or Borrower Parties.

Grantors, Borrowers, Borrower Parties, nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Grantors, Borrowers, Borrower Parties or Lender has notified the other parties (with such notice given in compliance with the requirements of Section 12) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action.  If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph.  The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 25 and the notice of acceleration given to Grantors, Borrowers, and Borrower Parties pursuant to Section 15 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 17.

18. Hazardous Substances.  As used in this Section 18:  (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials;  (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Grantors, Borrowers, and Borrower Parties shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property, other than the presence, use, storage and disposal of Hazardous Substances in quantities as necessary for Grantors', Borrowers' and Borrower Parties' normal farming operations located on the Property, all of which Grantors and Borrowers covenant have and will be used, stored, and disposed of in accordance with commercially reasonable farming practices and all applicable environmental laws. Grantors, Borrowers, and Borrower Parties shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property.  The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal farming and residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Grantors, Borrowers, and Borrower Parties shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Grantors, Borrowers, or Borrower Parties have actual knowledge,  (b) any Environmental Condition, including but not limited to, any spilling, leaking,

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

11

discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Grantors, Borrowers or Borrower Parties learn, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Grantors, Borrowers, and Borrower Parties shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup. Grantors and Borrowers agree to indemnify and hold Lender free and harmless from and against all loss, costs (including attorneys' fees and costs), damage (including consequential damages), and expenses Lender may sustain by reason of the assertion against Lender by any third-party of any claim in connection with Hazardous Substances on, in or affecting the Property. Grantors and Borrowers further agree that Lender shall have the right to join and participate in, as a party if it so elects, any legal proceedings or actions initiated in connection with any claims related to Hazardous Substances on, in or affecting the Property, and shall pay any such attorney fees and expenses Lender incurs in connection therewith.

**19. Additional Property Subject To The Security Instrument.** This Security Instrument also constitutes a security agreement within the meaning of the Uniform Commercial Code as adopted in the State of California (the "UCC"). In addition to the Property described in the Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in or on the Listed Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling, attached floor coverings, irrigation equipment (including, but not limited to, irrigation pipes and pumps, center irrigation pivots, pvc pipe, sprinklers, motors, well equipment, pumps and power units), livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom, and any substitutions or replacements therefore, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Grantors or Borrowers to collect or enforce payment thereof, as well as to enforce any guarantees of the forgoing and security therefor, and all of Grantors' and Borrowers' present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this Security Instrument as the "Property."

**20. Fixture Filing.** This Security Instrument constitutes a "fixture filing" for the purposes of the UCC against all of the Property which is or is to become fixtures per the UCC.

**21. Use of Property; Compliance With Law.** Grantors, Borrowers, or Borrower Parties shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Grantors and Borrowers shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**22. Assignment of Leases.** Upon Lender's request after default, Grantors and Borrowers shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**23. Assignment of Rents; Appointment of Receiver; Lender In Possession.** Grantors and Borrowers absolutely and unconditionally assign and transfer to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Grantors and Borrowers authorize Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

agents. However, Grantors, Borrowers, or Borrower Parties shall receive the Rents until (i) Lender has given Grantors, Borrowers, and Borrower Parties notice of default pursuant to Sections 12 and 25 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notices of default to Grantors, Borrowers or Borrower Parties: (i) all Rents received by Grantors, Borrowers, or Borrower Parties shall be held by Grantors or Borrowers as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Grantors and Borrowers agree that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorneys' fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Grantors, Borrowers, and Borrower Parties to Lender secured by the Security Instrument pursuant to Section 7 of the Security Instrument.

Grantors and Borrowers represent and warrant that none of Grantors, Borrowers, or Borrower Parties have executed any prior assignment of the Rents and have not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Grantors, Borrowers or Borrower Parties. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**24. Cross-Collateralization.** In addition to the Notes, all liens, security interests, assignments, suretyship obligations, stock pledges, rights and remedies granted to Lender in any loan document or agreement secure all obligations, debts and liabilities, plus interest thereon, of any or all Borrowers to Lender, as well as claims by Lender against any or all Borrowers, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Notes, whether voluntary or otherwise, whether due or not due, direct or indirect, absolute or contingent, whether any or all Borrowers may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

**25. Cross-Default Provision.** Grantors', Borrowers', or Borrower Parties' default or breach under any note or agreement in which Lender has an interest, including but not limited to the Notes, shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

NON-UNIFORM COVENANTS. Grantors, Borrowers, and Lender further covenant and agree as follows:
**26. Acceleration; Remedies. Following Grantors', Borrowers', or Borrower Parties' breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 15 unless Applicable Law provides otherwise) and prior to acceleration or Lender's exercise of any remedy, Lender shall give at least sixty (60) days written notice to Grantors, Borrowers, and Borrower Parties prior to exercising any remedy, unless otherwise provided under this Deed of Trust; provided, however, if such default cannot be cured within the 60-day period and Grantors, Borrowers, or Borrower Parties have commenced and diligently pursues the cure of the related default, Grantors, Borrowers, and Borrower Parties shall have such time as is commercially reasonably necessary for Grantors, Borrowers, and Borrower Parties to complete the cure,**

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

provided Lender is not materially prejudiced from such delay. Lender shall use commercially reasonable standards to determine if it is materially prejudiced by the delay. The notice shall specify: (a) the default; (b) the action required to cure the default; (c) the date by which the default must be cured. The notice shall further inform Grantors, Borrowers, and Borrower Parties of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Grantors, Borrowers, or Borrower Parties to acceleration and sale. If the default is not cured on or before the date specified in the notice or such extended period for defaults which cannot be cured within the 60-day period, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 25, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Grantors and Borrowers and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Grantors and Borrowers, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

27. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

28. **Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Grantors/Borrowers, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

29. **Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

30. **Other California State Specific Provisions.**

(a)      In addition to the provisions of any Loan agreement, Grantors and Borrowers further agree that, if Lender accepts a guaranty of only a portion of the Indebtedness, Grantors and Borrowers waive any right under California Civil Code Section 2822(a) to designate the portion of the Indebtedness which shall be satisfied by a guarantor's partial payment.

(b)      Except for matters covered by an O&M Program or matters described in the Environmental Indemnity Agreement, Grantors and Borrowers shall not cause or permit any lien (whether or not such lien has priority over the lien created by this Security Instrument) upon the Property imposed pursuant to any Environmental Laws.

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

Any such lien shall be considered a Prohibited Activity or Condition (as may also be contemplated in any environmental indemnity agreement).

(c)     Grantors and Borrowers represent and warrant to Lender that, except as previously disclosed by Grantors, Borrowers, or Borrower Parties to Lender in writing:

(1)     at the time of acquiring the Property, Grantors and Borrowers undertook all appropriate inquiry into the previous ownership and uses of the Property consistent with good commercial or customary practice and no evidence or indication came to light which would suggest that the Property has been or is now being used for any Prohibited Activities or Conditions; and

(2)     the Property has not been designated as "hazardous waste property" or "border zone property" pursuant to Section 25220, et seq., of the California Health and Safety Code.

The representations and warranties in this Security Instrument shall be continuing representations and warranties that shall be deemed to be made by Grantors and Borrowers throughout the term of the Loan, until the Indebtedness has been paid in full.

(d)     Without limiting any of the remedies provided in this Security Instrument, Grantors and Borrowers acknowledge and agree that certain provisions in this Security Instrument are environmental provisions (as defined in Section 736(f)(2) of the California Code of Civil Procedure) made by Grantors and Borrowers relating to the real property security (the "Environmental Provisions"), and that to the extent applicable, Grantor's failure to comply with any of the Environmental Provisions will be a breach of contract that will entitle Lender to pursue the remedies provided by Section 736 of the California Code of Civil Procedure for the recovery of damages and for the enforcement of the Environmental Provisions.

**31. Recourse.** Each of the Grantors, Borrowers, and Borrower Parties shall be fully and individually liable on a joint and several basis for the full repayment of all amounts due under the Loan. However, in the event of foreclosure of this Security Agreement or other enforcement of the Note or Loan, Lender, and any subsequent holder of this Security Agreement, shall not be able to pursue or obtain any deficiency against any of the Grantors with respect to the Loan.

Except as otherwise stated herein, nothing in the provisions of this Amendment shall be deemed in any way to affect the priority of the Original Security Instrument over any other lien, charge, encumbrance or conveyance, or to release or change the liability of any party who may be liable under the Note.

IN WITNESS WHEREOF, Borrower has signed and sealed this Security Instrument.

*[remainder of page intentionally left blank – signature page follows]*

---

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

BY SIGNING BELOW, Grantors and Borrowers accept and agree to the terms and covenants contained in this Security Instrument and in any Rider executed by Grantors and Borrowers.

**BORROWERS:**

**COPPER AVENUE INVESTMENTS, LLC,**
a California limited liability company

By:  Darius Assemi
Its:  Manager

**CANTUA ORCHARDS, LLC**
a California limited liability company

By: Farshid Assemi 1997 Ranch Trust, its
Member

Farid Assemi, its Trustee

By: Farid Assemi 1997 Ranch Trust, its Member

Farshid Assemi, its Trustee

By: Farid Assemi Revocable Trust dated January
24, 2007, its Member

Farid Assemi, its Trustee

By: Darius Assemi Revocable Trust dated January
30, 2007

Darius Assemi, its Trustee

By: Farshid Assemi and Sonia Rosemary Assemi
Revocable Trust dated January 31, 2007, its
Member

By: Farshid Assemi, its Co-Trustee

By: Sonia Assemi, its Co-Trustee

**LINCOLN GRANTOR FARMS, LLC,**
a California limited liability company

By:  Neema Assemi
Its:  Manager

**GRADON FARMS, LLC,**
a California limited liability company

By: Darius Assemi
Its:  Manager

**ACAP FARMS, LLC,**
a California limited liability company

By: Farshid Assemi
Its: Manager

**LENDER:**
**U.S. Bank National Association, as**
**Custodian/Trustee for Federal Agricultural**
**Mortgage Corporation programs**

By: Heather Wright, Manager- Closing & Servicing
of Federal Agricultural Mortgage Corporation
Attorney-in-Fact for U.S. Bank National Association,
as Custodian/Trustee for Federal Agricultural
Mortgage Corporation programs

---

> A notary public or other officer completing this
> certificate verifies only the identity of the individual
> who signed the document to which this certificate
> is attached, and not the truthfulness, accuracy, or
> validity of that document.

STATE OF CALIFORNIA

COUNTY OF _____

On _____ before me, _____, personally appeared Neema Assemi, Manager of Lincoln Grantor Farms, LLC, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

_____

Notary Public
Printed Name: _____
My commission expires: _____

> A notary public or other officer completing this
> certificate verifies only the identity of the individual
> who signed the document to which this certificate
> is attached, and not the truthfulness, accuracy, or
> validity of that document.

STATE OF IOWA

COUNTY OF __Polk__

On __Feb 3, 2023__ before me, __Megan Spalding__, personally appeared Heather Wright, Manager- Closing & Servicing of Federal Agricultural Mortgage Corporation Attorney-In-Fact for U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

_____

Notary Public
Printed Name: __Megan Spalding__
My commission expires: __6/3/2023__

> NOTARIAL SEAL
> IOWA
> MEGAN SPALDING
> Commission Number 716793
> My Commission Expires
> June 03, 2023

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT (Open End)

# ACKNOWLEDGMENT

A notary public or other officer completing this
certificate verifies only the identity of the individual
who signed the document to which this certificate is
attached, and not the truthfulness, accuracy, or
validity of that document.

State of California
County of _____ Fresno _____ )

On _Feb. 1, 2027_ before me, _L. Diaz, Notary Public_
(insert name and title of the officer)

personally appeared _Sonia Assemi, Darius Assemi_
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

L. DIAZ
Notary Public - California
Fresno County
Commission # 2398671
My Comm. Expires Apr 20, 2026

Signature _____     **(Seal)**

# ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of _____ Fresno _____ )

On Feb. 1, 2023 _____ before me, L. Diaz, Notary Public _____
(insert name and title of the officer)

personally appeared Farid Assemi, Farshid Assemi, Neema Assemi ,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

L. DIAZ
Notary Public - California
Fresno County
Commission # 2398671
My Comm. Expires Apr 20, 2026

Signature _____ (Seal)

## EXHIBIT "A"
## Legal Description of Land

PARCEL 1:

The West 20.15 acres of that portion of Lot 10 lying South of Laguna Canal, and all of Lots 11, 12, 13 in Section 10, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, in the County of Kings, State of California, as per map of the Laguna de Tache Grant thereof recorded in the Office of the County Recorder of Fresno County in Book 3 at Page 11 of Record of Surveys, together with that portion of 25th Avenue (abandoned) and 24 1/2 Avenue (abandoned) which would pass by a conveyance of said land under Sections 831 and 1112 of the Civil Code.

EXCEPTING THEREFROM such interest in a strip of land 50 feet wide lying between the Old Crescent Canal right of way and Lots 7 and 8 in said Section 10, as conveyed to Crescent Canal Company, a corporation, by Deed dated January 7, 1913 and recorded April 7, 1913 in Book 51 at Page 78 of Deeds, Kings County Records.

APN: 004-130-030

PARCEL 2:

Lots 1 and 2 lying North of the by-pass of Tulare Lake Basin Water Storage District, in Section 15, Township 18, Range 19 East, Mount Diablo Base and Meridian, as per map of Laguna De Tache Grant thereof recorded in the office of the County Recorder of Fresno County in Book 3 at Page 9 of Record of Surveys.

EXCEPTING THEREFROM any portion thereof lying within San Jose Subdivision as shown on that certain map recorded in Book 3 Page 4 of Licensed Surveyor Plats.

APN: 004-140-012 (Portion)

PARCEL 3:

Those portions of Lots 2 and 3 lying West of canal, all of Lots 3A, 3B, 4, 5, 6, 6A, the well reserved in the Northeast corner of said Lot 6, all of Lots 12, 13 and 13A, in Section 15, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of San Jose Subdivision, recorded March 11, 1930 in Book 3 Page 4, of Licensed Surveyor Plats, Kings County Records.

EXCEPTING THEREFROM all oil, gas and other hydrocarbon substances in or under said property as previously reserved of record.

APN: 004-140-012 (Portion)

PARCEL 3A:

One acre in the Northwest corner North and West of Kings River Bypass Canal, in Lot 7 in Section 15, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, as shown on Map of Laguna de Teche Grant on file with the office of the Kings County Surveyor in Map Book Page 70.

APN: 004-140-005

PARCEL 4:

Lots 14, 15 and 16, and that portion of Lot 17 lying North of the bypass of Tulare Lake Basin Water Storage District, in Section 10, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, as per map of the Laguna de Tache Grant thereof recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 11 of Record of Surveys.

EXCEPTING THEREFROM all oil, gas and other hydrocarbon substances in or under said property as previously reserved of record.

APN:  004-140-002

PARCEL 5:

The Westerly 361.5 feet of the Southerly 361.5 feet of Lot 14 in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of Laguna de Tache Grant recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 10, of Record of Surveys.

APN:  004-230-014

PARCEL 6:

Lots 5, 6, 6A, 11 and 12, in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of San Jose Subdivision, recorded March 11, 1930 in Book 3 at Page 4 of Licensed Surveyor Plats, Kings County Records.

EXCEPTING THEREFROM all oil, gas and other hydrocarbons minerals now or at any time hereafter situate therein and thereunder said land, as saved, excepted and reserved in Deed recorded May 22, 1945 in Book 329, Page 29, Official Records, as Document No. 3227.

APN:  004-230-026 (Portion)

PARCEL 7:

Lots 13 and 14 in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of Laguna de Tache Grant recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 10, of Record of Surveys, Fresno County Records, lying West of the strip of land described in the Deed from Summit Lake Investment Company, a corporation to Tulare Basin Water Storage District, recorded August 8, 1928 in Book 35 at Page 433, of Official Records, Kings County Records.

EXCEPTING THEREFROM the Westerly 361.5 feet of the Southerly 361.5 feet of Lot 14.

ALSO EXCEPTING THEREFROM such interest in a portion of said Lot 13, conveying to the County of Kings, by Deed dated June 13, 1960 and recorded August 18, 1960 in Book 763 Page 880, of Official Records, as Document No. 8922, described as follows:

Beginning at a point distant North 84° 30' 08" East 860.48 feet from the Southwest corner of said Section 22; thence North 3° 29' 59" West 10 feet; thence along a curve to the right, with a radius of 760.00 feet, through an angle of 94° 48' a distance of 1257.48 feet, with a chord that bears North 46° 05' 59" West, 1118.87 feet; thence South 1° 18' 01" West, 550.00 feet; thence South 88° 41' 59" East 125.10 feet; thence, a long curve to the left, with a radius of 840.00 feet, through an angle of 12° 59' 48" a distance of 190.54 feet, with a cord that bears South 46° 05' 59" East, 190.13 feet; thence South 3° 29' 59" East, 135.10 feet; thence North 86° 30' 01" East, 550.00 feet to a point of beginning.

APN: 004-230-026 (Portion)
     004-230-027

PARCEL 8:

That portion of Lot 15 in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, in the County of Kings, State of California, according to Map of Laguna de Tache Grant recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 10, of Record of Surveys, lying West of the strip of land described in the Deed from Summit Lake Investment Company, a corporation to Tulare Basin Water Storage District, recorded August 8, 1928 in Book 35 at Page 433, of Official Records, Kings County Records.

APN: 004-230-013

The land referred to below is situated in the unincorporated area of the County of Fresno, State of California:

PARCEL 9:

The North half of the Northeast Quarter of Section 22, Township 16 South, Range 14 East, Mount Diablo Base and Meridian, according to the Plat thereof.

EXCEPTING THEREFROM the North 50 feet, as conveyed to the County of Fresno in Deed recorded April 22, 1970 in Book 5780, Page 78 of Official Records.

APN: 038-141-21S

//

//

PARCEL 10:

The Northwest quarter of Section 8, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof;

EXCEPTING THEREFROM an undivided one-half interest in and to all oil, gas, minerals and other hydrocarbon substances now or at any time situate in and under said land, as reserved in the deed from R. T. Hughes and Bess L. Hughes, husband and wife, to John H. Edgar and Ruby Dale Edgar, husband and wife, as joint tenants, July 10, 1950, recorded January 24, 1950 in Book 2829 Page 69 of Official Records, Document No. 4385.

ALSO EXCEPTING THEREFROM an undivided one-fourth interest in and to all oil, gas and other hydrocarbons and minerals now or at any time hereinafter situate therein and thereunder, together with all easements and rights necessary or convenient for the production, storage and transportation thereof and the exploration and testing of the said real property, and also the right to drill for, produce and use water from the said real property in connection with drilling or mining operations thereon, as reserved in the deed from Raymond Dale Johnson to Bernie Thurman and James V. Gregory, as Trustees for Tanya Marie Marshall under that certain irrevocable Trust Agreement dated May 30, 1974, recorded on June 25, 1974 as Document No. 47802.

APN: 040-020-18-S

Exhibit O

Laura Avila, Assessor-Recorder
Kern County Official Records

LB
2/13/2023
12:21 PM

Recorded Electronically by:
39N  Contera Holdings

Recording Requested By:

**Conterra Agricultural Capital, LLC**

After Recording Return To:

**Conterra Agricultural Capital, LLC**
**5465 Mills Civic Pkwy, Ste 201**
**West Des Moines, IA 50266**
**Alison Werts**
**515-564-5147**

**DOC #:** 223016523

223016523

| Stat Types: | 3 | Pages: | 28 |
|---|---|---|---|
| FEES | | | 147.00 |
| TAXES | | | .00 |
| OTHER | | | 225.00 |
| PAID | | | 372.00 |

[Space Above This Line For Recording Data]

# AMENDED AND RESTATED OPEN-END DEED OF TRUST
## (With Future Advance Clause)
## Security Agreement, Assignment of Rents and Fixture Filing

Loan: <sup>REDACTED</sup>2676
Loan: <sup>REDACTED</sup>2678

This Amended and Restated Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing (this "**Amendment**", and, as further defined below, this "**Security Instrument**") is made and entered into as of February 2, 2023, is granted by Maricopa Orchards, LLC, a California limited liability company, C&A Farms, LLC, a California limited liability company, and Willow Avenue Investments, LLC, a California limited liability company, the grantors and trustors under this Security Instrument whose address is **5260 N. Palm Ave., Ste. 421, Mail Stop M, Fresno, CA 93704** ("**Borrowers**"), in favor of Fidelity National Title Company ("**Trustee**"), for the benefit of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs, whose address is 1133 Rankin Street, Suite 100, St. Paul, Minnesota 55116 ("**Lender**"), and amends and restates the Open-Ended Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing dated as of December 14, 2020, and recorded as Document No. 220194250 on December 15, 2020, with the Kern County Assessor - Recorder in the Official Records, Kern County, as affected by the Assignment of Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing dated as of December 14, 2020, and recorded as Document No. 220194251 on December 15, 2020 with the Kern County Clerk - Recorder in the Official Records, Kern County.

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in certain Sections of this document. Certain rules regarding the usage of words used in this document are also provided in Section 13.

**(A)** "**Security Instrument**" means this document, together with all Riders, if any, to this document.

**(B)** "**Lender**" is U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs, whose address is **1133 Rankin Street, Suite 100, St. Paul, MN 55116**. Lender is the beneficiary under this Security Instrument.

CALIFORNIA–UNIFORM INSTRUMENT (Open End)

1

**(C)** "Borrowers" are Maricopa Orchards, LLC, a California limited liability company, C&A Farms, LLC, a California limited liability company, and Willow Avenue Investments, LLC, a California limited liability company. Borrowers are the grantors and trustors under this Security Instrument. "Borrower Parties" are Borrowers and Assemi Brothers, LLC, a California limited liability company and Whitesbridge Farms, LLC, a California limited liability company. Borrower Parties' address is 5260 N. Palm Ave., Ste. 421, Mail Stop M, Fresno, CA 93704.

**(D)** "Trustee" is Fidelity National Title Company.

**(E)** "Note" means (i) Borrower Parties an open ended promissory note dated December 14, 2020, maturing on January 1, 2026, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of up to $12,500,000.00, plus interest; and (ii) Borrower Parties open ended promissory note dated December 14, 2020 maturing on January 1, 2026, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of up to $12,500,000.00, plus interest; (iii) an open ended promissory note made by C&A Farms, LLC and Whitesbridge Farms, LLC dated January 8, 2018, and subsequently converted on June 27, 2018, maturing on July 1, 2038, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of up to $1,500,000.00, plus interest (iv) a promissory note made by C&A Farms, LLC and Whitesbridge Farms, LLC dated January 8, 2018, maturing on July 1, 2033, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal of $5,500,000.00, plus interest, (v) an open ended promissory note made by Maricopa Orchards, LLC, Copper Avenue Investments, LLC, ACAP Farms, LLC and Lincoln Grantor Farms, LLC dated October 11, 2019, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of up to $5,297,232.00, plus interest; (vi) a promissory note made by Maricopa Orchards, LLC, Copper Avenue Investments, LLC, ACAP Farms, LLC and Lincoln Grantor Farms, LLC dated October 11, 2019, maturing on October 11, 2039, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of $10,258,632.00, plus interest; (vii) a promissory note made by Maricopa Orchards, LLC, C & A Farms, LLC, Willow Investments, LLC, Copper Avenue Investments, LLC, ACAP Farms, LLC, Lincoln Grantor Farms, LLC, Cantua Orchards, LLC, Gradon Farms, LLC, dated January 27, 2023, maturing on January 13, 2026, in the original principal amount of $7,400,000.00, plus interest. Borrower Parties have promised to pay this debt in regular Periodic Payments and to pay Notes in full not later than **maturity date of each Note.**

**(F)** "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

**(G)** "Loans" means the debt evidenced by the Notes, plus interest, any prepayment charges and late charges due under the Notes, and all sums due under this Security Instrument, plus interest.

**(H)** "Riders" mean all Riders to this Security Instrument that are executed Borrowers or Borrower Parties, whether recorded or unrecorded. The following Riders are to be executed by Borrowers or Borrower Parties:

☐ Irrigation Equipment Rider                 ☐ Water Rights Rider

☐ Financial Information and Covenants Rider   ☐ Permitted Prior Encumbrance Rider

---

CALIFORNIA—UNIFORM INSTRUMENT (Open End)

2

☐  Mortgage Insurance Rider                    ☐  Adjustable Rate Rider

☐  Other(s):

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 4) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(L) "Periodic Payment"** means the amount due for principal and interest under the Notes.

**(M) "Successor in Interest of Borrowers"** means any party that has taken title to the Property, whether or not that party has assumed obligations of the Borrowers under this Security Instrument or of Borrower Parties under the Notes.

––––––––––––

**Open-End Mortgage.** This Security Instrument is given to secure the payment of the initial advance, with interest as provided in the Open-Ended Promissory Notes dated December 14, 2020, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of up to **$25,000,000.00**. Upon request of the Borrowers or Borrower Parties, the Lender may hereafter at any time after the Security Instrument is recorded and before the release and cancellation of this Security Instrument, make further advances to the Borrower Parties to the extent that the total unpaid loan indebtedness, exclusive of interest thereon, does not exceed the maximum amount of **$25,000,000.00** which may be outstanding; and any such further advances, with interest, shall be secured by this Security Instrument and shall be evidenced by the Open-Ended Notes. Provided, however, that the amount of principal secured by this Security Instrument and remaining unpaid shall not at the time of and including any such advance exceed the original principal sum secured hereby. Provided, further, that nothing herein stipulated shall limit the amounts that shall be secured hereby when advanced to protect the security or in accordance with covenants contained in this Security Instrument. The Borrowers covenant with the Lender to repay all such advances aforesaid, with interest, and to apply all other covenants and conditions of this Security Instrument to such future advances. Nothing in this paragraph shall be deemed to limit the terms of the paragraph below titled "Transfer of Rights in the Property," including the description therein of the Loans and other obligations secured by this Security Instrument.

**TRANSFER OF RIGHTS IN THE PROPERTY**
This Security Instrument secures to Lender: (i) the repayment of the Loans, and all renewals, extensions and modifications of the Notes; and (ii) the performance of Borrowers' covenants and agreements under this Security Instrument and of Borrower Parties under the Notes.  For this purpose, Borrowers irrevocably grant and convey to Trustee, in trust, with power of sale, the following described property located in the County of Kern, California:

       **See Exhibit "A" attached hereto and made a part hereof.**

CALIFORNIA--UNIFORM INSTRUMENT (Open End)

3

which currently has the address of:

**2,915.23 +/- Acres**
**Kern County, California**
**("Property Address"):**

subject only to those matters set forth in the Permitted Prior Encumbrance Rider, if said rider is attached (hereafter "Permitted Prior Encumbrances");

**TOGETHER WITH** all buildings, improvements, equipment, fixtures and permanent plantings affixed, attached to or incorporated in the real property, and all additions, replacements, and improvements hereafter made thereto or placed therein or thereon; all rights-of-way, easements, rents, issues, profits, income, proceeds and general intangibles there from, tenements, hereditaments, remainders, reversions, privileges and appurtenances thereunto belonging, however evidenced, which are used or enjoyed in connection with the real property now or hereafter owned or belonging to the Borrowers or which hereafter may be acquired by Borrowers, excluding, however, the growing crop;

**TOGETHER WITH** all water rights appurtenant to the real property, whether such water rights are riparian, appropriative or otherwise, along with all ditch and ditch rights and any shares of stock, licenses, permits and contracts evidencing such water or ditch rights appurtenant to the property, and all wells, reservoirs, dams, embankments or fixtures located on the real property;

**TOGETHER WITH** all windmills, pumps, irrigation equipment, motors, engines, and devices of every kind, with the exception of rolling stock, now or hereafter attached or affixed to the real property, or for stock watering or domestic purposes thereon, and all grain bins and storage bins, which are owned by Borrowers and which are attached or affixed to the real property in Kern, California, described above together with all additional accessions, replacements, improvements, repairs and substitutions to said property and the proceeds thereof and all other fixtures now or hereafter attached or affixed to the real property, all of which are declared to be appurtenant to said real property, or incident to the ownership thereof;

**TOGETHER WITH** all judgments, awards of damages, settlements and payments or security (i) hereafter made as a result of or in lieu of any taking of all or any part of the real property under the power of eminent domain or for any damage to the real property and/or the improvements located thereon, or any part thereof, and (ii) hereafter made for any damage to the real property and/or the improvements located thereon, or any part thereof resulting from exercise of or attempted exercise of mining rights or claims, however reserved or asserted, and resulting from the disturbance of any of the surface of the real property. Borrowers do hereby covenant and agree that Borrowers will not give such consent as may be required of the owner for mining or other surface disturbance by the terms of any patent, deed, statute, law or otherwise, without the prior written consent of Lender;

**TOGETHER WITH** all proceeds of and any unearned premiums on any insurance policies covering the real property and/or the improvements located thereon, including, without limitation, the right to receive and apply the proceeds of any insurance judgments, or settlements made in lieu thereof, for damage to the real property and/or the improvements located thereon or the indebtedness secured thereby;

**TOGETHER WITH** all contract rights, chattel paper, documents, accounts and general intangibles, rights to performance, entitlement to payment in cash or in kind, or any other benefits under any current or future governmental program which pertain to the real property, whether now or hereafter existing or acquired, excluding crop receivables;

**TOGETHER WITH** all cash and noncash proceeds of the conversion, voluntary or involuntary, of any of the

CALIFORNIA--UNIFORM INSTRUMENT (Open End)

foregoing;

**TOGETHER WITH** any and all of Borrowers' right, title, and/or interest in any and all system memberships and/or ownership certificates in any non-municipal water sewer systems now or in the future serving said property.

All replacements and additions shall also be covered by this Security Instrument.

All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWERS COVENANT that Borrowers are lawfully seized of the estate hereby conveyed and have the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record and specifically those permitted prior encumbrances, if any, set forth in the Permitted Prior Encumbrances Rider, if said rider is attached to this Security Instrument. Borrowers warrant and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property and fixtures.

UNIFORM COVENANTS. Borrowers covenant and agree as follows:

**1. Payment of Principal, Interest, Prepayment Charges, Yield Maintenance Premiums and Late Charges.** Borrowers and/or Borrower Parties shall pay when due the principal of, and interest on, the debt evidenced by the Notes and any yield maintenance premiums, any prepayment charges and late charges due under the Notes. Payments due under the Notes and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Notes or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Notes and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Notes or at such other location as may be designated by Lender in accordance with the notice provisions in Section 12. Lender may return any payment or partial payment if the payment or partial payment is insufficient to bring the Loans current. Lender may accept any payment or partial payment insufficient to bring the Loans current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payment in the future. No offset or claim which Borrowers might have now or in the future against Lender shall relieve Borrowers or Borrower Parties from making payments due under the Notes and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Unless required otherwise by Applicable Law, payments will be applied as set forth under the Notes.

If Lender receives a payment from Borrowers or Borrower Parties for a delinquent Periodic Payment that includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrowers and/or Borrower Parties to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Notes shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Charges; Liens.** Excluding liens associated with operating lines of credit that are secured by a growing crop and other personal property (each a "Crop Loan"), Borrowers shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any.

Borrowers shall promptly discharge any lien which has priority over this Security Instrument unless Borrowers:

CALIFORNIA--UNIFORM INSTRUMENT (Open End)

5

(a) agree in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrowers are performing such agreement; (b) contest the lien in good faith by, or defend against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secure from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrowers a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrowers shall satisfy the lien or take one or more of the actions set forth above in this Section 3.

Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender, defined below, on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances. Lender may require Borrowers and/or Borrower Parties to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with the Loans.

**4. Property Insurance.** Borrowers shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loans. The insurance carrier providing the insurance shall be chosen by Borrowers subject to Lender's right to disapprove Borrowers' choice, which right shall not be exercised unreasonably. Lender may require Borrowers to pay, in connection with the Loans, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrowers shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrowers.

If Borrowers fail to maintain any of the coverages described above, such failure shall constitute a default under the terms of this Security Instrument and the Loans. Lender may obtain insurance coverage, at Lender's option and Borrowers' expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrowers, Borrowers' equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrowers acknowledge that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrowers could have obtained. Any amounts disbursed by Lender under this Section 4 shall become additional debt of Borrowers and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the rate(s) under the Notes from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrowers requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrowers shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrowers obtain any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrowers shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrowers. Unless Lender and Borrowers otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrowers or Borrower Parties any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by

CALIFORNIA--UNIFORM INSTRUMENT (Open End)

6

Borrowers or Borrower Parties shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrowers and Borrower Parties. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrowers and Borrower Parties. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrowers abandon the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrowers do not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 25 or otherwise, Borrowers hereby assign to Lender (a) Borrowers' and Borrower Parties' rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Notes or this Security Instrument, and (b) any other of Borrowers' rights (other than the right to any refund of unearned premiums paid by Borrowers or Borrower Parties) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Notes or this Security Instrument, whether or not then due.

**5. Preservation, Maintenance and Protection of the Property; Inspections.** Borrowers shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property, excluding ordinary wear and tear, ordinary farming practices and normal maturity of any permanent crop. Borrowers shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 4 that repair or restoration is not economically feasible, Borrowers shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrowers shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrowers are not relieved of Borrowers' obligation for the completion of such repair or restoration.

Borrowers will operate the Property in a good and workmanlike manner and in accordance with all Applicable Law and will pay all fees and charges of any kind in connection therewith. If applicable, Borrowers will use good farming and animal husbandry practices.

Lender or its agent may make reasonable entries upon and inspections of the Property with forty-eight (48) hours' advance written notice. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrowers notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**6. Loan Application.** Borrowers shall be in default if, during the Loan application process, Borrowers or Borrower Parties or any persons or entities acting at the direction of Borrowers or Borrower Parties or with Borrowers' or Borrower Parties' knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loans.

**7. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** Subject to any subordination or Intercreditor agreement entered into between Lender and the Crop Loan lender, and provided notice pursuant to Section 23 has been given to Borrowers, if (a) Borrowers fail to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrowers have abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding, (d) perform any farming operations related to the planting, growing, maintenance, and harvesting of crops located on the Property, and (e) perform any ranching

CALIFORNIA--UNIFORM INSTRUMENT (Open End)

operations related to any animals located on the Property. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 7, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 7. Lender may perform these or any other actions it deems necessary in Lender's sole discretion to preserve the value of the Property, and/or assign to others the right to do same on behalf of Lender. Lender may make advances under this Security Instrument or other instrument providing security for the Notes, to protect the Lender's interest in this security instrument or other instrument providing security for the Notes from loss of value or damage. Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate indicated in the Notes shall become an obligation due and owing under the terms of the Notes immediately upon the date advanced by Lender and is an obligation of the Borrowers secured by the Security Instrument or other instrument providing security for the Notes.

Any amounts disbursed by Lender under this Section 7 shall become additional debt of Borrowers and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the rate(s) under the Notes from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrowers and/or Borrower Parties requesting payment.

If this Security Instrument is on a leasehold, Borrowers shall comply with all the provisions of the lease. Borrowers shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrowers shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrowers acquire fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**8. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrowers or Borrower Parties any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrowers or Borrower Parties. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrowers or Borrower Parties.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrowers and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrowers.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrowers and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrowers, or if, after notice by Lender to Borrowers that the Opposing Party

(as defined in the next sentence) offers to make an award to settle a claim for damages, Borrowers and Borrower Parties fail to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrowers Miscellaneous Proceeds or the party against whom Borrowers have a right of action in regard to Miscellaneous Proceeds.

Borrowers shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or material impairment to the value of Lender's interest in the Property or rights under this Security Instrument. Borrowers can cure such a default and, if acceleration has occurred, reinstate as provided in Section 16, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**9. Borrowers Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrowers or any Successor in Interest of Borrowers shall not operate to release the liability of Borrowers or any Successors in Interest of Borrowers. Lender shall not be required to commence proceedings against any Successor in Interest of Borrowers or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrowers or any Successors in Interest of Borrowers. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from Borrowers, third persons, entities or Successors in Interest of Guarantors or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**10. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrowers covenant and agree that Borrowers' obligations and liability shall be joint and several. Subject to the provisions of Section 15, any Successor in Interest of Borrowers who assumes Borrowers' obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrowers' rights and benefits under this Security Instrument. Borrowers shall not be released from Borrowers' obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 17) and benefit the successors and assigns of Lender.

**11. Loan Charges.** Lender may charge Borrowers fees for services performed in connection with Borrowers' default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrowers shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loans are subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loans exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrowers which exceeded permitted limits will be refunded to Borrowers. Lender may choose to make this refund by reducing the principal owed under the Notes or by making a direct payment to Borrowers or Borrower Parties. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Notes). Borrowers' or Borrower Parties' acceptance of any such refund made by direct payment to Borrowers or Borrower Parties will constitute a waiver of any right of action Borrowers or Borrower Parties might have arising out of such overcharge.

**12. Notices.** All notices given by Borrowers or Lender in connection with this Security Instrument must be in writing. Any notice to Borrowers in connection with this Security Instrument shall be deemed to have been given to Borrowers when mailed by first class mail or when actually delivered to Borrowers' notice address if sent by other means. The notice address shall be Borrowers' Address unless Borrowers have designated a substitute notice address by notice to Lender. Borrowers shall promptly notify Lender of Borrowers' change of address. If Lender specifies a

CALIFORNIA--UNIFORM INSTRUMENT (Open End)

9

procedure for reporting Borrowers' change of address, then Borrowers shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrowers. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

      **13. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Notes conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Notes which can be given effect without the conflicting provision.

      As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

      **14. Borrowers' Copy.** Borrowers and Borrower Parties shall be given one copy of each of the Notes and of this Security Instrument.

      **15. Transfer of the Property or a Beneficial Interest in Borrowers.** As used in this Section 15, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrowers at a future date to a purchaser, excluding, however, easements granted by Borrowers in the ordinary course of business.

      If all or any part of the Property or any Interest in the Property is sold or transferred (or if any of the Borrowers are not a natural person and a beneficial interest in such of the Borrowers is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

      If Lender exercises this option, Lender shall give Borrowers notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 12 within which Borrowers must pay all sums secured by this Security Instrument. If Borrowers fail to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrowers.

      Borrowers may request Lender to release one or more parcels that make up the Property, from time to time, from the lien of the Deed of Trust (the "Partial Release") and Lender agrees to not unreasonably withhold its consent to the Partial Release, subject to the prior satisfaction of the condition that Borrowers shall submit a formal written request for the Partial Release (the "Request") not less than forty-five (45) days prior to the date upon which Borrowers desire to close the transfer of the parcel subject to the Partial Release (the "Release Parcel"). No more than three (3) Requests shall be made per calendar year. The Request shall be sufficiently detailed and include all necessary documentation so as to allow Lender adequate time to process the Partial Release.

      Notwithstanding the foregoing, upon the written request of Borrowers, Lender will subordinate its interest in any personal property, crops growing or to be grown on the Property, crop receivables, and all governmental payments relating to such crops (the "Crops"), but not to trees, irrigation equipment, water rights and permanent plantings, to the security interest of an institutional lender (a "Crop Lender") for one or more loans made to Borrowers or Borrower Parties to finance the production of crops on all or any portion of the Property ("Operating Financing"). Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances.

      **16. Right to Reinstate After Acceleration.** If Borrowers meet certain conditions, Borrowers shall have the

CALIFORNIA--UNIFORM INSTRUMENT (Open End)

10

right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrowers' right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrowers: (a) pay Lender all sums which then would be due under this Security Instrument and the Notes as if no acceleration had occurred; (b) cure any default of any other covenants or agreements; (c) pay all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) take such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrowers' obligations to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrowers pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrowers, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 15.

**17. Sale of Notes; Change of Loan Servicer; Notice of Grievance.** The Notes or a partial interest in the Notes (together with this Security Instrument) can be sold one or more times without prior notice to Borrowers or Borrower Parties.

Neither Borrowers nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrowers or Lender has notified the other parties (with such notice given in compliance with the requirements of Section 12) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrowers pursuant to Section 25 and the notice of acceleration given to Borrowers pursuant to Section 15 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 17.

**18. Hazardous Substances.** As used in this Section 18: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrowers shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property, other than the presence, use, storage and disposal of Hazardous Substances in quantities as necessary for Borrowers' and Borrower Parties' normal farming or other commercial operations located on the Property, all of which Borrowers covenant have and will be used, stored, and disposed of in accordance with commercially reasonable practices and all applicable environmental laws. Borrowers shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal farming and residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrowers shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrowers or Borrower Parties have actual knowledge, (b) any Environmental Condition,

CALIFORNIA--UNIFORM INSTRUMENT (Open End)

11

including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrowers learn, or are notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrowers shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup. Borrowers agree to indemnify and hold Lender free and harmless from and against all loss, costs (including attorneys' fees and costs), damage (including consequential damages), and expenses Lender may sustain by reason of the assertion against Lender by any third-party of any claim in connection with Hazardous Substances on, in or affecting the Property. Borrowers further agree that Lender shall have the right to join and participate in, as a party if it so elects, any legal proceedings or actions initiated in connection with any claims related to Hazardous Substances on, in or affecting the Property, and shall pay any such attorney fees and expenses Lender incurs in connection therewith.

**19. Additional Property Subject To The Security Instrument.** This Security Instrument also constitutes a security agreement within the meaning of the Uniform Commercial Code as adopted in the State of California (the "UCC"). In addition to the Property described in the Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in or on the Listed Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling, attached floor coverings, irrigation equipment (including, but not limited to, irrigation pipes and pumps, center irrigation pivots, pvc pipe, sprinklers, motors, well equipment, pumps and power units), livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom, and any substitutions or replacements therefore, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Borrowers or Borrower Parties to collect or enforce payment thereof, as well as to enforce any guarantees of the forgoing and security therefor, and all of Borrowers' and Borrower Parties' present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this Security Instrument as the "Property."

**20. Fixture Filing.** This Security Instrument constitutes a "fixture filing" for the purposes of the UCC against all of the Property which is or is to become fixtures per the UCC.

**21. Use of Property; Compliance With Law.** Borrowers shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrowers shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**22. Assignment of Leases.** Upon Lender's request after default, Borrowers shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**23. Assignment of Rents; Appointment of Receiver; Lender In Possession.** Borrowers absolutely and unconditionally assign and transfer to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrowers authorize Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrowers or Borrower Parties shall receive the Rents until (i) Lender has given Borrowers notice of default pursuant to Sections 12 and 25 of

CALIFORNIA--UNIFORM INSTRUMENT (Open End)

12

the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notices of default to Borrowers: (i) all Rents received by Borrowers or Borrower Parties shall be held by Borrowers or Borrower Parties as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrowers agree that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorneys' fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrowers and Borrower Parties to Lender secured by the Security Instrument pursuant to Section 7 of the Security Instrument.

Borrowers represent and warrant that Borrowers have not executed any prior assignment of the Rents and have not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrowers. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**24. Cross-Collateralization.** In addition to the Notes, all liens, security interests, assignments, suretyship obligations, stock pledges, rights and remedies granted to Lender in any loan document or agreement secure all obligations, debts and liabilities, plus interest thereon, of any or all Borrowers to Lender, as well as claims by Lender against any or all Borrowers, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Notes, whether voluntary or otherwise, whether due or not due, direct or indirect, absolute or contingent, whether any or all Borrowers may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

**25. Cross-Default Provision.** Borrowers' or Borrower Parties' default or breach under any note or agreement in which Lender has an interest, including but not limited to the Notes, shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

**NON-UNIFORM COVENANTS.** Borrowers further covenant and agree as follows:

**26. Acceleration; Remedies. Following Borrowers' breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 15 unless Applicable Law provides otherwise) and prior to acceleration or Lender's exercise of any remedy, Lender shall give at least sixty (60) days written notice to Borrowers prior to exercising any remedy, unless otherwise provided under this Deed of Trust; provided, however, if such default cannot be cured within the 60-day period and Borrowers have commenced and diligently pursues the cure of the related default, Borrowers shall have such time as is commercially reasonably necessary for Borrowers to complete the cure, provided Lender is not materially prejudiced from such delay. Lender shall use commercially reasonable standards to determine if it is materially prejudiced by the delay. The notice shall specify: (a) the default; (b) the action required to cure the default; (c) the date by which the default must be cured. The notice shall further inform Borrowers of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrowers to acceleration and sale.**

CALIFORNIA--UNIFORM INSTRUMENT (Open End)

13

If the default is not cured on or before the date specified in the notice or such extended period for defaults which cannot be cured within the 60-day period, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 25, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrowers and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrowers, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

27. Reconveyance.   Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

28. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrowers, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

29. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

30. Other California State Specific Provisions.

(a)    In addition to the provisions of any loan agreement, Borrowers further agree that, if Lender accepts a guaranty of only a portion of the Indebtedness, Borrowers waive any right under California Civil Code Section 2822(a) to designate the portion of the Indebtedness which shall be satisfied by a guarantor's partial payment.

(b)    Except for matters covered by an O&M Program or matters described in any environmental indemnity agreement, Borrowers shall not cause or permit any lien (whether or not such lien has priority over the lien created by this Security Instrument) upon the Property imposed pursuant to any Environmental Laws. Any such lien shall be considered a Prohibited Activity or Condition (as may also be contemplated in any environmental indemnity agreement).

(c)    Borrowers represent and warrant to Lender that, except as previously disclosed by Borrowers or Borrower Parties to Lender in writing:

CALIFORNIA--UNIFORM INSTRUMENT (Open End)

14

(1)    at the time of acquiring the Property, Borrowers undertook all appropriate inquiry into the previous ownership and uses of the Property consistent with good commercial or customary practice and no evidence or indication came to light which would suggest that the Property has been or is now being used for any Prohibited Activities or Conditions; and

(2)    the Property has not been designated as "hazardous waste property" or "border zone property" pursuant to Section 25220, et seq., of the California Health and Safety Code.

The representations and warranties in this Security Instrument shall be continuing representations and warranties that shall be deemed to be made by Borrowers throughout the term of the Loans, until the Indebtedness has been paid in full.

(d)    Without limiting any of the remedies provided in this Security Instrument, Borrowers acknowledge and agrees that certain provisions in this Security Instrument are environmental provisions (as defined in Section 736(f)(2) of the California Code of Civil Procedure) made by Borrowers relating to the real property security (the "**Environmental Provisions**"), and that to the extent applicable, Borrowers' failures to comply with any of the Environmental Provisions will be a breach of contract that will entitle Lender to pursue the remedies provided by Section 736 of the California Code of Civil Procedure for the recovery of damages and for the enforcement of the Environmental Provisions.

Except as otherwise stated herein, nothing in the provisions of this Amendment shall be deemed in any way to affect the priority of the Original Deed of Trust over any other lien, charge, encumbrance or conveyance, or to release or change the liability of any party who may be liable under the Note.

*[remainder intentionally left blank – signature page follows]*

BY SIGNING BELOW, Borrowers accept and agree to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrowers or Borrower Parties.

**CALIFORNIA–UNIFORM INSTRUMENT (Open End)**

**BORROWERS:**

**Maricopa Orchards, LLC,**
a California limited liability company

By: Farshid Assemi
Its:  General Manager

**C & A Farms, LLC,**
a California limited liability company

By: Farshid Assemi
Its: General Manager

**Willow Avenue Investments, LLC**
a California limited liability company

By: Neema Assemi
Its:  General Manager

*[Sign Originals Only]*

**LENDER:**
**U.S. Bank National Association, as**
**Custodian/Trustee for Federal Agricultural**
**Mortgage Corporation programs**

By: Heather Wright, Manager- Closing & Servicing of
Federal Agricultural Mortgage Corporation Attorney-in-Fact
for U.S. Bank National Association, as Custodian/Trustee for
Federal Agricultural Mortgage Corporation programs

---

**CALIFORNIA--UNIFORM INSTRUMENT (Open End)**

16

*[remainder intentionally left blank – notary page follows]*

# ACKNOWLEDGMENT

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of _____Fresno_____ )

On __Feb. 1, 2023_____ before me, __L. Diaz, Notary Public_____
                                        (insert name and title of the officer)

personally appeared ____Farshid Assemi , Neena Assemi_____,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

L. DIAZ
Notary Public - California
Fresno County
Commission # 2398671
My Comm. Expires Apr 20, 2026

Signature ____S. Diaz_____ (Seal)

A notary public or other officer completing this
certificate verifies only the identity of the individual
who signed the document to which this certificate
is attached, and not the truthfulness, accuracy, or
validity of that document.

STATE OF CALIFORNIA _IOWH_
COUNTY OF _Polk_

On _Feb 3, 2023_ before me, _Megan Spalding_, personally appeared
Heather Wright, Manager- Closing & Servicing of Federal Agricultural Mortgage Corporation Attorney-In-Fact
for U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation
programs, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to
the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his
signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the
instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Megan Spalding_ (Seal)

Notary Public
Printed Name: _Megan Spalding_
My commission expires: _6/3/2023_

NOTARIAL SEAL
IOWA
MEGAN SPALDING
Commission Number 716793
My Commission Expires
June 03, 2023

# EXHIBIT A

The land referred to is situated in the County of Kern, City of , State of California, and is described as follows:

PARCEL 1:

THE NORTHWEST QUARTER OF SECTION 30, TOWNSHIP 32 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN AN UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT ALL OIL AND GAS WITHIN OR UNDERLYING SAID LAND, AS PREVIOUSLY RESERVED OF RECORD.

APN: 220-170-01

PARCEL 3:

THE NORTHEAST QUARTER OF SECTION 30, TOWNSHIP 32 SOUTH, RANGE 25 EAST, M.D.B.&M., IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL RIGHT, TITLE AND INTEREST IN AND TO THE MINERAL RIGHTS IN THE PROPERTIES DESCRIBED HEREIN (EXPRESSLY EXCLUDING, HOWEVER, THE RIGHT TO USE THE SURFACE FOR OPEN PIT MINING, QUARRYING AND STRIP MINING), AND ALL RIGHTS, TITLE AND INTEREST IN ANY OTHER CONTRACT AGREEMENTS OR RIGHTS, TANGIBLE OR INTANGIBLE THAT ARE OWNED BY THE GRANTOR, IN WHOLE OR IN PART, AND THAT ARE RELATED TO THE OWNERSHIP AND USE OF THE MINERAL RIGHTS CONVEYED HEREBY, FROM THE LANDS.

SPECIFICALLY EXCEPTING THEREFROM ALL SURFACE RIGHTS (EXCEPT FOR THE RIGHTS OF SURFACE ACCESS FOR THE PURPOSE OF GRANTEE AND ITS ASSIGNS EXPLORING FOR, DEVELOPING, PRODUCING, TRANSPORTING AND SELLING MINERALS FROM THE PROPERTY AND WHICH ARE RECOGNIZED BY CALIFORNIA LAW, RULES, ORDER AND REGULATION), PERSONAL PROPERTY OR FIXTURES ASSOCIATED WITH, AFFIXED TO OR LOCATED UPON THE SURFACE, WELL BORES (IF ANY), WATER OR WATER RIGHTS OR ENTITLEMENTS (EXCEPT SUCH WATER AS MAY BE ASSOCIATED AND INCIDENTALLY PRODUCED WITH THE MINERALS FROM THE PROPERTY) OR ANY EXISTING OIL, GAS OR MINERAL PRODUCTION (IF ANY) FROM THE PROPERTY, AS GRANTED TO CALIFORNIA MINERALS, L.P., A TEXAS LIMITED PARTNERSHIP, IN DEED RECORDED DECEMBER 30, 1998 AS INSTRUMENT NO. 0198184684 OF OFFICIAL RECORDS.

APN: 220-170-02

PARCEL 4:

THE WEST HALF OF SECTION 29, TOWNSHIP 32 SOUTH, RANGE 25 EAST, M.D.B.M., IN THE UNINCORPORATED ARE OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING OF THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL RIGHT, TITLE AND INTEREST IN AND TO THE MINERAL RIGHTS IN THE PROPERTIES DESCRIBED HEREIN (EXPRESSLY EXCLUDING, HOWEVER, THE RIGHT TO USE THE SURFACE FOR OPEN PIT MINING, QUARRYING AND STRIP MINING), AND ALL RIGHTS, TITLE AND INTEREST IN ANY OTHER CONTRACT AGREEMENTS OR RIGHTS, TANGIBLE OR INTANGIBLE THAT ARE OWNED BY THE GRANTOR, IN WHOLE OR IN PART, AND THAT ARE RELATED TO THE OWNERSHIP AND USE OF THE MINERAL RIGHTS CONVEYED HEREBY, FROM THE LANDS.

SPECIFICALLY EXCEPTING THEREFROM ALL SURFACE RIGHTS (EXCEPT FOR THE RIGHTS OF SURFACE ACCESS FOR THE PURPOSE OF GRANTEE AND ITS ASSIGNS EXPLORING FOR, DEVELOPING, PRODUCING, TRANSPORTING AND SELLING MINERALS FROM THE PROPERTY AND WHICH ARE RECOGNIZED BY CALIFORNIA LAW, RULES, ORDER AND REGULATION), PERSONAL PROPERTY OR FIXTURES ASSOCIATED WITH, AFFIXED TO OR LOCATED UPON THE SURFACE, WELL BORES (IF ANY), WATER OR WATER RIGHTS OR ENTITLEMENTS (EXCEPT SUCH WATER AS MAY BE ASSOCIATED AND INCIDENTALLY PRODUCED WITH THE MINERALS FROM THE PROPERTY) OR ANY EXISTING OIL, GAS OR MINERAL PRODUCTION (IF ANY) FROM THE PROPERTY, AS GRANTED TO CALIFORNIA MINERALS, L.P., A TEXAS LIMITED PARTNERSHIP, IN DEED RECORDED DECEMBER 30, 1998 AS INSTRUMENT NO. 0198184684 OF OFFICIAL RECORDS.

ALSO EXCEPTING ALL OIL, GAS AND OTHER HYDROCARBONS; NON- HYDROCARBON GASSES OR GASEOUS SUBSTANCES; ALL OTHER MINERALS OF WHATSOEVER NATURE, WITHOUT REGARD TO SIMILARITY TO THE ABOVE-MENTIONED SUBSTANCES; AND ALL SUBSTANCES THAT MAY BE PRODUCED THEREWITH FROM SAID REAL PROPERTY.

ALSO EXCEPTING ALL GEOTHERMAL RESOURCES, EMBRACING: INDIGENOUS STEAM, HOT WATER AND HOT BRINES; STEAM AND OTHER GASES, HOT WATER AND HOT BRINES RESULTING FROM WATER, GAS OR OTHER FLUIDS ARTIFICIALLY INTRODUCED INTO SUBSURFACE FORMATIONS; HEAT OR THE ASSOCIATED ENERGY FOUND BENEATH THE SURFACE OF THE EARTH; AND BY-PRODUCTS OF ANY OF THE FOREGOING SUCH AS MINERALS (EXCLUSIVE OF OIL OR HYDROCARBON GAS THAT CAN BE SEPARATELY PRODUCED) WHICH ARE FOUND IN SOLUTION OR ASSOCIATION WITH OR DERIVED FROM ANY OF THE FOREGOING.

ALSO EXCEPTING, THE SOLE AND EXCLUSIVE RIGHT FROM TIME TO TIME TO DRILL AND MAINTAIN WELLS OR OTHER FACILITIES INTO OR THROUGH SAID REAL PROPERTY AND THE ADJOINING STREETS, ROADS AND HIGHWAYS FOR THE PURPOSE OF EXPLORING FOR AND PRODUCING ENERGY RESOURCES; THE EXCLUSIVE RIGHT TO PRODUCE, INJECT, STORE, AND REMOVE FROM AND THROUGH SUCH WELLS OR FACILITIES, OIL, GAS, WATER AND OTHER SUBSTANCES OF WHATEVER NATURE, INCLUDING THE RIGHT TO PERFORM ANY AND ALL OPERATIONS DEEMED BY GRANTOR NECESSARY OR CONVENIENT FOR THE EXERCISE OF SUCH RIGHTS, INCLUDING BUT NOT LIMITED TO THE RIGHT TO CONDUCT SEISMIC TESTING AND CONSTRUCT, MAINTAIN AND OPERATE PIPELINES, VALVES, CATHODIC PROTECTION

FACILITIES, AND APPURTENANCES; AND THE EXCLUSIVE RIGHT TO UTILIZE OR OCCUPY SUBSURFACE FORMATIONS TO STORE OR DISPOSE OF PRODUCED WATER OR OTHER FLUIDS WITHOUT REGARD TO THEIR PLACE OF ORIGIN, AS RESERVED BY CHEVRON U.S.A. INC., A PENNSYLVANIA CORPORATION, IN DEED RECORDED JUNE 6, 2004 AS DOCUMENT NO. 0204130494, OFFICIAL RECORDS.

APN: 220-170-07

PARCEL 6:

ALL OF SECTION 23, TOWNSHIP 32 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM THAT PORTION LYING WITHIN THE SUNSET RAILROAD.

EXCEPTING THEREFROM ALL RIGHT, TITLE AND INTEREST IN AND TO THE MINERAL RIGHTS IN THE PROPERTIES DESCRIBED HEREIN (EXPRESSLY EXCLUDING, HOWEVER, THE RIGHT TO USE THE SURFACE FOR OPEN PIT MINING, QUARRYING AND STRIP MINING), AND ALL RIGHTS, TITLE AND INTEREST IN ANY OTHER CONTRACT AGREEMENTS OR RIGHTS, TANGIBLE OR INTANGIBLE THAT ARE OWNED BY THE GRANTOR, IN WHOLE OR IN PART, AND THAT ARE RELATED TO THE OWNERSHIP AND USE OF THE MINERAL RIGHTS CONVEYED HEREBY, FROM THE LANDS.

SPECIFICALLY EXCEPTING THEREFROM ALL SURFACE RIGHTS (EXCEPT FOR THE RIGHTS OF SURFACE ACCESS FOR THE PURPOSE OF GRANTEE AND ITS ASSIGNS EXPLORING FOR, DEVELOPING, PRODUCING, TRANSPORTING AND SELLING MINERALS FROM THE PROPERTY AND WHICH ARE RECOGNIZED BY CALIFORNIA LAW, RULES, ORDER AND REGULATION), PERSONAL PROPERTY OR FIXTURES ASSOCIATED WITH, AFFIXED TO OR LOCATED UPON THE SURFACE, WELL BORES (IF ANY), WATER OR WATER RIGHTS OR ENTITLEMENTS (EXCEPT SUCH WATER AS MAY BE ASSOCIATED AND INCIDENTALLY PRODUCED WITH THE MINERALS FROM THE PROPERTY) OR ANY EXISTING OIL, GAS OR MINERAL PRODUCTION (IF ANY) FROM THE PROPERTY, AS GRANTED TO CALIFORNIA MINERALS, L.P., A TEXAS LIMITED PARTNERSHIP, IN DEED RECORDED DECEMBER 30, 1998 AS INSTRUMENT NO. 0198184684 OF OFFICIAL RECORDS.

**EXCEPTING THEREFROM that portion of Section 23, Township 32 South, Range 25 East, Mount Diablo Base and Meridian, particularly described as Parcel A of Parcel Map No. 12196, which Map was recorded on October 13, 2020, in Book 62 of Parcel maps at Pages 1 through 3, Kern County records.**

**APN: 220-110-87**

PARCEL 7:

THE SOUTH HALF OF THE NORTHEAST QUARTER OF SECTION 22, TOWNSHIP 32 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF

THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL RIGHT, TITLE AND INTEREST IN AND TO THE MINERAL RIGHTS IN THE PROPERTIES DESCRIBED HEREIN (EXPRESSLY EXCLUDING, HOWEVER, THE RIGHT TO USE THE SURFACE FOR OPEN PIT MINING, QUARRYING AND STRIP MINING), AND ALL RIGHTS, TITLE AND INTEREST IN ANY OTHER CONTRACT AGREEMENTS OR RIGHTS, TANGIBLE OR INTANGIBLE THAT ARE OWNED BY THE GRANTOR, IN WHOLE OR IN PART, AND THAT ARE RELATED TO THE OWNERSHIP AND USE OF THE MINERAL RIGHTS CONVEYED HEREBY, FROM THE LANDS.

SPECIFICALLY EXCEPTING THEREFROM ALL SURFACE RIGHTS (EXCEPT FOR THE RIGHTS OF SURFACE ACCESS FOR THE PURPOSE OF GRANTEE AND ITS ASSIGNS EXPLORING FOR, DEVELOPING, PRODUCING, TRANSPORTING AND SELLING MINERALS FROM THE PROPERTY AND WHICH ARE RECOGNIZED BY CALIFORNIA LAW, RULES, ORDER AND REGULATION), PERSONAL PROPERTY OR FIXTURES ASSOCIATED WITH, AFFIXED TO OR LOCATED UPON THE SURFACE, WELL BORES (IF ANY), WATER OR WATER RIGHTS OR ENTITLEMENTS (EXCEPT SUCH WATER AS MAY BE ASSOCIATED AND INCIDENTALLY PRODUCED WITH THE MINERALS FROM THE PROPERTY) OR ANY EXISTING OIL, GAS OR MINERAL PRODUCTION (IF ANY) FROM THE PROPERTY, AS GRANTED TO CALIFORNIA MINERALS, L.P., A TEXAS LIMITED PARTNERSHIP, IN DEED RECORDED DECEMBER 30, 1998 AS INSTRUMENT NO. 0198184684 OF OFFICIAL RECORDS.

APN: 220-110-10

//

//

PARCEL 8:

THE NORTH HALF OF THE NORTH HALF OF SECTION 26, TOWNSHIP 32 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM THE INTEREST OF THE SUNSET RAILROAD AS SAID RAILROAD IS NOW LOCATED.

EXCEPTING THEREFROM ALL RIGHT, TITLE AND INTEREST IN AND TO THE MINERAL RIGHTS IN THE PROPERTIES DESCRIBED HEREIN (EXPRESSLY EXCLUDING, HOWEVER, THE RIGHT TO USE THE SURFACE FOR OPEN PIT MINING, QUARRYING AND STRIP MINING), AND ALL RIGHTS, TITLE AND INTEREST IN ANY OTHER CONTRACT AGREEMENTS OR RIGHTS, TANGIBLE OR INTANGIBLE THAT ARE OWNED BY THE GRANTOR, IN WHOLE OR IN PART, AND THAT ARE RELATED TO THE OWNERSHIP AND USE OF THE MINERAL RIGHTS CONVEYED HEREBY, FROM THE LANDS.

SPECIFICALLY EXCEPTING THEREFROM ALL SURFACE RIGHTS (EXCEPT FOR THE RIGHTS OF SURFACE ACCESS FOR THE PURPOSE OF GRANTEE AND ITS ASSIGNS EXPLORING FOR, DEVELOPING, PRODUCING, TRANSPORTING AND SELLING MINERALS FROM THE PROPERTY AND WHICH ARE RECOGNIZED BY CALIFORNIA LAW, RULES, ORDER AND REGULATION), PERSONAL PROPERTY OR FIXTURES ASSOCIATED WITH, AFFIXED TO OR LOCATED UPON THE SURFACE, WELL BORES (IF ANY), WATER OR WATER RIGHTS OR ENTITLEMENTS (EXCEPT SUCH WATER AS MAY BE ASSOCIATED AND INCIDENTALLY PRODUCED WITH THE MINERALS FROM THE PROPERTY) OR ANY EXISTING OIL, GAS OR MINERAL PRODUCTION (IF ANY)

FROM THE PROPERTY, AS GRANTED TO CALIFORNIA MINERALS, L.P., A TEXAS LIMITED PARTNERSHIP, IN DEED RECORDED DECEMBER 30, 1998 AS INSTRUMENT NO. 0198184684 OF OFFICIAL RECORDS.

EXCEPTING THEREFROM ALL OIL, GAS AND OTHER HYDROCARBONS; NON-HYDROCARBON GASSES OR GASEOUS SUBSTANCES; ALL OTHER MINERALS OF WHATSOEVER NATURE, WITHOUT REGARD TO SIMILARITY TO THE ABOVE-MENTIONED SUBSTANCES; AND ALL SUBSTANCES THAT MAY BE PRODUCED THEREWITH FROM SAID REAL PROPERTY;

AND ALSO EXCEPTING THEREFROM ALL GEOTHERMAL RESOURCES, EMBRACING; INDIGENOUS STEAM, HOT WATER AND HOT BRINES; STEAM AND OTHER GASES, HOT WATER AND HOT BRINES RESULTING FROM WATER, GAS OR OTHER FLUIDS ARTIFICIALLY INTRODUCED INTO SUBSURFACE FORMATIONS; HEAT OR THE ASSOCIATED ENERGY FOUND BENEATH THE SURFACE OF THE EARTH; AND BY-PRODUCTS OF ANY OF THE FOREGOING SUCH AS MINERALS (EXCLUSIVE OF OIL OR HYDROCARBON GAS THAT CAN BE SEPARATELY PRODUCED) WHICH ARE FOUND IN SOLUTION OR ASSOCIATION WITH OR DERIVED FROM ANY OF THE FOREGOING.

TOGETHER WITH ALL RIGHTS ASSOCIATED WITH OR CONVENIENT FOR THE EXERCISE OF SUCH RIGHTS AS CONTAINED THEREIN, ALL AS RESERVED BY CHEVRON U.S.A., INC., IN DEED RECORDED DECEMBER 22, 2004 AS INSTRUMENT NO. 0204317445 OF OFFICIAL RECORDS.

APN: 220-130-02

PARCEL 10:

THE SURFACE AND 500 FEET OF THE SUBSURFACE VERTICALLY IN DEPTH BELOW THE SURFACE OF THE EAST HALF OF SECTION 29, TOWNSHIP 32 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT ALL OIL, GAS, ASPHALTUM, AND OTHER HYDROCARBONS AND OTHER MINERALS, WHETHER SIMILAR TO THOSE HEREIN SPECIFIED OR NOT, WITHIN OR THAT MAY BE PRODUCED FROM SAID PARCEL, 500 FEET IN DEPTH, TOGETHER WITH THE EXCLUSIVE RIGHT TO ENTER UPON SAID PREMISES FOR THE PURPOSE OF MINING FOR AND REMOVING THE SAME THEREFROM, AS EXCEPTED AND RESERVED IN THE DEED FROM STANDARD OIL COMPANY OF CALIFORNIA, A DELAWARE CORPORATION, TO CALIFORNIA LAND AND CATTLE COMPANY, A CORPORATION, RECORDED SEPTEMBER 18, 1963, IN BOOK 3644, PAGE 951 OF OFFICIAL RECORDS.

APN: 220-170-08 and 220-170-09 and 220-170-10

PARCEL 11:

THE NORTHWEST QUARTER OF SECTION 28, TOWNSHIP 32 SOUTH, RANGE 25 EAST, MOUNT DIABLO MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT $^1/_2$ OF ALL MINERALS, INCLUDING OIL, PETROLEUM, GAS, ASPHALTUM, BREA, AND OTHER HYDROCARBON SUBSTANCES WITHIN OR UNDERLYING SAID LAND, AS EXCEPTED IN A DECREE OF DECLARATION OF TAKING DATED DECEMBER 31, 1942, A CERTIFIED COPY OF WHICH WAS RECORDED JANUARY 13, 1943 IN BOOK 1090, PAGE 341 OF OFFICIAL RECORDS, AND AS EXCEPTED IN DEED FROM UNITED STATES OF AMERICA, DATED JANUARY 24, 1949 RECORDED MARCH 17, 1949 IN BOOK 1602, PAGE 105 OF OFFICIAL RECORDS.

ALSO EXCEPT REMAINING $^1/_2$ OF ALL MINERALS, INCLUDING OIL, PETROLEUM, GAS, ASPHALTUM, BREA AND OTHER HYDROCARBON SUBSTANCES WITHIN OR UNDERLYING SAID LAND, TOGETHER WITH RIGHT OF ENTRY.

APN: 220-170-11

PARCEL 13:

ALL OF THE SOUTHWEST QUARTER OF SECTION 28, TOWNSHIP 32 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT ALL MINERALS OF WHATSOEVER NATURE (INCLUDING BUT NOT LIMITED TO OIL, GAS, OTHER HYDROCARBONS AND ASSOCIATED SUBSTANCES) IN, UNDER OR WHICH MAY BE PRODUCED THEREFROM, TOGETHER WITH ALL RIGHTS AND PRIVILEGES OF INGRESS, EGRESS, USE AND OCCUPANCY OF, UPON AND WITHIN THE SURFACE AND SUBSURFACE THEREOF AS THE OWNER OF THE AFORESAID MINERALS MAY FROM TIME TO TIME DEEM NECESSARY OR CONVENIENT IN CONNECTION WITH THE EXPLORATION, DEVELOPMENT AND OPERATION OF SAID LANDS FOR THE AFORESAID MINERALS AND THE STORING, HANDLING, TREATING AND TRANSPORTATION THEREOF, ALL WITHOUT LIABILITY WHATSOEVER TO GRANTEE AND ALL AS CONVEYED BY GRANTORS TO SONICO, INC., A DELAWARE CORPORATION, BY MINERAL DEED DATED FEBRUARY 28, 1967, AND RECORDED IN BOOK 4030, PAGE 208 OF OFFICIAL RECORDS OF KERN COUNTY.

APN: 220-170-31 and 32

PARCEL 14:

ALL OF SECTION 19, TOWNSHIP 32 SOUTH, RANGE 26 EAST, M.D.B.M., IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL RIGHT, TITLE AND INTEREST IN AND TO THE MINERAL RIGHTS IN THE PROPERTIES DESCRIBED HEREIN (EXPRESSLY EXCLUDING, HOWEVER, THE RIGHT TO USE THE SURFACE FOR OPEN PIT MINING, QUARRYING AND STRIP MINING), AND ALL RIGHTS, TITLE AND INTEREST IN ANY OTHER CONTRACT AGREEMENTS OR RIGHTS, TANGIBLE OR INTANGIBLE THAT ARE OWNED BY THE GRANTOR, IN WHOLE OR IN PART, AND THAT ARE RELATED TO THE OWNERSHIP AND USE OF THE MINERAL RIGHTS CONVEYED HEREBY, FROM THE LANDS.

SPECIFICALLY EXCEPTING ALL SURFACE RIGHTS (EXCEPT FOR THE RIGHTS OF SURFACE ACCESS FOR THE PURPOSE OF GRANTEE AND ITS ASSIGNS EXPLORING FOR, DEVELOPING, PRODUCING, TRANSPORTING AND SELLING MINERALS FROM THE PROPERTY AND WHICH ARE RECOGNIZED BY CALIFORNIA LAW, RULES, ORDER AND REGULATION), PERSONAL PROPERTY OR FIXTURES ASSOCIATED WITH, AFFIXED TO OR LOCATED UPON THE SURFACE, WELL BORES (IF ANY), WATER OR WATER RIGHTS OR ENTITLEMENTS (EXCEPT SUCH WATER AS MAY BE ASSOCIATED AND INCIDENTALLY PRODUCED WITH THE MINERALS FROM THE PROPERTY) OR ANY EXISTING OIL, GAS OR MINERAL PRODUCTION (IF ANY) FROM THE PROPERTY, AS RESERVED IN DEED RECORDED DECEMBER 30, 1998 AS INSTRUMENT NO. 0198184684 OF OFFICIAL RECORDS.

EXCEPTING ALL OIL, GAS AND OTHER HYDROCARBONS; NON-HYDROCARBON GASSES OR GASEOUS SUBSTANCES; ALL OTHER MINERALS OF WHATSOEVER NATURE, WITHOUT

REGARD TO SIMILARITY TO THE ABOVE-MENTIONED SUBSTANCES; AND ALL SUBSTANCES THAT MAY BE PRODUCED THEREWITH FROM SAID REAL PROPERTY.

ALSO EXCEPTING ALL GEOTHERMAL RESOURCES, EMBRACING: INDIGENOUS STEAM, HOT WATER AND HOT BRINES; STEAM AND OTHER GASES, HOT WATER AND HOT BRINES RESULTING FROM WATER, GAS OR OTHER FLUIDS ARTIFICIALLY INTRODUCED INTO SUBSURFACE FORMATIONS; HEAT OR THE ASSOCIATED ENERGY FOUND BENEATH THE SURFACE OF THE EARTH; AND BY-PRODUCTS OF ANY OF THE FOREGOING SUCH AS MINERALS (EXCLUSIVE OF OIL OR HYDROCARBON GAS THAT CAN BE SEPARATELY PRODUCED) WHICH ARE FOUND IN SOLUTION OR ASSOCIATION WITH OR DERIVED FROM ANY OF THE FOREGOING.

ALSO EXCEPTING THE SOLE AND EXCLUSIVE RIGHT FROM TIME TO TIME TO DRILL AND MAINTAIN WELLS OR OTHER FACILITIES INTO OR THROUGH SAID REAL PROPERTY AND THE ADJOINING STREETS, ROADS AND HIGHWAYS FOR THE PURPOSE OF EXPLORING FOR AND PRODUCING ENERGY RESOURCES; THE EXCLUSIVE RIGHT TO PRODUCE, INJECT, STORE, AND REMOVE FROM AND THROUGH SUCH WELLS OR FACILITIES, OIL, GAS, WATER AND OTHER SUBSTANCES OF WHATEVER NATURE, INCLUDING THE RIGHT TO PERFORM ANY AND ALL OPERATIONS DEEMED BY GRANTOR NECESSARY OR CONVENIENT FOR THE EXERCISE OF SUCH RIGHTS, INCLUDING BUT NOT LIMITED TO THE RIGHT TO CONDUCT SEISMIC TESTING AND CONSTRUCT, MAINTAIN AND OPERATE PIPELINES, VALVES, CATHODIC PROTECTION FACILITIES, AND APPURTENANCES; AND THE EXCLUSIVE RIGHT TO UTILIZE OR OCCUPY SUBSURFACE FORMATIONS TO STORE OR DISPOSE OF PRODUCED WATER OR OTHER FLUIDS WITHOUT REGARD TO THEIR PLACE OF ORIGIN, AS RESERVED BY CHEVRON U.S.A. INC., A PENNSYLVANIA CORPORATION, IN DEED RECORDED DECEMBER 31, 2003 AS DOCUMENT NO. 0203281471, OFFICIAL RECORDS.

APN: 295-040-30 and 31

PARCEL 15: (Intentionally Deleted) APN: 295-050-17

PARCEL 16: (Intentionally Deleted) APN: 295-130-02

PARCEL 17: (Intentionally Deleted) (Easement)

PARCEL 24:

All of Section 13, Township 11 North, Range 23 West, San Bernardino Base and Meridian, in the unincorporated area of the County of Kern, State of California, according to the Official Plat thereof.

Excepting therefrom all right, title and interest in and to the mineral rights in the properties described herein (expressly excluding, however, the right to use the surface for open pit mining, quarrying and strip mining), and all right , title and interest in any other contract agreements or rights, tangible or intangible that are owned by the grantor, in whole or part, and that are related to the ownership and use of the mineral rights conveyed hereby, from the lands.

Specifically excepting and reserving therefrom all surface rights (except for the rights of surface access for the purpose of grantee and its assigns exploring for, developing, producing, transporting and selling minerals from the property and which are recognized by California law, rules, order and regulation), personal property for fixtures associated with affixed to or located upon the surface, well bores (if any), water or water rights or entitlements (except such water as may be associated and incidentally produced with the minerals from the property) or any existing oil, gas or mineral production (if any) from the property, as granted to California Minerals, L.P., a Texas limited partnership, in Deed recorded December 30, 1998 as Document No. 0198184684 of Official Records.

APN: 239-150-11

The land referred to hereinbelow is situated in an unincorporated area of the County of Kern, State of California and is described as follows:

A. Parcel 4 of Parcel Map No. 12364, filed August 3, 2021, recorded in Volume 62 Pages 72 through 76 of Maps in the Count of Kern, State of California.

Excepting any and all oil, gas and other mineral rights and any incidental rights thereto as previously reserved or conveyed by previous Deeds of Records.

Also excepting therefrom any interest grantors may have in all oil, mineral, natural gas, and other hydrocarbon substances under the real property described in this Deed, without the right of surface entry, as reserved in the Deed from Robert S. Andrews, et al, recorded January 10, 1989 in Book 6198, Page 1357 of Official Records, Document No. 2872.

B. Parcel 5 of Parcel Map No. 12364, filed August 3, 2021, recorded in Volume 62 Pages 72 through 76 of Maps in the County of Kern, State of California.

Excepting any and all oil, gas and other mineral rights and any incidental rights thereto as previously reserved or conveyed by previous Deeds of Record.

Also excepting therefrom any interest grantors may have in all oil, mineral, natural gas, and other hydrocarbon substances under the real property described in this Deed, without the right of surface entry, as reserved in the Deed from Robert S. Andrews, et al, recorded January 10, 1989 in Book 6198, Page 1357 of Official Records, Document No. 2872.

Exhibit P

DOC NBR: 2301891 02/07/2023 01:33:08 PM
OFFICIAL RECORDS OF Kings County
Kristine Lee, Clerk-Recorder,
RECORDING FEE: $343.00
COUNTY TAX: $0.00
CITY TAX: $0.00

Recorded at Request of
Old Republic Title Company    ePN



Recording Requested By:

Conterra Agricultural Capital, LLC

After Recording Return To:

Conterra Agricultural Capital, LLC
5465 Mills Civic Parkway, Suite 201
West Des Moines, IA 50266
Attn: Taylor Petersen



TITLE: 3
DOC TYPE: 08
21 PGS
R048

ERECORDING PARTNERS NETWORK

———————————————— [Space Above This Line For Recording Data] ————————————————

# DEED OF TRUST
## Security Agreement, Assignment of Rents and Fixture Filing

Loan<sup>REDACTED</sup>1004

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in certain Sections of this document. Certain rules regarding the usage of words used in this document are also provided in Section 13.

(A) "Security Instrument" means this document, which is dated February 2, 2023, together with all Riders to this document.

(B) "Lender" is Conterra Agricultural Capital, LLC. Lender is a limited liability company organized and existing under the laws of Iowa. Lender's address is 5465 Mills Civic Parkway, Suite 201, West Des Moines, IA 50266. Lender is the beneficiary under this Security Instrument.

(C) "Borrowers" are Copper Avenue Investments, LLC, a California limited liability company, Lincoln Grantor Farms, LLC, a California limited liability company, and ACAP Farms, LLC, a California limited liability company. Borrowers are trustors under this Security Instrument. Borrowers' address is 5260 N. Palm Ave. Ste. 421, Mail Stop M, Fresno, CA 93704.

"Borrower Parties" are Copper Avenue Investments, LLC, a California limited liability company, Lincoln Grantor Farms, LLC, a California limited liability company, and ACAP Farms, LLC, a California limited liability company. Maricopa Orchards, LLC, a California limited liability company, Cantua Orchards, LLC, a California limited liability company, Gradon Farms, LLC, a California limited liability company, C & A Farms, LLC, a California limited liability company, and Willow Avenue Investments, LLC, a California limited liability company. Borrower Parties' address is 5260 N. Palm Ave. Ste. 421, Mail Stop M, Fresno, CA 93704.

(D) "Trustee" is Old Republic Title Company.

(E) "Notes" means: (i) Borrower Parties' promissory note dated February 2, 2023, maturing on February 2, 2028, in the original principal amount of $7,400,000.00, plus interest; (ii) a promissory note made by C&A Farms, LLC and Whitesbridge Farms, LLC dated January 8, 2018, maturing on July 1, 2033, payable to the order of U.S. Bank National

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT

1

Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal of $5,500,000.00, plus interest; (iii) an open ended promissory note made by C&A Farms, LLC and Whitesbridge Farms, LLC dated January 8, 2018, and subsequently converted on June 27, 2018, maturing on July 1, 2038, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of up to $1,500,000.00, plus interest; (iv) an open ended promissory note made by Maricopa Orchards, LLC, Copper Avenue Investments, LLC, Lincoln Grantor Farms, LLC and ACAP Farms, LLC dated October 11, 2019, maturing on October 11, 2044, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of up to $5,297,232.00, plus interest; (v) a promissory note made by Maricopa Orchards, LLC, Copper Avenue Investments, LLC, Lincoln Grantor Farms, LLC, and ACAP Farms,, LLC dated October 11, 2019, maturing on October 11, 2039,  payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of $10,258,632.00, plus interest; (vi) an open ended promissory note made by Maricopa Orchards, LLC, C&A Farms, LLC, Willow Avenue Investments, LLC, Assemi Brothers, LLC and Whitesbridge Farms, LLC dated December 14, 2020, maturing on January 1, 2026, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of up to $12,500,000.00, plus interest; and (vii) an open ended promissory note made by Maricopa Orchards, LLC, C&A Farms, LLC, Willow Avenue Investments, LLC, Assemi Brothers, LLC, and Whitesbridge Farms, LLC dated December 14, 2020, maturing on January 1, 2026, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of up to $12,500,000.00, plus interest.  Borrower Parties have promised to pay this debt in regular Periodic Payments and to pay Notes in full not later than the maturity date of each Note.

(F) **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

(G) **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) **"Riders"** means all Riders to this Security Instrument that are executed by Borrowers or Borrower Parties and are to be recorded.  The following Riders are to be executed by Borrowers or Borrower Parties and recorded with this Security Instrument:

☐  Irrigation Equipment Rider                   ☐  Water Rights Rider

☐  Financial Information and Covenants Rider    ☐  Permitted Prior Encumbrance Rider

☐  Mortgage Insurance Rider                     ☐  Adjustable Rate Rider

☐  Other(s):    Cross    Default    Rider,    Cross
Collateralization Rider

(I) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(K) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT

party (other than insurance proceeds paid under the coverages described in Section 4) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(L)  **"Periodic Payment"** means the amount due for principal and interest under the Notes.

(M)  **"Successor in Interest of Borrowers"** means any party that has taken title to the Property, whether or not that party has assumed obligations of the Borrowers under this Security Instrument or of Borrower Parties under the Notes.

---

### TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loans, and all renewals, extensions and modifications of the Notes; and (ii) the performance of Borrowers' covenants and agreements under this Security Instrument and of Borrower Parties under the Notes.  For this purpose, Borrowers irrevocably grant and convey to Trustee, in trust, with power of sale, the following described property located in the **County of Kings, California**:

>        **See Exhibit "A" attached hereto and made a part hereof.**

which currently has the address of:

subject only to those matters set forth in the Permitted Prior Encumbrance Rider, if said rider is attached (hereafter "Permitted Prior Encumbrances");

>    **TOGETHER WITH** all buildings, improvements, equipment, fixtures and permanent plantings affixed, attached to or incorporated in the real property, and all additions, replacements, and improvements hereafter made thereto or placed therein or thereon; all rights-of-way, easements, rents, issues, profits, income, proceeds and general intangibles there from, tenements, hereditaments, remainders, reversions, privileges and appurtenances thereunto belonging, however evidenced, which are used or enjoyed in connection with the real property now or hereafter owned or belonging to the Borrowers or which hereafter may be acquired by Borrowers, excluding, however, the growing crop;

>    **TOGETHER WITH** all water rights appurtenant to the real property, whether such water rights are riparian, appropriative or otherwise, along with all ditch and ditch rights and any shares of stock, licenses, permits and contracts evidencing such water or ditch rights appurtenant to the property, and all wells, reservoirs, dams, embankments or fixtures located on the real property;

>    **TOGETHER WITH** all windmills, pumps, irrigation equipment, motors, engines, and devices of every kind, with the exception of rolling stock, now or hereafter attached or affixed to the real property, or for stock watering or domestic purposes thereon, and all grain bins and storage bins, which are owned by Borrowers and which are attached or affixed to the  real property in Kings County, California, described above together with all additional accessions, replacements, improvements, repairs and substitutions to said property and the proceeds thereof and all other fixtures now or hereafter attached or affixed to the real property, all of which are declared to be appurtenant to said real property, or incident to the ownership thereof;

>    **TOGETHER WITH** all judgments, awards of damages, settlements and payments or security (i) hereafter made as a result of or in lieu of any taking of all or any part of the real property under the power of eminent domain or for any damage to the real property and/or the improvements located thereon, or any part thereof, and (ii) hereafter made for any damage to the real property and/or the improvements located thereon, or any part thereof resulting from exercise of or attempted exercise of mining rights or claims, however reserved or asserted, and resulting from the disturbance of

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT

any of the surface of the real property.  Borrowers do hereby covenant and agree that Borrowers will not give such consent as may be required of the owner for mining or other surface disturbance by the terms of any patent, deed, statute, law or otherwise, without the prior written consent of Lender;

TOGETHER WITH all proceeds of and any unearned premiums on any insurance policies covering the real property and/or the improvements located thereon, including, without limitation, the right to receive and apply the proceeds of any insurance judgments, or settlements made in lieu thereof, for damage to the real property and/or the improvements located thereon or the indebtedness secured thereby;

TOGETHER WITH all contract rights, chattel paper, documents, accounts and general intangibles, rights to performance, entitlement to payment in cash or in kind, or any other benefits under any current or future governmental program which pertain to the real property, whether now or hereafter existing or acquired, excluding crop receivables;

TOGETHER WITH all cash and noncash proceeds of the conversion, voluntary or involuntary, of any of the foregoing;

TOGETHER WITH any and all of Borrowers' right, title, and/or interest in any and all system memberships and/or ownership certificates in any non-municipal water sewer systems now or in the future serving said property.

All replacements and additions shall also be covered by this Security Instrument.

All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWERS COVENANT that Borrowers are lawfully seized of the estate hereby conveyed and have the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record and specifically those permitted prior encumbrances, if any, set forth in the Permitted Prior Encumbrances Rider, if said rider is attached to this Security Instrument.  Borrowers warrant and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property and fixtures.

UNIFORM COVENANTS.  Borrowers covenant and agree as follows:
1. Payment of Principal, Interest, Prepayment Charges, Yield Maintenance Premiums and Late Charges. Borrowers and/or Borrower Parties shall pay when due the principal of, and interest on, the debt evidenced by the Notes and any yield maintenance premiums, any prepayment charges and late charges due under the Notes. Payments due under the Notes and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Notes or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Notes and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.
Payments are deemed received by Lender when received at the location designated in the Notes or at such other location as may be designated by Lender in accordance with the notice provisions in Section 12. Lender may return any payment or partial payment if the payment or partial payment is insufficient to bring the Loans current.  Lender may accept any payment or partial payment insufficient to bring the Loans current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payment in the future.  No offset or claim which Borrowers might have now or in the future against Lender shall relieve Borrowers or Borrower Parties from making payments due under the Notes and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.
2. Application of Payments or Proceeds.  Unless required otherwise by Applicable Law, payments will be

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT

4

applied as set forth under the Notes.

If Lender receives a payment from Borrowers or Borrower Parties for a delinquent Periodic Payment that includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrowers and/or Borrower Parties to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Notes shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Charges; Liens.** Excluding liens associated with operating lines of credit that are secured by a growing crop and other personal property (each a "Crop Loan"), Borrowers shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any.

Borrowers shall promptly discharge any lien which has priority over this Security Instrument unless Borrowers: (a) agree in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrowers are performing such agreement; (b) contest the lien in good faith by, or defend against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secure from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrowers a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrowers shall satisfy the lien or take one or more of the actions set forth above in this Section 3.

Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender, defined below, on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances. Lender may require Borrowers and/or Borrower Parties to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with the Loans.

**4. Property Insurance.** Borrowers shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loans. The insurance carrier providing the insurance shall be chosen by Borrowers subject to Lender's right to disapprove Borrowers' choice, which right shall not be exercised unreasonably. Lender may require Borrowers to pay, in connection with the Loans, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrowers shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrowers.

If Borrowers fail to maintain any of the coverages described above, such failure shall constitute a default under the terms of this Security Instrument and the Loans. Lender may obtain insurance coverage, at Lender's option and Borrowers' expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrowers, Borrowers' equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrowers acknowledge that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrowers could have obtained. Any amounts disbursed by Lender under this Section 4 shall become additional debt of Borrowers and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the rate(s) under the Notes from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrowers requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT

5

additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrowers shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrowers obtain any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrowers shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrowers. Unless Lender and Borrowers otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrowers or Borrower Parties any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrowers or Borrower Parties shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrowers and Borrower Parties. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrowers and Borrower Parties. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrowers abandon the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrowers do not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 25 or otherwise, Borrowers hereby assign to Lender (a) Borrowers' and Borrower Parties' rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Notes or this Security Instrument, and (b) any other of Borrowers' rights (other than the right to any refund of unearned premiums paid by Borrowers or Borrower Parties) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Notes or this Security Instrument, whether or not then due.

5. Preservation, Maintenance and Protection of the Property; Inspections. Borrowers shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property, excluding ordinary wear and tear, ordinary farming practices and normal maturity of any permanent crop. Borrowers shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 4 that repair or restoration is not economically feasible, Borrowers shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrowers shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrowers are not relieved of Borrowers' obligation for the completion of such repair or restoration.

Borrowers will operate the Property in a good and workmanlike manner and in accordance with all Applicable Law and will pay all fees and charges of any kind in connection therewith. If applicable, Borrowers will use good farming and animal husbandry practices.

Lender or its agent may make reasonable entries upon and inspections of the Property with forty-eight (48) hours' advance written notice. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrowers notice at the time of or prior to such an interior inspection specifying such reasonable cause.

6. Loan Application. Borrowers shall be in default if, during the Loan application process, Borrowers or Borrower Parties or any persons or entities acting at the direction of Borrowers or Borrower Parties or with Borrowers' or Borrower Parties' knowledge or consent gave materially false, misleading, or inaccurate information or statements to

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT

Lender (or failed to provide Lender with material information) in connection with the Loans.

    **7. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** Subject to any subordination or intercreditor agreement entered into between Lender and the Crop Loan lender, and provided notice pursuant to Section 23 has been given to Borrowers, if (a) Borrowers fail to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrowers have abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding, (d) perform any farming operations related to the planting, growing, maintenance, and harvesting of crops located on the Property, and (e) perform any ranching operations related to any animals located on the Property. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 7, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 7. Lender may perform these or any other actions it deems necessary in Lender's sole discretion to preserve the value of the Property, and/or assign to others the right to do same on behalf of Lender. Lender may make advances under this Security Instrument or other instrument providing security for the Notes, to protect the Lender's interest in this security instrument or other instrument providing security for the Notes from loss of value or damage. Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate indicated in the Notes shall become an obligation due and owing under the terms of the Notes immediately upon the date advanced by Lender and is an obligation of the Borrowers secured by the Security Instrument or other instrument providing security for the Notes.

    Any amounts disbursed by Lender under this Section 7 shall become additional debt of Borrowers and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the rate(s) under the Notes from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrowers and/or Borrower Parties requesting payment.

    If this Security Instrument is on a leasehold, Borrowers shall comply with all the provisions of the lease. Borrowers shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrowers shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrowers acquire fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

    **8. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

    If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrowers or Borrower Parties any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrowers or Borrower Parties. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

    In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to

**CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT**

Borrowers or Borrower Parties.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrowers and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrowers.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrowers and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrowers, or if, after notice by Lender to Borrowers that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrowers and Borrower Parties fail to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrowers Miscellaneous Proceeds or the party against whom Borrowers have a right of action in regard to Miscellaneous Proceeds.

Borrowers shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or material impairment to the value of Lender's interest in the Property or rights under this Security Instrument. Borrowers can cure such a default and, if acceleration has occurred, reinstate as provided in Section 16, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**9. Borrowers Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrowers or any Successor in Interest of Borrowers shall not operate to release the liability of Borrowers or any Successors in Interest of Borrowers. Lender shall not be required to commence proceedings against any Successor in Interest of Borrowers or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrowers or any Successors in Interest of Borrowers. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from Borrowers, third persons, entities or Successors in Interest of Guarantors or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**10. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrowers covenant and agree that Borrowers' obligations and liability shall be joint and several. Subject to the provisions of Section 15, any Successor in Interest of Borrowers who assumes Borrowers' obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrowers' rights and benefits under this Security Instrument. Borrowers shall not be released from Borrowers' obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 17) and benefit the successors and assigns of Lender.

**11. Loan Charges.** Lender may charge Borrowers fees for services performed in connection with Borrowers' default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrowers shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT

If the Loans are subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loans exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrowers which exceeded permitted limits will be refunded to Borrowers. Lender may choose to make this refund by reducing the principal owed under the Notes or by making a direct payment to Borrowers or Borrower Parties. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Notes). Borrowers' or Borrower Parties' acceptance of any such refund made by direct payment to Borrowers or Borrower Parties will constitute a waiver of any right of action Borrowers or Borrower Parties might have arising out of such overcharge.

12. **Notices.** All notices given by Borrowers or Lender in connection with this Security Instrument must be in writing. Any notice to Borrowers in connection with this Security Instrument shall be deemed to have been given to Borrowers when mailed by first class mail or when actually delivered to Borrowers' notice address if sent by other means. The notice address shall be Borrowers' Address unless Borrowers have designated a substitute notice address by notice to Lender. Borrowers shall promptly notify Lender of Borrowers' change of address. If Lender specifies a procedure for reporting Borrowers' change of address, then Borrowers shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrowers. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

13. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Notes conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Notes which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

14. **Borrowers' Copy.** Borrowers and Borrower Parties shall be given one copy of each of the Notes and of this Security Instrument.

15. **Transfer of the Property or a Beneficial Interest in Borrowers.** As used in this Section 15, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrowers at a future date to a purchaser, excluding, however, easements granted by Borrowers in the ordinary course of business.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if any of the Borrowers are not a natural person and a beneficial interest in such of the Borrowers is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrowers notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 12 within which Borrowers must pay all sums secured by this Security Instrument. If Borrowers fail to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrowers.

Borrowers may request Lender to release one or more parcels that make up the Property, from time to time, from the lien of the Deed of Trust (the "Partial Release") and Lender agrees to not unreasonably withhold its consent to the Partial Release, subject to the prior satisfaction of the condition that Borrowers shall submit a formal

CALIFORNIA–Farmer Mac UNIFORM INSTRUMENT

written request for the Partial Release (the "Request") not less than forty-five (45) days prior to the date upon which Borrowers desire to close the transfer of the parcel subject to the Partial Release (the "Release Parcel"). No more than three (3) Requests shall be made per calendar year. The Request shall be sufficiently detailed and include all necessary documentation so as to allow Lender adequate time to process the Partial Release.

Notwithstanding the foregoing, upon the written request of Borrowers, Lender will subordinate its interest in any personal property, crops growing or to be grown on the Property, crop receivables, and all governmental payments relating to such crops (the "Crops"), but not to trees, irrigation equipment, water rights and permanent plantings, to the security interest of an institutional lender (a "Crop Lender") for one or more loans made to Borrowers or Borrower Parties to finance the production of crops on all or any portion of the Property ("Operating Financing"). Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances.

**16.  Right to Reinstate After Acceleration.**  If Borrowers meet certain conditions, Borrowers shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrowers' right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrowers: (a) pay Lender all sums which then would be due under this Security Instrument and the Notes as if no acceleration had occurred; (b) cure any default of any other covenants or agreements; (c) pay all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) take such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrowers' obligations to pay the sums secured by this Security Instrument, shall continue unchanged.  Lender may require that Borrowers pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrowers, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 15.

**17.  Sale of Notes; Change of Loan Servicer; Notice of Grievance.**  The Notes or a partial interest in the Notes (together with this Security Instrument) can be sold one or more times without prior notice to Borrowers or Borrower Parties.

Neither Borrowers nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrowers or Lender has notified the other parties (with such notice given in compliance with the requirements of Section 12) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph.  The notice of acceleration and opportunity to cure given to Borrowers pursuant to Section 25 and the notice of acceleration given to Borrowers pursuant to Section 15 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 17.

**18.  Hazardous Substances.**  As used in this Section 18:  (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT

Borrowers shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property, other than the presence, use, storage and disposal of Hazardous Substances in quantities as necessary for Borrowers' and Borrower Parties' normal farming or other commercial operations located on the Property, all of which Borrowers covenant have and will be used, stored, and disposed of in accordance with commercially reasonable practices and all applicable environmental laws. Borrowers shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal farming and residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrowers shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrowers or Borrower Parties have actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrowers learn, or are notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrowers shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup. Borrowers agree to indemnify and hold Lender free and harmless from and against all loss, costs (including attorneys' fees and costs), damage (including consequential damages), and expenses Lender may sustain by reason of the assertion against Lender by any third-party of any claim in connection with Hazardous Substances on, in or affecting the Property. Borrowers further agree that Lender shall have the right to join and participate in, as a party if it so elects, any legal proceedings or actions initiated in connection with any claims related to Hazardous Substances on, in or affecting the Property, and shall pay any such attorney fees and expenses Lender incurs in connection therewith.

19. **Additional Property Subject To The Security Instrument.** This Security Instrument also constitutes a security agreement within the meaning of the Uniform Commercial Code as adopted in the State of California (the "UCC"). In addition to the Property described in the Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in or on the Listed Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling, attached floor coverings, irrigation equipment (including, but not limited to, irrigation pipes and pumps, center irrigation pivots, pvc pipe, sprinklers, motors, well equipment, pumps and power units), livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom, and any substitutions or replacements therefore, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Borrowers or Borrower Parties to collect or enforce payment thereof, as well as to enforce any guarantees of the forgoing and security therefor, and all of Borrowers' and Borrower Parties' present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this Security Instrument as the "Property."

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT

**20. Fixture Filing.** This Security Instrument constitutes a "fixture filing" for the purposes of the UCC against all of the Property which is or is to become fixtures per the UCC.

**21. Use of Property; Compliance With Law.** Borrowers shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrowers shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**22. Assignment of Leases.** Upon Lender's request after default, Borrowers shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**23. Assignment of Rents; Appointment of Receiver; Lender In Possession.** Borrowers absolutely and unconditionally assign and transfer to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrowers authorize Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrowers or Borrower Parties shall receive the Rents until (i) Lender has given Borrowers notice of default pursuant to Sections 12 and 25 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notices of default to Borrowers: (i) all Rents received by Borrowers or Borrower Parties shall be held by Borrowers or Borrower Parties as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrowers agree that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorneys' fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrowers and Borrower Parties to Lender secured by the Security Instrument pursuant to Section 7 of the Security Instrument.

Borrowers represent and warrant that Borrowers have not executed any prior assignment of the Rents and have not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrowers. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**24. Cross-Collateralization.** In addition to the Notes, all liens, security interests, assignments, suretyship obligations, stock pledges, rights and remedies granted to Lender in any loan document or agreement secure all obligations, debts and liabilities, plus interest thereon, of any or all Borrowers to Lender, as well as claims by Lender against any or all Borrowers, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Notes, whether voluntary or otherwise, whether due or not due, direct or indirect, absolute or contingent, whether any or all Borrowers may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

**25. Cross-Default Provision.** Borrowers' or Borrower Parties' default or breach under any note or agreement in which Lender has an interest, including but not limited to the Notes, shall be a breach under the Security Instrument

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT

12

and Lender may invoke any of the remedies permitted by the Security Instrument.

NON-UNIFORM COVENANTS.  Borrowers further covenant and agree as follows:

26.  Acceleration; Remedies.  Following Borrowers' breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 15 unless Applicable Law provides otherwise) and prior to acceleration or Lender's exercise of any remedy, Lender shall give at least sixty (60) days written notice to Borrowers prior to exercising any remedy, unless otherwise provided under this Deed of Trust; provided, however, if such default cannot be cured within the 60-day period and Borrowers have commenced and diligently pursues the cure of the related default, Borrowers shall have such time as is commercially reasonably necessary for Borrowers to complete the cure, provided Lender is not materially prejudiced from such delay.  Lender shall use commercially reasonable standards to determine if it is materially prejudiced by the delay.  The notice shall specify: (a) the default; (b) the action required to cure the default; (c) the date by which the default must be cured. The notice shall further inform Borrowers of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrowers to acceleration and sale. If the default is not cured on or before the date specified in the notice or such extended period for defaults which cannot be cured within the 60-day period, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law.  Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 25, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold.  Trustee shall cause this notice to be recorded in each county in which any part of the Property is located.  Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrowers and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrowers, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines.  Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied.  The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein.  Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

27.  Reconveyance.  Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee.  Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law.  If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

28.  Substitute Trustee.  Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located.  The instrument shall contain the name of the original Lender, Trustee and Borrowers, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law.  This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

29.  Statement of Obligation Fee.  Lender may collect a fee not to exceed the maximum amount permitted by

CALIFORNIA–Farmer Mac UNIFORM INSTRUMENT

13

Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.
      **30. Other California State Specific Provisions.**

        (a)      In addition to the provisions of any loan agreement, Borrowers further agree that, if Lender accepts a guaranty of only a portion of the Indebtedness, Borrowers waive any right under California Civil Code Section 2822(a) to designate the portion of the Indebtedness which shall be satisfied by a guarantor's partial payment.

        (b)      Except for matters covered by an O&M Program or matters described in any environmental indemnity agreement, Borrowers shall not cause or permit any lien (whether or not such lien has priority over the lien created by this Security Instrument) upon the Property imposed pursuant to any Environmental Laws.  Any such lien shall be considered a Prohibited Activity or Condition (as may also be contemplated in any environmental indemnity agreement).

        (c)      Borrowers represent and warrant to Lender that, except as previously disclosed by Borrowers or Borrower Parties to Lender in writing:

        (1)      at the time of acquiring the Property, Borrowers undertook all appropriate inquiry into the previous ownership and uses of the Property consistent with good commercial or customary practice and no evidence or indication came to light which would suggest that the Property has been or is now being used for any Prohibited Activities or Conditions; and

        (2)      the Property has not been designated as "hazardous waste property" or "border zone property" pursuant to Section 25220, et seq., of the California Health and Safety Code.

The representations and warranties in this Security Instrument shall be continuing representations and warranties that shall be deemed to be made by Borrowers throughout the term of the Loans, until the Indebtedness has been paid in full.

        (d)      Without limiting any of the remedies provided in this Security Instrument, Borrowers acknowledge and agrees that certain provisions in this Security Instrument are environmental provisions (as defined in Section 736(f)(2) of the California Code of Civil Procedure) made by Borrowers relating to the real property security (the "**Environmental Provisions**"), and that to the extent applicable, Borrowers' failures to comply with any of the Environmental Provisions will be a breach of contract that will entitle Lender to pursue the remedies provided by Section 736 of the California Code of Civil Procedure for the recovery of damages and for the enforcement of the Environmental Provisions.

        Except as otherwise stated herein, nothing in the provisions of this Amendment shall be deemed in any way to affect the priority of the Original Deed of Trust over any other lien, charge, encumbrance or conveyance, or to release or change the liability of any party who may be liable under the Note.

*[remainder of page intentionally left blank – signature page follows]*

---

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT

BY SIGNING BELOW, Borrowers accept and agree to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrowers or Borrower Parties.

**BORROWERS:**

**COPPER AVENUE INVESTMENTS, LLC,**
a California limited liability company

By: Farshid Assemi
Its: Manager

**LINCOLN GRANTOR FARMS, LLC,**
a California limited liability company

By: Neema Assemi
Its: Manager                 Neema Assemi

ACAP FARMS, LLC
a California limited liability company

By: Farshid Assemi
Its: Manager

This document is being executed in counterpart, each of which is deemed to be an original, but such parts constitute one and the same.

**CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT**

BY SIGNING BELOW, Borrowers accept and agree to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrowers or Borrower Parties.

**BORROWERS:**

**COPPER AVENUE INVESTMENTS, LLC,**
a California limited liability company

By:  Farshid Assemi
Its:  Manager

This document is being executed in counterpart, each of which is deemed to be an original, but such parts constitute one and the same.

**LINCOLN GRANTOR FARMS, LLC,**
a California limited liability company

By:  Neema Assemi
Its:  Manager

This document is being executed in counterpart, each of which is deemed to be an original, but such parts constitute one and the same.

Neema Assemi

**ACAP FARMS, LLC,**
a California limited liability company

By:  Farshid Assemi
Its:  Manager

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT

16

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA
COUNTY OF ___FRESNO___

On ___1/30/2023___ before me, ___L. Diaz, Notary Public___, personally appeared **Farshid Assemi**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

Notary Public
Printed Name: ___L. Diaz___
My commission expires: ___April 20, 2024___

L. DIAZ
Notary Public - California
Fresno County
Commission # 2398671
My Comm. Expires Apr 20, 2026

---

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA
COUNTY OF ___Fresno___

On ___1/30/2023___ before me, ___L. Diaz, Notary Public___, personally appeared **Neema Assemi**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

Notary Public
Printed Name: ___L. Diaz___
My commission expires: ___April 20, 2024___

L. DIAZ
Notary Public - California
Fresno County
Commission # 2398671
My Comm. Expires Apr 20, 2026

---

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT

17

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA
COUNTY OF ___Fresno___

On __Feb. 1, 2023__ before me, __L. Diaz, Notary Public__, personally appeared **Farshid Assemi**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)
_____

Notary Public
Printed Name: ___L. Diaz___
My commission expires: __April 20, 2026__

L. DIAZ
Notary Public - California
Fresno County
Commission # 2398671
My Comm. Expires Apr 20, 2026

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA
COUNTY OF _____

On _____ before me, _____, personally appeared **Neema Assemi**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)
_____

Notary Public
Printed Name: _____
My commission expires: _____

**CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT**

18

**ORDER NO. : 1421002561**

# EXHIBIT A

The land referred to is situated in the (See Below) State of California, and is described as follows:

**TRACT I:**

**The land referred to below is situated in an unincorporated area of the County of Kings, State of California:**

PARCEL 1:

The West 20.15 acres of that portion of Lot 10 lying South of Laguna Canal, and all of Lots 11, 12, 13 in Section 10, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, in the County of Kings, State of California, as per map of the Laguna de Tache Grant thereof recorded in the Office of the County Recorder of Fresno County in Book 3 at Page 11 of Record of Surveys, together with that portion of 25th Avenue (abandoned) and 24 1/2 Avenue (abandoned) which would pass by a conveyance of said land under Sections 831 and 1112 of the Civil Code.

EXCEPTING THEREFROM such interest in a strip of land 50 feet wide lying between the Old Crescent Canal right of way and Lots 7 and 8 in said Section 10, as conveyed to Crescent Canal Company, a corporation, by Deed dated January 7, 1913 and recorded April 7, 1913 in Book 51 at Page 78 of Deeds, Kings County Records.

APN: 004-130-030

PARCEL 2:

Lots 1 and 2 lying North of the by-pass of Tulare Lake Basin Water Storage District, in Section 15, Township 18, Range 19 East, Mount Diablo Base and Meridian, as per map of Laguna De Tache Grant thereof recorded in the office of the County Recorder of Fresno County in Book 3 at Page 9 of Record of Surveys.

EXCEPTING THEREFROM any portion thereof lying within San Jose Subdivision as shown on that certain map recorded in Book 3 Page 4 of Licensed Surveyor Plats.

APN: 004-140-012 (Portion)

PARCEL 3:

Those portions of Lots 2 and 3 lying West of canal, all of Lots 3A, 3B, 4, 5, 6, 6A, the well reserved in the Northeast corner of said Lot 6, all of Lots 12, 13 and 13A, in Section 15, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of San Jose Subdivision, recorded March 11, 1930 in Book 3 Page 4, of Licensed Surveyor Plats, Kings County Records.

EXCEPTING THEREFROM all oil, gas and other hydrocarbon substances in or under said property as previously reserved of record.

APN: 004-140-012 (Portion)

PARCEL 3A:

One acre in the Northwest corner North and West of Kings River Bypass Canal, in Lot 7 in Section 15, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, as shown on Map of Laguna de Teche Grant on file with the office of the Kings County Surveyor in Map Book Page 70.

APN: 004-140-005

PARCEL 4:

Lots 14, 15 and 16, and that portion of Lot 17 lying North of the bypass of Tulare Lake Basin Water Storage District, in Section 10, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, as per map of the Laguna de Tache Grant thereof recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 11 of Record of Surveys.

EXCEPTING THEREFROM all oil, gas and other hydrocarbon substances in or under said property as previously reserved of record.

APN: 004-140-002

PARCEL 5:

The Westerly 361.5 feet of the Southerly 361.5 feet of Lot 14 in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of Laguna de Tache Grant recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 10, of Record of Surveys.

APN: 004-230-014

PARCEL 6:

Lots 5, 6, 6A, 11 and 12, in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of San Jose Subdivision, recorded March 11, 1930 in Book 3 at Page 4 of Licensed Surveyor Plats, Kings County Records.

EXCEPTING THEREFROM all oil, gas and other hydrocarbons minerals now or at any time hereafter situate therein and thereunder said land, as saved, excepted and reserved in Deed recorded May 22, 1945 in Book 329, Page 29, Official Records, as Document No. 3227.

APN: 004-230-026 (Portion)

PARCEL 7:

Lots 13 and 14 in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of Laguna de Tache Grant recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 10, of Record of Surveys, Fresno County Records, lying West of the strip of land described in the Deed from Summit Lake Investment Company, a corporation to Tulare Basin Water Storage District, recorded August 8, 1928 in Book 35 at Page 433, of Official Records, Kings County Records.

EXCEPTING THEREFROM the Westerly 361.5 feet of the Southerly 361.5 feet of Lot 14.

ALSO EXCEPTING THEREFROM such interest in a portion of said Lot 13, conveying to the County of Kings, by Deed dated June 13, 1960 and recorded August 18, 1960 in Book 763 Page 880, of Official Records, as Document No. 8922, described as follows:

Beginning at a point distant North 84° 30' 08" East 860.48 feet from the Southwest corner of said Section 22; thence North 3° 29' 59" West 10 feet; thence along a curve to the right, with a radius of 760.00 feet, through an angle of 94° 48' a distance of 1257.48 feet, with a chord that bears North 46° 05' 59" West, 1118.87 feet; thence South 1° 18' 01" West, 550.00 feet; thence South 88° 41' 59" East 125.10 feet; thence, a long curve to the left, with a radius of 840.00 feet, through an angle of 12° 59' 48" a distance of 190.54 feet, with a cord that bears South 46° 05' 59" East, 190.13 feet; thence South 3° 29' 59" East, 135.10 feet; thence North 86° 30' 01" East, 550.00 feet to a point of beginning.

APN: 004-230-026 (Portion)
     004-230-027

PARCEL 8:

That portion of Lot 15 in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, in the County of Kings, State of California, according to Map of Laguna de Tache Grant recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 10, of Record of Surveys, lying West of the strip of land described in the Deed from Summit Lake Investment Company, a corporation to Tulare Basin Water Storage District, recorded August 8, 1928 in Book 35 at Page 433, of Official Records, Kings County Records.
APN: 004-230-013

Recorded at Request of
Old Republic Title Company  𝓛𝓟𝓝

1421002561-DB

Recording Requested By:

**Conterra Agricultural Capital, LLC**

After Recording Return To:

**Conterra Agricultural Capital, LLC**
**5465 Mills Civic Parkway, Suite 201**
**West Des Moines, IA 50266**
**Attn: Taylor Petersen**

**Fresno County Recorder**
**Paul Dictos, CPA**

# 2023-0010330

Recorded at the request of:
ERECORDING PARTNERS NETWORK

02/06/2023 09:36 05
Titles: 3      Pages: 24
Fees: $126.00
CA SB2 Fees:$225.00
Taxes: $0.00
Total: $351.00

_____ [Space Above This Line For Recording Data] _____

# DEED OF TRUST
## Security Agreement, Assignment of Rents and Fixture Filing

Loan #:REDACTED1004

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in certain Sections of this document. Certain rules regarding the usage of words used in this document are also provided in Section 13.

**(A) "Security Instrument"** means this document, which is dated **February 2, 2023**, together with all Riders to this document.

**(B) "Lender"** is Conterra Agricultural Capital, LLC. Lender is a limited liability company organized and existing under the laws of Iowa. Lender's address is 5465 Mills Civic Parkway, Suite 201, West Des Moines, IA 50266. Lender is the beneficiary under this Security Instrument.

**(C) "Borrowers"** are **C & A** Farms, LLC, a California limited liability company, Cantua Orchards, LLC, a California limited liability company, and Gradon Farms, LLC, a California limited liability company. Borrowers are trustors under this Security Instrument. "Borrower Parties" are Borrower and Maricopa Orchards, LLC, a California limited liability company, Copper Avenue Investments, LLC, a California limited liability company, ACAP Farms, LLC, a California limited liability company, Lincoln Grantor Farms, LLC, a California limited liability company, and Willow Avenue Investments, LLC, a California limited liability company. Borrower Parties' address is 5260 N. Palm Ave. Ste. 421, Mail Stop M, Fresno, CA 93704.

**(D) "Trustee"** is Old Republic Title Company.

**(E) "Notes"** means: (i) Borrower Parties' promissory note dated **February 2, 2023**, maturing on February 2, 2028, in the original principal amount of $7,400,000.00, plus interest; (ii) a promissory note made by C&A Farms, LLC and Whitesbridge Farms, LLC dated January 8, 2018, maturing on July 1, 2033, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal of $5,500,000.00, plus interest; (iii) an open ended promissory note made by C&A Farms, LLC and Whitesbridge Farms, LLC dated January 8, 2018, and subsequently converted on June 27, 2018, maturing on July 1, 2038, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT

1

Recorded at Request of
Old Republic Title Company  𝒬𝑃𝒩



142100256 l - DB

Recording Requested By:

**Conterra Agricultural Capital, LLC**

After Recording Return To:

**Conterra Agricultural Capital, LLC**
**5465 Mills Civic Parkway, Suite 201**
**West Des Moines, IA 50266**
**Attn: Taylor Petersen**

24 pgs _____ [Space Above This Line For Recording Data] _____
# DEED OF TRUST
## Security Agreement, Assignment of Rents and Fixture Filing

Loan ¡REDACTED 1004

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in certain Sections of this document. Certain rules regarding the usage of words used in this document are also provided in Section 13.

**(A) "Security Instrument"** means this document, which is dated **February 2, 2023**, together with all Riders to this document.

**(B) "Lender"** is **Conterra Agricultural Capital, LLC**. Lender is a **limited liability company** organized and existing under the laws of **Iowa**. Lender's address is **5465 Mills Civic Parkway, Suite 201, West Des Moines, IA 50266**. Lender is the beneficiary under this Security Instrument.

**(C) "Borrowers"** are **C & A Farms, LLC, a California limited liability company, Cantua Orchards, LLC, a California limited liability company,** and **Gradon Farms, LLC, a California limited liability company**. Borrowers are trustors under this Security Instrument. **"Borrower Parties"** are Borrower and **Maricopa Orchards, LLC, a California limited liability company, Copper Avenue Investments, LLC, a California limited liability company, ACAP Farms, LLC, a California limited liability company**, **Lincoln Grantor Farms, LLC, a California limited liability company,** and **Willow Avenue Investments, LLC, a California limited liability company**. Borrower Parties' address is **5260 N. Palm Ave. Ste. 421, Mail Stop M, Fresno, CA 93704**.

**(D) "Trustee"** is **Old Republic Title Company**.

**(E) "Notes"** means: (i) Borrower Parties' promissory note dated **February 2, 2023**, maturing on February 2, 2028, in the original principal amount of **$7,400,000.00**, plus interest; (ii) a promissory note made by C&A Farms, LLC and Whitesbridge Farms, LLC dated January 8, 2018, maturing on July 1, 2033,  payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal of $5,500,000.00, plus interest; (iii) an open ended promissory note made by C&A Farms, LLC and Whitesbridge Farms, LLC dated January 8, 2018, and subsequently converted on June 27, 2018, maturing on July 1, 2038, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT

original principal amount of up to $1,500,000.00, plus interest; (iv) an open ended promissory note made by Maricopa Orchards, LLC, Copper Avenue Investments, LLC, Lincoln Grantor Farms, LLC, and ACAP Farms, LLC dated October 11, 2019, maturing on October 11, 2044, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of up to $5,297,232.00, plus interest; (v) a promissory note made by Maricopa Orchards, LLC, Copper Avenue Investments, LLC, Lincoln Grantor Farms, LLC, and ACAP Farms, LLC dated October 11, 2019, maturing on October 11, 2039, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of $10,258,632.00, plus interest; (vi) an open ended promissory note made by Maricopa Orchards, LLC, C&A Farms, LLC, Willow Avenue Investments, LLC, Assemi Brothers, LLC, and Whitesbridge Farms, LLC dated December 14, 2020, maturing on January 1, 2026, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of up to $12,500,000.00, plus interest; and (vii) an open ended promissory note made by Maricopa Orchards, LLC, C&A Farms, LLC, Willow Avenue Investments, LLC, Assemi Brothers, LLC, and Whitesbridge Farms, LLC dated December 14, 2020, maturing on January 1, 2026, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of up to $12,500,000.00, plus interest. Borrower Parties have promised to pay this debt in regular Periodic Payments and to pay Notes in full not later than the **maturity date of each Note.**

(F) **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

(G) **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) **"Riders"** means all Riders to this Security Instrument that are executed by Borrowers or Borrower Parties and are to be recorded. The following Riders are to be executed by Borrowers or Borrower Parties and recorded with this Security Instrument:

☐ Irrigation Equipment Rider                    ☐ Water Rights Rider

☐ Financial Information and Covenants Rider      ☐ Permitted Prior Encumbrance Rider

☐ Mortgage Insurance Rider                       ☐ Adjustable Rate Rider

☐ Other(s):   **Cross   Default   Rider,   Cross Collateralization Rider**

(I) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(K) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 4) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT

2

**(L) "Periodic Payment"** means the amount due for principal and interest under the Notes.

**(M) "Successor in Interest of Borrowers"** means any party that has taken title to the Property, whether or not that party has assumed obligations of the Borrowers under this Security Instrument or of Borrower Parties under the Notes.

----------

**TRANSFER OF RIGHTS IN THE PROPERTY**
This Security Instrument secures to Lender: (i) the repayment of the Loans, and all renewals, extensions and modifications of the Notes; and (ii) the performance of Borrowers' covenants and agreements under this Security Instrument and of Borrower Parties under the Notes. For this purpose, Borrowers irrevocably grant and convey to Trustee, in trust, with power of sale, the following described property located in the **County of Fresno, California**:

        **See Exhibit "A" attached hereto and made a part hereof.**

which currently has the address of:

subject only to those matters set forth in the Permitted Prior Encumbrance Rider, if said rider is attached (hereafter "Permitted Prior Encumbrances");

        **TOGETHER WITH** all buildings, improvements, equipment, fixtures and permanent plantings affixed, attached to or incorporated in the real property, and all additions, replacements, and improvements hereafter made thereto or placed therein or thereon; all rights-of-way, easements, rents, issues, profits, income, proceeds and general intangibles there from, tenements, hereditaments, remainders, reversions, privileges and appurtenances thereunto belonging, however evidenced, which are used or enjoyed in connection with the real property now or hereafter owned or belonging to the Borrowers or which hereafter may be acquired by Borrowers, excluding, however, the growing crop;

        **TOGETHER WITH** all water rights appurtenant to the real property, whether such water rights are riparian, appropriative or otherwise, along with all ditch and ditch rights and any shares of stock, licenses, permits and contracts evidencing such water or ditch rights appurtenant to the property, and all wells, reservoirs, dams, embankments or fixtures located on the real property;

        **TOGETHER WITH** all windmills, pumps, irrigation equipment, motors, engines, and devices of every kind, with the exception of rolling stock, now or hereafter attached or affixed to the real property, or for stock watering or domestic purposes thereon, and all grain bins and storage bins, which are owned by Borrowers and which are attached or affixed to the real property in **Fresno County, California**, described above together with all additional accessions, replacements, improvements, repairs and substitutions to said property and the proceeds thereof and all other fixtures now or hereafter attached or affixed to the real property, all of which are declared to be appurtenant to said real property, or incident to the ownership thereof;

        **TOGETHER WITH** all judgments, awards of damages, settlements and payments or security (i) hereafter made as a result of or in lieu of any taking of all or any part of the real property under the power of eminent domain or for any damage to the real property and/or the improvements located thereon, or any part thereof, and (ii) hereafter made for any damage to the real property and/or the improvements located thereon, or any part thereof resulting from exercise of or attempted exercise of mining rights or claims, however reserved or asserted, and resulting from the disturbance of any of the surface of the real property. Borrowers do hereby covenant and agree that Borrowers will not give such consent as may be required of the owner for mining or other surface disturbance by the terms of any patent, deed, statute, law or otherwise, without the prior written consent of Lender;

**CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT**

3

TOGETHER WITH all proceeds of and any unearned premiums on any insurance policies covering the real property and/or the improvements located thereon, including, without limitation, the right to receive and apply the proceeds of any insurance judgments, or settlements made in lieu thereof, for damage to the real property and/or the improvements located thereon or the indebtedness secured thereby;

TOGETHER WITH all contract rights, chattel paper, documents, accounts and general intangibles, rights to performance, entitlement to payment in cash or in kind, or any other benefits under any current or future governmental program which pertain to the real property, whether now or hereafter existing or acquired, excluding crop receivables;

TOGETHER WITH all cash and noncash proceeds of the conversion, voluntary or involuntary, of any of the foregoing;

TOGETHER WITH any and all of Borrowers' right, title, and/or interest in any and all system memberships and/or ownership certificates in any non-municipal water sewer systems now or in the future serving said property.

All replacements and additions shall also be covered by this Security Instrument.

All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWERS COVENANT that Borrowers are lawfully seized of the estate hereby conveyed and have the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record and specifically those permitted prior encumbrances, if any, set forth in the Permitted Prior Encumbrances Rider, if said rider is attached to this Security Instrument. Borrowers warrant and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property and fixtures.

UNIFORM COVENANTS. Borrowers covenant and agree as follows:
1. Payment of Principal, Interest, Prepayment Charges, Yield Maintenance Premiums and Late Charges. Borrowers and/or Borrower Parties shall pay when due the principal of, and interest on, the debt evidenced by the Notes and any yield maintenance premiums, any prepayment charges and late charges due under the Notes. Payments due under the Notes and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Notes or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Notes and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Notes or at such other location as may be designated by Lender in accordance with the notice provisions in Section 12. Lender may return any payment or partial payment if the payment or partial payment is insufficient to bring the Loans current. Lender may accept any payment or partial payment insufficient to bring the Loans current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payment in the future. No offset or claim which Borrowers might have now or in the future against Lender shall relieve Borrowers or Borrower Parties from making payments due under the Notes and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Unless required otherwise by Applicable Law, payments will be applied as set forth under the Notes.

If Lender receives a payment from Borrowers or Borrower Parties for a delinquent Periodic Payment that includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT

late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrowers and/or Borrower Parties to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Notes shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Charges; Liens.** Excluding liens associated with operating lines of credit that are secured by a growing crop and other personal property (each a "Crop Loan"), Borrowers shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any.

Borrowers shall promptly discharge any lien which has priority over this Security Instrument unless Borrowers: (a) agree in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrowers are performing such agreement; (b) contest the lien in good faith by, or defend against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secure from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrowers a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrowers shall satisfy the lien or take one or more of the actions set forth above in this Section 3.

Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender, defined below, on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances. Lender may require Borrowers and/or Borrower Parties to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with the Loans.

**4. Property Insurance.** Borrowers shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loans. The insurance carrier providing the insurance shall be chosen by Borrowers subject to Lender's right to disapprove Borrowers' choice, which right shall not be exercised unreasonably. Lender may require Borrowers to pay, in connection with the Loans, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrowers shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrowers.

If Borrowers fail to maintain any of the coverages described above, such failure shall constitute a default under the terms of this Security Instrument and the Loans. Lender may obtain insurance coverage, at Lender's option and Borrowers' expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrowers, Borrowers' equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrowers acknowledge that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrowers could have obtained. Any amounts disbursed by Lender under this Section 4 shall become additional debt of Borrowers and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the rate(s) under the Notes from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrowers requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrowers shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrowers obtain any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT

5

shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrowers shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrowers. Unless Lender and Borrowers otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrowers or Borrower Parties any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrowers or Borrower Parties shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrowers and Borrower Parties. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrowers and Borrower Parties. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrowers abandon the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrowers do not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 25 or otherwise, Borrowers hereby assign to Lender (a) Borrowers' and Borrower Parties' rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Notes or this Security Instrument, and (b) any other of Borrowers' rights (other than the right to any refund of unearned premiums paid by Borrowers or Borrower Parties) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Notes or this Security Instrument, whether or not then due.

**5. Preservation, Maintenance and Protection of the Property; Inspections.** Borrowers shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property, excluding ordinary wear and tear, ordinary farming practices and normal maturity of any permanent crop. Borrowers shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 4 that repair or restoration is not economically feasible, Borrowers shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrowers shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrowers are not relieved of Borrowers' obligation for the completion of such repair or restoration.

Borrowers will operate the Property in a good and workmanlike manner and in accordance with all Applicable Law and will pay all fees and charges of any kind in connection therewith. If applicable, Borrowers will use good farming and animal husbandry practices.

Lender or its agent may make reasonable entries upon and inspections of the Property with forty-eight (48) hours' advance written notice. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrowers notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**6. Loan Application.** Borrowers shall be in default if, during the Loan application process, Borrowers or Borrower Parties or any persons or entities acting at the direction of Borrowers or Borrower Parties or with Borrowers' or Borrower Parties' knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loans.

**7. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** Subject to any subordination or Intercreditor agreement entered into between Lender and the Crop Loan lender, and provided notice

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT

6

pursuant to Section 23 has been given to Borrowers, if (a) Borrowers fail to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrowers have abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property.  Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding, (d) perform any farming operations related to the planting, growing, maintenance, and harvesting of crops located on the Property, and (e) perform any ranching operations related to any animals located on the Property. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 7, Lender does not have to do so and is not under any duty or obligation to do so.  It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 7.  Lender may perform these or any other actions it deems necessary in Lender's sole discretion to preserve the value of the Property, and/or assign to others the right to do same on behalf of Lender. Lender may make advances under this Security Instrument or other instrument providing security for the Notes, to protect the Lender's interest in this security instrument or other instrument providing security for the Notes from loss of value or damage.  Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate indicated in the Notes shall become an obligation due and owing under the terms of the Notes immediately upon the date advanced by Lender and is an obligation of the Borrowers secured by the Security Instrument or other instrument providing security for the Notes.

Any amounts disbursed by Lender under this Section 7 shall become additional debt of Borrowers and Borrower Parties secured by this Security Instrument.  These amounts shall bear interest at the rate(s) under the Notes from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrowers and/or Borrower Parties requesting payment.

If this Security Instrument is on a leasehold, Borrowers shall comply with all the provisions of the lease. Borrowers shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrowers shall not, without the express written consent of Lender, alter or amend the ground lease.  If Borrowers acquire fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**8.  Assignment of Miscellaneous Proceeds; Forfeiture.**  All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly.  Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed.  Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrowers or Borrower Parties any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrowers or Borrower Parties. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrowers or Borrower Parties.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the

---

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT

sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrowers and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrowers.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrowers and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrowers, or if, after notice by Lender to Borrowers that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrowers and Borrower Parties fail to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrowers Miscellaneous Proceeds or the party against whom Borrowers have a right of action in regard to Miscellaneous Proceeds.

Borrowers shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or material impairment to the value of Lender's interest in the Property or rights under this Security Instrument. Borrowers can cure such a default and, if acceleration has occurred, reinstate as provided in Section 16, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**9. Borrowers Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrowers or any Successor in Interest of Borrowers shall not operate to release the liability of Borrowers or any Successors in Interest of Borrowers. Lender shall not be required to commence proceedings against any Successor in Interest of Borrowers or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrowers or any Successors in Interest of Borrowers. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from Borrowers, third persons, entities or Successors in Interest of Guarantors or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**10. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrowers covenant and agree that Borrowers' obligations and liability shall be joint and several. Subject to the provisions of Section 15, any Successor in Interest of Borrowers who assumes Borrowers' obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrowers' rights and benefits under this Security Instrument. Borrowers shall not be released from Borrowers' obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 17) and benefit the successors and assigns of Lender.

**11. Loan Charges.** Lender may charge Borrowers fees for services performed in connection with Borrowers' default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrowers shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loans are subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loans exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b)

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT

any sums already collected from Borrowers which exceeded permitted limits will be refunded to Borrowers. Lender may choose to make this refund by reducing the principal owed under the Notes or by making a direct payment to Borrowers or Borrower Parties. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Notes). Borrowers' or Borrower Parties' acceptance of any such refund made by direct payment to Borrowers or Borrower Parties will constitute a waiver of any right of action Borrowers or Borrower Parties might have arising out of such overcharge.

    **12. Notices.** All notices given by Borrowers or Lender in connection with this Security Instrument must be in writing. Any notice to Borrowers in connection with this Security Instrument shall be deemed to have been given to Borrowers when mailed by first class mail or when actually delivered to Borrowers' notice address if sent by other means. The notice address shall be Borrowers' Address unless Borrowers have designated a substitute notice address by notice to Lender. Borrowers shall promptly notify Lender of Borrowers' change of address. If Lender specifies a procedure for reporting Borrowers' change of address, then Borrowers shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrowers. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

    **13. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Notes conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Notes which can be given effect without the conflicting provision.

    As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

    **14. Borrowers' Copy.** Borrowers and Borrower Parties shall be given one copy of each of the Notes and of this Security Instrument.

    **15. Transfer of the Property or a Beneficial Interest in Borrowers.** As used in this Section 15, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrowers at a future date to a purchaser, excluding, however, easements granted by Borrowers in the ordinary course of business.

    If all or any part of the Property or any Interest in the Property is sold or transferred (or if any of the Borrowers are not a natural person and a beneficial interest in such of the Borrowers is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

    If Lender exercises this option, Lender shall give Borrowers notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 12 within which Borrowers must pay all sums secured by this Security Instrument. If Borrowers fail to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrowers.

    Borrowers may request Lender to release one or more parcels that make up the Property, from time to time, from the lien of the Deed of Trust (the "Partial Release") and Lender agrees to not unreasonably withhold its consent to the Partial Release, subject to the prior satisfaction of the condition that Borrowers shall submit a formal written request for the Partial Release (the "Request") not less than forty-five (45) days prior to the date upon which Borrowers desire to close the transfer of the parcel subject to the Partial Release (the "Release Parcel"). No

---

**CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT**

more than three (3) Requests shall be made per calendar year. The Request shall be sufficiently detailed and include all necessary documentation so as to allow Lender adequate time to process the Partial Release.

Notwithstanding the foregoing, upon the written request of Borrowers, Lender will subordinate its interest in any personal property, crops growing or to be grown on the Property, crop receivables, and all governmental payments relating to such crops (the "Crops"), but not to trees, irrigation equipment, water rights and permanent plantings, to the security interest of an institutional lender (a "Crop Lender") for one or more loans made to Borrowers or Borrower Parties to finance the production of crops on all or any portion of the Property ("Operating Financing"). Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances.

16. **Right to Reinstate After Acceleration.** If Borrowers meet certain conditions, Borrowers shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrowers' right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrowers: (a) pay Lender all sums which then would be due under this Security Instrument and the Notes as if no acceleration had occurred; (b) cure any default of any other covenants or agreements; (c) pay all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) take such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrowers' obligations to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrowers pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrowers, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 15.

17. **Sale of Notes; Change of Loan Servicer; Notice of Grievance.** The Notes or a partial interest in the Notes (together with this Security Instrument) can be sold one or more times without prior notice to Borrowers or Borrower Parties.

Neither Borrowers nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrowers or Lender has notified the other parties (with such notice given in compliance with the requirements of Section 12) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrowers pursuant to Section 25 and the notice of acceleration given to Borrowers pursuant to Section 15 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 17.

18. **Hazardous Substances.** As used in this Section 18: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrowers shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property, other than the presence, use, storage

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT

10

and disposal of Hazardous Substances in quantities as necessary for Borrowers' and Borrower Parties' normal farming or other commercial operations located on the Property, all of which Borrowers covenant have and will be used, stored, and disposed of in accordance with commercially reasonable practices and all applicable environmental laws. Borrowers shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal farming and residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrowers shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrowers or Borrower Parties have actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrowers learn, or are notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrowers shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup. Borrowers agree to indemnify and hold Lender free and harmless from and against all loss, costs (including attorneys' fees and costs), damage (including consequential damages), and expenses Lender may sustain by reason of the assertion against Lender by any third-party of any claim in connection with Hazardous Substances on, in or affecting the Property. Borrowers further agree that Lender shall have the right to join and participate in, as a party if it so elects, any legal proceedings or actions initiated in connection with any claims related to Hazardous Substances on, in or affecting the Property, and shall pay any such attorney fees and expenses Lender incurs in connection therewith.

**19. Additional Property Subject To The Security Instrument.** This Security Instrument also constitutes a security agreement within the meaning of the Uniform Commercial Code as adopted in the **State of California** (the "UCC"). In addition to the Property described in the Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in or on the Listed Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling, attached floor coverings, irrigation equipment (including, but not limited to, irrigation pipes and pumps, center irrigation pivots, pvc pipe, sprinklers, motors, well equipment, pumps and power units), livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom, and any substitutions or replacements therefore, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Borrowers or Borrower Parties to collect or enforce payment thereof, as well as to enforce any guarantees of the forgoing and security therefor, and all of Borrowers' and Borrower Parties' present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this Security Instrument as the "Property."

**20. Fixture Filing.** This Security Instrument constitutes a "fixture filing" for the purposes of the UCC against all of the Property which is or is to become fixtures per the UCC.

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT

**21. Use of Property; Compliance With Law.** Borrowers shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrowers shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**22. Assignment of Leases.** Upon Lender's request after default, Borrowers shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**23.  Assignment of Rents; Appointment of Receiver; Lender In Possession.** Borrowers absolutely and unconditionally assign and transfer to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrowers authorize Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrowers or Borrower Parties shall receive the Rents until (i) Lender has given Borrowers notice of default pursuant to Sections 12 and 25 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notices of default to Borrowers: (i) all Rents received by Borrowers or Borrower Parties shall be held by Borrowers or Borrower Parties as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrowers agree that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorneys' fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrowers and Borrower Parties to Lender secured by the Security Instrument pursuant to Section 7 of the Security Instrument.

Borrowers represent and warrant that Borrowers have not executed any prior assignment of the Rents and have not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrowers. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**24. Cross-Collateralization.** In addition to the Notes, all liens, security interests, assignments, suretyship obligations, stock pledges, rights and remedies granted to Lender in any loan document or agreement secure all obligations, debts and liabilities, plus interest thereon, of any or all Borrowers to Lender, as well as claims by Lender against any or all Borrowers, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Notes, whether voluntary or otherwise, whether due or not due, direct or indirect, absolute or contingent, whether any or all Borrowers may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

**25.  Cross-Default Provision.** Borrowers' or Borrower Parties' default or breach under any note or agreement in which Lender has an interest, including but not limited to the Notes, shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

---

**CALIFORNIA–Farmer Mac UNIFORM INSTRUMENT**

NON-UNIFORM COVENANTS. Borrowers further covenant and agree as follows:

26. Acceleration; Remedies. Following Borrowers' breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 15 unless Applicable Law provides otherwise) and prior to acceleration or Lender's exercise of any remedy, Lender shall give at least sixty (60) days written notice to Borrowers prior to exercising any remedy, unless otherwise provided under this Deed of Trust; provided, however, if such default cannot be cured within the 60-day period and Borrowers have commenced and diligently pursues the cure of the related default, Borrowers shall have such time as is commercially reasonably necessary for Borrowers to complete the cure, provided Lender is not materially prejudiced from such delay. Lender shall use commercially reasonable standards to determine if it is materially prejudiced by the delay. The notice shall specify: (a) the default; (b) the action required to cure the default; (c) the date by which the default must be cured. The notice shall further inform Borrowers of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrowers to acceleration and sale. If the default is not cured on or before the date specified in the notice or such extended period for defaults which cannot be cured within the 60-day period, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 25, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrowers and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrowers, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

27. Reconveyance.   Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

28. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrowers, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

29. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

---

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT

**30. Other California State Specific Provisions.**

(a)     In addition to the provisions of any loan agreement, Borrowers further agree that, if Lender accepts a guaranty of only a portion of the Indebtedness, Borrowers waive any right under California Civil Code Section 2822(a) to designate the portion of the Indebtedness which shall be satisfied by a guarantor's partial payment.

(b)     Except for matters covered by an O&M Program or matters described in any environmental indemnity agreement, Borrowers shall not cause or permit any lien (whether or not such lien has priority over the lien created by this Security Instrument) upon the Property imposed pursuant to any Environmental Laws.  Any such lien shall be considered a Prohibited Activity or Condition (as may also be contemplated in any environmental indemnity agreement).

(c)     Borrowers represent and warrant to Lender that, except as previously disclosed by Borrowers or Borrower Parties to Lender in writing:

(1)     at the time of acquiring the Property, Borrowers undertook all appropriate inquiry into the previous ownership and uses of the Property consistent with good commercial or customary practice and no evidence or indication came to light which would suggest that the Property has been or is now being used for any Prohibited Activities or Conditions; and

(2)     the Property has not been designated as "hazardous waste property" or "border zone property" pursuant to Section 25220, et seq., of the California Health and Safety Code.

The representations and warranties in this Security Instrument shall be continuing representations and warranties that shall be deemed to be made by Borrowers throughout the term of the Loans, until the Indebtedness has been paid in full.

(d)     Without limiting any of the remedies provided in this Security Instrument, Borrowers acknowledge and agrees that certain provisions in this Security Instrument are environmental provisions (as defined in Section 736(f)(2) of the California Code of Civil Procedure) made by Borrowers relating to the real property security (the "**Environmental Provisions**"), and that to the extent applicable, Borrowers' failures to comply with any of the Environmental Provisions will be a breach of contract that will entitle Lender to pursue the remedies provided by Section 736 of the California Code of Civil Procedure for the recovery of damages and for the enforcement of the Environmental Provisions.

Except as otherwise stated herein, nothing in the provisions of this Amendment shall be deemed in any way to affect the priority of the Original Deed of Trust over any other lien, charge, encumbrance or conveyance, or to release or change the liability of any party who may be liable under the Note.

*[remainder of page intentionally left blank – signature page follows]*

**CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT**

14

BY SIGNING BELOW, Borrowers accept and agree to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrowers or Borrower Parties.

**BORROWERS:**

**C & A FARMS, LLC**,
a California limited liability company

_____

By:  Farshid Assemi
Its:  Manager

**ACAP FARMS, LLC**,
a California limited liability company

_____ N/A

By:  Farshid Assemi
Its:  Manager

**LINCOLN GRANTOR FARMS, LLC**,
a California limited liability company   N/A

_____

By:  Neema Assemi
Its:  Manager

**CANTUA ORCHARDS, LLC**,
a California limited liability company

_____

By:  Farshid Assemi
Its:  Manager

**GRADON FARMS, LLC**,
a California limited liability company

_____

By:  Neema Assemi
Its:  Manager

---

**CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT**

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA
COUNTY OF _Fresno_

On _1/25/2023_ before me, _L. Diaz, Notary Public_, personally appeared **Farshid Assemi**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

Notary Public
Printed Name: _L. Diaz_
My commission expires: _April 20, 2026_

> L. DIAZ
> Notary Public - California
> Fresno County
> Commission # 2398671
> My Comm. Expires Apr 20, 2026

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA
COUNTY OF _Fresno_

On _1/25/2023_ before me, _L. Diaz, Notary Public_, personally appeared **Neema Assemi**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

Notary Public
Printed Name: _L. Diaz_
My commission expires: _April 20, 2026_

> L. DIAZ
> Notary Public - California
> Fresno County
> Commission # 2398671
> My Comm. Expires Apr 20, 2026

**CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT**

16

ORDER NO. : 1421002561

# EXHIBIT A

**TRACT II:**

**The land referred to below is situated in an unincorporated area of the County of Fresno, State of California:**

PARCEL 9:

The North half of the Northeast Quarter of Section 22, Township 16 South, Range 14 East, Mount Diablo Base and Meridian, according to the Plat thereof.

EXCEPTING THEREFROM the North 50 feet, as conveyed to the County of Fresno in Deed recorded April 22, 1970 in Book 5780, Page 78 of Official Records.

APN: 038-141-21S
PARCEL 10:

The Northwest quarter of Section 8, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof;

EXCEPTING THEREFROM an undivided one-half interest in and to all oil, gas, minerals and other hydrocarbon substances now or at any time situate in and under said land, as reserved in the deed from R. T. Hughes and Bess L. Hughes, husband and wife, to John H. Edgar and Ruby Dale Edgar, husband and wife, as joint tenants, July 10, 1950, recorded January 24, 1950 in Book 2829 Page 69 of Official Records, Document No. 4385.

ALSO EXCEPTING THEREFROM an undivided one-fourth interest in and to all oil, gas and other hydrocarbons and minerals now or at any time hereinafter situate therein and thereunder, together with all easements and rights necessary or convenient for the production, storage and transportation thereof and the exploration and testing of the said real property, and also the right to drill for, produce and use water from the said real property in connection with drilling or mining operations thereon, as reserved in the deed from Raymond Dale Johnson to Bernie Thurman and James V. Gregory, as Trustees for Tanya Marie Marshall under that certain irrevocable Trust Agreement dated May 30, 1974, recorded on June 25, 1974 as Document No. 47802.

APN: 040-020-18-S

PARCEL 11:

The East half of the Northwest quarter of the Northeast quarter of the Northwest quarter; the West half of the Northeast quarter of the Northeast quarter of the Northwest quarter; and the East half of the Northeast quarter of the Northeast quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the East 420.9 feet of the North half of the Northeast quarter of the Northeast quarter of the Northwest quarter of said Section 7.

ALSO EXCEPTING THEREFROM commencing at the Northwest corner of the East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7, running thence East along the North boundary line of said Section 7; 4.09 feet; thence in a Southerly direction in a straight line to a point on the South boundary line of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7, said point being 17 feet East of the Southwest corner of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7; thence West along the South boundary line of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7; 17 feet to the Southwest corner of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7; thence North along the West boundary line of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7 to the said Northwest corner of the said East half of the Northwest quarter of the Northeast quarter of the Northeast quarter of said Section 7.

APN: 464-20-07

PARCEL 12:

The West 161 feet of the East 420.9 feet of the North half of the Northeast quarter of the Northeast quarter of the Northwest quarter of Section 17, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN: 464-020-08

PARCEL 13:

The North half of the East 259.9 feet of the East half of the Northeast quarter of the Northeast quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof; said 259.9 feet measured from the East line of said Northwest quarter of said section.

APN: 464-020-09

PARCEL 14:

The North half of the Northeast quarter of the Southeast quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN: 464-020-12

PARCEL 15:

The North half of the Northwest quarter of the Southeast quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN: 464-020-13

PARCEL 16:

The South one-half of the Northeast one-quarter of the Northwest one-quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the East 195 feet of the South 114 feet thereof.

ALSO EXCEPTING THEREFROM that portion lying within Parcel Map No. 82-33, according to the Map thereof recorded in Book 44, Pages 2 and 3 of Parcel Maps, Fresno County Records.

APN: 464-020-15

PARCEL 17:

The East 195 feet of the South 114 feet of the South one-half of the Northeast one-quarter of the Northwest one-quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN: 464-020-16

PARCEL 18:

The Southwest quarter of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN: 464-020-19

PARCEL 19:

The South three-fourths of the Southeast quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the South 351 feet of the East 340 feet thereof.

APN: 464-020-25

PARCEL 20:

Parcel "A" of Parcel Map No. 82-33, according to the Map thereof recorded in Book 44, Pages 2 and 3 of Parcel Maps, Fresno County Records.

APN: 464-020-26

PARCEL 20-A:

A right of way for road purposes over the Westerly 30 feet of the East 330 feet of the East half of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM that portion lying within Parcel Ten described therein.

PARCEL 21:

The fractional Southwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the East 990 feet thereof.

APN: 464-020-28
PARCEL 22:

The West 330 feet of the East 990 feet of the fractional Southwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN: 464-020-29

PARCEL 23:

The West 330 feet of the East 660 feet of the fractional Southwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN: 464-020-30

PARCEL 24:

The East 330 feet of the fractional Southwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN: 464-020-31

PARCEL 25:

Parcel B of Parcel Map No. 82-33, according to the Map thereof recorded in Book 44, Pages 2 and 3 of Parcel Maps, Fresno County Records.

APN: 464-020-34

PARCEL 26:

The East 125 feet of the Northwest quarter of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM that portion conveyed to the State of California, by Deed recorded July 31, 2003, as Document No. 2003-0173909, Official Records.

APN: 464-020-35

PARCEL 27:

The East half of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the East 330 feet thereof.

ALSO EXCEPTING THEREFROM that portion of said land as conveyed to the State of California by Grant Deed recorded July 31, 2003, as Document No. 2003-0173909, Official Records.

APN: 464-020-36

PARCEL 28:

The Northwest quarter of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the West 200 feet thereof.

EXCEPTING THEREFROM the East 125 feet thereof.

ALSO EXCEPTING THEREFROM that portion conveyed to the State of California in the Deed recorded January 12, 2004, as Document No. 2004-0007899, Official Records.

APN: 464-020-37

PARCEL 29:

All of Briscoe Tract, a Subdivision of the East half of the Southwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, unincorporated area, County of Fresno, State of California, except Lot 3 of Briscoe Tract, the same being in Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, unincorporated area, County of Fresno, State of California.

ALSO EXCEPTING THEREFROM that portion conveyed to the Fresno Irrigation District by Deed recorded February 13, 2006, as Instrument No. 2006-0031312 of Official Records.

APN: 464-060-17

PARCEL 30:

Lots 13, 14, 15 and 16 of Pleasant Dale, in the City of Fresno, County of Fresno, State of California, according to the Map thereof recorded in Book 2, Page 38 of Plats, in the Office of the County Recorder of said County.

TOGETHER WITH that portion of abandoned South Pleasant Avenue, which would pass by operation of law

APN: 477-021-09

PARCEL 31:

The South half of Lot 2, all of Lot 3 and the North half of Lot 4 of Pleasant Dale, according to the Map thereof recorded <u>December 30, 1887, in Book 2, Page 38 of Plats</u>, Fresno County Records.

PARCEL 31-A:

An easement for a right of way or right to maintain, repair and replace an underground water pipe system as created in that certain Grant of Easement (Agreement) by and between Henry N. Tsuruoka and Lily V. Tsuruoka, husband and wife, and Albert Medzadoorian, recorded <u>March 23, 1979 in Book 7246 of Official Records, Page 579, Instrument No. 34238</u>, and being further described as follows:

That certain 10-foot strip of land lying 5 feet on each side of the following described centerline:

Commencing at the North corner of Section 18, Township 14 South, Range 20 East, M.D.B.M.; thence South along the East line of the Northwest $1/4$ of said Section 18, a distance of 32.96 feet; thence West a distance of 77.95 feet to the true point of beginning; thence South 75° 33' 40" East, a distance of 18.00 feet; thence South 39° 51' 05" East, a distance of 38.13 feet; thence South 00° 58' 30", a distance of 447.09 feet to the North line of the South $1/2$ of Lot 2 of Pleasant Dale, <u>Plats Book 2, Page 38</u>, Fresno County Records.

APN: 477-021-11

PARCEL 32:

The Easterly 200.00 feet of the Southerly 270.00 feet of Lot 9 of Pleasant Dale, according to the Map thereof recorded in <u>Book 2, Page 38 of Plats</u>, Fresno County Records.

APN: 477-021-18

PARCEL 32-A:

A non-exclusive easement thirty (30) foot wide road right of way being described as follows:

The South 30.00 feet of the West 120.00 feet of the East 320.00 feet of Lot 9 of Pleasant Dale according to the Map thereof recorded in <u>Book 2, Page 38 of Plats</u>, Fresno County Records.

PARCEL 32-B:

A non-exclusive five (5) foot wide right of way for maintenance, repairs, operations, additions, alterations and betterments for a water pipeline, the centerline of said right of way being described as follows:

Commencing at a point on the Westerly line of that certain parcel of land, said point bearing South 89° 14' 00" West, 200.00 feet and North 0° 21' 43" East, 32.70 feet from the Southeast corner of Lot 9 of Pleasant Dale according to the Map thereof recorded in Book 2, Page 38 of Plats, Fresno County Records; thence South 89° 14' 00" West, 67.74 feet; thence South 0° 21'

45" West, 6.50 feet to a point South 0° 21' 45" West, 2.50 feet from an existing domestic water well.

PARCEL 33:

Lots 9, 10, 11 and 12 of Pleasant Dale, according to the Map thereof recorded in Book 2, Page 38 of Plats, Fresno County Records.

EXCEPTING THEREFROM the Easterly 200.00 feet of the Southerly 270.00 feet of said Lot 9.

ALSO EXCEPTING THEREFROM the Westerly 170.00 feet of the Southerly 270.00 feet of said Lot 9.

APN: 477-021-19

PARCEL 34:

The un-numbered Lot lying West of, and adjoining, Lots 21, 22, 23 and 234 of Pleasant Dale, according to the Map thereof, recorded in Book 2, Page 38 of Plats, Fresno County Records.

Said property is also described as the West one-half of the Southwest quarter of the fractional Northwest quarter of Section 18, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the North 214.29 feet of the South 627.7 feet to the West 280.00 feet thereof.

and

Lots 21, 22, 23 and 24 of pleasant dale according to the Map thereof recorded December 30, 1887, in Book 2, Page 38 of Plats, Fresno County Records.

APN: 477-021-20

PARCEL 35:

The West 330 feet of the West one-half of the Northwest quarter of the Northwest quarter of Section 18, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM that portion described in the Deed to the City of Fresno recorded November 14, 2003, as Document No. 2003-0276316, Official Records.

and

Lot 20 of Pleasant Dale, according to the Map thereof recorded in Book 2, Page 38 of Plats, Fresno County Records.

EXCEPTING THEREFROM that portion described in the Deed to the City of Fresno recorded November 14, 2003, as Document No. 2003-0276316, Official Records.

and

Beginning at a point on the North line of the Northwest quarter of Section 18, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof, 1980 feet West of the Northeast corner of the Northwest quarter of said Section; thence South 0° 35' East, 1321 feet to a point on the South line of the North half of the Northwest quarter of said Section distant 1970.5 feet South 89° 55' West from the Southeast corner of the Northeast quarter of the Northwest quarter of said Section; thence West along the South line of the North half of the Northwest quarter of said section to the West line of said section; thence North along said West line to the Northwest corner of said section; thence East along the North line of said section to the point of beginning.

EXCEPTING THEREFROM the West 330 feet thereof.

ALSO EXCEPTING THEREFROM that portion described in the Deed to the City of Fresno, recorded November 14, 2003, as Document No. 2003-0276316, Official Records.

APN: 477-021-25

PARCEL 36:

Lots 3, 4, 5 and 6 of West Villa Tract, according to the Map thereof, filed for record in Book 2, Page 49 of Plats, Fresno County Records.

APN: 464-070-10; and 464-070-11

PARCEL 37:

The Northwest quarter of the Southwest quarter of the Southeast quarter and the West half of the Northeast quarter of Southwest quarter of Southeast quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, in the County of Fresno, State of California, according to the United States Government Township Plats.

EXCEPTING THEREFROM that portion described in Grant Deed recorded September 8, 1982, as Instrument No. 82-77115, in Book 7969, Page 387 of Official Records.

APN: 464-101-23

Recorded at Request of
Old Republic Title Company ⓆⓅⓃ

Laura Avila, Assessor-Recorder
Kern County Official Records

BM
2/06/2023
09:15 AM

① 1421 002583-0B

Recording Requested By:

**Conterra Agricultural Capital, LLC**

After Recording Return To:

Conterra Agricultural Capital, LLC
5465 Mills Civic Parkway, Suite 201
West Des Moines, IA 50266
Attn: Taylor Petersen

Recorded Electronically by:
**451  Old Republic Title Company**



**DOC #:  223013714**

223013714

| Stat Types: 3 | Pages:  24 |
|---|---|
| FEES | 135.00 |
| TAXES | .00 |
| OTHER | 225.00 |
| PAID | 360.00 |

_____ [Space Above This Line For Recording Data] _____

# DEED OF TRUST
## Security Agreement, Assignment of Rents and Fixture Filing

Loan # REDACTED 1004

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in certain Sections of this document. Certain rules regarding the usage of words used in this document are also provided in Section 13.

**(A)  "Security Instrument"** means this document, which is dated **February 2, 2023**, together with all Riders to this document.

**(B)  "Lender"** is **Conterra Agricultural Capital, LLC**. Lender is a **limited liability company** organized and existing under the laws of **Iowa**. Lender's address is **5465 Mills Civic Parkway, Suite 201, West Des Moines, IA 50266**. Lender is the beneficiary under this Security Instrument.

**(C)  "Borrowers"** are **Maricopa Orchards, LLC**, a California limited liability company, **C&A Farms, LLC**, a California limited liability company, and **Willow Avenue Investments, LLC**, a California limited liability company. Borrowers are trustors under this Security Instrument. **"Borrower Parties"** are Borrowers and Copper Avenue Investments, LLC, a California limited liability company, **ACAP Farms, LLC**, a California limited liability company, Lincoln Grantor Farms, LLC a California limited liability company, Cantua Orchards, LLC, a California limited liability company, and Gradon Farms, LLC, a California limited liability company. Borrower Parties' address is **5260 N. Palm Ave. Ste. 421, Mail Stop M, Fresno, CA 93704**.

**(D)  "Trustee"** is **Old Republic Title Company**.

**(E)  "Notes"** means: (i) Borrower Parties' promissory note dated **February 2, 2023**, maturing on February 2, 2028, in the original principal amount of **$7,400,000.00**, plus interest; (ii) a promissory note made by C&A Farms, LLC and Whitesbridge Farms, LLC dated January 8, 2018, maturing on July 1, 2033, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal of $5,500,000.00, plus interest; (iii) an open ended promissory note made by C&A Farms, LLC and Whitesbridge Farms, LLC dated January 8, 2018, and subsequently converted on June 27, 2018, maturing on July 1, 2038, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT

1

Recorded at Request of
Old Republic Title Company  QPN

1421002583-OB

Recording Requested By:

**Conterra Agricultural Capital, LLC**

After Recording Return To:

**Conterra Agricultural Capital, LLC**
**5465 Mills Civic Parkway, Suite 201**
**West Des Moines, IA 50266**
**Attn: Taylor Petersen**

_____ [Space Above This Line For Recording Data] _____

# DEED OF TRUST
## Security Agreement, Assignment of Rents and Fixture Filing

Loan #<sup>REDACTED</sup>1004

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in certain Sections of this document. Certain rules regarding the usage of words used in this document are also provided in Section 13.

**(A) "Security Instrument"** means this document, which is dated **February 2, 2023**, together with all Riders to this document.

**(B) "Lender"** is **Conterra Agricultural Capital, LLC**. Lender is a **limited liability company** organized and existing under the laws of **Iowa**. Lender's address is **5465 Mills Civic Parkway, Suite 201, West Des Moines, IA 50266**. Lender is the beneficiary under this Security Instrument.

**(C) "Borrowers"** are **Maricopa Orchards, LLC, a California limited liability company, C&A Farms, LLC, a California limited liability company,** and **Willow Avenue Investments, LLC, a California limited liability company**. Borrowers are trustors under this Security Instrument. **"Borrower Parties"** are **Borrowers and Copper Avenue Investments, LLC, a California limited liability company, ACAP Farms, LLC, a California limited liability company, Lincoln Grantor Farms, LLC a California limited liability company, Cantua Orchards, LLC, a California limited liability company, and Gradon Farms, LLC, a California limited liability company.** Borrower Parties' address is **5260 N. Palm Ave. Ste. 421, Mail Stop M, Fresno, CA 93704**.

**(D) "Trustee"** is **Old Republic Title Company**.

**(E) "Notes"** means: (i) Borrower Parties' promissory note dated **February 2, 2023**, maturing on February 2, 2028, in the original principal amount of **$7,400,000.00**, plus interest; (ii) a promissory note made by C&A Farms, LLC and Whitesbridge Farms, LLC dated January 8, 2018, maturing on July 1, 2033, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal of $5,500,000.00, plus interest; (iii) an open ended promissory note made by C&A Farms, LLC and Whitesbridge Farms, LLC dated January 8, 2018, and subsequently converted on June 27, 2018, maturing on July 1, 2038, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT

1

original principal amount of up to $1,500,000.00, plus interest; (iv) an open ended promissory note made by Maricopa Orchards, LLC, Copper Avenue Investments, LLC, Lincoln Grantor Farms, LLC, and ACAP Farms, LLC dated October 11, 2019, maturing on October 11, 2044, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of up to $5,297,232.00, plus interest; (v) a promissory note made by Maricopa Orchards, LLC, Copper Avenue Investments, LLC, Lincoln Grantor Farms, LLC, and ACAP Farms, LLC dated October 11, 2019, maturing on October 11, 2039, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of $10,258,632.00, plus interest; (vi) an open ended promissory note made by Maricopa Orchards, LLC, C&A Farms, LLC, Willow Avenue Investments, LLC, Assemi Brothers, LLC, and Whitesbridge Farms, LLC dated December 14, 2020, maturing on January 1, 2026, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of up to $12,500,000.00, plus interest; and (vii) an open ended promissory note made by Maricopa Orchards, LLC, C&A Farms, LLC, Willow Avenue Investments, LLC, Assemi Brothers, LLC and Whitesbridge Farms, LLC dated December 14, 2020, maturing on January 1, 2026, payable to the order of U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs in the original principal amount of up to $12,500,000.00, plus interest. Borrower Parties have promised to pay this debt in regular Periodic Payments and to pay Notes in full not later than the **maturity date of each Note.**

(F) **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

(G) **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) **"Riders"** means all Riders to this Security Instrument that are executed by Borrowers or Borrower Parties and are to be recorded. The following Riders are to be executed by Borrowers or Borrower Parties and recorded with this Security Instrument:

☐ Irrigation Equipment Rider      ☐ Water Rights Rider

☐ Financial Information and Covenants Rider      ☐ Permitted Prior Encumbrance Rider

☐ Mortgage Insurance Rider      ☐ Adjustable Rate Rider

☐ Other(s):    Cross    Default    Rider,    Cross **Collateralization Rider**

(I) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(K) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 4) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(L) **"Periodic Payment"** means the amount due for principal and interest under the Notes.

**CALIFORNIA–Farmer Mac UNIFORM INSTRUMENT**

**(M)** **"Successor in Interest of Borrowers"** means any party that has taken title to the Property, whether or not that party has assumed obligations of the Borrowers under this Security Instrument or of Borrower Parties under the Notes.

———————

**TRANSFER OF RIGHTS IN THE PROPERTY**
This Security Instrument secures to Lender: (i) the repayment of the Loans, and all renewals, extensions and modifications of the Notes; and (ii) the performance of Borrowers' covenants and agreements under this Security Instrument and of Borrower Parties under the Notes.  For this purpose, Borrowers irrevocably grant and convey to Trustee, in trust, with power of sale, the following described property located in the **County of Kern, California**:

>    **See Exhibit "A" attached hereto and made a part hereof.**

which currently has the address of:

subject only to those matters set forth in the Permitted Prior Encumbrance Rider, if said rider is attached (hereafter "Permitted Prior Encumbrances");

>    **TOGETHER WITH** all buildings, improvements, equipment, fixtures and permanent plantings affixed, attached to or incorporated in the real property, and all additions, replacements, and improvements hereafter made thereto or placed therein or thereon; all rights-of-way, easements, rents, issues, profits, income, proceeds and general intangibles there from, tenements, hereditaments, remainders, reversions, privileges and appurtenances thereunto belonging, however evidenced, which are used or enjoyed in connection with the real property now or hereafter owned or belonging to the Borrowers or which hereafter may be acquired by Borrowers, excluding, however, the growing crop;

>    **TOGETHER WITH** all water rights appurtenant to the real property, whether such water rights are riparian, appropriative or otherwise, along with all ditch and ditch rights and any shares of stock, licenses, permits and contracts evidencing such water or ditch rights appurtenant to the property, and all wells, reservoirs, dams, embankments or fixtures located on the real property;

>    **TOGETHER WITH** all windmills, pumps, irrigation equipment, motors, engines, and devices of every kind, with the exception of rolling stock, now or hereafter attached or affixed to the real property, or for stock watering or domestic purposes thereon, and all grain bins and storage bins, which are owned by Borrowers and which are attached or affixed to the  real property in **Kern County, California**, described above together with all additional accessions, replacements, improvements, repairs and substitutions to said property and the proceeds thereof and all other fixtures now or hereafter attached or affixed to the real property, all of which are declared to be appurtenant to said real property, or incident to the ownership thereof;

>    **TOGETHER WITH** all judgments, awards of damages, settlements and payments or security (i) hereafter made as a result of or in lieu of any taking of all or any part of the real property under the power of eminent domain or for any damage to the real property and/or the improvements located thereon, or any part thereof, and (ii) hereafter made for any damage to the real property and/or the improvements located thereon, or any part thereof resulting from exercise of or attempted exercise of mining rights or claims, however reserved or asserted, and resulting from the disturbance of any of the surface of the real property.  Borrowers do hereby covenant and agree that Borrowers will not give such consent as may be required of the owner for mining or other surface disturbance by the terms of any patent, deed, statute, law or otherwise, without the prior written consent of Lender;

>    **TOGETHER WITH** all proceeds of and any unearned premiums on any insurance policies covering the real

---
CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT

3

property and/or the improvements located thereon, including, without limitation, the right to receive and apply the proceeds of any insurance judgments, or settlements made in lieu thereof, for damage to the real property and/or the improvements located thereon or the indebtedness secured thereby;

**TOGETHER WITH** all contract rights, chattel paper, documents, accounts and general intangibles, rights to performance, entitlement to payment in cash or in kind, or any other benefits under any current or future governmental program which pertain to the real property, whether now or hereafter existing or acquired, excluding crop receivables;

**TOGETHER WITH** all cash and noncash proceeds of the conversion, voluntary or involuntary, of any of the foregoing;

**TOGETHER WITH** any and all of Borrowers' right, title, and/or interest in any and all system memberships and/or ownership certificates in any non-municipal water sewer systems now or in the future serving said property.

All replacements and additions shall also be covered by this Security Instrument.

All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWERS COVENANT that Borrowers are lawfully seized of the estate hereby conveyed and have the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record and specifically those permitted prior encumbrances, if any, set forth in the Permitted Prior Encumbrances Rider, if said rider is attached to this Security Instrument. Borrowers warrant and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property and fixtures.

UNIFORM COVENANTS. Borrowers covenant and agree as follows:
**1. Payment of Principal, Interest, Prepayment Charges, Yield Maintenance Premiums and Late Charges.** Borrowers and/or Borrower Parties shall pay when due the principal of, and interest on, the debt evidenced by the Notes and any yield maintenance premiums, any prepayment charges and late charges due under the Notes. Payments due under the Notes and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Notes or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Notes and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Notes or at such other location as may be designated by Lender in accordance with the notice provisions in Section 12. Lender may return any payment or partial payment if the payment or partial payment is insufficient to bring the Loans current. Lender may accept any payment or partial payment insufficient to bring the Loans current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payment in the future. No offset or claim which Borrowers might have now or in the future against Lender shall relieve Borrowers or Borrower Parties from making payments due under the Notes and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Unless required otherwise by Applicable Law, payments will be applied as set forth under the Notes.

If Lender receives a payment from Borrowers or Borrower Parties for a delinquent Periodic Payment that includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrowers and/or Borrower Parties to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in

full.  To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Notes shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3.  Charges; Liens.**  Excluding liens associated with operating lines of credit that are secured by a growing crop and other personal property (each a "Crop Loan"), Borrowers shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any.

Borrowers shall promptly discharge any lien which has priority over this Security Instrument unless Borrowers: (a) agree in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrowers are performing such agreement; (b) contest the lien in good faith by, or defend against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secure from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument.  If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrowers a notice identifying the lien.  Within 10 days of the date on which that notice is given, Borrowers shall satisfy the lien or take one or more of the actions set forth above in this Section 3.

Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender, defined below, on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances.  Lender may require Borrowers and/or Borrower Parties to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with the Loans.

**4.  Property Insurance.**  Borrowers shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards for which Lender requires insurance.  This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires.  What Lender requires pursuant to the preceding sentences can change during the term of the Loans.  The insurance carrier providing the insurance shall be chosen by Borrowers subject to Lender's right to disapprove Borrowers' choice, which right shall not be exercised unreasonably.  Lender may require Borrowers to pay, in connection with the Loans, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification.  Borrowers shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrowers.

If Borrowers fail to maintain any of the coverages described above, such failure shall constitute a default under the terms of this Security Instrument and the Loans.  Lender may obtain insurance coverage, at Lender's option and Borrowers' expense.  Lender is under no obligation to purchase any particular type or amount of coverage.  Therefore, such coverage shall cover Lender, but might or might not protect Borrowers, Borrowers' equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect.  Borrowers acknowledge that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrowers could have obtained.  Any amounts disbursed by Lender under this Section 4 shall become additional debt of Borrowers and Borrower Parties secured by this Security Instrument.  These amounts shall bear interest at the rate(s) under the Notes from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrowers requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee.  Lender shall have the right to hold the policies and renewal certificates.  If Lender requires, Borrowers shall promptly give to Lender all receipts of paid premiums and renewal notices.  If Borrowers obtain any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrowers shall give prompt notice to the insurance carrier and Lender. Lender may make

---

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT

5

proof of loss if not made promptly by Borrowers. Unless Lender and Borrowers otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrowers or Borrower Parties any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrowers or Borrower Parties shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrowers and Borrower Parties. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrowers and Borrower Parties. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrowers abandon the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrowers do not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 25 or otherwise, Borrowers hereby assign to Lender (a) Borrowers' and Borrower Parties' rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Notes or this Security Instrument, and (b) any other of Borrowers' rights (other than the right to any refund of unearned premiums paid by Borrowers or Borrower Parties) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Notes or this Security Instrument, whether or not then due.

**5. Preservation, Maintenance and Protection of the Property; Inspections.** Borrowers shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property, excluding ordinary wear and tear, ordinary farming practices and normal maturity of any permanent crop. Borrowers shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 4 that repair or restoration is not economically feasible, Borrowers shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrowers shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrowers are not relieved of Borrowers' obligation for the completion of such repair or restoration.

Borrowers will operate the Property in a good and workmanlike manner and in accordance with all Applicable Law and will pay all fees and charges of any kind in connection therewith. If applicable, Borrowers will use good farming and animal husbandry practices.

Lender or its agent may make reasonable entries upon and inspections of the Property with forty-eight (48) hours' advance written notice. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrowers notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**6. Loan Application.** Borrowers shall be in default if, during the Loan application process, Borrowers or Borrower Parties or any persons or entities acting at the direction of Borrowers or Borrower Parties or with Borrowers' or Borrower Parties' knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loans.

**7. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** Subject to any subordination or Intercreditor agreement entered into between Lender and the Crop Loan lender, and provided notice pursuant to Section 23 has been given to Borrowers, if (a) Borrowers fail to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT

6

the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrowers have abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding, (d) perform any farming operations related to the planting, growing, maintenance, and harvesting of crops located on the Property, and (e) perform any ranching operations related to any animals located on the Property. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 7, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 7. Lender may perform these or any other actions it deems necessary in Lender's sole discretion to preserve the value of the Property, and/or assign to others the right to do same on behalf of Lender. Lender may make advances under this Security Instrument or other instrument providing security for the Notes, to protect the Lender's interest in this security instrument or other instrument providing security for the Notes from loss of value or damage. Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate indicated in the Notes shall become an obligation due and owing under the terms of the Notes immediately upon the date advanced by Lender and is an obligation of the Borrowers secured by the Security Instrument or other instrument providing security for the Notes.

Any amounts disbursed by Lender under this Section 7 shall become additional debt of Borrowers and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the rate(s) under the Notes from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrowers and/or Borrower Parties requesting payment.

If this Security Instrument is on a leasehold, Borrowers shall comply with all the provisions of the lease. Borrowers shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrowers shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrowers acquire fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**8. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrowers or Borrower Parties any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrowers or Borrower Parties. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrowers or Borrower Parties.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrowers and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the

---

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT

amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrowers.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrowers and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrowers, or if, after notice by Lender to Borrowers that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrowers and Borrower Parties fail to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrowers Miscellaneous Proceeds or the party against whom Borrowers have a right of action in regard to Miscellaneous Proceeds.

Borrowers shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or material impairment to the value of Lender's interest in the Property or rights under this Security Instrument. Borrowers can cure such a default and, if acceleration has occurred, reinstate as provided in Section 16, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**9.  Borrowers Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrowers or any Successor in Interest of Borrowers shall not operate to release the liability of Borrowers or any Successors in Interest of Borrowers. Lender shall not be required to commence proceedings against any Successor in Interest of Borrowers or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrowers or any Successors in Interest of Borrowers. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from Borrowers, third persons, entities or Successors in Interest of Guarantors or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**10.  Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrowers covenant and agree that Borrowers' obligations and liability shall be joint and several. Subject to the provisions of Section 15, any Successor in Interest of Borrowers who assumes Borrowers' obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrowers' rights and benefits under this Security Instrument. Borrowers shall not be released from Borrowers' obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 17) and benefit the successors and assigns of Lender.

**11.  Loan Charges.** Lender may charge Borrowers fees for services performed in connection with Borrowers' default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrowers shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loans are subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loans exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrowers which exceeded permitted limits will be refunded to Borrowers. Lender may choose to make this refund by reducing the principal owed under the Notes or by making a direct payment to Borrowers

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT

8

or Borrower Parties. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Notes). Borrowers' or Borrower Parties' acceptance of any such refund made by direct payment to Borrowers or Borrower Parties will constitute a waiver of any right of action Borrowers or Borrower Parties might have arising out of such overcharge.

**12. Notices.** All notices given by Borrowers or Lender in connection with this Security Instrument must be in writing. Any notice to Borrowers in connection with this Security Instrument shall be deemed to have been given to Borrowers when mailed by first class mail or when actually delivered to Borrowers' notice address if sent by other means. The notice address shall be Borrowers' Address unless Borrowers have designated a substitute notice address by notice to Lender. Borrowers shall promptly notify Lender of Borrowers' change of address. If Lender specifies a procedure for reporting Borrowers' change of address, then Borrowers shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrowers. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**13. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Notes conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Notes which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**14. Borrowers' Copy.** Borrowers and Borrower Parties shall be given one copy of each of the Notes and of this Security Instrument.

**15. Transfer of the Property or a Beneficial Interest in Borrowers.** As used in this Section 15, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrowers at a future date to a purchaser, excluding, however, easements granted by Borrowers in the ordinary course of business.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if any of the Borrowers are not a natural person and a beneficial interest in such of the Borrowers is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrowers notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 12 within which Borrowers must pay all sums secured by this Security Instrument. If Borrowers fail to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrowers.

Borrowers may request Lender to release one or more parcels that make up the Property, from time to time, from the lien of the Deed of Trust (the "Partial Release") and Lender agrees to not unreasonably withhold its consent to the Partial Release, subject to the prior satisfaction of the condition that Borrowers shall submit a formal written request for the Partial Release (the "Request") not less than forty-five (45) days prior to the date upon which Borrowers desire to close the transfer of the parcel subject to the Partial Release (the "Release Parcel"). No more than three (3) Requests shall be made per calendar year. The Request shall be sufficiently detailed and include all necessary documentation so as to allow Lender adequate time to process the Partial Release.

---

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT

9

Notwithstanding the foregoing,  upon the written request of Borrowers, Lender will subordinate its interest in any personal property, crops growing or to be grown on the Property, crop receivables, and all governmental payments relating to such crops (the "Crops"), but not to trees, irrigation equipment, water rights and permanent plantings, to the security interest of an institutional lender (a "Crop Lender") for one or more loans made to Borrowers or Borrower Parties to finance the production of crops on all or any portion of the Property ("Operating Financing"). Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances.

**16. Right to Reinstate After Acceleration.** If Borrowers meet certain conditions, Borrowers shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrowers' right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrowers: (a) pay Lender all sums which then would be due under this Security Instrument and the Notes as if no acceleration had occurred; (b) cure any default of any other covenants or agreements; (c) pay all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) take such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrowers' obligations to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrowers pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrowers, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 15.

**17. Sale of Notes; Change of Loan Servicer; Notice of Grievance.** The Notes or a partial interest in the Notes (together with this Security Instrument) can be sold one or more times without prior notice to Borrowers or Borrower Parties.

Neither Borrowers nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrowers or Lender has notified the other parties (with such notice given in compliance with the requirements of Section 12) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrowers pursuant to Section 25 and the notice of acceleration given to Borrowers pursuant to Section 15 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 17.

**18. Hazardous Substances.** As used in this Section 18: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrowers shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property, other than the presence, use, storage and disposal of Hazardous Substances in quantities as necessary for Borrowers' and Borrower Parties' normal farming or other commercial operations located on the Property, all of which Borrowers covenant have and will be used, stored, and

CALIFORNIA--Farmer Mac **UNIFORM INSTRUMENT**

10

disposed of in accordance with commercially reasonable practices and all applicable environmental laws. Borrowers shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property.  The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal farming and residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrowers shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrowers or Borrower Parties have actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property.  If Borrowers learn, or are notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrowers shall promptly take all necessary remedial actions in accordance with Environmental Law.  Nothing herein shall create any obligation on Lender for an Environmental Cleanup.  Borrowers agree to indemnify and hold Lender free and harmless from and against all loss, costs (including attorneys' fees and costs), damage (including consequential damages), and expenses Lender may sustain by reason of the assertion against Lender by any third-party of any claim in connection with Hazardous Substances on, in or affecting the Property.  Borrowers further agree that Lender shall have the right to join and participate in, as a party if it so elects, any legal proceedings or actions initiated in connection with any claims related to Hazardous Substances on, in or affecting the Property, and shall pay any such attorney fees and expenses Lender incurs in connection therewith.

**19. Additional Property Subject To The Security Instrument.**  This Security Instrument also constitutes a security agreement within the meaning of the Uniform Commercial Code as adopted in the State of California (the "UCC").  In addition to the Property described in the Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in or on the Listed Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling,  attached floor coverings, irrigation equipment (including, but not limited to, irrigation pipes and pumps, center irrigation pivots, pvc pipe, sprinklers, motors, well equipment, pumps and power units), livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom, and any substitutions or replacements therefore, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Borrowers or Borrower Parties to collect or enforce payment thereof, as well as to enforce any guarantees of the forgoing and security therefor, and all of  Borrowers' and Borrower Parties' present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument.  All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this Security Instrument as the "Property."

**20. Fixture Filing.**  This Security Instrument constitutes a "fixture filing" for the purposes of the UCC against all of the Property which is or is to become fixtures per the UCC.

**21. Use of Property; Compliance With Law.**  Borrowers shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change.  Borrowers shall comply

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT

11

with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**22. Assignment of Leases.** Upon Lender's request after default, Borrowers shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**23. Assignment of Rents; Appointment of Receiver; Lender In Possession.** Borrowers absolutely and unconditionally assign and transfer to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrowers authorize Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrowers or Borrower Parties shall receive the Rents until (i) Lender has given Borrowers notice of default pursuant to Sections 12 and 25 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notices of default to Borrowers: (i) all Rents received by Borrowers or Borrower Parties shall be held by Borrowers or Borrower Parties as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrowers agree that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorneys' fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrowers and Borrower Parties to Lender secured by the Security Instrument pursuant to Section 7 of the Security Instrument.

Borrowers represent and warrant that Borrowers have not executed any prior assignment of the Rents and have not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrowers. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**24. Cross-Collateralization.** In addition to the Notes, all liens, security interests, assignments, suretyship obligations, stock pledges, rights and remedies granted to Lender in any loan document or agreement secure all obligations, debts and liabilities, plus interest thereon, of any or all Borrowers to Lender, as well as claims by Lender against any or all Borrowers, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Notes, whether voluntary or otherwise, whether due or not due, direct or indirect, absolute or contingent, whether any or all Borrowers may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

**25. Cross-Default Provision.** Borrowers' or Borrower Parties' default or breach under any note or agreement in which Lender has an interest, including but not limited to the Notes, shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

NON-UNIFORM COVENANTS. Borrowers further covenant and agree as follows:

**26. Acceleration; Remedies. Following Borrowers' breach of any covenant or agreement in this Security**

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT

12

Instrument (but not prior to acceleration under Section 15 unless Applicable Law provides otherwise) and prior to acceleration or Lender's exercise of any remedy, Lender shall give at least sixty (60) days written notice to Borrowers prior to exercising any remedy, unless otherwise provided under this Deed of Trust; provided, however, if such default cannot be cured within the 60-day period and Borrowers have commenced and diligently pursues the cure of the related default, Borrowers shall have such time as is commercially reasonably necessary for Borrowers to complete the cure, provided Lender is not materially prejudiced from such delay. Lender shall use commercially reasonable standards to determine if it is materially prejudiced by the delay. The notice shall specify: (a) the default; (b) the action required to cure the default; (c) the date by which the default must be cured. The notice shall further inform Borrowers of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrowers to acceleration and sale. If the default is not cured on or before the date specified in the notice or such extended period for defaults which cannot be cured within the 60-day period, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 25, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrowers and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrowers, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

27. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

28. **Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrowers, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

29. **Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

**CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT**

**30. Other California State Specific Provisions.**

(a)      In addition to the provisions of any loan agreement, Borrowers further agree that, if Lender accepts a guaranty of only a portion of the Indebtedness, Borrowers waive any right under California Civil Code Section 2822(a) to designate the portion of the Indebtedness which shall be satisfied by a guarantor's partial payment.

(b)      Except for matters covered by an O&M Program or matters described in any environmental indemnity agreement, Borrowers shall not cause or permit any lien (whether or not such lien has priority over the lien created by this Security Instrument) upon the Property imposed pursuant to any Environmental Laws.  Any such lien shall be considered a Prohibited Activity or Condition (as may also be contemplated in any environmental indemnity agreement).

(c)      Borrowers represent and warrant to Lender that, except as previously disclosed by Borrowers or Borrower Parties to Lender in writing:

(1)      at the time of acquiring the Property, Borrowers undertook all appropriate inquiry into the previous ownership and uses of the Property consistent with good commercial or customary practice and no evidence or indication came to light which would suggest that the Property has been or is now being used for any Prohibited Activities or Conditions; and

(2)      the Property has not been designated as "hazardous waste property" or "border zone property" pursuant to Section 25220, et seq., of the California Health and Safety Code.

The representations and warranties in this Security Instrument shall be continuing representations and warranties that shall be deemed to be made by Borrowers throughout the term of the Loans, until the Indebtedness has been paid in full.

(d)      Without limiting any of the remedies provided in this Security Instrument, Borrowers acknowledge and agrees that certain provisions in this Security Instrument are environmental provisions (as defined in Section 736(f)(2) of the California Code of Civil Procedure) made by Borrowers relating to the real property security (the "**Environmental Provisions**"), and that to the extent applicable, Borrowers' failures to comply with any of the Environmental Provisions will be a breach of contract that will entitle Lender to pursue the remedies provided by Section 736 of the California Code of Civil Procedure for the recovery of damages and for the enforcement of the Environmental Provisions.

Except as otherwise stated herein, nothing in the provisions of this Amendment shall be deemed in any way to affect the priority of the Original Deed of Trust over any other lien, charge, encumbrance or conveyance, or to release or change the liability of any party who may be liable under the Note.

*[remainder of page intentionally left blank – signature page follows]*

BY SIGNING BELOW, Borrowers accept and agree to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrowers or Borrower Parties.

**BORROWERS:**

**MARICOPA ORCHARDS, LLC**,
a California limited liability company

By:  Farshid Assemi
Its:  Manager

**WILLOW AVENUE INVESTMENTS, LLC**,
a California limited liability company

By:  Neema Assemi
Its:  Manager

Neema Assemi

**C & A FARMS, LLC**,
a California limited liability company

By:  Farshid Assemi
Its:  Manager

A notary public or other officer completing this
certificate verifies only the identity of the individual
who signed the document to which this certificate
is attached, and not the truthfulness, accuracy, or
validity of that document.

STATE OF CALIFORNIA
COUNTY OF ___FRESNO___

On ___1/30/2023___ before me, ___L. Diaz, Notary Public___, personally appeared
**Farshid Assemi**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and
that by his signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed
the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)
_____

Notary Public
Printed Name: ___L. Diaz___
My commission expires: ___April 20, 2026___

> L. DIAZ
> Notary Public - California
> Fresno County
> Commission # 2398671
> My Comm. Expires Apr 20, 2026

---

A notary public or other officer completing this
certificate verifies only the identity of the individual
who signed the document to which this certificate
is attached, and not the truthfulness, accuracy, or
validity of that document.

STATE OF CALIFORNIA
COUNTY OF ___Fresno___

On ___1/30/2023___ before me, ___L. Diaz, Notary Public___, personally appeared
**Neema Assemi**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and
that by his signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed
the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)
_____

Notary Public
Printed Name: ___L. Diaz___
My commission expires: ___April 20, 2026___

> L. DIAZ
> Notary Public - California
> Fresno County
> Commission # 2398671
> My Comm. Expires Apr 20, 2026

---

CALIFORNIA--Farmer Mac UNIFORM INSTRUMENT

**ORDER NO. :** 1421002583

# EXHIBIT A

The land referred to is situated in the County of Kern, City of , State of California, and is described as follows:

PARCEL 1:

THE NORTHWEST QUARTER OF SECTION 30, TOWNSHIP 32 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN AN UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT ALL OIL AND GAS WITHIN OR UNDERLYING SAID LAND, AS PREVIOUSLY RESERVED OF RECORD.

APN: 220-170-01


PARCEL 2:

THE NORTHEAST QUARTER OF SECTION 30, TOWNSHIP 32 SOUTH, RANGE 25 EAST, M.D.B.&M., IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL RIGHT, TITLE AND INTEREST IN AND TO THE MINERAL RIGHTS IN THE PROPERTIES DESCRIBED HEREIN (EXPRESSLY EXCLUDING, HOWEVER, THE RIGHT TO USE THE SURFACE FOR OPEN PIT MINING, QUARRYING AND STRIP MINING), AND ALL RIGHTS, TITLE AND INTEREST IN ANY OTHER CONTRACT AGREEMENTS OR RIGHTS, TANGIBLE OR INTANGIBLE THAT ARE OWNED BY THE GRANTOR, IN WHOLE OR IN PART, AND THAT ARE RELATED TO THE OWNERSHIP AND USE OF THE MINERAL RIGHTS CONVEYED HEREBY, FROM THE LANDS.

SPECIFICALLY EXCEPTING THEREFROM ALL SURFACE RIGHTS (EXCEPT FOR THE RIGHTS OF SURFACE ACCESS FOR THE PURPOSE OF GRANTEE AND ITS ASSIGNS EXPLORING FOR, DEVELOPING, PRODUCING, TRANSPORTING AND SELLING MINERALS FROM THE PROPERTY AND WHICH ARE RECOGNIZED BY CALIFORNIA LAW, RULES, ORDER AND REGULATION), PERSONAL PROPERTY OR FIXTURES ASSOCIATED WITH, AFFIXED TO OR LOCATED UPON THE SURFACE, WELL BORES (IF ANY), WATER OR WATER RIGHTS OR ENTITLEMENTS (EXCEPT SUCH WATER AS MAY BE ASSOCIATED AND INCIDENTALLY PRODUCED WITH THE MINERALS FROM THE PROPERTY) OR ANY EXISTING OIL, GAS OR MINERAL PRODUCTION (IF ANY) FROM THE PROPERTY, AS GRANTED TO CALIFORNIA MINERALS, L.P., A TEXAS LIMITED PARTNERSHIP, IN DEED RECORDED DECEMBER 30, 1998 AS INSTRUMENT NO. 0198184684 OF OFFICIAL RECORDS.

APN: 220-170-02

PARCEL 3:

THE WEST HALF OF SECTION 29, TOWNSHIP 32 SOUTH, RANGE 25 EAST, M.D.B.M., IN THE UNINCORPORATED ARE OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING OF THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL RIGHT, TITLE AND INTEREST IN AND TO THE MINERAL RIGHTS IN THE PROPERTIES DESCRIBED HEREIN (EXPRESSLY EXCLUDING, HOWEVER, THE RIGHT TO USE THE SURFACE FOR OPEN PIT MINING, QUARRYING AND STRIP MINING), AND ALL RIGHTS, TITLE AND INTEREST IN ANY OTHER CONTRACT AGREEMENTS OR RIGHTS, TANGIBLE OR INTANGIBLE THAT ARE OWNED BY THE GRANTOR, IN WHOLE OR IN PART, AND THAT ARE RELATED TO THE OWNERSHIP AND USE OF THE MINERAL RIGHTS CONVEYED HEREBY, FROM THE LANDS.

SPECIFICALLY EXCEPTING THEREFROM ALL SURFACE RIGHTS (EXCEPT FOR THE RIGHTS OF SURFACE ACCESS FOR THE PURPOSE OF GRANTEE AND ITS ASSIGNS EXPLORING FOR, DEVELOPING, PRODUCING, TRANSPORTING AND SELLING MINERALS FROM THE PROPERTY AND WHICH ARE RECOGNIZED BY CALIFORNIA LAW, RULES, ORDER AND REGULATION), PERSONAL PROPERTY OR FIXTURES ASSOCIATED WITH, AFFIXED TO OR LOCATED UPON THE SURFACE, WELL BORES (IF ANY), WATER OR WATER RIGHTS OR ENTITLEMENTS (EXCEPT SUCH WATER AS MAY BE ASSOCIATED AND INCIDENTALLY PRODUCED WITH THE MINERALS FROM THE PROPERTY) OR ANY EXISTING OIL, GAS OR MINERAL PRODUCTION (IF ANY) FROM THE PROPERTY, AS GRANTED TO CALIFORNIA MINERALS, L.P., A TEXAS LIMITED PARTNERSHIP, IN DEED RECORDED DECEMBER 30, 1998 AS INSTRUMENT NO. 0198184684 OF OFFICIAL RECORDS.

ALSO EXCEPTING ALL OIL, GAS AND OTHER HYDROCARBONS; NON- HYDROCARBON GASSES OR GASEOUS SUBSTANCES; ALL OTHER MINERALS OF WHATSOEVER NATURE, WITHOUT REGARD TO SIMILARITY TO THE ABOVE-MENTIONED SUBSTANCES; AND ALL SUBSTANCES THAT MAY BE PRODUCED THEREWITH FROM SAID REAL PROPERTY.

ALSO EXCEPTING ALL GEOTHERMAL RESOURCES, EMBRACING: INDIGENOUS STEAM, HOT WATER AND HOT BRINES; STEAM AND OTHER GASES, HOT WATER AND HOT BRINES RESULTING FROM WATER, GAS OR OTHER FLUIDS ARTIFICIALLY INTRODUCED INTO SUBSURFACE FORMATIONS; HEAT OR THE ASSOCIATED ENERGY FOUND BENEATH THE SURFACE OF THE EARTH; AND BY-PRODUCTS OF ANY OF THE FOREGOING SUCH AS MINERALS (EXCLUSIVE OF OIL OR HYDROCARBON GAS THAT CAN BE SEPARATELY PRODUCED) WHICH ARE FOUND IN SOLUTION OR ASSOCIATION WITH OR DERIVED FROM ANY OF THE FOREGOING.

ALSO EXCEPTING, THE SOLE AND EXCLUSIVE RIGHT FROM TIME TO TIME TO DRILL AND MAINTAIN WELLS OR OTHER FACILITIES INTO OR THROUGH SAID REAL PROPERTY AND THE ADJOINING STREETS, ROADS AND HIGHWAYS FOR THE PURPOSE OF EXPLORING FOR AND PRODUCING ENERGY RESOURCES; THE EXCLUSIVE RIGHT TO PRODUCE, INJECT, STORE, AND REMOVE FROM AND THROUGH SUCH WELLS OR FACILITIES, OIL, GAS, WATER AND OTHER SUBSTANCES OF WHATEVER NATURE, INCLUDING THE RIGHT TO PERFORM ANY AND ALL OPERATIONS DEEMED BY GRANTOR NECESSARY OR CONVENIENT FOR THE EXERCISE OF SUCH RIGHTS, INCLUDING BUT NOT LIMITED TO THE RIGHT TO CONDUCT SEISMIC TESTING AND CONSTRUCT, MAINTAIN AND OPERATE PIPELINES, VALVES, CATHODIC PROTECTION FACILITIES, AND APPURTENANCES; AND THE EXCLUSIVE RIGHT TO UTILIZE OR OCCUPY SUBSURFACE FORMATIONS TO STORE OR DISPOSE OF PRODUCED WATER OR OTHER FLUIDS WITHOUT REGARD TO THEIR PLACE OF ORIGIN, AS RESERVED BY CHEVRON U.S.A. INC., A

PENNSYLVANIA CORPORATION, IN DEED RECORDED JUNE 6, 2004 AS DOCUMENT NO. 0204130494, OFFICIAL RECORDS.

APN: 220-170-07

PARCEL 4:

Parcel B of Parcel Map No. 12196, according to the map thereof, filed for record on October 13, 2020, in Book 62 of Parcel Maps, at Pages 1 through 3, Kern County Records.

EXCEPTING THEREFROM ALL RIGHT, TITLE AND INTEREST IN AND TO THE MINERAL RIGHTS IN THE PROPERTIES DESCRIBED HEREIN (EXPRESSLY EXCLUDING, HOWEVER, THE RIGHT TO USE THE SURFACE FOR OPEN PIT MINING, QUARRYING AND STRIP MINING), AND ALL RIGHTS, TITLE AND INTEREST IN ANY OTHER CONTRACT AGREEMENTS OR RIGHTS, TANGIBLE OR INTANGIBLE THAT ARE OWNED BY THE GRANTOR, IN WHOLE OR IN PART, AND THAT ARE RELATED TO THE OWNERSHIP AND USE OF THE MINERAL RIGHTS CONVEYED HEREBY, FROM THE LANDS.

SPECIFICALLY EXCEPTING THEREFROM ALL SURFACE RIGHTS (EXCEPT FOR THE RIGHTS OF SURFACE ACCESS FOR THE PURPOSE OF GRANTEE AND ITS ASSIGNS EXPLORING FOR, DEVELOPING, PRODUCING, TRANSPORTING AND SELLING MINERALS FROM THE PROPERTY AND WHICH ARE RECOGNIZED BY CALIFORNIA LAW, RULES, ORDER AND REGULATION), PERSONAL PROPERTY OR FIXTURES ASSOCIATED WITH, AFFIXED TO OR LOCATED UPON THE SURFACE, WELL BORES (IF ANY), WATER OR WATER RIGHTS OR ENTITLEMENTS (EXCEPT SUCH WATER AS MAY BE ASSOCIATED AND INCIDENTALLY PRODUCED WITH THE MINERALS FROM THE PROPERTY) OR ANY EXISTING OIL, GAS OR MINERAL PRODUCTION (IF ANY) FROM THE PROPERTY, AS GRANTED TO CALIFORNIA MINERALS, L.P., A TEXAS LIMITED PARTNERSHIP, IN DEED RECORDED DECEMBER 30, 1998 AS INSTRUMENT NO. 0198184684 OF OFFICIAL RECORDS.

APN: 220-110-87

PARCEL 5:

THE SOUTH HALF OF THE NORTHEAST QUARTER OF SECTION 22, TOWNSHIP 32 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL RIGHT, TITLE AND INTEREST IN AND TO THE MINERAL RIGHTS IN THE PROPERTIES DESCRIBED HEREIN (EXPRESSLY EXCLUDING, HOWEVER, THE RIGHT TO USE THE SURFACE FOR OPEN PIT MINING, QUARRYING AND STRIP MINING), AND ALL RIGHTS, TITLE AND INTEREST IN ANY OTHER CONTRACT AGREEMENTS OR RIGHTS, TANGIBLE OR INTANGIBLE THAT ARE OWNED BY THE GRANTOR, IN WHOLE OR IN PART, AND THAT ARE RELATED TO THE OWNERSHIP AND USE OF THE MINERAL RIGHTS CONVEYED HEREBY, FROM THE LANDS.

SPECIFICALLY EXCEPTING THEREFROM ALL SURFACE RIGHTS (EXCEPT FOR THE RIGHTS OF SURFACE ACCESS FOR THE PURPOSE OF GRANTEE AND ITS ASSIGNS EXPLORING FOR,

DEVELOPING, PRODUCING, TRANSPORTING AND SELLING MINERALS FROM THE PROPERTY AND WHICH ARE RECOGNIZED BY CALIFORNIA LAW, RULES, ORDER AND REGULATION), PERSONAL PROPERTY OR FIXTURES ASSOCIATED WITH, AFFIXED TO OR LOCATED UPON THE SURFACE, WELL BORES (IF ANY), WATER OR WATER RIGHTS OR ENTITLEMENTS (EXCEPT SUCH WATER AS MAY BE ASSOCIATED AND INCIDENTALLY PRODUCED WITH THE MINERALS FROM THE PROPERTY) OR ANY EXISTING OIL, GAS OR MINERAL PRODUCTION (IF ANY) FROM THE PROPERTY, AS GRANTED TO CALIFORNIA MINERALS, L.P., A TEXAS LIMITED PARTNERSHIP, IN DEED RECORDED DECEMBER 30, 1998 AS INSTRUMENT NO. 0198184684 OF OFFICIAL RECORDS.

APN: 220-110-10

PARCEL 6:

THE NORTH HALF OF THE NORTH HALF OF SECTION 26, TOWNSHIP 32 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM THE INTEREST OF THE SUNSET RAILROAD AS SAID RAILROAD IS NOW LOCATED.

EXCEPTING THEREFROM ALL RIGHT, TITLE AND INTEREST IN AND TO THE MINERAL RIGHTS IN THE PROPERTIES DESCRIBED HEREIN (EXPRESSLY EXCLUDING, HOWEVER, THE RIGHT TO USE THE SURFACE FOR OPEN PIT MINING, QUARRYING AND STRIP MINING), AND ALL RIGHTS, TITLE AND INTEREST IN ANY OTHER CONTRACT AGREEMENTS OR RIGHTS, TANGIBLE OR INTANGIBLE THAT ARE OWNED BY THE GRANTOR, IN WHOLE OR IN PART, AND THAT ARE RELATED TO THE OWNERSHIP AND USE OF THE MINERAL RIGHTS CONVEYED HEREBY, FROM THE LANDS.

SPECIFICALLY EXCEPTING THEREFROM ALL SURFACE RIGHTS (EXCEPT FOR THE RIGHTS OF SURFACE ACCESS FOR THE PURPOSE OF GRANTEE AND ITS ASSIGNS EXPLORING FOR, DEVELOPING, PRODUCING, TRANSPORTING AND SELLING MINERALS FROM THE PROPERTY AND WHICH ARE RECOGNIZED BY CALIFORNIA LAW, RULES, ORDER AND REGULATION), PERSONAL PROPERTY OR FIXTURES ASSOCIATED WITH, AFFIXED TO OR LOCATED UPON THE SURFACE, WELL BORES (IF ANY), WATER OR WATER RIGHTS OR ENTITLEMENTS (EXCEPT SUCH WATER AS MAY BE ASSOCIATED AND INCIDENTALLY PRODUCED WITH THE MINERALS FROM THE PROPERTY) OR ANY EXISTING OIL, GAS OR MINERAL PRODUCTION (IF ANY) FROM THE PROPERTY, AS GRANTED TO CALIFORNIA MINERALS, L.P., A TEXAS LIMITED PARTNERSHIP, IN DEED RECORDED DECEMBER 30, 1998 AS INSTRUMENT NO. 0198184684 OF OFFICIAL RECORDS.

EXCEPTING THEREFROM ALL OIL, GAS AND OTHER HYDROCARBONS; NON-HYDROCARBON GASSES OR GASEOUS SUBSTANCES; ALL OTHER MINERALS OF WHATSOEVER NATURE, WITHOUT REGARD TO SIMILARITY TO THE ABOVE-MENTIONED SUBSTANCES; AND ALL SUBSTANCES THAT MAY BE PRODUCED THEREWITH FROM SAID REAL PROPERTY;

AND ALSO EXCEPTING THEREFROM ALL GEOTHERMAL RESOURCES, EMBRACING; INDIGENOUS STEAM, HOT WATER AND HOT BRINES; STEAM AND OTHER GASES, HOT WATER AND HOT BRINES RESULTING FROM WATER, GAS OR OTHER FLUIDS ARTIFICIALLY INTRODUCED INTO SUBSURFACE FORMATIONS; HEAT OR THE ASSOCIATED ENERGY FOUND

BENEATH THE SURFACE OF THE EARTH; AND BY-PRODUCTS OF ANY OF THE FOREGOING SUCH AS MINERALS (EXCLUSIVE OF OIL OR HYDROCARBON GAS THAT CAN BE SEPARATELY PRODUCED) WHICH ARE FOUND IN SOLUTION OR ASSOCIATION WITH OR DERIVED FROM ANY OF THE FOREGOING.

TOGETHER WITH ALL RIGHTS ASSOCIATED WITH OR CONVENIENT FOR THE EXERCISE OF SUCH RIGHTS AS CONTAINED THEREIN, ALL AS RESERVED BY CHEVRON U.S.A., INC., IN DEED RECORDED DECEMBER 22, 2004 AS INSTRUMENT NO. 0204317445 OF OFFICIAL RECORDS.

APN: 220-130-02

PARCEL 7:

THE SURFACE AND 500 FEET OF THE SUBSURFACE VERTICALLY IN DEPTH BELOW THE SURFACE OF THE EAST HALF OF SECTION 29, TOWNSHIP 32 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT ALL OIL, GAS, ASPHALTUM, AND OTHER HYDROCARBONS AND OTHER MINERALS, WHETHER SIMILAR TO THOSE HEREIN SPECIFIED OR NOT, WITHIN OR THAT MAY BE PRODUCED FROM SAID PARCEL, 500 FEET IN DEPTH, TOGETHER WITH THE EXCLUSIVE RIGHT TO ENTER UPON SAID PREMISES FOR THE PURPOSE OF MINING FOR AND REMOVING THE SAME THEREFROM, AS EXCEPTED AND RESERVED IN THE DEED FROM STANDARD OIL COMPANY OF CALIFORNIA, A DELAWARE CORPORATION, TO CALIFORNIA LAND AND CATTLE COMPANY, A CORPORATION, RECORDED SEPTEMBER 18, 1963, IN BOOK 3644, PAGE 951  OF OFFICIAL RECORDS.

APN: 220-170-08 and 220-170-09 and 220-170-10

PARCEL 8:

THE NORTHWEST QUARTER OF SECTION 28, TOWNSHIP 32 SOUTH, RANGE 25 EAST, MOUNT DIABLO MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT $^1/_2$ OF ALL MINERALS, INCLUDING OIL, PETROLEUM, GAS, ASPHALTUM, BREA, AND OTHER HYDROCARBON SUBSTANCES WITHIN OR UNDERLYING SAID LAND, AS EXCEPTED IN A DECREE OF DECLARATION OF TAKING DATED DECEMBER 31, 1942, A CERTIFIED COPY OF WHICH WAS RECORDED JANUARY 13, 1943 IN BOOK 1090, PAGE 341 OF OFFICIAL RECORDS, AND AS EXCEPTED IN DEED FROM UNITED STATES OF AMERICA, DATED JANUARY 24, 1949 RECORDED MARCH 17, 1949 IN BOOK 1602, PAGE 105 OF OFFICIAL RECORDS.

ALSO EXCEPT REMAINING $^1/_2$ OF ALL MINERALS, INCLUDING OIL, PETROLEUM, GAS, ASPHALTUM, BREA AND OTHER HYDROCARBON SUBSTANCES WITHIN OR UNDERLYING SAID LAND, TOGETHER WITH RIGHT OF ENTRY.

APN: 220-170-11

PARCEL 9:

ALL OF THE SOUTHWEST QUARTER OF SECTION 28, TOWNSHIP 32 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT ALL MINERALS OF WHATSOEVER NATURE (INCLUDING BUT NOT LIMITED TO OIL, GAS, OTHER HYDROCARBONS AND ASSOCIATED SUBSTANCES) IN, UNDER OR WHICH MAY BE PRODUCED THEREFROM, TOGETHER WITH ALL RIGHTS AND PRIVILEGES OF INGRESS, EGRESS, USE AND OCCUPANCY OF, UPON AND WITHIN THE SURFACE AND SUBSURFACE THEREOF AS THE OWNER OF THE AFORESAID MINERALS MAY FROM TIME TO TIME DEEM NECESSARY OR CONVENIENT IN CONNECTION WITH THE EXPLORATION, DEVELOPMENT AND OPERATION OF SAID LANDS FOR THE AFORESAID MINERALS AND THE STORING, HANDLING, TREATING AND TRANSPORTATION THEREOF, ALL WITHOUT LIABILITY WHATSOEVER TO GRANTEE AND ALL AS CONVEYED BY GRANTORS TO SONICO, INC., A DELAWARE CORPORATION, BY MINERAL DEED DATED FEBRUARY 28, 1967, AND RECORDED IN BOOK 4030, PAGE 208 OF OFFICIAL RECORDS OF KERN COUNTY.

APN: 220-170-31 and 32

PARCEL 10:

ALL OF SECTION 19, TOWNSHIP 32 SOUTH, RANGE 26 EAST, M.D.B.M., IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL RIGHT, TITLE AND INTEREST IN AND TO THE MINERAL RIGHTS IN THE PROPERTIES DESCRIBED HEREIN (EXPRESSLY EXCLUDING, HOWEVER, THE RIGHT TO USE THE SURFACE FOR OPEN PIT MINING, QUARRYING AND STRIP MINING), AND ALL RIGHTS, TITLE AND INTEREST IN ANY OTHER CONTRACT AGREEMENTS OR RIGHTS, TANGIBLE OR INTANGIBLE THAT ARE OWNED BY THE GRANTOR, IN WHOLE OR IN PART, AND THAT ARE RELATED TO THE OWNERSHIP AND USE OF THE MINERAL RIGHTS CONVEYED HEREBY, FROM THE LANDS.

SPECIFICALLY EXCEPTING ALL SURFACE RIGHTS (EXCEPT FOR THE RIGHTS OF SURFACE ACCESS FOR THE PURPOSE OF GRANTEE AND ITS ASSIGNS EXPLORING FOR, DEVELOPING, PRODUCING, TRANSPORTING AND SELLING MINERALS FROM THE PROPERTY AND WHICH ARE RECOGNIZED BY CALIFORNIA LAW, RULES, ORDER AND REGULATION), PERSONAL PROPERTY OR FIXTURES ASSOCIATED WITH, AFFIXED TO OR LOCATED UPON THE SURFACE, WELL BORES (IF ANY), WATER OR WATER RIGHTS OR ENTITLEMENTS (EXCEPT SUCH WATER AS MAY BE ASSOCIATED AND INCIDENTALLY PRODUCED WITH THE MINERALS FROM THE PROPERTY) OR ANY EXISTING OIL, GAS OR MINERAL PRODUCTION (IF ANY) FROM THE PROPERTY, AS RESERVED IN DEED RECORDED DECEMBER 30, 1998 AS INSTRUMENT NO. 0198184684 OF OFFICIAL RECORDS.

EXCEPTING ALL OIL, GAS AND OTHER HYDROCARBONS; NON-HYDROCARBON GASSES OR GASEOUS SUBSTANCES; ALL OTHER MINERALS OF WHATSOEVER NATURE, WITHOUT REGARD TO SIMILARITY TO THE ABOVE-MENTIONED SUBSTANCES; AND ALL SUBSTANCES THAT MAY BE PRODUCED THEREWITH FROM SAID REAL PROPERTY.

ALSO EXCEPTING ALL GEOTHERMAL RESOURCES, EMBRACING: INDIGENOUS STEAM, HOT WATER AND HOT BRINES; STEAM AND OTHER GASES, HOT WATER AND HOT BRINES RESULTING FROM WATER, GAS OR OTHER FLUIDS ARTIFICIALLY INTRODUCED INTO SUBSURFACE FORMATIONS; HEAT OR THE ASSOCIATED ENERGY FOUND BENEATH THE SURFACE OF THE EARTH; AND BY-PRODUCTS OF ANY OF THE FOREGOING SUCH AS MINERALS (EXCLUSIVE OF OIL OR HYDROCARBON GAS THAT CAN BE SEPARATELY PRODUCED) WHICH ARE FOUND IN SOLUTION OR ASSOCIATION WITH OR DERIVED FROM ANY OF THE FOREGOING.

ALSO EXCEPTING THE SOLE AND EXCLUSIVE RIGHT FROM TIME TO TIME TO DRILL AND MAINTAIN WELLS OR OTHER FACILITIES INTO OR THROUGH SAID REAL PROPERTY AND THE ADJOINING STREETS, ROADS AND HIGHWAYS FOR THE PURPOSE OF EXPLORING FOR AND PRODUCING ENERGY RESOURCES; THE EXCLUSIVE RIGHT TO PRODUCE, INJECT, STORE, AND REMOVE FROM AND THROUGH SUCH WELLS OR FACILITIES, OIL, GAS, WATER AND OTHER SUBSTANCES OF WHATEVER NATURE, INCLUDING THE RIGHT TO PERFORM ANY AND ALL OPERATIONS DEEMED BY GRANTOR NECESSARY OR CONVENIENT FOR THE EXERCISE OF SUCH RIGHTS, INCLUDING BUT NOT LIMITED TO THE RIGHT TO CONDUCT SEISMIC TESTING AND CONSTRUCT, MAINTAIN AND OPERATE PIPELINES, VALVES, CATHODIC PROTECTION FACILITIES, AND APPURTENANCES; AND THE EXCLUSIVE RIGHT TO UTILIZE OR OCCUPY SUBSURFACE FORMATIONS TO STORE OR DISPOSE OF PRODUCED WATER OR OTHER FLUIDS WITHOUT REGARD TO THEIR PLACE OF ORIGIN, AS RESERVED BY CHEVRON U.S.A. INC., A PENNSYLVANIA CORPORATION, IN DEED RECORDED DECEMBER 31, 2003 AS DOCUMENT NO. 0203281471, OFFICIAL RECORDS.

APN: 295-040-30 and 31

PARCEL 11:

All of Section 13, Township 11 North, Range 23 West, San Bernardino Base and Meridian, in the unincorporated area of the County of Kern, State of California, according to the Official Plat thereof.

Excepting therefrom all right, title and interest in and to the mineral rights in the properties described herein (expressly excluding, however, the right to use the surface for open pit mining, quarrying and strip mining), and all right , title and interest in any other contract agreements or rights, tangible or intangible that are owned by the grantor, in whole or part, and that are related to the ownership and use of the mineral rights conveyed hereby, from the lands.

Specifically excepting and reserving therefrom all surface rights (except for the rights of surface access for the purpose of grantee and its assigns exploring for, developing, producing,

transporting and selling minerals from the property and which are recognized by California law, rules, order and regulation), personal property for fixtures associated with affixed to or located upon the surface, well bores (if any), water or water rights or entitlements (except such water as may be associated and incidentally produced with the minerals from the property) or any existing oil, gas or mineral production (if any) from the property, as granted to California Minerals, L.P., a Texas limited partnership, in Deed recorded December 30, 1998 as Document No. 0198184684 of Official Records.

APN: 239-150-11

# Exhibit Q

RECORDING REQUESTED BY
**OLD REPUBLIC TITLE COMPANY**

Order No.:   1411009548

WHEN RECORDED MAIL TO

Conterra Agricultural Capital, LLC
7755 Office Plaza Dr. North, Suite 195
West Des Moines, IA 50266

**FRESNO County Recorder**
**Paul Dictos, C.P.A.**
DOC-
**2018-0011387-00**
**Acct 8002-Old Republic Title CONCORD**
**Wednesday, JAN 31, 2018 13:07:06**
**Ttl Pd    $55.00     Rcpt # 0004931544**
**APR/R2/1-13**

―――――――――――――――― *SPACE ABOVE THIS LINE FOR RECORDER'S USE* ――――――――

## UCC FINANCING STATEMENT (Form UCC1)

1 ☐ Exempt from fee per GC27388.1; document recorded in connection with a concurrent transfer subject to the imposition of documentary transfer tax

2 ☐ Exempt from fee per GC27388.1; document transfers real property that is a residential dwelling to an owner-occupier

3 ☐ Exempt from fee per GC27388.1; document recorded in connection with a concurrent transfer that is a residential dwelling to an owner-occupier

4 ☒ Exempt from fee per GC27388.1; fee cap of $225 reached

5 ☐ Exempt from fee per GC27388.1; document is subject to the imposition of documentary transfer tax

From First Deed of Trust

DB/db

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
| --- |

| B. E-MAIL CONTACT AT FILER (optional) |
| --- |

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

Conterra Agricultural Capital, LLC
7755 Office Plaza Dr. North Suite 195
West Des Moines, IA 50266
Attention: Sarah Streeter

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| C&A Farms, LLC | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1306 W Herndon Ave Ste. 101 | Fresno | CA | 93711 | US |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| Whitesbridge Farms, LLC | | | | |
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1306 W Herndon Ave Ste. 101 | Fresno | CA | 93711 | US |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1133 Rankin Street, Suite 100 | St. Paul | MN | 55116 | US |

4. COLLATERAL: This financing statement covers the following collateral:

See UCC Financing Statement Addendum, Rider A to UCC, and Exhibit A Legal Description attached hereto and made a part hereof.

| 5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative | | |
| --- | --- | --- |
| 6a. Check only if applicable and check only one box: | | 6b. Check only if applicable and check only one box: |
| ☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility | | ☒ Agricultural Lien  ☐ Non-UCC Filing |
| 7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor | | |
| 8. OPTIONAL FILER REFERENCE DATA: Filing Office:  Fresno County    CA | | |

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)    International Association of Commercial Administrators (IACA)

# UCC FINANCING STATEMENT ADDENDUM
FOLLOW INSTRUCTIONS

**9. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| | |
|---|---|
| 9a. ORGANIZATION'S NAME | |

OR

| |
|---|
| 9b. INDIVIDUAL'S SURNAME |
| FIRST PERSONAL NAME |
| ADDITIONAL NAME(S)/INITIAL(S) · SUFFIX |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**10. DEBTOR'S NAME:** Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| 10a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|

OR

| 10b. INDIVIDUAL'S SURNAME | | | | |
|---|---|---|---|---|
| INDIVIDUAL'S FIRST PERSONAL NAME | | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | | SUFFIX |
| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY US |

**11.** ☐ ADDITIONAL SECURED PARTY'S NAME  or  ☒ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

| 11a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Conterra Agricultural Capital, LLC | | | |

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| 11c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| 7755 Office Plaza Dr. North     Suite 195 | West Des Moines | IA  50266 | US |

**12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):**

See Rider 'A to UCC attached hereto and made a part hereof.

**13.** ☒ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

**14. This FINANCING STATEMENT:**
☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing

**15.** Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

**16. Description of real estate:**
See Exhibit "A" attached hereto and made a part hereof.

**17. MISCELLANEOUS:**

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

# RIDER A TO UCC

Debtor:  **C&A Farms, LLC and Whitesbridge Farms, LLC**

Secured Party:  **Conterra Agricultural Capital, LLC**

In addition to the Property described in the Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling, attached floor coverings, irrigation pipes and pumps, livestock fencing and pens and specifically:

**All water and water rights now owned or hereafter acquired by Debtor and howsoever evidenced, whether such water and water rights are riparian, appropriative or otherwise and whether or not appurtenant to the real estate described herein, all ditch/pond and ditch/pond rights and any shares of stock, licenses, permits and contracts evidencing such water or ditch rights, and all wells, reservoirs, dams, embankments or fixtures relating thereto, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom.**

**All irrigation equipment of every kind and nature, including but not limited to center irrigation pivots, pumps, pvc pipe, sprinklers, motors, well equipment, pumps and power units, now owned or hereafter acquired by Debtor and now or hereafter located and situated on the real estate described herein, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom.**

all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to herein as the "Property."

---

RIDER A TO UCC

1

©PeirsonPatterson, LLP.-Arlington, Texas 2016
1153040118 [Doc Id 9696 M03212016]

## Exhibit "A"
**Legal Description For**

### 350.37 Acres Devoted to an Almond Orchard
**Fresno County, California**

See Exhibit "A" attached hereto and made a part hereof.

©PeirsonPatterson, LLP.-Arlington, Texas  2016
1153040118 [Doc Id 9696 M03212016]

# EXHIBIT A

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

TRACT ONE:

PARCEL ONE:

The East half of the Northwest quarter of the Northeast quarter of the Northwest quarter; the West half of the Northeast quarter of the Northeast of the Northwest quarter; and the East half of the Northeast quarter of the Northeast quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the East 420.9 feet of the North half of the Northeast quarter of the Northeast quarter of the Northwest quarter of said Section 7.

ALSO EXCEPTING THEREFROM commencing at the Northwest corner of the East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7, running thence East along the North boundary line of said Section 7; 4.09 feet; thence in a Southerly direction in a straight line to a point on the South boundary line of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7, said point being 17 feet East of the Southwest corner of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7; thence West along the South boundary line of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7; 17 feet to the Southwest corner of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7; thence North along the West boundary line of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7 to the said Northwest corner of the said East half of the Northwest quarter of the Northeast quarter of the Northeast quarter of said Section 7.

APN:   464-20-07

PARCEL TWO:

The West 161 feet of the East 420.9 feet of the North half of the Northeast quarter of the Northeast quarter of the Northwest quarter of Section 17, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:   464-020-08

PARCEL THREE:

The North half of the East 259.9 feet of the East half of the Northeast quarter of the Northeast quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof; said 259.9 feet measured from the East line of said Northwest quarter of said section.

APN:   464-020-09

PARCEL FOUR:

The North half of the Northeast quarter of the Southeast quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:   464-020-12

PARCEL FIVE:

The North half of the Northwest quarter of the Southeast quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:   464-020-13

PARCEL SIX:

The South one-half of the Northeast one-quarter of the Northwest one-quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the East 195 feet of the South 114 feet thereof.

ALSO EXCEPTING THEREFROM that portion lying within Parcel Map No. 82-33, according to the Map thereof recorded in Book 44, Pages 2 and 3 of Parcel Maps, Fresno County Records.

APN:   464-020-15

PARCEL SEVEN:

The East 195 feet of the South 114 feet of the South one-half of the Northeast one-quarter of the Northwest one-quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:   464-020-16

PARCEL EIGHT:

The Southwest quarter of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:   464-020-19

PARCEL NINE:

The South three-fourths of the Southeast quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the South 351 feet of the East 340 feet thereof.

APN:   464-020-25

PARCEL TEN:

Parcel "A" of Parcel Map No. 82-33, according to the Map thereof recorded in Book 44, Pages 2 and 3 of Parcel Maps, Fresno County Records.

APN:   464-020-26

PARCEL TEN-A:

A right of way for road purposes over the Westerly 30 feet of the East 330 feet of the East half of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM that portion lying within Parcel Ten described therein.

PARCEL ELEVEN:

The fractional Southwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the East 990 feet thereof.

APN:   464-020-28

PARCEL TWELVE:

The West 330 feet of the East 990 feet of the fractional Southwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:   464-020-29

PARCEL THIRTEEN:

The West 330 feet of the East 660 feet of the fractional Southwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:   464-020-30

PARCEL FOURTEEN:

The East 330 feet of the fractional Southwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:   464-020-31

PARCEL FIFTEEN:

Parcel B of Parcel Map No. 82-33, according to the Map thereof recorded in Book 44, Pages 2 and 3 of Parcel Maps, Fresno County Records.

APN:   464-020-34

PARCEL SIXTEEN:

The East 125 feet of the Northwest quarter of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM that portion conveyed to the State of California, by Deed recorded July 31, 2003, as Document No. 2003-0173909, Official Records.

APN:   464-020-35

PARCEL SEVENTEEN:

The East half of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the East 330 feet thereof.

ALSO EXCEPTING THEREFROM that portion of said land as conveyed to the State of California by Grant Deed recorded July 31, 2003, as Document No. 2003-0173909, Official Records.

APN:   464-020-36

PARCEL EIGHTEEN:

The Northwest quarter of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the West 200 feet thereof.

EXCEPTING THEREFROM the East 125 feet thereof.

ALSO EXCEPTING THEREFROM that portion conveyed to the State of California in the Deed recorded January 12, 2004, as Document No. 2004-0007899, Official Records.

APN:   464-020-37

PARCEL NINETEEN:

INTENTIONALLY DELETED

PARCEL TWENTY:

All of Briscoe Tract, a Subdivision of the East half of the Southwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, unincorporated area, County of Fresno, State of California, except Lot 3 of Briscoe Tract, the same being in Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, unincorporated area, County of Fresno, State of California.

ALSO EXCEPTING THEREFROM that portion conveyed to the Fresno Irrigation District by Deed recorded February 13, 2006, as Instrument No. 2006-0031312 of Official Records.

APN:   464-060-17

PARCEL TWENTY-ONE:

Lots 13, 14, 15 and 16 of Pleasant Dale, in the City of Fresno, County of Fresno, State of California, according to the Map thereof recorded in Book 2, Page 38 of Plats, in the Office of the County Recorder of said County.

TOGETHER WITH that portion of abandoned South Pleasant Avenue, which would pass by operation of law

APN:   477-021-09

PARCEL TWENTY-TWO:

The South half of Lot 2, all of Lot 3 and the North half of Lot 4 of Pleasant Dale, according to the Map thereof recorded December 30, 1887, in Book 2, Page 38 of Plats, Fresno County Records.

PARCEL TWENTY-TWO-A:

An easement for a right of way or right to maintain, repair and replace an underground water pipe system as created in that certain Grant of Easement (Agreement) by and between Henry N. Tsuruoka and Lily V. Tsuruoka, husband and wife, and Albert Medzadoorian, recorded March 23, 1979 in Book 7246 of Official Records, Page 579, Instrument No. 34238, and being further described as follows:

That certain 10-foot strip of land lying 5 feet on each side of the following described centerline:

Commencing at the North corner of Section 18, Township 14 South, Range 20 East, M.D.B.M.; thence South along the East line of the Northwest ¼ of said Section 18, a distance of 32.96 feet; thence West a distance of 77.95 feet to the true point of beginning; thence South 75° 33' 40" East, a distance of 18.00 feet; thence South 39° 51' 05" East, a distance of 38.13 feet; thence South 00° 58' 30", a distance of 447.09 feet to the North line of the South ½ of Lot 2 of Pleasant Dale, Plats Book 2, Page 38, Fresno County Records.

APN:   477-021-11

PARCEL TWENTY-THREE:

The Easterly 200.00 feet of the Southerly 270.00 feet of Lot 9 of Pleasant Dale, according to the Map thereof recorded in Book 2, Page 38 of Plats, Fresno County Records.

APN:   477-021-18

PARCEL TWENTY-THREE-A:

A non-exclusive easement thirty (30) foot wide road right of way being described as follows:

The South 30.00 feet of the West 120.00 feet of the East 320.00 feet of Lot 9 of Pleasant Dale according to the Map thereof recorded in Book 2, Page 38 of Plats, Fresno County Records.

PARCEL TWENTY-THREE-B:

A non-exclusive five (5) foot wide right of way for maintenance, repairs, operations, additions, alterations and betterments for a water pipeline, the centerline of said right of way being described as follows:

Commencing at a point on the Westerly line of that certain parcel of land, said point bearing South 89° 14' 00" West, 200.00 feet and North 0° 21' 43" East, 32.70 feet from the Southeast corner of Lot 9 of Pleasant Dale according to the Map thereof recorded in Book 2, Page 38 of Plats, Fresno County Records; thence South 89° 14' 00" West, 67.74 feet; thence South 0° 21' 45" West, 6.50 feet to a point South 0° 21' 45" West, 2.50 feet from an existing domestic water well.

PARCEL TWENTY-FOUR:

Lots 9, 10, 11 and 12 of Pleasant Dale, according to the Map thereof recorded in Book 2, Page 38 of Plats, Fresno County Records.

EXCEPTING THEREFROM the Easterly 200.00 feet of the Southerly 270.00 feet of said Lot 9.

ALSO EXCEPTING THEREFROM the Westerly 170.00 feet of the Southerly 270.00 feet of said Lot 9.

APN:   477-021-19

PARCEL TWENTY-FIVE:

The un-numbered Lot lying West of, and adjoining, Lots 21, 22, 23 and 234 of Pleasant Dale, according to the Map thereof, recorded in Book 2, Page 38 of Plats, Fresno County Records.

Said property is also described as the West one-half of the Southwest quarter of the fractional Northwest quarter of Section 18, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the North 214.29 feet of the South 627.7 feet to the West 280.00 feet thereof.

and

Lots 21, 22, 23 and 24 of pleasant dale according to the Map thereof recorded December 30, 1887, in Book 2, Page 38 of Plats, Fresno County Records.

APN:   477-021-20

PARCEL TWENTY-SIX:

The West 330 feet of the West one-half of the Northwest quarter of the Northwest quarter of Section 18, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM that portion described in the Deed to the City of Fresno recorded November 14, 2003, as Document No. 2003-0276316, Official Records.

and

Lot 20 of Pleasant Dale, according to the Map thereof recorded in Book 2, Page 38 of Plats, Fresno County Records.

EXCEPTING THEREFROM that portion described in the Deed to the City of Fresno recorded November 14, 2003, as Document No. 2003-0276316, Official Records.

and

Beginning at a point on the North line of the Northwest quarter of Section 18, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof, 1980 feet West of the Northeast corner of the Northwest quarter of said Section; thence South 0° 35' East, 1321 feet to a point on the South line of the North half of the Northwest quarter of said Section distant 1970.5 feet South 89° 55' West from the Southeast corner of the Northeast quarter of the Northwest quarter of said Section; thence West along the South line of the North half of the Northwest quarter of said section to the West line of said section; thence North along said West line to the Northwest corner of said section; thence East along the North line of said section to the point of beginning.

EXCEPTING THEREFROM the West 330 feet thereof.

ALSO EXCEPTING THEREFROM that portion described in the Deed to the City of Fresno, recorded November 14, 2003, as Document No. 2003-0276316, Official Records.

APN:   477-021-25

TRACT TWO:

Lots 3, 4, 5 and 6 of West Villa Tract, according to the Map thereof, filed for record in Book 2, Page 49 of Plats, Fresno County Records.

APN: 464-070-10; and
      464-070-11

TRACT THREE:

The Northwest quarter of the Southwest quarter of the Southeast quarter and the West half of the Northeast quarter of Southwest quarter of Southeast quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, in the County of Fresno, State of California, according to the United States Government Township Plats.

EXCEPTING THEREFROM that portion described in Grant Deed recorded September 8, 1982, as Instrument No. 82-77115, in Book 7969, Page 387 of Official Records.

APN: 464-101-23

Fresno County Recorder
Paul Dictos, CPA

# 2022-0125748

Recorded at the request of:
CSC, LOGAN

10/07/2022 01:43 58
Titles: 1      Pages: 11
Fees: $49.00
CA SB2 Fees:$75.00
Taxes: $0.00
Total: $124.00

## UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Shelby Peters 515-348-6409

**B. E-MAIL CONTACT AT FILER (optional)**
Shelby.peters@conterraag.com

**C. SEND ACKNOWLEDGMENT TO:   (Name and Address)**

Attn: Shelby Peters
5465 Mills Civic Parkway, Suite 201
West Des Moines, IA 50266

| Print | Reset |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER | 1b. ☑ This FINANCING STATEMENT AMENDMENT is to be filed [for record] |
|---|---|
| 2018-0011387-00 | (or recorded) in the REAL ESTATE RECORDS<br>Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☑ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:      AND Check one of these three boxes to:

This Change affects ☐ Debtor or ☐ Secured Party of record | ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c | ☐ ADD name: Complete item 7a or 7b, and item 7c | ☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. **CURRENT RECORD INFORMATION:**  Complete for Party Information Change - provide only one name (6a or 6b)

| | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. **CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| | 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 7b. INDIVIDUAL'S SURNAME | | | |
| | INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

8. ☐ **COLLATERAL CHANGE:** Also check one of these four boxes:   ☐ ADD collateral   ☐ DELETE collateral   ☐ RESTATE covered collateral   ☐ ASSIGN collateral
Indicate collateral:

9. **NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| | 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage programs | | | |
| OR | 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA:
21701725, 21701728 - C&A Farms, LLC

UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

# UCC FINANCING STATEMENT **AMENDMENT ADDENDUM**

FOLLOW INSTRUCTIONS

11. INITIAL FINANCING STATEMENT FILE NUMBER:  Same as item 1a on Amendment form
2018-0011387-00

12. NAME OF PARTY AUTHORIZING THIS AMENDMENT:  Same as item 9 on Amendment form

12a. ORGANIZATION'S NAME
U.S. Bank National Association, as Custodian/Trustee

for Federal Agricultural Mortgage Corporation programs

OR

12b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S)       SUFFIX

| Print | Reset |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

13. Name of DEBTOR on related financing statement (Name of a current Debtor of record required for indexing purposes only in some filing offices - see Instruction Item 13):  Provide only one Debtor name (13a or 13b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); see Instructions if name does not fit

13a. ORGANIZATION'S NAME
C&A Farms, LLC

OR

13b. INDIVIDUAL'S SURNAME        FIRST PERSONAL NAME        ADDITIONAL NAME(S)/INITIAL(S)        SUFFIX

14. ADDITIONAL SPACE FOR ITEM 8 (Collateral):
Additional Debtor:
Whitesbridge Farms, LLC

15. This FINANCING STATEMENT AMENDMENT:

☐ covers timber to be cut   ☐ covers as-extracted collateral   ☑ is filed as a fixture filing

16. Name and address of a RECORD OWNER of real estate described in item 17
(if Debtor does not have a record interest):

17. Description of real estate:
See Attached Exhibit A

18. MISCELLANEOUS:

UCC FINANCING STATEMENT AMENDMENT ADDENDUM (Form UCC3Ad) (Rev. 04/20/11)

## Exhibit "A"
### Legal Description For

### 350.37 Acres Devoted to an Almond Orchard
### Fresno County, California

**See Exhibit "A" attached hereto and made a part hereof.**

---

**RIDER A TO UCC**

©PeirsonPatterson, LLP.-Arlington, Texas 2016
1153040118 [Doc Id 9696 M03212016]

# EXHIBIT A

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

TRACT ONE:

PARCEL ONE:

The East half of the Northwest quarter of the Northeast quarter of the Northwest quarter; the West half of the Northeast quarter of the Northeast of the Northwest quarter; and the East half of the Northeast quarter of the Northeast quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the East 420.9 feet of the North half of the Northeast quarter of the Northeast quarter of the Northwest quarter of said Section 7.

ALSO EXCEPTING THEREFROM commencing at the Northwest corner of the East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7, running thence East along the North boundary line of said Section 7; 4.09 feet; thence in a Southerly direction in a straight line to a point on the South boundary line of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7, said point being 17 feet East of the Southwest corner of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7; thence West along the South boundary line of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7; 17 feet to the Southwest corner of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7; thence North along the West boundary line of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7 to the said Northwest corner of the said East half of the Northwest quarter of the Northeast quarter of the Northeast quarter of said Section 7.

APN:   464-20-07

PARCEL TWO:

The West 161 feet of the East 420.9 feet of the North half of the Northeast quarter of the Northeast quarter of the Northwest quarter of Section 17, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:   464-020-08

PARCEL THREE:

The North half of the East 259.9 feet of the East half of the Northeast quarter of the Northeast quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof; said 259.9 feet measured from the East line of said Northwest quarter of said section.

APN:   464-020-09

PARCEL FOUR:

The North half of the Northeast quarter of the Southeast quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:   464-020-12

PARCEL FIVE:

The North half of the Northwest quarter of the Southeast quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:   464-020-13

PARCEL SIX:

The South one-half of the Northeast one-quarter of the Northwest one-quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the East 195 feet of the South 114 feet thereof.

ALSO EXCEPTING THEREFROM that portion lying within Parcel Map No. 82-33, according to the Map thereof recorded in Book 44, Pages 2 and 3 of Parcel Maps, Fresno County Records.

APN:   464-020-15

PARCEL SEVEN:

The East 195 feet of the South 114 feet of the South one-half of the Northeast one-quarter of the Northwest one-quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:   464-020-16

PARCEL EIGHT:

The Southwest quarter of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:  464-020-19

PARCEL NINE:

The South three-fourths of the Southeast quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the South 351 feet of the East 340 feet thereof.

APN:  464-020-25

PARCEL TEN:

Parcel "A" of Parcel Map No. 82-33, according to the Map thereof recorded in Book 44, Pages 2 and 3 of Parcel Maps, Fresno County Records.

APN:  464-020-26

PARCEL TEN-A:

A right of way for road purposes over the Westerly 30 feet of the East 330 feet of the East half of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM that portion lying within Parcel Ten described therein.

PARCEL ELEVEN:

The fractional Southwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the East 990 feet thereof.

APN:  464-020-28

PARCEL TWELVE:

The West 330 feet of the East 990 feet of the fractional Southwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:  464-020-29

PARCEL THIRTEEN:

The West 330 feet of the East 660 feet of the fractional Southwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:   464-020-30

PARCEL FOURTEEN:

The East 330 feet of the fractional Southwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:   464-020-31

PARCEL FIFTEEN:

Parcel B of Parcel Map No. 82-33, according to the Map thereof recorded in Book 44, Pages 2 and 3 of Parcel Maps, Fresno County Records.

APN:   464-020-34

PARCEL SIXTEEN:

The East 125 feet of the Northwest quarter of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM that portion conveyed to the State of California, by Deed recorded July 31, 2003, as Document No. 2003-0173909, Official Records.

APN:   464-020-35

PARCEL SEVENTEEN:

The East half of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the East 330 feet thereof.

ALSO EXCEPTING THEREFROM that portion of said land as conveyed to the State of California by Grant Deed recorded July 31, 2003, as Document No. 2003-0173909, Official Records.

APN:   464-020-36

PARCEL EIGHTEEN:

The Northwest quarter of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the West 200 feet thereof.

EXCEPTING THEREFROM the East 125 feet thereof.

ALSO EXCEPTING THEREFROM that portion conveyed to the State of California in the Deed recorded January 12, 2004, as Document No. 2004-0007899, Official Records.

APN:   464-020-37

PARCEL NINETEEN:

INTENTIONALLY DELETED

PARCEL TWENTY:

All of Briscoe Tract, a Subdivision of the East half of the Southwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, unincorporated area, County of Fresno, State of California, except Lot 3 of Briscoe Tract, the same being in Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, unincorporated area, County of Fresno, State of California.

ALSO EXCEPTING THEREFROM that portion conveyed to the Fresno Irrigation District by Deed recorded February 13, 2006, as Instrument No. 2006-0031312 of Official Records.

APN:   464-060-17

PARCEL TWENTY-ONE:

Lots 13, 14, 15 and 16 of Pleasant Dale, in the City of Fresno, County of Fresno, State of California, according to the Map thereof recorded in Book 2, Page 38 of Plats, in the Office of the County Recorder of said County.

TOGETHER WITH that portion of abandoned South Pleasant Avenue, which would pass by operation of law

APN:   477-021-09

PARCEL TWENTY-TWO:

The South half of Lot 2, all of Lot 3 and the North half of Lot 4 of Pleasant Dale, according to the Map thereof recorded December 30, 1887, in Book 2, Page 38 of Plats, Fresno County Records.

PARCEL TWENTY-TWO-A:

An easement for a right of way or right to maintain, repair and replace an underground water pipe system as created in that certain Grant of Easement (Agreement) by and between Henry N. Tsuruoka and Lily V. Tsuruoka, husband and wife, and Albert Medzadoorian, recorded March 23, 1979 in Book 7246 of Official Records, Page 579, Instrument No. 34238, and being further described as follows:

That certain 10-foot strip of land lying 5 feet on each side of the following described centerline:

Commencing at the North corner of Section 18, Township 14 South, Range 20 East, M.D.B.M.; thence South along the East line of the Northwest ¼ of said Section 18, a distance of 32.96 feet; thence West a distance of 77.95 feet to the true point of beginning; thence South 75° 33' 40" East, a distance of 18.00 feet; thence South 39° 51' 05" East, a distance of 38.13 feet; thence South 00° 58' 30", a distance of 447.09 feet to the North line of the South ½ of Lot 2 of Pleasant Dale, Plats Book 2, Page 38, Fresno County Records.

APN:   477-021-11

PARCEL TWENTY-THREE:

The Easterly 200.00 feet of the Southerly 270.00 feet of Lot 9 of Pleasant Dale, according to the Map thereof recorded in Book 2, Page 38 of Plats, Fresno County Records.

APN:   477-021-18

PARCEL TWENTY-THREE-A:

A non-exclusive easement thirty (30) foot wide road right of way being described as follows:

The South 30.00 feet of the West 120.00 feet of the East 320.00 feet of Lot 9 of Pleasant Dale according to the Map thereof recorded in Book 2, Page 38 of Plats, Fresno County Records.

PARCEL TWENTY-THREE-B:

A non-exclusive five (5) foot wide right of way for maintenance, repairs, operations, additions, alterations and betterments for a water pipeline, the centerline of said right of way being described as follows:

Commencing at a point on the Westerly line of that certain parcel of land, said point bearing South 89° 14' 00" West, 200.00 feet and North 0° 21' 43" East, 32.70 feet from the Southeast corner of Lot 9 of Pleasant Dale according to the Map thereof recorded in Book 2, Page 38 of Plats, Fresno County Records; thence South 89° 14' 00" West, 67.74 feet; thence South 0° 21' 45" West, 6.50 feet to a point South 0° 21' 45" West, 2.50 feet from an existing domestic water well.

PARCEL TWENTY-FOUR:

Lots 9, 10, 11 and 12 of Pleasant Dale, according to the Map thereof recorded in Book 2, Page 38 of Plats, Fresno County Records.

EXCEPTING THEREFROM the Easterly 200.00 feet of the Southerly 270.00 feet of said Lot 9.

ALSO EXCEPTING THEREFROM the Westerly 170.00 feet of the Southerly 270.00 feet of said Lot 9.

APN:   477-021-19

PARCEL TWENTY-FIVE:

The un-numbered Lot lying West of, and adjoining, Lots 21, 22, 23 and 234 of Pleasant Dale, according to the Map thereof, recorded in Book 2, Page 38 of Plats, Fresno County Records.

Said property is also described as the West one-half of the Southwest quarter of the fractional Northwest quarter of Section 18, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the North 214.29 feet of the South 627.7 feet to the West 280.00 feet thereof.

and

Lots 21, 22, 23 and 24 of pleasant dale according to the Map thereof recorded December 30, 1887, in Book 2, Page 38 of Plats, Fresno County Records.

APN:   477-021-20

PARCEL TWENTY-SIX:

The West 330 feet of the West one-half of the Northwest quarter of the Northwest quarter of Section 18, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM that portion described in the Deed to the City of Fresno recorded November 14, 2003, as Document No. 2003-0276316, Official Records.

and

Lot 20 of Pleasant Dale, according to the Map thereof recorded in Book 2, Page 38 of Plats, Fresno County Records.

EXCEPTING THEREFROM that portion described in the Deed to the City of Fresno recorded November 14, 2003, as Document No. 2003-0276316, Official Records.

and

Beginning at a point on the North line of the Northwest quarter of Section 18, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof, 1980 feet West of the Northeast corner of the Northwest quarter of said Section; thence South 0° 35' East, 1321 feet to a point on the South line of the North half of the Northwest quarter of said Section distant 1970.5 feet South 89° 55' West from the Southeast corner of the Northeast quarter of the Northwest quarter of said Section; thence West along the South line of the North half of the Northwest quarter of said section to the West line of said section; thence North along said West line to the Northwest corner of said section; thence East along the North line of said section to the point of beginning.

EXCEPTING THEREFROM the West 330 feet thereof.

ALSO EXCEPTING THEREFROM that portion described in the Deed to the City of Fresno, recorded November 14, 2003, as Document No. 2003-0276316, Official Records.

APN:   477-021-25

TRACT TWO:

Lots 3, 4, 5 and 6 of West Villa Tract, according to the Map thereof, filed for record in Book 2, Page 49 of Plats, Fresno County Records.

APN: 464-070-10; and
       464-070-11

TRACT THREE:

The Northwest quarter of the Southwest quarter of the Southeast quarter and the West half of the Northeast quarter of Southwest quarter of Southeast quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, in the County of Fresno, State of California, according to the United States Government Township Plats.

EXCEPTING THEREFROM that portion described in Grant Deed recorded September 8, 1982, as Instrument No. 82-77115, in Book 7969, Page 387 of Official Records.

APN: 464-101-23

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**18-7631437101**
**01/31/2018 14:21**

**FILED**
CALIFORNIA
SECRETARY OF STATE

SOS

67579750002    UCC 1 FILING

A. NAME & PHONE OF CONTACT AT FILER (optional)
*SOS COMPLIANCE & CNET SERVICE*

B. E-MAIL CONTACT AT FILER (optional)
*ORDER @ SOSCCS.COM*

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

Conterra Agricultural Capital, LLC
7755 Office Plaza Dr. North
West Des Moines, IA 50266
Attention: Sarah Streeter

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| C&A Farms, LLC | | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| 1306 W Herndon Ave Ste. 101 | Fresno | | CA | 93711 | US |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Individual Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| Whitesbridge Farms, LLC | | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| 1306 W Herndon Ave Ste. 101 | Fresno | | CA | 93711 | US |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs | | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| 1133 Rankin Street, Suite 100 | St. Paul | | MN | 55116 | US |

4. COLLATERAL: This financing statement covers the following collateral:

See UCC Financing Statement Addendum, Rider A to UCC, and Exhibit A Legal Description attached hereto and made a part hereof.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative
6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility
6b. Check only if applicable and check only one box: ☒ Agricultural Lien ☐ Non-UCC Filing
7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor
8. OPTIONAL FILER REFERENCE DATA:
Filing Office: Secretary of State of California

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)    International Association of Commercial Administrators (IACA)

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

**67579750002**

---

**9. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| | |
|---|---|
| | **9a. ORGANIZATION'S NAME** |
| OR | **9b. INDIVIDUAL'S SURNAME** |
| | **FIRST PERSONAL NAME** |
| | **ADDITIONAL NAME(S)/INITIAL(S)** / **SUFFIX** |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

---

**10. DEBTOR'S NAME:** Provide (10a or 10b) only **one** additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| | |
|---|---|
| | **10a. ORGANIZATION'S NAME** |
| OR | **10b. INDIVIDUAL'S SURNAME** |
| | **INDIVIDUAL'S FIRST PERSONAL NAME** |
| | **INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)** / **SUFFIX** |

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | US |

---

**11.** ☐ **ADDITIONAL SECURED PARTY'S NAME** _or_ ☒ **ASSIGNOR SECURED PARTY'S NAME:** Provide only **one** name (11a or 11b)

| | |
|---|---|
| | **11a. ORGANIZATION'S NAME**  Conterra Agricultural Capital, LLC |
| OR | **11b. INDIVIDUAL'S SURNAME** / **FIRST PERSONAL NAME** / **ADDITIONAL NAME(S)/INITIAL(S)** / **SUFFIX** |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 7755 Office Plaza Dr. North        Suite 195 | West Des Moines | IA | 50266 | US |

---

**12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):**

See Rider A to UCC attached hereto and made a part hereof.

---

**13.** ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

**14.** This FINANCING STATEMENT: ☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing

**15.** Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

**16.** Description of real estate:

See Exhibit "A" attached hereto and made a part hereof.

---

**17. MISCELLANEOUS:**

International Association of Commercial Administrators (IACA)

**FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)**

67579750002

# RIDER A TO UCC

Debtor:        **C&A Farms, LLC and Whitesbridge Farms, LLC**

Secured Party:  **Conterra Agricultural Capital, LLC**

In addition to the Property described in the Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling, attached floor coverings, irrigation pipes and pumps, livestock fencing and pens and specifically:

**All water and water rights now owned or hereafter acquired by Debtor and howsoever evidenced, whether such water and water rights are riparian, appropriative or otherwise and whether or not appurtenant to the real estate described herein, all ditch/pond and ditch/pond rights and any shares of stock, licenses, permits and contracts evidencing such water or ditch rights, and all wells, reservoirs, dams, embankments or fixtures relating thereto, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom.**

**All irrigation equipment of every kind and nature, including but not limited to center irrigation pivots, pumps, pvc pipe, sprinklers, motors, well equipment, pumps and power units, now owned or hereafter acquired by Debtor and now or hereafter located and situated on the real estate described herein, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom.**

all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to herein as the "Property."

RIDER A TO UCC

©PeirsonPatterson, LLP.-Arlington, Texas 2016
1153040118 [Doc Id 9633 M03212016]

**67579750002**

## Exhibit "A"
### Legal Description For

**350.37 Acres Devoted to an Almond Orchard**
**Fresno County, California**

See Exhibit "A" attached hereto and made a part hereof.

---

©PeirsonPatterson, LLP.-Arlington, Texas  2016
1153040118 [Doc Id 9633 M03212016]

# EXHIBIT A

The land referred to is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

TRACT ONE:

PARCEL ONE:

The East half of the Northwest quarter of the Northeast quarter of the Northwest quarter; the West half of the Northeast quarter of the Northeast of the Northwest quarter; and the East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the East 420.9 feet of the North half of the Northeast quarter of the Northeast quarter of the Northwest quarter of said Section 7.

ALSO EXCEPTING THEREFROM commencing at the Northwest corner of the East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7, running thence East along the North boundary line of said Section 7; 4.09 feet; thence in a Southerly direction in a straight line to a point on the South boundary line of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7, said point being 17 feet East of the Southwest corner of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7; thence West along the South boundary line of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7; 17 feet to the Southwest corner of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7; thence North along the West boundary line of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7 to the said Northwest corner of the said East half of the Northwest quarter of the Northeast quarter of the Northeast quarter of said Section 7.

APN:   464-20-07

PARCEL TWO:

The West 161 feet of the East 420.9 feet of the North half of the Northeast quarter of the Northeast quarter of the Northwest quarter of Section 17, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:   464-020-08

PARCEL THREE:

67579750002

The North half of the East 259.9 feet of the East half of the Northeast quarter of the Northeast quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof; said 259.9 feet measured from the East line of said Northwest quarter of said section.

APN:   464-020-09

PARCEL FOUR:

The North half of the Northeast quarter of the Southeast quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:   464-020-12

PARCEL FIVE:

The North half of the Northwest quarter of the Southeast quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:   464-020-13

PARCEL SIX:

The South one-half of the Northeast one-quarter of the Northwest one-quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the East 195 feet of the South 114 feet thereof.

ALSO EXCEPTING THEREFROM that portion lying within Parcel Map No. 82-33, according to the Map thereof recorded in Book 44, Pages 2 and 3 of Parcel Maps, Fresno County Records.

APN:   464-020-15

PARCEL SEVEN:

The East 195 feet of the South 114 feet of the South one-half of the Northeast one-quarter of the Northwest one-quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:   464-020-16

PARCEL EIGHT:

The Southwest quarter of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

67579750002

APN:   464-020-19

PARCEL NINE:

The South three-fourths of the Southeast quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the South 351 feet of the East 340 feet thereof.

APN:   464-020-25

PARCEL TEN:

Parcel "A" of Parcel Map No. 82-33, according to the Map thereof recorded in Book 44, Pages 2 and 3 of Parcel Maps, Fresno County Records.

APN:   464-020-26

PARCEL TEN-A:

A right of way for road purposes over the Westerly 30 feet of the East 330 feet of the East half of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM that portion lying within Parcel Ten described therein.

PARCEL ELEVEN:

The fractional Southwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the East 990 feet thereof.

APN:   464-020-28

PARCEL TWELVE:

The West 330 feet of the East 990 feet of the fractional Southwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:   464-020-29

PARCEL THIRTEEN:

The West 330 feet of the East 660 feet of the fractional Southwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

67579750002

APN:   464-020-30

PARCEL FOURTEEN:

The East 330 feet of the fractional Southwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN:   464-020-31

PARCEL FIFTEEN:

Parcel B of Parcel Map No. 82-33, according to the Map thereof recorded in Book 44, Pages 2 and 3 of Parcel Maps, Fresno County Records.

APN:   464-020-34

PARCEL SIXTEEN:

The East 125 feet of the Northwest quarter of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM that portion conveyed to the State of California, by Deed recorded July 31, 2003, as Document No. 2003-0173909, Official Records.

APN:   464-020-35

PARCEL SEVENTEEN:

The East half of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the East 330 feet thereof.

ALSO EXCEPTING THEREFROM that portion of said land as conveyed to the State of California by Grant Deed recorded July 31, 2003, as Document No. 2003-0173909, Official Records.

APN:   464-020-36

PARCEL EIGHTEEN:

The Northwest quarter of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the West 200 feet thereof.

EXCEPTING THEREFROM the East 125 feet thereof.

67579750002

ALSO EXCEPTING THEREFROM that portion conveyed to the State of California in the Deed recorded January 12, 2004, as Document No. 2004-0007899, Official Records.

APN:   464-020-37

PARCEL NINETEEN:

INTENTIONALLY DELETED

PARCEL TWENTY:

All of Briscoe Tract, a Subdivision of the East half of the Southwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, unincorporated area, County of Fresno, State of California, except Lot 3 of Briscoe Tract, the same being in Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, unincorporated area, County of Fresno, State of California.

ALSO EXCEPTING THEREFROM that portion conveyed to the Fresno Irrigation District by Deed recorded February 13, 2006, as Instrument No. 2006-0031312 of Official Records.

APN:   464-060-17

PARCEL TWENTY-ONE:

Lots 13, 14, 15 and 16 of Pleasant Dale, in the City of Fresno, County of Fresno, State of California, according to the Map thereof recorded in Book 2, Page 38 of Plats, in the Office of the County Recorder of said County.

TOGETHER WITH that portion of abandoned South Pleasant Avenue, which would pass by operation of law

APN:   477-021-09

PARCEL TWENTY-TWO:

The South half of Lot 2, all of Lot 3 and the North half of Lot 4 of Pleasant Dale, according to the Map thereof recorded December 30, 1887, in Book 2, Page 38 of Plats, Fresno County Records.

PARCEL TWENTY-TWO-A:

An easement for a right of way or right to maintain, repair and replace an underground water pipe system as created in that certain Grant of Easement (Agreement) by and between Henry N. Tsuruoka and Lily V. Tsuruoka, husband and wife, and Albert Medzadoorian, recorded March 23, 1979 in Book 7246 of Official Records, Page 579, Instrument No. 34238, and being further described as follows:

That certain 10-foot strip of land lying 5 feet on each side of the following described centerline:

67579750002

Commencing at the North corner of Section 18, Township 14 South, Range 20 East, M.D.B.M.; thence South along the East line of the Northwest ¼ of said Section 18, a distance of 32.96 feet; thence West a distance of 77.95 feet to the true point of beginning; thence South 75° 33' 40" East, a distance of 18.00 feet; thence South 39° 51' 05" East, a distance of 38.13 feet; thence South 00° 58' 30", a distance of 447.09 feet to the North line of the South ½ of Lot 2 of Pleasant Dale, Plats Book 2, Page 38, Fresno County Records.

APN:   477-021-11

PARCEL TWENTY-THREE:

The Easterly 200.00 feet of the Southerly 270.00 feet of Lot 9 of Pleasant Dale, according to the Map thereof recorded in Book 2, Page 38 of Plats, Fresno County Records.

APN:   477-021-18

PARCEL TWENTY-THREE-A:

A non-exclusive easement thirty (30) foot wide road right of way being described as follows:

The South 30.00 feet of the West 120.00 feet of the East 320.00 feet of Lot 9 of Pleasant Dale according to the Map thereof recorded in Book 2, Page 38 of Plats, Fresno County Records.

PARCEL TWENTY-THREE-B:

A non-exclusive five (5) foot wide right of way for maintenance, repairs, operations, additions, alterations and betterments for a water pipeline, the centerline of said right of way being described as follows:

Commencing at a point on the Westerly line of that certain parcel of land, said point bearing South 89° 14' 00" West, 200.00 feet and North 0° 21' 43" East, 32.70 feet from the Southeast corner of Lot 9 of Pleasant Dale according to the Map thereof recorded in Book 2, Page 38 of Plats, Fresno County Records; thence South 89° 14' 00" West, 67.74 feet; thence South 0° 21' 45" West, 6.50 feet to a point South 0° 21' 45" West, 2.50 feet from an existing domestic water well.

PARCEL TWENTY-FOUR:

Lots 9, 10, 11 and 12 of Pleasant Dale, according to the Map thereof recorded in Book 2, Page 38 of Plats, Fresno County Records.

EXCEPTING THEREFROM the Easterly 200.00 feet of the Southerly 270.00 feet of said Lot 9.

ALSO EXCEPTING THEREFROM the Westerly 170.00 feet of the Southerly 270.00 feet of said Lot 9.

APN:   477-021-19

PARCEL TWENTY-FIVE:

67579750002

The un-numbered Lot lying West of, and adjoining, Lots 21, 22, 23 and 234 of Pleasant Dale, according to the Map thereof, recorded in Book 2, Page 38 of Plats, Fresno County Records.

Said property is also described as the West one-half of the Southwest quarter of the fractional Northwest quarter of Section 18, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the North 214.29 feet of the South 627.7 feet to the West 280.00 feet thereof.

and

Lots 21, 22, 23 and 24 of pleasant dale according to the Map thereof recorded December 30, 1887, in Book 2, Page 38 of Plats, Fresno County Records.

APN:   477-021-20

PARCEL TWENTY-SIX:

The West 330 feet of the West one-half of the Northwest quarter of the Northwest quarter of Section 18, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM that portion described in the Deed to the City of Fresno recorded November 14, 2003, as Document No. 2003-0276316, Official Records.

and

Lot 20 of Pleasant Dale, according to the Map thereof recorded in Book 2, Page 38 of Plats, Fresno County Records.

EXCEPTING THEREFROM that portion described in the Deed to the City of Fresno recorded November 14, 2003, as Document No. 2003-0276316, Official Records.

and

Beginning at a point on the North line of the Northwest quarter of Section 18, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof, 1980 feet West of the Northeast corner of the Northwest quarter of said Section; thence South 0° 35' East, 1321 feet to a point on the South line of the North half of the Northwest quarter of said Section distant 1970.5 feet South 89° 55' West from the Southeast corner of the Northeast quarter of the Northwest quarter of said Section; thence West along the South line of the North half of the Northwest quarter of said section to the West line of said section; thence North along said West line to the Northwest corner of said section; thence East along the North line of said section to the point of beginning.

EXCEPTING THEREFROM the West 330 feet thereof.

ALSO EXCEPTING THEREFROM that portion described in the Deed to the City of Fresno, recorded November 14, 2003, as Document No. 2003-0276316, Official Records.

67579750002

APN:   477-021-25

TRACT TWO:

Lots 3, 4, 5 and 6 of West Villa Tract, according to the Map thereof, filed for record in Book 2, Page 49 of Plats, Fresno County Records.

APN: 464-070-10; and
      464-070-11

TRACT THREE:

The Northwest quarter of the Southwest quarter of the Southeast quarter and the West half of the Northeast quarter of Southwest quarter of Southeast quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, in the County of Fresno, State of California, according to the United States Government Township Plats.

EXCEPTING THEREFROM that portion described in Grant Deed recorded September 8, 1982, as Instrument No. 82-77115, in Book 7969, Page 387 of Official Records.

APN: 464-101-23






**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**UCC FINANCING STATEMENT AMENDMENT (UCC 3)**

California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

| For Office Use Only |
| --- |
| **-FILED-** |
| File No.: U220233579230 |
| Date Filed: 10/7/2022 |

| Submitter Information: | |
| --- | --- |
| Contact Name | Shelby Peters |
| Organization Name | Conterra Ag Capital |
| Phone Number | (515) 348-6409 |
| Email Address | shelby.peters@conterraag.com |
| Address | 5465 Mills Civic Parkway, Ste. 201 West Des Moines, CA 50266 |

| Amendment Action Information: | |
| --- | --- |
| Initial Financing Statement File Number | 187631437101 |
| Date Filed | 01/31/2018 |
| Amendment Action | Continuation |

Name of Secured Party of Record Authorizing This Amendment:

☐ If this Amendment is authorized by a Debtor, check this box and select the name of the Authorizing Debtor below.

| Authorizing Secured Party Name | U.S. BANK NATIONAL ASSOCIATION, AS CUSTODIAN/TRUSTEE FOR FEDERAL AGRICULTURAL MORTGAGE CORPORATION PROGRAMS |
| --- | --- |

Optional Filer Reference Information:
21701725, 21701728, 22002676, 22002678

Miscellaneous Information:

RECORDING REQUESTED BY

OLD REPUBLIC TITLE COMPANY

Escrow No.: 1411016051 − DB
APN: 004-130-030, 004-230-013, 004-
140-002, 004-230-027, 004-140-
012, 004-140-005, 038-141-21s,
004-030-026, 004-230-014, 040-
020-18s

WHEN RECORDED MAIL TO

Conterra Agricultural Capital, LLC
Taylor Petersen
7755 Office Plaza Drive North, Suite 195
West Des Moines, IA 50266

‖‖‖ ‖‖‗‗‖‖‗ ‖‖‗ ‖‗‗‖‗ ‗‖‖‗‗ ‖‗‖‖‗ ‖‗‖‖‗‗‗‖‖‗ ‖‗‖‖‗‖‖ ‖‖ ‖‖

**2019−0123393**

FRESNO County Recorder
Paul Dictos, CPA

Tuesday, Oct 15, 2019 04:40:29 PM

Titles: 1          Pages: 8

Fees:                $40.00
CA SB2 Fee:          $0.00
Taxes:               $0.00
Total:               $40.00
CONTERRA AGRICULTURAL CAPITAL LLC

*SPACE ABOVE THIS LINE FOR RECORDER'S USE*

## UCC 1 - Financing Statement

1 ☐ Exempt from fee per GC27388.1(a)(2); document recorded in connection with a concurrent transfer subject to the imposition of documentary transfer tax

2 ☐ Exempt from fee per GC27388.1(a)(2); document transfers real property that is a residential dwelling to an owner-occupier

3 ☐ Exempt from fee per GC27388.1(a)(2); document recorded in connection with a concurrent transfer that is a residential dwelling to an owner-occupier

4 ☒ Exempt from fee per GC27388.1(a)(1); fee cap of $225 reached

5 ☐ Exempt from fee per GC27388.1(a)(2); document is subject to the imposition of documentary transfer tax

11 ☐ Exempt from fee per GC27388.1(a)(2); document is executed or recorded by the state or any county, municipality, or other political subdivision of the state

DB/db

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Conterra Agricultural Capital, LLC
Attn: Taylor Petersen
7755 Office Plaza Drive North, Suite 195
West Des Moines, Iowa 50266

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); If any part of the Individual Debtor's name will not fit in line 1b, leave all of Item 1 blank, check here ☐ and provide the Individual Debtor Information in Item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| Copper Avenue Investments, LLC, a California limited liability company | | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |
| 1306 W Herndon Ave. #101 | Fresno | CA | 93711 | | US |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); If any part of the Individual Debtor's name will not fit in line 2b, leave all of Item 2 blank, check here ☐ and provide the Individual Debtor Information in Item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| ACAP Holdings, LLC, a California limited liability comany | | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |
| 1306 W Herndon Ave. #101 | Fresno | CA | 93711 | | US |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corportation programs | | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |
| 1133 Rankin Street, Suite 100 | St. Paul | MN | 55116 | | US |

4. COLLATERAL: This financing statement covers the following collateral:
See UCC Financing Statement Addendum, Rider A to UCC, and Exhibit A Legal Description attached hereto and made a part hereof.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility
6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
Filing Office: Fresno County, California

## UCC FINANCING STATEMENT ADDENDUM
FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| 9a. ORGANIZATION'S NAME |
|---|
| Copper Avenue Investments, LLC, a California limited liability company |

OR

| 9b. INDIVIDUAL'S SURNAME |
|---|
| FIRST PERSONAL NAME |
| ADDITIONAL NAME(S)/INITIAL(S)  SUFFIX |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| 10a. ORGANIZATION'S NAME |
|---|
| Ashlan & Hayes Investments, LLC, a California limited liability company |

OR

| 10b. INDIVIDUAL'S SURNAME |
|---|
| INDIVIDUAL'S FIRST PERSONAL NAME |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)  SUFFIX |

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1306 W Herndon Ave. #101 | Fresno | CA | 93711 | |

11. ☐ ADDITIONAL SECURED PARTY'S NAME or ☑ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

| 11a. ORGANIZATION'S NAME |
|---|
| Conterra Agricultural Capital, LLC |

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 7755 Office Plaza Drive North, Suite 195 | West Des Moines | IA | 50266 | US |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):
See Rider A to UCC attached hereto and made a part hereof.

13. ☑ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

14. This FINANCING STATEMENT:
☐ covers timber to be cut  ☐ covers as-extracted collateral  ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

16. Description of real estate:
See Exhibit "A"

17. MISCELLANEOUS:

UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

## UCC FINANCING STATEMENT ADDITIONAL PARTY
FOLLOW INSTRUCTIONS

| 18. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐ | | | | | |
|---|---|---|---|---|---|
| 18a. ORGANIZATION'S NAME | | | | | |
| Copper Avenue Investments, LLC, a California limited liability company | | | | | |
| OR 18b. INDIVIDUAL'S SURNAME | | | | | |
| FIRST PERSONAL NAME | | | | | |
| ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX | | | |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

19. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (19a or 19b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 19a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| OR 19b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| Garcia | Betsy | | E. | | |
| 19c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |
| 575 E. Rumi Avenue | Fresno | CA | 93723 | | US |

20. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (20a or 20b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 20a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| OR 20b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| Derderian | Emily | | | | |
| 20c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |
| 6668 N. West Street | Fresno | CA | 93711 | | US |

21. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (21a or 21b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 21a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| OR 21b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 21c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |

22. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (22a or 22b)

| 22a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| OR 22b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 22c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |

23. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (23a or 23b)

| 23a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| OR 23b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 23c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |

24. MISCELLANEOUS:

UCC FINANCING STATEMENT ADDITIONAL PARTY (Form UCC1AP) (Rev. 08/22/11)

# RIDER A TO UCC

Debtor: **Copper Avenue Investments, LLC, ACAP Holdings, LLC, Ashlan & Hayes Investments, LLC, Emily Derderdian, Betsy E. Garcia**

Secured Party: **U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs**

Assignor Secured Party: **Conterra Agricultural Capital, LLC**

All building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property (as defined/described on Exhibit "A" attached hereto), including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling, attached floor coverings, livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom, and any substitutions or replacements therefore, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Debtor/Borrower to collect or enforce payment thereof, as well as to enforce any guarantees of the forgoing and security therefor, and all of Debtor's/Borrower's present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property, and further, specifically:.

All water and water rights now owned or hereafter acquired by Borrower and howsoever evidenced, including but not limited to any water rights specifically described in the Water Rights Rider if said rider is attached hereto, whether such water and water rights are riparian, appropriative or otherwise and whether or not appurtenant to the real property, along with all ditch and ditch rights and any shares of stock, licenses, permits and contracts evidencing such water or ditch rights, and all wells, reservoirs, dams, embankments or fixtures relating thereto; and

All irrigation equipment of every kind and nature, including but not limited to center irrigation pivots, pumps, PVC pipe, sprinklers, motors, well equipment, pumps and power units, now owned or hereafter acquired by Debtor/Borrower and now or hereafter located and situated on the Property, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom; and

All tangible personal property owned by Debtor/Borrower and located on the Property and all fixtures now owned or hereafter located on the Property,

All of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property.

---

RIDER A TO UCC

©PeirsonPatterson, LLP, 2019
191403350642 [Doc Id 9696 M10292018]

## Exhibit "A"
### Legal Description For

**1,110 +/- Acres**
**Kings County and Fresno**
**County, California**
[Property Address]

PARCEL 1:

The West 20.15 acres of that portion of Lot 10 lying South of Laguna Canal, and all of Lots 11, 12, 13 in Section 10, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, in the County of Kings, State of California, as per map of the Laguna de Tache Grant thereof recorded in the Office of the County Recorder of Fresno County in Book 3 at Page 11 of Record of Surveys, together with that portion of 25th Avenue (abandoned) and 24 1/2 Avenue (abandoned) which would pass by a conveyance of said land under Sections 831 and 1112 of the Civil Code.

EXCEPTING THEREFROM such interest in a strip of land 50 feet wide lying between the Old Crescent Canal right of way and Lots 7 and 8 in said Section 10, as conveyed to Crescent Canal Company, a corporation, by Deed dated January 7, 1913 and recorded April 7, 1913 in Book 51 at Page 78 of Deeds, Kings County Records.

APN: 004-130-030

PARCEL 2:

Lots 1 and 2 lying North of the by-pass of Tulare Lake Basin Water Storage District, in Section 15, Township 18, Range 19 East, Mount Diablo Base and Meridian, as per map of Laguna De Tache Grant thereof recorded in the office of the County Recorder of Fresno County in Book 3 at Page 9 of Record of Surveys.

EXCEPTING THEREFROM any portion thereof lying within San Jose Subdivision as shown on that certain map recorded in Book 3 Page 4 of Licensed Surveyor Plats.

APN: 004-140-012 (Portion)

PARCEL 3:

Those portions of Lots 2 and 3 lying West of canal, all of Lots 3A, 3B, 4, 5, 6, 6A, the well reserved in the Northeast corner of said Lot 6, all of Lots 12, 13 and 13A, in Section 15, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of San Jose Subdivision, recorded March 11, 1930 in Book 3 Page 4, of Licensed Surveyor Plats, Kings County Records.

EXCEPTING THEREFROM all oil, gas and other hydrocarbon substances in or under said property as previously reserved of record.

APN: 004-140-012 (Portion)

PARCEL 4:

Lots 14, 15 and 16, and that portion of Lot 17 lying North of the bypass of Tulare Lake Basin Water Storage District, in Section 10, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, as per map of the Laguna de Tache Grant thereof recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 11 of Record of Surveys.

EXCEPTING THEREFROM all oil, gas and other hydrocarbon substances in or under said property as previously reserved of record.

APN: 004-140-002

PARCEL 5:

The Westerly 361.5 feet of the Southerly 361.5 feet of Lot 14 in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of Laguna de Tache Grant recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 10, of Record of Surveys.

APN: 004-230-014

PARCEL 6:

Lots 5, 6, 6A, 11 and 12, in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of San Jose Subdivision, recorded March 11, 1930 in Book 3 at Page 4 of Licensed Surveyor Plats, Kings County Records.

EXCEPTING THEREFROM all oil, gas and other hydrocarbons minerals now or at any time hereafter situate therein and thereunder said land, as saved, excepted and reserved in Deed recorded May 22, 1945 in Book 329, Page 29, Official Records, as Document No. 3227.

APN: 004-230-026 (Portion)

PARCEL 7:

Lots 13 and 14 in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of Laguna de Tache Grant recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 10, of Record of Surveys, Fresno County Records, lying West of the strip of land described in the Deed from Summit Lake Investment Company, a corporation to Tulare Basin Water Storage District, recorded August 8, 1928 in Book 35 at Page 433, of Official Records, Kings County Records.

EXCEPTING THEREFROM the Westerly 361.5 feet of the Southerly 361.5 feet of Lot 14.

ALSO EXCEPTING THEREFROM such interest in a portion of said Lot 13, conveying to the County of Kings, by Deed dated June 13, 1960 and recorded August 18, 1960 in Book 763 Page 880, of Official Records, as Document No. 8922, described as follows:

Beginning at a point distant North 84° 30' 08" East 860.48 feet from the Southwest corner of said Section 22; thence North 3° 29' 59" West 10 feet; thence along a curve to the right, with a radius of 760.00 feet, through an angle of 94° 48' a distance of 1257.48 feet, with a chord that bears North 46° 05' 59" West, 1118.87 feet; thence South 1° 18' 01" West, 550.00 feet; thence South 88° 41' 59" East 125.10 feet; thence, a long curve to the left, with a radius of 840.00 feet, through an angle of 12° 59' 48" a distance of 190.54 feet, with a cord that bears South 46° 05' 59" East, 190.13 feet; thence South 3° 29' 59" East, 135.10 feet; thence North 86° 30' 01" East, 550.00 feet to a point of beginning.

APN: 004-230-026 (Portion)
     004-230-027

PARCEL 8:

That portion of Lot 15 in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, in the County of Kings, State of California, according to Map of Laguna de Tache Grant recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 10, of Record of Surveys, lying West of the strip of land described in the Deed from Summit Lake Investment Company, a corporation to Tulare Basin Water Storage District, recorded August 8, 1928 in Book 35 at Page 433, of Official Records, Kings County Records.

APN:  004-230-013

The land referred to below is situated in the unincorporated area of the County of Fresno, State of California:

PARCEL 9:

The North half of the Norhteast Quarter of Section 22, Township 16 South, Range 14 East, Mount Diablo Base and Meridian, according to the Plat thereof.

EXCEPTING THEREFROM the North 50 feet, as conveyed to the County of Fresno in Deed recorded April 22, 1970 in Book 5780, Page 78  of Official Records.

APN: 038-141-21S

PARCEL 10:

The Northwest quarter of Section 8, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof;

EXCEPTING THEREFROM an undivided one-half interest in and to all oil, gas, minerals and other hydrocarbon substances now or at any time situate in and under said land, as reserved in the deed from R. T. Hughes and Bess L. Hughes, husband and wife, to John H. Edgar and Ruby Dale Edgar, husband and wife, as joint tenants, July 10, 1950, recorded January 24, 1950 in Book 2829 Page 69  of Official Records, Document No. 4385.

ALSO EXCEPTING THEREFROM an undivided one-fourth interest in and to all oil, gas and other hydrocarbons and minerals now or at any time hereinafter situate therein and thereunder, together with all easements and rights necessary or convenient for the production, storage and transportation thereof and the exploration and testing of the said real property, and also the right to drill for, produce and use water from the said real property in connection with drilling or mining operations thereon, as reserved in the deed from Raymond Dale Johnson to Bernie Thurman and James V. Gregory, as Trustees for Tanya Marie Marshall under that certain irrevocable Trust Agreement dated May 30, 1974, recorded on June 25, 1974 as Document No. 47802.

APN:  040-020-18-S



Fresno County Recorder
 Paul Dictos, CPA

# 2024-0084618

Recording Requested By:

Lien Solutions
P.O. Box 29071
Glendale, CA 91209-9071

Return To:

Lien Solutions
P.O. Box 29071
Glendale, CA 91209-9071

Recorded at the request of:
SIMPLIFILE, PROVO

09/13/2024 08:07 02
Titles: 1      Pages: 6
Fees: $34.00
CA SB2 Fees:$75.00
Taxes: $0.00
Total: $109.00

THIS SPACE IS FOR RECORDER'S USE ONLY

---

### DOCUMENT TITLE(S)

**UCC FINANCING STATEMENT  Continuation Filing**

**THIS  Continuation Filing       FIXTURE FILING IS BEING RECORDED WITH    FRESNO              COUNTY**

Order No: 100702062

## UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Name: Wolters Kluwer Lien Solutions Phone: 800-331-3282 Fax: 818-662-4141

**B. E-MAIL CONTACT AT FILER (optional)**
uccfilingreturn@wolterskluwer.com

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)** 49931 - Conterra Ag -

Lien Solutions
P.O. Box 29071
Glendale, CA 91209-9071

File with: Fresno, CA

100702062

CALI
FIXTURE

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER | 1b. ☒ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS |
|---|---|
| 2019-0123393  10/15/2019 CC CA Fresno | Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☒ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:     AND Check one of these three boxes to:

This Change affects ☐ Debtor or ☐ Secured Party of record    ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c    ☐ ADD name: Complete item 7a or 7b, and item 7c    ☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Copper Avenue Investments, LLC, a California limited liability Company | | | |
| 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |
| 7b. INDIVIDUAL'S SURNAME | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

8. ☐ COLLATERAL CHANGE: Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral
Indicate collateral:

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| U.S. BANK NATIONAL ASSOCIATION, AS CUSTODIAN/TRUSTEE FOR FEDERAL AGRICULTURAL MORTGAGE CORPORATION PROGRAMS | | | |
| 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA: Debtor Name: Copper Avenue Investments, LLC, a California limited liability Company
100702062     21901673 & 21901674     ACAP Holdings, LCC

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

Prepared by Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282

## UCC FINANCING STATEMENT AMENDMENT ADDENDUM

FOLLOW INSTRUCTIONS

| 11. INITIAL FINANCING STATEMENT FILE NUMBER: Same as item 1a on Amendment form |
|---|
| 2019-0123393   10/15/2019 CC CA Fresno |

12. NAME OF PARTY AUTHORIZING THIS AMENDMENT: Same as item 9 on Amendment form

| | 12a. ORGANIZATION'S NAME | |
|---|---|---|
| | U.S. BANK NATIONAL ASSOCIATION, AS CUSTODIAN/TRUSTEE FOR | |
| | FEDERAL AGRICULTURAL MORTGAGE CORPORATION PROGRAMS | |
| OR | 12b. INDIVIDUAL'S SURNAME | |
| | FIRST PERSONAL NAME | |
| | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

13. Name of DEBTOR on related financing statement (Name of a current Debtor of record required for indexing purposes only in some filing offices - see Instruction item 13): Provide only one Debtor name (13a or 13b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); see Instructions if name does not fit

| | 13a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | Copper Avenue Investments, LLC, a California limited liability Company | | | |
| OR | 13b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

14. ADDITIONAL SPACE FOR ITEM 8 (Collateral):

Debtor Name and Address:
Copper Avenue Investments, LLC, a California limited liability Company - 1306 W Herndon Ave , Fresno, CA 93711
ACAP Holdings LLC, a California limited liability Company - 1306 W Herndon Ave , Fresno, CA 93711

Secured Party Name and Address:
U.S. BANK NATIONAL ASSOCIATION, AS CUSTODIAN/TRUSTEE FOR FEDERAL AGRICULTURAL MORTGAGE CORPORATION PROGRAMS - 1133 Rankin Street Suite 100, St Paul, MN 55116

| 15. This FINANCING STATEMENT AMENDMENT: | 17. Description of real estate: |
|---|---|
| ☐ covers timber to be cut   ☐ covers as-extracted collateral   ☒ is filed as a fixture filing | See the attached Exhibit "A" |
| 16. Name and address of a RECORD OWNER of real estate described in item 17 (if Debtor does not have a record interest): | |

18. MISCELLANEOUS: 100702062-CA-19   49931 - Conterra Ag - County        U.S. BANK NATIONAL ASSOCIATION,   File with: Fresno, CA        21901673 & 21901674  ACAP Holdings, LLC

Prepared by Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282

## Exhibit "A"
Legal Description For

**1,110 +/- Acres**
**Kings County and Fresno**
**County, California**
**[Property Address]**

PARCEL 1:

The West 20.15 acres of that portion of Lot 10 lying South of Laguna Canal, and all of Lots 11, 12, 13 in
Section 10, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, in the County of Kings, State
of California, as per map of the Laguna de Tache Grant thereof recorded in the Office of the County Recorder
of Fresno County in Book 3 at Page 11 of Record of Surveys, together with that portion of 25th Avenue
(abandoned) and 24 1/2 Avenue (abandoned) which would pass by a conveyance of said land under Sections
831 and 1112 of the Civil Code.

EXCEPTING THEREFROM such interest in a strip of land 50 feet wide lying between the Old Crescent Canal
right of way and Lots 7 and 8 in said Section 10, as conveyed to Crescent Canal Company, a corporation, by
Deed dated January 7, 1913 and recorded April 7, 1913 in Book 51 at Page 78 of Deeds, Kings County
Records.

APN: 004-130-030

PARCEL 2:

Lots 1 and 2 lying North of the by-pass of Tulare Lake Basin Water Storage District, in Section 15, Township
18, Range 19 East, Mount Diablo Base and Meridian, as per map of Laguna De Tache Grant thereof recorded
in the office of the County Recorder of Fresno County in Book 3 at Page 9 of Record of Surveys.

EXCEPTING THEREFROM any portion thereof lying within San Jose Subdivision as shown on that certain map
recorded in Book 3 Page 4 of Licensed Surveyor Plats.

APN: 004-140-012 (Portion)

PARCEL 3:

Those portions of Lots 2 and 3 lying West of canal, all of Lots 3A, 3B, 4, 5, 6, 6A, the well reserved in the
Northeast corner of said Lot 6, all of Lots 12, 13 and 13A, in Section 15, Township 18 South, Range 19 East,
Mount Diablo Base and Meridian, according to the Map of San Jose Subdivision, recorded March 11, 1930 in
Book 3 Page 4, of Licensed Surveyor Plats, Kings County Records.

EXCEPTING THEREFROM all oil, gas and other hydrocarbon substances in or under said property as previously
reserved of record.

APN: 004-140-012 (Portion)

PARCEL 4:

Lots 14, 15 and 16, and that portion of Lot 17 lying North of the bypass of Tulare Lake Basin Water Storage District, in Section 10, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, as per map of the Laguna de Tache Grant thereof recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 11 of Record of Surveys.

EXCEPTING THEREFROM all oil, gas and other hydrocarbon substances in or under said property as previously reserved of record.

APN:  004-140-002

PARCEL 5:

The Westerly 361.5 feet of the Southerly 361.5 feet of Lot 14 in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of Laguna de Tache Grant recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 10, of Record of Surveys.

APN:  004-230-014

PARCEL 6:

Lots 5, 6, 6A, 11 and 12, in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of San Jose Subdivision, recorded March 11, 1930 in Book 3 at Page 4 of Licensed Surveyor Plats, Kings County Records.

EXCEPTING THEREFROM all oil, gas and other hydrocarbons minerals now or at any time hereafter situate therein and thereunder said land, as saved, excepted and reserved in Deed recorded May 22, 1945 in Book 329, Page 29, Official Records, as Document No. 3227.

APN:  004-230-026 (Portion)

PARCEL 7:

Lots 13 and 14 in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of Laguna de Tache Grant recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 10, of Record of Surveys, Fresno County Records, lying West of the strip of land described in the Deed from Summit Lake Investment Company, a corporation to Tulare Basin Water Storage District, recorded August 8, 1928 in Book 35 at Page 433, of Official Records, Kings County Records.

EXCEPTING THEREFROM the Westerly 361.5 feet of the Southerly 361.5 feet of Lot 14.

ALSO EXCEPTING THEREFROM such interest in a portion of said Lot 13, conveying to the County of Kings, by Deed dated June 13, 1960 and recorded August 18, 1960 in Book 763 Page 880, of Official Records, as Document No. 8922, described as follows:

Beginning at a point distant North 84° 30' 08" East 860.48 feet from the Southwest corner of said Section 22; thence North 3° 29' 59" West 10 feet; thence along a curve to the right, with a radius of 760.00 feet, through an angle of 94° 48' a distance of 1257.48 feet, with a chord that bears North 46° 05' 59" West, 1118.87 feet; thence South 1° 18' 01" West, 550.00 feet; thence South 88° 41' 59" East 125.10 feet; thence, a long curve to the left, with a radius of 840.00 feet, through an angle of 12° 59' 48" a distance of 190.54 feet, with a cord that bears South 46° 05' 59" East, 190.13 feet; thence South 3° 29' 59" East, 135.10 feet; thence North 86° 30' 01" East, 550.00 feet to a point of beginning.

APN:  004-230-026 (Portion)
     004-230-027

PARCEL 8:

That portion of Lot 15 in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, in the County of Kings, State of California, according to Map of Laguna de Tache Grant recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 10, of Record of Surveys, lying West of the strip of land described in the Deed from Summit Lake Investment Company, a corporation to Tulare Basin Water Storage District, recorded August 8, 1928 in Book 35 at Page 433, of Official Records, Kings County Records.

APN: 004-230-013

The land referred to below is situated in the unincorporated area of the County of Fresno, State of California:

PARCEL 9:

The North half of the Norhteast Quarter of Section 22, Township 16 South, Range 14 East, Mount Diablo Base and Meridian, according to the Plat thereof.

EXCEPTING THEREFROM the North 50 feet, as conveyed to the County of Fresno in Deed recorded April 22, 1970 in Book 5780, Page 78 of Official Records.

APN: 038-141-21S

PARCEL 10:

The Northwest quarter of Section 8, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof;

EXCEPTING THEREFROM an undivided one-half interest in and to all oil, gas, minerals and other hydrocarbon substances now or at any time situate in and under said land, as reserved in the deed from R. T. Hughes and Bess L. Hughes, husband and wife, to John H. Edgar and Ruby Dale Edgar, husband and wife, as joint tenants, July 10, 1950, recorded January 24, 1950 in Book 2829 Page 69 of Official Records, Document No. 4385.

ALSO EXCEPTING THEREFROM an undivided one-fourth interest in and to all oil, gas and other hydrocarbons and minerals now or at any time hereinafter situate therein and thereunder, together with all easements and rights necessary or convenient for the production, storage and transportation thereof and the exploration and testing of the said real property, and also the right to drill for, produce and use water from the said real property in connection with drilling or mining operations thereon, as reserved in the deed from Raymond Dale Johnson to Bernie Thurman and James V. Gregory, as Trustees for Tanya Marie Marshall under that certain irrevocable Trust Agreement dated May 30, 1974, recorded on June 25, 1974 as Document No. 47802.

APN: 040-020-18-S

DOC NBR: 1917425   10/15/2019   03:49:28 PM
OFFICIAL RECORDS OF Kings County
Clerk-Recorder, Kristine Lee
RECORDING FEE: $97.00
COUNTY TAX: $0.00
CITY TAX: $0.00

DOC TYPE: 37
7 PGS
R055

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

ERECORDING PARTNERS NETWORK LL

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
| --- |

| B. E-MAIL CONTACT AT FILER (optional) |
| --- |

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

Conterra Agricultural Capital, LLC
Attn: Taylor Petersen
7755 Office Plaza Drive North, Suite 195
West Des Moines, Iowa 50266

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| Copper Avenue Investments, LLC, a California limited liability company | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1306 W Herndon Ave. #101 | Fresno | CA | 93711 | US |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| ACAP Holdings, LLC, a California limited liability comany | | | | |
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1306 W Herndon Ave. #101 | Fresno | CA | 93711 | US |

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corportation programs | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1133 Rankin Street, Suite 100 | St. Paul | MN | 55116 | US |

**4. COLLATERAL:** This financing statement covers the following collateral:

See UCC Financing Statement Addendum, Rider A to UCC, and Exhibit A Legal Description attached hereto and made a part hereof.

| 5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) | ☐ being administered by a Decedent's Personal Representative |
| --- | --- |
| 6a. Check only if applicable and check only one box: | 6b. Check only if applicable and check only one box: |
| ☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien   ☐ Non-UCC Filing |

| 7. ALTERNATIVE DESIGNATION (if applicable):   ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor |
| --- |

**8. OPTIONAL FILER REFERENCE DATA:**
Filing Office: Kings County, California

UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

## UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

| 9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐ |
|---|

| 9a. ORGANIZATION'S NAME |
|---|
| Copper Avenue Investments, LLC, a California limited liability company |

OR

| 9b. INDIVIDUAL'S SURNAME |
|---|
| FIRST PERSONAL NAME |
| ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| 10a. ORGANIZATION'S NAME |
|---|
| Ashlan & Hayes Investments, LLC, a California limited liability company |

OR

| 10b. INDIVIDUAL'S SURNAME |
|---|
| INDIVIDUAL'S FIRST PERSONAL NAME |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1306 W Herndon Ave. #101 | Fresno | CA | 93711 | |

11. ☐ ADDITIONAL SECURED PARTY'S NAME or ☑ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

| 11a. ORGANIZATION'S NAME |
|---|
| Conterra Agricultural Capital, LLC |

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 7755 Office Plaza Drive North, Suite 195 | West Des Moines | IA | 50266 | US |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):

See Rider A to UCC attached hereto and made a part hereof.

| 13. ☑ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable) | 14. This FINANCING STATEMENT:<br>☐ covers timber to be cut ☐ covers as-extracted collateral ☐ is filed as a fixture filing |
|---|---|
| 15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest): | 16. Description of real estate:<br><br>See Exhibit "A" |

17. MISCELLANEOUS:

UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

3

# UCC FINANCING STATEMENT ADDITIONAL PARTY
FOLLOW INSTRUCTIONS

**18. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| | |
|---|---|
| 18a. ORGANIZATION'S NAME | |
| Copper Avenue Investments, LLC, a California limited liability company | |

OR

| 18b. INDIVIDUAL'S SURNAME | |
|---|---|
| FIRST PERSONAL NAME | |
| ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**19. ADDITIONAL DEBTOR'S NAME:** Provide only one Debtor name (19a or 19b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 19a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

OR

| 19b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| Garcia | Betsy | E. | |
| **19c. MAILING ADDRESS** | CITY | STATE / POSTAL CODE | COUNTRY |
| 575 E. Rumi Avenue | Fresno | CA / 93723 | US |

**20. ADDITIONAL DEBTOR'S NAME:** Provide only one Debtor name (20a or 20b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 20a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

OR

| 20b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| Derderian | Emily | | |
| **20c. MAILING ADDRESS** | CITY | STATE / POSTAL CODE | COUNTRY |
| 6668 N. West Street | Fresno | CA / 93711 | US |

**21. ADDITIONAL DEBTOR'S NAME:** Provide only one Debtor name (21a or 21b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 21a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

OR

| 21b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |
| **21c. MAILING ADDRESS** | CITY | STATE / POSTAL CODE | COUNTRY |
| | | | |

**22.** ☐ ADDITIONAL SECURED PARTY'S NAME  or  ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (22a or 22b)

| 22a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

OR

| 22b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |
| **22c. MAILING ADDRESS** | CITY | STATE / POSTAL CODE | COUNTRY |
| | | | |

**23.** ☐ ADDITIONAL SECURED PARTY'S NAME  or  ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (23a or 23b)

| 23a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

OR

| 23b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |
| **23c. MAILING ADDRESS** | CITY | STATE / POSTAL CODE | COUNTRY |
| | | | |

**24. MISCELLANEOUS:**

# RIDER A TO UCC

Debtor:            **Copper Avenue Investments, LLC, ACAP Holdings, LLC, Ashlan & Hayes Investments, LLC, Emily Derderdian, Betsy E. Garcia**

Secured Party:     **U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs**

Assignor Secured Party:  **Conterra Agricultural Capital, LLC**

All building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property (as defined/described on Exhibit "A" attached hereto), including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling, attached floor coverings, livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom, and any substitutions or replacements therefore, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Debtor/Borrower to collect or enforce payment thereof, as well as to enforce any guarantees of the forgoing and security therefor, and all of Debtor's/Borrower's present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property, and further, specifically:.

> All water and water rights now owned or hereafter acquired by Borrower and howsoever evidenced, including but not limited to any water rights specifically described in the Water Rights Rider if said rider is attached hereto, whether such water and water rights are riparian, appropriative or otherwise and whether or not appurtenant to the real property, along with all ditch and ditch rights and any shares of stock, licenses, permits and contracts evidencing such water or ditch rights, and all wells, reservoirs, dams, embankments or fixtures relating thereto; and

> All irrigation equipment of every kind and nature, including but not limited to center irrigation pivots, pumps, PVC pipe, sprinklers, motors, well equipment, pumps and power units, now owned or hereafter acquired by Debtor/Borrower and now or hereafter located and situated on the Property, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom; and

> All tangible personal property owned by Debtor/Borrower and located on the Property and all fixtures now owned or hereafter located on the Property,

All of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property.

---

RIDER A TO UCC

i

©PeirsonPatterson, LLP.2019
191403350642 [Doc Id 9696 M10292018]

## Exhibit "A"
Legal Description For

**1,110 +/- Acres**
**Kings County and Fresno**
**County, California**
[Property Address]

PARCEL 1:

The West 20.15 acres of that portion of Lot 10 lying South of Laguna Canal, and all of Lots 11, 12, 13 in Section 10, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, in the County of Kings, State of California, as per map of the Laguna de Tache Grant thereof recorded in the Office of the County Recorder of Fresno County in Book 3 at Page 11 of Record of Surveys, together with that portion of 25th Avenue (abandoned) and 24 1/2 Avenue (abandoned) which would pass by a conveyance of said land under Sections 831 and 1112 of the Civil Code.

EXCEPTING THEREFROM such interest in a strip of land 50 feet wide lying between the Old Crescent Canal right of way and Lots 7 and 8 in said Section 10, as conveyed to Crescent Canal Company, a corporation, by Deed dated January 7, 1913 and recorded April 7, 1913 in Book 51 at Page 78 of Deeds, Kings County Records.

APN: 004-130-030

PARCEL 2:

Lots 1 and 2 lying North of the by-pass of Tulare Lake Basin Water Storage District, in Section 15, Township 18, Range 19 East, Mount Diablo Base and Meridian, as per map of Laguna De Tache Grant thereof recorded in the office of the County Recorder of Fresno County in Book 3 at Page 9 of Record of Surveys.

EXCEPTING THEREFROM any portion thereof lying within San Jose Subdivision as shown on that certain map recorded in Book 3 Page 4 of Licensed Surveyor Plats.

APN: 004-140-012 (Portion)

PARCEL 3:

Those portions of Lots 2 and 3 lying West of canal, all of Lots 3A, 3B, 4, 5, 6, 6A, the well reserved in the Northeast corner of said Lot 6, all of Lots 12, 13 and 13A, in Section 15, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of San Jose Subdivision, recorded March 11, 1930 in Book 3 Page 4, of Licensed Surveyor Plats, Kings County Records.

EXCEPTING THEREFROM all oil, gas and other hydrocarbon substances in or under said property as previously reserved of record.

APN: 004-140-012 (Portion)

PARCEL 4:

Lots 14, 15 and 16, and that portion of Lot 17 lying North of the bypass of Tulare Lake Basin Water Storage District, in Section 10, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, as per map of the Laguna de Tache Grant thereof recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 11 of Record of Surveys.

EXCEPTING THEREFROM all oil, gas and other hydrocarbon substances in or under said property as previously reserved of record.

APN: 004-140-002

PARCEL 5:

The Westerly 361.5 feet of the Southerly 361.5 feet of Lot 14 in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of Laguna de Tache Grant recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 10, of Record of Surveys.

APN: 004-230-014

PARCEL 6:

Lots 5, 6, 6A, 11 and 12, in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of San Jose Subdivision, recorded March 11, 1930 in Book 3 at Page 4 of Licensed Surveyor Plats, Kings County Records.

EXCEPTING THEREFROM all oil, gas and other hydrocarbon minerals now or at any time hereafter situate therein and thereunder said land, as saved, excepted and reserved in Deed recorded May 22, 1945 in Book 329, Page 29, Official Records, as Document No. 3227.

APN: 004-230-026 (Portion)

PARCEL 7:

Lots 13 and 14 in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of Laguna de Tache Grant recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 10, of Record of Surveys, Fresno County Records, lying West of the strip of land described in the Deed from Summit Lake Investment Company, a corporation to Tulare Basin Water Storage District, recorded August 8, 1928 in Book 35 at Page 433, of Official Records, Kings County Records.

EXCEPTING THEREFROM the Westerly 361.5 feet of the Southerly 361.5 feet of Lot 14.

ALSO EXCEPTING THEREFROM such interest in a portion of said Lot 13, conveying to the County of Kings, by Deed dated June 13, 1960 and recorded August 18, 1960 in Book 763 Page 880, of Official Records, as Document No. 8922, described as follows:

Beginning at a point distant North 84° 30' 08" East 860.48 feet from the Southwest corner of said Section 22; thence North 3° 29' 59" West 10 feet; thence along a curve to the right, with a radius of 760.00 feet, through an angle of 94° 48' a distance of 1257.48 feet, with a chord that bears North 46° 05' 59" West, 1118.87 feet; thence South 1° 18' 01" West, 550.00 feet; thence South 88° 41' 59" East 125.10 feet; thence, a long curve to the left, with a radius of 840.00 feet, through an angle of 12° 59' 48" a distance of 190.54 feet, with a cord that bears South 46° 05' 59" East, 190.13 feet; thence South 3° 29' 59" East, 135.10 feet; thence North 86° 30' 01" East, 550.00 feet to a point of beginning.

APN: 004-230-026 (Portion)
     004-230-027

PARCEL 8:

That portion of Lot 15 in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, in the County of Kings, State of California, according to Map of Laguna de Tache Grant recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 10, of Record of Surveys, lying West of the strip of land described in the Deed from Summit Lake Investment Company, a corporation to Tulare Basin Water Storage District, recorded August 8, 1928 in Book 35 at Page 433, of Official Records, Kings County Records.

APN: 004-230-013

The land referred to below is situated in the unincorporated area of the County of Fresno, State of California:

PARCEL 9:

The North half of the Norhteast Quarter of Section 22, Township 16 South, Range 14 East, Mount Diablo Base and Meridian, according to the Plat thereof.

EXCEPTING THEREFROM the North 50 feet, as conveyed to the County of Fresno in Deed recorded April 22, 1970 in Book 5780, Page 78 of Official Records.

APN: 038-141-21S

PARCEL 10:

The Northwest quarter of Section 8, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof;

EXCEPTING THEREFROM an undivided one-half interest in and to all oil, gas, minerals and other hydrocarbon substances now or at any time situate in and under said land, as reserved in the deed from R. T. Hughes and Bess L. Hughes, husband and wife, to John H. Edgar and Ruby Dale Edgar, husband and wife, as joint tenants, July 10, 1950, recorded January 24, 1950 in Book 2829 Page 69 of Official Records, Document No. 4385.

ALSO EXCEPTING THEREFROM an undivided one-fourth interest in and to all oil, gas and other hydrocarbons and minerals now or at any time hereinafter situate therein and thereunder, together with all easements and rights necessary or convenient for the production, storage and transportation thereof and the exploration and testing of the said real property, and also the right to drill for, produce and use water from the said real property in connection with drilling or mining operations thereon, as reserved in the deed from Raymond Dale Johnson to Bernie Thurman and James V. Gregory, as Trustees for Tanya Marie Marshall under that certain irrevocable Trust Agreement dated May 30, 1974, recorded on June 25, 1974 as Document No. 47802.

APN: 040-020-18-S

END OF DOCUMENT

███████████
███████████
███████████
███████████

## UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

| | |
|---|---|
| **A. NAME & PHONE OF CONTACT AT FILER** (optional)<br>Name: Wolters Kluwer Lien Solutions Phone: 800-331-3282 Fax: 818-662-4141 | |

**B. E-MAIL CONTACT AT FILER** (optional)
uccfilingreturn@wolterskluwer.com

**C. SEND ACKNOWLEDGMENT TO:** (Name and Address)   49931 - Conterra Ag -

Lien Solutions
P.O. Box 29071
Glendale, CA  91209-9071

100701925

CALI
FIXTURE

File with: Kings, CA

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER<br>1917425   10/15/2019 CC CA Kings | 1b. ☒ This FINANCING STATEMENT AMENDMENT is to be filed [for record]<br>(or recorded) in the REAL ESTATE RECORDS<br>Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |
|---|---|

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT** (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☒ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:                                     AND Check one of these three boxes to:

This Change affects ☐ Debtor or ☐ Secured Party of record | ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c | ☐ ADD name: Complete item 7a or 7b, and item 7c | ☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. **CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Copper Avenue Investments, LLC, a California limited liability Company | | | |
| OR 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. **CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 7b. INDIVIDUAL'S SURNAME | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

8. ☐ **COLLATERAL CHANGE:** Also check one of these four boxes: ☐ ADD collateral  ☐ DELETE collateral  ☐ RESTATE covered collateral  ☐ ASSIGN collateral

Indicate collateral:

9. **NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME<br>U.S. BANK NATIONAL ASSOCIATION, AS CUSTODIAN/TRUSTEE FOR FEDERAL AGRICULTURAL MORTGAGE CORPORATION PROGRAMS | | | |
|---|---|---|---|
| OR 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 10. OPTIONAL FILER REFERENCE DATA:  Debtor Name: Copper Avenue Investments, LLC, a California limited liability Company | |
|---|---|
| 100701925          21901673 & 21901674 | ACAP Holdings, LCC |

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

Prepared by Lien Solutions, P.O. Box 29071,<br>Glendale, CA 91209-9071 Tel (800) 331-3282

Recorded in Official Records
of Kings

Kristine Lee
Assessor/Clerk/Recorder

DOC # 2413324

09/24/2024        Doc Type:38 Pages:6
09:00 AM

R065
Recording Fees:$101.00
Taxes:$0.00

Recording Requested By:

Lien Solutions
P.O. Box 29071
Glendale, CA  91209-9071

Return To:

Lien Solutions
P.O. Box 29071
Glendale, CA  91209-9071

THIS SPACE IS FOR RECORDER'S USE ONLY

DOCUMENT TITLE(S)

UCC FINANCING STATEMENT Continuation Filing

THIS  Continuation Filing      FIXTURE FILING IS BEING RECORDED WITH   KINGS              COUNTY

Order No: 100701925

# UCC FINANCING STATEMENT AMENDMENT ADDENDUM

FOLLOW INSTRUCTIONS

11. INITIAL FINANCING STATEMENT FILE NUMBER: Same as item 1a on Amendment form

1917425   10/15/2019 CC CA Kings

12. NAME OF PARTY AUTHORIZING THIS AMENDMENT: Same as item 9 on Amendment form

12a. ORGANIZATION'S NAME

U.S. BANK NATIONAL ASSOCIATION, AS CUSTODIAN/TRUSTEE FOR

FEDERAL AGRICULTURAL MORTGAGE CORPORATION PROGRAMS

OR

12b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S)                                SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

13. Name of DEBTOR on related financing statement (Name of a current Debtor of record required for indexing purposes only in some filing offices - see Instruction item 13): Provide only one Debtor name (13a or 13b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); see Instructions if name does not fit

13a. ORGANIZATION'S NAME

Copper Avenue Investments, LLC, a California limited liability Company

OR

13b. INDIVIDUAL'S SURNAME        FIRST PERSONAL NAME        ADDITIONAL NAME(S)/INITIAL(S)        SUFFIX

14. ADDITIONAL SPACE FOR ITEM 8 (Collateral):

Debtor Name and Address:
Copper Avenue Investments, LLC, a California limited liability Company - 1306 W Herndon Ave #101, Fresno, CA 93711
ACAP Holdings LLC, a California limited liability Company - 1306 W Herndon Ave #101, Fresno, CA 93711

Secured Party Name and Address:
U.S. BANK NATIONAL ASSOCIATION, AS CUSTODIAN/TRUSTEE FOR FEDERAL AGRICULTURAL MORTGAGE CORPORATION PROGRAMS -
1133 Rankin Street Suite 100, St Paul, MN 55116

| 15. This FINANCING STATEMENT AMENDMENT: | 17. Description of real estate: |
|---|---|
| ☐ covers timber to be cut   ☐ covers as-extracted collateral   ☒ is filed as a fixture filing | See the attached Exhibit "A" |
| 16. Name and address of a RECORD OWNER of real estate described in item 17 (if Debtor does not have a record interest): | |

18. MISCELLANEOUS: 100701925-CA-31   49931 - Contero Ag - County        U.S. BANK NATIONAL ASSOCIATION,   File with: Kings, CA        21901673 & 21901674   ACAP Holdings, LCC

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT ADDENDUM (Form UCC3Ad) (Rev. 04/20/11)

Prepared by Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282

5

# Exhibit "A"
### Legal Description For

**1,110 +/- Acres**
**Kings County and Fresno**
**County, California**
**[Property Address]**

PARCEL 1:

The West 20.15 acres of that portion of Lot 10 lying South of Laguna Canal, and all of Lots 11, 12, 13 in Section 10, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, in the County of Kings, State of California, as per map of the Laguna de Tache Grant thereof recorded in the Office of the County Recorder of Fresno County in Book 3 at Page 11 of Record of Surveys, together with that portion of 25th Avenue (abandoned) and 24 1/2 Avenue (abandoned) which would pass by a conveyance of said land under Sections 831 and 1112 of the Civil Code.

EXCEPTING THEREFROM such interest in a strip of land 50 feet wide lying between the Old Crescent Canal right of way and Lots 7 and 8 in said Section 10, as conveyed to Crescent Canal Company, a corporation, by Deed dated January 7, 1913 and recorded April 7, 1913 in Book 51 at Page 78 of Deeds, Kings County Records.

APN: 004-130-030

PARCEL 2:

Lots 1 and 2 lying North of the by-pass of Tulare Lake Basin Water Storage District, in Section 15, Township 18, Range 19 East, Mount Diablo Base and Meridian, as per map of Laguna De Tache Grant thereof recorded in the office of the County Recorder of Fresno County in Book 3 at Page 9 of Record of Surveys.

EXCEPTING THEREFROM any portion thereof lying within San Jose Subdivision as shown on that certain map recorded In Book 3 Page 4 of Licensed Surveyor Plats.

APN: 004-140-012 (Portion)

PARCEL 3:

Those portions of Lots 2 and 3 lying West of canal, all of Lots 3A, 3B, 4, 5, 6, 6A, the well reserved in the Northeast corner of said Lot 6, all of Lots 12, 13 and 13A, in Section 15, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of San Jose Subdivision, recorded March 11, 1930 in Book 3 Page 4, of Licensed Surveyor Plats, Kings County Records.

EXCEPTING THEREFROM all oil, gas and other hydrocarbon substances in or under said property as previously reserved of record.

APN: 004-140-012 (Portion)

PARCEL 4:

Lots 14, 15 and 16, and that portion of Lot 17 lying North of the bypass of Tulare Lake Basin Water Storage District, In Section 10, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, as per map of the Laguna de Tache Grant thereof recorded in the Office of the County Recorder of Fresno County, In Book 3 at Page 11 of Record of Surveys.

EXCEPTING THEREFROM all oil, gas and other hydrocarbon substances in or under said property as previously reserved of record.

APN:  004-140-002

PARCEL 5:

The Westerly 361.5 feet of the Southerly 361.5 feet of Lot 14 in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of Laguna de Tache Grant recorded in the Office of the County Recorder of Fresno County, In Book 3 at Page 10, of Record of Surveys.

APN:  004-230-014

PARCEL 6:

Lots 5, 6, 6A, 11 and 12, in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of San Jose Subdivision, recorded March 11, 1930 in Book 3 at Page 4 of Licensed Surveyor Plats, Kings County Records.

EXCEPTING THEREFROM all oil, gas and other hydrocarbon's minerals now or at any time hereafter situate therein and thereunder said land, as saved, excepted and reserved in Deed recorded May 22, 1945 in Book 329, Page 29, Official Records, as Document No. 3227.

APN:  004-230-026 (Portion)

PARCEL 7:

Lots 13 and 14 in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of Laguna de Tache Grant recorded in the Office of the County Recorder of Fresno County, In Book 3 at Page 10, of Record of Surveys, Fresno County Records, lying West of the strip of land described in the Deed from Summit Lake Investment Company, a corporation to Tulare Basin Water Storage District, recorded August 8, 1928 in Book 35 at Page 433, of Official Records, Kings County Records.

EXCEPTING THEREFROM the Westerly 361.5 feet of the Southerly 361.5 feet of Lot 14.

ALSO EXCEPTING THEREFROM such interest in a portion of said Lot 13, conveying to the County of Kings, by Deed dated June 13, 1960 and recorded August 18, 1960 in Book 763 Page 880, of Official Records, as Document No. 8922, described as follows:

Beginning at a point distant North 84° 30' 08" East 860.48 feet from the Southwest corner of said Section 22; thence North 3° 29' 59" West 10 feet; thence along a curve to the right, with a radius of 760.00 feet, through an angle of 94° 48' a distance of 1257.48 feet, with a chord that bears North 46° 05' 59" West, 1118.87 feet; thence South 1° 18' 01" West, 550.00 feet; thence South 88° 41' 59" East 125.10 feet; thence, a long curve to the left, with a radius of 840.00 feet, through an angle of 12° 59' 48" a distance of 190.54 feet, with a cord that bears South 46° 05' 59" East, 190.13 feet; thence South 3° 29' 59" East, 135.10 feet; thence North 86° 30' 01" East, 550.00 feet to a point of beginning.

APN:  004-230-026 (Portion)
      004-230-027

PARCEL 8:

That portion of Lot 15 in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, in the County of Kings, State of California, according to Map of Laguna de Tache Grant recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 10, of Record of Surveys, lying West of the strip of land described in the Deed from Summit Lake Investment Company, a corporation to Tulare Basin Water Storage District, recorded August 8, 1928 in Book 35 at Page 433, of Official Records, Kings County Records.

APN:  004-230-013

The land referred to below is situated in the unincorporated area of the County of Fresno, State of California:

PARCEL 9:

The North half of the Northeast Quarter of Section 22, Township 16 South, Range 14 East, Mount Diablo Base and Meridian, according to the Plat thereof.

EXCEPTING THEREFROM the North 50 feet, as conveyed to the County of Fresno in Deed recorded April 22, 1970 in Book 5780, Page 78 of Official Records.

APN: 038-141-21S

PARCEL 10:

The Northwest quarter of Section 8, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof;

EXCEPTING THEREFROM an undivided one-half interest in and to all oil, gas, minerals and other hydrocarbon substances now or at any time situate in and under said land, as reserved in the deed from R. T. Hughes and Bess L. Hughes, husband and wife, to John H. Edgar and Ruby Dale Edgar, husband and wife, as joint tenants, July 10, 1950, recorded January 24, 1950 in Book 2829 Page 69 of Official Records, Document No. 4385.

ALSO EXCEPTING THEREFROM an undivided one-fourth interest in and to all oil, gas and other hydrocarbons and minerals now or at any time hereinafter situate therein and thereunder, together with all easements and rights necessary or convenient for the production, storage and transportation thereof and the exploration and testing of the said real property, and also the right to drill for, produce and use water from the said real property in connection with drilling or mining operations thereon, as reserved in the deed from Raymond Dale Johnson to Bernie Thurman and James V. Gregory, as Trustees for Tanya Marie Marshall under that certain irrevocable Trust Agreement dated May 30, 1974, recorded on June 25, 1974 as Document No. 47802.

APN:  040-020-18-S

END OF DOCUMENT

141101605 1

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**19-7741674006**

**10/16/2019 15:08**

**FILED**
CALIFORNIA
SECRETARY OF STATE

SOS

82932970003   UCC 1 FILING

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

    Conterra Agricultural Capital, LLC
    Attn: Taylor Petersen
    7755 Office Plaza Drive North, Suite 195
    West Des Moines, Iowa 50266

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Copper Avenue Investments, LLC, a California limited liability company | | | |
| **OR** 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| 1306 W Herndon Ave. #101 | Fresno | CA / 93711 | US |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| ACAP Holdings, LLC, a California limited liability company | | | |
| **OR** 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| 1306 W Herndon Ave. #101 | Fresno | CA / 93711 | US |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs | | | |
| **OR** 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| 1133 Rankin Street, Suite 100 | St. Paul | MN / 55116 | US |

4. COLLATERAL: This financing statement covers the following collateral:
   See UCC Financing Statement Addendum, Rider A to UCC, and Exhibit A Legal Description attached hereto and made a part hereof.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions)   ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:   6b. Check only if applicable and check only one box:
   ☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility      ☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable):   ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
   Filing Office: California Secretary of State

UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

82932970003

## UCC FINANCING STATEMENT ADDENDUM
FOLLOW INSTRUCTIONS

**9. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| 9a. ORGANIZATION'S NAME | |
|---|---|
| Copper Avenue Investments, LLC, a California limited liability company | |

OR

| 9b. INDIVIDUAL'S SURNAME | |
|---|---|
| | |
| FIRST PERSONAL NAME | |
| | |
| ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**10. DEBTOR'S NAME:** Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2c of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| 10a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Ashlan & Hayes Investments, LLC, a California limited liability company | | | |

OR

| 10b. INDIVIDUAL'S SURNAME | | | |
|---|---|---|---|
| | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1306 W Herndon Ave. #101 | Fresno | CA | 93711 | |

**11.** ☐ ADDITIONAL SECURED PARTY'S NAME   or   ☑ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

| 11a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Conterra Agricultural Capital, LLC | | | |

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 7755 Office Plaza Drive North, Suite 195 | West Des Moines | IA | 50266 | US |

**12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):**
See Rider A to UCC attached hereto and made a part hereof.

**13.** ☑ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

**14.** This FINANCING STATEMENT:
☐ covers timber to be cut   ☐ covers as-extracted collateral   ☑ is filed as a fixture filing

**15.** Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

**16.** Description of real estate:
See Exhibit "A"

**17. MISCELLANEOUS:**

UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

8293297003

# UCC FINANCING STATEMENT ADDITIONAL PARTY
FOLLOW INSTRUCTIONS

**18. NAME OF FIRST DEBTOR.** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because an Individual Debtor name did not fit, check here ☐

| 18a. ORGANIZATION'S NAME |
|---|
| Copper Avenue Investments, LLC, a California limited liability company |

OR

| 18b. INDIVIDUAL'S SURNAME | | |
|---|---|---|
| FIRST PERSONAL NAME | | |
| ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**19. ADDITIONAL DEBTOR'S NAME:** Provide only one Debtor name (19a or 19b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 19a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|

OR

| 19b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| Garcia | Betsy | E. | | |
| 19c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 575 E. Rumi Avenue | Fresno | CA | 93723 | US |

**20. ADDITIONAL DEBTOR'S NAME:** Provide only one Debtor name (20a or 20b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 20a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|

OR

| 20b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| Derderian | Emily | | | |
| 20c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 6668 N. West Street | Fresno | CA | 93711 | US |

**21. ADDITIONAL DEBTOR'S NAME:** Provide only one Debtor name (21a or 21b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 21a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|

OR

| 21b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| 21c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**22.** ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME. Provide only one name (22a or 22b)

| 22a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|

OR

| 22b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| 22c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**23.** ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME. Provide only one name (23a or 23b)

| 23a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|

OR

| 23b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| 23c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**24. MISCELLANEOUS:**

8293297003

# RIDER A TO UCC

Debtor:          **Copper Avenue Investments, LLC, ACAP Holdings, LLC, Ashlan & Hayes Investments, LLC, Emily Derderdian, Betsy E. Garcia**

Secured Party:   **U.S. Bank National Association, as Custodian/Trustee for Federal Agricultural Mortgage Corporation programs**

Assignor Secured Party:   **Conterra Agricultural Capital, LLC**

All building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property (as defined/described on Exhibit "A" attached hereto), including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling, attached floor coverings, livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom, and any substitutions or replacements therefore, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Debtor/Borrower to collect or enforce payment thereof, as well as to enforce any guarantees of the forgoing and security therefor, and all of Debtor's/Borrower's present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property, and further, specifically:.

All water and water rights now owned or hereafter acquired by Borrower and howsoever evidenced, including but not limited to any water rights specifically described in the Water Rights Rider if said rider is attached hereto, whether such water and water rights are riparian, appropriative or otherwise and whether or not appurtenant to the real property, along with all ditch and ditch rights and any shares of stock, licenses, permits and contracts evidencing such water or ditch rights, and all wells, reservoirs, dams, embankments or fixtures relating thereto; and

All irrigation equipment of every kind and nature, including but not limited to center irrigation pivots, pumps, PVC pipe, sprinklers, motors, well equipment, pumps and power units, now owned or hereafter acquired by Debtor/Borrower and now or hereafter located and situated on the Property, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom; and

All tangible personal property owned by Debtor/Borrower and located on the Property and all fixtures now owned or hereafter located on the Property.

All of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property.

---

RIDER A TO UCC

< PeirsonPatterson, LLP.2019
19140335042 [Doc Id 9606 M [02/2018]

8293297B003

## Exhibit "A"
Legal Description For

1,110 +/- Acres
Kings County and Fresno
County, California
[Property Address]

PARCEL 1:

The West 20.15 acres of that portion of Lot 10 lying South of Laguna Canal, and all of Lots 11, 12, 13 in Section 10, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, in the County of Kings, State of California, as per map of the Laguna de Tache Grant thereof recorded in the Office of the County Recorder of Fresno County in Book 3 at Page 11 of Record of Surveys, together with that portion of 25th Avenue (abandoned) and 24 1/2 Avenue (abandoned) which would pass by a conveyance of said land under Sections 831 and 1112 of the Civil Code.

EXCEPTING THEREFROM such interest in a strip of land 50 feet wide lying between the Old Crescent Canal right of way and Lots 7 and 8 in said Section 10, as conveyed to Crescent Canal Company, a corporation, by Deed dated January 7, 1913 and recorded April 7, 1913 in Book 51 at Page 78 of Deeds, Kings County Records.

APN: 004-130-030

PARCEL 2:

Lots 1 and 2 lying North of the by-pass of Tulare Lake Basin Water Storage District, in Section 15, Township 18, Range 19 East, Mount Diablo Base and Meridian, as per map of Laguna De Tache Grant thereof recorded in the office of the County Recorder of Fresno County in Book 3 at Page 9 of Record of Surveys.

EXCEPTING THEREFROM any portion thereof lying within San Jose Subdivision as shown on that certain map recorded in Book 3 Page 4 of Licensed Surveyor Plats.

APN: 004-140-012 (Portion)

PARCEL 3:

Those portions of Lots 2 and 3 lying West of canal, all of Lots 3A, 3B, 4, 5, 6, 6A, the well reserved in the Northeast corner of said Lot 6, all of Lots 12, 13 and 13A, in Section 15, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of San Jose Subdivision, recorded March 11, 1930 in Book 3 Page 4, of Licensed Surveyor Plats, Kings County Records.

EXCEPTING THEREFROM all oil, gas and other hydrocarbon substances in or under said property as previously reserved of record.

APN: 004-140-012 (Portion)

829329700003

PARCEL 4:

Lots 14, 15 and 16, and that portion of Lot 17 lying North of the bypass of Tulare Lake Basin Water Storage District, in Section 10, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, as per map of the Laguna de Tache Grant thereof recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 11 of Record of Surveys.

EXCEPTING THEREFROM all oil, gas and other hydrocarbon substances in or under said property as previously reserved of record.

APN: 004-140-002

PARCEL 5:

The Westerly 361.5 feet of the Southerly 361.5 feet of Lot 14 in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of Laguna de Tache Grant recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 10, of Record of Surveys.

APN: 004-230-014

PARCEL 6:

Lots 5, 6, 6A, 11 and 12, in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of San Jose Subdivision, recorded March 11, 1930 in Book 3 at Page 4 of Licensed Surveyor Plats, Kings County Records.

EXCEPTING THEREFROM all oil, gas and other hydrocarbons minerals now or at any time hereafter situate therein and thereunder said land, as saved, excepted and reserved in Deed recorded May 22, 1945 in Book 329, Page 29, Official Records, as Document No. 3227.

APN: 004-230-026 (Portion)

PARCEL 7:

Lots 13 and 14 in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of Laguna de Tache Grant recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 10, of Record of Surveys, Fresno County Records, lying West of the strip of land described in the Deed from Summit Lake Investment Company, a corporation to Tulare Basin Water Storage District, recorded August 8, 1928 in Book 35 at Page 433, of Official Records, Kings County Records.

EXCEPTING THEREFROM the Westerly 361.5 feet of the Southerly 361.5 feet of Lot 14.

ALSO EXCEPTING THEREFROM such interest in a portion of said Lot 13, conveying to the County of Kings, by Deed dated June 13, 1960 and recorded August 18, 1960 in Book 763 Page 880, of Official Records, as Document No. 8922, described as follows:

Beginning at a point distant North 84° 30' 08" East 860.48 feet from the Southwest corner of said Section 22; thence North 3° 29' 59" West 10 feet; thence along a curve to the right, with a radius of 760.00 feet, through an angle of 94° 48' a distance of 1257.48 feet, with a chord that bears North 46° 05' 59" West, 1118.87 feet; thence South 1° 18' 01" West, 550.00 feet; thence South 80° 41' 59" East 125.10 feet; thence, a long curve to the left, with a radius of 840.00 feet, through an angle of 12° 59' 48" a distance of 190.54 feet, with a cord that bears South 46° 05' 59" East, 190.13 feet; thence South 3° 29' 59" East, 135.10 feet; thence North 86° 30' 01" East, 550.00 feet to a point of beginning.

APN: 004-230-026 (Portion)
004-230-027

829325700003

PARCEL 8:

That portion of Lot 15 in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, in the County of Kings, State of California, according to Map of Laguna de Tache Grant recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 10, of Record of Surveys, lying West of the strip of land described in the Deed from Summit Lake Investment Company, a corporation to Tulare Basin Water Storage District, recorded August 8, 1928 in Book 35 at Page 433, of Official Records, Kings County Records.

APN: 004-230-013

The land referred to below is situated in the unincorporated area of the County of Fresno, State of California:

PARCEL 9:

The North half of the Norhteast Quarter of Section 22, Township 16 South, Range 14 East, Mount Diablo Base and Meridian, according to the Plat thereof.

EXCEPTING THEREFROM the North 50 feet, as conveyed to the County of Fresno in Deed recorded April 22, 1970 in Book 5780, Page 78 of Official Records.

APN: 038-141-21S

PARCEL 10:

The Northwest quarter of Section 8, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof;

EXCEPTING THEREFROM an undivided one-half interest in and to all oil, gas, minerals and other hydrocarbon substances now or at any time situate in and under said land, as reserved in the deed from R. T. Hughes and Bess L. Hughes, husband and wife, to John H. Edgar and Ruby Dale Edgar, husband and wife, as joint tenants, July 10, 1950, recorded January 24, 1950 in Book 2829 Page 69 of Official Records, Document No. 4385.

ALSO EXCEPTING THEREFROM an undivided one-fourth interest in and to all oil, gas and other hydrocarbons and minerals now or at any time hereinafter situate therein and thereunder, together with all easements and rights necessary or convenient for the production, storage and transportation thereof and the exploration and testing of the said real property, and also the right to drill for, produce and use water from the said real property in connection with drilling or mining operations thereon, as reserved in the deed from Raymond Dale Johnson to Bernie Thurman and James V. Gregory, as Trustees for Tanya Marie Marshall under that certain Irrevocable Trust Agreement dated May 30, 1974, recorded on June 25, 1974 as Document No. 47802.

APN: 040-020-18-S





U240078498037

<div style="float:right; writing-mode: vertical;">B3098-9040  10/08/2024  11:34  AM  Received by California Secretary of State</div>



**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**UCC FINANCING STATEMENT AMENDMENT (UCC 3)**

California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 657-5448

| For Office Use Only |
| --- |
| **-FILED-** |
| File No.: U240078498037 |
| Date Filed: 10/8/2024 |

Submitter Information:

| | |
| --- | --- |
| Contact Name | Abby Hendrickson |
| Organization Name | Conterra |
| Phone Number | (515) 564-5148 |
| Email Address | abby.hendrickson@conterraag.com |
| Address | 5465 Mills Civic Pkwy Ste 201 West Des Moines, IA 50266 |

Amendment Action Information:

| | |
| --- | --- |
| Initial Financing Statement File Number | 197741674006 |
| Date Filed | 10/16/2019 |
| Amendment Action | Continuation |

Name of Secured Party of Record Authorizing This Amendment:

☐ If this Amendment is authorized by a Debtor, check this box and select the name of the Authorizing Debtor below.

Authorizing Secured Party Name        CONTERRA AGRICULTURAL CAPITAL, LLC

Optional Filer Reference Information:

Miscellaneous Information:



SECRETARY OF STATE

STATE OF CALIFORNIA

## UCC Filing Acknowledgement

10/21/2019

Page 1 of 2

SOS CORPORATE & COURT SERVICES, INC.
520 9TH STREET, SUITE #103
SACRAMENTO CA 95814

| | |
|---|---|
| 3 or more pages: | $20.00 |
| Special Handling Fee: | $6.00 |
| Total Fee: | **$26.00** |

The California Secretary of State's Office has received and filed your document. The information below reflects the data that was indexed in our system. Please review the information for accuracy. Included is an image of the filed document to assist you in your review. If you find a potential error, please notify the UCC Section at the number listed below at your earliest convenience.

Filing Type: **Financing Statement**          File Date: **10/16/2019**          File Time: **15:08**

Filing Number: **19-7741674006**          Lapse Date: **10/16/2024**

Debtor(s):
ORGANIZATION          COPPER AVENUE INVESTMENTS, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY

1306 W HERNDON AVE. #101 FRESNO CA USA 93711

ORGANIZATION          ACAP HOLDINGS, LLC, A CALIFORNIA LIMITED LIABILITY COMANY

1306 W HERNDON AVE. #101 FRESNO CA USA 93711

ORGANIZATION          ASHLAN & HAYES INVESTMENTS, LLC. A CALIFORNIA LIMITED LIABILITY COMPANY

1306 W HERNDON AVE. #101 FRESNO CA USA 93711

INDIVIDUAL          GARCIA, BETSY, E.,

575 E. RUMI AVENUE FRESNO CA USA 93723

INDIVIDUAL          DERDERIAN, EMILY, ,

6668 N. WEST STREET FRESNO CA USA 93711

Secured Party(ies):
ORGANIZATION          U.S. BANK NATIONAL ASSOCIATION, AS

CUSTODIAN/TRUSTEE FOR FEDERAL AGRICULTURAL
MORTGAGE CORPORATION PROGRAMS

1133 RANKIN STREET, SUITE 100 ST. PAUL MN USA 55116

ORGANIZATION               CONTERRA AGRICULTURAL CAPITAL, LLC

7755 OFFICE PLAZA DRIVE NORTH, SUITE 195 WEST DES
MOINES IA USA 50266

Filing by the Secretary of State is not conclusive proof that all conditions for securing priority have
been met. Ensuring that accurate information is on the document to be filed is the responsibility of the
filing party. If this filing is challenged, the Secretary of State does not guarantee that the filing is legally
sufficient to secure priority under UCC Article 9 and expressly disclaims any liability for failure of the
filing party to secure priority resulting from the information contained in the filed document, or the lack
of information on the filed document.

UNIFORM COMMERCIAL CODE 1500 11TH STREET, 2ND FL · SACRAMENTO, CA 95814 · PO BOX 942835 · SACRAMENTO, CA 94235-0001 · (916) 653-3516 · HTTPS://UCCCONNECT.SOS.CA.GOV

PROGRAMS ARCHIVES, BUSINESS PROGRAMS, ELECTIONS, INFORMATION TECHNOLOGY, CALIFORNIA STATE HISTORY MUSEUM,
MANAGEMENT SERVICES, SAFE AT HOME, DOMESTIC PARTNERS REGISTRY, NOTARY PUBLIC, POLITICAL REFORM

Exhibit R

September 12, 2024

**VIA FEDERAL EXPRESS**

| | |
|---|---|
| Copper Avenue Investments, LLC | Maricopa Orchards, LLC |
| 5260 N Palm Ave Suite 421 | 5260 N Palm Ave Suite 421 |
| Mail Stop A | Mail Stop A |
| Fresno, CA 93704 | Fresno, CA 93704 |
| | |
| C & A Farms, LLC | Lincoln Grantor Farms, LLC |
| 5260 N Palm Ave Suite 421 | 5260 N Palm Ave Suite 421 |
| Mail Stop A | Mail Stop A |
| Fresno, CA 93704 | Fresno, CA 93704 |
| | |
| Willow Avenue Investments, LLC | ACAP Farms, LLC |
| 5260 N Palm Ave Suite 421 | 5260 N Palm Ave Suite 421 |
| Mail Stop A | Mail Stop A |
| Fresno, CA 93704 | Fresno, CA 93704 |
| | |
| Gradon Farms, LLC | Cantua Orchards, LLC |
| 5260 N Palm Ave Suite 421 | 5260 N Palm Ave Suite 421 |
| Mail Stop A | Mail Stop A |
| Fresno, CA 93704 | Fresno, CA 93704 |
| | |
| Whitesbridge Farms, LLC | Assemi Brothers, LLC |
| 5260 N Palm Ave Suite 421 | 5260 N Palm Ave Suite 421 |
| Mail Stop A | Mail Stop A |
| Fresno, CA 93704 | Fresno, CA 93704 |

Re:     **NOTICE OF EVENTS OF DEFAULT AND RESERVATION OF RIGHTS**

Dear Borrowers:

Federal Agricultural Mortgage Corporation ("Farmer Mac") is the holder of the loans described on Exhibit A attached hereto (the "Loans") to Maricopa Orchards, LLC, a California limited liability company ("Maricopa"), Copper Avenue Investments, LLC, a California limited liability company ("Copper"), Lincoln Grantor Farms, LLC, a California limited liability company ("Lincoln"), ACAP Farms, LLC, a California limited liability company ("ACAP Farms"), C & A Farms, LLC, a California limited liability company ("C & A"), Whitesbridge Farms, LLC, a California limited liability company ("Whitesbridge"), Willow Avenue Investments, LLC, a California limited liability company ("Willow"), Assemi Brothers, LLC, a California limited liability company ("Assemi"), Cantua Orchards, LLC, a California limited liability company ("Cantua"), and Gradon Farms, LLC, a California limited liability company ("Gradon" and, collectively with Maricopa, Copper, Lincoln, ACAP Farms, C & A, Whitesbridge, Willow, Assemi and Cantua, the "Borrowers"), which are evidenced by the Promissory Notes described on Exhibit A attached hereto (as amended, supplemented, restated, or otherwise modified, the "Promissory Notes") and are secured by, _inter alia_, the security instruments described on Exhibit B attached hereto (as amended, supplemented, restated, or otherwise modified, the "Security Instruments" and, collectively with the Promissory Notes and any other document evidencing or securing the Loans, in each case as amended, supplemented, restated, or otherwise modified, the "Loan Documents").  Except as otherwise specified,

capitalized terms used herein shall have the meanings set forth in the Loan Documents. The Loan numbers referenced herein are as defined on Exhibit A attached hereto.

Loans <sup>REDACTED</sup>1725, <sup>REDACTED</sup>1728, <sup>REDACTED</sup>2676, <sup>REDACTED</sup>2678, <sup>REDACTED</sup>1673, <sup>REDACTED</sup>1674 and <sup>REDACTED</sup>1004 are fully guaranteed by each of Farshid Assemi, Farid Assemi, Darius Assemi and Sonia Assemi (collectively, the "Guarantors", and such guarantees, collectively, the "Guarantees").

This correspondence serves as notice to the Borrowers and the Guarantors that the following Events of Default currently exist under the Loan Documents:

1. The Promissory Note for each of Loans REDACTED1725, REDACTED1728, REDACTED2676, REDACTED2678, REDACTED1673, REDACTED1674 and REDACTED1004 requires that the applicable Borrower(s) thereunder pay to Farmer Mac accrued interest with respect to such Loan on July 1, 2024. The applicable Borrower(s) under each such Loan failed to pay such interest on July 1, 2024, which constitutes an Event of Default under each such Loan and the applicable Loan Documents.

2. The Promissory Note for each of Loans REDACTED1725, REDACTED1728, REDACTED1674 and REDACTED1004 requires that the applicable Borrower(s) thereunder pay to Farmer Mac the principal amounts described therein with respect to such Loan on July 1, 2024. The applicable Borrower(s) under each such Loan failed to pay such principal amounts on July 1, 2024, which constitutes an Event of Default under each such Loan and the applicable Loan Documents.

3. The Loan Documents for each of Loans REDACTED2676, REDACTED2678 and REDACTED1004 require that the applicable Borrower(s) thereunder maintain as of the 2023 fiscal year end a debt service coverage ratio of greater than or equal to 1.25:1.00. The applicable Borrowers under each such Loan reported as of such fiscal year end a debt service coverage ratio of 0.46:1.00, which constitutes an Event of Default under each such Loan and the applicable Loan Documents. This Event of Default is not curable.

4. The Loan Documents for each of Loans REDACTED2676, REDACTED2678 and REDACTED1004 require that the applicable Borrower(s) thereunder maintain as of the 2023 fiscal year end a current ratio of not less than 1.50:1.00. The applicable Borrowers under each such Loan reported a current ratio for such period of 0.56:1.00, which constitutes an Event of Default under each such Loan and the applicable Loan Documents. This Event of Default is not curable.

5. Each Loan is cross defaulted with all other Loans and, accordingly, each of the Events of Default under the Loans and Loan Documents described in the preceding paragraphs (1) through (4) constitutes an Event of Default under all other Loans and Loan Documents.

The foregoing is not intended to be an exhaustive list of all existing breaches, violations, defaults or Events of Default under the Loan Documents (all such breaches, violations, defaults and Events of Default, regardless of whether set forth in the foregoing list, collectively, the "Events of Defaults").

Farmer Mac has not waived and does not waive, and instead hereby expressly reserves, any and all rights, powers, privileges and remedies it may have or to which it may be entitled, as well as any claims it may assert, now or in the future, pursuant to the Loan Documents and all applicable laws, which remedies include, without limitation, the right to: (i) setoff against any accounts held by Farmer Mac; (ii) accelerate and make immediately due and payable all amounts due from Borrowers to Farmer Mac under the Loan Documents; (iii) collect interest at the default rate specified in the Loan Documents; (iv) pursue all other remedies available to collect on the amounts due from the Borrowers, including, without limitation, instructing our legal counsel to commence proceedings to foreclose on collateral and security for the

2

obligations of the Borrowers under the Loan Documents (the "Obligations") and (v) demand payment under the Guarantees (or any of them) or any other guaranty of the Obligations, in each case immediately and without any further notice to the Borrowers or any Guarantor.  Farmer Mac has not agreed to forbear from exercising any of the rights and remedies available to it under the Promissory Notes, the Security Instruments, the Guarantees or the other Loan Documents, or to waive the Events of Default.  No delay in acting shall constitute a waiver of the Events of Default or Farmer Mac's rights and remedies in connection therewith.

This correspondence serves as notice to the Borrowers and the Guarantors of the Events of Default, and is delivered pursuant to, and to satisfy any notice requirements under, the Loan Documents.  In furtherance and not in limitation of the preceding sentence, this correspondence serves as notice that, if the Borrowers do not pay any currently-overdue amount or otherwise cure the Events of Default within thirty (30) days after receipt of this written notice, Farmer Mac may require immediate payment of the full amount of Principal of the Loans which has not been paid and all the interest and any applicable fees and costs that the Borrowers owe on that amount. Notwithstanding the foregoing, Farmer Mac reserves its rights to exercise any of the rights and remedies available to it under the Loan Documents with respect to the Events of Default, including acceleration of such amounts, at a different date as permitted by applicable law or otherwise in the Loan Documents. This correspondence further serves as notice by Farmer Mac to Borrowers that they may have the right to reinstate after acceleration and may have the right to bring a court action to assert the non-existence of a default or any other defense, as referenced under the Security Instruments, which Farmer Mac is incorporating by reference.

Please be advised that neither the acceptance by Farmer Mac of any further payments nor any agreement by Farmer Mac to extend, renew or otherwise modify the Loans, the Promissory Notes or the other Loan Documents shall constitute a waiver by Farmer Mac of any default or event of default that may exist under the Promissory Notes, the Security Instruments, the Guarantees or the other Loan Documents, including, without limitation, the Events of Default.

Additionally, be advised that pursuant to the Loan Documents, you are liable to Farmer Mac for all costs and expenses incurred by Farmer Mac in connection with the foregoing matters, including attorneys' fees.

Farmer Mac hereby notifies the Borrowers and the Guarantors that at no time shall any prior or subsequent course of conduct by any Borrower, any Guarantor or Farmer Mac directly or indirectly limit, impair or otherwise adversely affect any of Farmer Mac's rights, interests or remedies in connection with the Loans, the Promissory Notes, the Security Instruments, the Guarantees or the other Loan Documents or obligate Farmer Mac to agree to, or to negotiate or consider an agreement to, any waiver of any obligation, default or event of default by any Borrower or any Guarantor under the Loans, the Promissory Notes, the Security Instruments, the Guarantees or the other Loan Documents (including the Events of Default) or any amendment to any term or condition of the Loans, the Promissory Notes, the Security Instruments, the Guarantees or the other Loan Documents.

This written notice is being transmitted as a courtesy to you, and is not intended as an admission that any further written notice is otherwise due you and shall not constitute a course of dealing.  We also wish to remind you that no commitments, assurances, discussions or agreements on Farmer Mac's behalf with respect to any of the Loans, any Borrower, any Guarantor or any Loan Document shall be effective, nor should they be relied upon, unless in writing (email communications are considered to be the same as verbal communications and not a form of written commitment) and duly executed on behalf of Farmer Mac.

Very truly yours,

Federal Agricultural Mortgage Corporation

*Matthew Addison*

Matthew Addison
Senior Client Manager – Corporate AgFinance


With a copy to the following Guarantors:

Darius Assemi
5260 N Palm Ave Suite 421
Mail Stop A
Fresno, CA 93704

Farid Assemi
5260 N Palm Ave Suite 421
Mail Stop A
Fresno, CA 93704

Farshid Assemi
5260 N Palm Ave Suite 421
Mail Stop A
Fresno, CA 93704

Sonia Assemi
5260 N Palm Ave Suite 421
Mail Stop A
Fresno, CA 93704

CORE/3524122.0017/192334735.3

**EXHIBIT A**

**Loans**

1. On or about January 13, 2023, Conterra Agricultural Capital, LLC, an Iowa limited liability company ("Conterra"), made a loan ("Loan <sup>REDACTED</sup>1004") to Maricopa, Copper, Lincoln, C & A, ACAP Farms Willow, Cantua and Gradon, in the original principal amount of $7,400,000, which is evidenced by that certain promissory note, dated January 13, 2023, in the principal amount of $7,400,000, payable to the order of Conterra (Conterra's right, title and interest in and to Loan <sup>REDACTED</sup>1004, together with all documents evidencing or securing the same, having been assigned to Farmer Mac).

2. On or about January 8, 2018, Conterra made a loan ("Loan <sup>REDACTED</sup>1725") to C & A and Whitesbridge, in the principal amount of $5,500,000, which is evidenced by that certain promissory note, dated January 8, 2018, in the original principal amount of $5,500,000, payable to the order of Conterra (Conterra's right, title and interest in and to Loan <sup>REDACTED</sup>1725, together with all documents evidencing or securing the same, having been assigned to Farmer Mac).

3. On or about January 8, 2018, Conterra made a loan ("Loan <sup>REDACTED</sup>1728") to C & A and Whitesbridge in the principal amount of $1,500,000, which is evidenced by that certain promissory note, dated January 8, 2018, in the original principal amount of $1,500,000, payable to the order of Conterra (Conterra's right, title and interest in and to Loan <sup>REDACTED</sup>1728, together with all documents evidencing or securing the same, having been assigned to Farmer Mac).

4. On or about October 11, 2019, Conterra made a loan ("Loan <sup>REDACTED</sup>1673") to Copper, Maricopa, Gradon, Cantua, Lincoln, as transferee of Ashlan & Hayes Investments, LLC, a California limited liability company ("Ashlan & Hayes"), and ACAP Farms, as transferee of ACAP Holdings, LLC, a California limited liability company ("ACAP Holdings") in the original principal amount of $5,297,232, which is evidenced by that certain promissory note, dated October 11, 2019, in the principal amount of $5,297,232, payable to the order of Conterra (Conterra's right, title and interest in and to Loan <sup>REDACTED</sup>1673, together with all documents evidencing or securing the same, having been assigned to Farmer Mac).

5. On or about October 11, 2019, Conterra made a loan ("Loan <sup>REDACTED</sup>1674") to Copper, Maricopa, Gradon, Cantua, Lincoln, as transferee of Ashlan & Hayes, and ACAP Farms, as transferee of ACAP Holdings in the principal amount of $10,258,632, which is evidenced by that certain promissory note, dated October 11, 2019, in the original principal amount of $10,258,632, payable to the order of Conterra (Conterra's right, title and interest in and to Loan <sup>REDACTED</sup>1674, together with all documents evidencing or securing the same, having been assigned to Farmer Mac).

6. On or about December 14, 2020, Conterra made a loan ("Loan <sup>REDACTED</sup>2676") to Maricopa, C & A, Willow, Assemi, and Whitesbridge in the principal amount of $12,500,000, which is evidenced by that certain promissory note, dated December 14, 2020, in the original principal amount of $12,500,000, payable to the order of Conterra (Conterra's right, title and interest in and to Loan <sup>REDACTED</sup>2676, together with all documents evidencing or securing the same, having been assigned to Farmer Mac).

7. On or about December 14, 2020, Conterra made a loan ("Loan <sup>REDACTED</sup>2678") to Maricopa, C & A, Willow, Assemi, and Whitesbridge in the principal amount of $12,500,000, which is evidenced by that certain promissory note, dated December 14, 2020, in the original principal amount of $12,500,000, payable to the order of Conterra (Conterra's right, title and interest in and to Loan

REDACTED 2678, together with all documents evidencing or securing the same, having been assigned to Farmer Mac).

## EXHIBIT B

### Security Instruments

1. Deed of Trust, Assignment of Rents and Fixture Filing, dated as of February 2, 2023, executed and delivered by C & A, Cantua and Gradon, as trustor, to Old Republic Title Company, as trustee for the benefit of Conterra, as beneficiary, and recorded in the official records of Fresno County, California, as Document No. 2023-0010330 (Conterra's right, title and interest in and to Loan <sup>REDACTED</sup>1004, together with all documents evidencing or securing the same, having been assigned to Farmer Mac).

2. Deed of Trust, Assignment of Rents and Fixture Filing, dated as of February 2, 2023, executed and delivered by Maricopa, C & A and Willow, as trustor, to Old Republic Title Company, as trustee for the benefit of Conterra, as beneficiary, and recorded in the official records of Kern County, California, as Document No. 223013714 (Conterra's right, title and interest in and to Loan <sup>REDACTED</sup>1004, together with all documents evidencing or securing the same, having been assigned to Farmer Mac).

3. Deed of Trust, Assignment of Rents and Fixture Filing, dated as of February 2, 2023, executed and delivered by Copper, Lincoln and ACAP Farms, as trustor, to Old Republic Title Company, as trustee for the benefit of Conterra, as beneficiary, and recorded in the official records of King County, California, as Document No. 2301891 (Conterra's right, title and interest in and to Loan <sup>REDACTED</sup>1004, together with all documents evidencing or securing the same, having been assigned to Farmer Mac).

4. Amended and Restated Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing, dated as of February 2, 2023, executed and delivered by C & A, as trustor, to Old Republic Title Company, as trustee for the benefit of U.S. Bank National Association, as Custodian/Trustee for Farmer Mac, as beneficiary, and recorded in the official records of Fresno County, California, as Document No. 2023-0011222.

5. Amended and Restated Deed of Trust (With Future Advance Clause), Security Agreement, Assignment of Rents and Fixture Filing, dated as of February 2, 2023, executed and delivered by C & A, as trustor, to Michael H. Patterson, as trustee for the benefit of U.S. Bank National Association, as Custodian/Trustee for Farmer Mac, as beneficiary, and recorded in the official records of Fresno County, California, as Document No. 2023-0011223.

6. Amended and Restated Open-End Deed of Trust (With Future Advance Clause) Security Agreement, Assignment of Rents and Fixture Filing, dated as of February 2, 2023, executed and delivered by Copper, ACAP Farms, Lincoln, Gradon and Cantua, as trustor, to Old Republic Title Company, as trustee for the benefit of U.S. Bank National Association, as Custodian/Trustee for Farmer Mac, as beneficiary, and recorded in the official records of Fresno County, California, as Document No. 2023-0011386.

7. Amended and Restated Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing, dated as of February 2, 2023, executed and delivered by Copper, ACAP Farms, Lincoln, Gradon and Cantua, as trustor, to Old Republic Title Company, as trustee for the benefit of U.S. Bank National Association, as Custodian/Trustee for Farmer Mac, as beneficiary, and recorded in the official records of Fresno County, California, as Document No. 2023-0011359.

8. Amended and Restated Open-End Deed of Trust (With Future Advance Clause) Security Agreement, Assignment of Rents and Fixture Filing, dated as of February 2, 2023, executed and

delivered by Maricopa, C & A and Willow, as trustor, to Fidelity National Title Company, as trustee for the benefit of U.S. Bank National Association, as Custodian/Trustee for Farmer Mac, as beneficiary, and recorded in the official records of Kern County, California, as Document No. 223016523.

Exhibit S

# FARMER MAC

October 16, 2024

**VIA FIRST CLASS MAIL AND EMAIL**

Copper Avenue Investments, LLC
5260 N Palm Ave Suite 421
Mail Stop A
Fresno, CA 93704

Maricopa Orchards, LLC
5260 N Palm Ave Suite 421
Mail Stop A
Fresno, CA 93704

C & A Farms, LLC
5260 N Palm Ave Suite 421
Mail Stop A
Fresno, CA 93704

Lincoln Grantor Farms, LLC
5260 N Palm Ave Suite 421
Mail Stop A
Fresno, CA 93704

Willow Avenue Investments, LLC
5260 N Palm Ave Suite 421
Mail Stop A
Fresno, CA 93704

ACAP Farms, LLC
5260 N Palm Ave Suite 421
Mail Stop A
Fresno, CA 93704

Gradon Farms, LLC
5260 N Palm Ave Suite 421
Mail Stop A
Fresno, CA 93704

Cantua Orchards, LLC
5260 N Palm Ave Suite 421
Mail Stop A
Fresno, CA 93704

Whitesbridge Farms, LLC
5260 N Palm Ave Suite 421
Mail Stop A
Fresno, CA 93704

Assemi Brothers, LLC
5260 N Palm Ave Suite 421
Mail Stop A
Fresno, CA 93704

**Re:**   *Notice of Default and Reservation of Rights*

Ladies and Gentlemen:

Reference is made to that certain Notice of Events of Default and Reservation of Rights dated as of September 12, 2024 (the "Prior Reservation of Rights").

Federal Agricultural Mortgage Corporation ("Farmer Mac") is the holder of the loans described on Exhibit A attached hereto (the "Loans") to Maricopa Orchards, LLC, a California limited liability company ("Maricopa"), Copper Avenue Investments, LLC, a California limited liability company ("Copper"), Lincoln Grantor Farms, LLC, a California limited liability company ("Lincoln"), ACAP Farms, LLC, a California limited liability company ("ACAP Farms"), C & A Farms, LLC, a California limited liability company ("C & A"), Whitesbridge Farms, LLC, a California limited liability company ("Whitesbridge"), Willow Avenue Investments, LLC, a California limited liability company ("Willow"), Assemi Brothers, LLC, a California limited liability company ("Assemi"), Cantua Orchards, LLC, a California limited liability company ("Cantua"), and Gradon Farms, LLC, a California limited liability company ("Gradon" and, collectively with Maricopa, Copper, Lincoln, ACAP Farms, C & A, Whitesbridge, Willow, Assemi and Cantua, the "Borrowers"), which are evidenced by the Promissory Notes described on Exhibit A attached hereto (as amended, supplemented, restated, or otherwise modified, the "Promissory Notes") and are secured by, *inter alia*, the security instruments described on Exhibit B attached hereto (as amended, supplemented, restated, or otherwise modified, the "Security Instruments" and, collectively with the Promissory Notes and

**OFFICE:**
2100 Pennsylvania Avenue N.W., Suite 450N
Washington, D.C. 20037

**PHONE:**
800.879.3276

**FAX:**
800.999.1814

**WEBSITE:**
farmermac.com

any other document evidencing or securing the Loans, in each case as amended, supplemented, restated, or otherwise modified, the "<u>Loan Documents</u>"). Except as otherwise specified, capitalized terms used herein shall have the meanings set forth in the Loan Documents. The Loan numbers referenced herein are as defined on <u>Exhibit A</u> attached hereto.

Loans [REDACTED]1725, [REDACTED]1728, [REDACTED]2676, [REDACTED]2678, [REDACTED]1673, [REDACTED]1674 and [REDACTED]1004 are fully guaranteed by each of Farshid Assemi, Farid Assemi, Darius Assemi and Sonia Assemi (collectively, the "<u>Guarantors</u>", and such guarantees, collectively, the "<u>Guarantees</u>").

In the Prior Reservation of Rights, we advised you that certain Events of Default had occurred and were continuing under the relevant terms of the Promissory Notes. Specifically, without limitation:

1. The Promissory Note for each of Loans [REDACTED]1725, [REDACTED]1728, [REDACTED]2676, [REDACTED]2678, [REDACTED]1673, [REDACTED]1674 and [REDACTED]1004 requires that the applicable Borrower(s) thereunder pay to Farmer Mac accrued interest with respect to such Loan on July 1, 2024. The applicable Borrower(s) under each such Loan failed to pay such interest on July 1, 2024, which constitutes an Event of Default under each such Loan and the applicable Loan Documents.

2. The Promissory Note for each of Loans [REDACTED]1725, [REDACTED]1728, [REDACTED]1674 and [REDACTED]1004 requires that the applicable Borrower(s) thereunder pay to Farmer Mac the principal amounts described therein with respect to such Loan on July 1, 2024. The applicable Borrower(s) under each such Loan failed to pay such principal amounts on July 1, 2024, which constitutes an Event of Default under each such Loan and the applicable Loan Documents.

3. The Loan Documents for each of Loans [REDACTED]2676, [REDACTED]2678 and [REDACTED]1004 require that the applicable Borrower(s) thereunder maintain as of the 2023 fiscal year-end a debt service coverage ratio of greater than or equal to 1.25:1.00. The applicable Borrower(s) under each such Loan reported as of such fiscal year-end a debt service coverage ratio of 0.46:1.00, which constitutes an Event of Default under each such Loan and the applicable Loan Documents.

4. The Loan Documents for each of Loans [REDACTED]2676, [REDACTED]2678 and [REDACTED]1004 require that the applicable Borrower(s) thereunder maintain as of the 2023 fiscal year-end a current ratio of not less than 1.50:1.00. The applicable Borrower(s) under each such Loan reported a current ratio for such period of 0.56:1.00, which constitutes an Event of Default under each such Loan and the applicable Loan Documents.

5. Each Loan is cross defaulted with all other Loans and, accordingly, each of the Events of Default under the Loans and Loan Documents described in the preceding paragraphs (1) through (4) constitutes an Event of Default under all other Loans and Loan Documents.

The foregoing is not intended to be an exhaustive list of all existing breaches, violations, defaults or Events of Default under the Loan Documents (all such breaches, violations, defaults and Events of Default, regardless of whether set forth in the foregoing list, collectively, the "<u>Existing Events of Defaults</u>").

This correspondence serves as notice to the Borrowers and Guarantors of the Existing Events of Default, and is delivered pursuant to, and to satisfy any notice requirements under the Loan Documents, including but not limited to the notice requirements of Section 26 of each of the Security Instruments identified on <u>Exhibit B</u> hereto. The Borrowers must cure the Existing Events of Default constituting payment defaults as described herein within sixty (60) days of Borrowers' receipt of this notice, or December 15, 2024 (the "<u>Cure Date</u>"). If the Borrowers fail to cure any of the Existing Events of Default that are subject to cure by the Cure Date, Farmer Mac may exercise any and all rights and remedies, including but not limited to, the

2

acceleration and demand for immediate payment of all outstanding amounts due and payable from Borrowers to Farmer Mac under the Loan Documents.  We further note that, notwithstanding the foregoing, certain of the Existing Events of Default, such as those identified in paragraphs 3 and 4 above, are not subject to cure and Farmer Mac reserves all rights in connection therewith. The Borrowers are hereby notified that in the event Farmer Mac exercises its right to accelerate all amounts due and owing under the Loan Documents, Borrowers shall retain the right to reinstate after the acceleration pursuant to Section 16 and Section 26 of the Security Instruments, and shall have the right to bring an action in court of competent jurisdiction to assert the non-existence of a default or any other defense of the Borrowers to the acceleration of amounts due under the Loan Documents.

Please be advised that, as a result of the Existing Events of Defaults and Borrowers' continuing failure to cure the same following receipt of the Prior Reservation of Rights, all principal amounts outstanding under the Loan Documents shall bear interest from and after the date of this letter at the applicable default rate of interest.  The Promissory Notes and the respective applicable default rates of interest are specified on Exhibit A hereto.  In addition, Farmer Mac hereby reserves the right to assert late charges as provided under the Loan Documents based upon the payment defaults identified herein above.

Farmer Mac expressly reserves any and all rights, powers, privileges and remedies it may have or to which it may be entitled, as well as any claims it may assert now or in the future which have not already been exercised pursuant to the Loan Documents and all applicable laws, which remedies include, without limitation, the right to: (i) setoff against any accounts held by Farmer Mac; (ii) accelerate and make immediately due and payable all amounts due from Borrowers to Farmer Mac under the Loan Documents; (iii) pursue all other remedies available to collect on the amounts due from the Borrowers, including, without limitation, instructing our legal counsel to commence proceedings to foreclose on collateral and security for the obligations of the Borrowers under the Loan Documents (the "Obligations"); and (iv) demand payment under the Guarantees (or any of them) or any other guaranty of the Obligations, in each case immediately and without any further notice to the Borrowers or any Guarantor. Farmer Mac has not agreed to forbear from exercising any of the rights and remedies available to it under the Promissory Notes, the Security Instruments, the Guarantees or the other Loan Documents, or to waive the Existing Events of Default. No delay in acting shall constitute a waiver of the Existing Events of Default or Farmer Mac's rights and remedies in connection therewith.

At no time shall any prior or subsequent course of conduct, or the acceptance of any payment on the Promissory Note or agreement to amend modify or extend the terms thereof, by Farmer Mac, the Borrowers or Guarantors directly or indirectly limit, impair or otherwise adversely affect any of Farmer Mac's rights, interests or remedies in connection with the Loan Documents or obligate Farmer Mac to agree to, negotiate or consider an agreement to waive any obligation, Default or Event of Default by the Borrowers or Guarantors under any Loan Document or to amend any term or condition of the Loan Documents.

Sincerely,

FEDERAL AGRICULTURAL MORTGAGE CORPORATION

By: *Zachary Carpenter*
Name:  Zachary Carpenter
Title:    Executive Vice President – Chief Business Officer

cc:      Darius Assemi
         Farid Assemi
         Farshid Assemi
         Sonia Assemi

**FARMER MAC**

## EXHIBIT A

### Loans

1. On or about January 13, 2023, Conterra Agricultural Capital, LLC, an Iowa limited liability company ("Conterra"), made a loan ("Loan <sup>REDACTED</sup> 1004") to Maricopa, Copper, Lincoln, C & A, ACAP Farms Willow, Cantua and Gradon, in the original principal amount of $7,400,000, which is evidenced by that certain promissory note, dated January 13, 2023, in the principal amount of $7,400,000, payable to the order of Conterra (Conterra's right, title and interest in and to Loan <sup>REDACTED</sup> 1004, together with all documents evidencing or securing the same, having been assigned to Farmer Mac).  Pursuant to Section 6 of Loan <sup>REDACTED</sup> 1004, all principal amounts owing thereunder will accrue interest from and after the date hereof at the default interest rate of eighteen percent (18.000%).

2. On or about January 8, 2018, Conterra made a loan ("Loan <sup>REDACTED</sup> 1725") to C & A and Whitesbridge, in the principal amount of $5,500,000, which is evidenced by that certain promissory note, dated January 8, 2018, in the original principal amount of $5,500,000, payable to the order of Conterra (Conterra's right, title and interest in and to Loan <sup>REDACTED</sup> 1725, together with all documents evidencing or securing the same, having been assigned to Farmer Mac).  Pursuant to Section 7 of the note evidencing Loan <sup>REDACTED</sup> 1725, all principal amounts owing thereunder will accrue interest from and after the date hereof at the default interest rate of five (5.000%) above the current applicable interest rate pursuant to Section 2 of the note evidencing Loan <sup>REDACTED</sup> 1725.

3. On or about January 8, 2018, Conterra made a loan ("Loan <sup>REDACTED</sup> 1728") to C & A and Whitesbridge in the principal amount of $1,500,000, which is evidenced by that certain promissory note, dated January 8, 2018, in the original principal amount of $1,500,000, payable to the order of Conterra (Conterra's right, title and interest in and to Loan <sup>REDACTED</sup> 1728, together with all documents evidencing or securing the same, having been assigned to Farmer Mac).  Pursuant to Section 8(D) of the note evidencing Loan <sup>REDACTED</sup> 1728, the amounts due and owing thereunder will accrue interest from and after the date hereof at the default interest rate of five (5.000%) above the current applicable interest rate pursuant to Section 2 of the note evidencing Loan <sup>REDACTED</sup> 1728.

4. On or about October 11, 2019, Conterra made a loan ("Loan <sup>REDACTED</sup> 1673") to Copper, Maricopa, Gradon, Cantua, Lincoln, as transferee of Ashlan & Hayes Investments, LLC, a California limited liability company ("Ashlan & Hayes"), and ACAP Farms, as transferee of ACAP Holdings, LLC, a California limited liability company ("ACAP Holdings") in the original principal amount of $5,297,232, which is evidenced by that certain promissory note, dated October 11, 2019, in the principal amount of $5,297,232, payable to the order of Conterra (Conterra's right, title and interest in and to Loan <sup>REDACTED</sup> 1673, together with all documents evidencing or securing the same, having been assigned to Farmer Mac). Pursuant to Section 8(D) of the note evidencing Loan <sup>REDACTED</sup> 1673, the amounts due and owing thereunder will accrue interest from and after the date hereof at the default interest rate of eighteen percent (18.000%).

5. On or about October 11, 2019, Conterra made a loan ("Loan <sup>REDACTED</sup> 1674") to Copper, Maricopa, Gradon, Cantua, Lincoln, as transferee of Ashlan & Hayes, and ACAP Farms, as transferee of ACAP Holdings in the principal amount of $10,258,632, which is evidenced by that certain promissory note, dated October 11, 2019, in the original principal amount of $10,258,632, payable to the order of Conterra (Conterra's right, title and interest in and to Loan <sup>REDACTED</sup> 1674, together with all documents evidencing or securing the same, having been assigned to Farmer Mac).  Pursuant to Section 6 of the note evidencing Loan <sup>REDACTED</sup> 1674, all principal amounts owing thereunder will accrue interest from and after the date hereof at the default interest rate of eighteen percent (18.000%)

6. On or about December 14, 2020, Conterra made a loan ("Loan <sup>REDACTED</sup> 2676") to Maricopa, C & A, Willow, Assemi, and Whitesbridge in the principal amount of $12,500,000, which is evidenced by that certain promissory note, dated December 14, 2020, in the original principal amount of $12,500,000, payable to the order of Conterra (Conterra's right, title and interest in and to Loan <sup>REDACTED</sup> 2676, together with all documents evidencing or securing the same, having been assigned to Farmer Mac).  Pursuant to Section 8(D) of the note evidencing Loan <sup>REDACTED</sup> 2676, the amounts due and owing thereunder will accrue interest from and after the date hereof at the default interest rate of eighteen percent (18.000%).

7. On or about December 14, 2020, Conterra made a loan ("Loan <sup>REDACTED</sup> 2678") to Maricopa, C & A, Willow, Assemi, and Whitesbridge in the principal amount of $12,500,000, which is evidenced by that certain promissory note, dated December 14, 2020, in the original principal amount of $12,500,000, payable to the order of Conterra (Conterra's right, title and interest in and to Loan <sup>REDACTED</sup> 2678, together with all document evidencing or securing the same, having been assigned to Farmer Mac).  Pursuant to Section 8(D) of the note evidencing Loan <sup>REDACTED</sup> 2678, the amounts due and owing thereunder will accrue interest from and after the date hereof at the default interest rate of eighteen percent (18.000%).

**FARMER MAC**

<div align="center">

**EXHIBIT B**

**Security Instruments**

</div>

1. Deed of Trust, Assignment of Rents and Fixture Filing, dated as of February 2, 2023, executed and delivered by C & A, Cantua and Gradon, as trustor, to Old Republic Title Company, as trustee for the benefit of Conterra, as beneficiary, and recorded in the official records of Fresno County, California, as Document No. 2023-0010330 (Conterra's right, title and interest in and to Loan REDACTED 1004, together with all documents evidencing or securing the same, having been assigned to Farmer Mac).

2. Deed of Trust, Assignment of Rents and Fixture Filing, dated as of February 2, 2023, executed and delivered by Maricopa, C & A and Willow, as trustor, to Old Republic Title Company, as trustee for the benefit of Conterra, as beneficiary, and recorded in the official records of Kern County, California, as Document No. 223013714 (Conterra's right, title and interest in and to Loan REDACTED 1004, together with all documents evidencing or securing the same, having been assigned to Farmer Mac).

3. Deed of Trust, Assignment of Rents and Fixture Filing, dated as of February 2, 2023, executed and delivered by Copper, Lincoln and ACAP Farms, as trustor, to Old Republic Title Company, as trustee for the benefit of Conterra, as beneficiary, and recorded in the official records of King County, California, as Document No. 2301891 (Conterra's right, title and interest in and to Loan REDACTED 1004, together with all documents evidencing or securing the same, having been assigned to Farmer Mac).

4. Amended and Restated Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing, dated as of February 2, 2023, executed and delivered by C & A, as trustor, to Old Republic Title Company, as trustee for the benefit of U.S. Bank National Association, as Custodian/Trustee for Farmer Mac, as beneficiary, and recorded in the official records of Fresno County, California, as Document No. 2023-0011222.

5. Amended and Restated Deed of Trust (With Future Advance Clause), Security Agreement, Assignment of Rents and Fixture Filing, dated as of February 2, 2023, executed and delivered by C & A, as trustor, to Michael H. Patterson, as trustee for the benefit of U.S. Bank National Association, as Custodian/Trustee for Farmer Mac, as beneficiary, and recorded in the official records of Fresno County, California, as Document No. 2023-0011223.

6. Amended and Restated Open-End Deed of Trust (With Future Advance Clause) Security Agreement, Assignment of Rents and Fixture Filing, dated as of February 2, 2023, executed and delivered by Copper, ACAP Farms, Lincoln, Gradon and Cantua, as trustor, to Old Republic Title Company, as trustee for the benefit of U.S. Bank National Association, as Custodian/Trustee for Farmer Mac, as beneficiary, and recorded in the official records of Fresno County, California, as Document No. 2023-0011386.

7. Amended and Restated Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing, dated as of February 2, 2023, executed and delivered by Copper, ACAP Farms, Lincoln, Gradon and Cantua, as trustor, to Old Republic Title Company, as trustee for the benefit of U.S. Bank National Association, as Custodian/Trustee for Farmer Mac, as beneficiary, and recorded in the official records of Fresno County, California, as Document No. 2023-0011359.

<div align="center">B-1</div>

8. Amended and Restated Open-End Deed of Trust (With Future Advance Clause) Security Agreement, Assignment of Rents and Fixture Filing, dated as of February 2, 2023, executed and delivered by Maricopa, C & A and Willow, as trustor, to Fidelity National Title Company, as trustee for the benefit of U.S. Bank National Association, as Custodian/Trustee for Farmer Mac, as beneficiary, and recorded in the official records of Kern County, California, as Document No. 223016523.