MILLER NASH LLP
Bernie Kornberg
bernie.kornberg@millernash.com
Jack Wallan
jack.wallan@millernash.com
340 Golden Shore, Suite 450
Long Beach, California 90802
Telephone:    562.435.8002
Facsimile:    562.435.7967

Attorneys for Interested Party
Rooster Capital IV, LLC, a Delaware Limited Liability
Company

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| FEDERAL AGRICULTURAL MORTGAGE CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>ASSEMI BROTHERS, LLC et al.,<br><br>Defendants. | Case No. 1:24-cv-01455-KES-SAB<br><br>**DECLARATION OF MARK A. SMITH IN SUPPORT OF ROOSTER CAPITAL IV LLC'S MOTION TO INTERVENE**<br><br>Date:    May 19, 2025<br>Time:    1:30 p.m.<br>Ctrm:    6<br>Judge:    Hon. Kirk E. Sherriff |

I, Mark A. Smith, declare as follows:

1.      I am employed by Conterra Holdings, LLC, an Iowa limited liability company d/b/a Conterra Ag Capital ("Conterra") as its Chief Operating Officer ("COO") and General Counsel.

2.      I make this declaration in support of Rooster Capital IV, LLC, a Delaware Limited Liability Company's ("Rooster") Motion to Intervene.  Rooster's principal place of business is in West Des Moines, Iowa.

3.      Conterra is the Administrative Member of Rooster, and also acts as the authorized servicing agent for Rooster under a Master Loan Servicing Agreement.  As servicing agent,

DECLARATION OF MARK A. SMITH
1:24-CV-01455-KES-SAB

Conterra is charged with the collection of loans owned by Rooster.  As part of these duties, Conterra has access to all of the original loan documents it services, along with all servicing records for the loans.

4.      My duties at Conterra include serving as custodian of records on behalf of Conterra as to the loans it services.  I am familiar with the manner and procedures by which the records, letters and memoranda contained in Conterra's files are prepared and maintained.  Those records, letters and memoranda are prepared by agents or employees of Conterra in performance of their regular business duties.  Those records, letters and memoranda are made either by persons with knowledge of the matters they record or from information supplied by persons with such knowledge.  It is Conterra's regular business practice to maintain such records, letters or memoranda in the ordinary course of its business.  The documents herein contained and referenced are business records produced and maintained in this above-described manner.  Except as otherwise specifically stated in this Declaration, the facts set forth herein are based on my review of the files to this account and if called as a witness I could and would be competent to testify to those facts.

5.      My role as COO includes supervision and collection on the loan given to defendants Maricopa Orchards, LLC, Copper Avenue Investments, LLC, C&A Farms, LLC, ACAP Farms, LLC, Willow Avenue Investments, LLC, Lincoln Grantor Garms, LLC, Cantua Orchards, LLC, and Gardon Farms, LLC ("the Rooster Borrowers") by Conterra Agricultural Capital, LLC ("CAC"), a wholly owned subsidiary of Conterra, and which was subsequently assigned to Rooster, as follows.

6.      On February 2, 2023, the Rooster Borrowers signed a Note (the "Rooster Note") in favor of CAC in the amount of $7,400,000.  A copy of the Rooster Note is attached to this declaration as Exhibit A.

7.       The Rooster Note is secured by certain real property (the "Real Property Collateral") pursuant to deeds of trust recorded in Fresno County, Kings County, and Kern County (the "Rooster Deeds of Trust").  A copy of these deeds of trust are attached, respectively, as Exhibit B, Exhibit C, and Exhibit D to this declaration.

DECLARATION OF MARK A.SMITH
1:24-CV-01455-KES-SAB

8.      Upon origination, the Rooster Note and Rooster Deeds of Trust were assigned by CAC to Rooster.  A copy of these assignments are attached, respectively, as <u>Exhibit E</u>, <u>Exhibit F</u>, and <u>Exhibit G</u> to this declaration.

9.      Based on my review of the relevant records, the Real Property Collateral also secures the debt owed by the Rooster Borrowers, and other releated entities, to the Federal Agricultural Mortgage Corporation ("Farmer Mac").

10.      Based on my review of the relevant records, Farmer Mac is the senior lien as to the Real Property Collateral and Rooster is in second position.

11.      Based on my review of the relevant records, other lenders with liens junior to Farmer Mac and Rooster are also secured by the Real Property Collateral.

12.      The Rooster Borrowers have defaulted on payments owed on, and other terms and conditions of, the Rooster Note, along with other related loan documents.

13.      As of February 28, 2025, the current balance of the Rooster Note is $8,400,606.46, constituting $7,400,000 in unpaid principal balance, $961,871.62 in interest, and $38,734.84 in fees and charges.

14.      Rooster has identified certain parcels owned by Defendants on which it has a lien where Farmer Mac may not have a senior lien position or where Farmer Mac may not seek a sale.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Date:  April 10, 2025                                    /s/ Mark A. Smith
                                                                     Mark A. Smith

I, Bernie Kornberg, hereby attest that I have a signed original copy, via DocuSign, of the signature above.

                                                            /s/ Bernie Kornberg

4913-6913-4900.1

DECLARATION OF MARK A.SMITH
                                                                  1:24-CV-01455-KES-SAB

# EXHIBIT A

# NOTE

**Loan #R4030**

February 2, 2023
[Date]

**Fresno,**
[City]

**CA**
[State]

**4,357 +/- Acres**
**Fresno, Kings, and Kern Counties, California**
[Property Address]

## 1. BORROWERS' PROMISE TO PAY

In return for a loan that **Maricopa Orchards, LLC**, a California limited liability company, **Copper Avenue Investments, LLC**, a California limited liability company, **C & A Farms, LLC**, a California limited liability company, **ACAP Farms, LLC**, a California limited liability company, **Willow Avenue Investments, LLC**, a California limited liability company, **Lincoln Grantor Farms, LLC**, a California limited liability company, **Cantua Orchards, LLC**, a California limited liability company, and **Gradon Farms, LLC**, a California limited liability company (collectively, the "Borrowers"), have received, Borrowers promise to pay U.S. **$7,400,000.00** (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **Conterra Agricultural Capital, LLC**. Borrowers will make all payments under this Note in the form of cash, check or money order.

Borrowers understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is also called the "Lender", "Note holder" or "holder of the Note".

## 2. INTEREST

So long as no Event of Default exists under this Note, interest will be charged on unpaid Principal until the full amount of Principal has been paid. Borrowers will pay interest at a yearly rate of **9.98804%.** The interest rate Borrowers will pay will change in accordance with this Section 2.

**INITIAL ADJUSTMENT DATE**      **March 1, 2023**

**ADJUSTMENT FREQUENCY PERIOD** monthly

**SOFR RATE MARGIN**      **5.4500%**

**ADJUSTABLE RATE PROVISION.** The interest rate stated in this Note is subject to adjustment by the Lender or any subsequent holder of this Note on the Initial Adjustment Date and on subsequent dates established by the Adjustment Frequency Period thereafter. Any such change in the interest rate shall be made automatically but in no event shall the adjusted interest rate exceed the maximum interest rate then permitted by law. When the rate is adjusted the remaining current Principal balance of the Note will be reamortized over the remaining amortization term to determine subsequent payment amounts. Lender reserves the right to not adjust the loan during any Event of Default. Notice of the adjusted rate will be sent to the Borrowers after each interest rate adjustment. This is a CME SOFR[1] Rate Based Loan, and the applicable interest rate shall be equal to the sum of the (1) SOFR Base Rate, and (2) SOFR Rate Margin, determined and adjusted monthly as

---

1 The market data is the property of Chicago Mercantile Exchange Inc. ("CME") or its licensors as applicable. All rights reserved, or otherwise licensed by CME.

**MULTISTATE ADJUSTABLE RATE NOTE**
**UNIFORM INSTRUMENT**

follows:

CME 1-Month Term SOFR Based Rate: The "SOFR Base Rate" is an interest rate per annum equal to the CME 1- Month Term SOFR. The interest rate shall be adjusted monthly on the first day of the month. The index for adjustments is the CME 1-Month Term SOFR Index published by CME at https://www.cmegroup.com/market-data/cme-group-benchmark-administration/term-sofr.html?redirect=/termsofr two (2) business days before the applicable interest rate change date.  In the event that CME 1-Month Term SOFR Index is less than zero percent per annum the index shall be deemed to be zero percent (0.0000%) per annum. If the CME 1-Month Term SOFR Index is not reported on the tenth day of a month, the CME 1-Month Term SOFR Index reported on the first business day preceding such day will be used. If this index is no longer available for any reason, is no longer posted through electronic transmission or through a source providing such information, or the Lender determines that the index is unreliable or no longer adequately covers Lender's costs of making loans using this index, Lender will select a replacement index in its sole discretion which index may be based upon comparable information and may include an interest rate spread or other price adjustment to compensate Lender for costs incurred in making or maintaining the loan.

SOFR Rate Margin: The initial annual rate of margin to be added on the SOFR Base Rate (the "SOFR Rate Margin") is equal to 5.4500% per annum. Lender, in its sole and absolute discretion, may modify and change the SOFR Rate Margin annually, with the first adjustment occurring on the first anniversary of the Closing Date, effective as of the first day of the anniversary month and each subsequent adjustment occurring annually thereafter. Lender may however modify the Rate Margin more frequently than annually in the event that an Event of Default has occurred.

After and during the continuance of an Event of Default, interest will be charged on unpaid Principal at the interest rate stated in Section 6 of this Note.

3.    **SCHEDULED PAYMENTS**
   **(A)    Time and Amount of Payments**
   **1 interest only payment on March 1, 2023, with interest calculated from the date of closing on the unpaid Principal balance at the applicable interest rate under this Note; 59 consecutive monthly interest only payments, beginning April 1, 2023, and the final payment of all remaining Principal, accrued and unpaid interest, and any applicable fees and costs on February 2, 2028, which is called the "Maturity Date."**
   **(B)    Place of Payments**
   Borrowers will make payments at **5465 Mills Civic Parkway, Suite 201, West Des Moines, IA 50266** or at a different place if required by Lender.

If Lender at any time determines, in its sole but reasonable discretion, that it has miscalculated the amount of any installment payment (whether because of a miscalculation of the interest rate or otherwise), then Lender shall give notice to Borrowers of the corrected amount of the installment payment (and the corrected interest rate, if applicable) and: (i) if the corrected amount of the installment payment represents an increase, then Borrowers shall, within 30 calendar days thereafter, pay to Lender any sums that Borrowers would have otherwise been obligated under this Note to pay to Lender had the amount of the installment payment not been miscalculated, or (ii) if the corrected amount of the installment payment represents a decrease thereof and an Event of Default does not exist under this Note, the Security Instrument, as defined below, or any other loan document evidencing or securing this Note, then Borrowers shall thereafter be paid the sums that Borrowers would not have otherwise been obligated to pay to Lender had the amount of the installment payment not been miscalculated.

---

MULTISTATE ADJUSTABLE RATE NOTE
UNIFORM INSTRUMENT

2

4.    **INTEREST CALCULATION**

Interest on this Note is computed on a 30/360 simple interest basis; that is, with exception of the month in which the loan settlement occurs, monthly interest is calculated by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding unpaid Principal balance, multiplied by a month of 30 days.   The month in which the loan settlement date occurs, interest shall accrue on a "30/360" basis from and including the settlement date to and including the last day of such month, calculated as if such month had 30 days. (For example, if this Note had settled on either February 15 or March 15, in either case, there would be 15 days of interest for the remainder of that first month.) Unless required by applicable law, payments will be applied first to collection expenses and protective advances, second to interest, third to unpaid Principal, and finally to late charges.

5.    **PREPAYMENTS**

**6 month lockout**:  Borrowers shall have no right to make, and Lender shall have no obligation to accept, any voluntary prepayment, whether in whole or in part, of the Loan or any other amount under this Note at any time during the first 6 months of this Note, as calculated from the date of this Note.  Upon completion of payment of 6 months' interest, as calculated from the date of this Note, Borrower may prepay all or any portion of the Principal of this Note. Concurrently with any permitted prepayment of the unpaid Principal balance of this Note, Borrower shall pay any unpaid interest accrued on such Principal amount from the date to which interest was last paid to the date of the remitted prepayment.

6.    **INTEREST AFTER DEFAULT**

Upon the occurrence and during the continuance of any Event of Default under this Note, including failure to pay this Note upon final maturity, at Lender's option, Lender may add any unpaid interest and any applicable costs and expenses to Principal then due under the Note and such sum will bear interest therefrom until paid at the rate provided in this Note (including any increased interest rate).  From and after the occurrence of any Event of Default, whether by nonpayment, maturity, acceleration, nonperformance or otherwise, and until such Event of Default has been cured, all outstanding amounts due under this Note shall bear interest at a rate equal to 18% per annum, or the maximum legal rate allowed by applicable state law if this rate is in excess of the maximum rate Lender is permitted to charge.

7.    **ANNUAL FINANCIAL STATEMENTS**

Borrowers agree to provide Lender with updated financial statements and other requested financial reports, including tax returns on or before May 31st of each year.  The failure of Borrowers to provide annual financial statements or other requested reports within a reasonable time may be declared to be an Event of Default of this Note by Lender and Lender may exercise all remedies under Section 14 of this Note or as provided elsewhere in this Note.

8.    **DISSEMINATION OF INFORMATION**

If Lender determines at any time to sell, transfer or assign this Note, the Security Instrument, as defined below, and any other security instruments, and any or all servicing rights with respect thereto, or to grant participations therein ("Participations") or issue, in a public offering or private placement, mortgage pass-through certificates or other securities evidencing a beneficial interest in the loan ("Securities"), Lender may forward to each purchaser, transferee, assignee, servicer, participant, investor, or their respective successors in such Participations and/or Securities ("collectively, the "Investor"), any rating agency rating such Securities and each prospective Investor, all documents and information which Lender now has or may hereafter acquire relating to the Indebtedness and to Borrowers, any guarantor, any indemnitors and the Property, which shall have been furnished by Borrowers, any guarantor or any indemnitors, as Lender determines necessary or desirable. All information furnished by Borrowers shared with each prospective Investor shall be shared on a confidential basis and, excepting information shared with the Federal Agricultural Mortgage Corporation and any of its affiliates, which Borrowers hereby consent without further notice, Borrowers shall receive notice thereof.

---

**MULTISTATE ADJUSTABLE RATE NOTE**
**UNIFORM INSTRUMENT**

9.    **LENDER ADVANCES**
        Lender may make advances under the Security Instrument, as defined below, providing security for this Note, to protect the Lender's interest in the Security Instrument or other instrument providing security for this Note from loss of value or damage. Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate stated in Section 6 of this Note shall become an obligation due and owing under the terms of this Note immediately upon the date advanced by Lender and is an obligation of Borrowers secured by the Security Instrument or other instrument providing security for this Note.

10.    **GIVING OF NOTICES**
        Unless applicable law requires a different method, any notice that must be given to Borrowers under this Note will be given by delivering it or by mailing it by first class mail to Borrowers at **5260 N. Palm Ave., Ste. 421, Mail Stop M, Fresno, CA 93704**, or at a different address if Borrowers give Lender a notice of Borrowers' different address.
        Any notice that must be given to Lender under this Note will be given by delivering it or by mailing it by first class mail to Lender at the address stated in Section 3(B) above or at a different address if Borrowers are given a notice of that different address.

11.    **WAIVERS**
        Borrowers and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require Lender to demand payment of amounts due. "Notice of Dishonor" means the right to require Lender to give notice to other persons that amounts due have not been paid.

12.    **UNIFORM SECURED NOTE**
        This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Lender under this Note, one or more deeds of trust (each a "Security Instrument" and collectively, the "Security Instrument) dated the same date as this Note, protects the Lender from possible losses which might result if Borrowers do not keep the promises which Borrowers make in this Note. That Security Instrument describes how and under what conditions Borrowers may be required to make immediate payment in full of all amounts Borrowers owe under this Note. Some of those conditions are described as follows:

                If all or any part of the Property or any Interest in the Property is sold or transferred to a third party not under common control of one or more of the Guarantors (or if any of the Borrowers is not a natural person and a beneficial interest in such of the Borrowers of more than ten percent (10%) is sold or transferred, excluding transfer to trusts for estate planning purposes or which occur as a result of the administration of trusts following the death of a grantor of such trusts) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

13.    **USURY**
        The parties to this Note intend and agree that the indebtedness evidenced by this Note and any related documents shall remain in compliance with any usury provisions of the state within which this Note was made by Borrowers. This Note and any related documents are subject to the express condition that at no time shall Borrowers be obligated, or required, to pay interest on the unpaid Principal balance at a rate that could subject Lender to either civil or criminal liability as a result of such rate being in excess of the maximum rate which Lender is permitted to charge. If, by the terms of this Note, Borrowers are, at any time, required or obligated to pay interest on the unpaid Principal balance at a rate in excess of such maximum rate, then the rate of interest under this Note shall be deemed to be immediately reduced to such maximum rate, and interest payable hereunder shall be computed at such maximum rate, and any portion

MULTISTATE ADJUSTABLE RATE NOTE
UNIFORM INSTRUMENT

of all prior Interest payments in excess of such maximum rate shall be applied, and/or shall retroactively be deemed to have been payments made, in reduction of the Principal balance.

14. **DEFAULT AND BORROWERS' FAILURE TO PAY AS REQUIRED**

   **(A)    Event of Default**

   The occurrence of any one or more of the following shall constitute an "Event of Default" under this Note, the Security Instrument, and any related loan documents, as such term is used herein:

   **(1)**    If Borrowers fail to repay any interest or Principal under the Note when due;

   **(2)**    If Borrowers default in any material respect in the performance of any of the other covenants, agreements and obligations of Borrowers under the Security Instrument or any related loan document involving the payment of money and fails to cure such default within ten (10) days;

   **(3)**    If Borrowers default in any material respect in the performance of any of such Borrowers' non-monetary covenants, agreements and obligations under this Note, the Security Instrument or any related loan document and fails to cure such default within sixty (60) days after written notice thereof from Lender, provided however if the default is one which is not susceptible to cure within sixty (60) days and Borrower commences to cure and diligently pursues the cure to completion, then there shall be no Event of Default so long as the cure process continues and is timely completed;

   **(4)**    If any representation or warranty, statement, report or certificate now or hereafter made by any of the Borrowers, was not true and correct in any material respect when made;

   **(5)**    If any bankruptcy or insolvency petition is filed by or against any of the Borrowers under the Federal Bankruptcy Code or any similar state or federal Law, whether now or hereafter existing (and, in the case of involuntary proceedings, failure to cause the same to be vacated, stayed or set aside within sixty (60) days after filing);

   **(6)**    If a default occurs under the Security Instrument or any of the related loan documents and continues beyond the applicable grace period, if any, contained therein;

   **(7)**    If Borrowers or any grantor or any other obligated party under the Security Instrument transfer any interest in the Property in violation of Section 15 of the Security Instrument; provided, however, that Borrowers shall have the right to prepay the Principal balance of the Note, in whole or in part, subject to the prepayment conditions and any other applicable costs and fees, as further set forth in this Note.

   **(B)    Late Charge for Overdue Payments**

   If any installment of Principal or interest is not received by the Lender by the end of the 10th calendar day after the date it is due, a late fee shall be payable on such defaulted payment equal to 5% of such defaulted payment then due.

   **(C)    Notice of Default**

   Upon the occurrence and during the continuance of any Event of Default under this Note, and if allowed by applicable law, Lender will send Borrowers a written notice telling Borrowers that if Borrowers do not pay the overdue amount or otherwise cure the Event of Default within thirty (30) days after receipt of written notice from Lender specifying the nature of the Event of Default, Lender may require Borrowers to pay immediately the full amount of Principal which has not been paid and all the interest and any applicable fees and costs that Borrowers owe on that amount.

   **(D)    No Waiver By Lender**

   Even if after and during the continuance of any Event of Default, Lender does not require Borrowers to pay immediately in full as described above, Lender will still have the right to do so if an Event of Default occurs or is continuing at any later time.

   **(E)    Payment of Lender's Costs and Expenses**

   Upon the occurrence of any Event of Default under this Note or if Lender has required Borrowers to pay immediately in full as described above, Lender will have the right to be paid back by Borrowers for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. If allowed by applicable law, those expenses include, for example, reasonable attorneys' fees.

---

**MULTISTATE ADJUSTABLE RATE NOTE**
**UNIFORM INSTRUMENT**

15.     **CHOICE OF LAW**

     This Note shall be governed by and construed and interpreted in accordance with the laws of the United States of America and the State of California.

16.     **CROSS-DEFAULT PROVISION**

     Borrowers' default or breach under any note or agreement in which Lender has an interest shall be a breach under this Note, the Security Instrument, and any other agreements or documents securing this loan from Lender to Borrowers, and Lender may invoke any of the remedies permitted by the Security Instrument.

**NOTICE IS HEREBY GIVEN TO MAKER THAT ORAL AGREEMENTS OR ORAL COMMITMENTS TO LEND MONEY, EXTEND CREDIT, MODIFY LOAN TERMS OR FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER CALIFORNIA LAW.**

*[remainder intentionally left blank – signature page follows]*

**MULTISTATE ADJUSTABLE RATE NOTE**
**UNIFORM INSTRUMENT**

**BORROWERS:**

**MARICOPA ORCHARDS, LLC,**
a California limited liability company

By: Farshid Assemi
Its: General Manager

**COPPER AVENUE INVESTMENTS, LLC,**
a California limited liability company

By: Farshid Assemi
Its: Manager

**C & A FARMS, LLC,**
a California limited liability company

By: Farshid Assemi
Its: Manager

**ACAP FARMS, LLC,**
a California limited liability company

By: Farshid Assemi
Its: Manager

**WILLOW AVENUE INVESTMENTS, LLC,**
a California limited liability company

By: Neema Assemi
Its: Manager

**GRADON FARMS, LLC,**
a California limited liability company

By: Neema Assemi
Its: Manager

**LINCOLN GRANTOR FARMS, LLC,**
a California limited liability company

By: Neema Assemi
Its: Manager

**CANTUA ORCHARDS, LLC,**
a California limited liability company

By: Farshid Assemi
Its: Manager

# EXHIBIT B

Recorded at Request of
Old Republic Title Company  LPN

14210025 61-DB

Recording Requested By:

**Conterra Agricultural Capital, LLC**

After Recording Return To:

**Conterra Agricultural Capital, LLC**
**5465 Mills Civic Parkway, Suite 201**
**West Des Moines, IA 50266**
**Attn: Taylor Petersen**

*Exempt from fee per GC 27388.1;*
*fee cap of $225 reached*

**Fresno County Recorder**
**Paul Dictos, CPA**

# 2023-0010331

Recorded at the request of:
ERECORDING PARTNERS NETWORK

02/06/2023 09:36 05
Titles: 3      Pages: 24
Fees: $126.00
CA SB2 Fees:$0.00
Taxes: $0.00
Total:  $126.00

_____ [Space Above This Line For Recording Data] _____

# DEED OF TRUST
## Security Agreement, Assignment of Rents and Fixture Filing

Loan #R4030

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in certain Sections of this document. Certain rules regarding the usage of words used in this document are also provided in Section 13.

**(A) "Security Instrument"** means this document, which is dated February 2, 2023, together with all Riders to this document.

**(B) "Lender"** is Conterra Agricultural Capital, LLC. Lender is a limited liability company organized and existing under the laws of Iowa. Lender's address is 5465 Mills Civic Parkway, Suite 201, West Des Moines, IA 50266. Lender is the beneficiary under this Security Instrument.

**(C) "Borrowers"** are C & A Farms, LLC, a California limited liability company, Cantua Orchards, LLC, a California limited liability company, and Gradon Farms, LLC, a California limited liability company. Borrowers are trustors under this Security Instrument. **"Borrower Parties"** are Borrower and Maricopa Orchards, LLC, a California limited liability company, ACAP Farms, LLC, a California limited liability company, Lincoln Grantor Farms, LLC, a California limited liability company, Copper Avenue Investments, LLC, a California limited liability company, and Willow Avenue Investments, LLC, a California limited liability company. Borrower Parties' address is 5260 N. Palm Ave. Ste. 421, Mail Stop M, Fresno, CA 93704.

**(D) "Trustee"** is Old Republic Title Company.

**(E) "Note"** means Borrower Parties' promissory note dated February 2, 2023, in the original principal amount of $7,400,000.00. Borrower Parties have promised to pay this debt in regular Periodic Payments and to pay Notes in full not later than February 2, 2028.

**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the

**CALIFORNIA**

1

Recorded at Request of
Old Republic Title Company   QPN

14210002561-DB



Recording Requested By:

**Conterra Agricultural Capital, LLC**

After Recording Return To:

**Conterra Agricultural Capital, LLC**
**5465 Mills Civic Parkway, Suite 201**
**West Des Moines, IA 50266**
**Attn: Taylor Petersen**

Exempt from fee per GC 27388.1;
fee cap of $225 reached

24 pqs _____ [Space Above This Line For Recording Data] _____

# DEED OF TRUST
## Security Agreement, Assignment of Rents and Fixture Filing

**Loan #R4030**

**DEFINITIONS**

Words used in multiple sections of this document are defined below and other words are defined in certain Sections of this document. Certain rules regarding the usage of words used in this document are also provided in Section 13.

