# EXHIBIT A

1    Terence G. Banich (SBN 212173)[1]
     terence.banich@katten.com
2    **KATTEN MUCHIN ROSENMAN LLP**
     525 W. Monroe St.
3    Chicago, IL 60661-3693
     Telephone:    (312) 902-5200
4    Facsimile:    (312) 902-1061

5    John E. Mitchell (*pro hac vice*)
     Michaela C. Crocker (*pro hac vice*)
6    **KATTEN MUCHIN ROSENMAN LLP**
     2121 North Pearl St., Ste. 1100
7    Dallas, TX 75201-2591
     Telephone:    (214) 765-3600
8    Facsimile:    (214) 765-3602

9    *Attorneys for the Receiver*
     Lance Miller
10

11                  **UNITED STATES DISTRICT COURT**

12                  **EASTERN DISTRICT OF CALIFORNIA**

13

14   FEDERAL AGRICULTURAL MORTGAGE          ) No. 1:24-cv-01455-KES-SAB
     CORPORATION,                           )
15                                          ) **SUPPLEMENTAL DECLARATION**
                        Plaintiff,          ) **OF LANCE MILLER IN SUPPORT**
16                                          ) **OF OMNIBUS REPLY TO**
            v.                              ) **OBJECTIONS FILED BY AMERICAN**
17                                          ) **EQUITY INVESTMENT LIFE**
                                            ) **INSURANCE COMPANY [DKT. NOS.**
18   ASSEMI BROTHERS, LLC; MARICOPA         ) **56 & 74] AND JOINDER FILED BY**
     ORCHARDS, LLC; C & A FARMS, LLC;       ) **THE MARICOPA DEFENDANTS**
19   WHITESBRIDGE FARMS, LLC; WILLOW        ) **[DKT. NO. 75]**
     AVENUE INVESTMENTS, LLC; LINCOLN       )
20   GRANTOR FARMS, LLC; COPPER             ) Hearing:
     AVENUE INVESTMENTS, LLC; ACAP          ) Hearing Date:   April 21, 2025
21   FARMS, LLC; CANTUA ORCHARDS, LLC;      ) Hearing Time:  1:30 P.M. PT
     GRADON FARMS, LLC,                     )
22                                          ) Location: Robert E. Coyle U.S. Courthouse
                        Defendants.         )           2500 Tulare Street
23                                          )           Courtroom 6, 7th floor
                                            )           Fresno, CA 93721
24                                          )
                                            ) Judge:   Honorable Kirk E. Sherriff
25                                          )
                                            ) Action Filed: November 27, 2024
26                                          )
     _____)
27

28   _____
     [1]   Designated as counsel for service pursuant to L.R. 182(c)(1).

I, Lance E. Miller, declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury as follows:

1.      I am over the age of eighteen years, am under no disability, and am competent to testify to the matters set forth herein. Except as otherwise stated, all facts set forth in this declaration are based upon my personal knowledge and/or my review of documents. If called as a witness in this case, I could and would testify competently to the facts set forth in this Declaration.

2.      I submit this Declaration in support of the *Omnibus Reply to Objections Filed by American Equity Investment Life Insurance Company [Dkt. Nos. 56 & 74] and Joinder Filed by the Maricopa Defendants [Dkt. No. 75]* (the "**Omnibus Reply**").[2]

3.      This Declaration supplements my Declarations (the "**Declarations**") filed in support of the *Unopposed Motion of Receiver Lance Miller for Order Authorizing Engagement and Compensation of Pearson Realty as Real Estate Broker; Memorandum of Points and Authorities in Support Thereof* [Dkt. No. 48] ("**Employment Motion**"), *and Unopposed Motion of Receiver Lance Miller for an Order Establishing Marketing, Bid, and Auction Procedures for Broker-Marketed Properties; Memorandum of Points and Authorities* [Dkt. No. 50] ("**Marketing Motion**," and together with the Pearson Employment Motion, the "**Motions**").

4.      As described in the Declarations, pursuant to the *Order Appointing Receiver and for Preliminary Injunction* [Dkt. No. 29] (the "**Receivership Order**"), I, with the assistance of Pivot Group, have spent considerable time analyzing the Receivership Property (as defined in the Receivership Order) and related operations and have concluded, in the exercise of my business judgment, that a sale of the Receivership Property through an organized process via public option is appropriate.

5.      To maximize value, I have placed the Receivership Property into two categories in

---

[2]   All capitalized terms used in this Declaration but not defined shall have the meanings ascribed to them in the Omnibus Reply.

relation to the marketing and sale process: (1) parcels of real estate that should be sold together in order to maximize value (the "**Capstone Properties**"), which are the subject of motion to employ Capstone Marketing LLC ("**Capstone**") as investment banker, which is currently set for hearing on May 5, 2025; and (2) parcels of real estate whose value is not linked to the operation of the Capstone Properties (the "**Pearson Properties**"), which are the subject of the Employment Motion and are listed in the Pearson Engagement Letter (defined below).

6.    In addition, by the Marketing Motion, I am seeking to establish procedures to govern the marketing, bidding, and auction processes in connection with the Pearson Properties.

7.    To be clear, I am not seeking to sell any of Receivership Property free and clear of liens, claims, or encumbrances (collectively, the "**Interests**") at this time. Any request to sell property free and clear of Interests will come via a separate notice or motion to be filed with the Court.

**A. My Efforts During this Case**

8.    Since my appointment, I have devoted substantial and extraordinary amounts of time to communicate with stakeholders in this case. Among other things, I have established a virtual data room (the "**VDR**") for use by lenders in this case (including AEIL), where they can access information regarding loan obligations, crop receipts and allocations, and diligence regarding water infrastructure related to Maricopa Orchards, LLC and its affiliates (the "**Company**"). I also provide lengthy, bi-monthly written reports regarding all of his efforts. These reports, provided to each lender with access to the VDR (including AEIL), detail the receivership's cash and budget performance, the status regarding ongoing sale efforts, and updates regarding any other noteworthy efforts impacting the receivership. Each of these reports has a section specifically addressing the status of Pearson's and Capstone's sale efforts. I have received *no* feedback or questions from AEIL regarding these updates.

9.    I also began participating on weekly status calls with the MOC Defendants' principals almost immediately after my appointment in this case and have spoken with their counsel on numerous occasions since she filed a notice of appearance. The MOC Defendant status calls are in addition to weekly status calls I hold with the MetLife/Brighthouse Receiver, the Prudential Lenders, and FarmerMac, as well as periodic calls with the Touchstone Receiver and third parties that own land adjacent or near receivership property to keep them appraised of case status and the sale process. I have also reached out via email and telephone and have had discussions directly with Michael Rudnick, and my counsel has had multiple discussions with Rooster's counsel since each filed an objection in this case. This is in addition to the objections and other matters I have consensually resolved in the Prudential case.

10.    I believe that my push for open communication and coordination is further reflected in my approach to selecting sale-related professionals and the sale-related documents themselves. That process started in early November 2024, with my launch of a solicitation process to find professionals for marketing the Company's and the receivership's assets. Around this same time, I brought to the lenders' attention the need to negotiate with and/or reach out to multiple stakeholders regarding collective marketing of Company assets as a whole or in large pieces, and provided a copy of the request-for-proposal solicitation letter (the "**RFP**") to be distributed to prospective bankers and real estate brokers. A true and correct copy of the RFP provided to potential professionals, which was prepared with my participation and under my direct supervision, is attached hereto as **Exhibit 6**, In that RFP, I asked each recipient to, among other things, provide "[r]ecommendations regarding whether all assets should be marketed through the same process, or whether specific assets can/should be sold separately." This RFP letter was distributed to proposed professionals, each of whom provided a written response with their recommendations regarding how best to market the Company's and the receivership's assets. Virtually all of those recommendations – including from

Capstone and Pearson – recommended a multi-pronged approach whereby blocks of assets would be marketed together as a comprehensive operation, and others would be marketed through a brokerage process.

11.    Upon receipt of written responses to the RFP, I provided each of AEIL, the MOC Defendants, MetLife/Brighthouse, the MetLife/Brighthouse Receiver, Prudential, and FarmerMac (collectively, the "**Process Participation Group**") with copies of all pitch materials, along with a lengthy summary presentation prepared by me. I then solicited input from each party in the Process Participation Group regarding which professionals should be elevated to a round of interviews. Based on that feedback, I scheduled interviews with eight different candidates, and invited each member of the Process Participation Group (including AEIL) to attend. Each of these parties (including AEIL) accepted the invitation and participated in the interviews. During each interview, I asked each professional about their proposed timeline for completing sales and recommendations for which assets should be sold together and which through a brokerage process. AEIL was present for those discussions, and did not raise any objections or concerns. Following these interviews, I provided each member of the Process Participation Group (including AEIL) with my thoughts and recommendations regarding the selection and sought input. AEIL did not object to my recommendations or raise any concerns regarding the retention of Pearson or Capstone, whereupon I moved forward to select them as professionals in this case.

