# Exhibit A

Docusign Envelope ID: 173D2595-BF2E-836B-834C-928C4B339069

**PURCHASE AND SALE AGREEMENT
AND
JOINT ESCROW INSTRUCTIONS**

This Purchase and Sale Agreement and Joint Escrow Instructions (the "**Agreement**") dated June 17, 2026, to be effective on the date when all parties have executed it after entry of the Sale Order, which date shall be noted on the signature page hereto (the "**Effective Date**"), is made and entered into by and between (i) LANCE MILLER, solely in his capacity as court-appointed receiver (the "**Seller**") pursuant to the *Order Appointing Receiver and for Preliminary Injunction* (as supplemented or amended, the "**Receivership Order**") entered in the case styled *Federal Agricultural Mortgage Corporation v. Assemi Brothers, LLC et. al.*, Case No. 1:24-cv-01455-KES-SAB (the "**Proceeding**") pending in the U.S. District Court for the Eastern District of California (the "**Court**") and (ii) BRIGHTFIELD INVESTMENTS, LLC, a Delaware limited liability company ("**Buyer**").  For convenience, Buyer and Seller are sometimes referred to herein collectively as the "**Parties**" and individually as a "**Party**." This Agreement is made with respect to the following facts and circumstances which the Parties affirm as true and accurate:

A.     Seller, solely in his capacity as Court-appointed receiver, has the exclusive possession and control of, and authority to sell (subject to entry of the Sale Order), that certain real property consisting of approximately 235.7 assessed acres of land, as more particularly described on **Exhibit A** attached hereto (collectively, the "**Land**").

B.     Buyer desires to purchase and Seller desires to sell the Land and other components of the Property (defined below) on the terms and subject to the conditions herein set forth.

C.     The transactions contemplated by this Agreement are subject to the approval of the Court and will be consummated only pursuant to (i) the marketing procedures order of the Court to be entered in the Proceeding substantially in the form attached hereto as **Exhibit B** (the "**Marketing Procedures Order**") and (ii) if Buyer is the Successful Bidder (as defined in the Marketing Procedures Order), an order of the Court entered in the Proceeding authorizing the transactions contemplated herein in substantially the form attached hereto as **Exhibit C** ("**Sale Order**").

D.     The transactions contemplated by this Agreement are intended by Buyer to be made concurrently with the proposed purchase by Buyer of other real property related to or associated with the farming and other operations of the Property (the "**Concurrent Sale**" of the "**Concurrent Sale Property**")  pursuant to one or more separate Purchase and Sale Agreements and Joint Escrow Instructions between Buyer and the third-party owner(s) of such property (the "**Third-Party Owner(s)**"); provided, however, that closing of a Concurrent Sale shall not be a condition precedent to the binding nature or effectiveness of this Agreement.

**NOW, THEREFORE**, in consideration of the foregoing, the parties hereto hereby covenant and agree as follows:

1.     **Purchase and Sale**

20039.001/Westlands PSA - FarmerMac (EX)

Docusign Envelope ID: 173D2595-BF2E-836B-834C-928C4B339069

1.1     <u>Purchase and Sale of Property</u>.  Subject to the terms and upon satisfaction or proper waiver of the conditions set forth herein, Seller hereby agrees to sell and convey to Buyer, and Buyer hereby agrees to purchase and acquire from Seller, the Property, which shall consist of the following and, when used herein, the term "**Property**" shall mean and include collectively all of the following solely to the extent it is Receivership Property (as defined in the Receivership Order):

(a)     The Land;

(b)     All structures, permanent plantings, trees, whether *fructus naturales* or *fructus industriales*, whether mature or immature, together with all trellises, wires, endposts, and stakes relating thereto, and other improvements located on the Land (collectively, the "**Improvements**"), together with all fixtures located on or attached to the Land or attached to the Improvements which are deemed real property under the law of the State of California (the "**Fixtures**"), including without limitation all roads, paved areas, implement covers, fences, gates, cattle guards, and all improvements and infrastructure; and all water tanks, wells, casings, pumps, gearheads, motors, engines, control panels, fuel storage, all Seller-owned utility poles and transmission lines (if any), water and irrigation system equipment and facilities, pivots, sprinklers, drip irrigation systems, hand lines, drainage system equipment and facilities, irrigation motors, pipelines, pressure systems, lift pumps, siphons, filtration equipment, water treatment equipment and apparatus, ditches, culverts, canals, ponds, all drainage pipelines, settlement and/or detention/retention ponds, lagoons, leech systems, borrow pits and equipment, all mainlines and drip lines, emitters, all spare and replacement parts, components and supplies located on the Land or that provides drainage, irrigation and/or water to the Land;

(c)     All rights and interests, if any, in and to all rights, rights of way, reversions, remainders, strips or gores, if any, between the Land and abutting properties, and any land lying in or under the bed of any street, alley, road or right-of way, abutting or adjacent to the Land, all covenants, conditions and restrictions, privileges, easements, servitudes, hereditaments, and appurtenances appurtenant to the Land, or otherwise used or useful to or of benefit to the use and enjoyment of the Land and/or providing any benefit with respect to access, ingress, egress, irrigation water, domestic water, electricity, gas, telephone, sewer or other utility service to the Land, whether or not of record (collectively, the "**Appurtenant Rights**");

(d)     All crops and farm products, whether *fructus naturales* or *fructus industriales* (emblements), for the 2026 crop year and thereafter generated by the Land (the "**Crops**");

(e)     All rights of Seller in and to all oil, gas, minerals, and other hydrocarbon substances, on or hereafter on or under the Land before or after extraction, if any (collectively, the "**Oil, Gas and Mineral Rights**");

(f)     All surface water rights, groundwater rights and other water rights or water credits appurtenant to the Land, including riparian, littoral, appropriative, prescriptive, permitted, overlying, adjudicated and other rights, any and all shares of water stock or mutual water company stock appurtenant to the Land, all public agency water entitlements, credits, allocations, pumping rights or similar rights associated with or derived from the Property relative to groundwater as the result of any adjudications or other court or regulatory proceedings, or under any groundwater sustainability plan or similar plan associated with the Land, and all rights in any contracts for the sale

Docusign Envelope ID: 173D2595-BF2E-836B-834C-928C4B339069

of water generated from irrigation wells located on the Land (collectively, "**Water Rights**"), subject to the provisions of Section 1.6 below; and

(g)    Any licenses or other agreements material to the Property and operations thereon as listed on Schedule 1.1(g) (collectively, "**Contracts**") that Buyer would like to have assigned to it at Closing; provided that (i) such licenses or agreements are Receivership Property assignable by Seller to Buyer without any liability or consideration and (ii) in the event that there are any licenses or agreements that are material but not Receivership Property, Seller will use commercially reasonable efforts to provide partial assignments where possible (and without any liability or consideration) and enter into other agreements or arrangements that are reasonably satisfactory to Buyer and approved by the Court, as necessary.

1.2    As-Is Condition of Property; Disclaimer of Warranties; Certain Disclosures.

(a)    Buyer acknowledges that Seller is acting solely in his capacity as Court-appointed receiver and, consequently, has limited knowledge of the condition of the Property. **ACCORDINGLY, BUYER ACKNOWLEDGES AND AGREES THAT BUYER IS PURCHASING THE PROPERTY "AS-IS", "WHERE-IS", AND "WITH ALL FAULTS AND DEFECTS" AS OF THE EFFECTIVE DATE AND CLOSING DATE, AND BUYER FURTHER ACKNOWLEDGES AND AGREES THAT SELLER HEREBY EXPRESSLY DISCLAIMS ANY AND ALL IMPLIED WARRANTIES CONCERNING THE CONDITION, VALUE AND QUALITY OF THE PROPERTY AND ANY PORTIONS THEREOF, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF HABITABILITY, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE. BUYER ACKNOWLEDGES THAT NO WARRANTY HAS ARISEN THROUGH TRADE, CUSTOM OR COURSE OF DEALING WITH SELLER. BUYER FURTHER ACKNOWLEDGES AND AGREES THAT IT HAS HAD THE OPPORTUNITY TO INSPECT THE PROPERTY AND BUYER WILL RELY SOLELY ON ITS INVESTIGATION OF THE PROPERTY IN ITS ACQUISITION THEREOF. SELLER HAS NO OBLIGATION TO ALTER, REPAIR OR IMPROVE THE PROPERTY. BUYER REPRESENTS TO SELLER THAT BUYER WILL CONDUCT PRIOR TO CLOSING SUCH INVESTIGATIONS OF THE PROPERTY, INCLUDING THE PHYSICAL AND ENVIRONMENTAL CONDITIONS THEREOF, AS BUYER DEEMS NECESSARY OR DESIRABLE TO SATISFY ITSELF AS TO THE CONDITION OF THE PROPERTY,** PROVIDED, HOWEVER, THAT NOTHING IN THIS SECTION 1.2(a) SHALL RELIEVE SELLER FROM OBLIGATIONS EXPRESSLY SET FORTH IN THIS AGREEMENT OR ANY CLOSING DOCUMENTS DELIVERED PURSUANT TO SECTION 10.2 OF THIS AGREEMENT.

(b)    Buyer acknowledges and agrees that Buyer will not rely upon any (i) representations or warranties (oral or written) made by or purportedly on behalf of Seller unless expressly set forth in this Agreement, the documents delivered at Closing pursuant to Section 10.2 of this Agreement, or any representations or warranties (oral or written) of any Lenders (as defined below) or (ii) documents or other information (oral or written) supplied by, or purportedly on behalf of, Seller, including Lenders. **BUYER FURTHER ACKNOWLEDGES AND AGREES THAT ANY DOCUMENTS OR INFORMATION PROVIDED TO BUYER BY SELLER OR ON**

Docusign Envelope ID: 173D2595-BF2E-836B-834C-928C4B339069

SELLER'S BEHALF HAVE BEEN OBTAINED FROM A VARIETY OF SOURCES, HAVE NOT BEEN INDEPENDENTLY INVESTIGATED OR VERIFIED BY SELLER, AND ARE NOT TO BE RELIED UPON BY BUYER IN ENTERING INTO THIS AGREEMENT OR PURCHASING THE PROPERTY.  EXCEPT TO THE EXTENT EXPRESSLY PROVIDED IN THIS AGREEMENT OR IN THE DOCUMENTS DELIVERED AT CLOSING PURSUANT TO SECTION 10.2 OF THIS AGREEMENT, SELLER MAKES NO EXPRESS REPRESENTATIONS OR WARRANTIES AND DISCLAIMS ANY AND ALL IMPLIED WARRANTIES CONCERNING THE TRUTH, ACCURACY, AND COMPLETENESS OF ANY DOCUMENTS OR INFORMATION SUPPLIED TO BUYER BY SELLER OR ANYONE ACTING OR PURPORTING TO ACT ON SELLER'S BEHALF.

(c)    EXCEPT TO THE EXTENT EXPRESSLY PROVIDED IN THIS AGREEMENT OR IN THE DOCUMENTS DELIVERED AT CLOSING PURSUANT TO SECTION 10.2 OF THIS AGREEMENT, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, CONCERNING ANY MATTERS INVOLVING THE PROPERTY.  WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, SELLER HEREBY AFFIRMATIVELY DISCLAIMS ANY EXPRESS OR IMPLIED REPRESENTATIONS OR WARRANTIES CONCERNING THE FOLLOWING MATTERS:  (i) EXCEPT AS EXPRESSLY SET FORTH IN THE DEED, ANY MATTERS AFFECTING TITLE TO THE REAL PROPERTY INCLUDING THE EXISTENCE OR SUFFICIENCY OF LEGAL AND PHYSICAL ACCESS; (ii) THE COMPLIANCE OF THE PROPERTY OR ANY PORTION THEREOF, INCLUDING BUT NOT LIMITED TO IMPROVEMENTS, SOIL, GROUNDWATER AND SUBSURFACE GEOLOGY, WITH ANY AND ALL APPLICABLE FEDERAL, STATE, AND LOCAL LAWS, ORDINANCES, PERMITS, RULES, REGULATIONS, OR REQUIREMENTS, INCLUDING, BUT NOT LIMITED TO, ANY OF THE FOREGOING PERTAINING TO ENVIRONMENTAL PROTECTION, POLLUTION AND LAND USE; (iii) THE SUITABILITY OR APPROPRIATENESS OF THE PROPERTY OR ANY PORTION THEREOF FOR AGRICULTURAL USES OR FOR THE CONDUCT OF ANY USES OR ACTIVITIES THAT BUYER MAY CONTEMPLATE OR ELECT TO CONDUCT THEREON, OR THE AVAILABILITY OF WATER OR WATER RIGHTS ON OR BENEFITTING THE PROPERTY; (iv) THE PRESENCE OF ANY LATENT OR PATENT DEFECTS AFFECTING THE PROPERTY INCLUDING BUT NOT LIMITED TO IMPROVEMENTS, SOIL, GROUNDWATER AND SUBSURFACE GEOLOGY; AND (v) THE QUALITY OF CONSTRUCTION AND MATERIALS INCORPORATED INTO ANY IMPROVEMENTS LOCATED ON THE PROPERTY AND THE EXISTENCE, QUALITY, NATURE, ADEQUACY, OR CONDITION OF ANY UTILITIES SERVING THE PROPERTY.

(d)    BUYER, FOR ITSELF AND ITS HEIRS, SUCCESSORS AND ASSIGNS, AND ANYONE CLAIMING BY, THROUGH, OR UNDER BUYER, HEREBY EXPRESSLY (i) WAIVES ANY CLAIM AND CAUSE OF ACTION WHICH RELATE, REFER, PERTAIN TO, OR ARISE OUT OF ANY OF THE MATTERS DESCRIBED IN THIS SECTION 1.2, AND ANY FAILURE BY SELLER TO DISCLOSE INFORMATION

-4-

**TO BUYER CONCERNING THE PROPERTY (COLLECTIVELY, "SUCH CLAIMS") (REGARDLESS OF WHETHER SUCH CLAIMS ARE KNOWN OR DISCOVERABLE AS OF THE EFFECTIVE DATE OR THE CLOSING DATE) AND (ii) RELEASES SELLER FROM ANY AND ALL LIABILITY FROM ANY SUCH CLAIMS; PROVIDED, IN EACH CASE THE FOREGOING WAIVER AND RELEASE DOES NOT EXTEND TO (AND SHALL EXPRESSLY EXCLUDE) (A) CLAIMS ARISING FROM SELLER'S FRAUD OR WILLFUL BREACH OF THIS AGREEMENT, AND (B) CLAIMS ARISING FROM SELLER'S FAILURE TO PERFORM OBLIGATIONS EXPRESSLY SET FORTH IN THIS AGREEMENT OR IN THE CLOSING DOCUMENTS TO BE DELIVERED PURSUANT TO <u>SECTION 10.2</u> OF THE AGREEMENT.**

With respect to the waivers and releases set forth herein and elsewhere in this Agreement, in each case relating to claims unknown to or unsuspected by Buyer, Buyer hereby acknowledges that such waivers and releases are being made after obtaining the advice of counsel and with full knowledge and understanding of the consequences and effects of such waivers and releases, and that such waivers and releases are made with the full knowledge, understanding and agreement that California Civil Code Section 1542 provides as follows, and that the protections afforded by said code section are hereby waived by Buyer solely to the extent such claims do not involve (i) Seller's fraud or willful breach of this Agreement and (ii) Seller's obligations expressly set forth in the Agreement:

> **"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."**



**Buyer's Initials**

1.3    <u>Release</u>.  At the Closing, as a condition of Seller's obligation to convey the Property to Buyer, Buyer shall deliver to Seller and Federal Agricultural Mortgage Corporation ("**FAMC**"), Rooster Capital IV LLC ("**Rooster**"), and American Equity Investment Life Insurance Company (collectively with FAMC and Rooster, the "**Lenders**") a release (the "**Release**") in the form and content set forth on **Exhibit D.**

1.4    <u>Not a Residential Purchase</u>.  Notwithstanding the existence of any residence upon the Land, any such residence is incidental to the Property and the parties acknowledge, understand, and agree that this Agreement is a commercial transaction and Buyer is not a homebuyer purchasing a dwelling or residence.  As a material inducement to Seller to sell the Property, Buyer represents and warrants:  (i) that it is purchasing the Property as a commercial transaction; (ii) that the existence of any residence is not a material consideration of its desire to purchase the Property; (iii) that nothing of value is being attributed to any such residence; and (iv) that Buyer does not intend to occupy any such residence as Buyer's residence.  To the fullest extent permitted by applicable law,

Docusign Envelope ID: 173D2595-BF2E-836B-834C-928C4B339069

Buyer waives any and all disclosures and requirements specific to the sale of any dwelling, home, or residence.

1.5     Bid Deposit.  Within three (3) business days of Buyer's execution of this Agreement and pursuant to the Marketing Procedures Order, Buyer shall deposit into a non-interest-bearing account with Seller an amount equal to 2% of the Purchase Price (the "**Bid Deposit**") in immediately available, good funds of the United States of America.  If Buyer is the Successful Bidder, the Bid Deposit shall be credited and applied toward payment of the cash consideration due at the Closing.  Seller shall remit the Bid Deposit to Buyer if Buyer provides written notice of termination of this Agreement if Buyer is entitled to the Bid Deposit per the terms hereof within five (5) business days following receipt of such notice.

1.6     Surface Water/Water Credits.  Except for the maximum amount of surface water that can be carried over pursuant to Westland's Water District rules or direction of Westland's Water District, in either case in effect at the earlier of the Closing or the end of the 2025 Water Year (the "**2025 Carryover Allowance**"), which Seller shall cause to be carried over to the next water year, Seller shall have the unrestricted right to sell any unused 2025 water year surface water allocations for the Property ("**2025 SWA**") which are not required to irrigate the Property during the period in which they can be used, and shall retain all proceeds thereof.  In the event that Seller cannot reasonably use or sell the 2025 SWA in excess of the 2025 Carryover Allowance, Seller shall have the right to convert such unused 2025 SWA to groundwater credits through recharge, and the costs of such recharge fees shall be reimbursed by Buyer to Seller at the closing as part of the Cultural Cost Reimbursement. Seller shall not sell any groundwater credits of record as of November 1, 2025, or accruing thereafter through recharge of 2025 SWA for which Seller is reimbursed at the Closing, and such shall be conveyed to Buyer at the Closing.

2.     Escrow.  Within three (3) business days following the Effective Date, Seller will deliver a fully executed counterpart of this Agreement to Chicago Title Company, 7330 N. Palm Avenue, Suite 101, Fresno, CA  93711 (Attention:  Sue Meyer) who shall act as "**Escrow Holder**," in connection with an escrow to be established to complete the transaction contemplated by this Agreement (the "**Escrow**").  The parties agree to execute any additional standard instructions reasonably required by Escrow Holder except for instructions that would excuse, release, or relieve Escrow Holder from theft of funds or any other criminal act, gross negligence, willful misconduct, violation of the standard of care with respect to its conduct, or breach of this Agreement on the part of Escrow Holder.

3.     Close of Escrow.  Provided all of the conditions to close of escrow set forth herein shall have been acknowledged as waived or satisfied by the Party benefitted by the subject condition, the close of escrow for the purchase and sale transaction provided for herein (the "**Closing**" or "**Close of Escrow**") shall occur on or before **5:00 p.m., Pacific Time, on a date (i) no later than October 12, 2026, but only in the event that such date is at least one (1) business day following the date the Sale Order becomes final and non-appealable, otherwise (ii) no later than ten (10) business days following the date the Sale Order becomes final and non-appealable** (the "**Closing Date**") or such other date as agreed to by the Parties; provided that the Closing Date shall in no event occur later than the Outside Date (as set forth in Section 6.4).

-6-

Docusign Envelope ID: 173D2595-BF2E-836B-834C-928C4B339069

3.1     Purchase Price.  The Purchase Price of the Property ("**Purchase Price**") is **Two Million Three Hundred Forty-Six Thousand One Hundred Forty Seven and 00/100ths Dollars ($2,346,147.00) United States currency**.  The Purchase Price shall be payable as follows:

(a)     Notwithstanding any term or provision of this Agreement, Buyer hereby delivers to Seller an amount equal to **One Hundred and 00/100ths Dollars ($100.00)** from the Bid Deposit  (the "**Independent Consideration**") as independent consideration to Seller for having entered into this Agreement at any time subsequent to execution hereof.  The Independent Consideration shall be nonrefundable if Close of Escrow does not occur for any reason related to a Buyer default or termination under this Agreement, or due to a failure of a Buyer condition under Section 6.3, and to the extent that this Agreement requires any funds to be refunded to Buyer, any amount so refunded shall not include the Independent Consideration; provided, however, that the Independent Consideration shall be refunded to Buyer from Seller, as part of Buyer's damages, in the event of a Seller default under this Agreement.