**(A) "Security Instrument"** means this document, which is dated **February 2, 2023**, together with all Riders to this document.

**(B) "Lender"** is **Conterra Agricultural Capital, LLC**. Lender is a **limited liability company** organized and existing under the laws of **Iowa**. Lender's address is **5465 Mills Civic Parkway, Suite 201, West Des Moines, IA 50266**. Lender is the beneficiary under this Security Instrument.

**(C) "Borrowers"** are **C & A Farms, LLC, a California limited liability company, Cantua Orchards, LLC, a California limited liability company,** and **Gradon Farms, LLC, a California limited liability company**. Borrowers are trustors under this Security Instrument. **"Borrower Parties"** are Borrower and **Maricopa Orchards, LLC, a California limited liability company, ACAP Farms, LLC, a California limited liability company, Lincoln Grantor Farms, LLC, a California limited liability company, Copper Avenue Investments, LLC, a California limited liability company,** and **Willow Avenue Investments, LLC, a California limited liability company**. Borrower Parties' address is **5260 N. Palm Ave. Ste. 421, Mail Stop M, Fresno, CA 93704**.

**(D) "Trustee"** is **Old Republic Title Company**.

**(E) "Note"** means Borrower Parties' promissory note dated **February 2, 2023**, in the original principal amount of **$7,400,000.00**. Borrower Parties have promised to pay this debt in regular Periodic Payments and to pay Notes in full not later than **February 2, 2028**.

**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the

**CALIFORNIA**

1

Note, and all sums due under this Security Instrument, plus interest.

**(H) "Riders"** mean all Riders to this Security Instrument that are executed by Borrowers or Borrower Parties. The following Riders are to be executed by Borrowers or Borrower Parties:

☐  Irrigation Equipment Rider      ☐  Water Rights Rider

☐  Financial Information and Covenants Rider      ☐  Permitted Prior Encumbrance Rider

☐  Mortgage Insurance Rider      ☐  Adjustable Rate Rider

☐  Other(s):

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 4) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(L) "Periodic Payment"** means the amount due for principal and interest under the Notes.

**(M) "Successor in Interest of Borrowers"** means any party that has taken title to the Property, whether or not that party has assumed obligations of the Borrowers under this Security Instrument or of Borrower Parties under the Notes.

------------

**TRANSFER OF RIGHTS IN THE PROPERTY**
This Security Instrument secures to Lender: (i) the repayment of the Loans, and all renewals, extensions and modifications of the Notes; and (ii) the performance of Borrowers' covenants and agreements under this Security Instrument and of Borrower Parties under the Notes. For this purpose, Borrowers irrevocably grant and convey to Trustee, in trust, with power of sale, the following described property located in the **County of Fresno, State of California:**

         **See Exhibit "A" attached hereto and made a part hereof.**

which currently has the address of:

_____

**CALIFORNIA**

2

**4,357 +/- Acres**
**Fresno, Kings and Kern Counties, California**
("Property Address"):

subject only to those matters set forth in the Permitted Prior Encumbrance Rider, if said rider is attached (hereafter "Permitted Prior Encumbrances");

**TOGETHER WITH** all buildings, improvements, equipment, fixtures and permanent plantings affixed, attached to or incorporated in the real property, and all additions, replacements, and improvements hereafter made thereto or placed therein or thereon; all rights-of-way, easements, rents, issues, profits, income, proceeds and general intangibles there from, tenements, hereditaments, remainders, reversions, privileges and appurtenances thereunto belonging, however evidenced, which are used or enjoyed in connection with the real property now or hereafter owned or belonging to the Borrowers or which hereafter may be acquired by Borrowers, excluding, however, the growing crop;

**TOGETHER WITH** all water rights appurtenant to the real property, whether such water rights are riparian, appropriative or otherwise, along with all ditch and ditch rights and any shares of stock, licenses, permits and contracts evidencing such water or ditch rights appurtenant to the property, and all wells, reservoirs, dams, embankments or fixtures located on the real property;

**TOGETHER WITH** all windmills, pumps, irrigation equipment, motors, engines, and devices of every kind, with the exception of rolling stock, now or hereafter attached or affixed to the real property, or for stock watering or domestic purposes thereon, and all grain bins and storage bins, which are owned by Borrowers and which are attached or affixed to the real property in **Fresno County, California**, described above together with all additional accessions, replacements, improvements, repairs and substitutions to said property and the proceeds thereof and all other fixtures now or hereafter attached or affixed to the real property, all of which are declared to be appurtenant to said real property, or incident to the ownership thereof;

**TOGETHER WITH** all judgments, awards of damages, settlements and payments or security (i) hereafter made as a result of or in lieu of any taking of all or any part of the real property under the power of eminent domain or for any damage to the real property and/or the improvements located thereon, or any part thereof, and (ii) hereafter made for any damage to the real property and/or the improvements located thereon, or any part thereof resulting from exercise of or attempted exercise of mining rights or claims, however reserved or asserted, and resulting from the disturbance of any of the surface of the real property.  Borrowers do hereby covenant and agree that Borrowers will not give such consent as may be required of the owner for mining or other surface disturbance by the terms of any patent, deed, statute, law or otherwise, without the prior written consent of Lender;

**TOGETHER WITH** all proceeds of and any unearned premiums on any insurance policies covering the real property and/or the improvements located thereon, including, without limitation, the right to receive and apply the proceeds of any insurance judgments, or settlements made in lieu thereof, for damage to the real property and/or the improvements located thereon or the indebtedness secured thereby;

**TOGETHER WITH** all contract rights, chattel paper, documents, accounts and general intangibles, rights to performance, entitlement to payment in cash or in kind, or any other benefits under any current or future governmental program which pertain to the real property, whether now or hereafter existing or acquired, excluding crop receivables;

**TOGETHER WITH** all cash and noncash proceeds of the conversion, voluntary or involuntary, of any of the foregoing;

**TOGETHER WITH** any and all of Borrowers' right, title, and/or interest in any and all system memberships and/or ownership certificates in any non-municipal water sewer systems now or in the future serving said property.

CALIFORNIA

3

All replacements and additions shall also be covered by this Security Instrument.

All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWERS COVENANT that Borrowers are lawfully seized of the estate hereby conveyed and have the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record and specifically those permitted prior encumbrances, if any, set forth in the Permitted Prior Encumbrances Rider, if said rider is attached to this Security Instrument. Borrowers warrant and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property and fixtures.

UNIFORM COVENANTS. Borrowers covenant and agree as follows:

**1. Payment of Principal, Interest, Prepayment Charges, Yield Maintenance Premiums and Late Charges.** Borrowers and/or Borrower Parties shall pay when due the principal of, and interest on, the debt evidenced by the Notes and any yield maintenance premiums, any prepayment charges and late charges due under the Notes. Payments due under the Notes and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Notes or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Notes and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Notes or at such other location as may be designated by Lender in accordance with the notice provisions in Section 12. Lender may return any payment or partial payment if the payment or partial payment is insufficient to bring the Loans current. Lender may accept any payment or partial payment insufficient to bring the Loans current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payment in the future. No offset or claim which Borrowers might have now or in the future against Lender shall relieve Borrowers or Borrower Parties from making payments due under the Notes and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Unless required otherwise by Applicable Law, payments will be applied as set forth under the Notes.

If Lender receives a payment from Borrowers or Borrower Parties for a delinquent Periodic Payment that includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrowers and/or Borrower Parties to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Notes shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Charges; Liens.** Excluding liens associated with operating lines of credit that are secured by a growing crop and other personal property (each a "Crop Loan"), Borrowers shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any.

Borrowers shall promptly discharge any lien which has priority over this Security Instrument unless Borrowers: (a) agree in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrowers are performing such agreement; (b) contest the lien in good faith by, or defend against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secure from the holder of the lien an

CALIFORNIA

4

agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrowers a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrowers shall satisfy the lien or take one or more of the actions set forth above in this Section 3.

Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender, defined below, on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances. Lender may require Borrowers and/or Borrower Parties to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with the Loans.

**4. Property Insurance.** Borrowers shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loans. The insurance carrier providing the insurance shall be chosen by Borrowers subject to Lender's right to disapprove Borrowers' choice, which right shall not be exercised unreasonably. Lender may require Borrowers to pay, in connection with the Loans, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrowers shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrowers.

If Borrowers fail to maintain any of the coverages described above, such failure shall constitute a default under the terms of this Security Instrument and the Loans. Lender may obtain insurance coverage, at Lender's option and Borrowers' expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrowers, Borrowers' equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrowers acknowledge that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrowers could have obtained. Any amounts disbursed by Lender under this Section 4 shall become additional debt of Borrowers and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the rate(s) under the Notes from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrowers requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrowers shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrowers obtain any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrowers shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrowers. Unless Lender and Borrowers otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrowers or Borrower Parties any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrowers or Borrower Parties shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrowers and Borrower Parties. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrowers and Borrower Parties. Such insurance proceeds shall be applied in the

CALIFORNIA

order provided for in Section 2.

If Borrowers abandon the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrowers do not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 25 or otherwise, Borrowers hereby assign to Lender (a) Borrowers' and Borrower Parties' rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Notes or this Security Instrument, and (b) any other of Borrowers' rights (other than the right to any refund of unearned premiums paid by Borrowers or Borrower Parties) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Notes or this Security Instrument, whether or not then due.

**5. Preservation, Maintenance and Protection of the Property; Inspections.** Borrowers shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property, excluding ordinary wear and tear, ordinary farming practices and normal maturity of any permanent crop. Borrowers shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 4 that repair or restoration is not economically feasible, Borrowers shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrowers shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrowers are not relieved of Borrowers' obligation for the completion of such repair or restoration.

Borrowers will operate the Property in a good and workmanlike manner and in accordance with all Applicable Law and will pay all fees and charges of any kind in connection therewith. If applicable, Borrowers will use good farming and animal husbandry practices.

Lender or its agent may make reasonable entries upon and inspections of the Property with forty-eight (48) hours' advance written notice. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrowers notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**6. Loan Application.** Borrowers shall be in default if, during the Loan application process, Borrowers or Borrower Parties or any persons or entities acting at the direction of Borrowers or Borrower Parties or with Borrowers' or Borrower Parties' knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loans.

**7. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** Subject to any subordination or Intercreditor agreement entered into between Lender and the Crop Loan lender, and provided notice pursuant to Section 23 has been given to Borrowers, if (a) Borrowers fail to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrowers have abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding, (d) perform any farming operations related to the planting, growing, maintenance, and harvesting of crops located on the Property, and (e) perform any ranching operations related to any animals located on the Property. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 7, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed

CALIFORNIA

6

that Lender incurs no liability for not taking any or all actions authorized under this Section 7. Lender may perform these or any other actions it deems necessary in Lender's sole discretion to preserve the value of the Property, and/or assign to others the right to do same on behalf of Lender. Lender may make advances under this Security Instrument or other instrument providing security for the Notes, to protect the Lender's interest in this security instrument or other instrument providing security for the Notes from loss of value or damage. Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate indicated in the Notes shall become an obligation due and owing under the terms of the Notes immediately upon the date advanced by Lender and is an obligation of the Borrowers secured by the Security Instrument or other instrument providing security for the Notes.

Any amounts disbursed by Lender under this Section 7 shall become additional debt of Borrowers and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the rate(s) under the Notes from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrowers and/or Borrower Parties requesting payment.

If this Security Instrument is on a leasehold, Borrowers shall comply with all the provisions of the lease. Borrowers shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrowers shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrowers acquire fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**8. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrowers or Borrower Parties any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrowers or Borrower Parties. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrowers or Borrower Parties.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrowers and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrowers.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrowers and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrowers, or if, after notice by Lender to Borrowers that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrowers and Borrower Parties fail to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrowers Miscellaneous Proceeds or the

CALIFORNIA

7

party against whom Borrowers have a right of action in regard to Miscellaneous Proceeds.

Borrowers shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or material impairment to the value of Lender's interest in the Property or rights under this Security Instrument. Borrowers can cure such a default and, if acceleration has occurred, reinstate as provided in Section 16, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**9. Borrowers Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrowers or any Successor in Interest of Borrowers shall not operate to release the liability of Borrowers or any Successors in Interest of Borrowers. Lender shall not be required to commence proceedings against any Successor in Interest of Borrowers or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrowers or any Successors in Interest of Borrowers. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from Borrowers, third persons, entities or Successors in Interest of Guarantors or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**10. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrowers covenant and agree that Borrowers' obligations and liability shall be joint and several. Subject to the provisions of Section 15, any Successor in Interest of Borrowers who assumes Borrowers' obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrowers' rights and benefits under this Security Instrument. Borrowers shall not be released from Borrowers' obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 17) and benefit the successors and assigns of Lender.

**11. Loan Charges.** Lender may charge Borrowers fees for services performed in connection with Borrowers' default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrowers shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loans are subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loans exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrowers which exceeded permitted limits will be refunded to Borrowers. Lender may choose to make this refund by reducing the principal owed under the Notes or by making a direct payment to Borrowers or Borrower Parties. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Notes). Borrowers' or Borrower Parties' acceptance of any such refund made by direct payment to Borrowers or Borrower Parties will constitute a waiver of any right of action Borrowers or Borrower Parties might have arising out of such overcharge.

**12. Notices.** All notices given by Borrowers or Lender in connection with this Security Instrument must be in writing. Any notice to Borrowers in connection with this Security Instrument shall be deemed to have been given to Borrowers when mailed by first class mail or when actually delivered to Borrowers' notice address if sent by other means. The notice address shall be Borrowers' Address unless Borrowers have designated a substitute notice address by notice to Lender. Borrowers shall promptly notify Lender of Borrowers' change of address. If Lender specifies a procedure for reporting Borrowers' change of address, then Borrowers shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrowers. Any notice in connection with this Security

CALIFORNIA

Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**13. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Notes conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Notes which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**14. Borrowers' Copy.** Borrowers and Borrower Parties shall be given one copy of each of the Notes and of this Security Instrument.

**15. Transfer of the Property or a Beneficial Interest in Borrowers.** As used in this Section 15, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrowers at a future date to a purchaser, excluding, however, easements granted by Borrowers in the ordinary course of business.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if any of the Borrowers are not a natural person and a beneficial interest in such of the Borrowers is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrowers notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 12 within which Borrowers must pay all sums secured by this Security Instrument. If Borrowers fail to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrowers.

Borrowers may request Lender to release one or more parcels that make up the Property, from time to time, from the lien of the Deed of Trust (the "Partial Release") and Lender agrees to not unreasonably withhold its consent to the Partial Release, subject to the prior satisfaction of the condition that Borrowers shall submit a formal written request for the Partial Release (the "Request") not less than forty-five (45) days prior to the date upon which Borrowers desire to close the transfer of the parcel subject to the Partial Release (the "Release Parcel"). No more than three (3) Requests shall be made per calendar year. The Request shall be sufficiently detailed and include all necessary documentation so as to allow Lender adequate time to process the Partial Release.

Notwithstanding the foregoing, upon the written request of Borrowers, Lender will subordinate its interest in any personal property, crops growing or to be grown on the Property, crop receivables, and all governmental payments relating to such crops (the "Crops"), but not to trees, irrigation equipment, water rights and permanent plantings, to the security interest of an institutional lender (a "Crop Lender") for one or more loans made to Borrowers or Borrower Parties to finance the production of crops on all or any portion of the Property ("Operating Financing"). Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances.

**16. Right to Reinstate After Acceleration.** If Borrowers meet certain conditions, Borrowers shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrowers' right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrowers: (a) pay Lender all sums which then would be due under

CALIFORNIA

9

this Security Instrument and the Notes as if no acceleration had occurred; (b) cure any default of any other covenants or agreements; (c) pay all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) take such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrowers' obligations to pay the sums secured by this Security Instrument, shall continue unchanged.  Lender may require that Borrowers pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer.  Upon reinstatement by Borrowers, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred.  However, this right to reinstate shall not apply in the case of acceleration under Section 15.

    **17. Sale of Notes; Change of Loan Servicer; Notice of Grievance.**  The Notes or a partial interest in the Notes (together with this Security Instrument) can be sold one or more times without prior notice to Borrowers or Borrower Parties.

    Neither Borrowers nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrowers or Lender has notified the other parties (with such notice given in compliance with the requirements of Section 12) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action.  If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph.  The notice of acceleration and opportunity to cure given to Borrowers pursuant to Section 25 and the notice of acceleration given to Borrowers pursuant to Section 15 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 17.

    **18. Hazardous Substances.**  As used in this Section 18: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

    Borrowers shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property, other than the presence, use, storage and disposal of Hazardous Substances in quantities as necessary for Borrowers' and Borrower Parties' normal farming or other commercial operations located on the Property, all of which Borrowers covenant have and will be used, stored, and disposed of in accordance with commercially reasonable practices and all applicable environmental laws. Borrowers shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property.  The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal farming and residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

    Borrowers shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrowers or Borrower Parties have actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property.  If Borrowers learn, or are notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrowers shall

CALIFORNIA

promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup. Borrowers agree to indemnify and hold Lender free and harmless from and against all loss, costs (including attorneys' fees and costs), damage (including consequential damages), and expenses Lender may sustain by reason of the assertion against Lender by any third-party of any claim in connection with Hazardous Substances on, in or affecting the Property. Borrowers further agree that Lender shall have the right to join and participate in, as a party if it so elects, any legal proceedings or actions initiated in connection with any claims related to Hazardous Substances on, in or affecting the Property, and shall pay any such attorney fees and expenses Lender incurs in connection therewith.

**19. Additional Property Subject To The Security Instrument.** This Security Instrument also constitutes a security agreement within the meaning of the Uniform Commercial Code as adopted in the **State of California** (the "UCC"). In addition to the Property described in the Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in or on the Listed Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling, attached floor coverings, irrigation equipment (including, but not limited to, irrigation pipes and pumps, center irrigation pivots, pvc pipe, sprinklers, motors, well equipment, pumps and power units), livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom, and any substitutions or replacements therefore, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Borrowers or Borrower Parties to collect or enforce payment thereof, as well as to enforce any guarantees of the forgoing and security therefor, and all of Borrowers' and Borrower Parties' present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this Security Instrument as the "Property."

**20. Fixture Filing.** This Security Instrument constitutes a "fixture filing" for the purposes of the UCC against all of the Property which is or is to become fixtures per the UCC.

**21. Use of Property; Compliance With Law.** Borrowers shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrowers shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**22. Assignment of Leases.** Upon Lender's request after default, Borrowers shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**23. Assignment of Rents; Appointment of Receiver; Lender In Possession.** Borrowers absolutely and unconditionally assign and transfer to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrowers authorize Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrowers or Borrower Parties shall receive the Rents until (i) Lender has given Borrowers notice of default pursuant to Sections 12 and 25 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notices of default to Borrowers: (i) all Rents received by Borrowers or Borrower Parties shall

CALIFORNIA

11

be held by Borrowers or Borrower Parties as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrowers agree that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorneys' fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrowers and Borrower Parties to Lender secured by the Security Instrument pursuant to Section 7 of the Security Instrument.

Borrowers represent and warrant that Borrowers have not executed any prior assignment of the Rents and have not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrowers. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**24. Cross-Default Provision.** Borrowers' or Borrower Parties' default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

NON-UNIFORM COVENANTS. Borrowers further covenant and agree as follows:

**25. Acceleration; Remedies. Following Borrowers' breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 15 unless Applicable Law provides otherwise) and prior to acceleration or Lender's exercise of any remedy, Lender shall give at least sixty (60) days written notice to Borrowers prior to exercising any remedy, unless otherwise provided under this Deed of Trust; provided, however, if such default cannot be cured within the 60-day period and Borrowers have commenced and diligently pursues the cure of the related default, Borrowers shall have such time as is commercially reasonably necessary for Borrowers to complete the cure, provided Lender is not materially prejudiced from such delay. Lender shall use commercially reasonable standards to determine if it is materially prejudiced by the delay. The notice shall specify: (a) the default; (b) the action required to cure the default; (c) the date by which the default must be cured. The notice shall further inform Borrowers of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrowers to acceleration and sale. If the default is not cured on or before the date specified in the notice or such extended period for defaults which cannot be cured within the 60-day period, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 25, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrowers and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrowers, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the**

CALIFORNIA

12

notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**26. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**27. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrowers, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**28. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

**29. Other California State Specific Provisions.**

(a)    In addition to the provisions of any loan agreement, Borrowers further agree that, if Lender accepts a guaranty of only a portion of the Indebtedness, Borrowers waive any right under California Civil Code Section 2822(a) to designate the portion of the Indebtedness which shall be satisfied by a guarantor's partial payment.

(b)    Except for matters covered by an O&M Program or matters described in any environmental indemnity agreement, Borrowers shall not cause or permit any lien (whether or not such lien has priority over the lien created by this Security Instrument) upon the Property imposed pursuant to any Environmental Laws. Any such lien shall be considered a Prohibited Activity or Condition (as may also be contemplated in any environmental indemnity agreement).

(c)    Borrowers represent and warrant to Lender that, except as previously disclosed by Borrowers or Borrower Parties to Lender in writing:

(1)    at the time of acquiring the Property, Borrowers undertook all appropriate inquiry into the previous ownership and uses of the Property consistent with good commercial or customary practice and no evidence or indication came to light which would suggest that the Property has been or is now being used for any Prohibited Activities or Conditions; and

(2)    the Property has not been designated as "hazardous waste property" or "border zone property" pursuant to Section 25220, et seq., of the California Health and Safety Code.

The representations and warranties in this Security Instrument shall be continuing representations and warranties that shall be deemed to be made by Borrowers throughout the term of the Loans, until the Indebtedness has been paid in full.

CALIFORNIA

(d)      Without limiting any of the remedies provided in this Security Instrument, Borrowers acknowledge and agrees that certain provisions in this Security Instrument are environmental provisions (as defined in Section 736(f)(2) of the California Code of Civil Procedure) made by Borrowers relating to the real property security (the "**Environmental Provisions**"), and that to the extent applicable, Borrowers' failures to comply with any of the Environmental Provisions will be a breach of contract that will entitle Lender to pursue the remedies provided by Section 736 of the California Code of Civil Procedure for the recovery of damages and for the enforcement of the Environmental Provisions.

Except as otherwise stated herein, nothing in the provisions of this Amendment shall be deemed in any way to affect the priority of the Original Deed of Trust over any other lien, charge, encumbrance or conveyance, or to release or change the liability of any party who may be liable under the Note.

*[remainder of page intentionally left blank – signature page follows]*

**CALIFORNIA**

BY SIGNING BELOW, Borrowers accept and agree to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrowers or Borrower Parties.

**BORROWERS:**

**C & A FARMS, LLC,**
a California limited liability company
_____
By:  Farshid Assemi
Its:  Manager

**ACAP FARMS, LLC,**
a California limited liability company
_____
By:  Farshid Assemi
Its:  Manager

**LINCOLN GRANTOR FARMS, LLC,**
a California limited liability company
_____
By:  Neema Assemi
Its:  Manager

**CANTUA ORCHARDS, LLC,**
a California limited liability company
_____
By:  Farshid Assemi
Its:  Manager

**GRADON FARMS, LLC,**
a California limited liability company
_____
By:  Neema Assemi
Its:  Manager

**CALIFORNIA**

15

A notary public or other officer completing this
certificate verifies only the identity of the individual
who signed the document to which this certificate
is attached, and not the truthfulness, accuracy, or
validity of that document.

STATE OF CALIFORNIA
COUNTY OF __Fresno__

On __1/25/2023__ before me, __L. Díaz, Notary Public__, personally appeared
**Farshid Assemi**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and
that by his signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed
the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

Notary Public
Printed Name: __L. Díaz__
My commission expires: __April 20, 2026__

```
L. DIAZ
Notary Public - California
Fresno County
Commission # 2398671
My Comm. Expires Apr 20, 2026
```

A notary public or other officer completing this
certificate verifies only the identity of the individual
who signed the document to which this certificate
is attached, and not the truthfulness, accuracy, or
validity of that document.

STATE OF CALIFORNIA
COUNTY OF __Fresno__

On __1/25/2023__ before me, __L. Díaz, Notary Public__, personally appeared
**Neema Assemi**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and
that by his signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed
the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

Notary Public
Printed Name: __L. Díaz__
My commission expires: __April 20, 2026__

```
L. DIAZ
Notary Public - California
Fresno County
Commission # 2398671
My Comm. Expires Apr 20, 2026
```

**CALIFORNIA**

16

**ORDER NO. :** 1421002561

# EXHIBIT A

**TRACT II:**

**The land referred to below is situated in an unincorporated area of the County of Fresno, State of California:**

PARCEL 9:

The North half of the Northeast Quarter of Section 22, Township 16 South, Range 14 East, Mount Diablo Base and Meridian, according to the Plat thereof.