12.    The engagement letter between the myself and Capstone [Dkt. No. 171], which is set for hearing on May 5, 2025, continues to give parties an opportunity to participate in the sale process by specifically stating that I and Capstone will work to add additional properties into the Capstone sale process, including (to the extent each wishes to participate) properties owned/controlled, or subject to liens held, by: (a) the MetLife/Brighthouse receiver; (b) the MOC Defendants that are landowners; (c) third-parties owning properties adjacent, bounded by or otherwise related to the

Capstone-marketed properties; and (d) additional lenders to the MOC Defendants or their affiliates. Capstone Engagement Letter § 2(d). In fact, I have reached agreement on a form of joinder with certain MOC Defendants and continue to work with MetLife/Brighthouse and the MetLife/Brighthouse receiver, as well as other third parties, on similar joinders. I am aware of nothing preventing potential buyers from purchasing parcels administered by different receivers and I will gladly work with others in this regard.

13. The marketing procedures proposed in the Marketing Motion were based on the procedures filed by the MetLife/Brighthouse receiver that were previously approved by this Court on April 1, 2025[Case No. 24-1261 Dkt. No. 132]. This was done intentionally since both receivers were seeking to employ Pearson to market certain real estate and I believe that consistency between estates should help avoid confusion in the market (or difficulties if a party wishes to purchase Pearson-marketed properties across multiple estates).

14. Moreover, I am in weekly contact with the MOC Defendants, FarmerMac, Prudential, the MetLife/Brighthouse Receiver, and others, and am working with those parties with respect to the sale process and to help ensure that properties that should remain together are sold together.

15. I believe that the process I am pursuing provides the very thing that AEIL purports to want in its Supplemental Objection. Through a series of negotiations and cooperation with the various stakeholders in these cases, I have managed to coordinate a marketing process for substantially all of the MOC Defendants' assets (both receivership and non-receivership property). As reflected in the table below, which was prepared at my direction and under my supervision, the marketing efforts for Capstone and Pearson combined are addressing approximately 86% of the Company's properties. AEIL is the sole remaining material holdout from the process, and if AEIL would simply "say yes" to the Receiver's coordination, that percentage would increase to approximately 93%. AEIL's refusal to participate speaks volumes.

**Total Participation w/o AEIL**

| 1st Lien/Owner | Total Assessed Acres | Included in Sale Process | Excluded from Process |
|---|---|---|---|
| 3rd Party | 424 | 70 | 354 |
| FAMC (Solar Loans) | 1,430 | 1,430 | |
| AEIL | 4,226 | | 4,226 |
| FAMC | 2,956 | 2,956 | |
| Met Life | 4,108 | 4,108 | |
| Met Life/Prudential | 79 | 79 | |
| Prudential | 44,098 | 44,098 | |
| AgWest Farm Credit | 1,981 | | 1,981 |
| RaboBank | 1,182 | | 1,182 |
| Modern Woodsman | 3,311 | 3,311 | |
| Assemi | 1,922 | 757 | 1,165 |
| **Totals:** | 65,716 | 56,808 | 8,908 |
| **Percentages** | 100% | 86% | 14% |

**Total Participation w/ AEIL Participating**

| 1st Lien/Owner | Total Assessed Acres | Included in Sale Process | Excluded from Process |
|---|---|---|---|
| 3rd Party | 424 | 70 | 354 |
| FAMC (Solar Loans) | 1,430 | 1,430 | |
| AEIL | 4,226 | 4,226 | |
| FAMC | 2,956 | 2,956 | |
| Met Life | 4,108 | 4,108 | |
| Met Life/Prudential | 79 | 79 | |
| Prudential | 44,098 | 44,098 | |
| AgWest Farm Credit | 1,981 | - | 1,981 |
| RaboBank | 1,182 | - | 1,182 |
| Modern Woodsman | 3,311 | 3,311 | |
| Assemi | 1,922 | 757 | 1,165 |
| **Totals:** | 65,716 | 61,035 | 4,682 |
| **Percentages** | 100% | 93% | 7% |

302821817

**B.  My Meet and Confer Efforts with AEIL**

16.    Since entry of this Court's March 6 Minute Order, Michael Rudnick and I have participated on at least four calls and multiple emails related to assets sales in this case, including the Pearson Properties:

- On March 17-19, 2025, Mr. Rudnick and I exchanged emails regarding the cooperating procedures being proposed by the MOC Defendants in relation to the sale processes. A true and correct copy of this email chain, with attachment and as printed by my counsel, is attached hereto as **Exhibit 1.**

- On March 20, 2025, I had a call with Mr. Rudnick that lasted approximately 30 minutes to discuss the cooperation agreement proposed by the MOC Defendants, which would include AEIL participating in weekly status calls, receiving pre-notice of certain sale-related actions, and consultation rights. During that call, he expressed a strong desire for transparency regarding the sale process and input on allocation of sale proceeds, which I understand was the intent of the cooperation agreement.

- On April 1, 2025, I received a short call from Mr. Rudnick indicating that I would be receiving comments to the proposed cooperation procedures shortly. On that call, he expressed appreciation for the approach and for trying to work with AEIL to address its concerns. I committed to review his comments and get back in touch with him as soon as possible.

- On April 2, 2025, I received Mr. Rudnick's comments to the cooperation procedures. A true and correct copy of the email dated April 2, 2025, with attachments and as printed by my counsel, is attached hereto as **Exhibit 2.**

- On April 3, 2025, I provided additional comments to Mr. Rudnick regarding the cooperation procedures. A true and correct copy of the email dated April 3, 2025,

with attachments and as printed by my counsel, is attached hereto as **Exhibit 3**. The redline attached to this email reflects changes to address the fact that the Court had denied the Coordination Motion filed by the MOC Defendants in the Touchstone case, but I was willing to proceed by agreement on similar terms with AEIL and Rooster in order to resolve their respective objections.

- On April 5, 2025, I sent a proposed sale proceeds allocation methodology and timeline to Mr. Rudnick with a request for comments. A true and correct copy of the April 5, 2025, email, without the confidential attachment and as printed by my counsel, is attached hereto as **Exhibit 4**. I believe that premature public disclosure of the proposed allocation methodology, which is a work in process, could affect ongoing sale-related negotiations and, as such, must remain confidential. That same day, Mr. Rudnick and I also exchanged emails regarding my decision to re-file the Capstone employment motion in this case. A true and correct copy of that email chain, as printed by my counsel, is attached hereto as **Exhibit 5.**

- On April 10, 2025, I called Mr. Rudnick to ask about the status of the cooperation procedures. He apologized and said he had not reviewed and committed to reviewing the document.

- April 14, 2025, I called Mr. Rudnick again to inquire about the status of the cooperation procedures. He did not mention a forthcoming objection and instead asked me to remind him of where things stand on the cooperation procedures. He also asked if I would be willing to carve out the Pearson assets until after a resolution was reached, and I informed him I could not do so. He then said he "understood the bid and the ask" and would get back to me.

- The Objection was filed later that evening, stating that "[c]ontrary to the Court's

302821817

Minute Order, the Receiver failed to contact American Equity to initiate meet-and-confer discussions." Supp. Obj. at 1.

17.    At no point during my discussions with Mr. Rudnick did he direct me to AEIL's counsel or request that I speak to AEIL through its counsel.

18.    During my discussions with Mr. Rudnick, I offered to schedule a call between AEIL and Pearson to discuss the sale process, but AEIL declined. AEIL has also not requested additional information regarding the terms of Pearson's engagement or its compensation structure since the Motions were filed.

19.    At my request, Capstone contacted AEIL on two separate occasions to provide updates regarding the sale process, associated thinking regarding sale-related strategy and planning, and the desire to pursue a comprehensive and integrated sale process that would include AEIL's collateral.

20.    Despite the efforts described above, I was unable to reach an agreement with AEIL regarding the cooperation protocol or the Objection.

21.    Based on my discussions with various parties, including Mr. Rudnick, it is my firm belief that AEIL does not really have concerns regarding my proposed sale process. To the contrary, Mr. Rudnick explained AEIL's primary goal to me, summarized as follows: finding itself in a junior lien position amidst concerns of repayment from a full and fair sale process, AEIL believes that it can push the MOC Defendants into a bankruptcy filing where AEIL, as a debtor-in-possession lender, can improve its secured position. To that end, it is my understanding, based on my conversations with Mr. Rudnick, that AEIL is attempting a two-pronged approach: (1) it is aggressively pursuing claims under personal guarantees owed by the owners of the MOC Defendants – claims for which the amount owed cannot be liquidated until these sales are completed; and (2) AEIL will object to every step along the way in the administration of receivership

302821817

assets and take all possible avenues of appeal, in order to make the receivership as difficult as possible for other stakeholders.

**C. Selection of Pearson**

22.    I ran and participated in a fulsome engagement process before selecting Pearson, including sending the RFP to potential brokers and investment bankers, interviewing eight separate firms and, in consultation with FarmerMac, as required by the Receivership Order, determined to hire Pearson. I opened the interview process to various parties in interest, including AEIL, who attended Pearson's interview (as well as other interviews) and participated in post-interview calls regarding the candidates. At no time during that process did AEIL raise concerns regarding Pearson's qualification or employment.

23.    Pearson has extensive experience with, and connections to, the regional market and potentially interested buyers. Pearson possesses broad familiarity with the local farming community, which I believe will enable it to facilitate sales with greater efficiency and a higher degree of certainty. I believe that Pearson's established relationships and market knowledge will enhance the likelihood of securing timely and successful transactions. I believe that the resources available to Pearson will be instrumental in navigating complex issues and ensuring a smooth sale process.

24.    The terms of the Engagement Letter with Pearson (the "**Pearson Engagement Letter**") are the product of good-faith, arm's length negotiations between the me, or other members of Pivot, and Pearson that included the exchange of multiple rounds of drafts to align the terms of Pearson's employment with the objectives of Pearson's engagement. The terms of Pearson's engagement are customary and consistent with market standards for transactions of this nature and complexity.