(b)     At the Closing, the Escrow Holder shall apply the Bid Deposit plus any interest thereon toward the Purchase Price.

(c)     The balance of the Purchase Price (the **"Balance"**) shall be deposited by Buyer into Escrow no later than one (1) business day prior to the Closing and paid to Seller in cash, by cashier's check or wire transfer of immediately available good funds, at the Close of Escrow.

**4.     LIQUIDATED DAMAGES.  NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, IN THE EVENT THAT THE ESCROW FAILS TO CLOSE DUE TO A BREACH OF OR DEFAULT BY BUYER, AND BUYER FAILS TO CURE SUCH DEFAULT WITHIN FIFTEEN (15) BUSINESS DAYS OF RECEIVING WRITTEN NOTICE FROM SELLER OF THE SAME, OR, IF THE BREACH IS OF A NATURE THAT IT CANNOT BE REASONABLY CURED WITHIN FIFTEEN (15) BUSINESS DAYS, AND BUYER HAS DILIGENTLY COMMENCED SUCH CURE WITHIN SAID FIFTEEN (15) BUSINESS DAY PERIOD, BUYER SHALL HAVE SUCH ADDITIONAL TIME AS IS NECESSARY TO CURE THE BREACH BUT IN NO EVENT MORE THAN A TOTAL OF FORTY FIVE (45) DAYS, THEN SELLER SHALL BE ENTITLED TO THE BID DEPOSIT SET FORTH IN SECTION 1.5 AS LIQUIDATED DAMAGES, AND NOT AS A PENALTY, AND AS SELLER'S SOLE AND EXCLUSIVE REMEDY AGAINST BUYER AT LAW OR OTHERWISE FOR BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE PROPERTY.  THE PARTIES HERETO EXPRESSLY ACKNOWLEDGE AND AGREE THAT THE AMOUNT OF SELLER'S ACTUAL DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE PROPERTY OR OTHER EVENT OF DEFAULT BY BUYER UNDER THIS AGREEMENT WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO ASCERTAIN, AND THE AMOUNT SET FORTH ABOVE AS LIQUIDATED DAMAGES HAS BEEN AGREED UPON BY SELLER AND BUYER AFTER SPECIFIC NEGOTIATION. THE PAYMENT OF SUCH AMOUNT AS LIQUIDATED DAMAGES IS NOT INTENDED AS A FORFEITURE OR PENALTY. THE PARTIES AGREE THAT THE BID DEPOSIT AMOUNT SET FORTH IN SECTION 1.5 REPRESENTS A REASONABLE ESTIMATE**

20039.001/Westlands PSA - FarmerMac (EX)

**OF THE ACTUAL DAMAGES WHICH SELLER WOULD INCUR IN THE CASE OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE PROPERTY.  BY INITIALING THE SPACES WHICH FOLLOW, SELLER AND BUYER SPECIFICALLY AND EXPRESSLY AGREE TO ABIDE BY THE TERMS AND PROVISIONS OF THIS SECTION CONCERNING LIQUIDATED DAMAGES IN THE EVENT OF BUYER'S FAILURE TO CLOSE THE PURCHASE OF THE PROPERTY.  FOR THE AVOIDANCE OF DOUBT, THE FOREGOING LIQUIDATED DAMAGES COVENANT SHALL NOT APPLY TO ANY BUYER INDEMNITY OF SELLER, OR ANY OTHER DEFAULT BY BUYER UNDER THIS AGREEMENT, OTHER THAN THE FAILURE OF BUYER TO CLOSE THE PURCHASE OF THE PROPERTY.**

**ACKNOWLEDGMENT AS TO ACCEPTANCE OF THE IMMEDIATELY PRECEDING LIQUIDATED DAMAGES PROVISION**

| | |
|---|---|
| —DS— _IM_ | —Initial— |
| Seller | Buyer |

Lance Miller, solely in his capacity
as Court-appointed Receiver

## 5.    Seller's Deliveries; Condition of Title.

5.1    Seller's Deliveries.

Seller will deliver to Buyer as soon as practical following the Effective Date, a Natural Hazards Disclosure Statement (the "**Natural Hazards Disclosure**") with respect to the Land.  Prior to the Close of Escrow, Buyer shall deliver to Seller through Escrow, documents evidencing and acknowledging receipt and acceptance of the Natural Hazards Disclosure and all other disclosures that are required in connection with the conveyance of the property, if any, in California. The written report prepared by the natural hazards disclosure company retained by Seller (the "**Natural Hazard Expert**") regarding the results of its full examination will fully and completely discharge Seller from its disclosure obligations referred to herein, if and to the extent any such obligations exist, and, for the purpose of this Agreement, the provisions of Civil Code Section 1102.4 regarding non-liability of Seller for errors or omissions not within its personal knowledge shall be deemed to apply and the Natural Hazard Expert shall be deemed to be an expert, dealing with matters within the scope of its expertise with respect to the examination and written report regarding the natural hazards referred to above. As used in this Agreement, "Disclosure Statutes" means, without limitation, collectively, California Government Code Sections 8589.3, 8589.4 and 51183.5, California Public Resources Code Sections 2621.9, 2694 and 4136, and any other California statutes that require Seller to make disclosures concerning the Property.  Buyer hereby agrees as follows with respect to the Disclosure Statutes and the Natural Hazards Disclosure, provided that the following will not apply if Seller delivers any inaccurate or untrue information to the Natural Hazard Expert:

(a)    Seller shall not be liable for any error or inaccuracy in, or omission from, the information in the Natural Hazards Disclosure.

-8-

Docusign Envelope ID: 173D2595-BF2E-836B-834C-928C4B339069

(b)    The Natural Hazards Disclosure is being provided by Seller for purposes of complying with the Disclosure Statutes and shall not be deemed to constitute a representation or warranty by Seller as to the presence or absence in, at or around of the Property of the conditions that are the subject of the Disclosure Statutes.

5.2    Condition of Title. Seller agrees to convey fee simple title in and to the Property to Buyer. Title shall be conveyed by Seller to Buyer by receiver's deed, using the form attached hereto as **Exhibit E** (the "**Deed**"), subject to the items enumerated in this Section. Buyer shall accept title to the Property subject to the following exceptions, provided, however, that nothing herein shall limit or restrict Buyer's right to (i) negotiate with the Title Company to remove or modify any such exceptions, or (ii) obtain title endorsements at Buyer's expense to insure over any such exceptions:

(a)    any lien for current real property taxes, special taxes, special assessments, and water and other utility district taxes and assessments, if any, not yet due;

(b)    any lien for supplemental taxes and assessments resulting from the change in ownership created by the sale of the Property to Buyer;

(c)    all covenants, conditions, restrictions, easements, agreements, defects, encumbrances, other than financial liens not created by Buyer, and other matters of record, including without limitation, the Permitted Exceptions, except to the extent Seller has agreed in writing to terminate or remove;

(d)    physical matters and conditions, if any, that exist at the Property on the Effective Date and that would be disclosed by a current survey or inspection of the Property;

(e)    laws, regulations, or ordinances relating to zoning, environmental protection, subdivision, occupancy, use, construction, or development of the Property;

(f)    any matters or interests created or otherwise caused by Buyer or its agents, consultants, and representatives;

(g)    the printed standard exceptions listed in the Preliminary Report issued by Chicago Title Company with a Title Number of 45006896-MW, dated effective March 20, 2026 (the "**Preliminary Report**"); and

(h)    such other matters as Buyer either waives, assumes, or consents to in writing, which shall include the leaseholds and other rights listed in Schedule 5.2(h).

5.3    No Liens. The Property shall be sold free and clear of any and all financial liens, liabilities, obligations, encumbrances, or claims (except for any such liens, encumbrances, claims or interests set forth and described in Section 5.2 above) effective upon the Closing.

5.4    [Reserved]

5.5    Buyer's Indemnification of Seller. Any damage caused to the Property in connection with Buyer's Inspection shall be promptly and fully repaired by Buyer and the Property

20039.001/Westlands PSA - FarmerMac (EX)

Docusign Envelope ID: 173D2595-BF2E-836B-834C-928C4B339069

returned to its prior condition, all at Buyer's sole cost and expense, which obligation shall survive any termination of this Agreement; provided, however, that Buyer shall not be responsible for pre-existing conditions or defaults, including hazardous or toxic materials, not caused or exacerbated by Buyer or Buyer's Agents. Buyer shall keep the Property free and clear of any mechanic's liens and materialmen's liens and all other liens and encumbrances arising out of any of Buyer's or Buyer's Agent's activities, which obligation shall survive any termination of this Agreement. Further, except for the discovery and remediation or repair of existing conditions on the Property (including, without limitation, the existence of hazardous or toxic materials not placed on the Property by Buyer or its agents or representatives) or to the extent arising from Seller's gross negligence or willful misconduct, Buyer hereby agrees to indemnify, defend and hold Seller, Lenders, and Seller's and Lenders' respective beneficiaries, partners, affiliates, subsidiaries, principals, members, shareholders, agents, employees, professionals, successors, and assigns (together with Seller, collectively, the "**Seller Parties**"), harmless from and against any and all claims, actions, losses, costs, liabilities, obligations and expenses arising out of the acts or omissions of Buyer or Buyer's Agents in connection with any such entry, inspection, test, study or other activity, including without limitation all legal expenses reasonably incurred by Seller Parties in connection therewith. The indemnity provided herein shall not extend to indirect, consequential, punitive or speculative damages and shall survive the Close of Escrow and any termination of this Agreement

5.6    SGMA Disclosure.    The Sustainable Groundwater Management Act ("**SGMA**") is a law enacted in the year 2014. SGMA may limit the amount of well water that may be pumped from underground aquifers. Applicable rules and regulations are in place implementing SGMA. Seller and its agents and representatives make no representation on water rights or the effect of SGMA on the Property now or in the future, except that Seller shall disclose to Buyer any notices, violations, or regulatory actions of which Seller has actual knowledge, and shall further disclose to Buyer, and deliver true and complete copies of, any contracts, agreements, or understandings (whether written or oral) with third parties relating to the pumping, diversion, sharing or transfer of groundwater, banked water, surface water, water rights or pumping allocations affecting the Property, whether or not of record, of which Seller has actual knowledge (provided that any such document which is included in the Preliminary Report is deemed delivered). Buyer has been advised to consult an expert on water rights and SGMA to determine the effect of SGMA on the Property now and in the future. In making the decision to purchase the Property, Buyer is not relying upon any statement, representation, or warranty of Seller (or any other Seller Party), but rather, Buyer is relying upon Buyer's own independent investigation and analysis of water rights and SGMA in regards to the Property. Upon Closing, Buyer assumes the risk of implementation of SGMA on the Property. Buyer releases Seller and all other Seller Parties, from any liability, known or unknown, arising from the implementation of SGMA in regards to the Property, provided this release shall not apply to any liability arising from Seller's or any Seller Parties' fraud or intentional misrepresentations in connection with SGMA or water rights information provided to Buyer.

6.    **Conditions Precedent; Termination**.

6.1    Conditions to Obligations of all Parties. The obligation of each Party to consummate the transactions contemplated by this Agreement at Closing is subject to the fulfillment on or prior to the Closing of the following conditions:

20039.001/Westlands PSA - FarmerMac (EX)

Docusign Envelope ID: 173D2595-BF2E-836B-834C-928C4B339069

(a)    the Court shall have entered the Sale Order and such order shall be in full force and effect and shall not have been stayed or vacated, and any applicable appeal period thereafter having lawfully expired, with no appeal having been filed with respect thereto. The Sale Order shall be deemed obtained prior to the lapse of the appeals period if the Court approves this Agreement, the sale of the Property pursuant to the terms of this Agreement, and Closing by Seller upon a motion joined in, or their approval stipulated to the Court as agreed to, by Owner, Lenders, and all parties of interest in the Action, and Title Company agrees to insure title to the Property without taking exception to the appeals period or any potential appeal that could be filed during such period. Buyer acknowledges and confirms that neither Seller nor any of Lenders has made any representations or warranties, express or implied, that the Sale Order will be obtained. Promptly upon obtaining the Sale Order, Seller shall deliver a copy of the Sale Order to Buyer and Escrow Holder. If: (i) the Court denies approval of this Agreement, or (ii) the Sale Order is overturned in an appeal, this Agreement shall be terminated, the Bid Deposit plus any interest thereon shall be delivered to Buyer and neither party shall have any further rights or obligations hereunder except with respect to the provisions hereof which specifically survive termination; and

(b)    no injunction by any court or other tribunal of competent jurisdiction shall have been entered and shall continue to be in effect, and no legal proceeding, bankruptcy , insolvency or automatic stay is pending, and no law shall have been adopted that, in the case of any of the foregoing, remains in effect or be effective, that prevents, enjoins, prohibits, or makes illegal the consummation of the transactions contemplated by this Agreement.

6.2    Seller's Conditions Precedent.  Seller's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

(a)    Buyer shall have performed each of the acts to be performed by it pursuant to this Agreement and the Marketing Procedures Order, including without limitation, depositing the Bid Deposit, the Cultural Cost Reimbursement (as defined in Section 9 below), and the Buyer's share of the Closing Costs (as defined in Section 12 below) and Prorations (as defined in Section 13 below) into the Escrow by the Closing Date.

(b)    Each of Buyer's representations and warranties set forth in Section 8 hereof shall be true and correct at the Close of Escrow as if affirmatively made at that time.

(c)    The Closing shall occur simultaneously with the closing of the Concurrent Sale.

(d)    On or before the Bid Deadline (as defined in in the Marketing Procedures Order), Buyer has provided evidence of its ability to close the transactions contemplated under this Agreement in form and substance reasonably acceptable to Seller.

(e)    On or before the Bid Deadline (a) Buyer has disclosed to Seller, in writing, the identity of each person and/or entity: (i) participating in its bid to Purchase the Property by having made a specific capital commitment in writing designated to fund, in whole or in part, the acquisition of the Property pursuant to this Agreement (each, a "**Participant**") and (ii) that has or will have a direct ownership interest in Buyer or the Property (each, a "**Buyer Party**"); and (b) each Buyer

-11-

Docusign Envelope ID: 173D2595-BF2E-836B-834C-928C4B339069

Party has agreed in writing to be bound by the terms of Section 27 of this Agreement, substantially in the form set forth as Exhibit I, attached hereto. In the event additional Buyer Parties and/or Participants arise after the Bid Deadline and prior to or through the Closing, prior to or concurrently with Buyer accepting such Buyer Party or Participant or commitment of such Buyer Party or Participant, Buyer shall comply with the provisions of clause (a) of this Section 6.2(e), and shall cause such new Buyer Party to comply, with the provisions of clause (b) of this Section 6.2(e). Buyer shall provide such additional disclosures regarding Buyer Parties and/or Participants that Seller may reasonably request and, at Seller's reasonable request, shall cause additional Buyer Parties and/or Participants identified by Seller to sign and agree in writing to be bound by the terms of Section 27 of this Agreement.

The foregoing conditions are solely for the benefit of Seller, any or all of which may be waived by Seller in his sole discretion.

6.3     Buyer's Conditions Precedent.  Buyer's obligation to perform as set forth in this Agreement is hereby expressly conditioned on satisfaction of each and every one of the following conditions precedent:

(a)     Seller shall have performed every act to be performed by it pursuant to this Agreement and the Marketing Procedures Order, including without limitation, depositing into the Escrow the Deed.

(b)     Except as listed in Schedule 5.2(h), Seller shall have terminated any and all existing leases on the Property and provided Buyer with satisfactory written evidence of the same, in each case solely to the extent such leases are Receivership Property and terminable under applicable law without damages.

(c)     [Reserved]

(d)     [Reserved]

(e)     Each of the representations and warranties of Seller contained in Section 7 or elsewhere in this Agreement shall be true and correct at the Close of Escrow as if affirmatively made at that time.

(f)     All monetary liens, deeds of trust, mortgages, security interests, tax liens, mechanics' liens, crop liens, and other financial encumbrances securing the payment of money against the Property which Seller is obligated to remove or cause the removal pursuant to this Agreement shall have been fully paid, released, and reconveyed (or other arrangements reasonably satisfactory to Buyer shall have been made for their release concurrently with Closing), so that title to the Property is conveyed to Buyer free and clear of all such monetary liens, subject only to the Permitted Exceptions (as defined below).

(g)     All exhibits, schedules, attachments, and ancillary documents to this Agreement shall have been fully executed and delivered to Escrow, in form and substance satisfactory to Buyer in its sole discretion.

-12-

The foregoing conditions are solely for the benefit of Buyer, any or all of which may be waived by Buyer in Buyer's sole discretion.

6.4    Termination.  This Agreement may be terminated in accordance with this Section 6.4 at any time prior to the Closing:

(a)    By written notice of either Buyer or Seller if the Closing shall not have occurred on or before thirty (30) days after the Sale Order becomes final and non-appealable, unless otherwise agreed to by Buyer and Seller in writing (such date, the "**Outside Date**") and the Party seeking to terminate this Agreement has not breached this Agreement in a manner that has been the principal cause of the Closing not occurring on or prior to the Outside Date; provided, however, that the Outside Date may be extended by Seller and Buyer upon mutual agreement;

(b)    By written notice of either Buyer or Seller if an order by a governmental authority of competent jurisdiction shall have been issued permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby and such order shall have become final and nonappealable; provided that the right to terminate this Agreement pursuant to this Section 6.4(b) shall not be available to a Party if such order resulted from, or could have been avoided but for, the breach by such Party of any covenant or other agreement of such Party set forth in this Agreement;

(c)    By written notice of either Buyer or Seller if Seller closes or consummates an alternative transaction pursuant to order of the Court or the Court enters an order approving such alternative transaction; provided that, if Buyer is not the Successful Bidder at the Auction, but is the Back-Up Bidder, then notwithstanding anything to the contrary contained in this Agreement, Buyer shall not be permitted to terminate this Agreement pursuant to this Section 6.4(c) until the earlier of (i) the date the alternative transaction closes or (ii) sixty (60) days following the date the Sale Order becomes final and non-appealable;

(d)    By Buyer by giving written notice to Seller at any time prior to Closing (i) in the event there has been a material breach of or material inaccuracy in any representation or warranty made by Seller in this Agreement or if Seller has breached any covenant contained in this Agreement in any respect, which breach, inaccuracy or failure to perform (1) gives rise to a failure of the conditions set forth in Section 6.3 to be satisfied, and (2) (A) is not capable of being cured by the Outside Date or (B) if capable of being cured by the Outside Date, is not cured by the earlier of the Outside Date and thirty (30) days after delivery by Buyer of written notice to Seller of such breach, or (ii) in the event that any condition set forth in Section 6.3 shall not be satisfied by the Outside Date; provided that, Buyer's right to terminate this Agreement pursuant to this Section 6.4(d) will not be available to Buyer at any time that Buyer is in material breach of any covenant, representation or warranty hereunder; or;

(e)    by Seller by giving written notice to Buyer at any time prior to Closing (i) in the event there has been a material breach of or material inaccuracy in any representation or warranty made by Buyer in this Agreement or if Buyer has materially breached any covenant contained in this Agreement in any respect, which breach, inaccuracy or failure to perform (1) gives rise to a failure of the conditions set forth in Section 6.2 to be satisfied and (2) (A) is not capable of being cured by the Outside Date or (B) if capable of being cured by the Outside Date, is not cured by the earlier

-13-

of the Outside Date and forty-five (45) days after delivery by Seller of written notice to Buyer of such breach, or (ii) in the event that any condition set forth in Section 6.2 shall become incapable of being satisfied by the Outside Date; provided that, Seller's right to terminate this Agreement pursuant to this Section 6.4(e) will not be available to Seller at any time that Seller is in material breach of any covenant, representation or warranty hereunder; and

(f)      by the mutual written consent of Seller and Buyer;

(g)      By Seller, by giving written notice to Buyer if the Sale Order is subject to appeal; or

(h)      By Buyer by giving written notice to Seller if the Sale Order is: (i) modified or otherwise altered in a manner materially adverse to Buyer not otherwise agreed to by Buyer, in writing, or (ii) vacated by the Court or a court of competent jurisdiction.

(i)      By Seller, by giving written notice to Buyer that it has failed to comply with the provisions of Section 6.2(d) or Section 6.2(e), if Buyer has failed to comply with either of such provision.