EXCEPTING THEREFROM the North 50 feet, as conveyed to the County of Fresno in Deed recorded April 22, 1970 in Book 5780, Page 78 of Official Records.

APN: 038-141-21S
PARCEL 10:

The Northwest quarter of Section 8, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof;

EXCEPTING THEREFROM an undivided one-half interest in and to all oil, gas, minerals and other hydrocarbon substances now or at any time situate in and under said land, as reserved in the deed from R. T. Hughes and Bess L. Hughes, husband and wife, to John H. Edgar and Ruby Dale Edgar, husband and wife, as joint tenants, July 10, 1950, recorded January 24, 1950 in Book 2829 Page 69 of Official Records, Document No. 4385.

ALSO EXCEPTING THEREFROM an undivided one-fourth interest in and to all oil, gas and other hydrocarbons and minerals now or at any time hereinafter situate therein and thereunder, together with all easements and rights necessary or convenient for the production, storage and transportation thereof and the exploration and testing of the said real property, and also the right to drill for, produce and use water from the said real property in connection with drilling or mining operations thereon, as reserved in the deed from Raymond Dale Johnson to Bernie Thurman and James V. Gregory, as Trustees for Tanya Marie Marshall under that certain irrevocable Trust Agreement dated May 30, 1974, recorded on June 25, 1974 as Document No. 47802.

APN: 040-020-18-S

PARCEL 11:

The East half of the Northwest quarter of the Northeast quarter of the Northwest quarter; the West half of the Northeast quarter of the Northeast of the Northwest quarter; and the East half of the Northeast quarter of the Northeast quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the East 420.9 feet of the North half of the Northeast quarter of the Northeast quarter of the Northwest quarter of said Section 7.

ALSO EXCEPTING THEREFROM commencing at the Northwest corner of the East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7, running thence East along the North boundary line of said Section 7; 4.09 feet; thence in a Southerly direction in a straight line to a point on the South boundary line of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7, said point being 17 feet East of the Southwest corner of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7; thence West along the South boundary line of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7; 17 feet to the Southwest corner of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7; thence North along the West boundary line of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7 to the said Northwest corner of the said East half of the Northwest quarter of the Northeast quarter of the Northeast quarter of said Section 7.

APN: 464-20-07

PARCEL 12:

The West 161 feet of the East 420.9 feet of the North half of the Northeast quarter of the Northeast quarter of the Northwest quarter of Section 17, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN: 464-020-08

PARCEL 13:

The North half of the East 259.9 feet of the East half of the Northeast quarter of the Northeast quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof; said 259.9 feet measured from the East line of said Northwest quarter of said section.

APN: 464-020-09

PARCEL 14:

The North half of the Northeast quarter of the Southeast quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN: 464-020-12

PARCEL 15:

The North half of the Northwest quarter of the Southeast quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN: 464-020-13

PARCEL 16:

The South one-half of the Northeast one-quarter of the Northwest one-quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the East 195 feet of the South 114 feet thereof.

ALSO EXCEPTING THEREFROM that portion lying within Parcel Map No. 82-33, according to the Map thereof recorded in Book 44, Pages 2 and 3 of Parcel Maps, Fresno County Records.

APN: 464-020-15


PARCEL 17:

The East 195 feet of the South 114 feet of the South one-half of the Northeast one-quarter of the Northwest one-quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN: 464-020-16

PARCEL 18:

The Southwest quarter of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN: 464-020-19

PARCEL 19:

The South three-fourths of the Southeast quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the South 351 feet of the East 340 feet thereof.

APN: 464-020-25

PARCEL 20:

Parcel "A" of Parcel Map No. 82-33, according to the Map thereof recorded in Book 44, Pages 2 and 3 of Parcel Maps, Fresno County Records.

APN: 464-020-26

PARCEL 20-A:

A right of way for road purposes over the Westerly 30 feet of the East 330 feet of the East half of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM that portion lying within Parcel Ten described therein.

PARCEL 21:

The fractional Southwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the East 990 feet thereof.

APN: 464-020-28
PARCEL 22:

The West 330 feet of the East 990 feet of the fractional Southwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN: 464-020-29

PARCEL 23:

The West 330 feet of the East 660 feet of the fractional Southwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN: 464-020-30

PARCEL 24:

The East 330 feet of the fractional Southwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN: 464-020-31

PARCEL 25:

Parcel B of Parcel Map No. 82-33, according to the Map thereof recorded in Book 44, Pages 2 and 3 of Parcel Maps, Fresno County Records.

APN: 464-020-34

PARCEL 26:

The East 125 feet of the Northwest quarter of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM that portion conveyed to the State of California, by Deed recorded July 31, 2003, as Document No. 2003-0173909, Official Records.

APN: 464-020-35

PARCEL 27:

The East half of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the East 330 feet thereof.

ALSO EXCEPTING THEREFROM that portion of said land as conveyed to the State of California by Grant Deed recorded July 31, 2003, as Document No. 2003-0173909, Official Records.

APN: 464-020-36

PARCEL 28:

The Northwest quarter of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the West 200 feet thereof.

EXCEPTING THEREFROM the East 125 feet thereof.

ALSO EXCEPTING THEREFROM that portion conveyed to the State of California in the Deed recorded January 12, 2004, as Document No. 2004-0007899, Official Records.

APN: 464-020-37

PARCEL 29:

All of Briscoe Tract, a Subdivision of the East half of the Southwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, unincorporated area, County of Fresno, State of California, except Lot 3 of Briscoe Tract, the same being in Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, unincorporated area, County of Fresno, State of California.

ALSO EXCEPTING THEREFROM that portion conveyed to the Fresno Irrigation District by Deed recorded February 13, 2006, as Instrument No. 2006-0031312 of Official Records.

APN: 464-060-17

PARCEL 30:

Lots 13, 14, 15 and 16 of Pleasant Dale, in the City of Fresno, County of Fresno, State of California, according to the Map thereof recorded in Book 2, Page 38 of Plats, in the Office of the County Recorder of said County.

TOGETHER WITH that portion of abandoned South Pleasant Avenue, which would pass by operation of law

APN: 477-021-09

PARCEL 31:

The South half of Lot 2, all of Lot 3 and the North half of Lot 4 of Pleasant Dale, according to the Map thereof recorded December 30, 1887, in Book 2, Page 38 of Plats, Fresno County Records.

PARCEL 31-A:

An easement for a right of way or right to maintain, repair and replace an underground water pipe system as created in that certain Grant of Easement (Agreement) by and between Henry N. Tsuruoka and Lily V. Tsuruoka, husband and wife, and Albert Medzadoorian, recorded March 23, 1979 in Book 7246 of Official Records, Page 579, Instrument No. 34238, and being further described as follows:

That certain 10-foot strip of land lying 5 feet on each side of the following described centerline:

Commencing at the North corner of Section 18, Township 14 South, Range 20 East, M.D.B.M.; thence South along the East line of the Northwest $1/4$ of said Section 18, a distance of 32.96 feet; thence West a distance of 77.95 feet to the true point of beginning; thence South 75° 33′ 40″ East, a distance of 18.00 feet; thence South 39° 51′ 05″ East, a distance of 38.13 feet; thence South 00° 58′ 30″, a distance of 447.09 feet to the North line of the South $1/2$ of Lot 2 of Pleasant Dale, Plats Book 2, Page 38, Fresno County Records.

APN: 477-021-11

PARCEL 32:

The Easterly 200.00 feet of the Southerly 270.00 feet of Lot 9 of Pleasant Dale, according to the Map thereof recorded in Book 2, Page 38 of Plats, Fresno County Records.

APN: 477-021-18

PARCEL 32-A:

A non-exclusive easement thirty (30) foot wide road right of way being described as follows:

The South 30.00 feet of the West 120.00 feet of the East 320.00 feet of Lot 9 of Pleasant Dale according to the Map thereof recorded in Book 2, Page 38 of Plats, Fresno County Records.

PARCEL 32-B:

A non-exclusive five (5) foot wide right of way for maintenance, repairs, operations, additions, alterations and betterments for a water pipeline, the centerline of said right of way being described as follows:

Commencing at a point on the Westerly line of that certain parcel of land, said point bearing South 89° 14′ 00″ West, 200.00 feet and North 0° 21′ 43″ East, 32.70 feet from the Southeast corner of Lot 9 of Pleasant Dale according to the Map thereof recorded in Book 2, Page 38 of Plats, Fresno County Records; thence South 89° 14′ 00″ West, 67.74 feet; thence South 0° 21′

45" West, 6.50 feet to a point South 0° 21' 45" West, 2.50 feet from an existing domestic water well.

PARCEL 33:

Lots 9, 10, 11 and 12 of Pleasant Dale, according to the Map thereof recorded in Book 2, Page 38 of Plats, Fresno County Records.

EXCEPTING THEREFROM the Easterly 200.00 feet of the Southerly 270.00 feet of said Lot 9.

ALSO EXCEPTING THEREFROM the Westerly 170.00 feet of the Southerly 270.00 feet of said Lot 9.

APN: 477-021-19

PARCEL 34:

The un-numbered Lot lying West of, and adjoining, Lots 21, 22, 23 and 234 of Pleasant Dale, according to the Map thereof, recorded in Book 2, Page 38 of Plats, Fresno County Records.

Said property is also described as the West one-half of the Southwest quarter of the fractional Northwest quarter of Section 18, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the North 214.29 feet of the South 627.7 feet to the West 280.00 feet thereof.

*and*

Lots 21, 22, 23 and 24 of pleasant dale according to the Map thereof recorded December 30, 1887, in Book 2, Page 38 of Plats, Fresno County Records.

APN: 477-021-20

PARCEL 35:

The West 330 feet of the West one-half of the Northwest quarter of the Northwest quarter of Section 18, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM that portion described in the Deed to the City of Fresno recorded November 14, 2003, as Document No. 2003-0276316, Official Records.

*and*

Lot 20 of Pleasant Dale, according to the Map thereof recorded in Book 2, Page 38 of Plats, Fresno County Records.

EXCEPTING THEREFROM that portion described in the Deed to the City of Fresno recorded November 14, 2003, as Document No. 2003-0276316, Official Records.

*and*

Beginning at a point on the North line of the Northwest quarter of Section 18, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof, 1980 feet West of the Northeast corner of the Northwest quarter of said Section; thence South 0° 35' East, 1321 feet to a point on the South line of the North half of the Northwest quarter of said Section distant 1970.5 feet South 89° 55' West from the Southeast corner of the Northeast quarter of the Northwest quarter of said Section; thence West along the South line of the North half of the Northwest quarter of said section to the West line of said section; thence North along said West line to the Northwest corner of said section; thence East along the North line of said section to the point of beginning.

EXCEPTING THEREFROM the West 330 feet thereof.

ALSO EXCEPTING THEREFROM that portion described in the Deed to the City of Fresno, recorded November 14, 2003, as Document No. 2003-0276316, Official Records.

APN: 477-021-25

PARCEL 36:

Lots 3, 4, 5 and 6 of West Villa Tract, according to the Map thereof, filed for record in Book 2, Page 49 of Plats, Fresno County Records.

APN: 464-070-10; and 464-070-11

PARCEL 37:

The Northwest quarter of the Southwest quarter of the Southeast quarter and the West half of the Northeast quarter of Southwest quarter of Southeast quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, in the County of Fresno, State of California, according to the United States Government Township Plats.

EXCEPTING THEREFROM that portion described in Grant Deed recorded September 8, 1982, as Instrument No. 82-77115, in Book 7969, Page 387 of Official Records.

APN: 464-101-23

# EXHIBIT C

Recorded at Request of
Old Republic Title Company ℓPN

1421002583 - 0B

Recording Requested By:

Conterra Agricultural Capital, LLC

After Recording Return To:

Conterra Agricultural Capital, LLC
5465 Mills Civic Parkway, Suite 201
West Des Moines, IA 50266
Attn: Taylor Petersen

*Exempt from fee per GC 27388.1;*
*fee cap of $225 reached*

Laura Avila, Assessor-Recorder
Kern County Official Records

BM
2/06/2023
09:15 AM

Recorded Electronically by:
451 Old Republic Title Company

DOC #: 223013715



223013715

| Stat Types: 3 | Pages: 24 |
|---|---|
| FEES | 135.00 |
| TAXES | .00 |
| OTHER | .00 |
| PAID | 135.00 |

_____ [Space Above This Line For Recording Data] _____

# DEED OF TRUST
## Security Agreement, Assignment of Rents and Fixture Filing

**Loan #R4030**

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in certain Sections of this document. Certain rules regarding the usage of words used in this document are also provided in Section 13.

**(A) "Security Instrument"** means this document, which is dated **February 2, 2023**, together with all Riders to this document.

**(B) "Lender"** is **Conterra Agricultural Capital, LLC**. Lender is a limited liability company organized and existing under the laws of Iowa. Lender's address is **5465 Mills Civic Parkway, Suite 201, West Des Moines, IA 50266**. Lender is the beneficiary under this Security Instrument.

**(C) "Borrowers"** are **Maricopa Orchards, LLC, a California limited liability company, C&A Farms, LLC, a California limited liability company, and Willow Avenue Investments, LLC, a California limited liability company.** Borrowers are trustors under this Security Instrument. **"Borrower Parties"** are Borrowers and Copper Avenue Investments, LLC, a California limited liability company and ACAP Farms, LLC, a California limited liability company, Lincoln Grantor Farms, LLC a California limited liability company, Cantua Orchards, LLC, a California limited liability company, Gradon Farms, LLC, a California limited liability company. Borrower Parties' address is **5260 N. Palm Ave. Ste. 421, Mail Stop M, Fresno, CA 93704.**

**(D) "Trustee"** is **Old Republic Title Company.**

**(E) "Note"** means Borrower Parties' promissory note dated **February 2, 2023**, in the original principal amount of **$7,400,000.00**. Borrower Parties have promised to pay this debt in regular Periodic Payments and to pay Notes in full not later than **February 2, 2028.**

**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the

CALIFORNIA

1

Recorded at Request of
Old Republic Title Company ℓPℕ



1421002583 -DB

Recording Requested By:

**Conterra Agricultural Capital, LLC**

After Recording Return To:

**Conterra Agricultural Capital, LLC**
**5465 Mills Civic Parkway, Suite 201**
**West Des Moines, IA 50266**
**Attn: Taylor Petersen**

Exempt from fee per GC 27388.1;
fee cap of $225 reached

_____ [Space Above This Line For Recording Data] _____

# DEED OF TRUST
## Security Agreement, Assignment of Rents and Fixture Filing

**Loan #R4030**

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in certain Sections of this document. Certain rules regarding the usage of words used in this document are also provided in Section 13.

**(A) "Security Instrument"** means this document, which is dated **February 2, 2023**, together with all Riders to this document.

**(B) "Lender"** is **Conterra Agricultural Capital, LLC**. Lender is a **limited liability company** organized and existing under the laws of **Iowa**. Lender's address is **5465 Mills Civic Parkway, Suite 201, West Des Moines, IA 50266**. Lender is the beneficiary under this Security Instrument.

**(C) "Borrowers"** are **Maricopa Orchards, LLC, a California limited liability company, C&A Farms, LLC, a California limited liability company,** and **Willow Avenue Investments, LLC, a California limited liability company**. Borrowers are trustors under this Security Instrument. **"Borrower Parties"** are **Borrowers and Copper Avenue Investments, LLC, a California limited liability company** and **ACAP Farms, LLC, a California limited liability company, Lincoln Grantor Farms, LLC a California limited liability company, Cantua Orchards, LLC, a California limited liability company, Gradon Farms, LLC, a California limited liability company.** Borrower Parties' address is **5260 N. Palm Ave. Ste. 421, Mail Stop M, Fresno, CA 93704**.

**(D) "Trustee"** is **Old Republic Title Company**.

**(E) "Note"** means Borrower Parties' promissory note dated **February 2, 2023**, in the original principal amount of **$7,400,000.00**. Borrower Parties have promised to pay this debt in regular Periodic Payments and to pay Notes in full not later than **February 2, 2028.**

**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the
**CALIFORNIA**

1

Note, and all sums due under this Security Instrument, plus interest.

**(H) "Riders"** mean all Riders to this Security Instrument that are executed by Borrowers or Borrower Parties. The following Riders are to be executed by Borrowers or Borrower Parties:

☐ Irrigation Equipment Rider                    ☐ Water Rights Rider

☐ Financial Information and Covenants Rider     ☐ Permitted Prior Encumbrance Rider

☐ Mortgage Insurance Rider                      ☐ Adjustable Rate Rider

☐ Other(s):

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 4) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(L) "Periodic Payment"** means the amount due for principal and interest under the Notes.

**(M) "Successor in Interest of Borrowers"** means any party that has taken title to the Property, whether or not that party has assumed obligations of the Borrowers under this Security Instrument or of Borrower Parties under the Notes.

---

**TRANSFER OF RIGHTS IN THE PROPERTY**

This Security Instrument secures to Lender: (i) the repayment of the Loans, and all renewals, extensions and modifications of the Notes; and (ii) the performance of Borrowers' covenants and agreements under this Security Instrument and of Borrower Parties under the Notes. For this purpose, Borrowers irrevocably grant and convey to Trustee, in trust, with power of sale, the following described property located in the **County of Kern, State of California**:

       **See Exhibit "A" attached hereto and made a part hereof.**

which currently has the address of:

**4,357 +/- Acres**
**Fresno, Kings and Kern Counties, California**
("Property Address"):

**CALIFORNIA**

subject only to those matters set forth in the Permitted Prior Encumbrance Rider, if said rider is attached (hereafter "Permitted Prior Encumbrances");

**TOGETHER WITH** all buildings, improvements, equipment, fixtures and permanent plantings affixed, attached to or incorporated in the real property, and all additions, replacements, and improvements hereafter made thereto or placed therein or thereon; all rights-of-way, easements, rents, issues, profits, income, proceeds and general intangibles there from, tenements, hereditaments, remainders, reversions, privileges and appurtenances thereunto belonging, however evidenced, which are used or enjoyed in connection with the real property now or hereafter owned or belonging to the Borrowers or which hereafter may be acquired by Borrowers, excluding, however, the growing crop;

**TOGETHER WITH** all water rights appurtenant to the real property, whether such water rights are riparian, appropriative or otherwise, along with all ditch and ditch rights and any shares of stock, licenses, permits and contracts evidencing such water or ditch rights appurtenant to the property, and all wells, reservoirs, dams, embankments or fixtures located on the real property;

**TOGETHER WITH** all windmills, pumps, irrigation equipment, motors, engines, and devices of every kind, with the exception of rolling stock, now or hereafter attached or affixed to the real property, or for stock watering or domestic purposes thereon, and all grain bins and storage bins, which are owned by Borrowers and which are attached or affixed to the  real property in **Kern County, California**, described above together with all additional accessions, replacements, improvements, repairs and substitutions to said property and the proceeds thereof and all other fixtures now or hereafter attached or affixed to the real property, all of which are declared to be appurtenant to said real property, or incident to the ownership thereof;

**TOGETHER WITH** all judgments, awards of damages, settlements and payments or security (i) hereafter made as a result of or in lieu of any taking of all or any part of the real property under the power of eminent domain or for any damage to the real property and/or the improvements located thereon, or any part thereof, and (ii) hereafter made for any damage to the real property and/or the improvements located thereon, or any part thereof resulting from exercise of or attempted exercise of mining rights or claims, however reserved or asserted, and resulting from the disturbance of any of the surface of the real property.  Borrowers do hereby covenant and agree that Borrowers will not give such consent as may be required of the owner for mining or other surface disturbance by the terms of any patent, deed, statute, law or otherwise, without the prior written consent of Lender;

**TOGETHER WITH** all proceeds of and any unearned premiums on any insurance policies covering the real property and/or the improvements located thereon, including, without limitation, the right to receive and apply the proceeds of any insurance judgments, or settlements made in lieu thereof, for damage to the real property and/or the improvements located thereon or the indebtedness secured thereby;

**TOGETHER WITH** all contract rights, chattel paper, documents, accounts and general intangibles, rights to performance, entitlement to payment in cash or in kind, or any other benefits under any current or future governmental program which pertain to the real property, whether now or hereafter existing or acquired, excluding crop receivables;

**TOGETHER WITH** all cash and noncash proceeds of the conversion, voluntary or involuntary, of any of the foregoing;

**TOGETHER WITH** any and all of Borrowers' right, title, and/or interest in any and all system memberships and/or ownership certificates in any non-municipal water sewer systems now or in the future serving said property.

All replacements and additions shall also be covered by this Security Instrument.

All of the foregoing is referred to in this Security Instrument as the "Property."

**CALIFORNIA**

3

BORROWERS COVENANT that Borrowers are lawfully seized of the estate hereby conveyed and have the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record and specifically those permitted prior encumbrances, if any, set forth in the Permitted Prior Encumbrances Rider, if said rider is attached to this Security Instrument. Borrowers warrant and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property and fixtures.

UNIFORM COVENANTS. Borrowers covenant and agree as follows:

**1. Payment of Principal, Interest, Prepayment Charges, Yield Maintenance Premiums and Late Charges.** Borrowers and/or Borrower Parties shall pay when due the principal of, and interest on, the debt evidenced by the Notes and any yield maintenance premiums, any prepayment charges and late charges due under the Notes. Payments due under the Notes and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Notes or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Notes and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Notes or at such other location as may be designated by Lender in accordance with the notice provisions in Section 12. Lender may return any payment or partial payment if the payment or partial payment is insufficient to bring the Loans current. Lender may accept any payment or partial payment insufficient to bring the Loans current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payment in the future. No offset or claim which Borrowers might have now or in the future against Lender shall relieve Borrowers or Borrower Parties from making payments due under the Notes and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Unless required otherwise by Applicable Law, payments will be applied as set forth under the Notes.

If Lender receives a payment from Borrowers or Borrower Parties for a delinquent Periodic Payment that includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrowers and/or Borrower Parties to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Notes shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Charges; Liens.** Excluding liens associated with operating lines of credit that are secured by a growing crop and other personal property (each a "Crop Loan"), Borrowers shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any.

Borrowers shall promptly discharge any lien which has priority over this Security Instrument unless Borrowers: (a) agree in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrowers are performing such agreement; (b) contest the lien in good faith by, or defend against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secure from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrowers a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrowers shall satisfy the lien or take one or more of the actions set forth above in this Section 3.

---

**CALIFORNIA**

4

Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender, defined below, on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances. Lender may require Borrowers and/or Borrower Parties to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with the Loans.

**4. Property Insurance.** Borrowers shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loans. The insurance carrier providing the insurance shall be chosen by Borrowers subject to Lender's right to disapprove Borrowers' choice, which right shall not be exercised unreasonably. Lender may require Borrowers to pay, in connection with the Loans, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrowers shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrowers.

If Borrowers fail to maintain any of the coverages described above, such failure shall constitute a default under the terms of this Security Instrument and the Loans. Lender may obtain insurance coverage, at Lender's option and Borrowers' expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrowers, Borrowers' equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrowers acknowledge that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrowers could have obtained. Any amounts disbursed by Lender under this Section 4 shall become additional debt of Borrowers and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the rate(s) under the Notes from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrowers requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrowers shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrowers obtain any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrowers shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrowers. Unless Lender and Borrowers otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrowers or Borrower Parties any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrowers or Borrower Parties shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrowers and Borrower Parties. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrowers and Borrower Parties. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrowers abandon the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrowers do not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is

CALIFORNIA

5

given. In either event, or if Lender acquires the Property under Section 25 or otherwise, Borrowers hereby assign to Lender (a) Borrowers' and Borrower Parties' rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Notes or this Security Instrument, and (b) any other of Borrowers' rights (other than the right to any refund of unearned premiums paid by Borrowers or Borrower Parties) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Notes or this Security Instrument, whether or not then due.

**5. Preservation, Maintenance and Protection of the Property; Inspections.** Borrowers shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property, excluding ordinary wear and tear, ordinary farming practices and normal maturity of any permanent crop. Borrowers shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 4 that repair or restoration is not economically feasible, Borrowers shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrowers shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrowers are not relieved of Borrowers' obligation for the completion of such repair or restoration.

Borrowers will operate the Property in a good and workmanlike manner and in accordance with all Applicable Law and will pay all fees and charges of any kind in connection therewith. If applicable, Borrowers will use good farming and animal husbandry practices.

Lender or its agent may make reasonable entries upon and inspections of the Property with forty-eight (48) hours' advance written notice. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrowers notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**6. Loan Application.** Borrowers shall be in default if, during the Loan application process, Borrowers or Borrower Parties or any persons or entities acting at the direction of Borrowers or Borrower Parties or with Borrowers' or Borrower Parties' knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loans.