25.    The commission structure set forth in the Pearson Engagement Letter is a step function

302821817

based on the total transfer sales price and, based on my experience, is commensurate with the commission structure proposed by other brokers and are consistent with market terms for broker engagements of this nature and complexity. The fee structure reflects prevailing industry practices for engagements of comparable size and complexity.

26.     The proposed marketing procedures in the Marketing Motion were based on the procedures filed by the MetLife/Brighthouse receiver that were previously approved by this Court on April 1, 2025[Case No. 24-1261 Dkt. No. 132]. This was done intentionally since both receivers were seeking to employ Pearson to market certain real estate and I believe that consistency between estates should help avoid any confusion in the market (or difficulties if a party wishes to purchase Pearson-marketed properties across multiple estates).

27.     Given the expertise offered by Pearson, the scope of its engagement and the benefits its services will provide in this case, I believe that the terms of Pearson's engagement as reflected in the Pearson Engagement Letter are customary, appropriate, warranted, and reasonable under the circumstances.

**D.  Concerns Raised in the Tracy Declaration**

28.     I have reviewed the declaration of Thaddeus Tracy in support of the Supplemental Objection [Dkt. 74-2] (the "**Tracy Declaration**"). I am acquainted with Mr. Tracy, and have spoken directly with him on several occasions. Until his Declaration, neither AEIL nor Mr. Tracy raised any of the concerns addressed in his Declaration. Nevertheless, I believe that the anticipated sale process and retention of Pearson will address and ameliorate the concerns raised in the Tracy Declaration.

29.     Mr. Tracy is concerned with the sale effort for Copus Ranch, located in the Wheeler Ridge Irrigation District, and states that a single chief restructuring officer ("**CRO**") "would be able to consider a sale of the Farmer Mac collateral at the Copus Ranch and package that with adjacent

parcels that are controlled today by receivers nominated by Prudential and MetLife." Tracy Decl. ¶ 15. In fact, as part of the RFP and interview process discussed above, I and my team solicited feedback from each potential broker and banker candidate – along with members of the Sale Process Group (including AEIL and Mr. Tracy) – as to whether assets located within Wheeler Ridge should be sold through a separate brokerage process (now led by Pearson), or through the banking process (now led by Capstone). My consideration of this potential issue related to all of the Company's assets in Wheeler Ridge, not just receivership assets. I was concerned that selling assets individually, as opposed to with adjacent parcels, might not maximize the value for all stakeholders. Ultimately, in the exercise of my business judgment and based on feedback from the RFP process and discussions with both Pearson and Capstone, I concluded that the assets located within Wheeler Ridge are sufficiently individualized and should be sold separately through a brokerage process, as opposed to Kamm Ranch where, in the exercise of my business judgment, I concluded the receivership parcels should be sold with adjacent properties. I do not believe that I would have made a different decision if I were a CRO (rather than a receiver) in this matter.

30.     With respect to Kamm Ranch and the "landlocked parcel" that is subject to an AEIL third lien/FarmerMac first lien, I filed a motion in this case to employ Capstone that would have added the landlocked parcel to Capstone's sale of the surrounding Prudential parcels. AEIL objected to that motion, which resulted in my withdrawing the motion on March 10, 2025, and filing a renewed motion April 7, 2025. I believe that selling the landlocked parcel in conjunction with the surrounding parcels will maximize value for the lenders for whom the parcel serves as collateral. Based on the tone of the Objection, I believe it likely that AEIL will, once again, object to the landlocked parcel being marketed as part of Kamm Ranch, despite the concerns raised by Mr. Tracy in his Declaration.

31.     Mr. Tracy is also concerned that the brokerage process "risks flooding the market and

302821817

pushing prices down, or worse, incentivizes a race among the sellers to transact first." *Id*. at ¶ 16. I had the same concern when various responses to the RFP process suggested that some assets should be sold through a brokerage process ahead of the banking/Capstone process, and I spent a considerable amount of time and effort to investigate this risk. Among other things, I asked each of the interviewed RFP professionals about this risk in particular and, following their selection, discussed the risk at length with both Pearson and Capstone. Notably, Capstone – whose sales will likely trail behind the brokerage process and therefore be most impacted by this concern – was *supportive* of selling some assets first and through a brokerage process. In addition, I discussed this concern at length with the MetLife/Brighthouse receiver in order to underscore the need for our coordination. Ultimately, based on these and other discussions and in the exercise of my business judgment, I concluded that there is not a risk of "flooding the market and pushing prices down." I reached this conclusion, in consultation with the parties mentioned above, for the following reasons:

a) Each water district is generally its own market and, for the most part, has its own demand and set of buyers. This means that prices for assets in Wheeler Ridge, for example, would not be expected to be influenced by supply in the Semitropic water district (and vice versa).

b) A "flood the market" concern is most acute where there are multiple brokers chasing the same buyers. Here, both the MetLife/Brighthouse and FarmerMac receiverships have retained the same broker – Pearson – so that conversations with buyers can be coordinated and wholistic regarding their needs and interest. For example, Mr. Tracy points to adjacent parcels of land in the Copus Ranch. Whereas each of those parcels will be listed separately for sale (all by Pearson), the conversation with Pearson will allow for combination of these parcels where appropriate so as to reduce a "flood the market" dynamic. Although I am seeking authority to hire Ca Ag Properties as my

broker in the related Prudential case (24-cv-1102), I have directed the brokers to cooperate and communicate and I will oversee and coordinate their sale efforts.

    c)    There is legitimate reason to believe that selling assets early can *increase* the overall result in this case. Early sales can set market expectations on a price-per-acre for future sales. By coordinating with Pearson and the MetLife/Brighthouse receiver, I expect that these early sales will have favorable pricing that will set an important metric for bids received for the banking process down the road.

    32.    Finally, Mr. Tracy points to the Calaveras Ranch and expresses a preference for marketing those assets "as a single property to capitalize on the shared irrigation infrastructure and services." I agree with this preference, and have approached each of the owners and lenders that are outside of this receivership (Modern Woodsman of America and AEIL) with a request that they agree to participate in the Capstone sale process. My understanding is that Modern Woodsman is favorably considering that request. AEIL, however, has refused.

    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 18, 2025
In Manhattan Beach, California


                      By:  /s/ Lance E. Miller
                            Lance E. Miller

302821817

# EXHIBIT 1

**Harris, Connie**

| | |
|---|---|
| **From:** | Lance Miller <lance.miller@pivotgrp.com> |
| **Sent:** | Wednesday, March 19, 2025 11:57 AM |
| **To:** | Rudnick, Michael |
| **Cc:** | Thaddeus Tracy |
| **Subject:** | RE: Maricopa MOU |

Thank you.

Lance Miller
Managing Partner
Pivot Group
323-774-7122
Lance.miller@pivotgrp.com



**From:** Rudnick, Michael <michael.rudnick@brookfield.com>
**Sent:** Wednesday, March 19, 2025 9:53 AM
**To:** Lance Miller <lance.miller@pivotgrp.com>
**Cc:** Thaddeus Tracy <ttracy@farmersgateag.com>
**Subject:** Re: Maricopa MOU

Lance,

Apologies, I am traveling this week but confirming receipt.  We will review and come back as soon as possible.  Thank you for the MOU.

**Michael Rudnick**
Managing Director | Investments
Brookfield Special Investments

Brookfield Asset Management
Brookfield Place New York
250 Vesey Street, 15th Floor, New York, New York 10281
T +1.212.618.3444 | M +1.914.450.4774
michael.rudnick@brookfield.com
www.brookfield.com

**Brookfield**

View important disclosures and information about our e-mail policies here

**From:** Lance Miller <lance.miller@pivotgrp.com>
**Sent:** Wednesday, March 19, 2025 11:42:11 AM
**To:** Rudnick, Michael <michael.rudnick@brookfield.com>

**Cc:** Thaddeus Tracy <ttracy@farmersgateag.com>
**Subject:** RE: Maricopa MOU

==**CAUTION EXTERNAL EMAIL:** DO NOT CLICK ON LINKS OR OPEN ATTACHMENTS UNLESS YOU KNOW THE CONTENT IS SAFE.==

Hi Michael,

Following up regarding the below.

Lance Miller
Managing Partner
Pivot Group
323-774-7122
Lance.miller@pivotgrp.com



**From:** Lance Miller
**Sent:** Monday, March 17, 2025 8:58 PM
**To:** Rudnick, Michael <michael.rudnick@brookfield.com>
**Cc:** Thaddeus Tracy <ttracy@farmersgateag.com>
**Subject:** Maricopa MOU

SUBJECT TO FRE 408
CONFIDENTIAL

Hi Michael,

As previously discussed, we have been in discussions with the Company regarding a construct that would give participating parties visibility and input into the sale process. Attached is the current version. Please take a look and let me know if this is something that can serve as a basis for resolving your concerns. My request would be that, as part of this construct, Brookfield would consent to the marketing of its collateral (subject to a reservation of rights with respect to an actual transaction).