6.5      Effect of Termination

(a)      In the event of the termination of this Agreement as provided in Section 6.4, this Agreement shall forthwith become void and there shall be no liability on the part of either Party (except with respect to confidentiality, liquidated damages, obligations relating to indemnity, the return or disbursement of the Bid Deposit, the Breakup Fee, and any rights or obligations that expressly survive the termination of this Agreement, each of which shall survive any termination); provided, however, that in the event this Agreement is terminated (x) pursuant to Section 6.4(e) or Section 6.4(i) and Seller is not then in material breach of Seller's' obligations hereunder, then Seller shall be entitled to retain the Bid Deposit plus any interest thereon and (y) for any reason other than pursuant to Section 6.4(e) or Section 6.4(i), Buyer shall be entitled to a return of the Bid Deposit plus any interest thereon as set forth in this Agreement. Notwithstanding the foregoing, nothing in this Article 6 will be deemed to release any Party from liability for any willful breach of this Agreement prior to its termination pursuant to Section 6.4, willful misconduct, fraudulent, or criminal acts, the remedies for which shall not be limited by the provisions of this Agreement; provided this sentence shall not include breach of Buyer due to failure to close, for which liability is governed by Section 4 hereof.

(b)      In consideration for Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof, if this Agreement is terminated pursuant to Sections 6.4(c), and an alternative transaction is consummated, Seller (subject to entry of the Marketing Procedures Order) shall pay to Buyer a break-up fee in an amount equal to $46,922.94 (the "**Breakup Fee**"); provided that the Breakup Fee shall be payable concurrently with the consummation of, and only out of the cash proceeds of, an alternative transaction, to an account designated by Buyer in writing to Seller; and provided further that this provision shall only be effective upon (i) the entry of the Marketing Procedures Order by the Court and (ii) the designation of Buyer by Seller as the "stalking horse" bidder pursuant to the Marketing Procedures Order.

-14-

(c)      In the event of any breach by Seller of this Agreement, whether or not a willful breach, or any failure of the transaction contemplated by this Agreement to be consummated for whatever reason whatsoever, the sole and exclusive remedy of Buyer shall be to terminate this Agreement in accordance with Section 6.4 and, if applicable, to receive the Breakup Fee in accordance with Section 6.5, if payable thereunder; provided that in the case of any fraud or willful misconduct by Seller, Buyer shall have the right to pursue specific performance, if applicable.

(d)      Each of the Parties acknowledges and agrees that the agreements contained in this Section 6.5 are an integral part of this Agreement and that the Breakup Fee is not a penalty, but rather represent liquidated damages in a reasonable amount that will reasonably compensate Buyer in the circumstances in which such Breakup Fee is payable for the efforts and resources expended and opportunities foregone by Buyer while negotiating and pursuing this Agreement and in reasonable reliance on this Agreement and on the reasonable expectation of the consummation of the transactions contemplated herein, which amount would otherwise be impossible to calculate with precision.

## 7.      **Seller's Representations and Warranties; Covenants**.

7.1      Seller's Representations and Warranties.  Except as set forth on Schedule 7.1, attached hereto, Seller hereby warrants, represents, covenants, and certifies to Buyer that:

(a)      Court-Appointed Receiver.  Seller is the Court-appointed receiver over the Receivership Property, duly appointed and acting within the scope of authority granted by the Court, and has not received any written notice of challenge or appeal to such appointment that remains unresolved.

(b)      Authority.  Subject to entry of the Marketing Procedures Order and the Sale Order, this Agreement has been duly authorized, executed and delivered by Seller, is the legal, valid and binding obligation of Seller, and neither this Agreement nor compliance with or fulfillment of the terms and conditions hereof will conflict with, or result in a breach of, the terms, conditions or provisions of, or constitute a default under, any agreement to which Seller is a party or by which Seller is otherwise bound, or any judicial order to which Seller is a party or to which Seller is subject.  All documents to be executed by Seller which are to be delivered at Closing, will, at the time of Closing, (i) be duly authorized, executed and delivered by Seller, (ii) be legal, valid and binding obligations of Seller, and (iii) not violate, to Seller's Knowledge, any provision of any agreement or judicial order to which Seller is a party or to which Seller is subject

(c)      OFAC Compliance.  Seller (which, for the purposes of this Section 7.1(c), shall include its partners, members, beneficial owners and affiliates) (i) has not been designated as a "specifically designated national and blocked person" on the most current list published by the Office of Foreign Asset Control of the U.S. Department of the Treasury ("**OFAC**") at its official website (http://www.treas.gov/ofac/t11sdn.pdf) or at any replacement website or other replacement official publication of such list (collectively, the "**List**"); (ii) is currently in compliance with and will at all times during the term of this Agreement (including any extension thereof) remain in compliance with the regulations of OFAC and any statute, executive order (including the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action relating thereto;

-15-

Docusign Envelope ID: 173D2595-BF2E-836B-834C-928C4B339069

and (iii) will not transfer or permit the transfer of any controlling interest in Seller to any person or entity who is, or any of whose beneficial owners are, listed on the List.

(d)      Foreign Person and Withholding.  Seller is not a "foreign person" within the meaning of Sections 1445(f)(3) and 7701(a)(3) of the Internal Revenue Code of 1986, as amended (the "**Code**"), and is not subject to any federal, state, or local withholding obligation of Buyer under the tax laws applicable to Seller or the Property.  Seller will provide Buyer an Affidavit of Exemption pursuant to Section 1445(b)(c) of the Code, or provide Escrow Holder an Affidavit of non-foreign status under the Housing and Economic Recovery Act of 2008.  A Seller may be subject to withholding tax under California Revenue and Taxation Section 18662, and if so will submit California Form 593 as may be applicable to Buyer through Escrow Holder.

(e)      Organic Trees or Vines.  The Property may include one or more varieties of trees or vines that are organic and/or are the subject of plant royalties.  Seller makes no representations or warranties in this regard.

(f)      Contracts. Except as disclosed to Buyer in writing or set forth on Schedule 7.1, Schedule 5.2(h), or which are Permitted Exceptions or otherwise set forth in the Preliminary Report, Seller has not entered into, and to Seller's Knowledge (as defined below) there are no, contracts, agreements, leases, licenses, management agreements, service contracts, maintenance agreements, construction contracts, or other similar arrangements, including, without limitation, agreements with third parties related to the pumping, diversion, sharing or transfer of groundwater, banked water, surface water, water rights or pumping allocations affecting the Property that will be binding on Buyer after the Close of Escrow. To Seller's Knowledge, (i) Seller has delivered complete copies of such documents comprising the Contracts listed in Schedule 1.1(g) attached hereto which are in Seller's possession, (ii) Seller has not delivered any notice of default to any counterparty under any Contract, and (iii) Seller has not received any notice of default from any counterparty under any Contract.

(g)      Options. To Seller's Knowledge, other than the Contracts, the Permitted Exceptions, or other items set forth in the Preliminary Report (whether a Permitted Exception or otherwise), there are no purchase options, rights of first offer, rights of first refusal or any similar options applicable to the transaction contemplated by this Agreement or that would be binding on the Property or Buyer following Closing.

(h)      [Reserved]

(i)      Taxes and Assessments. To Seller's Knowledge, all general real property taxes and regular assessments currently due and payable with respect to the Property have been paid or will be prorated at Closing. To Seller's Knowledge, there are no pending or threatened special assessments, impact fees, or similar charges affecting the Property other than those disclosed to Buyer in writing or that are matters of public record.

(j)      Litigation. To Seller's Knowledge, there are no actions, suits, or proceedings pending or threatened against Seller relating solely to the Property, other than those disclosed to Buyer in writing or matters of public record.

-16-

Docusign Envelope ID: 173D2595-BF2E-836B-834C-928C4B339069

(k)        Insurance. To Seller's Knowledge, Seller has, or will as such policies are acquired for the 2026 crop year, provided Buyer with true, correct and complete copies of all insurance policies with respect to the Property, including without limitation the multi-peril crop insurance in place with respect to the Land.

(l)        Violation of Law. To Seller's Knowledge, Seller has not received any written notice from any governmental authority alleging that the Property is in violation of any applicable law (including, without limitation, laws related to the environment or public health or safety) which violation remains uncured.

(m)        Employees. To Seller's Knowledge, there are no employees of the Receiver or Pivot Management Group for which Buyer shall have responsibility for after Closing.

(n)        [Reserved]

(o)        Knowledge Definition. As used in this Agreement, the term "Seller's Knowledge" means the current actual (and not constructive or imputed) knowledge of LANCE MILLER, solely in his capacity as court-appointed receiver, without any duty of inquiry or investigation, and expressly excluding the knowledge of any other person, including Seller's agents, employees, consultants, or representatives. Any disclosure required hereunder shall be deemed made if such matter is listed in the Preliminary Report.

(p)        Lender Approval. Each of FMAC and Rooster has provided its written approval of this Agreement to Seller.  For the avoidance of doubt, the approval of either FMAC or Rooster is not a condition precedent to the effectiveness or binding nature of this Agreement.

7.2        Survival.  The express representations and warranties made in this Article by Buyer or Seller will not merge into any instrument of conveyance delivered at the Closing; provided, however, that any action, suit or proceeding with respect to the truth, accuracy or completeness of any such representations and warranties shall be commenced, if at all, on or before the date which is three (3) months after the date of the Closing and, if not commenced on or before such date, thereafter will be void and of no force or effect.

7.3        Seller Covenants. Seller hereby covenants and agrees with Buyer as to the following matters:

(a)        Seller shall maintain and farm the Property in a commercially reasonable manner until the Closing; provided that, if Seller takes any action requested by Buyer, or refrains from taking an action at the request of Buyer, pursuant to the provisions of Section 9 allowing Buyer to direct cultural activities, or otherwise, such action or inaction shall not be a breach of this covenant.

(b)        Seller shall maintain in effect all insurance policies in each case that are in effect on the Effective Date, including that Seller shall maintain the same level of multi-policy crop insurance for the 2025-2026 crop year coverage as was in place for the 2024-2025 crop year, provided that such are available on commercially reasonable terms.

20039.001/Westlands PSA - FarmerMac (EX)

Docusign Envelope ID: 173D2595-BF2E-836B-834C-928C4B339069

(c)    Seller shall not enter into any new lease or contract affecting the Property or any part thereof, or modify, extend or terminate any Contract without the prior written consent of Buyer, except that Seller shall have the right, without Buyer's consent but with prior notice to and consultation with Buyer, to enter into such new leases or contracts, or modify, extend or terminate any Contracts which:

(i)    in connection with entry into or extension of Contracts, are entered or extended pursuant to valid written options pursuant to Contracts listed on Schedule 1.1(g) in favor of the counterparty thereof (or an eligible assignee), or

(ii)    will terminate prior to the Closing, or

(iii)    will extend beyond the Closing, but only if such are on commercially reasonable terms and are required to provide for ongoing operations and maintenance on the Property, in Seller's reasonable discretion, and shall not extend beyond the Closing more than is required on a commercially reasonable basis to address the need therefor; provided, however, for the avoidance of doubt, Buyer shall have the right to not assume any such lease or contract and the same shall not encumber the Land or be binding on Buyer beyond the Closing and shall solely be the responsibility of Seller.

Seller shall provide Buyer with true, correct and complete copies of any agreements entered into after the Effective Date.

(d)    [Reserved]

(e)    Without Buyer's prior written consent or as otherwise provided herein, Seller shall not remove, sell or otherwise transfer the Property or any portion thereof or any interest therein, except to the Successful Bidder, or grant any new option, pledge, offer, right, right of first refusal or right of first offer with respect to the Property or any part thereof or any direct or indirect interest therein.

(f)    Seller shall promptly advise Buyer of and provide complete copies of (i) any written notices that Seller receives from any governmental authority, including notices of violations or regarding condemnation, and (ii) any notices of default given or received by Seller under any Contracts. Seller will promptly advise Buyer of any litigation, arbitration proceeding or administrative hearing which is instituted against Seller after the Effective Date and which concerns or affects Seller.  Seller shall promptly advise Buyer of any material casualty that affects the Property which it has Knowledge thereof.

### 8.    Buyer's Representations and Warranties

8.1    Buyer's Representations and Warranties. Buyer hereby warrants, represents, covenants and certifies to Seller and agrees that as of the Close of Escrow:

(a)    Good Standing.  Buyer is a limited liability company, that is properly and duly formed, validly existing and in good standing under the laws of the State of Delaware,

-18-

20039.001/Westlands PSA - FarmerMac (EX)

Docusign Envelope ID: 173D2595-BF2E-836B-834C-928C4B339069

registered to transact business in the State of California, and is in good standing under the laws of the State of California.

(b)     Authority.  Buyer, and its Authorized Assignee(s) (defined below), acting through any of their respective duly empowered and authorized managers, members, partners or officers, as applicable, has all necessary entity power and authority to transact the business in which it is engaged, and has full power and authority to enter into this Agreement, to execute and deliver the documents and instruments required of Buyer herein, and to perform its obligations hereunder.  This Agreement has been duly authorized, executed and delivered by Buyer, is the legal, valid and binding obligation of Buyer, and, neither this Agreement nor compliance with or fulfillment of the terms and conditions hereof will conflict with, or result in a breach of, the terms, conditions or provisions of, or constitute a default under, any agreement to which Buyer is a party or by which Buyer is otherwise bound, or any judicial order to which Buyer is a party or to which Buyer is subject.  All documents to be executed by Buyer which are to be delivered at Closing, will, at the time of Closing, (i) be duly authorized, executed and delivered by Buyer, (ii) be legal, valid and binding obligations of Buyer, and (iii) not violate, to the best of Buyer's knowledge, any provision of any agreement or judicial order to which Buyer is a party or to which Buyer is subject.

(c)     OFAC Compliance.  Buyer or its Authorized Assignee (which, for the purposes of this Section 8(c), shall include its members, officers, beneficial owners and affiliates) (i) has not been designated as a "specifically designated national and blocked person" on the most current list published by the OFAC at its official website (http://www.treas.gov/ofac/t11sdn.pdf) or at any replacement website or other replacement official publication of such List; (ii) is currently in compliance with and will at all times during the term of this Agreement (including any extension thereof) remain in compliance with the regulations of OFAC and any statute, executive order (including the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action relating thereto; and (iii) will not transfer or permit the transfer of any controlling interest in Buyer to any person or entity who is, or any of whose beneficial owners are, listed on the List.

(d)     Bankruptcy.  Buyer has not (i) filed or been the subject of any filing of a petition under the U.S. bankruptcy code (11 U.S.C. § 101, et seq.) or any insolvency laws, or any laws for composition of indebtedness or for the reorganization of debtors; (ii) made a general assignment for the benefit of creditors, (iii) suffered the appointment of a receiver to take possession of all or substantially all of Buyer's assets, or (iv) suffered the attachment or other judicial seizure of all or substantially all of Buyer's assets.

(e)     Debts, Liens, and Encumbrance.  Buyer shall pay, when due, any claims, liabilities, debts, injuries, liens or other encumbrances, and any consultant or other expense contracted for or incurred by Buyer incurred or arising before the Close of Escrow or the earlier termination of this Agreement that relate in any manner to any of Buyer's activities relating to the Property prior to the Closing (collectively, "**Claims**") and shall indemnify, defend and hold Seller, the Seller Parties, and the Property harmless from any Claims relating thereto.

(f)     No Collusion; Negotiations with Third-Party Owners.  Buyer represents and warrants that (i) it has not engaged in any collusion with respect to its bid on the Property and the transaction contemplated hereunder and (ii) absent Seller's express written consent,

-19-

which consent may be withheld in Seller's sole discretion, any and all discussions and negotiations by Buyer regarding a Concurrent Sale or the purchase of a Concurrent Sale Property shall be conducted through Seller and that Buyer shall have no direct or indirect communications with a Third-Party Owner regarding a Concurrent Sale or a Concurrent Sale Property.

## 9. Cultural Cost Reimbursements; Property Operations

9.1     Cultural Cost Reimbursements. At the Closing, through the Escrow, and expressly conditioned on the Crops being vested in Seller and fully transferable to Buyer free and clear of any and all liens, interests, liabilities, obligations, encumbrances, or claims, Buyer shall reimburse Seller for all reasonable 2026 Cultural Costs and 2027 Cultural Costs (defined below) incurred by Seller after November 1, 2025, and for which Seller retains responsibility to pay following Closing, in connection with the Property (the "**Cultural Costs Reimbursement**"), excluding receivership costs, management fees (other than the per acre management fee payable to Receiver's contracted farm manager), and other oversight costs.  Upon written request from Buyer, Seller shall provide Buyer with statements reflecting the amount 2026 Cultural Costs and 2027 Cultural Costs incurred by Seller for the Property for the 2026  and 2027 crop years through the anticipated Closing and for which Seller retains responsibility to pay following Closing, based on the Seller's estimates and historical data (to the extent available) to the extent actual invoices for such costs are not reasonably available.  At least five (5) business days prior to the Closing Date, Seller shall provide Buyer and Escrow Holder with a written statement showing the final amount of the Cultural Costs Reimbursement (including an estimate of all 2026 Cultural Costs and 2027 Cultural Costs to be incurred between the date of such statement and the Closing Date, if any), together with a detailed listing of all of such costs (the "**Statement**") and any backup reasonably requested by Buyer.  Buyer shall deposit the Cultural Costs Reimbursement (including an estimate of all 2026 Cultural Costs and 2027 Cultural Costs, to the extent estimable, to be incurred between the date of the Statement and the Closing Date, if any, and for which Seller retains responsibility to pay following Closing) with Escrow Holder, by wire transfer, or by other cash substitute of immediately available funds acceptable to Escrow Holder, at least one (1) business day prior to the Closing Date.  The Cultural Costs Reimbursement shall also include any crop insurance premiums paid by Seller for the 2026 and 2027 crop year, and Buyer's assumption at Close of Escrow, if any, of crop insurance payments due for the 2026 crop year and 2027 crop year. Following the date on which the Sale Order is entered, if Buyer is the Successful Bidder, Buyer shall also have the exclusive right to direct, in writing, reasonable farming operations for the 2026 and 2027 crop on the Property, and Seller shall comply with such reasonable directions so long as they are consistent with standard agricultural practices, and included in the Cultural Costs Reimbursement or approved as an addition thereto by Buyer, provided that Seller shall have no liability under Section 7.3(a) for the results of complying with any direction of Buyer and Buyer shall have no recourse against Seller therefor.

No later than 45 days after Closing, Seller shall provide Buyer with its actual, documented, 2026 Cultural Costs and 2027 Cultural Costs incurred prior to Closing and paid by Seller following the Statement date (the "**True-Up Cultural Costs**"). If Buyer accepts the True-Up Cultural Costs, or if Buyer fails to give notice to Seller of any objection within 15 days after receipt of the True-Up Cultural Costs, the True-Up Cultural Costs shall be the final and binding calculation of the 2026 Cultural Costs and 2027 Cultural Costs for purpose of the Cultural Costs Reimbursement.  If Buyer gives notice to the Seller of an objection to the True-Up Cultural Costs within 15 days after receipt of

-20-

Docusign Envelope ID: 173D2595-BF2E-836B-834C-928C4B339069

the True-Up Cultural Costs, the Seller and Buyer shall attempt in good faith to resolve their differences in writing. If the Seller and Buyer are able to resolve their differences in writing, the True-Up Cultural Costs, as modified to reflect the resolution of the difference between the Seller and Buyer, shall be the final and binding calculation of the Cultural Costs Reimbursement, and the Seller shall refund any overage or Buyer shall pay any shortfall (as compared to the amounts paid at the Closing) within five (5) business days. If, however, the Seller and Buyer are unable to resolve their differences within 15 days of the Buyer's objection, then (i) Seller shall refund any overage or Buyer shall pay any shortfall on the undisputed amounts (as compared to the amounts paid at the Closing) within five (5) business days, and (ii) such disputed amounts shall be submitted to the Court for resolution, or if the Court declines jurisdiction, the Parties shall attempt to resolve the differences pursuant to mediation with a mediator reasonably acceptable to both Parties, the cost of which shall be borne equally by each Party.

As used herein, (i) "**2026 Cultural Costs**" means all out of pocket cultural costs paid by Seller for the 2026 crop year, and shall include, without limitation, all third party management fees, inputs, services, farm labor, water charges, and irrigation pumping and distribution costs (including electrical and/or fuel costs), and harvesting and hauling charges, necessary or desirable for the production, harvest and transportation of the 2026 crops generated by the Land, and (ii) "**2027 Cultural Costs**" means all out of pocket cultural costs paid by Seller for the 2027 crop year, and shall include, without limitation, all third party management fees, inputs, services, farm labor, water charges, and irrigation pumping and distribution costs (including electrical and/or fuel costs), and harvesting and hauling charges, necessary or desirable for the production, harvest and transportation of the 2027 crops generated by the Land.