**7. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** Subject to any subordination or Intercreditor agreement entered into between Lender and the Crop Loan lender, and provided notice pursuant to Section 23 has been given to Borrowers, if (a) Borrowers fail to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrowers have abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding, (d) perform any farming operations related to the planting, growing, maintenance, and harvesting of crops located on the Property, and (e) perform any ranching operations related to any animals located on the Property. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 7, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 7. Lender may perform these or any other actions it deems necessary in Lender's sole discretion to preserve the value of the Property, and/or assign to others the right to do same on behalf of Lender. Lender may make advances under this Security Instrument or other instrument providing security for the Notes, to protect the Lender's interest in this security instrument or other

CALIFORNIA

instrument providing security for the Notes from loss of value or damage. Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate indicated in the Notes shall become an obligation due and owing under the terms of the Notes immediately upon the date advanced by Lender and is an obligation of the Borrowers secured by the Security Instrument or other instrument providing security for the Notes.

Any amounts disbursed by Lender under this Section 7 shall become additional debt of Borrowers and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the rate(s) under the Notes from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrowers and/or Borrower Parties requesting payment.

If this Security Instrument is on a leasehold, Borrowers shall comply with all the provisions of the lease. Borrowers shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrowers shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrowers acquire fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**8. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrowers or Borrower Parties any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrowers or Borrower Parties. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrowers or Borrower Parties.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrowers and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrowers.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrowers and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrowers, or if, after notice by Lender to Borrowers that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrowers and Borrower Parties fail to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrowers Miscellaneous Proceeds or the party against whom Borrowers have a right of action in regard to Miscellaneous Proceeds.

Borrowers shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or material impairment to the value of Lender's interest in the Property or rights under this Security Instrument. Borrowers can cure such a default and, if acceleration has occurred,

CALIFORNIA

reinstate as provided in Section 16, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**9. Borrowers Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrowers or any Successor in Interest of Borrowers shall not operate to release the liability of Borrowers or any Successors in Interest of Borrowers. Lender shall not be required to commence proceedings against any Successor in Interest of Borrowers or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrowers or any Successors in Interest of Borrowers. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from Borrowers, third persons, entities or Successors in Interest of Guarantors or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**10. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrowers covenant and agree that Borrowers' obligations and liability shall be joint and several. Subject to the provisions of Section 15, any Successor in Interest of Borrowers who assumes Borrowers' obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrowers' rights and benefits under this Security Instrument. Borrowers shall not be released from Borrowers' obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 17) and benefit the successors and assigns of Lender.

**11. Loan Charges.** Lender may charge Borrowers fees for services performed in connection with Borrowers' default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrowers shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loans are subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loans exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrowers which exceeded permitted limits will be refunded to Borrowers. Lender may choose to make this refund by reducing the principal owed under the Notes or by making a direct payment to Borrowers or Borrower Parties. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Notes). Borrowers' or Borrower Parties' acceptance of any such refund made by direct payment to Borrowers or Borrower Parties will constitute a waiver of any right of action Borrowers or Borrower Parties might have arising out of such overcharge.

**12. Notices.** All notices given by Borrowers or Lender in connection with this Security Instrument must be in writing. Any notice to Borrowers in connection with this Security Instrument shall be deemed to have been given to Borrowers when mailed by first class mail or when actually delivered to Borrowers' notice address if sent by other means. The notice address shall be Borrowers' Address unless Borrowers have designated a substitute notice address by notice to Lender. Borrowers shall promptly notify Lender of Borrowers' change of address. If Lender specifies a procedure for reporting Borrowers' change of address, then Borrowers shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrowers. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**13. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by

CALIFORNIA

federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Notes conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Notes which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**14. Borrowers' Copy.** Borrowers and Borrower Parties shall be given one copy of each of the Notes and of this Security Instrument.

**15. Transfer of the Property or a Beneficial Interest in Borrowers.** As used in this Section 15, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrowers at a future date to a purchaser, excluding, however, easements granted by Borrowers in the ordinary course of business.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if any of the Borrowers are not a natural person and a beneficial interest in such of the Borrowers is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrowers notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 12 within which Borrowers must pay all sums secured by this Security Instrument. If Borrowers fail to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrowers.

Borrowers may request Lender to release one or more parcels that make up the Property, from time to time, from the lien of the Deed of Trust (the "Partial Release") and Lender agrees to not unreasonably withhold its consent to the Partial Release, subject to the prior satisfaction of the condition that Borrowers shall submit a formal written request for the Partial Release (the "Request") not less than forty-five (45) days prior to the date upon which Borrowers desire to close the transfer of the parcel subject to the Partial Release (the "Release Parcel"). No more than three (3) Requests shall be made per calendar year. The Request shall be sufficiently detailed and include all necessary documentation so as to allow Lender adequate time to process the Partial Release.

Notwithstanding the foregoing, upon the written request of Borrowers, Lender will subordinate its interest in any personal property, crops growing or to be grown on the Property, crop receivables, and all governmental payments relating to such crops (the "Crops"), but not to trees, irrigation equipment, water rights and permanent plantings, to the security interest of an institutional lender (a "Crop Lender") for one or more loans made to Borrowers or Borrower Parties to finance the production of crops on all or any portion of the Property ("Operating Financing"). Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances.

**16. Right to Reinstate After Acceleration.** If Borrowers meet certain conditions, Borrowers shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrowers' right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrowers: (a) pay Lender all sums which then would be due under this Security Instrument and the Notes as if no acceleration had occurred; (b) cure any default of any other covenants or agreements; (c) pay all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) take such action as Lender may reasonably

CALIFORNIA

require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrowers' obligations to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrowers pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrowers, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 15.

**17. Sale of Notes; Change of Loan Servicer; Notice of Grievance.** The Notes or a partial interest in the Notes (together with this Security Instrument) can be sold one or more times without prior notice to Borrowers or Borrower Parties.

Neither Borrowers nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrowers or Lender has notified the other parties (with such notice given in compliance with the requirements of Section 12) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrowers pursuant to Section 25 and the notice of acceleration given to Borrowers pursuant to Section 15 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 17.

**18. Hazardous Substances.** As used in this Section 18: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrowers shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property, other than the presence, use, storage and disposal of Hazardous Substances in quantities as necessary for Borrowers' and Borrower Parties' normal farming or other commercial operations located on the Property, all of which Borrowers covenant have and will be used, stored, and disposed of in accordance with commercially reasonable practices and all applicable environmental laws. Borrowers shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal farming and residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrowers shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrowers or Borrower Parties have actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrowers learn, or are notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrowers shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup. Borrowers agree to indemnify and hold Lender free and harmless from and against all loss, costs (including attorneys' fees and costs), damage (including consequential damages), and expenses Lender may sustain by reason of the assertion against Lender by any third-party of any claim in connection

---

CALIFORNIA

with Hazardous Substances on, in or affecting the Property. Borrowers further agree that Lender shall have the right to join and participate in, as a party if it so elects, any legal proceedings or actions initiated in connection with any claims related to Hazardous Substances on, in or affecting the Property, and shall pay any such attorney fees and expenses Lender incurs in connection therewith.

**19. Additional Property Subject To The Security Instrument.** This Security Instrument also constitutes a security agreement within the meaning of the Uniform Commercial Code as adopted in the **State of California** (the "UCC"). In addition to the Property described in the Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in or on the Listed Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling, attached floor coverings, irrigation equipment (including, but not limited to, irrigation pipes and pumps, center irrigation pivots, pvc pipe, sprinklers, motors, well equipment, pumps and power units), livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom, and any substitutions or replacements therefore, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Borrowers or Borrower Parties to collect or enforce payment thereof, as well as to enforce any guarantees of the forgoing and security therefor, and all of Borrowers' and Borrower Parties' present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this Security Instrument as the "Property."

**20. Fixture Filing.** This Security Instrument constitutes a "fixture filing" for the purposes of the UCC against all of the Property which is or is to become fixtures per the UCC.

**21. Use of Property; Compliance With Law.** Borrowers shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrowers shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**22. Assignment of Leases.** Upon Lender's request after default, Borrowers shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**23. Assignment of Rents; Appointment of Receiver; Lender In Possession.** Borrowers absolutely and unconditionally assign and transfer to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrowers authorize Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrowers or Borrower Parties shall receive the Rents until (i) Lender has given Borrowers notice of default pursuant to Sections 12 and 25 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notices of default to Borrowers: (i) all Rents received by Borrowers or Borrower Parties shall be held by Borrowers or Borrower Parties as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrowers agree that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or

**CALIFORNIA**

11

Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorneys' fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrowers and Borrower Parties to Lender secured by the Security Instrument pursuant to Section 7 of the Security Instrument.

Borrowers represent and warrant that Borrowers have not executed any prior assignment of the Rents and have not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrowers. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**24. Cross-Default Provision.** Borrowers' or Borrower Parties' default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

NON-UNIFORM COVENANTS. Borrowers further covenant and agree as follows:

**25. Acceleration; Remedies. Following Borrowers' breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 15 unless Applicable Law provides otherwise) and prior to acceleration or Lender's exercise of any remedy, Lender shall give at least sixty (60) days written notice to Borrowers prior to exercising any remedy, unless otherwise provided under this Deed of Trust; provided, however, if such default cannot be cured within the 60-day period and Borrowers have commenced and diligently pursues the cure of the related default, Borrowers shall have the same as is commercially reasonably necessary for Borrowers to complete the cure, provided Lender is not materially prejudiced from such delay. Lender shall use commercially reasonable standards to determine if it is materially prejudiced by the delay. The notice shall specify: (a) the default; (b) the action required to cure the default; (c) the date by which the default must be cured. The notice shall further inform Borrowers of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrowers to acceleration and sale. If the default is not cured on or before the date specified in the notice or such extended period for defaults which cannot be cured within the 60-day period, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 25, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrowers and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrowers, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or**

CALIFORNIA

12

warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**26. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**27. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrowers, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**28. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

**29. Other California State Specific Provisions.**

(a)    In addition to the provisions of any loan agreement, Borrowers further agree that, if Lender accepts a guaranty of only a portion of the Indebtedness, Borrowers waive any right under California Civil Code Section 2822(a) to designate the portion of the Indebtedness which shall be satisfied by a guarantor's partial payment.

(b)    Except for matters covered by an O&M Program or matters described in any environmental indemnity agreement, Borrowers shall not cause or permit any lien (whether or not such lien has priority over the lien created by this Security Instrument) upon the Property imposed pursuant to any Environmental Laws. Any such lien shall be considered a Prohibited Activity or Condition (as may also be contemplated in any environmental indemnity agreement).

(c)    Borrowers represent and warrant to Lender that, except as previously disclosed by Borrowers or Borrower Parties to Lender in writing:

(1)    at the time of acquiring the Property, Borrowers undertook all appropriate inquiry into the previous ownership and uses of the Property consistent with good commercial or customary practice and no evidence or indication came to light which would suggest that the Property has been or is now being used for any Prohibited Activities or Conditions; and

(2)    the Property has not been designated as "hazardous waste property" or "border zone property" pursuant to Section 25220, et seq., of the California Health and Safety Code.

The representations and warranties in this Security Instrument shall be continuing representations and warranties that shall be deemed to be made by Borrowers throughout the term of the Loans, until the Indebtedness has been paid in full.

(d)    Without limiting any of the remedies provided in this Security Instrument, Borrowers acknowledge and agrees that certain provisions in this Security Instrument are environmental provisions (as defined in Section 736(f)(2) of the California Code of Civil Procedure) made by Borrowers relating to the real property security (the "**Environmental Provisions**"), and that to the extent applicable, Borrowers' failures to comply with any of the Environmental Provisions will be a breach of contract that will entitle Lender to pursue the remedies provided by

CALIFORNIA

13

Section 736 of the California Code of Civil Procedure for the recovery of damages and for the enforcement of the Environmental Provisions.

Except as otherwise stated herein, nothing in the provisions of this Amendment shall be deemed in any way to affect the priority of the Original Deed of Trust over any other lien, charge, encumbrance or conveyance, or to release or change the liability of any party who may be liable under the Note.

*[remainder of page intentionally left blank – signature page follows]*

**CALIFORNIA**

14

BY SIGNING BELOW, Borrowers accept and agree to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrowers or Borrower Parties.

**BORROWERS:**

**MARICOPA ORCHARDS, LLC**,
a California limited liability company

_____

By:  Farshid Assemi
Its:  Manager

**WILLOW AVENUE INVESTMENTS, LLC**,
a California limited liability company

_____

By:  Neema Assemi
Its:  Manager

**C & A FARMS, LLC**,
a California limited liability company

_____

By:  Farshid Assemi
Its:  Manager

**CALIFORNIA - Kern Co DoT Signature Page**

15

A notary public or other officer completing this
certificate verifies only the identity of the individual
who signed the document to which this certificate
is attached, and not the truthfulness, accuracy, or
validity of that document.

STATE OF CALIFORNIA
COUNTY OF ____FRESNO____

On ____1/25/2023____ before me, L. Diaz, Notary Public ____, personally appeared
**Farshid Assemi**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and
that by his signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed
the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

Notary Public
Printed Name:____ L. Diaz ____
My commission expires:____ April 20 2026 ____

L. DIAZ
Notary Public - California
Fresno County
Commission # 2398671
My Comm. Expires Apr 20, 2026

A notary public or other officer completing this
certificate verifies only the identity of the individual
who signed the document to which this certificate
is attached, and not the truthfulness, accuracy, or
validity of that document.

STATE OF CALIFORNIA
COUNTY OF ____Fresno____

On ____1/25/2023____ before me, L. Diaz, Notary Public ____, personally appeared
**Neema Assemi**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and
that by his signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed
the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

Notary Public
Printed Name:____ L. Diaz ____
My commission expires:____ April 20, 2026 ____

L. DIAZ
Notary Public - California
Fresno County
Commission # 2398671
My Comm. Expires Apr 20, 2026

**CALIFORNIA - Kern Co DoT Signature Page**

16

**ORDER NO. :** 1421002583

# EXHIBIT A

The land referred to is situated in the County of Kern, City of , State of California, and is described as follows:

PARCEL 1:

THE NORTHWEST QUARTER OF SECTION 30, TOWNSHIP 32 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN AN UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT ALL OIL AND GAS WITHIN OR UNDERLYING SAID LAND, AS PREVIOUSLY RESERVED OF RECORD.

APN: 220-170-01

PARCEL 2:

THE NORTHEAST QUARTER OF SECTION 30, TOWNSHIP 32 SOUTH, RANGE 25 EAST, M.D.B.&M., IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL RIGHT, TITLE AND INTEREST IN AND TO THE MINERAL RIGHTS IN THE PROPERTIES DESCRIBED HEREIN (EXPRESSLY EXCLUDING, HOWEVER, THE RIGHT TO USE THE SURFACE FOR OPEN PIT MINING, QUARRYING AND STRIP MINING), AND ALL RIGHTS, TITLE AND INTEREST IN ANY OTHER CONTRACT AGREEMENTS OR RIGHTS, TANGIBLE OR INTANGIBLE THAT ARE OWNED BY THE GRANTOR, IN WHOLE OR IN PART, AND THAT ARE RELATED TO THE OWNERSHIP AND USE OF THE MINERAL RIGHTS CONVEYED HEREBY, FROM THE LANDS.

SPECIFICALLY EXCEPTING THEREFROM ALL SURFACE RIGHTS (EXCEPT FOR THE RIGHTS OF SURFACE ACCESS FOR THE PURPOSE OF GRANTEE AND ITS ASSIGNS EXPLORING FOR, DEVELOPING, PRODUCING, TRANSPORTING AND SELLING MINERALS FROM THE PROPERTY AND WHICH ARE RECOGNIZED BY CALIFORNIA LAW, RULES, ORDER AND REGULATION), PERSONAL PROPERTY OR FIXTURES ASSOCIATED WITH, AFFIXED TO OR LOCATED UPON THE SURFACE, WELL BORES (IF ANY), WATER OR WATER RIGHTS OR ENTITLEMENTS (EXCEPT SUCH WATER AS MAY BE ASSOCIATED AND INCIDENTALLY PRODUCED WITH THE MINERALS FROM THE PROPERTY) OR ANY EXISTING OIL, GAS OR MINERAL PRODUCTION (IF ANY) FROM THE PROPERTY, AS GRANTED TO CALIFORNIA MINERALS, L.P., A TEXAS LIMITED PARTNERSHIP, IN DEED RECORDED DECEMBER 30, 1998 AS INSTRUMENT NO. 0198184684 OF OFFICIAL RECORDS.

APN: 220-170-02

PARCEL 3:

THE WEST HALF OF SECTION 29, TOWNSHIP 32 SOUTH, RANGE 25 EAST, M.D.B.M., IN THE UNINCORPORATED ARE OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING OF THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL RIGHT, TITLE AND INTEREST IN AND TO THE MINERAL RIGHTS IN THE PROPERTIES DESCRIBED HEREIN (EXPRESSLY EXCLUDING, HOWEVER, THE RIGHT TO USE THE SURFACE FOR OPEN PIT MINING, QUARRYING AND STRIP MINING), AND ALL RIGHTS, TITLE AND INTEREST IN ANY OTHER CONTRACT AGREEMENTS OR RIGHTS, TANGIBLE OR INTANGIBLE THAT ARE OWNED BY THE GRANTOR, IN WHOLE OR IN PART, AND THAT ARE RELATED TO THE OWNERSHIP AND USE OF THE MINERAL RIGHTS CONVEYED HEREBY, FROM THE LANDS.

SPECIFICALLY EXCEPTING THEREFROM ALL SURFACE RIGHTS (EXCEPT FOR THE RIGHTS OF SURFACE ACCESS FOR THE PURPOSE OF GRANTEE AND ITS ASSIGNS EXPLORING FOR, DEVELOPING, PRODUCING, TRANSPORTING AND SELLING MINERALS FROM THE PROPERTY AND WHICH ARE RECOGNIZED BY CALIFORNIA LAW, RULES, ORDER AND REGULATION), PERSONAL PROPERTY OR FIXTURES ASSOCIATED WITH, AFFIXED TO OR LOCATED UPON THE SURFACE, WELL BORES (IF ANY), WATER OR WATER RIGHTS OR ENTITLEMENTS (EXCEPT SUCH WATER AS MAY BE ASSOCIATED AND INCIDENTALLY PRODUCED WITH THE MINERALS FROM THE PROPERTY) OR ANY EXISTING OIL, GAS OR MINERAL PRODUCTION (IF ANY) FROM THE PROPERTY, AS GRANTED TO CALIFORNIA MINERALS, L.P., A TEXAS LIMITED PARTNERSHIP, IN DEED RECORDED DECEMBER 30, 1998 AS INSTRUMENT NO. 0198184684 OF OFFICIAL RECORDS.

ALSO EXCEPTING ALL OIL, GAS AND OTHER HYDROCARBONS; NON- HYDROCARBON GASSES OR GASEOUS SUBSTANCES; ALL OTHER MINERALS OF WHATSOEVER NATURE, WITHOUT REGARD TO SIMILARITY TO THE ABOVE-MENTIONED SUBSTANCES; AND ALL SUBSTANCES THAT MAY BE PRODUCED THEREWITH FROM SAID REAL PROPERTY.

ALSO EXCEPTING ALL GEOTHERMAL RESOURCES, EMBRACING: INDIGENOUS STEAM, HOT WATER AND HOT BRINES; STEAM AND OTHER GASES, HOT WATER AND HOT BRINES RESULTING FROM WATER, GAS OR OTHER FLUIDS ARTIFICIALLY INTRODUCED INTO SUBSURFACE FORMATIONS; HEAT OR THE ASSOCIATED ENERGY FOUND BENEATH THE SURFACE OF THE EARTH; AND BY-PRODUCTS OF ANY OF THE FOREGOING SUCH AS MINERALS (EXCLUSIVE OF OIL OR HYDROCARBON GAS THAT CAN BE SEPARATELY PRODUCED) WHICH ARE FOUND IN SOLUTION OR ASSOCIATION WITH OR DERIVED FROM ANY OF THE FOREGOING.

ALSO EXCEPTING, THE SOLE AND EXCLUSIVE RIGHT FROM TIME TO TIME TO DRILL AND MAINTAIN WELLS OR OTHER FACILITIES INTO OR THROUGH SAID REAL PROPERTY AND THE ADJOINING STREETS, ROADS AND HIGHWAYS FOR THE PURPOSE OF EXPLORING FOR AND PRODUCING ENERGY RESOURCES; THE EXCLUSIVE RIGHT TO PRODUCE, INJECT, STORE, AND REMOVE FROM AND THROUGH SUCH WELLS OR FACILITIES, OIL, GAS, WATER AND OTHER SUBSTANCES OF WHATEVER NATURE, INCLUDING THE RIGHT TO PERFORM ANY AND ALL OPERATIONS DEEMED BY GRANTOR NECESSARY OR CONVENIENT FOR THE EXERCISE OF SUCH RIGHTS, INCLUDING BUT NOT LIMITED TO THE RIGHT TO CONDUCT SEISMIC TESTING AND CONSTRUCT, MAINTAIN AND OPERATE PIPELINES, VALVES, CATHODIC PROTECTION FACILITIES, AND APPURTENANCES; AND THE EXCLUSIVE RIGHT TO UTILIZE OR OCCUPY SUBSURFACE FORMATIONS TO STORE OR DISPOSE OF PRODUCED WATER OR OTHER FLUIDS WITHOUT REGARD TO THEIR PLACE OF ORIGIN, AS RESERVED BY CHEVRON U.S.A. INC., A

PENNSYLVANIA CORPORATION, IN DEED RECORDED JUNE 6, 2004 AS DOCUMENT NO. 0204130494, OFFICIAL RECORDS.

APN: 220-170-07

PARCEL 4:

Parcel B of Parcel Map No. 12196, according to the map thereof, filed for record on October 13, 2020, in Book 62 of Parcel Maps, at Pages 1 through 3, Kern County Records.

EXCEPTING THEREFROM ALL RIGHT, TITLE AND INTEREST IN AND TO THE MINERAL RIGHTS IN THE PROPERTIES DESCRIBED HEREIN (EXPRESSLY EXCLUDING, HOWEVER, THE RIGHT TO USE THE SURFACE FOR OPEN PIT MINING, QUARRYING AND STRIP MINING), AND ALL RIGHTS, TITLE AND INTEREST IN ANY OTHER CONTRACT AGREEMENTS OR RIGHTS, TANGIBLE OR INTANGIBLE THAT ARE OWNED BY THE GRANTOR, IN WHOLE OR IN PART, AND THAT ARE RELATED TO THE OWNERSHIP AND USE OF THE MINERAL RIGHTS CONVEYED HEREBY, FROM THE LANDS.

SPECIFICALLY EXCEPTING THEREFROM ALL SURFACE RIGHTS (EXCEPT FOR THE RIGHTS OF SURFACE ACCESS FOR THE PURPOSE OF GRANTEE AND ITS ASSIGNS EXPLORING FOR, DEVELOPING, PRODUCING, TRANSPORTING AND SELLING MINERALS FROM THE PROPERTY AND WHICH ARE RECOGNIZED BY CALIFORNIA LAW, RULES, ORDER AND REGULATION), PERSONAL PROPERTY OR FIXTURES ASSOCIATED WITH, AFFIXED TO OR LOCATED UPON THE SURFACE, WELL BORES (IF ANY), WATER OR WATER RIGHTS OR ENTITLEMENTS (EXCEPT SUCH WATER AS MAY BE ASSOCIATED AND INCIDENTALLY PRODUCED WITH THE MINERALS FROM THE PROPERTY) OR ANY EXISTING OIL, GAS OR MINERAL PRODUCTION (IF ANY) FROM THE PROPERTY, AS GRANTED TO CALIFORNIA MINERALS, L.P., A TEXAS LIMITED PARTNERSHIP, IN DEED RECORDED DECEMBER 30, 1998 AS INSTRUMENT NO. 0198184684 OF OFFICIAL RECORDS.

APN: 220-110-87

PARCEL 5:

THE SOUTH HALF OF THE NORTHEAST QUARTER OF SECTION 22, TOWNSHIP 32 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL RIGHT, TITLE AND INTEREST IN AND TO THE MINERAL RIGHTS IN THE PROPERTIES DESCRIBED HEREIN (EXPRESSLY EXCLUDING, HOWEVER, THE RIGHT TO USE THE SURFACE FOR OPEN PIT MINING, QUARRYING AND STRIP MINING), AND ALL RIGHTS, TITLE AND INTEREST IN ANY OTHER CONTRACT AGREEMENTS OR RIGHTS, TANGIBLE OR INTANGIBLE THAT ARE OWNED BY THE GRANTOR, IN WHOLE OR IN PART, AND THAT ARE RELATED TO THE OWNERSHIP AND USE OF THE MINERAL RIGHTS CONVEYED HEREBY, FROM THE LANDS.

SPECIFICALLY EXCEPTING THEREFROM ALL SURFACE RIGHTS (EXCEPT FOR THE RIGHTS OF SURFACE ACCESS FOR THE PURPOSE OF GRANTEE AND ITS ASSIGNS EXPLORING FOR,

DEVELOPING, PRODUCING, TRANSPORTING AND SELLING MINERALS FROM THE PROPERTY AND WHICH ARE RECOGNIZED BY CALIFORNIA LAW, RULES, ORDER AND REGULATION), PERSONAL PROPERTY OR FIXTURES ASSOCIATED WITH, AFFIXED TO OR LOCATED UPON THE SURFACE, WELL BORES (IF ANY), WATER OR WATER RIGHTS OR ENTITLEMENTS (EXCEPT SUCH WATER AS MAY BE ASSOCIATED AND INCIDENTALLY PRODUCED WITH THE MINERALS FROM THE PROPERTY) OR ANY EXISTING OIL, GAS OR MINERAL PRODUCTION (IF ANY) FROM THE PROPERTY, AS GRANTED TO CALIFORNIA MINERALS, L.P., A TEXAS LIMITED PARTNERSHIP, IN DEED RECORDED DECEMBER 30, 1998 AS INSTRUMENT NO. 0198184684 OF OFFICIAL RECORDS.