Lance Miller
Managing Partner
Pivot Group
323-774-7122
Lance.miller@pivotgrp.com



*Privileged and Confidential*
*Settlement Purposes Only*
*Draft 3/12/2025*

The Maricopa Defendants will move the Court to enter an order or enter into a stipulated order requiring cooperation and coordination of a sale process among the Metropolitan Receiver, the Prudential/FAMC Receiver, and the Maricopa Defendants (collectively, the "Parties" and each, individually, a "Party") substantially on the terms described below:

- A Consultation Group (the "CG") shall be formed by no later than 7 days following entry of a Court order approving these procedures (the "Coordination Order"), consisting of the following parties (by and through themselves and their respective designated professionals and representatives):

    o Phillip Christensen, solely in his capacity as receiver (the "Metropolitan Receiver");

    o Lance Miller, solely in his capacity as receiver (the "Prudential/FAMC Receiver");

    o The Maricopa Defendants;

    o American Equity Investment Life Insurance (subject to withdrawal of its objection to Pearson Realty's employment and agreement to add APN Nos. 038-141-21S and 040-020-18S to the Capstone sale process and joinder in the Capstone Engagement Letter);

    o Rooster Capital IV, LLC (subject to withdrawal of its objection to Pearson Realty's employment and agreement to add APN Nos. 038-141-21S and 040-020-18S to the Capstone sale process and joinder in the Capstone Engagement Letter); and

    o any third-party holding a lien in real property that the Receivers determine should be added to the CG in furtherance of the sale process.

- The Prudential/FAMC Receiver shall be the chair of the CG. In that capacity, the Prudential/FAMC Receiver shall convene weekly status conferences of the CG to discuss the status of each Receivers' respective sale processes, including (1) bidder interest and discussions, (2) any cross-over or interest in multiple receivership assets, (3) updates on any offers received, and (4) timelines of sale processes.

*Privileged and Confidential*
*Settlement Purposes Only*
*Draft 3/12/2025*

- All conferences and communications among the Parties, as well as all documents and information shared, pursuant to the Stipulated Protocol shall be strictly confidential and conducted under and pursuant to FRE 408. Nothing in the Stipulated Protocol will (a) amend or otherwise modify each Receiver's duties under their respective appointment orders or other orders entered by the Court or (b) require a Receiver to provide the same, or substantially similar, information to members of a CG.

- The Parties agree to promptly engage in good faith in order to reach agreement on any sales process or issue related thereto, including sharing information to assist on allocations of value in relation to pending or future asset sales.

- The Maricopa Defendants agree to timely respond to commercially reasonable information requests from the Receivers without charge to the Receivership estates.

- Each Receiver shall provide, by e-mail, written notice (such receiver, the "Notifying Receiver" and such notice, a "Pre-Action Notice") to the CG prior to taking any of the following actions (each, a "Notice Action"):

  o Listing of any real property for sale, unless such listing is expressly contemplated, by APN, in an engagement letter on file with the Court;

  o Relisting of any real property at a materially reduced price;

  o Selection of any bid, including stalking horse bid, and entry into contract; or

  o Consummation of any sale transaction.

- Upon the receipt of a Pre-Action Notice, the other Parties shall have two (2) business days (the "Objection Period") to inform the Notifying Receiver of any concerns about the Notice Action described in the Pre-Action Notice (a "Notice of Objection"). Following receipt of a Notice of Objection, the relevant receiver and the objecting party will have three (3) business days to discuss any stated concerns or objections in good faith (the "Discussion Period"); provided, however, that nothing herein shall restrict or impede either (i) the Notifying Receiver from proceeding with a Notice Action, or (ii) any other Party from objecting to or otherwise seeking relief with respect to the Notice Action, following the expiration of the Discussion Period.

*Privileged and Confidential*
*Settlement Purposes Only*
*Draft 3/12/2025*

- Except in emergency situations, the Notifying Receiver shall not take any Notice Action until the Objection Period has expired without the receipt of a Notice of Objection, or (ii) the Discussion Period has expired.

- All rights of all Parties shall be reserved with respect to any Notice Action.

- The Parties shall consult in good faith and attempt to reach agreement on bids related to properties subject to multiple liens and to consider the impact of the proposed sale of any property on all creditors and parties and interest, and work in good faith on allocation of values related to a sale, as needed.

- The Prudential/FAMC Receiver shall create a model for recommended value allocations with respect to assets being sold by Capstone. The Parties shall engage in good faith regarding that model, and promptly provide the Prudential/FAMC Receiver with any concerns or objections, with the goal of reaching consensus prior to receipt of any bids.

- The Stipulated Order shall extend the stay currently in place in each of the Receivership Cases to the Maricopa Defendants.

- The Maricopa Defendants shall agree, and the Court will order, in the Stipulated Order that the Maricopa Defendants shall not file a voluntary bankruptcy petition by or on behalf of any Maricopa Defendants or their affiliates without first filing a motion with the Court seeking relief from the Coordination Order and providing Parties at least fourteen (14) days to object.

# EXHIBIT 2

**Harris, Connie**

| | |
|---|---|
| **From:** | Rudnick, Michael <michael.rudnick@brookfield.com> |
| **Sent:** | Wednesday, April 2, 2025 6:28 PM |
| **To:** | Lance Miller |
| **Subject:** | Consultation group |
| **Attachments:** | 4907-5599-9024.v3 D017A (Draft Coordinated Sale Procedures).docx; D017A (Draft Coordinated Sale Procedures) [4907-5599-9024 V1] vs D017A (Draft Coordinated Sale Procedures) [4907-5599-9024 V3] 04-02-25.pdf |

Lance,

Attaching comments to the consultation group agreement.  We made a concerted effort to balance the goals of all parties, with everyone reserve their rights while seeking to work together.

As I've mentioned, AEL is very concerned that it will end up with a deficiency through the proposed sale process. As such, we need to preserve our rights, including pursuing the guarantors. Always happy to discuss.

Best,
Michael

**Michael Rudnick**
Managing Director | Investments
Brookfield Special Investments

Brookfield Asset Management
Brookfield Place New York
250 Vesey Street, 15th Floor, New York, New York 10281
T +1.212.618.3444 | M +1.914.450.4774
michael.rudnick@brookfield.com
www.brookfield.com

## Brookfield

View important disclosures and information about our e-mail policies here

*Privileged and Confidential*
*Settlement Purposes Only*
*Draft 3/31/2025*

The Maricopa Defendants will move the Court to enter into a stipulated order requiring cooperation and coordination of a sale process among the Metropolitan Receiver, the Prudential/FAMC Receiver, and the Maricopa Defendants (collectively, the "Parties" and each, individually, a "Party") substantially on the terms described below:

1. A Consultation Group (the "CG") shall be formed by no later than 2 business days following entry of a Court order approving these procedures (the "Coordination Order"), consisting of the following parties (by and through themselves and their respective designated professionals and representatives):

    1. Phillip Christensen, solely in his capacity as receiver (the "Metropolitan Receiver");

    2. Lance Miller, solely in his capacity as receiver (the "Prudential/FAMC Receiver");

    3. The Maricopa Defendants;

    4. American Equity Investment Life Insurance ("AEIF") (subject to withdrawal of its objection to Pearson Realty's employment [and agreement to add APN Nos. 038-141-21S and 040-020-18S to the Capstone sale process and joinder in the Capstone Engagement Letter. Lance, happy to discuss, and the parameters under which AEIF would consent to a sale.]);

    5. Rooster Capital IV, LLC (subject to withdrawal of its objection to Pearson Realty's employment [and agreement to add APN Nos. 038-141-21S and 040-020-18S to the Capstone sale process and joinder in the Capstone Engagement Letter); and

    6. any third-party holding a lien in real property that the Receivers determine should be added to the CG in furtherance of the sale process.

2. The Prudential/FAMC Receiver shall be the chair of the CG. In that capacity, the Prudential/FAMC Receiver shall convene weekly status conferences of the CG to discuss the status of each Receivers' respective sale processes, including (1) bidder interest and discussions, (2) any cross-over or interest in multiple receivership assets, (3) updates on any offers

4907-5599-9024.3 68700.001                           1

*Privileged and Confidential*
*Settlement Purposes Only*
*Draft 3/31/2025*

received, (4) timelines of sale processes, and (5) updates on the resolution of any allocation mechanism regarding the sale of parcels owned but different parties.

3.      All conferences and communications among the Parties, as well as all documents and information shared, pursuant to the Stipulated Protocol shall be strictly confidential and conducted under and pursuant to FRE 408. Nothing in the Stipulated Protocol will (a) amend or otherwise modify each Receiver's duties under their respective appointment orders or other orders entered by the Court, but (b) shall require a Receiver to provide the same, or substantially similar, information to each member of the CG.

4.      The Parties agree to promptly engage in good faith in order to reach agreement on any sales process or issue related thereto, including sharing information to assist on allocations of value in relation to pending or future asset sales.

5.      The Maricopa Defendants agree to timely respond to commercially reasonable information requests from the Receivers without charge to the Receivership estates, and shall also do so for the other members of the CG.

6.      Each Receiver shall provide, by e-mail, written notice such receiver, the "Notifying Receiver" and such notice, a "Pre-Action Notice" to the CG prior to taking any of the following actions (each, a "Notice Action"):

    1.  Listing of any real property for sale, unless such listing is expressly contemplated, by APN, in an engagement letter on file with the Court;

    2.  Relisting of any real property at a materially reduced price;

    3.  Selection of any bid, including stalking horse bid, and entry into contract;

    4.  Consummation of any sale transaction;

    5.  Any allocation of proceeds or distribution of same; or

    6.  The filing of any motion or pleading seeking relief from the Court, with a copy of the motion or pleading attached to the Pre-Action Notice.