The provisions of this Section 9.1 shall survive the Closing..

9.2    Post-Harvest Closing.   To the extent the Closing occurs after the commencement of the 2026 harvest, at the Closing, Seller shall deliver an Assignment of Crop Proceeds with respect to all 2026 Crop Proceeds to be received following the Closing in the form set forth as Exhibit H (the "**Assignment of 2026 Crop Proceeds**"). As used herein, "**2026 Crop Proceeds**" means the net proceeds (net of all hauling, huller/sheller, packing, shipping and processing costs deducted by the processor/packer/shipper) from the sale or disposition of all crops and farm products generated by the Land for the 2026 crop year.

9.3    Trans-Harvest Closing.  In the event that the 2026 harvest is ongoing at the time of Closing, Buyer acknowledges that Seller shall terminate its farm management contract as of the Closing and Buyer shall be solely responsible to arrange for continuing harvest management and activities to commence as of Closing. Notwithstanding the foregoing, and further notwithstanding the obligation of Buyer to reimburse Seller for all 2026 Cultural Costs incurred by Seller, the Parties shall cooperate to insure that any costs associated with the 2026 harvest invoiced by shared contractors or vendors shall be appropriately allocated and/or prorated as necessary, outside of Escrow, for accurate cost accounting by the Parties.

9.4    Trans-Appeal Lease.  In the event that an appeal of the Sale Order is filed with the Court, at Seller's sole option, the Parties shall meet and confer to determine if it would be mutually beneficial to the Parties to enter into a lease of the Property, to be negotiated in good faith, for a period to run concurrently with the pendency of the appeal, or some portion thereof, and for such rent and on such terms as may be agreed by the Parties. Nothing in this provision shall prohibit Seller

-21-

20039.001/Westlands PSA - FarmerMac (EX)

from exercising its rights under Section 6.4(g) at any time prior to the execution of such a Lease by both Parties, and thereafter except as may be prohibited by subsequent agreement signed by the Parties, and neither Party shall be in breach if the Parties are unable to reach an agreement as to a mutually acceptable lease.

**10.     Closing**.

10.1     Closing Date.  Closing shall evidence Buyer's and Seller's satisfaction of their respective Closing obligations, as set forth herein.  Closing shall occur on or before the Closing Date. Closing shall be conditioned upon:

(a)     Full Performance.  Seller and Buyer shall have performed all of their respective obligations under this Agreement unless waived in writing by the other Party.

(b)     Conditions.  The conditions precedent set forth in Section  6.1, 6.2, and 6.3 have been satisfied or waived by the Party for whose benefit the condition exists.

(c)     Title Policies.  Title Company shall be ready, willing, and able to issue upon the Closing and following recordation of the Deed to Buyer, a current Owner's CLTA Standard Coverage Policy of title insurance (or ALTA Extended Coverage Policy, if Buyer shall elect to obtain an ALTA Survey), at no more than the insurer's standard rates ("**Buyer's Title Policy"**).  Buyer's Title Policy shall show title to the Land, Improvements and appurtenant easements vested in Buyer, subject only to the lien of real property taxes for the current fiscal year not yet due and payable, those Schedule B exceptions listed in the title commitment for the Buyer's Title Policy (except to the extent Seller and/or Escrow Holder has agreed in writing to remove), and those exceptions listed on Schedule 10.1(c), attached hereto and incorporated by reference (the "**Permitted Exceptions**").  The premium for such title policy shall be paid as required under Section 12.

(d)     Delivery.  Possession of the Property shall be delivered to Buyer at the time of the Closing free of all leases, contracts, occupancy agreements, tenancies, licenses, use agreements or otherwise, except as may be included within the Permitted Exceptions, if applicable, or to the extent such items are not Receivership Property.

10.2     Seller's Closing Obligations.  On or before the Closing Date, Seller shall deposit or cause the following to be deposited into Escrow (duly executed, as appropriate), for recordation or delivery to Buyer as appropriate:

(a)     The Deed, executed by Seller.

(b)     A bill of sale for the Crops, and the Improvements, Oil Gas and Mineral Rights, and Water Rights (in so far as any of the foregoing are personal property) in substantially the form attached hereto as **Exhibit F** (the "**Bill of Sale**").

(c)     Duplicate counterparts of an assignment and assumption agreement (the "**Assignment Agreement**"), in substantially the form attached hereto as **Exhibit G,** with respect to any contracts, licenses or other agreements material to the Property and operations thereon that are Receivership Property and that Buyer informs the Seller in writing that Buyer would like to have

-22-

Docusign Envelope ID: 173D2595-BF2E-836B-834C-928C4B339069

assigned to it at Closing (to the extent that Seller can transfer or assign such licenses or agreements to Buyer without breach or liability).

(d)     An assignment of multi-peril crop insurance related to the Land, if any (the "**Assignment of Crop Insurance**") to the extent assignable.

(e)     If applicable pursuant to Section 9.2, Duplicate counterparts of the Assignment of 2026 Crop Proceeds, executed by Seller.

(f)     The Closing Statement (as defined below) executed by Seller.

(g)     To the extent they are then in Seller's possession, comprise Receivership Property, and not posted at the Property, any licenses or permits issued for or with respect to the Property by governmental and quasi-governmental authorities having jurisdiction.

(h)     Seller's certification to the effect that it is not a "foreign person," as such term is defined in Section 1445 of the Internal Revenue Code of 1986, or evidence that any taxes due have been paid or otherwise provided for, using Escrow Holder's standard form.

(i)     Seller's California Form 593, if required.

(j)     Seller's IRS Form 1099-S if required by Escrow.

(k)     All keys, codes and combinations for locks, safes or security devices under Seller's control located on the Property, if any.

(l)     A copy of the Sale Order entered by the Court.

(m)     Such other documents, resolutions, consents, and affidavits reasonably necessary or advisable to effect the valid consummation of the transaction evidenced by this Agreement, including without limitation any such affidavits and other documents reasonably required by the Title Company to issue the Buyer's Title Policy.

10.3    Buyer's Closing Obligations.   On or before the Closing, Buyer or its Authorized Assignee shall deposit or cause the following to be deposited into Escrow (duly executed as appropriate) for recordation or delivery to Seller, as appropriate:

(a)     The Balance of the Purchase Price and Buyer's share of the Closing Costs and Prorations.

(b)     Evidence reasonably acceptable to Seller's counsel that the documents delivered to Seller by Buyer or its Authorized Assignee have been duly authorized by Buyer or its Authorized Assignee, duly executed on behalf of Buyer or its Authorized Assignee and when delivered constitute valid and binding obligations of Buyer or its Authorized Assignee.

(c)     A Preliminary Change of Ownership Report in the forms specified by Fresno County (the "**PCOR**").

-23-

Docusign Envelope ID: 173D2595-BF2E-836B-834C-928C4B339069

(d)    Duplicate counterparts of the Assignment Agreement, executed by Buyer.

(e)    If applicable pursuant to Section 9.2, Duplicate counterparts of the Assignment of 2026 Crop Proceeds, executed by Buyer.

(f)    The Closing Statement (as defined below) executed by Buyer.

(g)    Such other documents, resolutions, consents, and affidavits reasonably necessary or advisable to effect the valid consummation of the transaction evidenced by this Agreement.

10.4    **Escrow Holder Closing Obligations.**    The Escrow Holder shall close escrow on or before the Closing Date (i) if it has received all of the items to be deposited by Seller pursuant to Section 10.2, and all of the items to be deposited by Buyer pursuant to Section 10.3, and (ii) the Title Company is prepared to issue Buyer's Title Policy in the condition required in Section 10.1(c) above.  The Escrow Holder shall close escrow by:

(a)    Recording the Deed in the Official Records of Fresno County(ies), California, and return the recorded Deed to Buyer with a conformed copy to Seller, and file the PCOR in Fresno County, California;

(b)    Issuing the Buyer's Title Policy (within fifteen (15) days after the Closing);

(c)    Delivering to Seller the proceeds due Seller from the Purchase Price, after deducting Seller's share of Closing Costs, and adjusting for Prorations;

(d)    Delivering to Buyer, Seller's certification that it is not a "foreign person;"

(e)    Delivering to Buyer the items deposited into Escrow by Seller for delivery to Buyer, including the Bill of Sale;

(f)    Delivering to each of Buyer and Seller, a fully executed counterpart of (i) the Assignment Agreement and (ii) the Assignment of 2026 Crop Proceeds; and

(g)    Delivering to Seller the items deposited into Escrow by Buyer for delivery to Seller.

11.    **Like-Kind Exchange**.    Each Party agrees to cooperate, in all reasonable respects, relating to any 1031 exchange requested by the other Party; provided that (i) such cooperation is at no cost, expense, or liability to the non-exchanging Party and (ii) that the Closing is not delayed as a result thereof.

12.    **Closing Costs**.    All closing costs incurred in connection with closing the Escrow (the "**Closing Costs**") shall be paid as follows:

-24-

Docusign Envelope ID: 173D2595-BF2E-836B-834C-928C4B339069

(a)　　　Buyer and Seller shall pay their respective:  (i) legal fees and expenses, and (ii) share of Prorations as provided in the Closing Statement.

(b)　　　Seller shall pay (i) the documentary transfer taxes, sales taxes and transfer taxes applicable to the sale, (ii) one-half of the escrow fees, and (iii) the premium for a CLTA Standard Owner's Policy of Title Insurance for the Land.

(c)　　　Buyer shall pay (i) one-half of the escrow fees, (iii) 100% of the cost of recording and filing of any instrument to be recorded or filed as provided herein, (ii) premium for Buyer's Title Policy in excess of the premium for a CLTA Standard Owner's Policy of Title Insurance, if any, together with the costs of any endorsement Buyer shall request, and (iii) the costs of any new or updated ALTA site survey, if elected by Buyer.

(d)　　　Escrow Holder shall prepare a closing statement in form and content satisfactory to Buyer and Seller with respect to the transaction contemplated by this Agreement and deliver the same to Buyer and Seller within five (5) days prior to the Close of Escrow for their approval in writing (provided each will provide Escrow Holder with the information necessary to prepare such closing statement) ("**Closing Statement**").

**13.**　　　**Prorations**.  Except to the extent included in Cultural Cost Reimbursement, the following are to be paid by Buyer or Seller or prorated and apportioned on the Closing (the "**Prorations**"):

13.1　　Utility Charges.  The Parties agree that utility and water charges (other than assessments collected with real property assessments by the county tax assessor) shall not be prorated in Escrow.  Seller shall be liable for all such charges incurred prior to the Closing (subject to reimbursement under Section 9, as applicable) and Buyer shall be liable for all such charges incurred after the Closing.

13.2　　Other Apportionments.  Liability for real property taxes and assessments and water district or water company assessments if any, shall be prorated at and as of the Close of Escrow using the latest bills and assessments, with Seller being liable for all real estate taxes, assessments and water district or water company assessments for the Property attributable to a period before the Closing.  Rent or income under all residential, farm related, hunting and mineral, and other leases, if any, or any Contracts shall be prorated as of the Close of Escrow.  Such prorations and apportionments shall be made such that Seller is allocated or liable for all such amounts attributable to the period before the Close of Escrow and Buyer shall be allocated or liable for all such amounts attributable to the period following the Close of Escrow. If any such taxes, assessments, or charges relate to periods prior to the Close of Escrow but are billed or become due after the Close of Escrow, such amounts shall be a credit against the Purchase Price at Closing unless such amounts are unknown in which case Seller shall remain liable for (and promptly reimburse Buyer for) the portion allocable to the period prior to the Close of Escrow. If any such taxes, assessments, or charges relate to periods following the Close of Escrow but are paid by Seller at or prior to the Close of Escrow, such amounts shall be a credit to Seller as an addition to the Purchase Price, for the portion allocable to the period following the Close of Escrow.

-25-

13.3     Survival.  The provisions of this Section 13 shall survive the Closing; provided, however, that all claims for improper proration or adjustment under this Section 13 must be made in writing to the other Party within six months after the Closing Date.

14.     **Risk of Loss**.  Risk of physical loss, casualty or condemnation affecting the Property shall be borne by Buyer from and after the date that Buyer receives title and possession thereof.  In the event of the loss, destruction of a material part of the Property or condemnation prior to the Closing, from a cause other than the intentional act or omission or gross negligence of Buyer then, at Buyer's sole option, and upon Buyer's written notice to Seller within ten (10) business days of Buyer's receipt of notification of such loss, both Parties may be relieved of their obligations and this Agreement shall be deemed void and without further effect, and the Bid Deposit shall be returned to Buyer, unless Seller shall restore the lost or destroyed portion of the Property to its condition prior to the subject loss, casualty or condemnation, within thirty (30) days of receipt of notice and has fully paid all costs thereof and cleared any potential liens associated therewith (in which case, if applicable, the Closing Date shall be extended) or Buyer and Seller agree to reduce the Purchase Price by the value of the lost, destroyed or condemned portion of the Property.

15.     **Assignment**.  Buyer may assign to any entity which is either (i) owned or controlled by, or under common control with, Buyer, or (ii) owned or controlled by George Bravante (each, an "**Authorized Assignee**"), any or all of its rights and obligations under this Agreement, including the right to purchase the Property, by giving Seller notice of such assignment at least three (3) days prior to the Close of Escrow, containing the name of the Authorized Assignee and the portion of the Property to be acquired by such Authorized Assignee, provided that Buyer shall not be released from any liability under this Agreement.  Any other proposed assignment shall require the written consent of Seller, which may be withheld at his sole discretion, but if consent is so granted shall then be an Authorized Assignee.  Each Authorized Assignee, along with Buyer, shall be obligated jointly and severally to fulfill all of Buyer's duties and obligations under this Agreement with respect to the portion of the property to be purchased by such Authorized Assignee and the warranties and representations of Buyer shall be the warranties and representations of the Authorized Assignee.

Following the Closing, Seller shall have the right to assign any of its rights to performance of any obligations of Buyer which survive the Closing, provided it shall provide written notice of such assignment to Buyer.

16.     **Receivership Matters.**  Seller and Buyer acknowledge that this Agreement and the sale of the Property are subject to Court approval and the consideration by Seller of alternative bids (if any). Seller and Buyer acknowledge that to obtain such approval, Seller must demonstrate that he has taken reasonable steps to obtain the highest or otherwise best offer possible for the Property, including giving notice of the transactions contemplated hereby to creditors and certain other interested parties as ordered by the Court, and conducting an auction in respect of the Property pursuant to the Marketing Procedures Order (the "**Auction**"). Seller and Buyer shall use commercially reasonable efforts to cooperate, assist, and consult with each other to secure the entry of the Marketing Procedures Order and Sale Order following the date hereof, and to consummate the transactions contemplated by this Agreement.

17.     **Backup Bidder**. If an Auction is conducted, and Seller does not choose Buyer as the Successful Bidder, but instead chooses Buyer as the Back-up Bidder in accordance with the

-26-

Docusign Envelope ID: 173D2595-BF2E-836B-834C-928C4B339069

Marketing Procedures, Buyer will serve as the Back-up Bidder.  If Buyer is chosen as the Back-up Bidder, Buyer will be required to keep its bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon by Buyer prior to or at the Auction) open and irrevocable until the earlier of (i) sixty (60) days following the date on which the Sale Order becomes final and non-appealable, or (ii) the closing of the sale to the Successful Bidder.  If an alternative transaction with the Successful Bidder is terminated prior to the termination of this Agreement, Buyer will be deemed to be the Successful Bidder and will forthwith consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon by Buyer prior to or at the Auction).

18. **Brokers**.  Buyer and Seller each represent and warrant to the other that, except for Capstone Capital Markets, LLC ("**Seller's Broker**") and Pearson Realty ("**Buyer's Broker**"), neither has engaged the services of any other real estate broker, salesperson, agent or finder, nor done any other act nor made any statement, promise or undertaking which would result in the imposition of liability for the payment of any other real estate brokerage commission, finder's fee or other fee or otherwise in connection with the transaction described herein.  Seller shall be responsible for (i) the payment of a commission or fee to Seller's Broker in accordance with its separate agreement therewith, and (ii) only in the event of the Closing to Buyer or its Authorized Assignee, the payment of a commission to Buyer's Broker in the amount of 0.5% of the final purchase price paid for the Property. Buyer shall be responsible for the payment of any commission or fee to Buyer's Broker in excess of the foregoing, if any, in accordance with its separate agreement therewith.  In the event that any person or entity perfects a claim for a brokerage commission, finder's fee or otherwise, based upon any such agreement, statement or act, the Party through whom such person or entity makes such claim shall be responsible therefor and shall defend, indemnify and hold the other Party and the Property harmless from and against such claim and all loss, cost and expense associated therewith, including attorney's fees.

19. **Attorney's Fees; Pre-litigation Dispute Resolution**.  Each Party shall pay the fees and expenses of its own attorneys in connection with the preparation, negotiation, and execution of this Agreement.  In the event of any action between the Parties hereto for breach of or to enforce any provision or right hereunder, the unsuccessful Party in such action shall pay to the prevailing Party all costs and expenses expressly including, but not limited to, reasonable attorneys' fees and costs, including but not limited to expert fees, incurred by the prevailing Party in connection with such action.  The Parties agree that before either institutes litigation against the other arising from this Agreement, it will make a good faith attempt to meet with the other Party first and attempt to resolve the dispute.

20. **Notices**.  All notices and demands which either Party is required or desires to give to the other shall be given in writing (i) by certified mail, return receipt requested with appropriate postage paid, (ii) by personal delivery or by private overnight courier service to the address set forth below for the respective Party, or (iii) by e-mail with an electronic confirmation of delivery; provided that if any Party gives notice of a change of name or address, notices to that Party shall thereafter be given as demanded in that notice.  All notices and demands so given shall be effective upon receipt by the Party to whom notice or demand is being given, except that any notice given by certified mail shall be deemed delivered three (3) business days after deposit in the United States Mails, and any

-27-

Docusign Envelope ID: 173D2595-BF2E-836B-834C-928C4B339069

notice given by overnight courier shall be deemed delivered one (1) business day after delivery to the overnight courier.

|  |  |
|---|---|
| If to Buyer: | Brightfield Investments LLC<br>c/o International Farming Corporation, LLC<br>1318 Dale St.<br>Raleigh, NC 27605<br>Attention: Ralph Isenrich<br>Email: risenrich@intlfarming.com |
| With a copy to: | George Bravante<br>1356 S. Buttonwillow Avenue<br>Reedley, CA 93654<br>Email: george@bravantefarmcapital.com |
| With a copy to: | Wild, Carter & Tipton<br>246 W. Shaw Ave.<br>Fresno, CA 93704<br>Attn: Bruce Brown<br>Telephone: 559-224-2131 (Ext 3763)<br>Email: bbrown@wctlaw.com<br><br>Sheppard, Mullin, Richter & Hampton LLP<br>Four Embarcadero Center, 17th Floor<br>San Francisco, CA 94111-4109<br>Attention: Ori Katz, Robert Sahyan, Kirk Rider<br>Email: okatz@sheppard.com, rsahyan@sheppard.com, krider@sheppard.com |
| If to Seller: | Lance Miller, Receiver<br>c/o Pivot Group<br>1230 Rosecrans Avenue<br>Suite 300 – PMB928<br>Manhattan Beach, CA 90266<br>Attn: Lance Miller or Matt Covington<br>Telephone: 424-363-0599<br>Email: lance.miller@pivotgrp.com and matt.covington@pivotgrp.com |
| With a copy to: | Katten Muchin Rosenman LLP<br>2121 North Pearl Street, Suite 1100<br>Dallas, TX 75201-2591<br>Attn: John Mitchell and Michaela Crocker<br>Telephone: 214-765-3600<br>Email: john.mitchell@katten.com and michaela.crocker@katten.com |

-28-

20039.001/Westlands PSA - FarmerMac (EX)

Docusign Envelope ID: 173D2595-BF2E-836B-834C-928C4B339069

and            Cutts Law, PC
               5088 N. Fruit Ave, Ste 101
               Fresno, CA 93711
               Attn:  Lisa A. Cutts
               Telephone:     559-226-8177
               Email: lac@cutts-law.com

21.    **Waivers**.  Any Party can waive a provision, condition or covenant contained in this Agreement, which is included herein for the benefit of the Party making such waiver.  Any such waiver shall be in writing and delivered to the other Party and the Escrow Holder.  No waiver by any Party of any covenant, condition or breach hereunder shall be deemed a waiver of any other subsequent covenant, condition, or breach.