APN: 220-110-10

PARCEL 6:

THE NORTH HALF OF THE NORTH HALF OF SECTION 26, TOWNSHIP 32 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM THE INTEREST OF THE SUNSET RAILROAD AS SAID RAILROAD IS NOW LOCATED.

EXCEPTING THEREFROM ALL RIGHT, TITLE AND INTEREST IN AND TO THE MINERAL RIGHTS IN THE PROPERTIES DESCRIBED HEREIN (EXPRESSLY EXCLUDING, HOWEVER, THE RIGHT TO USE THE SURFACE FOR OPEN PIT MINING, QUARRYING AND STRIP MINING), AND ALL RIGHTS, TITLE AND INTEREST IN ANY OTHER CONTRACT AGREEMENTS OR RIGHTS, TANGIBLE OR INTANGIBLE THAT ARE OWNED BY THE GRANTOR, IN WHOLE OR IN PART, AND THAT ARE RELATED TO THE OWNERSHIP AND USE OF THE MINERAL RIGHTS CONVEYED HEREBY, FROM THE LANDS.

SPECIFICALLY EXCEPTING THEREFROM ALL SURFACE RIGHTS (EXCEPT FOR THE RIGHTS OF SURFACE ACCESS FOR THE PURPOSE OF GRANTEE AND ITS ASSIGNS EXPLORING FOR, DEVELOPING, PRODUCING, TRANSPORTING AND SELLING MINERALS FROM THE PROPERTY AND WHICH ARE RECOGNIZED BY CALIFORNIA LAW, RULES, ORDER AND REGULATION), PERSONAL PROPERTY OR FIXTURES ASSOCIATED WITH, AFFIXED TO OR LOCATED UPON THE SURFACE, WELL BORES (IF ANY), WATER OR WATER RIGHTS OR ENTITLEMENTS (EXCEPT SUCH WATER AS MAY BE ASSOCIATED AND INCIDENTALLY PRODUCED WITH THE MINERALS FROM THE PROPERTY) OR ANY EXISTING OIL, GAS OR MINERAL PRODUCTION (IF ANY) FROM THE PROPERTY, AS GRANTED TO CALIFORNIA MINERALS, L.P., A TEXAS LIMITED PARTNERSHIP, IN DEED RECORDED DECEMBER 30, 1998 AS INSTRUMENT NO. 0198184684 OF OFFICIAL RECORDS.

EXCEPTING THEREFROM ALL OIL, GAS AND OTHER HYDROCARBONS; NON-HYDROCARBON GASSES OR GASEOUS SUBSTANCES; ALL OTHER MINERALS OF WHATSOEVER NATURE, WITHOUT REGARD TO SIMILARITY TO THE ABOVE-MENTIONED SUBSTANCES; AND ALL SUBSTANCES THAT MAY BE PRODUCED THEREWITH FROM SAID REAL PROPERTY;

AND ALSO EXCEPTING THEREFROM ALL GEOTHERMAL RESOURCES, EMBRACING; INDIGENOUS STEAM, HOT WATER AND HOT BRINES; STEAM AND OTHER GASES, HOT WATER AND HOT BRINES RESULTING FROM WATER, GAS OR OTHER FLUIDS ARTIFICIALLY INTRODUCED INTO SUBSURFACE FORMATIONS; HEAT OR THE ASSOCIATED ENERGY FOUND

BENEATH THE SURFACE OF THE EARTH; AND BY-PRODUCTS OF ANY OF THE FOREGOING SUCH AS MINERALS (EXCLUSIVE OF OIL OR HYDROCARBON GAS THAT CAN BE SEPARATELY PRODUCED) WHICH ARE FOUND IN SOLUTION OR ASSOCIATION WITH OR DERIVED FROM ANY OF THE FOREGOING.

TOGETHER WITH ALL RIGHTS ASSOCIATED WITH OR CONVENIENT FOR THE EXERCISE OF SUCH RIGHTS AS CONTAINED THEREIN, ALL AS RESERVED BY CHEVRON U.S.A., INC., IN DEED RECORDED DECEMBER 22, 2004 AS INSTRUMENT NO. 0204317445 OF OFFICIAL RECORDS.

APN: 220-130-02

PARCEL 7:

THE SURFACE AND 500 FEET OF THE SUBSURFACE VERTICALLY IN DEPTH BELOW THE SURFACE OF THE EAST HALF OF SECTION 29, TOWNSHIP 32 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT ALL OIL, GAS, ASPHALTUM, AND OTHER HYDROCARBONS AND OTHER MINERALS, WHETHER SIMILAR TO THOSE HEREIN SPECIFIED OR NOT, WITHIN OR THAT MAY BE PRODUCED FROM SAID PARCEL, 500 FEET IN DEPTH, TOGETHER WITH THE EXCLUSIVE RIGHT TO ENTER UPON SAID PREMISES FOR THE PURPOSE OF MINING FOR AND REMOVING THE SAME THEREFROM, AS EXCEPTED AND RESERVED IN THE DEED FROM STANDARD OIL COMPANY OF CALIFORNIA, A DELAWARE CORPORATION, TO CALIFORNIA LAND AND CATTLE COMPANY, A CORPORATION, RECORDED SEPTEMBER 18, 1963, IN BOOK 3644, PAGE 951 OF OFFICIAL RECORDS.

APN: 220-170-08 and 220-170-09 and 220-170-10

PARCEL 8:

THE NORTHWEST QUARTER OF SECTION 28, TOWNSHIP 32 SOUTH, RANGE 25 EAST, MOUNT DIABLO MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT $^1/_2$ OF ALL MINERALS, INCLUDING OIL, PETROLEUM, GAS, ASPHALTUM, BREA, AND OTHER HYDROCARBON SUBSTANCES WITHIN OR UNDERLYING SAID LAND, AS EXCEPTED IN A DECREE OF DECLARATION OF TAKING DATED DECEMBER 31, 1942, A CERTIFIED COPY OF WHICH WAS RECORDED JANUARY 13, 1943 IN BOOK 1090, PAGE 341 OF OFFICIAL RECORDS, AND AS EXCEPTED IN DEED FROM UNITED STATES OF AMERICA, DATED JANUARY 24, 1949 RECORDED MARCH 17, 1949 IN BOOK 1602, PAGE 105 OF OFFICIAL RECORDS.

ALSO EXCEPT REMAINING $^1/_2$ OF ALL MINERALS, INCLUDING OIL, PETROLEUM, GAS, ASPHALTUM, BREA AND OTHER HYDROCARBON SUBSTANCES WITHIN OR UNDERLYING SAID LAND, TOGETHER WITH RIGHT OF ENTRY.

APN: 220-170-11

PARCEL 9:

ALL OF THE SOUTHWEST QUARTER OF SECTION 28, TOWNSHIP 32 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT ALL MINERALS OF WHATSOEVER NATURE (INCLUDING BUT NOT LIMITED TO OIL, GAS, OTHER HYDROCARBONS AND ASSOCIATED SUBSTANCES) IN, UNDER OR WHICH MAY BE PRODUCED THEREFROM, TOGETHER WITH ALL RIGHTS AND PRIVILEGES OF INGRESS, EGRESS, USE AND OCCUPANCY OF, UPON AND WITHIN THE SURFACE AND SUBSURFACE THEREOF AS THE OWNER OF THE AFORESAID MINERALS MAY FROM TIME TO TIME DEEM NECESSARY OR CONVENIENT IN CONNECTION WITH THE EXPLORATION, DEVELOPMENT AND OPERATION OF SAID LANDS FOR THE AFORESAID MINERALS AND THE STORING, HANDLING, TREATING AND TRANSPORTATION THEREOF, ALL WITHOUT LIABILITY WHATSOEVER TO GRANTEE AND ALL AS CONVEYED BY GRANTORS TO SONICO, INC., A DELAWARE CORPORATION, BY MINERAL DEED DATED FEBRUARY 28, 1967, AND RECORDED IN BOOK 4030, PAGE 208 OF OFFICIAL RECORDS OF KERN COUNTY.

APN: 220-170-31 and 32

PARCEL 10:

ALL OF SECTION 19, TOWNSHIP 32 SOUTH, RANGE 26 EAST, M.D.B.M., IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL RIGHT, TITLE AND INTEREST IN AND TO THE MINERAL RIGHTS IN THE PROPERTIES DESCRIBED HEREIN (EXPRESSLY EXCLUDING, HOWEVER, THE RIGHT TO USE THE SURFACE FOR OPEN PIT MINING, QUARRYING AND STRIP MINING), AND ALL RIGHTS, TITLE AND INTEREST IN ANY OTHER CONTRACT AGREEMENTS OR RIGHTS, TANGIBLE OR INTANGIBLE THAT ARE OWNED BY THE GRANTOR, IN WHOLE OR IN PART, AND THAT ARE RELATED TO THE OWNERSHIP AND USE OF THE MINERAL RIGHTS CONVEYED HEREBY, FROM THE LANDS.

SPECIFICALLY EXCEPTING ALL SURFACE RIGHTS (EXCEPT FOR THE RIGHTS OF SURFACE ACCESS FOR THE PURPOSE OF GRANTEE AND ITS ASSIGNS EXPLORING FOR, DEVELOPING, PRODUCING, TRANSPORTING AND SELLING MINERALS FROM THE PROPERTY AND WHICH ARE RECOGNIZED BY CALIFORNIA LAW, RULES, ORDER AND REGULATION), PERSONAL PROPERTY OR FIXTURES ASSOCIATED WITH, AFFIXED TO OR LOCATED UPON THE SURFACE, WELL BORES (IF ANY), WATER OR WATER RIGHTS OR ENTITLEMENTS (EXCEPT SUCH WATER AS MAY BE ASSOCIATED AND INCIDENTALLY PRODUCED WITH THE MINERALS FROM THE PROPERTY) OR ANY EXISTING OIL, GAS OR MINERAL PRODUCTION (IF ANY) FROM THE PROPERTY, AS RESERVED IN DEED RECORDED DECEMBER 30, 1998 AS INSTRUMENT NO. 0198184684 OF OFFICIAL RECORDS.

EXCEPTING ALL OIL, GAS AND OTHER HYDROCARBONS; NON-HYDROCARBON GASSES OR GASEOUS SUBSTANCES; ALL OTHER MINERALS OF WHATSOEVER NATURE, WITHOUT REGARD TO SIMILARITY TO THE ABOVE-MENTIONED SUBSTANCES; AND ALL SUBSTANCES THAT MAY BE PRODUCED THEREWITH FROM SAID REAL PROPERTY.

ALSO EXCEPTING ALL GEOTHERMAL RESOURCES, EMBRACING: INDIGENOUS STEAM, HOT WATER AND HOT BRINES; STEAM AND OTHER GASES, HOT WATER AND HOT BRINES RESULTING FROM WATER, GAS OR OTHER FLUIDS ARTIFICIALLY INTRODUCED INTO SUBSURFACE FORMATIONS; HEAT OR THE ASSOCIATED ENERGY FOUND BENEATH THE SURFACE OF THE EARTH; AND BY-PRODUCTS OF ANY OF THE FOREGOING SUCH AS MINERALS (EXCLUSIVE OF OIL OR HYDROCARBON GAS THAT CAN BE SEPARATELY PRODUCED) WHICH ARE FOUND IN SOLUTION OR ASSOCIATION WITH OR DERIVED FROM ANY OF THE FOREGOING.

ALSO EXCEPTING THE SOLE AND EXCLUSIVE RIGHT FROM TIME TO TIME TO DRILL AND MAINTAIN WELLS OR OTHER FACILITIES INTO OR THROUGH SAID REAL PROPERTY AND THE ADJOINING STREETS, ROADS AND HIGHWAYS FOR THE PURPOSE OF EXPLORING FOR AND PRODUCING ENERGY RESOURCES; THE EXCLUSIVE RIGHT TO PRODUCE, INJECT, STORE, AND REMOVE FROM AND THROUGH SUCH WELLS OR FACILITIES, OIL, GAS, WATER AND OTHER SUBSTANCES OF WHATEVER NATURE, INCLUDING THE RIGHT TO PERFORM ANY AND ALL OPERATIONS DEEMED BY GRANTOR NECESSARY OR CONVENIENT FOR THE EXERCISE OF SUCH RIGHTS, INCLUDING BUT NOT LIMITED TO THE RIGHT TO CONDUCT SEISMIC TESTING AND CONSTRUCT, MAINTAIN AND OPERATE PIPELINES, VALVES, CATHODIC PROTECTION FACILITIES, AND APPURTENANCES; AND THE EXCLUSIVE RIGHT TO UTILIZE OR OCCUPY SUBSURFACE FORMATIONS TO STORE OR DISPOSE OF PRODUCED WATER OR OTHER FLUIDS WITHOUT REGARD TO THEIR PLACE OF ORIGIN, AS RESERVED BY CHEVRON U.S.A. INC., A PENNSYLVANIA CORPORATION, IN DEED RECORDED DECEMBER 31, 2003 AS DOCUMENT NO. 0203281471, OFFICIAL RECORDS.

APN: 295-040-30 and 31

PARCEL 11:

All of Section 13, Township 11 North, Range 23 West, San Bernardino Base and Meridian, in the unincorporated area of the County of Kern, State of California, according to the Official Plat thereof.

Excepting therefrom all right, title and interest in and to the mineral rights in the properties described herein (expressly excluding, however, the right to use the surface for open pit mining, quarrying and strip mining), and all right , title and interest in any other contract agreements or rights, tangible or intangible that are owned by the grantor, in whole or part, and that are related to the ownership and use of the mineral rights conveyed hereby, from the lands.

Specifically excepting and reserving therefrom all surface rights (except for the rights of surface access for the purpose of grantee and its assigns exploring for, developing, producing,

transporting and selling minerals from the property and which are recognized by California law, rules, order and regulation), personal property for fixtures associated with affixed to or located upon the surface, well bores (if any), water or water rights or entitlements (except such water as may be associated and incidentally produced with the minerals from the property) or any existing oil, gas or mineral production (if any) from the property, as granted to California Minerals, L.P., a Texas limited partnership, in Deed recorded December 30, 1998 as Document No. 0198184684 of Official Records.

APN: 239-150-11

# EXHIBIT D

DOC NBR: 2301892          02/07/2023 01:33:08 PM
OFFICIAL RECORDS OF Kings County
Kristine Lee, Clerk-Recorder,
RECORDING FEE: $121.00
COUNTY TAX: $0.00
CITY TAX: $0.00



Recorded at Request of   ePN
Old Republic Title Company

1421002561-08

Recording Requested By:

Conterra Agricultural Capital, LLC

After Recording Return To:

Conterra Agricultural Capital, LLC
5465 Mills Civic Parkway, Suite 201
West Des Moines, IA 50266
Attn: Taylor Petersen



TITLE: 3
DOC TYPE: 08
22 PGS
R048

ERECORDING PARTNERS NETWORK

Exempt from fee per GC 27388.1;
fee cap of $225 reached

_____ [Space Above This Line For Recording Data] _____

# DEED OF TRUST
## Security Agreement, Assignment of Rents and Fixture Filing

Loan #R4030

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in certain Sections of this document. Certain rules regarding the usage of words used in this document are also provided in Section 13.

(A) "Security Instrument" means this document, which is dated February 2, 2023, together with all Riders to this document.

(B) "Lender" is Conterra Agricultural Capital, LLC. Lender is a limited liability company organized and existing under the laws of Iowa. Lender's address is 5465 Mills Civic Parkway, Suite 201, West Des Moines, IA 50266. Lender is the beneficiary under this Security Instrument.

(C) "Borrowers" are Copper Avenue Investments, LLC, a California limited liability company, Lincoln Grantor Farms, LLC, a California limited liability company, and ACAP Farms, LLC, a California limited liability company. Borrowers are trustors under this Security Instrument. Borrowers' address is 5260 N. Palm Ave. Ste. 421, Mail Stop M, Fresno, CA 93704.

"Borrower Parties" are Copper Avenue Investments, LLC, a California limited liability company, Lincoln Grantor Farms, LLC, a California limited liability company, and ACAP Farms, LLC, a California limited liability company. Maricopa Orchards, LLC, a California limited liability company, Cantua Orchards, LLC, a California limited liability company, Gradon Farms, LLC, a California limited liability company, C & A Farms, LLC, a California limited liability company and Willow Avenue Investments, LLC, a California limited liability company. Borrower Parties' address is 5260 N. Palm Ave. Ste. 421, Mail Stop M, Fresno, CA 93704.

(D) "Trustee" is Old Republic Title Company.

(E) "Note" means Borrower Parties' promissory note dated Feburary 2, 2023, in the original principal amount of $7,400,000.00. Borrower Parties have promised to pay this debt in regular Periodic Payments and to pay Notes in full not later than February 2, 2028.

CALIFORNIA

1

**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(H) "Riders"** mean all Riders to this Security Instrument that are executed by Borrowers or Borrower Parties. The following Riders are to be executed by Borrowers or Borrower Parties:

☐ Irrigation Equipment Rider          ☐ Water Rights Rider

☐ Financial Information and Covenants Rider     ☐ Permitted Prior Encumbrance Rider

☐ Mortgage Insurance Rider          ☐ Adjustable Rate Rider

☐ Other(s):

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 4) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(L) "Periodic Payment"** means the amount due for principal and interest under the Notes.

**(M) "Successor in Interest of Borrowers"** means any party that has taken title to the Property, whether or not that party has assumed obligations of the Borrowers under this Security Instrument or of Borrower Parties under the Notes.

---

**TRANSFER OF RIGHTS IN THE PROPERTY**
This Security Instrument secures to Lender: (i) the repayment of the Loans, and all renewals, extensions and modifications of the Notes; and (ii) the performance of Borrowers' covenants and agreements under this Security Instrument and of Borrower Parties under the Notes. For this purpose, Borrowers irrevocably grant and convey to Trustee, in trust, with power of sale, the following described property located in the **County of Kings, State of California:**

　　　See Exhibit "A" attached hereto and made a part hereof.

which currently has the address of:

CALIFORNIA

2

**4,357 +/- Acres**
**Fresno, Kings and Kern Counties, California**
**("Property Address"):**

subject only to those matters set forth in the Permitted Prior Encumbrance Rider, if said rider is attached (hereafter "Permitted Prior Encumbrances");

**TOGETHER WITH** all buildings, improvements, equipment, fixtures and permanent plantings affixed, attached to or incorporated in the real property, and all additions, replacements, and improvements hereafter made thereto or placed therein or thereon; all rights-of-way, easements, rents, issues, profits, income, proceeds and general intangibles there from, tenements, hereditaments, remainders, reversions, privileges and appurtenances thereunto belonging, however evidenced, which are used or enjoyed in connection with the real property now or hereafter owned or belonging to the Borrowers or which hereafter may be acquired by Borrowers, excluding, however, the growing crop;

**TOGETHER WITH** all water rights appurtenant to the real property, whether such water rights are riparian, appropriative or otherwise, along with all ditch and ditch rights and any shares of stock, licenses, permits and contracts evidencing such water or ditch rights appurtenant to the property, and all wells, reservoirs, dams, embankments or fixtures located on the real property;

**TOGETHER WITH** all windmills, pumps, irrigation equipment, motors, engines, and devices of every kind, with the exception of rolling stock, now or hereafter attached or affixed to the real property, or for stock watering or domestic purposes thereon, and all grain bins and storage bins, which are owned by Borrowers and which are attached or affixed to the  real property in **Kings County, California**, described above together with all additional accessions, replacements, improvements, repairs and substitutions to said property and the proceeds thereof and all other fixtures now or hereafter attached or affixed to the real property, all of which are declared to be appurtenant to said real property, or incident to the ownership thereof;

**TOGETHER WITH** all judgments, awards of damages, settlements and payments or security (i) hereafter made as a result of or in lieu of any taking of all or any part of the real property under the power of eminent domain or for any damage to the real property and/or the improvements located thereon, or any part thereof, and (ii) hereafter made for any damage to the real property and/or the improvements located thereon, or any part thereof resulting from exercise of or attempted exercise of mining rights or claims, however reserved or asserted, and resulting from the disturbance of any of the surface of the real property.  Borrowers do hereby covenant and agree that Borrowers will not give such consent as may be required of the owner for mining or other surface disturbance by the terms of any patent, deed, statute, law or otherwise, without the prior written consent of Lender;

**TOGETHER WITH** all proceeds of and any unearned premiums on any insurance policies covering the real property and/or the improvements located thereon, including, without limitation, the right to receive and apply the proceeds of any insurance judgments, or settlements made in lieu thereof, for damage to the real property and/or the improvements located thereon or the indebtedness secured thereby;

**TOGETHER WITH** all contract rights, chattel paper, documents, accounts and general intangibles, rights to performance, entitlement to payment in cash or in kind, or any other benefits under any current or future governmental program which pertain to the real property, whether now or hereafter existing or acquired, excluding crop receivables;

**TOGETHER WITH** all cash and noncash proceeds of the conversion, voluntary or involuntary, of any of the foregoing;

**TOGETHER WITH** any and all of Borrowers' right, title, and/or interest in any and all system memberships and/or ownership certificates in any non-municipal water sewer systems now or in the future serving said property.

CALIFORNIA

3

All replacements and additions shall also be covered by this Security Instrument.

All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWERS COVENANT that Borrowers are lawfully seized of the estate hereby conveyed and have the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record and specifically those permitted prior encumbrances, if any, set forth in the Permitted Prior Encumbrances Rider, if said rider is attached to this Security Instrument. Borrowers warrant and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property and fixtures.

UNIFORM COVENANTS. Borrowers covenant and agree as follows:

1. **Payment of Principal, Interest, Prepayment Charges, Yield Maintenance Premiums and Late Charges.** Borrowers and/or Borrower Parties shall pay when due the principal of, and interest on, the debt evidenced by the Notes and any yield maintenance premiums, any prepayment charges and late charges due under the Notes. Payments due under the Notes and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Notes or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Notes and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Notes or at such other location as may be designated by Lender in accordance with the notice provisions in Section 12. Lender may return any payment or partial payment if the payment or partial payment is insufficient to bring the Loans current. Lender may accept any payment or partial payment insufficient to bring the Loans current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payment in the future. No offset or claim which Borrowers might have now or in the future against Lender shall relieve Borrowers or Borrower Parties from making payments due under the Notes and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Unless required otherwise by Applicable Law, payments will be applied as set forth under the Notes.

If Lender receives a payment from Borrowers or Borrower Parties for a delinquent Periodic Payment that includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrowers and/or Borrower Parties to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Notes shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Charges; Liens.** Excluding liens associated with operating lines of credit that are secured by a growing crop and other personal property (each a "Crop Loan"), Borrowers shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any.

Borrowers shall promptly discharge any lien which has priority over this Security Instrument unless Borrowers: (a) agree in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrowers are performing such agreement; (b) contest the lien in good faith by, or defend against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secure from the holder of the lien an

---

CALIFORNIA

4

agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrowers a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrowers shall satisfy the lien or take one or more of the actions set forth above in this Section 3.

Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender, defined below, on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances. Lender may require Borrowers and/or Borrower Parties to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with the Loans.

**4. Property Insurance.** Borrowers shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loans. The insurance carrier providing the insurance shall be chosen by Borrowers subject to Lender's right to disapprove Borrowers' choice, which right shall not be exercised unreasonably. Lender may require Borrowers to pay, in connection with the Loans, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrowers shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrowers.

If Borrowers fail to maintain any of the coverages described above, such failure shall constitute a default under the terms of this Security Instrument and the Loans. Lender may obtain insurance coverage, at Lender's option and Borrowers' expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrowers, Borrowers' equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrowers acknowledge that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrowers could have obtained. Any amounts disbursed by Lender under this Section 4 shall become additional debt of Borrowers and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the rate(s) under the Notes from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrowers requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrowers shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrowers obtain any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrowers shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrowers. Unless Lender and Borrowers otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrowers or Borrower Parties any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrowers or Borrower Parties shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrowers and Borrower Parties. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrowers and Borrower Parties. Such insurance proceeds shall be applied in the

CALIFORNIA

order provided for in Section 2.

If Borrowers abandon the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrowers do not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 25 or otherwise, Borrowers hereby assign to Lender (a) Borrowers' and Borrower Parties' rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Notes or this Security Instrument, and (b) any other of Borrowers' rights (other than the right to any refund of unearned premiums paid by Borrowers or Borrower Parties) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Notes or this Security Instrument, whether or not then due.