7.      Upon the receipt of a Pre-Action Notice, the other Parties shall have three (3) business days (the "Objection Period") to inform the Notifying Receiver

*Privileged and Confidential*
*Settlement Purposes Only*
*Draft 3/31/2025*

of any concerns about the Notice Action described in the Pre-Action Notice (a "Notice of Objection").  Following receipt of a Notice of Objection, the relevant receiver and the objecting party will have five (5) business days to discuss any stated concerns or objections in good faith (the "Discussion Period"); provided, however, that nothing herein shall restrict or impede either (i) the Notifying Receiver from proceeding with a Notice Action, or (ii) any other Party from objecting to or otherwise seeking relief with respect to the Notice Action, during or following the expiration of the Discussion Period.  In the event of the filing of any motion or pleading seeking relief from the Court, the moving party shall not seek the relief on less than regular notice or to change the time to respond or object, without providing in the Pre-Action Notice the emergency causing the need to seek to modify the regular notice period and any response thereto. Nothing in the Stipulated Order shall modify the rights of any CG from objecting to any timing or relief sought in the applicable motion or pleading.

8.     Except in emergency situations where each CG has consented to the Notice Action, or as otherwise ordered by the Court, the Notifying Receiver shall not take any Notice Action until the Objection Period has expired without the receipt of a Notice of Objection, or (ii) the Discussion Period has expired.

9.     All rights of all Parties shall be reserved with respect to any Notice Action.

10.    The Parties shall consult in good faith and attempt to reach agreement on bids related to properties subject to multiple liens and while the non-Receiver members of the CG understand the Receiver members of the CG need to consider the impact of the proposed sale of any property on all creditors and parties-in-interest, the non-Receiver members of the CV owe no duty to any creditors or parties-in-interest, and do not have to consider those parties' interests.  The CG will also work in good faith on allocation of values related to a sale, as needed.

11.    The Prudential/FAMC Receiver shall create a model by April 7 for recommended value allocations with respect to assets being sold by Capstone.  The Parties shall engage in good faith regarding that model, and promptly provide the Prudential/FAMC Receiver with any concerns or objections, with the goal of reaching consensus prior to receipt of any bids.

12.    Notwithstanding anything contained in the Stipulated Order, all partes reserve all rights not specifically addressed in the Stipulated Order including, but not limited to, pursuing any claims against guarantors of any debt held by any CG party, or seeking to terminate any pending

*Privileged and Confidential*
*Settlement Purposes Only*
*Draft 3/31/2025*

Receivership, or seeking to expand or to limit the terms of any Receivership.

*Privileged and Confidential*
*Settlement Purposes Only*
*Draft 3/~~12~~31/2025*

The Maricopa Defendants will move the Court to enter ~~an order or enter~~ into a stipulated order requiring cooperation and coordination of a sale process among the Metropolitan Receiver, the Prudential/FAMC Receiver, and the Maricopa Defendants (collectively, the "Parties" and each, individually, a "Party") substantially on the terms described below:

1.   A Consultation Group (the "CG") shall be formed by no later than ~~7~~2 business days following entry of a Court order approving these procedures (the "Coordination Order"), consisting of the following parties (by and through themselves and their respective designated professionals and representatives):

     1.   Phillip Christensen, solely in his capacity as receiver (the "Metropolitan Receiver");

     2.   Lance Miller, solely in his capacity as receiver (the "Prudential/FAMC Receiver");

     3.   The Maricopa Defendants;

     4.   American Equity Investment Life Insurance ("AEIF") (subject to withdrawal of its objection to Pearson Realty's employment [and agreement to add APN Nos. 038-141-21S and 040-020-18S to the Capstone sale process and joinder in the Capstone Engagement Letter. Lance, happy to discuss, and the parameters under which AEIF would consent to a sale.]);

     5.   Rooster Capital IV, LLC (subject to withdrawal of its objection to Pearson Realty's employment [and agreement to add APN Nos. 038-141-21S and 040-020-18S to the Capstone sale process and joinder in the Capstone Engagement Letter); and

     6.   any third-party holding a lien in real property that the Receivers determine should be added to the CG in furtherance of the sale process.

2.   The Prudential/FAMC Receiver shall be the chair of the CG. In that capacity, the Prudential/FAMC Receiver shall convene weekly status conferences of the CG to discuss the status of each Receivers' respective

*Privileged and Confidential*
*Settlement Purposes Only*
*Draft 3/~~12~~31/2025*

sale processes, including (1) bidder interest and discussions, (2) any cross-over or interest in multiple receivership assets, (3) updates on any offers received, ~~and~~ (4) timelines of sale processes, and (5) updates on the resolution of any allocation mechanism regarding the sale of parcels owned but different parties.

3.     All conferences and communications among the Parties, as well as all documents and information shared, pursuant to the Stipulated Protocol shall be strictly confidential and conducted under and pursuant to FRE 408. Nothing in the Stipulated Protocol will (a) amend or otherwise modify each Receiver's duties under their respective appointment orders or other orders entered by the Court, ~~or~~but (b) shall require a Receiver to provide the same, or substantially similar, information to each member~~s~~ of ~~a~~the CG.

4.     The Parties agree to promptly engage in good faith in order to reach agreement on any sales process or issue related thereto, including sharing information to assist on allocations of value in relation to pending or future asset sales.

5.     The Maricopa Defendants agree to timely respond to commercially reasonable information requests from the Receivers without charge to the Receivership estates, and shall also do so for the other members of the CG.

6.     Each Receiver shall provide, by e-mail, written notice (such receiver, the "Notifying Receiver" and such notice, a "Pre-Action Notice") to the CG prior to taking any of the following actions (each, a "Notice Action"):

1.     Listing of any real property for sale, unless such listing is expressly contemplated, by APN, in an engagement letter on file with the Court;

2.     Relisting of any real property at a materially reduced price;

3.     Selection of any bid, including stalking horse bid, and entry into contract; ~~or~~

4.     Consummation of any sale transaction~~.~~;

5.     Any allocation of proceeds or distribution of same; or

6.     The filing of any motion or pleading seeking relief from the Court, with a copy of the motion or pleading attached to the Pre-Action Notice.

*Privileged and Confidential*
*Settlement Purposes Only*
*Draft 3/~~12~~31/2025*

7.    ▲Upon the receipt of a Pre-Action Notice, the other Parties shall have ~~two~~three (~~2~~3) business days (the "Objection Period") to inform the Notifying Receiver of any concerns about the Notice Action described in the Pre-Action Notice (a "Notice of Objection"). Following receipt of a Notice of Objection, the relevant receiver and the objecting party will have ~~three~~five (~~3~~5) business days to discuss any stated concerns or objections in good faith (the "Discussion Period"); provided, however, that nothing herein shall restrict or impede either (i) the Notifying Receiver from proceeding with a Notice Action, or (ii) any other Party from objecting to or otherwise seeking relief with respect to the Notice Action, during or following the expiration of the Discussion Period. In the event of the filing of any motion or pleading seeking relief from the Court, the moving party shall not seek the relief on less than regular notice or to change the time to respond or object, without providing in the Pre-Action Notice the emergency causing the need to seek to modify the regular notice period and any response thereto. Nothing in the Stipulated Order shall modify the rights of any CG from objecting to any timing or relief sought in the applicable motion or pleading.

8.    ▲Except in emergency situations where each CG has consented to the Notice Action, or as otherwise ordered by the Court, the Notifying Receiver shall not take any Notice Action until the Objection Period has expired without the receipt of a Notice of Objection, or (ii) the Discussion Period has expired.

9.    ▲All rights of all Parties shall be reserved with respect to any Notice Action.

10.   ▲The Parties shall consult in good faith and attempt to reach agreement on bids related to properties subject to multiple liens and while the non-Receiver members of the CG understand the Receiver members of the CG need to consider the impact of the proposed sale of any property on all creditors and parties ~~and interest, and~~ -in-interest, the non-Receiver members of the CV owe no duty to any creditors or parties-in-interest, and do not have to consider those parties' interests. The CG will also work in good faith on allocation of values related to a sale, as needed.

11.   ▲The Prudential/FAMC Receiver shall create a model by April 7 for recommended value allocations with respect to assets being sold by Capstone. The Parties shall engage in good faith regarding that model, and promptly provide the Prudential/FAMC Receiver with any concerns or objections, with the goal of reaching consensus prior to receipt of any bids.

*Privileged and Confidential*
*Settlement Purposes Only*
*Draft 3/~~12~~31/2025*

- ~~The Stipulated Order shall extend the stay currently in place in each of the Receivership Cases to the Maricopa Defendants.~~

- ~~The Maricopa Defendants shall agree, and the Court will order,~~ in the Stipulated Order ~~that the Maricopa Defendants shall not file a voluntary bankruptcy petition by or on behalf of any Maricopa Defendants or their affiliates without first filing a motion with the Court seeking relief from the Coordination Order and providing Parties at least fourteen (14) days to object.~~

12. Notwithstanding anything contained in the Stipulated Order, all partes reserve all rights not specifically addressed in the Stipulated Order including, but not limited to, pursuing any claims against guarantors of any debt held by any CG party, or seeking to terminate any pending Receivership, or seeking to expand or to limit the terms of any Receivership.