22.    **Governing Law**.  This Agreement shall be governed by and construed in accordance with California law without regard to conflict of laws principles.  The Court shall have exclusive jurisdiction over any legal action brought by any Party to interpret or enforce this Agreement. To the extent the Court declines jurisdiction, any legal action brought by any Party to interpret or enforce this Agreement shall be venued in the appropriate state or federal court sitting in the City and County of Fresno, California.

23.    **Business Days**.  In the event that this Agreement calls for an act to be performed, or a notice to be given, on or by a specific date, which date falls on a Saturday, Sunday, or holiday (as defined in Section 6700 and 6701 of the California Government Code), then such act may be performed upon or such notice given on the next business day with the same effect as if it had been performed on the day appointed.  Any reference to "business days" herein shall mean those days other than Saturdays, Sundays, or holidays (as defined in Section 6700 and 6701 of the California Government Code).

24.    **WAIVER OF JURY TRIAL**.  TO THE FULLEST EXTENT THAT IT MAY HEREAFTER BE PERMITTED BY LAW, THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTION CONTEMPLATED HEREBY.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES (EACH A "DISPUTE", AND COLLECTIVELY, ANY OR ALL, THE "DISPUTES") OF ANY KIND WHATSOEVER THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT OR THE TRANSACTION CONTEMPLATED HEREBY, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, ANTITRUST CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON-LAW OR STATUTORY CLAIMS.  THE PARTIES FURTHER WARRANT AND REPRESENT TO ONE ANOTHER THAT IT HAS REVIEWED THIS WAIVER WITH LEGAL COUNSEL OF ITS OWN CHOOSING, OR HAS HAD AN OPPORTUNITY TO DO SO, AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS HAVING HAD THE OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL.

-29-

25.    **Entire Agreement**.    This Agreement and the Confidentiality and Nondisclosure Agreement (if any) entered into between Buyer and Seller prior to the date hereof (the "**NDA**") constitute the entire agreement between the Parties hereto with respect to the subject matter hereof and supersede all prior agreements between the Parties hereto with respect thereto. The NDA shall continue in accordance with its terms, and shall terminate upon any Closing under this Agreement. This Agreement may not be altered, amended, changed, terminated, or modified in any respect or particular, unless the same shall be in writing and signed by the Party to be charged.

26.    **Pending Receivership**.    Buyer, on behalf of itself and its successors and assigns, acknowledges, and expressly agrees that Seller is entering into this Agreement solely in his capacity as Court-appointed receiver in the Proceeding and, as such, shall have no personal liability for any claims arising under or related to this Agreement, the Property, or otherwise.

27.    **Bidding Procedures**.    The bidding procedures to be employed with respect to this Agreement shall be those reflected in the Marketing Procedures Order.  Buyer agrees and acknowledges that Seller is and may continue soliciting inquiries, proposals, or offers from third parties for any and all of the Property in connection with any pursuant to the terms of the Marketing Procedures Order. **Buyer and each Buyer Party and Participant has agreed in writing to be bound by this Section 27 the Agreement also agree to be bound by and comply with the terms of the Marketing Procedures Order, the Sale Order, or any other orders entered by the Court with respect to the Property.  Buyer and such Buyer Parties and Participants further agree that each hereby waives any right it may hold to appeal, seek vacatur of, reconsideration of, collaterally challenge, or otherwise challenge a Court-approved sale of the Property on any grounds other than the Seller, in his capacity as receiver, failed to materially comply with the terms of the Marketing Procedures Order and that such failure directly resulted in a materially lower purchase price than what could have been otherwise obtained.  Buyer and each Buyer Party and Participant that has agreed in writing to be bound by this Section 27 further agree that neither Section 6.2(e) nor this Section 27 confer appellate or other rights upon such parties that do not otherwise exist under applicable law.**

**Buyer's Initials:** _____

28.    **Validity**.    Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be valid under applicable law, but, if any provision of this Agreement shall be invalid or prohibited thereunder, such provision shall be effective to the extent of such prohibition without invalidating the remainder of such provision or the remaining provisions of this Agreement.

29.    **Facsimile Electronic Signatures**.    For all documents to be executed by the Parties pursuant hereto, except documents to be recorded or where originals are otherwise required by either Party or Escrow Holder, Escrow Holder is instructed to accept, and the Parties agree to accept, (i) facsimile or electronic e-mail signatures of the signor if the signor or his representative has assured Escrow Holder and the other Party that the original has been placed in regular mail to the Escrow Holder, or (ii) DocuSign signatures of the signor.

30.    **Time**.    Time is of the essence of this Agreement.

-30-

20039.001/Westlands PSA - FarmerMac (EX)

Docusign Envelope ID: 173D2595-BF2E-836B-834C-928C4B339069

**31.**     **Counterparts**.  This Agreement may be signed by the Parties in different counterparts and the signature pages combined to create a document binding on all Parties.

**32.**     **Binding Offer**. Buyer agrees that, upon written notice to Buyer by Seller that this Agreement as executed by Buyer only (the "**Offer**") is the subject of a notice filed with the Court, this Agreement (as may be amended by written agreement of Seller and Buyer) shall be irrevocable for a period of sixty (60) days from the date of such notice or such other period as agreed to by the Parties in writing (the "**Irrevocable Period**"). If the Court enters a Sale Order approving this Agreement (as may be amended by written agreement of the Seller and Buyer), then a binding agreement of purchase and sale (without any conditions whatsoever for the benefit of the Buyer, including any conditions for review or approval by third party advisors of the Buyer, financial, planning, banking, legal or otherwise) comes into existence immediately upon the Seller's acceptance.  Buyer acknowledges that this Section 32 obligates the Buyer to complete the purchase of the Property in accordance with the terms of this Agreement (as may be amended by written agreement of Seller and Buyer) upon Seller's acceptance.  Notwithstanding the foregoing, the provisions of Section 14 of this Agreement shall apply during the Irrevocable Period in the event of a casualty or condemnation affecting the Property.

*SIGNATURES FOLLOW NEXT PAGE*

20039.001/Westlands PSA - FarmerMac (EX)

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement effective as of the date first above written.

SELLER                                                    BUYER

Lance Miller

Lance Miller, solely in his capacity as
Court-appointed Receiver

Date of Execution: ___6/22/2026___

BRIGHTFIELD INVESTMENTS, LLC,
a Delaware limited liability company

By: _____
GEORGE R. BRAVANTE
Managing Member

Date of Execution: ___6/17/2026___

Effective Date: ___6/22/2026___

-32-

Docusign Envelope ID: 173D2595-BF2E-836B-834C-928C4B339069

ACCEPTANCE BY ESCROW HOLDER


CHICAGO TITLE COMPANY, a California corporation, hereby acknowledges that it has received an executed counterpart of the foregoing Purchase and Sale Agreement and Joint Escrow Instructions and agrees to act as Escrow Holder thereunder, and to be bound by and perform the terms thereof as such terms apply to Escrow Holder.


CHICAGO TITLE COMPANY,
a California corporation

By: _____
Name: _____
Title: _____

Escrow Number: _____

Dated: _____

Docusign Envelope ID: 173D2595-BF2E-836B-834C-928C4B339069

EXHIBIT A

LEGAL DESCRIPTION OF THE LAND

## *TO BE VERIFIED BY PRELIMINARY REPORT*

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE UNINCORPORATED AREA IN COUNTY OF FRESNO, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

**PARCEL 226: APN: 040-020-18s:**

The Northwest quarter of Section 8, Township 16 South, Range 16 East, Mount Diablo Base and Meridian, in the unincorporated area of the County of Fresno, State of California, according to the Official Plat thereof.

EXCEPTING THEREFROM, an undivided one-half interest in and to all oil, gas, minerals and other hydrocarbon substances now or at any time hereafter situate therein and thereunder said land, SUBJECT, to the terms and conditions contained therein, as reserved by R. T. Hughes and Bess L Hughes, husband and wife, in the Deed recorded January 24, 1950, in Book 2829, Page 69 of Official Records, as Document No. 4385.

ALSO EXCEPTING THEREFROM, an undivided one-fourth interest in and to all oil, gas and other hydrocarbons and minerals now or at any time hereinafter situate therein and thereunder, TOGETHER WITH, all easements and rights necessary or convenient for the production, storage and transportation thereof and the exploration and testing of the said real property, and also the right to drill for, produce and use water from the said real property in connection with drilling or mining operations thereon, all as reserved by Raymond Dale Johnson in the Deed recorded June 25, 1974, in Book 6316, Page 194 of Official Records, as Document No. 47802

**PARCEL 235: APN: 038-141-21s:**

The North half of the Northeast quarter of Section 22, Township 16 South, Range 14 East, Mount Diablo Base and Meridian, in the unincorporated area of the County of Fresno, State of California, according to the Official Plat thereof.

EXCEPTING THEREFROM, the North 50 feet, as conveyed to the County of Fresno in THE Deed recorded April 22, 1970, in Book 5780, Page 78 of Official Records, as Document No. 27979.

ALSO EXCEPTING THEREFROM, the South 20 feet of the North 70 feet, as conveyed to the County of Fresno in the Deed recorded October 5, 1971, in Book 5943, Page 447 of Official Records, as Document No. 80339.

ALSO EXCEPTING THEREFROM, the North 70 feet, as conveyed to the County of Fresno in the Deed recorded October 5, 1971, in Book 5943, Page 449 of Official Records, as Document No. 80340.

EXCEPTING THEREFROM all the coal and other minerals in the lands so patented, TOGETHER WITH, the right to prospect for, mine and remove the same pursuant to the provisions and limitations

20039.001/Westlands PSA - FarmerMac (EX)

Docusign Envelope ID: 173D2595-BF2E-836B-834C-928C4B339069

of the Act of December 29, 1916 (39 Stat. 862), as reserved by the United State of America, in the Patent recorded March 10, 1925, in Book 541, Page 367 of Official Records, as Document No. 7588.

**END OF DESCRIPTION**

20039.001/Westlands PSA - FarmerMac (EX)

Docusign Envelope ID: 173D2595-BF2E-836B-834C-928C4B339069

EXHIBIT B

FORM OF MARKETING PROCEDURES ORDER

(ATTACHED)

20039.001/Westlands PSA - FarmerMac (EX)

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| FEDERAL AGRICULTURAL MORTGAGE CORPORATION, | ) No. 1:24-cv-01455-KES-SAB ) |
| Plaintiff, | ) **[PROPOSED] AMENDED ORDER (I)** ) **APPROVING BID PROCEDURES FOR THE** ) **SALE OF REAL PROPERTY; (II)** |
| v. | ) **APPROVING BID PROTECTIONS FOR** ) **STALKING HORSE BIDDER; AND (III)** ) **SCHEDULING THE AUCTION AND SALE** |
| ASSEMI BROTHERS, LLC; MARICOPA ORCHARDS, LLC; C & A FARMS, LLC; | ) **HEARING (WESTLANDS)** ) |
| WHITESBRIDGE FARMS, LLC; LINCOLN GRANTOR FARMS, LLC;COPPER AVENUE | ) Related to Dkt. No. ___ ) |
| INVESTMENTS, LLC; ACAP FARMS, LLC; CANTUA ORCHARDS, LLC; GRADON | ) Judge:        Hon. Kirk E. Sherriff ) |
| FARMS, LLC, | ) Action Filed:    November 27, 2024 ) |
| Defendants. | ) ) |
|  | ) ) ) |

Before the Honorable Kirk E. Sherriff, United States District Judge, is a motion (the "**Motion to Amend**") filed by Lance Miller (the "**Receiver**"), solely in his capacity as Court-appointed receiver in the above-captioned case, seeking to amend the dates and deadlines contained in the bidding procedures entered by this Court on December 1, 2025, at Dkt. No. 370 (the "**Original Bidding Procedures Order**" approving the "**Original Bidding Procedures**").[1]

The Court hereby finds that:[2] (a) it has jurisdiction over the Property and the parties in this case, including exclusive jurisdiction over the administration, control, and possession of the Property; (b) it has the statutory authority to enter this Order; and (c) due and proper notice of the relief requested in the Motion to Amend and the entry of this Order was given and no other or further notice is necessary other than as set forth in the Bidding Procedures. The Court further finds that:

---

[1] Capitalized terms used but not defined in this Order shall have the meanings ascribed in the Bidding Procedures attached to this Order as **Exhibit A**.

[2] The findings and conclusion set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. To the extent a finding of fact constitutes a conclusion of law, or a conclusion of law a finding of fact, they are adopted as such. The Court's finding and conclusions set forth at on the record at the Hearing (if held) are incorporated herein by reference.

A.    As demonstrated by (i) the testimony and other evidence submitted by declaration, including the declarations submitted by Lance Miller and Skye Root in support of the Original Bidding Procedures and the Motion to Amend and (ii) the representations of counsel in the record, the Receiver has demonstrated good, sufficient, and sound business purpose and justifications for entry of this Order, and that the bidding procedures attached hereto (the "**Bidding Procedures**") are an appropriate exercise of the Receiver's business judgment, are in the best interest of the receivership estate, and are the best available method for maximizing the value of the Property.

B.    To maximize the value of the Property, it is necessary for the Receiver to have the means to induce a third-party bidder to serve as the Stalking Horse Bidder and provide Bid Protections pursuant to the terms of this Order, and the Bid Protections are reasonable and represent a sound exercise of the Receiver's business judgment.

C.    The dates, deadlines, and notice provisions set forth in the Bidding Procedures are reasonably calculated to provide parties with notice of, and opportunity to participate in, the Auction for the Property.

D.    The Motion to Amend and the Bidding Procedures comply with all applicable statutes and the local rules of this Court.

E.    Due, sufficient, and adequate notice of the relief granted herein has been given to all parties in interest.

F.    No objections to the relief requested in the Motion to Amend were filed, and the deadline to file an objection has passed.

Accordingly, it is hereby:

**ORDERED** that all objections to the Motion to Amend, and entry of the Bidding Procedures, if any, are hereby overruled and the Motion to Amend is granted.

**IT IS FURTHER ORDERED** the Bidding Procedures, which are fully incorporated herein by reference, are hereby approved in all respects, supersede the bidding procedures previously approved by this Court by the order at Docket No. 170, and shall govern all Potential Bidders and Bids, including those that may be submitted by Qualified Bidders at the Auction.

**IT IS FURTHER ORDERED** that Potential Bidders seeking to submit Bids for the Property must do so in accordance with the terms of the Bidding Procedures and this Order.

**IT IS FURTHER ORDERED** that all dates and deadlines set forth in the Bidding Procedures are hereby approved. The failure of any objecting person or entity to timely file an objection prior to the Sale Objection Deadline may be deemed a bar to the assertion at the Sale Hearing or thereafter of any objection to the relief requested by the Receiver or the consummation and performance of the sale of the Property to the Successful Bidder, including the transfer of the Property free and clear of Interests to the fullest extent permitted by law (with such Interests attaching to the cash proceeds of the sale to the same extent and with the same priority as existed immediately prior to the sale).

**IT IS FURTHER ORDERED** that all notice and service provisions set forth in the Bidding Procedures are hereby approved as adequate and reasonable.

**IT IS FURTHER ORDERED** that the failure to specifically include or reference any particular provision of the Bidding Procedures in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Bidding Procedures be authorized and approved in their entirety.

**IT IS FURTHER ORDERED** that the Receiver is authorized and empowered to take such steps, expend such sums, and do such other things as may be necessary to implement and effectuate the terms and requirements established and relief granted in this Order.

**IT IS FURTHER ORDERED** that the Receiver is authorized to modify the Bidding Procedures before service to parties to conform to the terms of this Order, including updating dates and deadlines.

**IT IS FURTHER ORDERED** that this Court shall retain exclusive jurisdiction over any disputes arising from or related to the Property, the Bidding Procedures, or the implementation or interpretation of this Order.

Dated: _____

_____
Hon. Kirk E. Sherriff
United States District Court

3

Docusign Envelope ID: 173D2595-BF2E-836B-834C-928C4B339069

# Exhibit A

Docusign Envelope ID: 173D2595-BF2E-836B-834C-928C4B339069

Terence G. Banich (SBN 212173)[1]
terence.banich@katten.com
**KATTEN MUCHIN ROSENMAN LLP**
525 W. Monroe St.
Chicago, IL 60661-3693
Telephone:     (312) 902-5200
Facsimile:     (312) 902-1061

John E. Mitchell (*pro hac vice*)
Michaela C. Crocker (*pro hac vice*)
**KATTEN MUCHIN ROSENMAN LLP**
2121 North Pearl St., Ste. 1100
Dallas, TX 75201-2591
Telephone:     (214) 765-3600
Facsimile:     (214) 765-3602

Arlen P. Moradi (SBN 353956)
**KATTEN MUCHIN ROSENMAN LLP**
2121 Avenue of the Stars, Ste. 1100
Los Angeles, CA 90067-5010
Telephone: (310) 778-4449
*Attorneys for the Receiver Lance Miller*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| FEDERAL AGRICULTURAL MORTGAGE CORPORATION,<br><br>        Plaintiff,<br><br>v.<br><br>ASSEMI BROTHERS, LLC; MARICOPA ORCHARDS, LLC; C & A FARMS, LLC; WHITESBRIDGE FARMS, LLC; LINCOLN GRANTOR FARMS, LLC;COPPER AVENUE INVESTMENTS, LLC; ACAP FARMS, LLC; CANTUA ORCHARDS, LLC; GRADON FARMS, LLC,<br><br>        Defendants. | No. 1:24-cv-01455-KES-SAB<br><br>***AMENDED* BIDDING PROCEDURES FOR THE SALE OF RECEIVERSHIP PROPERTY MARKETED BY CAPSTONE CAPITAL MARKETS LLC (WESTLANDS)**<br><br>Judge:        Hon. Kirk E. Sherriff<br><br>Action Filed:  November 27, 2024 |

---

[1] Designated as counsel for service pursuant to L.R. 182(c)(1).

-1-

304685261

The United States District Court for the Eastern District of California (the "**Court**") has entered an amended Order (the "**Bidding Procedures Order**"), by which the Court approved the amended bidding procedures set forth herein (the "**Bidding Procedures**"). These Bidding Procedures establish the process by which the Receiver is authorized to conduct a public auction (the "**Auction**") for the sale of the land and associated rights (the "**Property**") as more fully set forth in the Purchase and Sale Agreement to be submitted by the Stalking Horse Bidder (defined below).[2] A list of APNs that comprise the land is attached hereto as **Exhibit 1**.

The Court has also approved substantially identical bidding procedures for certain property that is related to farming operations on the Property and being administered by the Receiver in the related case styled *The Prudential Insurance Company of America, et al. v. ACDF, LLC, et al.,* Case No. 24-cv-1102-KES-SAB (the "**Related Property**").  With the exception of credit bids, a bid for the Property must also include a bid for the Related Property.

**1.    Key Dates**

These Bidding Procedures provide interested parties with the opportunity to qualify for and participate in the Auction to be conducted by the Receiver and to submit Bids (as defined below) for the Property (to include the Related Property). The Receiver with the assistance of Capstone Capital Markets LLC ("**Capstone**") and Pivot Management Group, LLC ("**Pivot**") will assist interested parties in conducting their respective due diligence investigations.

The key dates for the sale process are as follows:

| Event | Timing of Amended Date/Deadline | Est. Amended Date/Deadline[3] |
|---|---|---|
| Deadline to Serve Court-Approved Bidding Procedures[4] | Within two (2) business days of entry of the | Wednesday, |

---

[2] All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures Order.

[3] All dates/deadlines are subject to extension or adjournment as provided for in the Bidding Procedures Order.