**5. Preservation, Maintenance and Protection of the Property; Inspections.** Borrowers shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property, excluding ordinary wear and tear, ordinary farming practices and normal maturity of any permanent crop. Borrowers shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 4 that repair or restoration is not economically feasible, Borrowers shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrowers shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrowers are not relieved of Borrowers' obligation for the completion of such repair or restoration.

Borrowers will operate the Property in a good and workmanlike manner and in accordance with all Applicable Law and will pay all fees and charges of any kind in connection therewith. If applicable, Borrowers will use good farming and animal husbandry practices.

Lender or its agent may make reasonable entries upon and inspections of the Property with forty-eight (48) hours' advance written notice. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrowers notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**6. Loan Application.** Borrowers shall be in default if, during the Loan application process, Borrowers or Borrower Parties or any persons or entities acting at the direction of Borrowers or Borrower Parties or with Borrowers' or Borrower Parties' knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loans.

**7. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** Subject to any subordination or intercreditor agreement entered into between Lender and the Crop Loan lender, and provided notice pursuant to Section 23 has been given to Borrowers, if (a) Borrowers fail to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrowers have abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding, (d) perform any farming operations related to the planting, growing, maintenance, and harvesting of crops located on the Property, and (e) perform any ranching operations related to any animals located on the Property. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 7, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed

CALIFORNIA

6

that Lender incurs no liability for not taking any or all actions authorized under this Section 7. Lender may perform these or any other actions it deems necessary in Lender's sole discretion to preserve the value of the Property, and/or assign to others the right to do same on behalf of Lender. Lender may make advances under this Security Instrument or other instrument providing security for the Notes, to protect the Lender's interest in this security instrument or other instrument providing security for the Notes from loss of value or damage. Any money so advanced (including reasonable costs of recovery and attorneys' fees) plus interest at the default rate indicated in the Notes shall become an obligation due and owing under the terms of the Notes immediately upon the date advanced by Lender and is an obligation of the Borrowers secured by the Security Instrument or other instrument providing security for the Notes.

Any amounts disbursed by Lender under this Section 7 shall become additional debt of Borrowers and Borrower Parties secured by this Security Instrument. These amounts shall bear interest at the rate(s) under the Notes from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrowers and/or Borrower Parties requesting payment.

If this Security Instrument is on a leasehold, Borrowers shall comply with all the provisions of the lease. Borrowers shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrowers shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrowers acquire fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**8. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrowers or Borrower Parties any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrowers or Borrower Parties. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrowers or Borrower Parties.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrowers and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrowers.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrowers and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrowers, or if, after notice by Lender to Borrowers that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrowers and Borrower Parties fail to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrowers Miscellaneous Proceeds or the

CALIFORNIA

party against whom Borrowers have a right of action in regard to Miscellaneous Proceeds.

Borrowers shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or material impairment to the value of Lender's interest in the Property or rights under this Security Instrument. Borrowers can cure such a default and, if acceleration has occurred, reinstate as provided in Section 16, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

9. **Borrowers Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrowers or any Successor in Interest of Borrowers shall not operate to release the liability of Borrowers or any Successors in Interest of Borrowers. Lender shall not be required to commence proceedings against any Successor in Interest of Borrowers or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrowers or any Successors in Interest of Borrowers. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from Borrowers, third persons, entities or Successors in Interest of Guarantors or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

10. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrowers covenant and agree that Borrowers' obligations and liability shall be joint and several. Subject to the provisions of Section 15, any Successor in Interest of Borrowers who assumes Borrowers' obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrowers' rights and benefits under this Security Instrument. Borrowers shall not be released from Borrowers' obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 17) and benefit the successors and assigns of Lender.

11. **Loan Charges.** Lender may charge Borrowers fees for services performed in connection with Borrowers' default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrowers shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loans are subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loans exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrowers which exceeded permitted limits will be refunded to Borrowers. Lender may choose to make this refund by reducing the principal owed under the Notes or by making a direct payment to Borrowers or Borrower Parties. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Notes). Borrowers' or Borrower Parties' acceptance of any such refund made by direct payment to Borrowers or Borrower Parties will constitute a waiver of any right of action Borrowers or Borrower Parties might have arising out of such overcharge.

12. **Notices.** All notices given by Borrowers or Lender in connection with this Security Instrument must be in writing. Any notice to Borrowers in connection with this Security Instrument shall be deemed to have been given to Borrowers when mailed by first class mail or when actually delivered to Borrowers' notice address if sent by other means. The notice address shall be Borrowers' Address unless Borrowers have designated a substitute notice address by notice to Lender. Borrowers shall promptly notify Lender of Borrowers' change of address. If Lender specifies a procedure for reporting Borrowers' change of address, then Borrowers shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrowers. Any notice in connection with this Security

CALIFORNIA

8

Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

13. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Notes conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Notes which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

14. **Borrowers' Copy.** Borrowers and Borrower Parties shall be given one copy of each of the Notes and of this Security Instrument.

15. **Transfer of the Property or a Beneficial Interest in Borrowers.** As used in this Section 15, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrowers at a future date to a purchaser, excluding, however, easements granted by Borrowers in the ordinary course of business.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if any of the Borrowers are not a natural person and a beneficial interest in such of the Borrowers is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrowers notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 12 within which Borrowers must pay all sums secured by this Security Instrument. If Borrowers fail to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrowers.

Borrowers may request Lender to release one or more parcels that make up the Property, from time to time, from the lien of the Deed of Trust (the "Partial Release") and Lender agrees to not unreasonably withhold its consent to the Partial Release, subject to the prior satisfaction of the condition that Borrowers shall submit a formal written request for the Partial Release (the "Request") not less than forty-five (45) days prior to the date upon which Borrowers desire to close the transfer of the parcel subject to the Partial Release (the "Release Parcel"). No more than three (3) Requests shall be made per calendar year. The Request shall be sufficiently detailed and include all necessary documentation so as to allow Lender adequate time to process the Partial Release.

Notwithstanding the foregoing, upon the written request of Borrowers, Lender will subordinate its interest in any personal property, crops growing or to be grown on the Property, crop receivables, and all governmental payments relating to such crops (the "Crops"), but not to trees, irrigation equipment, water rights and permanent plantings, to the security interest of an institutional lender (a "Crop Lender") for one or more loans made to Borrowers or Borrower Parties to finance the production of crops on all or any portion of the Property ("Operating Financing"). Any subordination to be provided by Lender must be evidenced by a subordination or intercreditor agreement to be entered into between Lender and the Crop Lender on terms and conditions satisfactory to Lender in accordance with reasonable terms customarily agreed to between lenders in similar circumstances.

16. **Right to Reinstate After Acceleration.** If Borrowers meet certain conditions, Borrowers shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrowers' right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrowers: (a) pay Lender all sums which then would be due under

CALIFORNIA

9

this Security Instrument and the Notes as if no acceleration had occurred; (b) cure any default of any other covenants or agreements; (c) pay all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) take such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrowers' obligations to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrowers pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrowers, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 15.

17. **Sale of Notes; Change of Loan Servicer; Notice of Grievance.** The Notes or a partial interest in the Notes (together with this Security Instrument) can be sold one or more times without prior notice to Borrowers or Borrower Parties.

Neither Borrowers nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrowers or Lender has notified the other parties (with such notice given in compliance with the requirements of Section 12) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrowers pursuant to Section 25 and the notice of acceleration given to Borrowers pursuant to Section 15 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 17.

18. **Hazardous Substances.** As used in this Section 18: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrowers shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property, other than the presence, use, storage and disposal of Hazardous Substances in quantities as necessary for Borrowers' and Borrower Parties' normal farming or other commercial operations located on the Property, all of which Borrowers covenant have and will be used, stored, and disposed of in accordance with commercially reasonable practices and all applicable environmental laws. Borrowers shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal farming and residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrowers shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrowers or Borrower Parties have actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrowers learn, or are notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrowers shall

CALIFORNIA

promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup. Borrowers agree to indemnify and hold Lender free and harmless from and against all loss, costs (including attorneys' fees and costs), damage (including consequential damages), and expenses Lender may sustain by reason of the assertion against Lender by any third-party of any claim in connection with Hazardous Substances on, in or affecting the Property. Borrowers further agree that Lender shall have the right to join and participate in, as a party if it so elects, any legal proceedings or actions initiated in connection with any claims related to Hazardous Substances on, in or affecting the Property, and shall pay any such attorney fees and expenses Lender incurs in connection therewith.

19. **Additional Property Subject To The Security Instrument.** This Security Instrument also constitutes a security agreement within the meaning of the Uniform Commercial Code as adopted in the State of California (the "UCC"). In addition to the Property described in the Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in or on the Listed Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling, attached floor coverings, irrigation equipment (including, but not limited to, irrigation pipes and pumps, center irrigation pivots, pvc pipe, sprinklers, motors, well equipment, pumps and power units), livestock fencing and pens, windmills and related equipment and pumps, grain bins and storage bins, along with all replacements, substitutions, accessions thereto and proceeds derived therefrom, and any substitutions or replacements therefore, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Borrowers or Borrower Parties to collect or enforce payment thereof, as well as to enforce any guarantees of the forgoing and security therefor, and all of Borrowers' and Borrower Parties' present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this Security Instrument as the "Property."

20. **Fixture Filing.** This Security Instrument constitutes a "fixture filing" for the purposes of the UCC against all of the Property which is or is to become fixtures per the UCC.

21. **Use of Property; Compliance With Law.** Borrowers shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrowers shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

22. **Assignment of Leases.** Upon Lender's request after default, Borrowers shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

23. **Assignment of Rents; Appointment of Receiver; Lender In Possession.** Borrowers absolutely and unconditionally assign and transfer to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrowers authorize Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrowers or Borrower Parties shall receive the Rents until (i) Lender has given Borrowers notice of default pursuant to Sections 12 and 25 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notices of default to Borrowers: (i) all Rents received by Borrowers or Borrower Parties shall

CALIFORNIA

11

be held by Borrowers or Borrower Parties as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrowers agree that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorneys' fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrowers and Borrower Parties to Lender secured by the Security Instrument pursuant to Section 7 of the Security Instrument.

Borrowers represent and warrant that Borrowers have not executed any prior assignment of the Rents and have not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrowers. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

24. Cross-Default Provision. Borrowers' or Borrower Parties' default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

NON-UNIFORM COVENANTS. Borrowers further covenant and agree as follows:

25. Acceleration; Remedies. Following Borrowers' breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 15 unless Applicable Law provides otherwise) and prior to acceleration or Lender's exercise of any remedy, Lender shall give at least sixty (60) days written notice to Borrowers prior to exercising any remedy, unless otherwise provided under this Deed of Trust; provided, however, if such default cannot be cured within the 60-day period and Borrowers have commenced and diligently pursues the cure of the related default, Borrowers shall have such time as is commercially reasonably necessary for Borrowers to complete the cure, provided Lender is not materially prejudiced from such delay. Lender shall use commercially reasonable standards to determine if it is materially prejudiced by the delay. The notice shall specify: (a) the default; (b) the action required to cure the default; (c) the date by which the default must be cured. The notice shall further inform Borrowers of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrowers to acceleration and sale. If the default is not cured on or before the date specified in the notice or such extended period for defaults which cannot be cured within the 60-day period, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 25, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrowers and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrowers, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the

CALIFORNIA

12

notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

26.  Reconveyance.  Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

27.  Substitute Trustee.  Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrowers, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

28.  Statement of Obligation Fee.  Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

29.  Other California State Specific Provisions.

(a)  In addition to the provisions of any loan agreement, Borrowers further agree that, if Lender accepts a guaranty of only a portion of the Indebtedness, Borrowers waive any right under California Civil Code Section 2822(a) to designate the portion of the Indebtedness which shall be satisfied by a guarantor's partial payment.

(b)  Except for matters covered by an O&M Program or matters described in any environmental indemnity agreement, Borrowers shall not cause or permit any lien (whether or not such lien has priority over the lien created by this Security Instrument) upon the Property imposed pursuant to any Environmental Laws. Any such lien shall be considered a Prohibited Activity or Condition (as may also be contemplated in any environmental indemnity agreement).

(c)  Borrowers represent and warrant to Lender that, except as previously disclosed by Borrowers or Borrower Parties to Lender in writing:

(1)  at the time of acquiring the Property, Borrowers undertook all appropriate inquiry into the previous ownership and uses of the Property consistent with good commercial or customary practice and no evidence or indication came to light which would suggest that the Property has been or is now being used for any Prohibited Activities or Conditions; and

(2)  the Property has not been designated as "hazardous waste property" or "border zone property" pursuant to Section 25220, et seq., of the California Health and Safety Code.

The representations and warranties in this Security Instrument shall be continuing representations and warranties that shall be deemed to be made by Borrowers throughout the term of the Loans, until the Indebtedness has been paid in full.

---

CALIFORNIA

(d)    Without limiting any of the remedies provided in this Security Instrument, Borrowers acknowledge and agrees that certain provisions in this Security Instrument are environmental provisions (as defined in Section 736(f)(2) of the California Code of Civil Procedure) made by Borrowers relating to the real property security (the "**Environmental Provisions**"), and that to the extent applicable, Borrowers' failures to comply with any of the Environmental Provisions will be a breach of contract that will entitle Lender to pursue the remedies provided by Section 736 of the California Code of Civil Procedure for the recovery of damages and for the enforcement of the Environmental Provisions.

Except as otherwise stated herein, nothing in the provisions of this Amendment shall be deemed in any way to affect the priority of the Original Deed of Trust over any other lien, charge, encumbrance or conveyance, or to release or change the liability of any party who may be liable under the Note.

*[remainder of page intentionally left blank – signature page follows]*

CALIFORNIA

BY SIGNING BELOW, Borrowers accept and agree to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrowers or Borrower Parties.

**BORROWERS:**

**COPPER AVENUE INVESTMENTS, LLC,**
a California limited liability company

By:  Farshid Assemi
Its:  Manager

**LINCOLN GRANTOR FARMS, LLC,**
a California limited liability company

By:  Neema Assemi
Its:  Manager

ACAP FARMS, LLC
a California limited liability company

By: Farshid Assemi
Its: Manager

This document is being executed in counterpart, each of which is deemed to be an original, but such parts constitute one and the same.

BY SIGNING BELOW, Borrowers accept and agree to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrowers or Borrower Parties.

**BORROWERS:**

**COPPER AVENUE INVESTMENTS, LLC,**
a California limited liability company

**LINCOLN GRANTOR FARMS, LLC,**
a California limited liability company

By:  Farshid Assemi
Its:  Manager

This document is being executed in counterpart, each of which is deemed to be an original, but such parts constitute one and the same

By:  Neema Assemi
Its:  Manager

This document is being executed in counterpart, each of which is deemed to be an original, but such parts constitute one and the same

*Neema Assemi*

**ACAP FARMS, LLC**
a California limited liability company

By:  Farshid Assemi
Its:  Manager

A notary public or other officer completing this
certificate verifies only the identity of the individual
who signed the document to which this certificate
is attached, and not the truthfulness, accuracy, or
validity of that document.

STATE OF CALIFORNIA
COUNTY OF ___Fresno___

On ___1/25/2023___ before me, L. Diaz, Notary Public ___, personally appeared
**Farshid Assemi**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and
that by his signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed
the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

Notary Public
Printed Name: ___L. Diaz___
My commission expires: ___April 20, 2026___

L. DIAZ
Notary Public - California
Fresno County
Commission # 2398671
My Comm. Expires Apr 20, 2026

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA
COUNTY OF ___FRESNO___

On __Feb. 1, 2023__ before me, __L. Diaz, Notary Public__, personally appeared **Farshid Assemi**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

Notary Public
Printed Name: __L. Diaz__
My commission expires: __April 20, 2026__

> L. DIAZ
> Notary Public - California
> Fresno County
> Commission # 2398671
> My Comm. Expires Apr 20, 2026

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA
COUNTY OF _____

On _____ before me, _____, personally appeared **Neema Assemi**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

Notary Public
Printed Name: _____
My commission expires: _____

CALIFORNIA

18

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA
COUNTY OF _FRESNO_

On _1/25/2023_ before me, _L. Diaz, Notary Public_, personally appeared **Neema Assemi**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

Notary Public
Printed Name: _____L. Diaz_____
My commission expires: __April 20, 2026__

```
L. DIAZ
Notary Public - California
Fresno County
Commission # 2398671
My Comm. Expires Apr 20, 2026
```

**CALIFORNIA**

19

**ORDER NO. :** 1421002561

# EXHIBIT A

The land referred to is situated in the (See Below) State of California, and is described as follows:

**TRACT I:**

**The land referred to below is situated in an unincorporated area of the County of Kings, State of California:**

PARCEL 1:

The West 20.15 acres of that portion of Lot 10 lying South of Laguna Canal, and all of Lots 11, 12, 13 in Section 10, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, in the County of Kings, State of California, as per map of the Laguna de Tache Grant thereof recorded in the Office of the County Recorder of Fresno County in Book 3 at Page 11 of Record of Surveys, together with that portion of 25th Avenue (abandoned) and 24 1/2 Avenue (abandoned) which would pass by a conveyance of said land under Sections 831 and 1112 of the Civil Code.

EXCEPTING THEREFROM such interest in a strip of land 50 feet wide lying between the Old Crescent Canal right of way and Lots 7 and 8 in said Section 10, as conveyed to Crescent Canal Company, a corporation, by Deed dated January 7, 1913 and recorded April 7, 1913 in Book 51 at Page 78 of Deeds, Kings County Records.

APN: 004-130-030

PARCEL 2:

Lots 1 and 2 lying North of the by-pass of Tulare Lake Basin Water Storage District, in Section 15, Township 18, Range 19 East, Mount Diablo Base and Meridian, as per map of Laguna De Tache Grant thereof recorded in the office of the County Recorder of Fresno County in Book 3 at Page 9 of Record of Surveys.

EXCEPTING THEREFROM any portion thereof lying within San Jose Subdivision as shown on that certain map recorded in Book 3 Page 4 of Licensed Surveyor Plats.

APN: 004-140-012 (Portion)

PARCEL 3:

Those portions of Lots 2 and 3 lying West of canal, all of Lots 3A, 3B, 4, 5, 6, 6A, the well reserved in the Northeast corner of said Lot 6, all of Lots 12, 13 and 13A, in Section 15, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of San Jose Subdivision, recorded March 11, 1930 in Book 3 Page 4, of Licensed Surveyor Plats, Kings County Records.

EXCEPTING THEREFROM all oil, gas and other hydrocarbon substances in or under
said property as previously reserved of record.

APN: 004-140-012 (Portion)

PARCEL 3A:

One acre in the Northwest corner North and West of Kings River Bypass Canal, in Lot 7 in
Section 15, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, as shown on
Map of Laguna de Teche Grant on file with the office of the Kings County Surveyor in Map
Book Page 70.

APN: 004-140-005

PARCEL 4:

Lots 14, 15 and 16, and that portion of Lot 17 lying North of the bypass of Tulare Lake Basin
Water Storage District, in Section 10, Township 18 South, Range 19 East, Mount Diablo Base
and Meridian, as per map of the Laguna de Tache Grant thereof recorded in the Office of the
County Recorder of Fresno County, in Book 3 at Page 11 of Record of Surveys.

EXCEPTING THEREFROM all oil, gas and other hydrocarbon substances in or under
said property as previously reserved of record.

APN: 004-140-002

PARCEL 5:

The Westerly 361.5 feet of the Southerly 361.5 feet of Lot 14 in Section 22, Township 18 South,
Range 19 East, Mount Diablo Base and Meridian, according to the Map of Laguna de Tache
Grant recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 10, of
Record of Surveys.

APN: 004-230-014

PARCEL 6:

Lots 5, 6, 6A, 11 and 12, in Section 22, Township 18 South, Range 19 East, Mount Diablo Base
and Meridian, according to the Map of San Jose Subdivision, recorded March 11, 1930 in Book 3
at Page 4 of Licensed Surveyor Plats, Kings County Records.

EXCEPTING THEREFROM all oil, gas and other hydrocarbons minerals now or at any time
hereafter situate therein and thereunder said land, as saved, excepted and reserved in Deed
recorded May 22, 1945 in Book 329, Page 29, Official Records, as Document No. 3227.

APN: 004-230-026 (Portion)

PARCEL 7:

Lots 13 and 14 in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of Laguna de Tache Grant recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 10, of Record of Surveys, Fresno County Records, lying West of the strip of land described in the Deed from Summit Lake Investment Company, a corporation to Tulare Basin Water Storage District, recorded August 8, 1928 in Book 35 at Page 433, of Official Records, Kings County Records.

EXCEPTING THEREFROM the Westerly 361.5 feet of the Southerly 361.5 feet of Lot 14.

ALSO EXCEPTING THEREFROM such interest in a portion of said Lot 13, conveying to the County of Kings, by Deed dated June 13, 1960 and recorded August 18, 1960 in Book 763 Page 880, of Official Records, as Document No. 8922, described as follows:

Beginning at a point distant North 84° 30' 08" East 860.48 feet from the Southwest corner of said Section 22; thence North 3° 29' 59" West 10 feet; thence along a curve to the right, with a radius of 760.00 feet, through an angle of 94° 48' a distance of 1257.48 feet, with a chord that bears North 46° 05' 59" West, 1118.87 feet; thence South 1° 18' 01" West, 550.00 feet; thence South 88° 41' 59" East 125.10 feet; thence, a long curve to the left, with a radius of 840.00 feet, through an angle of 12° 59' 48" a distance of 190.54 feet, with a cord that bears South 46° 05' 59" East, 190.13 feet; thence South 3° 29' 59" East, 135.10 feet; thence North 86° 30' 01" East, 550.00 feet to a point of beginning.

APN: 004-230-026 (Portion)
     004-230-027

PARCEL 8:

That portion of Lot 15 in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, in the County of Kings, State of California, according to Map of Laguna de Tache Grant recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 10, of Record of Surveys, lying West of the strip of land described in the Deed from Summit Lake Investment Company, a corporation to Tulare Basin Water Storage District, recorded August 8, 1928 in Book 35 at Page 433, of Official Records, Kings County Records.
APN: 004-230-013

# EXHIBIT E

Fresno County Recorder
Paul Dictos, CPA

# 2023-0021406

Recorded at the request of:
CSC, LOGAN

03/09/2023 09:47 52
Titles: 1      Pages: 10
Fees: $46.00
CA SB2 Fees:$75.00
Taxes:  $0.00
Total:  $121.00

This instrument prepared by:
**Conterra Agricultural Capital, LLC**
**Post Closing**
**5465 Mills Civic Parkway, Suite 201**
**West Des Moines, IA 50266**

Recording Requested By/Return To:
**Conterra Agricultural Capital, LLC**
**Post Closing**
**5465 Mills Civic Parkway, Suite 201**
**West Des Moines, IA 50266**

# ASSIGNMENT OF DEED OF TRUST

Loan # **R4030**

For Value Received, the undersigned holder (herein "Assignor") of a Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing (herein "Deed of Trust") whose address is **5465 Mills Civic Parkway, Suite 201, West Des Moines, IA 50266**, does hereby grant, sell, assign, transfer and convey, unto **Rooster Capital IV LLC, a Delaware limited liability company**, whose address is **5465 Mills Civic Parkway, Suite 201, West Des Moines, IA 50266**, ("Assignee"), all beneficial interest under that certain Deed of Trust, Security Agreement, Assignment, all beneficial interest under a certain Deed of Trust dated **February 2, 2023**, made and executed by **C & A Farms, LLC, a California limited liability company, Cantua Orchards, LLC, a California limited liability company, and Gradon Farms, LLC, a California limited liability company to Old Republic Title Company**, Trustee, upon the following described property situated in **Fresno County**, State of **California**:

**Please see the Exhibit "A" attached hereto and made a part hereof.**

Such Deed of Trust having been given to secure payment in the principal amount of $7,400,000.00, which Deed of Trust is of record in the official records of **Fresno County, State of California**, as Document Number: 2023-0010331 together with the notes and obligations therein described, the money due and to become due thereon with interest, and all rights accrued or to accrue under such Deed of Trust.

TO HAVE AND TO HOLD the same unto Assignee, its successor and assigns, forever, subject only to the terms and conditions of the above-described Deed of Trust.

Dated effective this 2nd day of February, 2023.

Multistate Deed of Trust Assignment

1

211631000322 [Doc Id 8448 M11182020]

Conterra Agricultural Capital, LLC

_____  2/28/2023
Signature                                                Date
**Mark A. Smith, COO & General Counsel**

_____
Witness    Madyson Riethoff

STATE OF IOWA
COUNTY OF Polk

Before me, the undersigned authority, on this day personally appeared Mark A. Smith, COO & General Counsel of Conterra Agricultural Capital, LLC, known or proved to me according to law to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he/she/they voluntarily executed the same for the purposes of consideration therein expressed, and in the capacity stated.

Given under my hand and seal this 28ᵗʰ day of February , 2023 .