# EXHIBIT 3

**Harris, Connie**

| | |
|---|---|
| **From:** | Lance Miller <lance.miller@pivotgrp.com> |
| **Sent:** | Thursday, April 3, 2025 10:01 PM |
| **To:** | Michael Rudnick |
| **Subject:** | Cooperation Agreement |
| **Attachments:** | Term Sheet Resolving AEIL Objection to Employment Motions-302987943-v2.docx; Redline with tracked changes - Term Sheet Resolving AEIL Objection to Employment Motions-302987943-v1 and Term Sheet Resolving AEIL Objection to Employment Moti.docx |

Subject to FRE 408

Hi Michael,

Comments to the cooperation agreement attached. I think we may be close. Let me know if a call is in order.

Lance Miller
Managing Partner
Pivot Group
323-774-7122
Lance.miller@pivotgrp.com

*Privileged and Confidential*
*Settlement Purposes Only*
*Draft 4/3/2025*

Lance Miller, solely in his capacity as Court-appointed receiver (the "**Receiver**") in the case styled *Federal Agricultural Mortgage Corporation v. Assemi Brothers, LLC, et al.*, Case No. 23-1455 (the "**Case**"), on the one hand, and American Equity Investment Life Insurance ("**AEIL**") and Rooster Capital IV, LLC ("**Rooster**"), on the other, agree to resolve Rooster's and AEIL's respective objections to the Receiver's motions to employ Capstone Capital Markets, LLC ("**Capstone**") [Dkt. No. ___] and Pearson Realty ("**Pearson**") [Dkt. 48], and the proposed Pearson-related marketing procedures [Dkt. 50], on the following terms, which shall be incorporated into agreed orders authorizing the employment motions and proposed marketing procedures, as follows:

1.   A consultation group (the "CG") shall be formed by no later than [____], consisting of the following parties (by and through themselves and their respective designated professionals and representatives):

     a) The Receiver;

     b) AEIL;

     c) Rooster; and

     d) any third-party holding a lien in real property that the Receiver determines should be added to the CG in furtherance of the sale process.

2.   AEIL and Rooster each agree to (a) withdraw their respective objections to the employment of Pearson and entry of the Pearson-related marketing procedures in the Case [Dkt. Nos. 55, 56] (b) not object to the Receiver's employment of Capstone Capital Markets LLC in the Case, which shall be on substantially the same terms as Capstone is employed in the case styled *The Prudential Insurance Company of America et al. v. ACDF, LLC, et al.*, Case No. 24-cv-1102 (the "**Prudential Case**"), (c) the inclusion of APN Nos. 038-141-21S and 040-020-18S in the Capstone sale process; and (d) join in the Capstone Engagement Letter pursuant to the joinder procedures contemplated therein with respect to the following real estate:

     **[LIST APNS]**

1

302987943v2

*Privileged and Confidential*
*Settlement Purposes Only*
*Draft 4/3/2025*

3.    The Receiver shall be the chair of the CG. In that capacity, the Receiver shall convene weekly status conferences of the CG to discuss the status of the sale processes in both the Case and the Prudential Case, including (a) bidder interest and discussions, (b) any cross-over or interest in assets, (c) updates on any offers received, (d) timelines of sale processes, and (e) updates on the resolution of any allocation mechanism regarding the sale of parcels owned by different parties or subject to the liens of different lenders.

4.    All conferences and communications among the members of the CG and all documents and information shared pursuant to the Agreed Order shall be strictly confidential and conducted under and pursuant to FRE 408. The Receiver shall provide the same, or substantially similar, information to each member of the CG.

5.    Nothing in the Agreed Order shall amend or otherwise modify the Receiver's duties under his appointment orders or other orders entered by the Court.

6.    The members of the CG agree to promptly engage in good faith in order to reach agreement on any sales processes or issue related thereto, including sharing information to assist on allocations of value in relation to pending or future asset sales.

7.    The Receiver shall provide, by e-mail, written notice (such notice, a "Pre-Action Notice") to the CG prior to taking any of the following actions (each, a "Notice Action"):

    a)  Listing of any real property for sale, unless such listing is expressly contemplated, by APN, in an engagement letter on file with the Court;

    b)  Relisting of any real property at a materially reduced price;

    c)  Selection of any bid, including stalking horse bids, and entry into any purchase and sale agreement;

    d)  Consummation of any sale transaction;

    e)  Any allocation of proceeds or distribution of same; or

    f)  The filing of any sale-related motion or pleading seeking relief from the Court, with a draft copy of the motion or pleading attached to the Pre-Action Notice.

8.    Upon receipt of a Pre-Action Notice, members of the CG shall have three (3) business days (the "Objection Period") to inform the Receiver in writing

*Privileged and Confidential*
*Settlement Purposes Only*
*Draft 4/3/2025*

(email will suffice) of any concerns regarding the Notice Action described in the Pre-Action Notice (a "Notice of Objection"). Following receipt of a Notice of Objection, the Receiver and the objecting party shall have five (5) business days to discuss any stated concerns or objections in good faith (the "Discussion Period"); provided, however, that nothing in the Agreed Order shall restrict or impede either (a) the Receiver from proceeding with a Notice Action, or (b) any other Party from objecting to or otherwise seeking relief with respect to the Notice Action during or following the expiration of the Discussion Period.

9.  In the event of the filing of any sale-related motion or pleading seeking relief from the Court, the moving party shall not seek the relief on less than regular notice or change the time to respond or object, without providing in the Pre-Action Notice the emergency causing the need to seek to modify the regular notice period and any response thereto. Nothing in the Agreed Order shall modify the rights of any member of the CG objecting to any timing or relief sought in the applicable motion or pleading.

10. Except in emergency situations where each member of the CG has consented to the Notice Action, or as otherwise ordered by the Court, the Notifying Receiver shall not take any Notice Action until the Objection Period has expired without the receipt of a Notice of Objection, or (ii) the Discussion Period has expired.

11. All rights of all members of the CG shall be reserved with respect to any Notice Action.

12. The members of the CG shall consult in good faith and attempt to reach agreement on bids related to properties subject to liens held by members of the CG. Members of the CG shall not owe any duty creditors or other parties-in-interest, and do not have to consider those parties' interests in making a decision.

13. The CG shall work in good faith on allocation of values related to a sale, as needed, and the Receiver shall create a model by **[April 7, 2025,]** for recommended value allocations with respect to assets being sold by Capstone. The CG shall engage in good faith regarding that model, and promptly provide the Receiver with any concerns or objections, with the goal of reaching consensus prior to receipt of any bids.

14. The Agreed Order shall state that all members of the CG reserve all rights not specifically addressed in the Agreed Order including, but not limited to, pursuing any claims against guarantors of any debt held by any member of

3

*Privileged and Confidential*
*Settlement Purposes Only*
*Draft 4/3/2025*

the CG, or seeking to terminate any pending Receivership, or seeking to expand or to limit the terms of any Receivership.

*Privileged and Confidential*
*Settlement Purposes Only*
*Draft 3/31/20254/3/2025*

~~The Maricopa Defendants will move the Court to enter into a stipulated order requiring cooperation and coordination of a sale process among the Metropolitan Receiver, the Prudential/FAMC Receiver, and the Maricopa Defendants (collectively, the "Parties" and each, individually, a "Party") substantially on the terms described below:~~

Lance Miller, solely in his capacity as Court-appointed receiver (the "**Receiver**") in the case styled *Federal Agricultural Mortgage Corporation v. Assemi Brothers, LLC, et al* , Case No. 23-1455 (the "**Case**"), on the one hand, and American Equity Investment Life Insurance ("**AEIL**") and Rooster Capital IV, LLC ("**Rooster**"), on the other, agree to resolve Rooster's and AEIL's respective objections to the Receiver's motions to employ Capstone Capital Markets, LLC ("**Capstone**") [Dkt. No. ___] and Pearson Realty ("**Pearson**") [Dkt. 48], and the proposed Pearson-related marketing procedures [Dkt. 50], on the following terms, which shall be incorporated into agreed orders authorizing the employment motions and proposed marketing procedures, as follows:

1.  A ~~Consultation Group~~consultation group (the "CG") shall be formed by no later than ~~2 business days following entry of a Court order approving these procedures (the "Coordination Order")~~[    ], consisting of the following parties (by and through themselves and their respective designated professionals and representatives):

    ~~1. Phillip Christensen, solely in his capacity as receiver (the "Metropolitan Receiver");~~

    ~~2. Lance Miller, solely in his capacity as receiver (the "Prudential/FAMC Receiver");~~

    ~~3.~~a)    The ~~Maricopa Defendants~~Receiver;

    b)  AEIL;

    c)  Rooster; and

*Privileged and Confidential*
*Settlement Purposes Only*
*Draft ~~3/31/2025~~4/3/2025*

4. ~~American Equity Investment Life Insurance ("AEIF") (subject to withdrawal of its objection to Pearson Realty's employment [and agreement to add APN Nos. 038-141-21S and 040-020-18S to the Capstone sale process and joinder in the Capstone Engagement Letter. Lance, happy to discuss, and the parameters under which AEIF would consent to a sale.]);~~

5. ~~Rooster Capital IV, LLC (subject to withdrawal of its objection to Pearson Realty's employment [and agreement to add APN Nos. 038-141-21S and 040-020-18S to the Capstone sale process and joinder in the Capstone Engagement Letter); and~~

~~6.~~d)        any third-party holding a lien in real property that the ~~Receivers determine~~Receiver determines should be added to the CG in furtherance of the sale process.