[4] A copy of the Court-approved Bidding Procedures will be served via (i) first class mail on: (a) the potential holders of Interests, (b) the Consultation Parties, (c) all parties who have expressed a bona fide interest in purchasing the Property, and (d) the service list established in this case; and (ii) via the Court's ECF filing system. **Parties wishing to receive expedited service of sale-related**

-2-

304685261

| Event | Timing of Amended Date/Deadline | Est. Amended Date/Deadline[3] |
|---|---|---|
| | Bidding Procedures Order | July 8, 2026 |
| Deadline to File Notice of Stalking Horse Bidder or Notice of No Stalking Horse Bidder | Within two (2) business days of entry of the Bidding Procedures Order | Wednesday, July 8, 2026 |
| Deadline to Submit Qualified Bids (the "**Bid Deadline**") | Twenty-one (21) days after filing of the Notice of Stalking Horse Bidder or Notice of No Stalking Horse Bidder | Wednesday, July 29, 2026 |
| Deadline to Either (1) Notify Qualified Bidders of Auction or (2) Cancel Auction | Within five (5) days of the Bid Deadline | Monday, August 3, 2026 |
| Auction, if held (the "**Auction Date**") | Within five (5) days of the Deadline to Notify Qualified Bidders of Auction | Friday, August 7, 2026 |
| Deadline to File Notice of Successful Bidder, if Auction Held (the "**Deadline to Designate Successful Bidder**") | Within three (3) days of conclusion of the Auction | Monday, August 10, 2026 |
| Deadline to Object to Sale | No less than seven (7) days after either the (i) Deadline to File Notice of Successful Bidder or (ii) the filing of the Notice of Cancellation of Auction, as applicable | (i) Monday, August 17, 2026 if Auction is held or (ii) Monday, August 10, 2026 if no Auction held |
| Reply Deadline | No less than seven (7) days of the Deadline to Object to Sale | (i) Monday, August 24, 2026 if Auction is held or (ii) Monday, August 17, 2026 if no Auction held |
| Sale Hearing | | September 8, 2026 |

**pleadings or other documents should contact Janice Brooks-Patton at janice.brooks-patton@katten.com and request to receive e-mail service.**

-3-

304685261

Docusign Envelope ID: 173D2595-BF2E-836B-834C-928C4B339069

**2.    Consultation Parties.**

(a)    Except as set forth in Section 2(b) below, the "**Consultation Parties**" referred to herein consist of the following entities, solely with respect to parcels subject to their respective liens or owner interests:

        i.    Plaintiff;

        ii.    Farming Defendants (as defined in the Receivership Order);

        iii.    Rooster Capital IV, LLC ("**Rooster**");

        iv.    American Equity Investment Life Insurance Company ("**AEIL**"); and

        v.    Any other person or entity that is participating in the sale process with respect to the Property in accordance with ¶ 2(d) of the Capstone Engagement Letter [Docket No. 157-2] and as agreed to by Receiver.

(b)    If any of the persons or entities listed in paragraph 2(a), above, submits a Bid (other than a credit bid), such person shall no longer be a Consultation Party for purposes of these Bidding Procedures. The Receiver shall not consult with Plaintiff if determining whether a bid submitted by Plaintiff is a higher or better bid.

**3.    Potential Bidders.**

To participate in the bidding process or otherwise be considered for any purpose under these Bidding Procedures, a person or entity interested in consummating a sale (a "**Potential Bidder**") must deliver or have previously delivered to the Receiver the following documents:

(a)    an executed non-disclosure agreement (an "**NDA**") on terms acceptable to the Receiver;

(b)    identification of the Potential Bidder and any of the principals, corporate officers, or other representatives that are authorized to appear for and act on behalf of the Potential Bidder with respect to the contemplated transaction; and

(c)    proof of an ability to close the proposed transaction in form and substance acceptable to the Receiver in his business judgment and in consultation with the Consultation Parties.

-4-

304685261

**4.    Provisions Governing Joint Bid Discussions.**

If a Potential Bidder is interested in engaging in discussions with a third party concerning a potential joint Bid ("**Joint Bid**") for the purchase of the Property and Related Property, such Potential Bidder shall, prior to engaging in such discussions, (a) identify the third party(ies) to the Receiver and (b) receive the Receiver's written consent to engage in such discussions (the "**Joint Bid Discussion Protocol**").

**5.    No Collusion**

All bidders, including Potential Bidders and Qualified Bidders (defined below), are expressly prohibited from directly or indirectly colluding or taking any other action in restraint of free competitive bidding in connection with the sale process.

**6.    Qualified Bidders**

(a)    A "**Qualified Bidder**" is a Potential Bidder who satisfies these Bidding Procedures and whose financial information, the financial information of its equity holder(s), or written commitments, as applicable, demonstrate the financial capability to consummate the sale, whose Bid  is a Qualified Bid, and that the Receiver determines should be considered a Qualified Bidder, in consultation with the Consultation Parties. No later than the Deadline to Designate Successful Bidder, the Receiver will notify each Potential Bidder in writing (email being sufficient) whether such Potential Bidder is a Qualified Bidder and shall provide counsel to the Consultation Parties copies of each Qualified Bid.

(b)    If the Receiver in his discretion determines any Potential Bidder not to be a Qualified Bidder, the Receiver will refund such Qualified Bidder's Deposit (defined below) on or within five (5) business days after the Bid Deadline.

(c)    Without the written consent of the Receiver, a Qualified Bidder may not modify or amend its Qualified Bid, except for proposed amendments to increase their consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; provided that any Qualified Bid may be improved at the Auction as set forth herein. Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

-5-

304685261

(d) Creditors who have a valid and perfected lien on the Property ("**Secured Creditor(s)**") shall be deemed Potential Bidders and Qualified Bidders under and in connection with these Bidding Procedures and may credit bid all or any portion of the applicable Defendant(s)' obligations to such Secured Creditor. Any credit bid made by a Secured Creditor (or any designee) by the Bid Deadline is, and will be deemed to be, a Qualified Bid in each instance for all purposes under and in connection with the Bidding Procedures; provided, however, that nothing herein constitutes a waiver of the Receiver's rights to challenge the liens and claims of Secured Creditors. Any credit bid made by a Successful Bidder must include a cash component sufficient to pay the Bid Protections and any fees and expenses that will be payable by the Receiver to Capstone or other professionals at closing.[5]

**7.    Due Diligence**

Only Potential Bidders (whether submitting cash or credit Bids) whose financial information, the financial information of its equity holder(s), or written commitments, as applicable, demonstrate the financial capability to consummate the sale shall be eligible to receive due diligence information and access to the Receiver's electronic data room and additional non-public information regarding the Property and Related Property. No Potential Bidder will be permitted to conduct due diligence without signing an NDA in a form acceptable to the Receiver. The Receiver will provide to each Potential Bidder that satisfies the foregoing reasonable due diligence information, as requested by such Potential Bidder in writing, as soon as reasonably practicable after such request. For all Potential Bidders, the due diligence period will end on the Bid Deadline. The Receiver shall have no obligation to furnish any due diligence information after the Bid Deadline. Neither the Receiver nor his professionals make any representations as to the completeness or accuracy of information provided to Potential Bidders in relation to the sale of the Property and Related Property.

Each Potential Bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Receiver or his advisors regarding the ability of the

---

[5] Designation of a Secured Creditor as Qualified Bidder shall not limit such Secured Creditor's rights and remedies under its loan documents, including, with the Receiver's consent, the ability to commence a foreclosure proceeding in respect of the Property.

-6-

304685261

Potential Bidder to consummate a sale. Failure by a Potential Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Receiver to determine that such bidder is not a Qualified Bidder or that a Bid made by such bidder is not a Qualified Bid.

All due diligence requests should be directed to Capstone Capital Markets, LLC, Attn: Arnav Virmani (avirmani@capstonepartners.com) and Hunter Costello (hcostello@capstonepartners.com).

**8.    Bid Requirements.**

A proposal, solicitation, or offer for a purchase and sale of the Property and the Related Property (each, a "**Bid**") by a bidder that is submitted in writing and satisfies each of the following requirements (the "**Bid Requirements**") as determined by the Receiver, in his discretion and in consultation with the Consultation Parties, shall constitute a "**Qualified Bid**":

(a)    Identity: Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid and the complete terms of any such participation. Each Bid must also include contact information for the specific persons, including financial advisors and counsel, if any, that the Receiver's advisors should contact regarding such Bid.

(b)    Purchase Price. Each Bid must clearly set forth the purchase price in U.S. dollars to be paid for the Property and the Related Property (the "**Purchase Price**").

(c)    Deposit. On or before the Bid Deadline, each Bid must be accompanied by a deposit in the amount equal to two percent (2%) of the aggregate cash Purchase Price of the Bid, to be held together with other bidders' cash deposits in a non-interest-bearing account to be established by the Receiver or Pivot (the "**Deposit**"). For the avoidance of doubt, the Deposit requirement only applies to the cash Purchase Price of a Bid and does not apply to the credit bid portion of a Bid.

(d)    Assumption of Obligations. Each Bid must clearly state which liabilities the Bidder agrees to assume, if any.

(e)    Qualified Bid Documents. Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transactions contemplated in the Bid, as well as

-7-

304685261

all other material documents integral to such Bid (the "**Qualified Bid Documents**"). Such documents may be based on and marked against the Stalking Horse PSA or an alternative form of Purchase and Sale Agreement provided or agreed to by the Receiver (including a summary of each Bid as may be reasonably requested by the Receiver). Any modifications to the form of documents provided by the Receiver must be in form and substance acceptable to the Receiver, in consultation with the Consultation Parties, to be considered Qualified Bid Documents.

(f)     No Material Modifications. After either the Notice of Stalking Horse Bidder or Notice of No Stalking Horse Bidder is filed with the Court, unless otherwise agreed by the Receiver in writing, all further Bids must be submitted on the Stalking Horse PSA or an alternative form of Purchase and Sale Agreement provided or agreed to by the Receiver, and include all material terms in the applicable Purchase and Sale Agreement, including the following:

1.     Property: With the exception of credit bids, the Bid must be for all Property and Related Property, unless otherwise agreed to in writing by the Receiver in his sole discretion, in consultation with the Consultation Parties.

2.     No Representations and Warranties by the Receiver: The sale will be "as is" and "with all faults," without representations or warranties, and without recourse. Each Bidder will represent that it has relied solely on its independent diligence, and not on any representations of the Receiver or his agents, in formulating and submitting its Bid.

3.     Free and Clear: The sale will be free and clear of liens, claims and encumbrances, other than easements, rights of way and other encumbrances running with the land, (the "**Interests**") to the fullest extent permitted by applicable law.

If a Notice of No Stalking Horse Bidder is filed and Plaintiff determines not to execute a Credit Bid PSA, the Receiver reserves the right to withdraw the Bidding Procedures with respect to the Property subject to Plaintiff's liens and cancel the Auction.

(g)     Committed Financing. To the extent that a Bid is not accompanied by evidence of the Bidder's capacity to consummate the sale set forth in its Bid with cash on hand, each Bid must include unconditional committed financing from a reputable financing institution documented to the satisfaction of the Receiver that demonstrates that the Bidder has received sufficient debt and/or

-8-

equity funding commitments to satisfy the Bidder's Purchase Price and other obligations under its Bid. Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Receiver.

(h)    Contingencies. A Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence.

(i)    Time Frame for Closing. Closing must occur within seven (7) days of the order approving the sale of the Property (the "**Sale Order**") becoming a final, non-appealable order, unless otherwise agreed in writing by the Receiver in consultation with the Consultation Parties.

(j)    Binding and Irrevocable. A Qualified Bidder's Bid shall be binding and irrevocable unless and until the Receiver accepts a higher Bid and such Qualified Bidder is not selected as the Backup Bidder.

(k)    Expenses and Disclaimer of Fees. Apart from the Qualified Bid submitted by the Stalking Horse Bidder, if any, each Bid must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation. For the avoidance of doubt, with the exception of the Stalking Horse Bidder, no Qualified Bidder will be permitted to request, nor be granted by the Receiver, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis.

(l)    Authorization. Each Bid must contain evidence that the Qualified Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Receiver) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

(m)    Completed Diligence. Each Bid must include a written acknowledgement and representation that the Qualified Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Property and Related Property prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the

-9-

304685261

Docusign Envelope ID: 173D2595-BF2E-836B-834C-928C4B339069

Property or the Related Property in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Property or Related Property or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bidder's Bid.

(n)    Adherence to Bidding Procedures. By submitting its Bid, each Bidder shall be deemed to have agreed to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid not in conformity with these Bidding Procedures or seek to reopen the Auction after conclusion of the Auction.

(o)    Regulatory Approvals and Covenants. A Bid must set forth each regulatory approval required for the Bidder to consummate the sale, if any, and the time period within which the Bidder expects to receive such regulatory approvals.

(p)    Consent to Jurisdiction. Each Qualified Bidder shall be deemed to have submitted to the jurisdiction of the Court and waive any right to a jury trial in connection with any disputes relating to the Receiver's qualification of bids, the Auction, the construction and enforcement of these Bidding Procedures, the sale documents, and the Closing, as applicable.

(q)    Joint Bids. Joint Bids are permitted, provided that the Qualified Bidders have complied with the Joint Bid Discussion Protocol.

(r)    Bid Deadline. Each Bid must be transmitted via email (in .pdf or similar format) so as to be actually received on or before the Bid Deadline by: (a) Counsel to the Receiver: Katten Muchin Rosenman LLP, Attn: John Mitchell (john.mitchell@katten.com) and Michaela Crocker (michaela.crocker@katten.com); (b) the Receiver's investment banker, Capstone Capital Markets, LLC, Attn: Skye Root (sroot@capstonepartners.com), Arnav Virmani (avirmani@capstonepartners.com), and Hunter Costello (hcostello@capstonepartners.com); and (c) Counsel for Plaintiff: Moore & VanAllen PLLC, Attn.; Steve Gruendel (stevegruendel@mvalaw.com) and Zachary Smith (zacharysmith@mvalaw.com).

-10-

304685261

**9. Designation of Stalking Horse; Election to Move Forward with Credit Bid**

Pursuant to the Bidding Procedures Order, the Receiver is authorized, but not obligated, in his discretion and in consultation with the Consultation Parties, to designate a "**Stalking Horse Bidder**" for the Property and Related Property by filing a Notice of Stalking Horse Bidder with the Court, which will entitle such Stalking Horse Bidder to bid protections not to exceed two percent (2%) in the aggregate of the initial cash Purchase Price set forth in the Stalking Horse PSA (the "**Bid Protections**"). If the Receiver designates a Stalking Horse Bidder, he will file a Notice of Stalking Horse Bidder with the Court that will include a purchase and sale agreement with the Stalking Horse (the "**Stalking Horse PSA**") and the proposed form of order approving a sale to the Stalking Horse Bidder. Unless otherwise agreed by the Receiver in writing, Bidders wishing to submit Qualified Bids must submit their Bid in the form of the Stalking Horse PSA or an alternative form of Purchase and Sale Agreement provided or agreed to by the Receiver.

Alternatively, the Receiver, in consultation with the Consultation Parties, may chose not to designate a Stalking Horse Bidder. If the Receiver does not designate a Stalking Horse Bidder, he will file a Notice of No Stalking Horse Bidder with the Court that will include a purchase and sale agreement with Plaintiff, or its assignee (the "**Credit Bid PSA**"). Bidders wishing to submit Qualified Bids must submit their Bid on the form of Credit Bid PSA attached to the Notice of No Stalking Horse Bidder. Parties submitting credit bids will not be eligible to receive Bid Protections.

**10. Auction**

If the Receiver receives more than one Qualified Bid for the Property and Related Property, he will conduct the Auction to determine the Successful Bidder.

No later than the commencement of the Auction, the Receiver shall notify each Qualified Bidder of the highest or otherwise best Qualified Bid for the Property and Related Property, as determined in the Receiver's reasonable business judgment, in consultation with the Consultation Parties, as applicable (the "**Baseline Bid**"). The determination of which Qualified Bid constitutes the Baseline Bid and which Qualified Bid constitutes the Successful Bid shall take into account any factors the Receiver reasonably deems, in consultation with the Consultation Parties, relevant to the value of the Qualified Bid, including, but not limited to: (a) the amount and nature of the total

-11-

304685261

consideration payable to the Receiver; (b) the likelihood of the Qualified Bidder's ability to close the sale and the timing thereof; and (c) the net economic effect of the value to be received by the Receiver from the transaction contemplated by the Qualified Bid Documents, including in light of the effect of any Bid Protections (collectively, the "**Bid Assessment Criteria**").

The Auction shall take place on the Auction Date or such later date and time, and by such other means, as selected by the Receiver in consultation with the Consultation Parties. The Auction shall be conducted in a timely fashion according to these Bidding Procedures, and the Receiver shall maintain a written or recorded transcript of the Auction. Remote participation by Qualified Bidders at the Auction will be permitted in the Receiver's discretion.

(a)    **The Receiver Shall Conduct the Auction.**

The Receiver or his designee shall direct and preside over the Auction. At the start of the Auction, the Receiver or his designee shall describe the terms of the Baseline Bid. All incremental Bids made thereafter shall be Overbids (defined below) and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders who submitted Bids. The Receiver shall maintain a written or recorded transcript of the Auction, including the Baseline Bid, all applicable Overbids, and the Successful Bid.

Only (i) Qualified Bidders and their legal and financial advisors and (ii) the members of, and advisors to, the Consultation Parties shall be entitled to attend the Auction, and the Qualified Bidders shall appear at the Auction in person or via Zoom and may speak or bid themselves or through duly authorized representatives. Only Qualified Bidders shall be entitled to Bid at the Auction. The Receiver may allow other parties to attend the Auction in his discretion.

(b)    **Terms of Overbid.**

"**Overbid**" means any Bid made at the Auction by a Qualified Bidder after the Receiver's announcement of the Baseline Bid. Each applicable Overbid must comply with the following conditions:

i.    *Minimum Initial Overbid*. The first overbid at the Auction (the "**Minimum Initial Overbid**") shall be in an amount not less than the purchase price set for in either the Stalking Horse PSA or Credit Bid PSA, as applicable, plus an amount equal to the Bid

-12-

304685261

Docusign Envelope ID: 173D2595-BF2E-836B-834C-928C4B339069

Protections, if any, plus an additional $1 million (the "**Initial Overbid Amount**"). The amount of the Initial Overbid shall be included in the Notice of Stalking Horse Bidder or Notice of No Stalking Horse Bidder, as applicable, filed with the Court.

ii.    *Minimum Overbid Increment*. Any Overbid following the Minimum Initial Overbid or following any subsequent Prevailing Highest Bid (as defined below) for the Property and Related Property shall be in increments of $1 million. The Receiver may establish different overbid increments at the Auction, as determined by the Receiver in the exercise of his business judgment, in consultation with the Consultation Parties.

iii.    *Conclusion of Each Overbid Round*. Upon the solicitation of each round of Overbids, the Receiver may announce a deadline (as he may, in his business judgment, extend from time to time, the "**Overbid Round Deadline**") by which time any Overbids must be submitted to the Receiver.

Subsequent to each Overbid Round Deadline, the Receiver shall announce whether he has identified, after consultation with the Consultation Parties, an Overbid as being higher or otherwise better than the Baseline Bid, in the initial Overbid round, or, in subsequent rounds, the Overbid previously designated by the Receiver as the prevailing highest or otherwise best Bid (the "**Prevailing Highest Bid**"). The Receiver shall describe to all Qualified Bidders the material terms of any new Overbid designated by him as the Prevailing Highest Bid as well as the value attributable by the Receiver (after consultation with the Consultation Parties) to such Prevailing Highest Bid based on, among other things, the Bid Assessment Criteria.

iv.    *Overbid Alterations*. An applicable Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable than any prior Bid or Overbid, as determined in the Receiver's reasonable business judgment, in consultation with the Consultation Parties, but shall otherwise comply with the terms of these Bidding Procedures.

-13-

304685261

(c)    **Consideration of Overbids.**

The Receiver reserves the right, in his reasonable business judgment and in consultation with the Consultation Parties, to adjourn the Auction one or more times to, among other things: (i) facilitate discussions between the Receiver and Qualified Bidders; (ii) allow Qualified Bidders to consider how they wish to proceed; and (iii) provide Qualified Bidders the opportunity to provide the Receiver with such additional evidence as the Receiver, in his reasonable business judgment, may require, that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing Overbid amount.

(d)    **Closing the Auction.**

i.    The Auction shall continue until there is only one Qualified Bid that the Receiver determines, in his reasonable business judgment, and in consultation with the Consultation Parties, to be the highest or otherwise best Bid. Such Qualified Bid shall be declared the "**Successful Bid**," and such Qualified Bidder, the "**Successful Bidder**" and at which point the Auction will be closed. The Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then-Prevailing Highest Bid. The Receiver's acceptance of the Successful Bid is conditioned upon Court approval at the Sale Hearing.

ii.    The Receiver shall not consider any Bids or Overbids submitted after the conclusion of the Auction, and any such Bids or Overbids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid.

iii.    No later than either the filing of the Notice of Cancellation of Auction or the Deadline to Designate Successful Bidder, as applicable, the Receiver shall cause the Qualified Bid Documents for the Successful Bid and Backup Bid (defined below) to be filed with the Court.