_____
Notary, State of Iowa

Printed Name: Taylor Petersen
My Commission Expires: 11/9/2024

TAYLOR PETERSEN
Commission Number 813700
My Commission Expires
11-01-2024

Multistate Deed of Trust Assignment

2

211631000322 [Doc Id 8448 Mf 1182020]

**ORDER NO. :** 1421002561

# EXHIBIT A

**TRACT II:**

**The land referred to below is situated in an unincorporated area of the County of Fresno, State of California:**

PARCEL 9:

The North half of the Northeast Quarter of Section 22, Township 16 South, Range 14 East, Mount Diablo Base and Meridian, according to the Plat thereof.

EXCEPTING THEREFROM the North 50 feet, as conveyed to the County of Fresno in Deed recorded April 22, 1970 in Book 5780, Page 78 of Official Records.

APN: 038-141-21S
PARCEL 10:

The Northwest quarter of Section 8, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, according to the Official Plat thereof;

EXCEPTING THEREFROM an undivided one-half interest in and to all oil, gas, minerals and other hydrocarbon substances now or at any time situate in and under said land, as reserved in the deed from R. T. Hughes and Bess L. Hughes, husband and wife, to John H. Edgar and Ruby Dale Edgar, husband and wife, as joint tenants, July 10, 1950, recorded January 24, 1950 in Book 2829 Page 69 of Official Records, Document No. 4385.

ALSO EXCEPTING THEREFROM an undivided one-fourth interest in and to all oil, gas and other hydrocarbons and minerals now or at any time hereinafter situate therein and thereunder, together with all easements and rights necessary or convenient for the production, storage and transportation thereof and the exploration and testing of the said real property, and also the right to drill for, produce and use water from the said real property in connection with drilling or mining operations thereon, as reserved in the deed from Raymond Dale Johnson to Bernie Thurman and James V. Gregory, as Trustees for Tanya Marie Marshall under that certain irrevocable Trust Agreement dated May 30, 1974, recorded on June 25, 1974 as Document No. 47802.

APN: 040-020-18-S

PARCEL 11:

The East half of the Northwest quarter of the Northeast quarter of the Northwest quarter; the West half of the Northeast quarter of the Northeast of the Northwest quarter; and the East half of the Northeast quarter of the Northeast quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the East 420.9 feet of the North half of the Northeast quarter of the Northeast quarter of the Northwest quarter of said Section 7.

ALSO EXCEPTING THEREFROM commencing at the Northwest corner of the East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7, running thence East along the North boundary line of said Section 7; 4.09 feet; thence in a Southerly direction in a straight line to a point on the South boundary line of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7, said point being 17 feet East of the Southwest corner of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7; thence West along the South boundary line of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7; 17 feet to the Southwest corner of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7; thence North along the West boundary line of said East half of the Northwest quarter of the Northeast quarter of the Northwest quarter of said Section 7 to the said Northwest corner of the said East half of the Northwest quarter of the Northeast quarter of the Northeast quarter of said Section 7.

APN: 464-20-07

PARCEL 12:

The West 161 feet of the East 420.9 feet of the North half of the Northeast quarter of the Northeast quarter of the Northwest quarter of Section 17, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN: 464-020-08

PARCEL 13:

The North half of the East 259.9 feet of the East half of the Northeast quarter of the Northeast quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof; said 259.9 feet measured from the East line of said Northwest quarter of said section.

APN: 464-020-09

PARCEL 14:

The North half of the Northeast quarter of the Southeast quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN: 464-020-12

PARCEL 15:

The North half of the Northwest quarter of the Southeast quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN: 464-020-13

PARCEL 16:

The South one-half of the Northeast one-quarter of the Northwest one-quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the East 195 feet of the South 114 feet thereof.

ALSO EXCEPTING THEREFROM that portion lying within Parcel Map No. 82-33, according to the Map thereof recorded in Book 44, Pages 2 and 3 of Parcel Maps, Fresno County Records.

APN: 464-020-15


PARCEL 17:

The East 195 feet of the South 114 feet of the South one-half of the Northeast one-quarter of the Northwest one-quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN: 464-020-16

PARCEL 18:

The Southwest quarter of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN: 464-020-19

PARCEL 19:

The South three-fourths of the Southeast quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the South 351 feet of the East 340 feet thereof.

APN: 464-020-25

PARCEL 20:

Parcel "A" of Parcel Map No. 82-33, according to the Map thereof recorded in Book 44, Pages 2 and 3 of Parcel Maps, Fresno County Records.

APN: 464-020-26

PARCEL 20-A:

A right of way for road purposes over the Westerly 30 feet of the East 330 feet of the East half of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM that portion lying within Parcel Ten described therein.

PARCEL 21:

The fractional Southwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the East 990 feet thereof.

APN: 464-020-28
PARCEL 22:

The West 330 feet of the East 990 feet of the fractional Southwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN: 464-020-29

PARCEL 23:

The West 330 feet of the East 660 feet of the fractional Southwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN: 464-020-30

PARCEL 24:

The East 330 feet of the fractional Southwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

APN: 464-020-31

PARCEL 25:

Parcel B of Parcel Map No. 82-33, according to the Map thereof recorded in Book 44, Pages 2 and 3 of Parcel Maps, Fresno County Records.

APN: 464-020-34

PARCEL 26:

The East 125 feet of the Northwest quarter of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM that portion conveyed to the State of California, by Deed recorded July 31, 2003, as Document No. 2003-0173909, Official Records.

APN: 464-020-35

PARCEL 27:

The East half of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the East 330 feet thereof.

ALSO EXCEPTING THEREFROM that portion of said land as conveyed to the State of California by Grant Deed recorded July 31, 2003, as Document No. 2003-0173909, Official Records.

APN: 464-020-36

PARCEL 28:

The Northwest quarter of the Northwest quarter of the Northwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the West 200 feet thereof.

EXCEPTING THEREFROM the East 125 feet thereof.

ALSO EXCEPTING THEREFROM that portion conveyed to the State of California in the Deed recorded January 12, 2004, as Document No. 2004-0007899, Official Records.

APN: 464-020-37

PARCEL 29:

All of Briscoe Tract, a Subdivision of the East half of the Southwest quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, unincorporated area, County of Fresno, State of California, except Lot 3 of Briscoe Tract, the same being in Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, unincorporated area, County of Fresno, State of California.

ALSO EXCEPTING THEREFROM that portion conveyed to the Fresno Irrigation District by Deed recorded February 13, 2006, as Instrument No. 2006-0031312 of Official Records.

APN: 464-060-17

PARCEL 30:

Lots 13, 14, 15 and 16 of Pleasant Dale, in the City of Fresno, County of Fresno, State of California, according to the Map thereof recorded in Book 2, Page 38 of Plats, in the Office of the County Recorder of said County.

TOGETHER WITH that portion of abandoned South Pleasant Avenue, which would pass by operation of law

APN: 477-021-09

PARCEL 31:

The South half of Lot 2, all of Lot 3 and the North half of Lot 4 of Pleasant Dale, according to the Map thereof recorded December 30, 1887, in Book 2, Page 38 of Plats, Fresno County Records.

PARCEL 31-A:

An easement for a right of way or right to maintain, repair and replace an underground water pipe system as created in that certain Grant of Easement (Agreement) by and between Henry N. Tsuruoka and Lily V. Tsuruoka, husband and wife, and Albert Medzadoorian, recorded March 23, 1979 in Book 7246 of Official Records, Page 579, Instrument No. 34238, and being further described as follows:

That certain 10-foot strip of land lying 5 feet on each side of the following described centerline:

Commencing at the North corner of Section 18, Township 14 South, Range 20 East, M.D.B.M.; thence South along the East line of the Northwest $1/4$ of said Section 18, a distance of 32.96 feet; thence West a distance of 77.95 feet to the true point of beginning; thence South 75° 33' 40" East, a distance of 18.00 feet; thence South 39° 51' 05" East, a distance of 38.13 feet; thence South 00° 58' 30", a distance of 447.09 feet to the North line of the South $1/2$ of Lot 2 of Pleasant Dale, Plats Book 2, Page 38, Fresno County Records.

APN: 477-021-11

PARCEL 32:

The Easterly 200.00 feet of the Southerly 270.00 feet of Lot 9 of Pleasant Dale, according to the Map thereof recorded in Book 2, Page 38 of Plats, Fresno County Records.

APN: 477-021-18

PARCEL 32-A:

A non-exclusive easement thirty (30) foot wide road right of way being described as follows:

The South 30.00 feet of the West 120.00 feet of the East 320.00 feet of Lot 9 of Pleasant Dale according to the Map thereof recorded in Book 2, Page 38 of Plats, Fresno County Records.

PARCEL 32-B:

A non-exclusive five (5) foot wide right of way for maintenance, repairs, operations, additions, alterations and betterments for a water pipeline, the centerline of said right of way being described as follows:

Commencing at a point on the Westerly line of that certain parcel of land, said point bearing South 89° 14' 00" West, 200.00 feet and North 0° 21' 43" East, 32.70 feet from the Southeast corner of Lot 9 of Pleasant Dale according to the Map thereof recorded in Book 2, Page 38 of Plats, Fresno County Records; thence South 89° 14' 00" West, 67.74 feet; thence South 0° 21'

45" West, 6.50 feet to a point South 0° 21' 45" West, 2.50 feet from an existing domestic water well.

PARCEL 33:

Lots 9, 10, 11 and 12 of Pleasant Dale, according to the Map thereof recorded in Book 2, Page 38 of Plats, Fresno County Records.

EXCEPTING THEREFROM the Easterly 200.00 feet of the Southerly 270.00 feet of said Lot 9.

ALSO EXCEPTING THEREFROM the Westerly 170.00 feet of the Southerly 270.00 feet of said Lot 9.

APN: 477-021-19

PARCEL 34:

The un-numbered Lot lying West of, and adjoining, Lots 21, 22, 23 and 234 of Pleasant Dale, according to the Map thereof, recorded in Book 2, Page 38 of Plats, Fresno County Records.

Said property is also described as the West one-half of the Southwest quarter of the fractional Northwest quarter of Section 18, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM the North 214.29 feet of the South 627.7 feet to the West 280.00 feet thereof.

and

Lots 21, 22, 23 and 24 of pleasant dale according to the Map thereof recorded December 30, 1887, in Book 2, Page 38 of Plats, Fresno County Records.

APN: 477-021-20

PARCEL 35:

The West 330 feet of the West one-half of the Northwest quarter of the Northwest quarter of Section 18, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof.

EXCEPTING THEREFROM that portion described in the Deed to the City of Fresno recorded November 14, 2003, as Document No. 2003-0276316, Official Records.

and

Lot 20 of Pleasant Dale, according to the Map thereof recorded in Book 2, Page 38 of Plats, Fresno County Records.

EXCEPTING THEREFROM that portion described in the Deed to the City of Fresno recorded November 14, 2003, as Document No. 2003-0276316, Official Records.

and

Beginning at a point on the North line of the Northwest quarter of Section 18, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, according to the Official Plat thereof, 1980 feet West of the Northeast corner of the Northwest quarter of said Section; thence South 0° 35' East, 1321 feet to a point on the South line of the North half of the Northwest quarter of said Section distant 1970.5 feet South 89° 55' West from the Southeast corner of the Northeast quarter of the Northwest quarter of said Section; thence West along the South line of the North half of the Northwest quarter of said section to the West line of said section; thence North along said West line to the Northwest corner of said section; thence East along the North line of said section to the point of beginning.

EXCEPTING THEREFROM the West 330 feet thereof.

ALSO EXCEPTING THEREFROM that portion described in the Deed to the City of Fresno, recorded November 14, 2003, as Document No. 2003-0276316, Official Records.

APN: 477-021-25

PARCEL 36:

Lots 3, 4, 5 and 6 of West Villa Tract, according to the Map thereof, filed for record in Book 2, Page 49 of Plats, Fresno County Records.

APN: 464-070-10; and 464-070-11

PARCEL 37:

The Northwest quarter of the Southwest quarter of the Southeast quarter and the West half of the Northeast quarter of Southwest quarter of Southeast quarter of Section 7, Township 14 South, Range 20 East, Mount Diablo Base and Meridian, in the County of Fresno, State of California, according to the United States Government Township Plats.

EXCEPTING THEREFROM that portion described in Grant Deed recorded September 8, 1982, as Instrument No. 82-77115, in Book 7969, Page 387 of Official Records.

APN: 464-101-23

# EXHIBIT F

Laura Avila, Assessor-Recorder
Kern County Official Records

SA
3/09/2023
08:48 AM

Recorded Electronically by:
39N Contera Holdings

**DOC#:** 223027084



223027084

| Stat Types: 1 | Pages: 10 |
| --- | --- |
| FEES | 51.00 |
| TAXES | .00 |
| OTHER | 75.00 |
| PAID | 126.00 |

This instrument prepared by:
**Conterra Agricultural Capital, LLC**
**Post Closing**
**5465 Mills Civic Parkway, Suite 201**
**West Des Moines, IA 50266**

Recording Requested By/Return To:
**Conterra Agricultural Capital, LLC**
**Post Closing**
**5465 Mills Civic Parkway, Suite 201**
**West Des Moines, IA 50266**

# ASSIGNMENT OF DEED OF TRUST

**Loan # R4030**

For Value Received, the undersigned holder (herein "Assignor") of a Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing (herein "Deed of Trust") whose address is **5465 Mills Civic Parkway, Suite 201, West Des Moines, IA 50266**, does hereby grant, sell, assign, transfer and convey, unto **Rooster Capital IV LLC, a Delaware limited liability company**, whose address is **5465 Mills Civic Parkway, Suite 201, West Des Moines, IA 50266**, ("Assignee"), all beneficial interest under that certain Deed of Trust, Security Agreement, Assignment, all beneficial interest under a certain Deed of Trust dated **February 2, 2023**, made and executed by **Maricopa Orchards, LLC, a California limited liability company, C & A Farms, LLC, a California limited liability company and Willow Avenue Investments, LLC, a California limited liability company to Old Republic Title Company**, Trustee, upon the following described property situated in **Kern County**, State of **California**:

**Please see the Exhibit "A" attached hereto and made a part hereof.**

Such Deed of Trust having been given to secure payment in the principal amount of $7,400,000.00, which Deed of Trust is of record in the official records of **Kern County, State of California**, as Document Number: 223013715 together with the notes and obligations therein described, the money due and to become due thereon with interest, and all rights accrued or to accrue under such Deed of Trust.

TO HAVE AND TO HOLD the same unto Assignee, its successor and assigns, forever, subject only to the terms and conditions of the above-described Deed of Trust.

Dated effective this 2nd day of February, 2023.

---

Multistate Deed of Trust Assignment

1

**Conterra Agricultural Capital, LLC**

Signature _____ Date 2/28/2023

**Mark A. Smith, COO & General Counsel**

Witness _____
Madyson Riebhoff

STATE OF IOWA
COUNTY OF Polk

Before me, the undersigned authority, on this day personally appeared Mark A. Smith, COO & General Counsel of Conterra Agricultural Capital, LLC, known or proved to me according to law to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he/she/they voluntarily executed the same for the purposes of consideration therein expressed, and in the capacity stated.

Given under my hand and seal this 28TH day of February , 20 23 .

_____
Notary, State of Iowa

Printed Name: Taylor Petersen
My Commission Expires: 11/9/2024



TAYLOR PETERSEN
Commission Number 813700
My Commission Expires
11-9-2024

**ORDER NO. :** 1421002583

# EXHIBIT A

The land referred to is situated in the County of Kern, City of , State of California, and is described as follows:

PARCEL 1:

THE NORTHWEST QUARTER OF SECTION 30, TOWNSHIP 32 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN AN UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT ALL OIL AND GAS WITHIN OR UNDERLYING SAID LAND, AS PREVIOUSLY RESERVED OF RECORD.

APN: 220-170-01

PARCEL 2:

THE NORTHEAST QUARTER OF SECTION 30, TOWNSHIP 32 SOUTH, RANGE 25 EAST, M.D.B.&M., IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL RIGHT, TITLE AND INTEREST IN AND TO THE MINERAL RIGHTS IN THE PROPERTIES DESCRIBED HEREIN (EXPRESSLY EXCLUDING, HOWEVER, THE RIGHT TO USE THE SURFACE FOR OPEN PIT MINING, QUARRYING AND STRIP MINING), AND ALL RIGHTS, TITLE AND INTEREST IN ANY OTHER CONTRACT AGREEMENTS OR RIGHTS, TANGIBLE OR INTANGIBLE THAT ARE OWNED BY THE GRANTOR, IN WHOLE OR IN PART, AND THAT ARE RELATED TO THE OWNERSHIP AND USE OF THE MINERAL RIGHTS CONVEYED HEREBY, FROM THE LANDS.

SPECIFICALLY EXCEPTING THEREFROM ALL SURFACE RIGHTS (EXCEPT FOR THE RIGHTS OF SURFACE ACCESS FOR THE PURPOSE OF GRANTEE AND ITS ASSIGNS EXPLORING FOR, DEVELOPING, PRODUCING, TRANSPORTING AND SELLING MINERALS FROM THE PROPERTY AND WHICH ARE RECOGNIZED BY CALIFORNIA LAW, RULES, ORDER AND REGULATION), PERSONAL PROPERTY OR FIXTURES ASSOCIATED WITH, AFFIXED TO OR LOCATED UPON THE SURFACE, WELL BORES (IF ANY), WATER OR WATER RIGHTS OR ENTITLEMENTS (EXCEPT SUCH WATER AS MAY BE ASSOCIATED AND INCIDENTALLY PRODUCED WITH THE MINERALS FROM THE PROPERTY) OR ANY EXISTING OIL, GAS OR MINERAL PRODUCTION (IF ANY) FROM THE PROPERTY, AS GRANTED TO CALIFORNIA MINERALS, L.P., A TEXAS LIMITED PARTNERSHIP, IN DEED RECORDED DECEMBER 30, 1998 AS INSTRUMENT NO. 0198184684 OF OFFICIAL RECORDS.

APN: 220-170-02

PARCEL 3:

THE WEST HALF OF SECTION 29, TOWNSHIP 32 SOUTH, RANGE 25 EAST, M.D.B.M., IN THE UNINCORPORATED ARE OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING OF THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL RIGHT, TITLE AND INTEREST IN AND TO THE MINERAL RIGHTS IN THE PROPERTIES DESCRIBED HEREIN (EXPRESSLY EXCLUDING, HOWEVER, THE RIGHT TO USE THE SURFACE FOR OPEN PIT MINING, QUARRYING AND STRIP MINING), AND ALL RIGHTS, TITLE AND INTEREST IN ANY OTHER CONTRACT AGREEMENTS OR RIGHTS, TANGIBLE OR INTANGIBLE THAT ARE OWNED BY THE GRANTOR, IN WHOLE OR IN PART, AND THAT ARE RELATED TO THE OWNERSHIP AND USE OF THE MINERAL RIGHTS CONVEYED HEREBY, FROM THE LANDS.

SPECIFICALLY EXCEPTING THEREFROM ALL SURFACE RIGHTS (EXCEPT FOR THE RIGHTS OF SURFACE ACCESS FOR THE PURPOSE OF GRANTEE AND ITS ASSIGNS EXPLORING FOR, DEVELOPING, PRODUCING, TRANSPORTING AND SELLING MINERALS FROM THE PROPERTY AND WHICH ARE RECOGNIZED BY CALIFORNIA LAW, RULES, ORDER AND REGULATION), PERSONAL PROPERTY OR FIXTURES ASSOCIATED WITH, AFFIXED TO OR LOCATED UPON THE SURFACE, WELL BORES (IF ANY), WATER OR WATER RIGHTS OR ENTITLEMENTS (EXCEPT SUCH WATER AS MAY BE ASSOCIATED AND INCIDENTALLY PRODUCED WITH THE MINERALS FROM THE PROPERTY) OR ANY EXISTING OIL, GAS OR MINERAL PRODUCTION (IF ANY) FROM THE PROPERTY, AS GRANTED TO CALIFORNIA MINERALS, L.P., A TEXAS LIMITED PARTNERSHIP, IN DEED RECORDED DECEMBER 30, 1998 AS INSTRUMENT NO. 0198184684 OF OFFICIAL RECORDS.

ALSO EXCEPTING ALL OIL, GAS AND OTHER HYDROCARBONS; NON- HYDROCARBON GASSES OR GASEOUS SUBSTANCES; ALL OTHER MINERALS OF WHATSOEVER NATURE, WITHOUT REGARD TO SIMILARITY TO THE ABOVE-MENTIONED SUBSTANCES; AND ALL SUBSTANCES THAT MAY BE PRODUCED THEREWITH FROM SAID REAL PROPERTY.

ALSO EXCEPTING ALL GEOTHERMAL RESOURCES, EMBRACING: INDIGENOUS STEAM, HOT WATER AND HOT BRINES; STEAM AND OTHER GASES, HOT WATER AND HOT BRINES RESULTING FROM WATER, GAS OR OTHER FLUIDS ARTIFICIALLY INTRODUCED INTO SUBSURFACE FORMATIONS; HEAT OR THE ASSOCIATED ENERGY FOUND BENEATH THE SURFACE OF THE EARTH; AND BY-PRODUCTS OF ANY OF THE FOREGOING SUCH AS MINERALS (EXCLUSIVE OF OIL OR HYDROCARBON GAS THAT CAN BE SEPARATELY PRODUCED) WHICH ARE FOUND IN SOLUTION OR ASSOCIATION WITH OR DERIVED FROM ANY OF THE FOREGOING.

ALSO EXCEPTING, THE SOLE AND EXCLUSIVE RIGHT FROM TIME TO TIME TO DRILL AND MAINTAIN WELLS OR OTHER FACILITIES INTO OR THROUGH SAID REAL PROPERTY AND THE ADJOINING STREETS, ROADS AND HIGHWAYS FOR THE PURPOSE OF EXPLORING FOR AND PRODUCING ENERGY RESOURCES; THE EXCLUSIVE RIGHT TO PRODUCE, INJECT, STORE, AND REMOVE FROM AND THROUGH SUCH WELLS OR FACILITIES, OIL, GAS, WATER AND OTHER SUBSTANCES OF WHATEVER NATURE, INCLUDING THE RIGHT TO PERFORM ANY AND ALL OPERATIONS DEEMED BY GRANTOR NECESSARY OR CONVENIENT FOR THE EXERCISE OF SUCH RIGHTS, INCLUDING BUT NOT LIMITED TO THE RIGHT TO CONDUCT SEISMIC TESTING AND CONSTRUCT, MAINTAIN AND OPERATE PIPELINES, VALVES, CATHODIC PROTECTION FACILITIES, AND APPURTENANCES; AND THE EXCLUSIVE RIGHT TO UTILIZE OR OCCUPY SUBSURFACE FORMATIONS TO STORE OR DISPOSE OF PRODUCED WATER OR OTHER FLUIDS WITHOUT REGARD TO THEIR PLACE OF ORIGIN, AS RESERVED BY CHEVRON U.S.A. INC., A

PENNSYLVANIA CORPORATION, IN DEED RECORDED JUNE 6, 2004 AS DOCUMENT NO. 0204130494, OFFICIAL RECORDS.

APN: 220-170-07

PARCEL 4:

Parcel B of Parcel Map No. 12196, according to the map thereof, filed for record on October 13, 2020, in Book 62 of Parcel Maps, at Pages 1 through 3, Kern County Records.


EXCEPTING THEREFROM ALL RIGHT, TITLE AND INTEREST IN AND TO THE MINERAL RIGHTS IN THE PROPERTIES DESCRIBED HEREIN (EXPRESSLY EXCLUDING, HOWEVER, THE RIGHT TO USE THE SURFACE FOR OPEN PIT MINING, QUARRYING AND STRIP MINING), AND ALL RIGHTS, TITLE AND INTEREST IN ANY OTHER CONTRACT AGREEMENTS OR RIGHTS, TANGIBLE OR INTANGIBLE THAT ARE OWNED BY THE GRANTOR, IN WHOLE OR IN PART, AND THAT ARE RELATED TO THE OWNERSHIP AND USE OF THE MINERAL RIGHTS CONVEYED HEREBY, FROM THE LANDS.

SPECIFICALLY EXCEPTING THEREFROM ALL SURFACE RIGHTS (EXCEPT FOR THE RIGHTS OF SURFACE ACCESS FOR THE PURPOSE OF GRANTEE AND ITS ASSIGNS EXPLORING FOR, DEVELOPING, PRODUCING, TRANSPORTING AND SELLING MINERALS FROM THE PROPERTY AND WHICH ARE RECOGNIZED BY CALIFORNIA LAW, RULES, ORDER AND REGULATION), PERSONAL PROPERTY OR FIXTURES ASSOCIATED WITH, AFFIXED TO OR LOCATED UPON THE SURFACE, WELL BORES (IF ANY), WATER OR WATER RIGHTS OR ENTITLEMENTS (EXCEPT SUCH WATER AS MAY BE ASSOCIATED AND INCIDENTALLY PRODUCED WITH THE MINERALS FROM THE PROPERTY) OR ANY EXISTING OIL, GAS OR MINERAL PRODUCTION (IF ANY) FROM THE PROPERTY, AS GRANTED TO CALIFORNIA MINERALS, L.P., A TEXAS LIMITED PARTNERSHIP, IN DEED RECORDED DECEMBER 30, 1998 AS INSTRUMENT NO. 0198184684 OF OFFICIAL RECORDS.