2.    AEIL and Rooster each agree to (a) withdraw their respective objections to the employment of Pearson and entry of the Pearson-related marketing procedures in the Case [Dkt. Nos. 55, 56] (b) not object to the Receiver's employment of Capstone Capital Markets LLC in the Case, which shall be on substantially the same terms as Capstone is employed in the case styled *The Prudential Insurance Company of America et al. v. ACDF, LLC, et al.*, Case No. 24-cv-1102 (the "**Prudential Case**"), (c) the inclusion of APN Nos. 038-141-21S and 040-020-18S in the Capstone sale process; and (d) join in the Capstone Engagement Letter pursuant to the joinder procedures contemplated therein with respect to the following real estate:

**[LIST APNS]**

~~2.~~3.    The ~~Prudential/FAMC~~ Receiver shall be the chair of the CG.  In that capacity, the ~~Prudential/FAMC~~ Receiver shall convene weekly status conferences of the CG to discuss the status of ~~each Receivers' respective~~the sale processes in both the Case and the Prudential Case, including (~~1~~a) bidder interest and discussions, (~~2~~b) any cross-over or interest in ~~multiple receivership~~ assets, (~~3~~c) updates on any offers received, (~~4~~d) timelines of sale processes, and (~~5~~e) updates on the resolution of any allocation mechanism regarding the sale of parcels owned ~~but~~by different parties or subject to the liens of different lenders.

~~3.~~4.    All conferences and communications among the ~~Parties, as well as~~members of the CG and all documents and information shared~~,~~ pursuant to the ~~Stipulated Protocol~~Agreed Order shall be strictly confidential and conducted under and pursuant to FRE 408. ~~Nothing in the Stipulated Protocol will (a)~~

Formatted: Body Text First Indent, Indent: Left: 1.25", Outline numbered + Level: 2 + Numbering Style: a, b, c, … + Start at: 1 + Alignment: Left + Aligned at: 0.75" + Indent at: 1", Tab stops: 1", List tab

Formatted: Indent: Left: 1.25", Outline numbered + Level: 2 + Numbering Style: a, b, c, … + Start at: 1 + Alignment: Left + Aligned at: 0.75" + Indent at: 1"

Formatted: Indent: Left: 0.5", Hanging: 0.5", Outline numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.25" + Tab after: 0.5" + Indent at: 0.5"

Formatted: Indent: Left: 0.5", Hanging: 0.5", Outline numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.25" + Tab after: 0.5" + Indent at: 0.5"

*Privileged and Confidential*
*Settlement Purposes Only*
*Draft ~~3/31/2025~~4/3/2025*

~~amend or otherwise modify each Receiver's duties under their respective appointment orders or other orders entered by the Court, but (b) shall require a Receiver to~~The Receiver shall provide the same, or substantially similar, information to each member of the CG.

5.  Nothing in the Agreed Order shall amend or otherwise modify the Receiver's duties under his appointment orders or other orders entered by the Court.

~~4.~~6.  The ~~Parties~~members of the CG agree to promptly engage in good faith in order to reach agreement on any sales ~~process~~processes or issue related thereto, including sharing information to assist on allocations of value in relation to pending or future asset sales.

~~5.   The Maricopa Defendants agree to timely respond to commercially reasonable information requests from the Receivers without charge to the Receivership estates, and shall also do so for the other members of the CG.~~

~~6.~~7.  ~~Each~~The Receiver shall provide, by e-mail, written notice ~~such receiver, the "Notifying Receiver" and~~ (such notice, a "Pre-Action Notice") to the CG prior to taking any of the following actions (each, a "Notice Action"):

~~1.~~a)  Listing of any real property for sale, unless such listing is expressly contemplated, by APN, in an engagement letter on file with the Court;

~~2.~~b)  Relisting of any real property at a materially reduced price;

~~3.~~c)  Selection of any bid, including stalking horse ~~bid~~bids, and entry into ~~contract~~any purchase and sale agreement;

~~4.~~d)  Consummation of any sale transaction;

~~5.~~e)  Any allocation of proceeds or distribution of same; or

~~6.~~f)  The filing of any sale-related motion or pleading seeking relief from the Court, with a draft copy of the motion or pleading attached to the Pre-Action Notice.

~~7.~~8.  Upon ~~the~~receipt of a Pre-Action Notice, members of the ~~other Parties~~CG shall have three (3) business days (the "Objection Period") to inform the ~~Notifying~~Receiver in writing (email will suffice) of any concerns ~~about~~regarding the Notice Action described in the Pre-Action Notice (a "Notice of Objection"). Following receipt of a Notice of Objection, the ~~relevant receiver~~Receiver and the objecting party ~~will~~shall have five (5)

*Privileged and Confidential*
*Settlement Purposes Only*
*Draft 3/31/20254/3/2025*

business days to discuss any stated concerns or objections in good faith (the "Discussion Period"); provided, however, that nothing hereinin the Agreed Order shall restrict or impede either (ia) the Notifying Receiver from proceeding with a Notice Action, or (iib) any other Party from objecting to or otherwise seeking relief with respect to the Notice Action, during or following the expiration of the Discussion Period.

2.9.    In the event of the filing of any sale-related motion or pleading seeking relief from the Court, the moving party shall not seek the relief on less than regular notice or to change the time to respond or object, without providing in the Pre-Action Notice the emergency causing the need to seek to modify the regular notice period and any response thereto. Nothing in the StipulatedAgreed Order shall modify the rights of any member of the CG from objecting to any timing or relief sought in the applicable motion or pleading.

8.10.    Except in emergency situations where each member of the CG has consented to the Notice Action, or as otherwise ordered by the Court, the Notifying Receiver shall not take any Notice Action until the Objection Period has expired without the receipt of a Notice of Objection, or (ii) the Discussion Period has expired.

9.11.    All rights of all Partiesmembers of the CG shall be reserved with respect to any Notice Action.

10.12.    The Partiesmembers of the CG shall consult in good faith and attempt to reach agreement on bids related to properties subject to multiple liens and while the non-Receiverheld by members of the CG understand the Receiver members of the CG need to consider the impact of the proposed sale of any property on all creditors and parties-in-interest, the non-Receiver members of the CV owe no duty to any. Members of the CG shall not owe any duty creditors or other parties-in-interest, and do not have to consider those parties' interests— in making a decision.

13.    The CG will alsoshall work in good faith on allocation of values related to a sale, as needed.

11.    , and the The Prudential/FAMC Receiver shall create a model by [April 7, 2025,] for recommended value allocations with respect to assets being sold by Capstone. The PartiesCG shall engage in good faith regarding that model, and promptly provide the Prudential/FAMC Receiver with any concerns or objections, with the goal of reaching consensus prior to receipt of any bids.

4807-5599-9024.3 68700.001
302987943v2

4

*Privileged and Confidential*
*Settlement Purposes Only*
*Draft 3/31/20254/3/2025*

12.14.  ~~Notwithstanding anything contained in the Stipulated Order, all parties~~<u>The Agreed Order shall state that all members of the CG</u> reserve all rights not specifically addressed in the ~~Stipulated~~<u>Agreed</u> Order including, but not limited to, pursuing any claims against guarantors of any debt held by any <u>member of the</u> CG~~ party~~, or seeking to terminate any pending Receivership, or seeking to expand or to limit the terms of any Receivership.

| Summary report: Litera Compare for Word 11.8.0.56 Document comparison done on 4/3/2025 9:56:47 PM | |
|---|---|
| **Style name:** Adds Double Underline, Delete Strikethrough | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://cloudimanage.com/US/302987943/1 | |
| **Modified DMS:** iw://cloudimanage.com/US/302987943/2 | |
| **Changes:** | |
| Add | 88 |
| Delete | 83 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 171 |

# EXHIBIT 4

**Harris, Connie**

| | |
|---|---|
| **From:** | Lance Miller <lance.miller@pivotgrp.com> |
| **Sent:** | Saturday, April 5, 2025 4:36 PM |
| **To:** | Rudnick, Michael; Thaddeus Tracy |
| **Cc:** | Matt Covington; eric; Kyle Liebentritt; Steve Borse; Sarah Rohr |
| **Subject:** | MOC Allocation Methodology and Timeline |
| **Attachments:** | Allocation Methodology and Timing_0404.docx |

SUBJECT TO FRE 408
CONFIDENTIAL

Hi Michael and Thaddeus,

As you know, Pivot is working on an allocation methodology for the MOC collateral with respect to the Capstone process. This analysis will serve several purposes, including:

1. Working towards alignment among lenders as to how bids should be allocated, when they come in.
2. Inform our discussions with Capstone as to bid guidelines and requirements for how bids need to be grouped for specific assets (e.g., whether bids should be ranch-level or have specific allocations or indications of interest for specific items).
3. Provide a platform and common language/understanding for purposes of negotiations and discussions with each lender and owner.

The first step in this analysis was to create a methodology and outline of approach. That step is now complete. Attached please find an outline of our anticipated methodology, along with a timeline for completion of the analysis. The goal is to complete the analysis **before** bids are submitted and/or selected. Please note that this is a work in progress, and may change as we get into specifics with our retained valuation expert.

Please let us know of any comments. The hope/expectation is that we can finalize our cooperation agreement with your team soon, so that we can start to share/discuss the allocation work as it develops.