(e)    **No Collusion; Good Faith *Bona Fide* Offer**

Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that: (i) it has not engaged in any collusion with respect to the bidding; and (ii) its

-14-

304685261

Qualified Bid is a good-faith bona fide offer, and it intends to consummate the proposed transaction if selected as the Successful Bidder.

(f)   **Cancellation of Auction.**

If the Receiver does not receive a competing Qualified Bid by the Bid Deadline, then the Receiver may file a notice cancelling the Auction and designating the sole Qualified Bidder as the Successful Bidder.

**11.   Backup Bidder**

The Qualified Bidder with the next highest or otherwise second-best Qualified Bid (the "**Backup Bid**") at the Auction, as determined by the Receiver in the exercise of his business judgment and in consultation with the Consultation Parties, shall be required to serve as a backup bidder (the "**Backup Bidder**"). The Receiver shall announce the identity of any Backup Bidder and the amount and material terms of the Qualified Bid of the Backup Bidder at the conclusion of the Auction at the same time the Receiver announces the identity of the Successful Bidder. Unless otherwise agreed in writing by the Receiver in consultation with the Consultation Parties, the Backup Bidder shall be required to keep its Qualified Bid open and irrevocable until the closing of the transaction with the Successful Bidder. The Backup Bidder's Deposit shall be held by the Receiver until the closing of the transaction with the Successful Bidder. If the Successful Bidder fails to consummate its Successful Bid, the Receiver may select the Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed the Successful Bidder for all purposes. The Receiver will be authorized, but not required, to consummate all transactions contemplated by the Bid of such Backup Bidder without further order of the Court or notice to any party. In such case, the defaulting Successful Bidder's Deposit shall be forfeited to the Receiver, and the Receiver specifically reserves the right to seek all available remedies against the defaulting Successful Bidder, including specific performance.

**12.   Reservation of Rights.**

The Receiver reserves the right to modify these Bidding Procedures in his reasonable business judgment, and in consultation with the Consultation Parties, in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, additional customary

-15-

304685261

terms and conditions on the sale, including, without limitation: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; and (e) rejecting any or all Bids.

**13.    Sale Hearing.**

The hearing to approve the sale (the "**Sale Hearing**") shall take place in the courtroom of the Honorable Kirk E. Sherriff in the United States District Court for the Eastern District of California, Robert E. Coyle U.S. Courthouse, 2500 Tulare Street, Courtroom 6, 7th Floor, Fresno, California on **September 8, 2026, at 1:30 p.m. (PT)**. With the consent of the Successful Bidder (in consultation with the Consultation Parties), or as otherwise directed by the Court, the Sale Hearing may be adjourned or rescheduled without notice by an announcement of the adjourned date at the Sale Hearing or by filing a notice on the docket in the above-captioned case. At the Sale Hearing, the Receiver shall present the Successful Bid to the Court for approval.

**14.    Return of Deposit.**

The Deposit of the Successful Bidder shall be applied to the Purchase Price at closing. The Deposits for each Qualified Bidder shall be held in one or more accounts on terms acceptable to the Receiver in his sole discretion and shall be returned (other than with respect to the Successful Bidder and the Backup Bidder) on or within five (5) business days after the Auction.

If a Successful Bidder fails to consummate a proposed transaction because of a breach by such Successful Bidder, the Receiver will not have any obligation to return the Deposit deposited by such Successful Bidder, which may be retained by the Receiver as damages, in addition to any and all rights, remedies, or causes of action that may be available to the Receiver, and the Receiver shall be free to consummate the proposed transaction with the Backup Bidder without the need for an additional hearing or order of the Court.

304685261

Docusign Envelope ID: 173D2595-BF2E-836B-834C-928C4B339069

**15.    Additional Provisions**

(a)    **Plaintiff's Rights**

In the event the Sale Order has not become a final, non-appealable order within thirty-one (31) days of its entry and Closing has not occurred, then: (a) the Receiver, with the Plaintiff's' prior written consent, shall have the right to terminate the Successful Bidder's purchase and sale agreement (the "**Successful Bidder's PSA**") pursuant to the terms thereof; (b) Plaintiff shall be entitled to take all steps necessary to hold a foreclosure auction for the Property under applicable state law, including placing credit bids for the Property and taking ownership thereof. For the avoidance of doubt, nothing in this paragraph is intended to, and shall not be interpreted to, limit or restrict the rights or remedies available to Plaintiff under the applicable loan documents, at law, or in equity.

(b)    **Rights of First Refusal and Similar Rights**

Holders of rights of first refusal to purchase the Property or similar rights, if any, must comply with all terms of these Bidding Procedures, including the requirements for designation of Qualified Bidders and Qualified Bids, the purchase of the Property in its entirety, and the timelines set forth herein.

-17-

304685261

Docusign Envelope ID: 173D2595-BF2E-836B-834C-928C4B339069

## EXHIBIT 1 TO BIDDING PROCEDURES

### List of APNs

| Map Location | APN Number | Assessor Acres |
|---|---|---|
| Calaveras Ranch | 040-020-18S | 160.00 |
| Kamm Avenue | 038-141-21S | 75.74 |

304685261

Docusign Envelope ID: 173D2595-BF2E-836B-834C-928C4B339069

EXHIBIT C

FORM OF SALE ORDER

(ATTACHED)

20039.001/Westlands PSA - FarmerMac (EX)

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| FEDERAL AGRICULTURAL MORTGAGE CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> ASSEMI BROTHERS, LLC; MARICOPA ORCHARDS, LLC; C & A FARMS, LLC; WHITESBRIDGE FARMS, LLC; LINCOLN GRANTOR FARMS, LLC;COPPER AVENUE INVESTMENTS, LLC; ACAP FARMS, LLC; CANTUA ORCHARDS, LLC; GRADON FARMS, LLC, <br><br> Defendants. | No. 1:24-cv-014552-KES-SAB <br><br> **[PROPOSED] ORDER (I) AUTHORIZING SALE OF REAL ESTATE FREE AND CLEAR OF INTERESTS; (II) AUTHORIZING THE PAYMENT OF SALE-RELATED COSTS; AND (III) GRANTING RELATED RELIEF (WESTLANDS)** <br><br> Related to Dkt. No. __ <br><br> Action Filed:  November 27, 2024 |

Before the Honorable Kirk E. Sherriff, United States District Judge, is the *Notice of Proposed Auction and Sale of Real Property (Westlands)* [Dkt. No. ___] (the "**Sale Notice**") filed by Lance Miller, solely in his capacity as Court-appointed receiver in the above-captioned case (the "**Receiver**") for entry of an order (a) authorizing the Receiver to sell the Property[1] free and clear of

---

[1] Capitalized terms used herein shall have the meanings ascribed in the Purchase and Sale Agreement attached hereto as **Exhibit A** (the "**PSA**")

liens, claims, and encumbrances, other than easements, rights of way, and other encumbrances running with the land, to the fullest extent permitted by law (collectively, the "**Interests**") with such Interests attaching to the proceeds of the sale ("**Sale Proceeds**") with the same force and in the same priority as existed immediately prior to the Closing Date; (b) authorizing the Receiver to pay, without further order of the Court, all sale-related costs and expenses, including break-up fees (if applicable), commissions, and transaction fees (but excluding the Receiver's attorneys' fees); and (c) granting related relief. The Court hereby finds that:[2] (a) the marketing and sale of the Property was held in accordance with the order establishing auction and bid procedures [Dkt. No. ___] (the "**Bidding Procedures Order**"); (b) it has jurisdiction over the Property and the parties in this case, including exclusive jurisdiction over the administration, control, and possession of the Property; (c) it has the statutory authority to enter this Order, including pursuant to 28 U.S.C. § 2001 and Rule 55 of the Federal Rules of Civil Procedure; and (d) due and proper notice of the Sale Notice was given and no other or further notice is necessary. The Court further finds that:

A.    This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Rule 54(b) of the Federal Rules of Civil Procedures, the Court expressly finds that there is no just reason for delay in the implementation of this Order.

B.    The Court entered the Bidding Procedures Order on _____, 2026, that, among other things, established the procedures in connection with the marketing, auction, and sale of the Property (the "**Bidding Procedures**") and granted related relief.

C.    As demonstrated by (i) the testimony and other evidence submitted by declaration and adduced at the Sale Hearing, including the declarations submitted by Lance Miller and Sky Roote and (ii) the representations of counsel made on the record at the Sale Hearing (if held), all aspects of the sale process, including notice thereof, have been conducted in compliance with the Bidding Procedures and Bidding Procedures Order.

---

[2] The findings and conclusion set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. To the extent a finding of fact constitutes a conclusion of law, or a conclusion of law a finding of fact, they are adopted as such. The Court's finding and conclusions set forth at on the record at the Sale Hearing are incorporated herein by reference.

**No. 1:24-cv-01455-KES-SAB**
**[PROPOSED] ORDER**

305567715v2

Docusign Envelope ID: 173D2595-BF2E-836B-834C-928C4B339069

D.      In compliance with the Bidding Procedure Order, the Receiver published notice of the Auction and proposed sale in (a) *The Bakersfield Californian*, (b) *The Business Journal* and (c) *The Hanford Sentinel* newspapers on September 19, 2025, September 26, 2025, October 3, 2025, and October 10, 2025. *See Proof of Service by Publication* [Dkt. No. 171].

E.      The Receiver has demonstrated good, sufficient, and sound business purpose and justifications for the sale and other transactions contemplated in the PSA, and such actions are an appropriate exercise of the Receiver's business judgment and in the best interest of the receivership estate.

F.      The Receiver conducted the marketing and auction process in accordance with the order appointing the Receiver in this case (as amended, the "**Receivership Order**"), the Bidding Procedures, and the Bidding Procedures Order.  The marketing and auction process set forth in the Bidding Procedures Order afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Property, and Receiver afforded potential purchasers a full and fair opportunity to make higher and better offers for the Property.

G.      The Receiver conducted the sale process for the Property without engaging in any collusion and in accordance with the Bidding Procedure and the Bidding Procedures Order. Following the Bid Deadline and at the conclusion of the Auction, the Receiver determined in the sound exercise of his business judgment, in consultation with Plaintiff, that _____ ("**Buyer**") submitted the highest or otherwise best offer for the Property.

H.      The Receiver and Buyer have acted at arm's length and in good faith with respect to the proposed sale, and the Purchase Price represents the highest or otherwise best offer for the Property. The Receiver's determination that the PSA executed by Buyer constitutes the highest and best offer for the Property constitutes a valid and sound exercise of the Receiver's business judgment.

I.      The purchase price for the Property constitutes (i) reasonably equivalent value under the Uniform Fraudulent Transfer Act, (ii) fair consideration under the Uniform Fraudulent Conveyance Act, and (iii) reasonably equivalent value, fair consideration, and fair value under any

305567715v2

Docusign Envelope ID: 173D2595-BF2E-836B-834C-928C4B339069

other applicable laws of the United States, any state, territory or possession of the United States or the District of Columbia.

J.    Except as expressly set forth in the PSA, the Buyer shall have no liability, responsibility, or obligations of any kind or nature whatsoever for any Interest of or against the Defendants, or otherwise related to the Property, by reason of the transfer of the Property to the Buyer.  The Buyer is not acquiring or assuming any Interest, except as expressly set forth in the PSA.

K.    Pursuant to this Order and the Receivership Order, the Receiver has full power and authority to execute, deliver, and perform the obligations under the PSA and all other documents and transactions contemplated thereby and no consents or approvals, other than those expressly provided for herein or in the PSA, are required for the Receiver to consummate the sale transaction. As of the Closing Date, the transfer of the Property to the Buyer will be a legal, valid, and effective transfer thereof, and vests the Buyer with all right, title, and interest of the Defendants and the Receiver in and to the Property free and clear of all Interests accruing or arising any time prior to the Closing Date, except as expressly set forth in the PSA.

L.    The Buyer would not have entered into the PSA and would not consummate the sale if the transfer of the Property were not free and clear of all Interests (other than those contained in the PSA, as applicable), if the Buyer would, or in the future could, be liable for any such Interests, or if any such Interests would or could be asserted against the Buyer after the closing of the sale.  Sale of the Property other than free and clear of Interests, and without the protections of this Order, would impact materially and adversely the value the Receiver would be able to obtain for the Property. In addition, Plaintiff has consented to the sale of the Property free and clear of its Interests. Other holders of Interests who did not object, or who withdrew their objections, to the Sale Notice are deemed to have consented. Therefore, approval of the PSA and the consummation of the sale of the Property free and clear of Interests is appropriate under 28 U.S.C. § 2001, the Receivership Order and the interests of equity, and is in the best interests of the Receivership estate, creditors, and other parties in interest.

305567715v2

M.      Buyer is the designated Successful Bidder and the Buyer's PSA is designated as the Successful Bid in accordance with the Bidding Procedures.

N.      **[_____, a _____ limited liability company  (the "Back-up Bidder") is designated as the Back-up Bidder and Back-up Bidder's purchase and sale agreement (the "Back-up PSA"), which is attached hereto as <u>Exhibit B</u>, is designated as the Back-up Bid. The Back-up Bidder has compiled in all respect with the Bidding Procedures Order and all other applicable orders of this Court in negotiating and entering into the Back-up PSA.]**

O.      The Receiver's (i) publication of notice of the opportunity to purchase the Property, the Bidding Procedures, and solicitation of bids for the Property as set forth above, (ii) solicitation of bids for the Property through the Receiver's and his professionals' efforts to market the Property, and (iii) conduct of the Auction in Fresno, California, establish the Receiver's satisfaction of the public sale requirements in 28 U.S.C. §§ 2001 and 2002. To the extent the Receiver has not fully satisfied the provisions of 28 U.S.C. §§ 2001 and 2002, he is excused from compliance for cause shown.

Accordingly, it is hereby:

**ORDERED** that the Receiver's request to sell the Property (including the assignment of any applicable contracts to the extent set forth in the PSA) is granted as set forth herein and all objections to the Sale Notice, to the extent not resolved or withdrawn on the record, are overruled on the merits. All persons and entities who received notice of the Sale Notice and/or the Sale Hearing that failed to timely object thereto as deemed to have consented to the relief sought in the Motion and set forth in this Order.

**IT IS FURTHER ORDERED** that the Receiver is authorized to enter into and consummate the transactions set forth in the PSA with Buyer or its assignee as the Successful Bidder in accordance with the Bidding Procedures Order **[or, to the extent Buyer is unwilling or unable to close under the PSA, to Back-up Bidder pursuant to the Back-up Bidder PSA]**. The Receiver is authorized to act on behalf of Defendants in connection with the sale and conveyance of title to the Property to Buyer and no other consents or approvals are necessary or required for the Receiver to carry out the sale and conveyance. All persons and entities are hereby prohibited and enjoined

305567715v2

from taking any action that would adversely affect or interfere with the ability of the Receiver to sell and transfer the Property in accordance with the terms of this Order or the PSA.

**IT IS FURTHER ORDERED** that the Receiver is authorized to sell the Property pursuant to the terms of the PSA.

**IT IS FURTHER ORDERED** that the Receiver is authorized to sell the Property to Buyer free and clear of Interests, with such Interests attaching to the Sale Proceeds with the same force and in the same priority as existed immediately prior to the Closing, and such sale shall be free and clear of any rights of redemption or repurchase of any Defendant in this Case.

**IT IS FURTHER ORDERED** that service of the Sale Notice and the PSA upon the holders of any contractual rights of first offer or rights of first refusal encumbering the Property constitutes written notice of the proposed sale sufficient to satisfy any notice obligation arising under such agreements. Any holder of a right of first offer or right of first refusal to purchase a portion of the Property who failed to timely object to the Sale Notice or to otherwise provide written notice of its intent to exercise such right to purchase prior to the deadline to object to the sale is deemed to have waived and released such right to purchase with respect to the sale of the Property to Buyer, and the Property shall be conveyed to Buyer free and clear of any claims arising from any such unexercised right of first offer or right of first refusal.

**IT IS FURTHER ORDERED** that Buyer shall not, by virtue of its acquisition of the Property in this sale, be held liable for any Interests or obligations that arose prior to the close of the sale of the Property, and Buyer shall not be deemed to be the successor-in-interest of Receiver or any other person or entity with respect to any Interests or obligations related to the Property that arose prior to such close of sale or be liable as a successor with respect to the same.

**IT IS FURTHER ORDERED** that the Receiver is authorized to pay, without further Court order, all sale-related costs and expenses, including break-up fees (if applicable), closing costs, real estate taxes, title insurance, prorations, recording fees, and commissions (but specifically excluding attorneys' fees), with the net proceeds payable to Plaintiff in partial satisfaction of its liens. To the extent Plaintiff's liens are satisfied, the Receiver is authorized to pay the net proceeds to the second lienholder on the Property in partial satisfaction of its liens.

6

305567715v2

**IT IS FURTHER ORDERED** that the Receiver is authorized to enter into any documents reasonably necessary or desirable to implement the terms of this Order and effectuate the sale of the Property and to take all further actions as may reasonably be requested by Buyer for the purposes of assigning, transferring, granting and conveying to the Buyer, as may be necessary or appropriate to the performance of the Receiver's obligations hereunder. The Receiver is also authorized to execute any documents on behalf of the Defendants to the extent necessary to complete.

**IT IS FURTHER ORDERED** that Property shall be transferred on an "AS IS," "WHERE, IS," and "WITH ALL FAULTS" basis. All sale documents shall provide language substantially similar to the following: "Buyer acknowledges and agrees that Buyer is purchasing the Property 'as-is', 'where-is', and 'with all faults' as of the Closing Date, and Buyer further acknowledges and agrees that Seller hereby expressly disclaims any and all implied warranties concerning the condition, value and quality of the Property and any portions thereof, including, but not limited to, the implied warranties of habitability, merchantability, or fitness for a particular purpose. Buyer acknowledges that no warranty has arisen through trade, custom or course of dealing with Seller."

**IT IS FURTHER ORDERED** that the holders of any Interests in the Property shall be prohibited from pursuing or asserting such Interests against Buyer, any of its assets, property, successors or assigns, or the Property. The sale and assignment contemplated by the PSA is a sale of assets, and Buyer, including by virtue of its acquisition of the Property and assignment of contracts pursuant thereto (or by virtue of any other reason), shall not have any successor or vicarious liabilities of any kind or nature with respect to any alleged liability of Defendants or Receiver.

**IT IS FURTHER ORDERED** that, except with prior leave of this Court, all persons or entities with notice of this Order are prohibited from (i) commencing, prosecuting, continuing or enforcing any action against the Receiver related to the Property or the Sale Proceeds (except that such actions may be filed, but not prosecuted, to toll any statute of limitations), (ii) taking any action to interfere with the Receiver's management, control or possession of the Property or the Sale Proceeds, or (c) interfering in any manner with the exclusive jurisdiction of this Court over the Property or the Sale Proceeds.

305567715v2

**IT IS FURTHER ORDERED** that, on and after the Closing Date, any persons holding an Interest shall execute such documents and take all other actions as may be reasonably necessary to further demonstrate the release of their respective Interests in the Property, as such Interests may have been recorded or otherwise filed.  Buyer may, but shall not be required to, file a certified copy of this Sale Order in any filing or recording office in any federal, state, county or other territory or jurisdiction in which Property is located, or with any other appropriate clerk or recorded with any other appropriate recorder, and such filing or recording shall be accepted and shall be sufficient to release, discharge, and terminate any of the Interests as set forth in this Sale Order as of the Closing Date.  All persons and entities that are in possession or control of any portion of the Property on the Closing Date shall promptly surrender possession and control thereof to the Buyer on, or as soon as reasonably practicable after, the Closing Date.

**IT IS FURTHER ORDERED** that the Receiver shall serve a copy of this Order on all parties known to have asserted an Interest in the Property. The Receiver is authorized to file a copy of this Order in any court where an action is pending involving the Property.

**IT IS FURTHER ORDERED** that nothing contained herein shall prevent the Receiver from seeking additional relief from this Court related to the PSA, the Property, or the Sale Proceeds.