APN: 220-110-87

PARCEL 5:

THE SOUTH HALF OF THE NORTHEAST QUARTER OF SECTION 22, TOWNSHIP 32 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL RIGHT, TITLE AND INTEREST IN AND TO THE MINERAL RIGHTS IN THE PROPERTIES DESCRIBED HEREIN (EXPRESSLY EXCLUDING, HOWEVER, THE RIGHT TO USE THE SURFACE FOR OPEN PIT MINING, QUARRYING AND STRIP MINING), AND ALL RIGHTS, TITLE AND INTEREST IN ANY OTHER CONTRACT AGREEMENTS OR RIGHTS, TANGIBLE OR INTANGIBLE THAT ARE OWNED BY THE GRANTOR, IN WHOLE OR IN PART, AND THAT ARE RELATED TO THE OWNERSHIP AND USE OF THE MINERAL RIGHTS CONVEYED HEREBY, FROM THE LANDS.

SPECIFICALLY EXCEPTING THEREFROM ALL SURFACE RIGHTS (EXCEPT FOR THE RIGHTS OF SURFACE ACCESS FOR THE PURPOSE OF GRANTEE AND ITS ASSIGNS EXPLORING FOR,

DEVELOPING, PRODUCING, TRANSPORTING AND SELLING MINERALS FROM THE PROPERTY AND WHICH ARE RECOGNIZED BY CALIFORNIA LAW, RULES, ORDER AND REGULATION), PERSONAL PROPERTY OR FIXTURES ASSOCIATED WITH, AFFIXED TO OR LOCATED UPON THE SURFACE, WELL BORES (IF ANY), WATER OR WATER RIGHTS OR ENTITLEMENTS (EXCEPT SUCH WATER AS MAY BE ASSOCIATED AND INCIDENTALLY PRODUCED WITH THE MINERALS FROM THE PROPERTY) OR ANY EXISTING OIL, GAS OR MINERAL PRODUCTION (IF ANY) FROM THE PROPERTY, AS GRANTED TO CALIFORNIA MINERALS, L.P., A TEXAS LIMITED PARTNERSHIP, IN DEED RECORDED DECEMBER 30, 1998 AS INSTRUMENT NO. 0198184684 OF OFFICIAL RECORDS.

APN: 220-110-10

PARCEL 6:

THE NORTH HALF OF THE NORTH HALF OF SECTION 26, TOWNSHIP 32 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM THE INTEREST OF THE SUNSET RAILROAD AS SAID RAILROAD IS NOW LOCATED.

EXCEPTING THEREFROM ALL RIGHT, TITLE AND INTEREST IN AND TO THE MINERAL RIGHTS IN THE PROPERTIES DESCRIBED HEREIN (EXPRESSLY EXCLUDING, HOWEVER, THE RIGHT TO USE THE SURFACE FOR OPEN PIT MINING, QUARRYING AND STRIP MINING), AND ALL RIGHTS, TITLE AND INTEREST IN ANY OTHER CONTRACT AGREEMENTS OR RIGHTS, TANGIBLE OR INTANGIBLE THAT ARE OWNED BY THE GRANTOR, IN WHOLE OR IN PART, AND THAT ARE RELATED TO THE OWNERSHIP AND USE OF THE MINERAL RIGHTS CONVEYED HEREBY, FROM THE LANDS.

SPECIFICALLY EXCEPTING THEREFROM ALL SURFACE RIGHTS (EXCEPT FOR THE RIGHTS OF SURFACE ACCESS FOR THE PURPOSE OF GRANTEE AND ITS ASSIGNS EXPLORING FOR, DEVELOPING, PRODUCING, TRANSPORTING AND SELLING MINERALS FROM THE PROPERTY AND WHICH ARE RECOGNIZED BY CALIFORNIA LAW, RULES, ORDER AND REGULATION), PERSONAL PROPERTY OR FIXTURES ASSOCIATED WITH, AFFIXED TO OR LOCATED UPON THE SURFACE, WELL BORES (IF ANY), WATER OR WATER RIGHTS OR ENTITLEMENTS (EXCEPT SUCH WATER AS MAY BE ASSOCIATED AND INCIDENTALLY PRODUCED WITH THE MINERALS FROM THE PROPERTY) OR ANY EXISTING OIL, GAS OR MINERAL PRODUCTION (IF ANY) FROM THE PROPERTY, AS GRANTED TO CALIFORNIA MINERALS, L.P., A TEXAS LIMITED PARTNERSHIP, IN DEED RECORDED DECEMBER 30, 1998 AS INSTRUMENT NO. 0198184684 OF OFFICIAL RECORDS.

EXCEPTING THEREFROM ALL OIL, GAS AND OTHER HYDROCARBONS; NON-HYDROCARBON GASSES OR GASEOUS SUBSTANCES; ALL OTHER MINERALS OF WHATSOEVER NATURE, WITHOUT REGARD TO SIMILARITY TO THE ABOVE-MENTIONED SUBSTANCES; AND ALL SUBSTANCES THAT MAY BE PRODUCED THEREWITH FROM SAID REAL PROPERTY;

AND ALSO EXCEPTING THEREFROM ALL GEOTHERMAL RESOURCES, EMBRACING; INDIGENOUS STEAM, HOT WATER AND HOT BRINES; STEAM AND OTHER GASES, HOT WATER AND HOT BRINES RESULTING FROM WATER, GAS OR OTHER FLUIDS ARTIFICIALLY INTRODUCED INTO SUBSURFACE FORMATIONS; HEAT OR THE ASSOCIATED ENERGY FOUND

BENEATH THE SURFACE OF THE EARTH; AND BY-PRODUCTS OF ANY OF THE FOREGOING SUCH AS MINERALS (EXCLUSIVE OF OIL OR HYDROCARBON GAS THAT CAN BE SEPARATELY PRODUCED) WHICH ARE FOUND IN SOLUTION OR ASSOCIATION WITH OR DERIVED FROM ANY OF THE FOREGOING.

TOGETHER WITH ALL RIGHTS ASSOCIATED WITH OR CONVENIENT FOR THE EXERCISE OF SUCH RIGHTS AS CONTAINED THEREIN, ALL AS RESERVED BY CHEVRON U.S.A., INC., IN DEED RECORDED DECEMBER 22, 2004 AS INSTRUMENT NO. 0204317445 OF OFFICIAL RECORDS.

APN: 220-130-02

PARCEL 7:

THE SURFACE AND 500 FEET OF THE SUBSURFACE VERTICALLY IN DEPTH BELOW THE SURFACE OF THE EAST HALF OF SECTION 29, TOWNSHIP 32 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT ALL OIL, GAS, ASPHALTUM, AND OTHER HYDROCARBONS AND OTHER MINERALS, WHETHER SIMILAR TO THOSE HEREIN SPECIFIED OR NOT, WITHIN OR THAT MAY BE PRODUCED FROM SAID PARCEL, 500 FEET IN DEPTH, TOGETHER WITH THE EXCLUSIVE RIGHT TO ENTER UPON SAID PREMISES FOR THE PURPOSE OF MINING FOR AND REMOVING THE SAME THEREFROM, AS EXCEPTED AND RESERVED IN THE DEED FROM STANDARD OIL COMPANY OF CALIFORNIA, A DELAWARE CORPORATION, TO CALIFORNIA LAND AND CATTLE COMPANY, A CORPORATION, RECORDED SEPTEMBER 18, 1963, IN BOOK 3644, PAGE 951 OF OFFICIAL RECORDS.

APN: 220-170-08 and 220-170-09 and 220-170-10

PARCEL 8:

THE NORTHWEST QUARTER OF SECTION 28, TOWNSHIP 32 SOUTH, RANGE 25 EAST, MOUNT DIABLO MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT $^1/_2$ OF ALL MINERALS, INCLUDING OIL, PETROLEUM, GAS, ASPHALTUM, BREA, AND OTHER HYDROCARBON SUBSTANCES WITHIN OR UNDERLYING SAID LAND, AS EXCEPTED IN A DECREE OF DECLARATION OF TAKING DATED DECEMBER 31, 1942, A CERTIFIED COPY OF WHICH WAS RECORDED JANUARY 13, 1943 IN BOOK 1090, PAGE 341 OF OFFICIAL RECORDS, AND AS EXCEPTED IN DEED FROM UNITED STATES OF AMERICA, DATED JANUARY 24, 1949 RECORDED MARCH 17, 1949 IN BOOK 1602, PAGE 105 OF OFFICIAL RECORDS.

ALSO EXCEPT REMAINING $^1/_2$ OF ALL MINERALS, INCLUDING OIL, PETROLEUM, GAS, ASPHALTUM, BREA AND OTHER HYDROCARBON SUBSTANCES WITHIN OR UNDERLYING SAID LAND, TOGETHER WITH RIGHT OF ENTRY.

APN: 220-170-11

PARCEL 9:

ALL OF THE SOUTHWEST QUARTER OF SECTION 28, TOWNSHIP 32 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT ALL MINERALS OF WHATSOEVER NATURE (INCLUDING BUT NOT LIMITED TO OIL, GAS, OTHER HYDROCARBONS AND ASSOCIATED SUBSTANCES) IN, UNDER OR WHICH MAY BE PRODUCED THEREFROM, TOGETHER WITH ALL RIGHTS AND PRIVILEGES OF INGRESS, EGRESS, USE AND OCCUPANCY OF, UPON AND WITHIN THE SURFACE AND SUBSURFACE THEREOF AS THE OWNER OF THE AFORESAID MINERALS MAY FROM TIME TO TIME DEEM NECESSARY OR CONVENIENT IN CONNECTION WITH THE EXPLORATION, DEVELOPMENT AND OPERATION OF SAID LANDS FOR THE AFORESAID MINERALS AND THE STORING, HANDLING, TREATING AND TRANSPORTATION THEREOF, ALL WITHOUT LIABILITY WHATSOEVER TO GRANTEE AND ALL AS CONVEYED BY GRANTORS TO SONICO, INC., A DELAWARE CORPORATION, BY MINERAL DEED DATED FEBRUARY 28, 1967, AND RECORDED IN BOOK 4030, PAGE 208 OF OFFICIAL RECORDS OF KERN COUNTY.

APN: 220-170-31 and 32

PARCEL 10:

ALL OF SECTION 19, TOWNSHIP 32 SOUTH, RANGE 26 EAST, M.D.B.M., IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL RIGHT, TITLE AND INTEREST IN AND TO THE MINERAL RIGHTS IN THE PROPERTIES DESCRIBED HEREIN (EXPRESSLY EXCLUDING, HOWEVER, THE RIGHT TO USE THE SURFACE FOR OPEN PIT MINING, QUARRYING AND STRIP MINING), AND ALL RIGHTS, TITLE AND INTEREST IN ANY OTHER CONTRACT AGREEMENTS OR RIGHTS, TANGIBLE OR INTANGIBLE THAT ARE OWNED BY THE GRANTOR, IN WHOLE OR IN PART, AND THAT ARE RELATED TO THE OWNERSHIP AND USE OF THE MINERAL RIGHTS CONVEYED HEREBY, FROM THE LANDS.

SPECIFICALLY EXCEPTING ALL SURFACE RIGHTS (EXCEPT FOR THE RIGHTS OF SURFACE ACCESS FOR THE PURPOSE OF GRANTEE AND ITS ASSIGNS EXPLORING FOR, DEVELOPING, PRODUCING, TRANSPORTING AND SELLING MINERALS FROM THE PROPERTY AND WHICH ARE RECOGNIZED BY CALIFORNIA LAW, RULES, ORDER AND REGULATION), PERSONAL PROPERTY OR FIXTURES ASSOCIATED WITH, AFFIXED TO OR LOCATED UPON THE SURFACE, WELL BORES (IF ANY), WATER OR WATER RIGHTS OR ENTITLEMENTS (EXCEPT SUCH WATER AS MAY BE ASSOCIATED AND INCIDENTALLY PRODUCED WITH THE MINERALS FROM THE PROPERTY) OR ANY EXISTING OIL, GAS OR MINERAL PRODUCTION (IF ANY) FROM THE PROPERTY, AS RESERVED IN DEED RECORDED DECEMBER 30, 1998 AS INSTRUMENT NO. 0198184684 OF OFFICIAL RECORDS.

EXCEPTING ALL OIL, GAS AND OTHER HYDROCARBONS; NON-HYDROCARBON GASSES OR GASEOUS SUBSTANCES; ALL OTHER MINERALS OF WHATSOEVER NATURE, WITHOUT REGARD TO SIMILARITY TO THE ABOVE-MENTIONED SUBSTANCES; AND ALL SUBSTANCES THAT MAY BE PRODUCED THEREWITH FROM SAID REAL PROPERTY.

ALSO EXCEPTING ALL GEOTHERMAL RESOURCES, EMBRACING: INDIGENOUS STEAM, HOT WATER AND HOT BRINES; STEAM AND OTHER GASES, HOT WATER AND HOT BRINES RESULTING FROM WATER, GAS OR OTHER FLUIDS ARTIFICIALLY INTRODUCED INTO SUBSURFACE FORMATIONS; HEAT OR THE ASSOCIATED ENERGY FOUND BENEATH THE SURFACE OF THE EARTH; AND BY-PRODUCTS OF ANY OF THE FOREGOING SUCH AS MINERALS (EXCLUSIVE OF OIL OR HYDROCARBON GAS THAT CAN BE SEPARATELY PRODUCED) WHICH ARE FOUND IN SOLUTION OR ASSOCIATION WITH OR DERIVED FROM ANY OF THE FOREGOING.

ALSO EXCEPTING THE SOLE AND EXCLUSIVE RIGHT FROM TIME TO TIME TO DRILL AND MAINTAIN WELLS OR OTHER FACILITIES INTO OR THROUGH SAID REAL PROPERTY AND THE ADJOINING STREETS, ROADS AND HIGHWAYS FOR THE PURPOSE OF EXPLORING FOR AND PRODUCING ENERGY RESOURCES; THE EXCLUSIVE RIGHT TO PRODUCE, INJECT, STORE, AND REMOVE FROM AND THROUGH SUCH WELLS OR FACILITIES, OIL, GAS, WATER AND OTHER SUBSTANCES OF WHATEVER NATURE, INCLUDING THE RIGHT TO PERFORM ANY AND ALL OPERATIONS DEEMED BY GRANTOR NECESSARY OR CONVENIENT FOR THE EXERCISE OF SUCH RIGHTS, INCLUDING BUT NOT LIMITED TO THE RIGHT TO CONDUCT SEISMIC TESTING AND CONSTRUCT, MAINTAIN AND OPERATE PIPELINES, VALVES, CATHODIC PROTECTION FACILITIES, AND APPURTENANCES; AND THE EXCLUSIVE RIGHT TO UTILIZE OR OCCUPY SUBSURFACE FORMATIONS TO STORE OR DISPOSE OF PRODUCED WATER OR OTHER FLUIDS WITHOUT REGARD TO THEIR PLACE OF ORIGIN, AS RESERVED BY CHEVRON U.S.A. INC., A PENNSYLVANIA CORPORATION, IN DEED RECORDED DECEMBER 31, 2003 AS DOCUMENT NO. 0203281471, OFFICIAL RECORDS.

APN: 295-040-30 and 31

PARCEL 11:


All of Section 13, Township 11 North, Range 23 West, San Bernardino Base and Meridian, in the unincorporated area of the County of Kern, State of California, according to the Official Plat thereof.

Excepting therefrom all right, title and interest in and to the mineral rights in the properties described herein (expressly excluding, however, the right to use the surface for open pit mining, quarrying and strip mining), and all right , title and interest in any other contract agreements or rights, tangible or intangible that are owned by the grantor, in whole or part, and that are related to the ownership and use of the mineral rights conveyed hereby, from the lands.

Specifically excepting and reserving therefrom all surface rights (except for the rights of surface access for the purpose of grantee and its assigns exploring for, developing, producing,

transporting and selling minerals from the property and which are recognized by California law, rules, order and regulation), personal property for fixtures associated with affixed to or located upon the surface, well bores (if any), water or water rights or entitlements (except such water as may be associated and incidentally produced with the minerals from the property) or any existing oil, gas or mineral production (if any) from the property, as granted to California Minerals, L.P., a Texas limited partnership, in Deed recorded December 30, 1998 as Document No. 0198184684 of Official Records.

APN: 239-150-11

# EXHIBIT G

DOC NBR: 2304388          03/23/2023 02:21:12 PM
OFFICIAL RECORDS OF Kings County
Kristine Lee, Clerk-Recorder,
RECORDING FEE: $103.00
COUNTY TAX: $0.00
CITY TAX: $0.00



DOC TYPE: 04
5 PGS
R065

CONTERRA AGRICULTURAL CAPITAL LLC

This instrument prepared by:
**Conterra Agricultural Capital, LLC**
**Post Closing**
**5465 Mills Civic Parkway, Suite 201**
**West Des Moines, IA 50266**

Recording Requested By/Return To:
**Conterra Agricultural Capital, LLC**
**Post Closing**
**5465 Mills Civic Parkway, Suite 201**
**West Des Moines, IA 50266**

# ASSIGNMENT OF DEED OF TRUST

Loan # **R4030**

For Value Received, the undersigned holder (herein "Assignor") of a Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing (herein "Deed of Trust") whose address is **5465 Mills Civic Parkway, Suite 201, West Des Moines, IA 50266**, does hereby grant, sell, assign, transfer and convey, unto **Rooster Capital IV LLC, a Delaware limited liability company**, whose address is **5465 Mills Civic Parkway, Suite 201, West Des Moines, IA 50266**, ("Assignee"), all beneficial interest under that certain Deed of Trust, Security Agreement, Assignment, all beneficial interest under a certain Deed of Trust dated **February 2, 2023**, made and executed by **Copper Avenue Investments, LLC, a California limited liability company, Lincoln Grantor Farms, LLC, a California limited liability company, and ACAP Farms, LLC, a California limited liability company to Old Republic Title Company**, Trustee, upon the following described property situated in **Kings County**, State of **California**:

**Please see the Exhibit "A" attached hereto and made a part hereof.**

Such Deed of Trust having been given to secure payment in the principal amount of $7,400,000.00, which Deed of Trust is of record in the official records of **Kings County, State of California**, as Document Number: 2301892 together with the notes and obligations therein described, the money due and to become due thereon with interest, and all rights accrued or to accrue under such Deed of Trust.

TO HAVE AND TO HOLD the same unto Assignee, its successor and assigns, forever, subject only to the terms and conditions of the above-described Deed of Trust.

Dated effective this 2nd day of February, 2023.

---

Multistate Deed of Trust Assignment

1

211631000322 [Doc Id 8448 M11182020]

**Conterra Agricultural Capital, LLC**

_____    2/28/2023
Signature                                    Date

**Mark A. Smith, COO & General Counsel**

_____
Witness

Madyson Riebhoff

STATE OF IOWA
COUNTY OF Polk

Before me, the undersigned authority, on this day personally appeared Mark A. Smith, COO & General Counsel of Conterra Agricultural Capital, LLC, known or proved to me according to law to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he/she/they voluntarily executed the same for the purposes of consideration therein expressed, and in the capacity stated.

Given under my hand and seal this 28th day of February , 20 23 .

_____
Notary, State of Iowa

Printed Name: Taylor Petersen
My Commission Expires: 11/9/2024

**TAYLOR PETERSEN**
Commission Number 813700
My Commission Expires.
11-9-2024

---

**Multistate Deed of Trust Assignment**

2

**ORDER NO. : 1421002561**

# EXHIBIT A

The land referred to is situated in the (See Below) State of California, and is described as follows:

**TRACT I:**

**The land referred to below is situated in an unincorporated area of the County of Kings, State of California:**

PARCEL 1:

The West 20.15 acres of that portion of Lot 10 lying South of Laguna Canal, and all of Lots 11, 12, 13 in Section 10, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, in the County of Kings, State of California, as per map of the Laguna de Tache Grant thereof recorded in the Office of the County Recorder of Fresno County in Book 3 at Page 11 of Record of Surveys, together with that portion of 25th Avenue (abandoned) and 24 1/2 Avenue (abandoned) which would pass by a conveyance of said land under Sections 831 and 1112 of the Civil Code.

EXCEPTING THEREFROM such interest in a strip of land 50 feet wide lying between the Old Crescent Canal right of way and Lots 7 and 8 in said Section 10, as conveyed to Crescent Canal Company, a corporation, by Deed dated January 7, 1913 and recorded April 7, 1913 in Book 51 at Page 78 of Deeds, Kings County Records.

APN: 004-130-030

PARCEL 2:

Lots 1 and 2 lying North of the by-pass of Tulare Lake Basin Water Storage District, in Section 15, Township 18, Range 19 East, Mount Diablo Base and Meridian, as per map of Laguna De Tache Grant thereof recorded in the office of the County Recorder of Fresno County in Book 3 at Page 9 of Record of Surveys.

EXCEPTING THEREFROM any portion thereof lying within San Jose Subdivision as shown on that certain map recorded in Book 3 Page 4 of Licensed Surveyor Plats.

APN: 004-140-012 (Portion)

PARCEL 3:

Those portions of Lots 2 and 3 lying West of canal, all of Lots 3A, 3B, 4, 5, 6, 6A, the well reserved in the Northeast corner of said Lot 6, all of Lots 12, 13 and 13A, in Section 15, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of San Jose Subdivision, recorded March 11, 1930 in Book 3 Page 4, of Licensed Surveyor Plats, Kings County Records.

*3*

EXCEPTING THEREFROM all oil, gas and other hydrocarbon substances in or under said property as previously reserved of record.

APN: 004-140-012 (Portion)

PARCEL 3A:

One acre in the Northwest corner North and West of Kings River Bypass Canal, in Lot 7 in Section 15, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, as shown on Map of Laguna de Teche Grant on file with the office of the Kings County Surveyor in Map Book Page 70.

APN: 004-140-005

PARCEL 4:

Lots 14, 15 and 16, and that portion of Lot 17 lying North of the bypass of Tulare Lake Basin Water Storage District, in Section 10, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, as per map of the Laguna de Tache Grant thereof recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 11 of Record of Surveys.

EXCEPTING THEREFROM all oil, gas and other hydrocarbon substances in or under said property as previously reserved of record.

APN: 004-140-002

PARCEL 5:

The Westerly 361.5 feet of the Southerly 361.5 feet of Lot 14 in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of Laguna de Tache Grant recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 10, of Record of Surveys.

APN: 004-230-014

PARCEL 6:

Lots 5, 6, 6A, 11 and 12, in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of San Jose Subdivision, recorded March 11, 1930 in Book 3 at Page 4 of Licensed Surveyor Plats, Kings County Records.

EXCEPTING THEREFROM all oil, gas and other hydrocarbons minerals now or at any time hereafter situate therein and thereunder said land, as saved, excepted and reserved in Deed recorded May 22, 1945 in Book 329, Page 29, Official Records, as Document No. 3227.

APN: 004-230-026 (Portion)

PARCEL 7:

Lots 13 and 14 in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, according to the Map of Laguna de Tache Grant recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 10, of Record of Surveys, Fresno County Records, lying West of the strip of land described in the Deed from Summit Lake Investment Company, a corporation to Tulare Basin Water Storage District, recorded August 8, 1928 in Book 35 at Page 433, of Official Records, Kings County Records.

EXCEPTING THEREFROM the Westerly 361.5 feet of the Southerly 361.5 feet of Lot 14.

ALSO EXCEPTING THEREFROM such interest in a portion of said Lot 13, conveying to the County of Kings, by Deed dated June 13, 1960 and recorded August 18, 1960 in Book 763 Page 880, of Official Records, as Document No. 8922, described as follows:

Beginning at a point distant North 84° 30' 08" East 860.48 feet from the Southwest corner of said Section 22; thence North 3° 29' 59" West 10 feet; thence along a curve to the right, with a radius of 760.00 feet, through an angle of 94° 48' a distance of 1257.48 feet, with a chord that bears North 46° 05' 59" West, 1118.87 feet; thence South 1° 18' 01" West, 550.00 feet; thence South 88° 41' 59" East 125.10 feet; thence, a long curve to the left, with a radius of 840.00 feet, through an angle of 12° 59' 48" a distance of 190.54 feet, with a cord that bears South 46° 05' 59" East, 190.13 feet; thence South 3° 29' 59" East, 135.10 feet; thence North 86° 30' 01" East, 550.00 feet to a point of beginning.

APN: 004-230-026 (Portion)
        004-230-027

PARCEL 8:

That portion of Lot 15 in Section 22, Township 18 South, Range 19 East, Mount Diablo Base and Meridian, in the County of Kings, State of California, according to Map of Laguna de Tache Grant recorded in the Office of the County Recorder of Fresno County, in Book 3 at Page 10, of Record of Surveys, lying West of the strip of land described in the Deed from Summit Lake Investment Company, a corporation to Tulare Basin Water Storage District, recorded August 8, 1928 in Book 35 at Page 433, of Official Records, Kings County Records.
APN: 004-230-013