Lance Miller
Managing Partner
Pivot Group
323-774-7122
Lance.miller@pivotgrp.com



# EXHIBIT 5

**Harris, Connie**

| | |
|---|---|
| **From:** | Rudnick, Michael <michael.rudnick@brookfield.com> |
| **Sent:** | Thursday, April 3, 2025 4:53 PM |
| **To:** | Lance Miller |
| **Subject:** | Re: MOC |

Im not sure we'll be ok with that before this is all resolved

**Michael Rudnick**
Managing Director | Investments
Brookfield Special Investments

Brookfield Asset Management
Brookfield Place New York
250 Vesey Street, 15th Floor, New York, New York 10281
T +1.212.618.3444 | M +1.914.450.4774
michael.rudnick@brookfield.com
www.brookfield.com

## Brookfield

View important disclosures and information about our e-mail policies here

---

**From:** Lance Miller <lance.miller@pivotgrp.com>
**Sent:** Thursday, April 3, 2025 10:44:51 PM
**To:** Rudnick, Michael <michael.rudnick@brookfield.com>
**Subject:** RE: MOC

<mark>**CAUTION EXTERNAL EMAIL:** DO NOT CLICK ON LINKS OR OPEN ATTACHMENTS UNLESS YOU KNOW THE CONTENT IS SAFE.</mark>

It'll punt that issue. Just saying that we are going to market it.

Lance Miller
Managing Partner
Pivot Group
323-774-7122
Lance.miller@pivotgrp.com



---

**From:** Rudnick, Michael <michael.rudnick@brookfield.com>
**Sent:** Thursday, April 3, 2025 5:43 PM
**To:** Lance Miller <lance.miller@pivotgrp.com>
**Subject:** Re: MOC

Will the motion / order say the properties we have liens on cannot be sold without our consent?

**Michael Rudnick**
Managing Director | Investments
Brookfield Special Investments

Brookfield Asset Management
Brookfield Place New York
250 Vesey Street, 15th Floor, New York, New York 10281
T +1.212.618.3444 | M +1.914.450.4774
michael.rudnick@brookfield.com
www.brookfield.com

## Brookfield

View important disclosures and information about our e-mail policies here

---

**From:** Lance Miller <lance.miller@pivotgrp.com>
**Sent:** Thursday, April 3, 2025 10:41:24 PM
**To:** Rudnick, Michael <michael.rudnick@brookfield.com>
**Subject:** MOC

<mark>CAUTION EXTERNAL EMAIL:</mark> DO NOT CLICK ON LINKS OR OPEN ATTACHMENTS UNLESS YOU KNOW THE CONTENT IS SAFE.

Hey Michael,

Just circling back on our discussion yesterday. I think we can work with your comments, and we are working on a responsive redline. Just a heads' up that we are going to file a motion tomorrow to include the Farmer Mac collateral in the Capstone engagement – we need to get that filed tomorrow in order to align with the hearing schedule – but I think we will be resolving your concerns about that inclusion through this deal anyway, and I expect that resolution should be reached well before the hearing.

Lance Miller
Managing Partner
Pivot Group
323-774-7122
Lance.miller@pivotgrp.com



# EXHIBIT 6





# INVESTMENT BANKER REQUEST FOR PROPOSAL

### November 21, 2024

**1.    Purpose**

Pivot Management Group, LLC and Agriglobe, LLC (the "Receivers") are the duly appointed and acting receivers over certain farming assets (the "Assets") owned by Maricopa Orchards, LLC and certain of its affiliates and subsidiaries ("MOC"). Through this Request for Proposals (RFP), the Receivers invite investment bankers experienced in selling agricultural assets and properties under distressed situations to submit proposals for the marketing and sale of the Assets.

**2.    Business Overview & Background**

Founded in 1989 and based out of Fresno, California, MOC is a large-scale grower of high-quality pistachios and almonds in Fresno, Kings, and Kern counties in California. It presently has ~35,000 planted acres across a total land base of ~70,000 acres in seven water districts. Approximately 65% of the company's ranch assets are in the Westlands Water District, while ~10% percent are in the Semitropic Water Storage District and Wheeler Ridge Water District, respectively (although planted acres are a lower percentage in Wheeler Ridge). Other water districts include the Central California Irrigation District, Fresno Irrigation District, Laguna Irrigation District, Lower Tule River Irrigation District, Panoche Water District and Southern San Joaquin Municipal Utility District.

MOC's pistachio varieties include Golden Hills, Kaleghouchi, Kerman, and Lost Hills. Its almonds include Bennett Hickman, Butte, Carmel, Fritz, Independence, Monterey, Nonpareil, Padre, and Wood Colony. Although at a smaller scale, MOC also farms blueberries, cherries, citrus, and row crops.

On September 24, 2024, the District Court for the Eastern District of California (the "Court") entered an *Agreed Order Appointing Receiver with Limited Authority*, with respect to The Prudential Insurance Company of America and PGIM Real Estate Finance, LLC v. ACDF, LLC, et. al., Case No. 1:24-cv-01102-KES-SAB (E.D. Cal.), appointing Lance Miller of Pivot Management Group, LLC, as a receiver with limited authority over certain assets of MOC that are encumbered by liens held by The Prudential Insurance Company of America, PGIM Real Estate Finance, LLC, and PAR U Hartford Life & Annuity Comfort Trust (the "Prudential Collateral"). On October 30, 2024, the Court entered an *Order Amending Order Appointing Receiver With Limited Authority*, expanding the receiver's authority to include, among other things, the marketing and sale of receivership assets, and on November 7, 2024 entered the *Order Expanding Receivership and for Preliminary Injunction* appointing Mr. Miller as general receiver over the Prudential Collateral.

On November 7, 2024, the Court entered an *Order Granting Motion for Order Appointing Receiver and for Preliminary Injunction* with respect to *Metropolitan Life Insurance Company v. ACDF, LLC, et al*., Case No. 1:24-cv-01261-KES-SAB, appointing Phillip Christensen of Agriglobe, LLC, as receiver with authority over certain assets of MOC that are encumbered by liens held by Metropolitan Life Insurance Company ("MetLife").  MetLife and affiliates have filed seven additional actions before the Court in which Mr. Christensen has been (or is in the process of being) appointed receiver, as follows: Metropolitan Life Insurance Company v. FNF Farms, LLC et al, 1:24-cv-01226; Metropolitan Life Insurance Company v. C & A Farms, LLC et al, 1:24-cv-01230; Metropolitan Life Insurance Company v. Maricopa Orchards, LLC et al, 1:24-cv-01231; Brighthouse Life Insurance Company v. Kamm South, LLC et al, 1:24-cv-01232; Brighthouse Life Insurance Company v. Manning Avenue Pistachios, LLC et al, 1:24-cv-01233; Brighthouse Life Insurance Company v. ACDF, LLC, et al., 1:24-cv-01235; and MetLife Real Estate Lending, LLC v. Panoche Pistachios, LLC et al, 1:24-cv-01241. The eight actions filed by MetLife and its affiliates detailed above are referred to collectively as the "MetLife Receivership."

Between the Prudential Receivership and the MetLife Receivership, the Receivers control and otherwise have authority over approximately 75% of MOC's farming-related assets. Upon request, the Receivers will provide your team with access to a virtual data room containing information regarding the extent of the farming assets and associated maps.

**Note: The Receivers are in the process of contacting other lenders with collateral owned by MOC, as well as other non-affiliated owners, for the purpose of discussing their coordination with these sale efforts.  The ultimate goal is to reach agreements for the marketing and sale of the Kamm Ranch as a single opportunity.**

**3.      Proposal Information**

Your proposal should include the following elements:

A.  Qualifications and Case Studies – Please describe your qualifications for this marketing effort, including any case studies that you believe are relevant.  Please address:

  i.    Experience involving agriculture assets, including similar land and water assets.

  ii.   Experience involving distressed asset sales (Receivership, foreclosure, and 363 sales).

B.  Marketing Recommendations and Viewpoints – Please provide your recommendations and viewpoints for how this marketing process should be approached. Please include the following:

  i.    Recommendations regarding the type of sale process to pursue (standard investment banker process, an auction process, a hybrid approach, etc.).

  ii.   Recommendations regarding specific or unique items that should be included in the marketing procedures to be submitted to the Court.

  iii.  Recommendations regarding whether all assets should be marketed through the same process, or whether specific assets can/should be sold separately.

    iv.    Likely buyer profile / list of prospective buyers, including experience with international investors.

    v.    Recommendations regarding the sale timeline(s) that should be assumed.

    vi.    Unique risks or obstacles to the marketing process, or alternatives to your recommendations.

C.  Preliminary views on value range.

D.  Proposed fee structure.

## 4.    **Proposal Timing**

We strongly recommend that you make time to tour the properties prior to submitting a proposal. The properties will be available for tours during the week of December 9. Please contact us to make arrangements.

The deadline for submission of your materials is **December 16, 2024 at 4:00 p.m. pacific time.** We envision the following process for selection:

| | |
|---|---|
| Property Tours: | December 2-5 and 10-12 |
| RFP Submission Deadline: | December 16, at 4:00 p.m. pacific time |
| Live Presentations (via Zoom): | December 18 and 19 |
| Candidate Selection: | December 20 |

## 5.    **Contact Information**

Please contact sarah.rohr@pivotgrp.com to request access.  Should you have any questions regarding this RFP process, please contact Mike Lang (mike.lang@pivotgrp.com).

Thank you for your consideration. We look forward to reviewing your submissions.

Lance E. Miller, solely in his capacity as court-appointed receiver

Phil Christensen, solely in his capacity as court-appointed receiver

/s/ Lance Miller

/s/ Phil Christensen