**[IT IS FURTHER ORDERED that, should Buyer fail to close on the sale pursuant to and in accordance with the terms of the PSA (as may be amended by written agreement of the Receiver and Buyer), and without further order from the Court, the Receiver is hereby authorized and empowered to sell the Property to Back-up Bidder, execute and deliver the Back-up Bidder PSA, and to implement and consummate all of the transactions and perform all obligations contemplated by the Back-up Bidder PSA and this Sale Order as if the Back-up Bidder were the Successful Bidder at Auction, and the Back-up Bidder shall be entitled to all the findings and protections of this Sale Order provided to the Buyer. In the event of a sale to Back-up Bidder, Back-up Bidder shall be substituted as "Buyer" as defined in this Order.]**

**IT IS FURTHER ORDERED** that this Order and the terms and provisions of the PSA shall be binding on Defendants, all of Defendants' creditors (whether known or unknown), Buyer, [**Back-up Bidder,]** and their respective affiliates, successors and assigns, and any affected third parties,

305567715v2

including, but not limited to, all persons asserting any interest in the Property. The provisions of this Order and the terms and provisions of the PSA, and any actions taken pursuant hereto or thereto, shall survive the entry of any order for relief under title 11 of the United States Code, and shall be binding on Defendants and their successors and assigns, including any debtor-in-possession or any trustee appointed under title 11 of the United States Code, or similar custodian or fiduciary appointed over Defendants or their assets. Any title company and its agents may rely upon the provisions of this Order when issuing any policies of title insurance.

**IT IS FURTHER ORDERED** that any party seeking to stay, challenge, or appeal this Order or the sale authorized herein shall first obtain a stay from this Court and post a bond in an amount determined by the Court sufficient to protect Receiver, the receivership estate, secured creditors, and Buyer from damages, delay, and carrying costs resulting from such challenge.

**IT IS FURTHER ORDERED** that this Order shall be effective immediately upon entry.

**IT IS FURTHER ORDERED** that this Court shall retain exclusive jurisdiction over any disputes arising from or related to the Property, the PSA, or the implementation or interpretation of this Order.

Dated: _____

_____
Hon. Kirk E. Sherriff
United States District Court

9

Docusign Envelope ID: 173D2595-BF2E-836B-834C-928C4B339069

EXHIBIT D

FORM OF RELEASE

_____ ("**Buyer**"), [as successor by assignment to _____], and LANCE MILLER, solely in his capacity as court-appointed receiver (the "**Seller**") in the case styled *Federal Agricultural Mortgage Corporation v. Assemi Brothers, LLC et. al.*, Case No. 1:24-cv-01455-KES-SAB pending in the U.S. District Court for the Eastern District of California (the "**Court**") have previously entered into that certain Purchase and Sale Agreement and Joint Escrow Instructions dated _____ (as such may have been amended, prior to the date hereof, the "**Agreement**"). Unless otherwise indicated, capitalized terms not otherwise defined herein shall have the meanings given to them in the Agreement.

As material consideration for Seller's obligations under the Agreement, effective as of the Closing Date, Buyer on behalf of itself and its members, managers, partners, officers, directors, and employees (collectively, including Buyer, "**Releasors**"), hereby releases Seller, Federal Agricultural Mortgage Corporation, Rooster Capital IV LLC, and American Equity Investment Life Insurance Company, and their respective partners, professionals, agents, employees, shareholders, members, affiliates, principals, beneficiaries, subsidiaries, successors, and assigns (collectively with Seller, "**Releasees**") from any and all complaints, claims, charges, claims for relief, demands, suits, actions and causes of action, whether in law or in equity, which Buyer asserts or could assert at common law or under any statute, rule, regulation, order or law, whether federal, state or local, on any ground whatsoever, whether or not known, suspected, liquidated, contingent or matured, with respect to any event, matter, claim, occurrence, damages or injury (collectively, "**Claims**"), to the extent arising out of a condition or state of the Property, including the value of the Property or its suitability for Buyer's use.

Buyer, on behalf of itself, its successors, assigns and successors-in-interest and such other persons and entities, hereby waives the protections and benefits afforded California Civil Code Section 1542, acknowledging that its waivers and releases herein are being made after obtaining the advice of counsel and with full knowledge and understanding of the consequences and effects of such waivers and releases, and that California Civil Code Section 1542 provides as follows:

**"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."**

_____
**Buyer's Initials**

Notwithstanding anything stated to the contrary in this Agreement, the foregoing release shall not extend to (and shall expressly exclude): (i) claims arising from Seller's intentional fraud or willful misconduct; or (ii) claims for breach of Seller's express representations, warranties, covenants, or indemnities under the Agreement or any document delivered at Closing, but solely to the extent so provided for under such Agreement or document delivered at Closing.

-38-

20039.001/Westlands PSA - FarmerMac (EX)

Docusign Envelope ID: 173D2595-BF2E-836B-834C-928C4B339069

This Release is made by Buyer for the benefit of Seller and the Releasees on _____.

[Buyer Signature Block]

20039.001/Westlands PSA - FarmerMac (EX)

Docusign Envelope ID: 173D2595-BF2E-836B-834C-928C4B339069

EXHIBIT E

Form of Deed

Recording Requested By And

**When Recorded Return To:**

**Mail Tax Statements To:**

(SPACE ABOVE THIS LINE FOR RECORDER'S USE ONLY)

## GRANT DEED

THE UNDERSIGNED RECEIVER DECLARES:

DOCUMENTARY TRANSFER TAX IS $_____

____Unincorporated Area            ____City of _____
___Computed on full value of interest or property conveyed, or
___Computed on full value less value of liens or encumbrances remaining at time of sale

Assessor's Parcel No. _____

FOR VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, LANCE MILLER, solely in his capacity as court-appointed receiver (the "**Grantor**") pursuant to the _____("**Sale Order**") entered in the case styled *Federal Agricultural Mortgage Corporation v. Assemi Brothers, LLC et al.*, Case No. 1:24-cv-001455-KES-SAB, pending in the U.S. District Court for the Eastern District of California, does hereby **grant, sell and convey** to _____ ("**Grantee**")**,** the following described real property and improvements thereon, in the County of _____, State of California, and more particularly described as follows:

See Exhibit A, attached hereto and incorporated by reference.

Together with all of Grantor's right, title and interest in and to the improvements and structures thereon, and all privileges, easements, appurtenances, rights-of way, and hereditaments appertaining to the same, and subject to all matters of record and all matters that would be reflected on an accurate survey at the time of recordation of this deed.

THE PROPERTY IS CONVEYED TO GRANTEE WITHOUT ANY COVENANTS OR WARRANTIES, EXPRESS OR IMPLIED, EXCEPT AS SET FORTH IN THE SALE ORDER, AND SPECIFICALLY EXCLUDES THOSE IMPLIED COVENANTS DESCRIBED IN CALIFORNIA CIVIL CODE SECTION 1113.

MAIL TAX STATEMENTS AS SET FORTH ABOVE

Dated: _____, 202_

_____
LANCE MILLER, solely in his capacity as Court-appointed Receiver

-40-

20039.001/Westlands PSA - FarmerMac (EX)

Docusign Envelope ID: 173D2595-BF2E-836B-834C-928C4B339069

EXHIBIT F

Form of Bill of Sale

FOR VALUABLE CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged, LANCE MILLER, solely in his capacity as court-appointed receiver (the "**Seller**") pursuant to the _____("**Sale Order**") entered in the case styled *Federal Agricultural Mortgage Corporation v. Assemi Brothers, LLC et al.*, Case No. 1:24-cv-001455-KES-SAB, pending in the U.S. District Court for the Eastern District of California, does hereby sell, bargain, assign, transfer, convey and deliver to _____ ("**Buyer**"), all of Seller's rights, title, interests in and to the Improvements, Crops (for the 2026 crop year and following), Oil Gas and Mineral Rights, and Water Rights (in so far as any of the foregoing are personal property) (the "**Personal Property**"), as such terms are defined in that certain Purchase and Sale Agreement and Joint Escrow Instructions dated _____ by and between Buyer and Seller (the "**Purchase Agreement**"), for the real property situated in _____ County[ies], California as more particularly described in **Exhibit A** attached hereto and incorporated herein by reference. The Personal Property is conveyed free and clear of all liens and encumbrances, except for the Permitted Exceptions (as defined in the Agreement).

IT IS UNDERSTOOD AND AGREED THAT BUYER HAS EXAMINED THE PERSONAL PROPERTY HEREIN SOLD AND THAT THIS SALE IS MADE "AS IS, WHERE IS" AND SELLER DISCLAIMS ANY EXPRESS OR IMPLIED WARRANTY OTHER THAN THE WARRANTY OF TITLE SET FORTH ABOVE, AS TO THE PERSONAL PROPERTY INCLUDING WITHOUT LIMITATION THE IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

IN WITNESS WHEREOF, Seller has caused this Bill of Sale to be executed and delivered as of _____, 202__

SELLER

_____
LANCE MILLER, solely in his capacity as
Court-appointed Receiver

[attach legal description exhibit]

-41-

Docusign Envelope ID: 173D2595-BF2E-836B-834C-928C4B339069

EXHIBIT G

Form of Assignment Agreement

## ASSIGNMENT AGREEMENT

THIS ASSIGNMENT AGREEMENT ("Assignment") is entered into effective as of _____, 202__ ("**Effective Date**"), by and between LANCE MILLER, solely in his capacity as court-appointed receiver (the ("**Assignor**"), pursuant to the _____("**Sale Order**") entered in the case styled *Federal Agricultural Mortgage Corporation v. Assemi Brothers, LLC et al.*, Case No. 1:24-cv-001455-KES-SAB, pending in the U.S. District Court for the Eastern District of California, and _____("**Assignee**").

A.      Assignor and Assignee are parties to that certain Purchase and Sale Agreement and Joint Escrow Instructions, dated _____ (the "**Purchase Agreement**"), with respect to the purchase and sale of the property described in Exhibit A, attached hereto and incorporated by reference (the "**Property**").

B.      Assignor and Assignee closed the purchase and sale of the Property on the date hereof, and pursuant to the Purchase Agreement and Sale Order, Assignor has agreed to assign to Assignee all of its right, title and interest under those contracts affecting the Property as set forth on Exhibit B, attached hereto and incorporated by reference (the "**Assigned Contracts**").

NOW, THEREFORE, Assignor and Assignee, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged and agreed, agree as follows.

1.      Assignor hereby assigns to Assignee all its right, title, obligation, and interest as in and to the Assigned Contracts, subject to the receipt of any consents of the counterparties required thereunder, from and after the Effective Date.  Assignee hereby assumes the right, title, obligation, and interest, and agrees to perform all obligations of Assignor under the Assigned Contracts to be performed after the date hereof.

2.      Assignee shall indemnify, defend, and hold Assignor harmless from all obligations on the part of Assignee arising under the Assigned Contracts from and after the Effective Date, and from all claims, judgments, injuries, losses, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements) incurred in connection therewith.  This indemnity shall not apply to any claims arising from Assignor's willful misconduct or material breach of representations specifically authorized by the Sale Order.

3.      Assignor has not previously assigned the Assigned Contracts and has, subject to the required consent of any counterparty, authority to assign the Assigned Contracts (and to the extent counterparty consent is required under any Assigned Contract and has been obtained, the consent is attached hereto as Exhibit C).  Other than as expressly set forth herein or in the Purchase Agreement, Assignor has made no, and disclaims any and all, express or implied warranties concerning the condition, value and quality of the property and any portions the Assigned Contracts.

-42-

20039.001/Westlands PSA - FarmerMac (EX)

4.      Each party will, at any time and from time to time upon written request therefor, execute and deliver to the other party such documents as such other party may reasonably request in order to fully assign and transfer the Assigned Contracts, and cooperate in the obtaining of any additional consents which are required and not obtained prior to the date hereof.  Assignor shall use commercially reasonable efforts, consistent with its authority as receiver, to assist in obtaining such Consents.

5.      In the event of any litigation initiated to enforce the terms of this Assignment, the prevailing party shall be entitled to an award for its reasonable attorneys' fees and expenses from the non-prevailing party.  This Assignment shall be governed by, interpreted under, and construed and enforced in accordance with, the laws of the State of California.  This Assignment may be executed in one or more counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute but one agreement.  This Assignment shall bind and inure to Assignor and Assignee and their respective successors and assigns.

IN WITNESS WHEREOF, the parties have executed this Assignment as of the date first written above.


ASSIGNOR                                          ASSIGNEE

                                                  **[assignee sig blocks]**

_____
LANCE MILLER, solely in his capacity as
Court-appointed Receiver




[attach legal description exhibit, contract list exhibit, and counterparty consents (if any)]

-43-

EXHIBIT H

Form of Assignment of Crop Proceeds

**ASSIGNMENT OF CROP PROCEEDS**

THIS ASSIGNMENT OF CROP PROCEEDS ("**Assignment of Crop Proceeds**"), dated _____, 2026 (the "**Effective Date**"), is given by LANCE MILLER, solely in his capacity as court-appointed receiver (the "**Assignor**") pursuant to the _____ ("**Sale Order**") entered in the case styled *Federal Agricultural Mortgage Corporation v. Assemi Brothers, LLC et. al.*, Case No. 1:24-cv-01455-KES-SAB, pending in the U.S. District Court for the Eastern District of California, to _____ ("**Assignee**").

WHEREAS, Assignor and Assignee (or its predecessor by assignment) are parties to that certain Purchase and Sale Agreement and Joint Escrow Instructions, dated _____ (the "**Purchase Agreement**"), with respect to the purchase and sale of the property described in Exhibit A, attached hereto and incorporated by reference (the "**Property**"); and

WHEREAS, the transaction set forth in the Purchase Agreement includes, among other things, the conveyance of all revenue from the sale of crops from the Property for the [year] crop year (the "**[year] Crops**") paid after the Closing (as defined in the Purchase Agreement) to Assignee; and

WHEREAS, Assignor has completed the harvest from the Property and delivered the [year] Crops to the Crop Purchasers (defined below) for hulling, shelling, processing and marketing; and

WHEREAS Assignor and Assignee closed the purchase and sale of the Property on the date hereof, and pursuant to the Purchase Agreement and Sale Order, Assignor has agreed to assign to Assignee all of its right, title and interest in and to all revenue from the sale of the [year] Crops paid after the Closing, as set forth herein;

THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, Assignor hereby assigns and transfers to Assignee all of Seller's right, title and interest, to the extent assignable and/or transferrable, in and to the following, to the extent paid after the Closing  (collectively, the "**Crop Proceeds**"): (i) the net proceeds arising out of or generated from the sale or other disposition of the [year] Crops, after deducting Crop Purchaser's standard processing and handling charges, (ii) any rights of Assignor in and to the[year] Crops held by Crop Purchaser; (iii) all money or other forms of payment payable to Assignor from Crop Purchaser that is related to or arises out of the sale or other disposition of the [year] Crops, including, but not limited to all rights to the payment of money or payment in kind, whether due or to become due and whether or not earned by performance, including crop insurance payments, contract rights, revolving funds, credits, cash (including any money or proceeds on deposit with or held by Crop Purchaser on behalf of Assignor), patronage dividends, and any non-cash proceeds from the sale or other disposition of the [year] Crops, and (iv) all statutory lien rights of a grower of agricultural products delivered to Crop Purchaser under applicable law with respect to the [year] Crops.

-44-

Docusign Envelope ID: 173D2595-BF2E-836B-834C-928C4B339069

As used in this Assignment the following terms will have the following meanings and all capitalized terms not otherwise defined herein shall have the meanings as set forth in the Purchase Agreement:

"**Crop Contract**" means any agreement for the purchase, marketing, processing or cooperative arrangement for the purchase, marketing, processing, or other disposition of the [year] Crops.

"**Crop Purchaser**" means any purchaser, cooperative, marketing organization, agricultural processor, or other Person, whether or not such person takes title to or possession of the [year] Crops, who either purchases the [year] Crops from Assignor or agrees to sell, market, or otherwise dispose of the [year] Crops.

Assignee shall have the right, with respect to the [year] Crops (but not other crops delivered by Assignor under the Crop Contracts): (a) to demand, collect, receive, receipt for, sue and recover all sums of money or other property which may now or hereafter become due, owing or payable from the Crop Proceeds, whether under the Crop Contracts, or otherwise;  (b)  to execute, sign and endorse any and all claims, instruments, receipts, checks, drafts or warrants issued in payment for the Crop Proceeds;  (c)  to settle or compromise any and all claims arising under the Crop Contracts or with respect to the Crop Proceeds, and in the place and stead of Assignor, to execute and deliver its release and settlement for the claim; and  (d)  to file any claim or claims or to take any action or institute or take part in any proceedings, either in its own name or in the name of Assignor, or otherwise, which in the discretion of Assignee may seem to be necessary or advisable.

**Assignor irrevocably directs each Crop Purchaser to remit directly to Assignee all Crop Proceeds due to Assignor under the Crop Contract with such Crop Purchaser solely with respect to the [year] Crops.**

Assignor agrees to warrant and defend title in Assignee, its successors and assigns, against the lawful claims of all persons claiming by, through or under Assignor, but not otherwise, in and to the Crop Proceeds.  Each party will, at any time and from time to time upon written request therefor, execute and deliver to the other party such documents as such other party may reasonably request in order to fully assign and transfer the Crop Proceeds.  In the event of any litigation initiated to enforce the terms of this Assignment, the prevailing party shall be entitled to an award for its reasonable attorneys' fees and expenses from the non-prevailing party.  This Assignment shall be governed by, interpreted under, and construed and enforced in accordance with, the laws of the State of California.  This Assignment may be executed in one or more counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute but one agreement.  This Assignment shall bind and inure to Assignor and Assignee and their respective successors and assigns.

Assignee, on behalf of itself and its successors and assigns, acknowledges, and expressly agrees that Assignor is entering into this Assignment of Crop Proceeds solely in his capacity as Court-appointed receiver and, as such, shall have no personal liability for any claims arising under or related to this agreement, the [year] Crops, or otherwise.

SIGNATURE PAGE FOLLOWS

20039.001/Westlands PSA - FarmerMac (EX)

Docusign Envelope ID: 173D2595-BF2E-836B-834C-928C4B339069

IN WITNESS WHEREOF, the parties have executed this Assignment of Crop Proceeds as of the date first written above.

ASSIGNOR                                                     ASSIGNEE

By: _____                **[insert assignee sig block]**
Lance Miller, solely in his capacity as
Court-appointed Receiver


[attach legal description exhibit]

-46-

20039.001/Westlands PSA - FarmerMac (EX)

Docusign Envelope ID: 173D2595-BF2E-836B-834C-928C4B339069

EXHIBIT I

Form of Joinder by Buyer Parties

JOINDER BY BUYER PARTY(IES)

The below listed Buyer Party(ies) hereby join(s) in the making of the foregoing Purchase and Sale Agreement and Joint Escrow Instructions dated [___], 2026 for the purpose of evidencing their agreement to the provisions of Section 27 thereof.

DATE: _____

[SIG BLOCKS TO BE DETERMINED]

-47-

20039.001/Westlands PSA - FarmerMac (EX)

Docusign Envelope ID: 173D2595-BF2E-836B-834C-928C4B339069

SCHEDULE 1.1(g)

Contract Schedule

1.  Option Agreement dated September 30, 2023, by and between Gradon Farms, LLC, a California limited liability company, ACDF, LLC, a California limited liability company, and GSCE Valley Solar Development, LLC, a Delaware limited liability company, as amended by that First Amendment to Option Agreement, dated May 30, 2024, as amended by that certain Second Amendment to Option Agreement, dated October 18, 2024.

20039.001/Westlands PSA - FarmerMac (EX)

Docusign Envelope ID: 173D2595-BF2E-836B-834C-928C4B339069

SCHEDULE 5.2(h)

Leases and Specific Title Encumbrances

1.  Option Agreement dated September 30, 2023, by and between Gradon Farms, LLC, a California limited liability company, ACDF, LLC, a California limited liability company, and GSCE Valley Solar Development, LLC, a Delaware limited liability company, as amended by that First Amendment to Option Agreement, dated May 30, 2024, as amended by that certain Second Amendment to Option Agreement, dated October 18, 2024.

20039.001/Westlands PSA - FarmerMac (EX)

Docusign Envelope ID: 173D2595-BF2E-836B-834C-928C4B339069

SCHEDULE 7.1

Exceptions to Seller's Representations

1.  None

20039.001/Westlands PSA - FarmerMac (EX)

Docusign Envelope ID: 173D2595-BF2E-836B-834C-928C4B339069

SCHEDULE 10.1(c)

Permitted Exceptions

ALL Schedule B exceptions listed in that certain Preliminary Report issued by Chicago Title Company with a Title Number of 4500896-MW, dated effective March 20, 2026, <u>except the following</u>:  2, 3, 18, 19, 28 – 40, 47, and 48.

20039.001/Westlands PSA - FarmerMac (EX)